1  *[SEE SIGNATURE BLOCK FOR COUNSEL INFORMATION]*

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

11

12  SPEX TECHNOLOGIES, INC.,

13       Plaintiff,

14       v.

15

16  KINGSTON TECHNOLOGY
CORPORATION, KINGSTON

17  DIGITAL, INC., KINGSTON
TECHNOLOGY COMPANY, INC.,

18  IMATION CORPORATION,
DATALOCKER INC., DATA LOCKER

19  INTERNATIONAL, LLC,

20       Defendants.

21

Case No. 8:16-CV-01790-JVS-AGR

Hon. James V. Selna

**KINGSTON'S REPLY IN SUPPORT OF MOTION TO AMEND ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Honorable Judge James V. Selna

Date: September 23, 2019
Time: 1:30 p.m.
Courtroom: Santa Ana, 10C

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................3

    I.    THIS COURT SHOULD GRANT KINGSTON LEAVE TO
        AMEND ITS ANSWER ................................................................3

        A.    Amendment Would Not Be Futile as Kingston's Claims
            Are Supprted by Well-Founded Factual Allegations and
            Established Law ........................................................................3

        B.    Kingston's Amendments Neither Prejudice SPEX Nor
            Are They Brought In Bad Faith .............................................18

CONCLUSION ................................................................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
   92 F.3d 781 (9th Cir. 1996) ................................................................. 12

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
   No. 18-CV-00933-MMC, 2019 WL 633008 (N.D. Cal. Feb. 14,
   2019) ............................................................................................. 14

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991) ........................................................... 14

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ............................................................. 11

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) ............................................................. 12

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*,
   No. SACV 12-2146 JGB, 2013 WL 3337676 (C.D. Cal. June 28,
   2013) ............................................................................................. 11

*Eichman v. Fotomat Corp.*,
   880 F.2d 149 (9th Cir. 1989) ............................................................. 12

*F.T.C. v. Actavis, Inc.*,
   570 U.S. 136 (2013) ............................................................... 14, 15, 16

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969) ......................................................................... 11

*Handgards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) ................................................. 7, 8, 14, 15

*In re High-Tech Employee Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) .............................................. 12

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
   812 F.2d 786 (2d Cir. 1987) .............................................................. 10

*Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem.*
   *Co.,*
   225 F. Supp. 3d 1034 (N.D. Cal. 2016) ................................................... 6

*Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.,*
   915 F.3d 617 (9th Cir. 2019) .................................................................. 5

*Navarro v. Block,*
   250 F.3d 729 (9th Cir. 2001) .................................................................. 7

*Paladin Assocs., Inc. v. Montana Power Co.,*
   328 F.3d 1145 (9th Cir. 2003) .............................................. 10, 12, 14

*Potter Voice Techs., LLC v. Apple Inc.,*
   No. C 13-1710 CW, 2015 WL 13404106 (N.D. Cal. Mar. 20, 2015) ................. 19

*SPEX Technologies, Inc. v. Toshiba America Electronics Components,*
   *Inc. et al.,*
   Case No. 16-cv-01800 (C.D. Cal.) ........................................................ 17

*SPEX Technologies, Inc. v. Western Digital Corp. et al.,*
   Case No. 16-cv-01788 (C.D. Cal.) ........................................................ 17

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.,*
   782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................ 13

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*
   809 F.2d 626 (9th Cir. 1987) ................................................................ 12

*United States v. Sanchez-Murillo,*
   608 F.2d 1314 (9th Cir. 1979) ................................................................ 6

**Statutes**

28 U.S.C. § 1338 .......................................................................................... 9

35 U.S.C. § 315(e)(2) ................................................................................... 9

California Business and Professions Code § 17200 .................................. 14

California Cartwright Act ........................................................................... 13

Sherman Act § 1 ............................................................................. *passim*

Sherman Act § 2 ........................................................................... 10, 13, 15

# INTRODUCTION

Kingston's motion for leave to amend should be granted.  As Kingston explained in its original motion, and as detailed in the amended answer and counterclaims, the claims Kingston seeks to add are firmly grounded in SPEX's continued assertion of claims it knows are invalid.  Contrary to what SPEX says in its response, the amended pleading contains more than sufficient factual basis for a jury to reasonably infer that SPEX knows the claims are invalid.  Nearly identical claims were already adjudicated to be invalid in a PTAB proceeding (which SPEX did not appeal), and Kingston pleads more than sufficient factual basis to infer that SPEX knows that the only element not recited in those nearly identical claims would be practiced by any PCMCIA device, such as those described in both of the prior art references from the PTAB proceeding.  The only reason the claims at issue here were not found invalid is because, before the PTAB reached a final determination of the claims, SPEX gave the challengers to the patent a free perpetual license to it to avoid adjudication of the invalidity of these claims.  This illegal reverse settlement allowed SPEX to continue seeking monopoly rents based on claims it knows are invalid in an effort to harm the market for portable secure USB storage devices.

SPEX's response attempts to confuse the issues by asserting that Kingston is estopped from bringing anti-trust counterclaims because of earlier IPR proceedings in which Kingston challenged the validity of the claims at issue.  To be clear, Kingston's anti-trust and patent misuse counterclaims plead that **SPEX knows** that the claims are invalid over Harari and Anderson.  This is far different than affirmatively seeking a judgment of invalidity over these two references.  Indeed, Kingston will bring an entirely separate invalidity case against the '135 patent based on entirely different prior art–art that could not have been raised in the IPRs and for which there can be no contention that Kingston is estopped.  SPEX points to no authority that would

1  conflate these two different inquiries, nor anything that even suggests that Kingston is
2  barred from bringing anti-trust or patent misuse claims.

3       SPEX also attempts to confuse the issues by incorrectly claiming that Kingston
4  must prove that all parties to an illegal contract in restraint of trade must have an intent
5  to restrain trade in order to maintain its anti-trust claims.  This is wholly unsupported
6  even by the cases cited by SPEX.  Kingston must prove, as the amended answer and
7  counterclaims successfully plead, that SPEX entered into an agreement that constitutes
8  an unreasonable restraint of trade.  SPEX cannot escape anti-trust liability by asserting
9  that it alone intended to restrain trade with its illegal reverse-payment settlement.

10      SPEX is also wrong to suggest that Kingston's counterclaims fail to plead
11 adequate harm to a market and that, somehow, its illegal reverse settlement increases
12 competition in the marketplace.  To the contrary, as alleged in Kingston's complaint,
13 seeking a monopoly rent against Kingston predicated on claims that SPEX knows are
14 invalid will cause prices in the U.S. and California markets for secure portable USB
15 storage devices to increase without any benefit to consumers.  If Kingston is forced to
16 pay the exorbitant license fees SPEX is demanding, Kingston will be forced to raise
17 prices of its portable, secure USB products.  As Kingston holds a significant market
18 share for these products, Kingston raising its prices will allow other competitors to
19 raise prices.  Thus, SPEX's wrongful assertion of known-invalid claims will cause harm
20 to consumers, who will be forced to pay higher prices.

21      Lastly, SPEX's complaints of alleged prejudice and bad faith are without merit.
22 The only prejudice and "bad faith" SPEX identifies is that it will have to defend itself
23 against Kingston's well-founded claims.  Having to answer for illegal actions is not
24 prejudice that should prevent this Court from allowing Kingston to amend its claims.
25 Nor are these claims brought for any other purpose other than to bring SPEX to
26 account for its illegal actions which have harmed Kingston.

27

28

Because Kingston's claims are well-founded in law and fact and will not cause any real prejudice to SPEX, the amendments should be allowed.

## ARGUMENT

### I.   THIS COURT SHOULD GRANT KINGSTON LEAVE TO AMEND ITS ANSWER

#### A.   Amendment Would Not Be Futile as Kingston's Claims Are Supported by Well-Founded Factual Allegations and Established Law

As explained in Kingston's motion, and as laid out in Kingston's amended counterclaims, Kingston seeks to amend its answer and add counterclaims alleging violations of both Federal and State anti-trust laws and add an affirmative defense and counterclaim asserting misuse of a patent.  Each of these claims are predicated on SPEX's continued assertion of claims that SPEX knows are invalid.  Because SPEX continues to try to collect monopoly rents on these known-invalid claims, the market for portable secure USB products in the United States (including California) will be harmed as consumers will be forced to pay more for these same products without any added benefit.  Each of these claims is well supported by factual allegations in Kingston's counterclaim complaint, and each finds strong support in well-established law.  In other words, Kingston's amendments would be far from futile.

SPEX disagrees, but offers little more than confusion and obfuscation.  In particular, SPEX primarily asserts that Kingston is estopped from asserting that SPEX knows that its claims are invalid—improperly conflating a counterclaim seeking a judgment of invalidity with a counterclaim seeking damages and an injunction for violations of anti-trust law.  Next, SPEX also attacks the factual allegations underlying Kingston's assertion that SPEX knows the relevant claims are invalid, but SPEX's denials of fact hardly warrant denial of this motion.  Knowledge can be (and is often) proved using circumstantial evidence such as the allegations pled in Kingston's counterclaim complaint.  Lastly, SPEX's assertion that Kingston has not adequately pled its antitrust claims ignores the allegations made in Kingston's counterclaim

KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR

complaint and misstate what is required to plead these antitrust and patent misuse claims.  Each of SPEX's arguments are addressed below.

### 1. Kingston's Counterclaims Plead Facts Sufficient to Show SPEX Knows Claims 55 and 57 Are Invalid over Harari and Anderson

SPEX's contention (at 15–20) that the counterclaim complaint fails to plead that SPEX knows that claims 55 and 57 of the '135 patent are invalid is simply wrong.  At the outset, though, it is important to clear up confusion created by SPEX's response.  Kingston is not asserting that SPEX knows these claims are invalid over a combination of Harari, Anderson, **and Jones.**  *See, e.g.,* Resp. at 7.  Rather, Kingston asserts that SPEX knows claims 55 and 57 of the '135 patent are invalid over Harari and Anderson because nearly-identical claims from the '802 patent were found obvious by the PTAB over these two references—a decision with SPEX has not attempted to appeal.  This was made plainly clear in Kingston's amended complaint and in Kingston's motion.  (*See* D.I. 172–2 at ¶ 26 (asserting that SPEX knows "the same prior art which rendered all other elements of these claims unpatentable (as determined by the PTAB) also teaches" the only limitation present in claim 55 and 57 that distinguishes these claims from the earlier-adjudicated invalid claims); D.I. 172, at 3 ("SPEX knows . . . that the only [non-common] limitation present in claims 55 and 57 of the '135 patent is also taught by Harari and Anderson").  It is unclear why SPEX chose to misstate the basis for Kingston's claim.

In reality, Kingston's allegation that SPEX knows that claims 55 and 57 are invalid is straightforward and simple.  Claims 55 and 57 of the '135 patent are nearly identical to claims 38 and 39 of the '802 patent.  Kingston's counterclaim complaint explains how even SPEX's own infringement expert said the common elements were the same in his expert report.  (*See* D.I. 172–2.)  Although SPEX now appears to have changed its tune (at 20) with respect to the common elements, this is not a basis to deny Kingston leave to amend.  At most, this creates a fact issue regarding SPEX's understanding as to the scope of claims 55 and 57 of the '135 patent as compared to

the nearly-identical previously-adjudicated invalid claims, both now and at the time it entered into the illegal reverse settlement with the other defendants.  Kingston's counterclaim complaint sufficiently states a plausible factual basis to conclude that claims 55 and 57 are nearly-identical to claims 38 and 39, notwithstanding SPEX's recent change of position regarding the similarity of these claims.[1]  *See Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 627 (9th Cir. 2019) (explaining that, on a motion to dismiss, courts "are not permitted to weigh evidence and determine whether the explanations proffered by Plaintiffs or [Defendants] are ultimately more persuasive").

Claims 38 and 39 of the '802 patent were found by the PTAB to be invalid over Harari and Anderson, and thus SPEX knows that the common elements of claims 55 and 57 are also obvious over Harari and Anderson..  (*See* D.I. 172–2 at ¶ 21.)  The only element not common between these two sets of claims is an additional element recited in both claims 55 and 57 of the '135 patent, which requires that the modular device "operably connect[s] the security module and/or the target module to the host computing device in response to an instruction from the host computing device."  (*See* D.I. 172–2 at ¶ 25.)  Kingston's counterclaim complaint contains more than sufficient factual allegations that would lead a jury to believe that SPEX knows this element is also taught by Harari and Anderson.

For one, Kingston pleads that following the PTAB's initial determination in the IPR that Harari and Anderson taught the "operably connecting" limitation, SPEX chose to drop its assertion that other defendants infringed these claims in exchange for short-circuiting final adjudication of the validity of these claims.  But unlike a typical settlement agreement, the patent owner gave something of value to the accused

---

[1]  If SPEX is now asserting that these claims are not the same, such an assertion would raise serious questions about SPEX's infringement case for claims 55 and 57 of the '135 patent, as SPEX's infringement expert relied entirely on his earlier analysis regarding claims 38 and 39 of the '802 patent to provide his basis for concluding Kingston's products infringed the claims.

infringers—not the other way around.  As Kingston notes in its pleading, this "reverse settlement" is highly indicative of the fact that SPEX knew that the Harari and Anderson disclosed the "operably connecting" limitations and that the claims would be found invalid.

Contrary to SPEX's assertion (at 17–18), Kingston is not seeking to "elevate" a preliminary determination into a final determination.  Rather, Kingston is simply making a common-sense inference about SPEX's knowledge from SPEX's own actions when it was faced with a proceeding that would likely have ended with claims 55 and 57 invalid.  This is wholly proper.  As is widely recognized, a person's actions can be (and often are) circumstantial evidence regarding that person's knowledge.  *See, e.g., Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F. Supp. 3d 1034, 1040 (N.D. Cal. 2016) (in a fraud case, recognizing that "[k]nowledge . . . is a question of fact and like any other fact, it may be proved by circumstantial evidence" (internal quotation marks omitted)); *see also United States v. Sanchez-Murillo*, 608 F.2d 1314, 1318 (9th Cir. 1979) ("knowledge can be inferred from the defendant's actions and other circumstantial evidence in the case as a whole").

Kingston need not rely only on circumstantial evidence as to SPEX's knowledge. SPEX acknowledged that any prior art PCMCIA card practices the "operably connecting" step by failing to challenge Kingston's invalidity presentation in this case regarding that step.  As is detailed in Kingston's counterclaim complaint, Kingston asserted this element was taught by the PCMCIA specification, which is practiced by any PCMCIA card.  (*See* D.I. 271-2 at ¶ 27.)  SPEX did not disagree.  (*See id.*)  Both the Harari and Anderson references teach PCMCIA cards, and thus SPEX must know that Harari and Anderson practice the "operably connecting" step.  (*See id.*)  Again, SPEX may have a different view as to why it didn't respond on these points (it didn't provide any explanation in its response), but the reasonable inference drawn from SPEX's experts failure to contest that this element was taught by PCMCIA is that SPEX knows

1    that it is.  Kingston should, at minimum, be allowed to ask SPEX's expert why he

2    didn't expound on this point and to query SPEX's knowledge concerning this element

3    and PCMCIA.

4         Contrary to SPEX's contention, it is immaterial that there has been no

5    adjudication of invalidity regarding these claims.  Indeed, in *Handguards*, this did not

6    even prove to be a relevant consideration, despite that case turning on whether a

7    Defendant knew that its claims were invalid.  *See generally Handgards, Inc. v. Ethicon, Inc.*,

8    601 F.2d 986, 991 (9th Cir. 1979).  If there had been an adjudication of invalidity, there

9    would be no need for Kingston to bring these counterclaims.  This case is about

10   SPEX's actions to short-circuit the process that it knew would have resulted in a

11   determination of invalidity, and its continued assertion of claims SPEX knows

12   rightfully should have been found invalid.

13        At its core, SPEX's issue with Kingston's complaint does not in reality appear to

14   be that Kingston sufficiently pled SPEX's knowledge, but that SPEX simply disagrees

15   with the inferences drawn from the factual allegations in Kingston's complaint.  SPEX

16   is free to present its interpretation to the jury, but the factual allegations in Kingston's

17   complaint are not insufficient because SPEX disagrees with them.  It is a bedrock

18   principle that under the 12(b)(6) standard that is applied to determine whether

19   Kingston's amendments would be futile, this Court is to accept "all reasonable

20   inferences" drawn from the factual allegations of the complaint.  *E.g. Navarro v. Block*,

21   250 F.3d 729, 732 (9th Cir. 2001).  Asserting that SPEX knows its claims are invalid

22   based on tacit admissions made by SPEX and SPEX's own actions is a wholly

23   reasonable inference from these facts, and as such, Kingston's allegations are sufficient

24   to support its contention that SPEX knows these claims are invalid.

25

26

27

28

KINGSTON'S REPLY ISO MOTION TO AMEND
      ANSWER, DEFENSES AND COUNTERCLAIMS
      8:16-cv-01790-JVS-AGR

### 2. Kingston Is Not Estopped From Bringing Anti-Trust and Patent Misuse Claims Predicated on SPEX's Knowledge Regarding Validity

We next address SPEX's flawed assertion that the IPR statute bars Kingston from bringing anti-trust and patent misuse counterclaims.  Throughout its brief, SPEX attempts to improperly conflate seeking a judgment of invalidity with seeking a judgment for damages and an injunction based on anti-competitive behavior.  To be clear, Kingston is not affirmatively seeking to prove that claims 55 and 57 are invalid over Harari and Anderson.  Kingston intends to present an invalidity case based on entirely different system art.  Kingston expects that it will be successful in doing so, but these amendments and counterclaims are not about proving invalidity of claims 55 and 57 of the '135 patent.

To the contrary, Kingston's amended counterclaims are about SPEX's anticompetitive behavior.  Kingston will seek to prove that SPEX knows the claims are invalid, based on SPEX's own actions and admissions.  (*See* D.I. 172–2, at ¶¶ 21–28.) Kingston will show that, rather than trying a case before the PTAB on the validity of these claims, SPEX instead chose to enter into an illegal reverse settlement agreement to avoid a certain finding that the claims were invalid.  (*See id.* at ¶ 30.)  Kingston will show that the purpose of this agreement was to allow SPEX to continue to assert known-invalid claims against Kingston—an action which the 9th Circuit has recognized constitutes an illegal restraint of trade.  (*See id.* at ¶ 30–31); *see also Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994 (9th Cir. 1979) (recognizing that bad-faith enforcement of known-invalid claims constitutes a violation of the anti-trust laws).  And Kingston will show that SPEX's continued assertion of known-invalid claims harms the market in the U.S. and California for secure, portable USB products and harms Kingston.  (*See* D.I. 172–2 at ¶ 18; ¶¶ 32–33.)  This is materially different than seeking a judgment of invalidity, which turns solely on whether a skilled artisan would have combined references in a way that teaches the elements of a claimed invention.

KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR

SPEX cites no authority that Kingston's previous challenges to the validity of claims 55 and 57 should bar Kingston from bringing anti-trust counterclaims based on an illegal reverse settlement.  SPEX instead argues that Kingston is barred from bringing these claims because the invalidity of claims 55 and 57 is a "predicate fact" that Kingston is required to prove in order to show SPEX knows these claims are invalid.  Not so.  SPEX cites no authority for this proposition, nor is the invalidity of the claims an element of any of the counterclaims raised by Kingston.  And, though Kingston believes that SPEX did believe that its claims would be found invalid, this case does not turn on whether the claims are actually invalid.  Rather, the case turns on SPEX's knowledge and actions.

Additionally, the IPR statute relied upon by SPEX only bars assertions that a "claim is invalid" in a civil action that "arise[s] in whole or in part" under the patent laws of the United States.  *See* 35 U.S.C. § 315(e)(2); *see also* 28 U.S.C. § 1338.  Kingston's counterclaims do not arise under the Patent Laws of the United States— rather Kingston alleges violations of the Anti-trust laws based firmly on SPEX's actions.  Moreover, Kingston will not be seeking to prove that claims 55 and 57 are invalid based on the Harari and Anderson, but (as discussed above) will be seeking to prove that SPEX engaged in violations of these antitrust laws because it knows the claims are invalid over these references.  As such, the statute does not apply, and Kingston is not estopped from proving that SPEX engaged in illegal anti-competitive behavior by entering into a settlement agreement to prop up claims SPEX knows should no longer be in force.[2]

---

[2]   SPEX appears to assert that because the statute provides that estoppel applies to civil actions that arise "in part" under the Patent Laws, that somehow that reaches Kingston's anti-trust counterclaims.  This cannot be the case.  Had Kingston brought its counterclaims in a separate case, SPEX (it appears) would agree that estoppel would not apply because the claims would then not arise out of the Patent Laws, even in part. Whether estoppel does or does not apply cannot turn on what claims have been joined into the same action.

### 3. Neither the Sherman Act Nor the Cartwright Act Require Proof of an Intent to Restrain Trade By All Parties

After spending considerable time on its flawed IPR argument, SPEX next turns to Kingston's anti-trust allegations but here too, it misstates the law and fails to provide a basis for denying Kingston's motion.  First, SPEX  attacks Kingston's allegations regarding the first element of a Sherman Act section 1 claim (proof of a contract or conspiracy).  SPEX asserts (at 11-15) that this element cannot be met because, according to SPEX, Kingston's complaint fails to allege that all parties to the illegal reverse-settlement agreement had an intent to restrain trade by entering into the agreement.  SPEX makes a similar argument regarding Kingston's Cartwright Act claim (at 14–15).  SPEX is wrong, as neither Section 1 of the Sherman Act nor the Cartwright Act require proof of a specific intent by *all parties* to an illegal agreement to restrain trade.

As to section 1 of the Sherman Act, the 9th Circuit has directly rejected the argument advanced by SPEX that Section 1 requires proof of intent.  Indeed, the 9th Circuit has found error where a district court "improperly graft[ed] an additional requirement—specific intent to destroy competition—onto the element of [a] prima facie case [under Section 1 of the Sherman Act] requiring that the defendants acted in concert."  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003).  As the 9th Circuit explained, "[o]ur antitrust law is clear that [a plaintiff] need not prove intent to control prices or destroy competition to demonstrate the element of 'an agreement  ... among two or more entities.'"  *Id.* (citing cases).  "Although a defendant's . . . intent may be relevant in determining whether a particular agreement is *unreasonable*, . . . it is not required to prove the existence of an agreement" or combination.  *Id.*  All that is required to prove concerted activity between two or more parties is evidence that agreements have been signed–here unrefutable.  *See id.*; *see also Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987) ("Unlike the proof

KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR

1  required to establish a conspiracy to monopolize under section 2, a specific intent to

2  create a monopoly is not required under section 1.")

3           Indeed, classic cases of violations of section 1 show this must be true.  An

4  agreement which "ties" purchase of an unpatented article to a license for a patent is

5  classic, well-recognized violation of section 1 of the Sherman Act.  *Fortner Enterprises,*

6  *Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 498 (1969); *see also Cascade Health Sols. v. PeaceHealth*,

7  515 F.3d 883, 912 (9th Cir. 2008) (explaining that "[a] tying arrangement is a device

8  used by a seller with market power in one product market to extend its market power

9  to a distinct product market").  In such an arrangement, it is only the seller who intends

10  to improperly control a market by imposing conditions on the buyer.  *See Fortner*, 394

11  U.S. at 498 (explaining that, in a tying agreement, the seller is trying to "leverage"

12  power in the market for another product); *Cascade Health*, 515 F.3d 883, 912 (9th Cir.

13  2008) (in a tying agreement, "the seller conditions the sale of one product (the tying

14  product) on the buyer's purchase of a second product (the tied product)").  The buyer

15  is a victim of this arrangement because while the buyer would like to purchase the tied

16  product from others, the agreement prohibits her from doing so.  *Fortner,* 394 U.S. at

17  499 (explaining that, in a tying arrangement, "buyers are forced to forego their free

18  choice between competing products").  Despite the fact that, in a tying arrangement

19  only the seller has an intent to unreasonably restrain trade, tying stands as a *per-se*

20  violation of section 1 of the Sherman Act.  *See Cascade Health*, 515 F.3d at 913

21  (explaining that "[t]he Supreme Court has developed a unique per se rule for illegal

22  tying arrangements").  It would make little sense to place an additional requirement to

23  plead a Sherman section 1 claim that would read out one of the classic violations of the

24  section.

25           Nothing in SPEX's cited cases is to the contrary.  SPEX cites *Credit Bureau Servs.,*

26  *Inc. v. Experian Info. Sols., Inc.* as purportedly supporting its theory that all parties to an

27  agreement must have an intent to unreasonably restrain trade.  *See* No. SACV 12-2146

28

1    JGB, 2013 WL 3337676, at *1 (C.D. Cal. June 28, 2013).  The holding of this case,

2    though, is simply that to plead a section 1 violation, there must be proof that there is

3    "some meeting of the minds" between the parties to an alleged conspiracy.  *See id.* at *6.

4    Unlike here, where there is direct proof of an agreement entered into by the parties,

5    that case was dismissed because the plaintiff could not prove an agreement or even a

6    conspiracy by more than one party, and section 1 of the Sherman Act only applies to

7    contracts or conspiracies in restraint of trade.  *See id.* at *6–*7.  The same is true of *Coal.*

8    *For ICANN Transparency, Inc. v. VeriSign, Inc.*, where the 9th Circuit determined that

9    unilateral acts, in the absence of a contract or conspiracy, were insufficient to sustain a

10   section 1 claim.  *See* 611 F.3d 495, 504 (9th Cir. 2010) (explaining that 'an entity cannot

11   be held liable for antitrust violations if it simply unilaterally increases its prices, absent a

12   showing that it either conspired with another entity in order to restrain trade").  In

13   other words, these cases hold that some proof of contract or conspiracy is required and

14   that a party acting solely on its own (with no contract, for example) will usually not be

15   sufficient to sustain a Sherman section 1 claim.[3]

16        However, this is not the case here as Kingston has asserted that the existence of

17   a contact, which is more than sufficient to plead a "contract or conspiracy" under the

18   Sherman Act.  *See Paladin Assocs.*, 328 F.3d at 1153; *see also Am. Ad Mgmt., Inc. v. GTE*

19   *Corp.*, 92 F.3d 781, 788 (9th Cir. 1996) (no requirement of intent); *Eichman v. Fotomat*

20   *Corp.*, 880 F.2d 149, 161 (9th Cir. 1989) (same); *T.W. Elec. Serv., Inc. v. Pac. Elec.*

21   *Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987) (same).  Indeed, there can be no

22

23   [3]   SPEX appears to ignore the "contract" provision of the statute and focus only on
           "conspiracy."  While this is flawed, even a conspiracy does not require common intent.
24         To prove the existence of a conspiracy, a plaintiff would need to plead that "the
           conspirators must have a unity of purpose or a common design and understanding."  *In re*
25         *High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012).  "A co-
           conspirator need not know of the existence or identity of the other members of the
26         conspiracy or the full extent of the conspiracy."  *See id.*  However, even under a conspiracy
           rather than contract, Kingston's pleading is more than sufficient, as it shows that SPEX
27         and the other defendants had a common purpose of enabling SPEX to keep its invalid
           patent, which could then be asserted against Kingston.

28

KINGSTON'S REPLY ISO MOTION TO AMEND
                                                         ANSWER, DEFENSES AND COUNTERCLAIMS
                                                                          8:16-cv-01790-JVS-AGR

1   question that Kingston's counterclaim complaint successfully pleads more than

2   unilateral activity.  SPEX does not, and cannot, dispute that it entered into a contract

3   with Western Digital, Apricorn, and Toshiba.  (*See* D.I. 172–2, at ¶ 30.)

4        However, even if some level of intent is required to be pled, Kingston's

5   complaint remains sufficient.  Kingston pleads that the settlement with the parties who

6   were pursuing the IPR was offered by SPEX in furtherance of its plan to enforce

7   claims it knew were invalid, and that likewise the settling parties knew it was a "quid

8   pro quo" to permit to SPEX to carry out its plan.  (*See* D.I. 172–2, at ¶¶ 5, 6, 30–33,

9   33–38.)  These factual allegations and the reasonable inferences from them show intent

10  not only by SPEX, but also by the settling defendants.  The settling defendants knew

11  their settlement would allow SPEX to force the burden of litigation and presumably the

12  cost burden of a royalty on Kingston.  Kingston specifically pleads that by interfering

13  with Kingston's business and hoping to impose a greater cost burden on it, as well as

14  others who were not licensed, SPEX would permit its sister company to continue to

15  sell products into the relevant market at inflated prices. (*See* D.I. 172–2, at ¶ 40.)  The

16  clear inference is that at least one of the settling parties likewise could and would

17  benefit from increasing a major competitor's costs, which would enable them to raise

18  or maintain prices above competitive levels.

19       Lastly, SPEX also makes some argument that Kingston's allegations are only

20  cognizable under Sherman Section 2, monopolization or attempt to monopolize.  This,

21  however, is plainly wrong as SPEX's scheme is based on its contract with the settling

22  defendants which falls squarely under Section 1.

23       SPEX's similar arguments concerning the California Cartwright Act fails for

24  similar reasons.  For one, courts have recognized that "[c]ases decided under the

25  Sherman Act are applicable to interpreting the Cartwright Act" as "the analysis under

26  California's antitrust law mirrors the analysis under federal law because the Cartwright

27  Act was modeled after the Sherman Act." *Stanislaus Food Prod. Co. v. USS-POSCO*

28

*Indus.*, 782 F. Supp. 2d 1059, 1079 (E.D. Cal. 2011).  As noted above, that case law for the Sherman Act show that there need not be proof of intent by all parties to restrain trade—all that is required is an agreement or other concerted activity.  Likewise, proof of a contract between two or more parties is sufficient to show a combination under the Cartwright Act.  Indeed, just as tying arrangements where only a seller has an intent to restrain competition are per-se violations of the Sherman Act, so too are tying arrangement violations of the Cartwright Act.  *See, e.g., Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-CV-00933-MMC, 2019 WL 633008, at \*5 (N.D. Cal. Feb. 14, 2019).[4]

Having pled the facts, the intent and harm to competition in the relevant market, Kingston's claim is not futile on its face.  Kingston should be permitted discovery to prove what it knows to be true.

### 4.  Kingston's Counterclaim Complaint Successfully Pleads that the Contract Is an Unreasonable Restraint of Trade

SPEX also attacks (at 12–14) the second element of Kingston's Sherman Act claim, which requires that the contract or conspiracy be an unreasonable restraint of trade.  *Paladin Assocs.*, 328 F.3d at 1153.  SPEX's arguments are again baseless.

In order to determine whether a contract is an unreasonable restraint of trade under section 1, courts turn to a "rule of reason" analysis, where Courts look to an agreement to determine the "degree of harm to competition along with any justifications or pro-competitive effects to determine whether the practice is unreasonable on balance."  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991).  In anti-trust cases involving patents, this rule of reason involves looking to the competing policies of patent and anti-trust laws.  *See F.T.C. v. Actavis, Inc.*, 570 U.S. at 147 (weighing patent law policies against anti-trust policies); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 (9th Cir. 1979) (same).  Thus, the question here is whether the

---

[4]   SPEX makes no separate arguments regarding Kingston's claims under section 17200 of the California Business and Professions Code, so we need not address it separately here.

anti-competitive effect of SPEX's agreement with the other defendants outweighs any
benefits from the agreement, including the benefits provided by the patent laws. *See id.*

Here, Kingston's counterclaim complaint explains that the anti-competitive
harms resulting from the agreement far outweigh the policies of the patent law and any
purported benefits to the market. Specifically, Kingston's complaint alleges, as is stated
on the face of the agreement, that the purpose of the agreement was to avoid an
adjudication of the validity of claim 55 and 57 by the PTAB in order for SPEX to be
able to assert those claims against Kingston and possibly others in the future. (*See* D.I.
172–2, at ¶ 30; *see also* D.I. 172–2, at p. 45 (the agreement, stating that "SPEX continues
to assert claims based on the '135 and '802 patents against Kingston"). Because the
agreement was made in order to allow SPEX to assert claims that it knows are invalid
and would have been found invalid but for the agreement, the purpose of the
complaint was to facilitate bad-faith enforcement of claims that SPEX knows are
invalid. (*See id.* at ¶ 37–38.)

Contrary to SPEX's assertion, these allegations are sufficient to show that the
settlement agreement constitutes an unreasonable restraint on trade under the
reasoning of both the 9th Circuit's seminal *Handgards* case and the Supreme Court's
*Actavis* case. As to *Handgards,* the 9th Circuit determined that, though "[p]atentees must
be permitted to test the validity of their patents" in litigation, "infringement actions
initiated and conducted in bad faith contribute nothing to the furtherance of the
policies of either the patent law or the anti-trust law." *Handgards, Inc. v. Ethicon, Inc.*, 601
F.2d 986, 993 (9th Cir. 1979). Thus, the anti-competitive harms resulting from bad-
faith enforcement of known-invalid claims outweighs the countervailing considerations
of the Patent Law, and the benefits to society from patents. *See id.* It is of no moment
that *Handgards* specifically addressed an allegation under Section 2 of the Sherman Act.
This reasoning is directly relevant here, because (as alleged) the agreement allows SPEX
to engage in bad-faith enforcement. Thus, because the agreement facilitates and

1  enables violations of the anti-trust law, the agreement constitutes an unreasonable

2  restraint on trade.

3         SPEX also ignores the reasoning of *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013).

4  Contrary to SPEX's limited interpretation, this case was not just about specific

5  agreement where a patent owner pays a potential infringer to stay out of the market.

6  The case broadly addressed questions underlying whether agreements that settle patent

7  disputes can constitute unreasonable restraints on trade.  *See Actavis, Inc.*, 570 U.S. at

8  148–150 (discussing broadly how and when patent settlement agreements can

9  constitute unreasonable restraints on trade).  And on that question, the Supreme Court

10 answered that "unusual" agreements—such as where a patent owner gives something

11 of value to an alleged infringer to achieve an anti-competitive effect—can constitute

12 illegal "reverse-payment" settlements if the agreements are "unjustified" by the

13 circumstances leading to the settlement.  *See id.* at 153–158.  Here, as alleged by

14 Kingston in its counterclaim complaint, SPEX gave something it asserts has great

15 value—a royalty-free perpetual license to the '135 patent—solely to avoid an

16 adjudication of the validity of the claim of that patent.  (*See* D.I. 172–2 at ¶¶ 30–31, 38.)

17 The agreement therefore is wholly unjustified and serves no purpose other than to

18 achieve an anti-competitive effect (to permit assertion of known-invalid claims against

19 Kingston).[5]

20                    **5.  Kingston's Counterclaims Pleads Facts Sufficient to Show Anti-Competitive Harm**

21        Lastly, SPEX asserts (at 13–14) that Kingston has not sufficiently pled harm to

22 the market resulting from SPEX's anti-competitive behavior, contending that its

23 reverse-payment settlement with the other defendants actually increases competition.

24 This argument falls flat for a number of reasons.

25

26 ────────────

27 [5]  Notably, a restraint of trade is not required for Kingston's patent misuse affirmative defense, so this affirmative defense should be unaffected by any ruling on the restraint of trade pleading.

28

For one, SPEX ignores the relevant market.  As laid out in Kingston's counterclaim complaint, the market that is harmed by SPEX's anticompetitive conduct is the market for "portable, secure USB products."  (*See* D.I. 172–2 at ¶¶ 14–15.) SPEX does not, and cannot, explain how a license granted to makers of hard drives (like Western Digital and Toshiba) increases competition in that market, particularly since none of the Western Digital products SPEX alleged infringed its patents were portable, secure USB products.  *See* Complaint, D.I. 1, *SPEX Technologies, Inc. v. Toshiba America Electronics Components, Inc. et al.*, Case No. 16-cv-01800 (C.D. Cal.); Complaint, D.I. 1, *SPEX Technologies, Inc. v. Western Digital Corp. et al.*, Case No. 16-cv-01788 (C.D. Cal.).  As SPEX has alleged infringement, the only relevant player in the market as defined in Kingston's counterclaim complaint is Defendant Apricorn.

Beyond that, SPEX ignores the allegations of market harm in Kingston's counterclaim complaint.  Here, Kingston pleads that SPEX "paid off" the other defendants with extraordinarily favorable licenses in exchange for dropping their IPR. This hurts the market because Kingston, a major supplier or secure portable USB products, is now under a cloud of litigation and faces a threat of costs far greater than its competitors.  Should the contracts be given their intended effect, this ultimately means Kingston will be burdened with a higher cost that its competitors do not have to bare.  Thus, as alleged by Kingston, Kingston will be forced to raise prices in order to pay the monopoly rents sought by SPEX.  (*See* D.I. 172–2, at ¶ 18).  As Kingston is a significant player in this market, this in turn allows other sellers of secure, USB products to increase their prices, including allowing SPEX's sister company to continue to maintain higher prices.  (*See* D.I. 172–2, at ¶¶ 18. 40.)  Thus, consumers of secure, portable USB memory will be forced to pay higher prices, with no countervailing benefit to the market. *See id.*  SPEX presents no authority that such a theory is foreclosed, nor can it.

At most, SPEX presents a different view of the facts.  All of this will, of course, be the subject of expert testimony.  SPEX is free to obtain its own expert who can expound that SPEX's settlement agreement increased competition.[6]  But this Court cannot and should weigh this bare, attorney argument against the factual allegations of the complaint at this stage of the litigation.  Rather, this Court should allow the amendment and allow development of the factual record so that Kingston can prove, as it has alleged, that the illegal settlement agreement harmed the market for secure, portable USB products.[7]

### B. Kingston's Amendments Neither Prejudice SPEX Nor Are They Brought In Bad Faith

Kingston's amended answer and counterclaims neither unfairly prejudice SPEX nor are they brought in bad faith.  None of SPEX's arguments to the contrary are meritorious.

SPEX identifies no prejudice it will suffer other than the natural results of having to answer for its actions.  First, SPEX asserts (at 21) that it will be unfairly prejudiced because it will be forced to relitigate the validity of claims 55 and 57 over Harari and Anderson.  As an initial matter, the validity of these claims has never actually been adjudicated, so this entire argument has a flawed premise.  However, as noted above, SPEX conflates Kingston's anti-trust counterclaims with an adjudication of validity.  To combat Kingston's counterclaims, SPEX will have to answer about its knowledge concerning the validity of these claims.  It is SPEX's knowledge of the claims' invalidity and SPEX's anti-competitive actions associated therewith that are the

---

[6]   It simply lacks credibility to assert that providing a free license to certain hand-picked market players while seeking royalties from others acts to increase competition and help consumers.  This is especially the case here where SPEX had been suing those same hand-picked players and then suddenly decided to simply drop their case for nothing.

[7]   Notably, anti-competitive harm is not required for Kingston's patent misuse affirmative defense, so this affirmative defense should be unaffected by any ruling on the anti-competitive harm pleading.

1  core basis of Kingston's counterclaims.  Kingston will not assert, and SPEX need not

2  "relitigate," the invalidity of these claims over Harari and Anderson.

3        Second, SPEX complains that Kingston's counterclaims will increase the

4  complexity of the trial.  SPEX's complaint is overblown.  Kingston's counterclaims,

5  though distinct from an assertion of invalidity or infringement, share significant overlap

6  with the case as it already exists.  For example, both SPEX's claims of infringement,

7  Kingston's invalidity defenses, and Kingston's added counterclaims all involve similar

8  factual underpinnings, including the disclosure of the '135 patent, the scope of the

9  claims of the '135 patent, and the technology of the '135 patent.  Addressing the

10  counterclaims will require no more than an additional witness or two, for example to

11  expound on the market effects of SPEX's conduct.

12        Judicial efficiency dictates that all of these SPEX claims of infringement and

13  Kingston's counterclaims be tried together.  Separating SPEX's claims of infringement

14  from Kingston's anti-trust counterclaims will require significant inefficiencies and

15  additional expense from having to educate two different juries of similar facts, having

16  to call witnesses to two separate trials, and taking additional time on this Court's

17  calendar.  Courts have routinely allowed amendment where amendments "promote

18  judicial efficiency by allowing the parties to resolve all of their disputes" in a single

19  action, "rather than through piecemeal litigation." *Potter Voice Techs., LLC v. Apple Inc.*,

20  No. C 13-1710 CW, 2015 WL 13404106, at *2 (N.D. Cal. Mar. 20, 2015).  The added

21  complexity and expense from having to have two separate cases far outweighs the

22  minor added complexity from allowing Kingston to amend its answer in this case and

23  have all of the issue tried together.

24        Third, SPEX complains that Kingston's counterclaims would necessitate "costly,

25  burdensome, and time-consuming discovery."  Resp. at 22.  SPEX's complaints are

26  again overblown.  For one, this Court has already scheduled ample time to conduct

27  additional discovery related to Kingston's counterclaims.  For another thing, the only

28

19  KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR

1   additional discovery that is required, as Kingston previously explained, would be "one

2   additional 30(b)(6) deposition of a SPEX witness" along with expert reports and

3   deposition to address the economic impacts of SPEX's behavior.  (*See* D.I. 167, at 7.)

4   Contrary to SPEX's assertion (at 22), there will be no need to gather discovery from

5   the other defendants, as their intentions in entering into the settlement agreement is

6   immaterial, as discussed above.  *See supra* pp. 9–11.  Moreover, Kingston does not

7   anticipate bringing any motions to compel material that SPEX withholds as privileged,

8   as Kingston does not believe that it will need any privileged information to prove its

9   claims.[8]

10      Lastly, SPEX's claim that Kingston's counterclaims are made in bad faith as a

11   "collateral attack" on determinations made by other courts is unfounded.  Kingston is

12   continuing its appeals relating to the '135 patent, and fully expects those appeals to be

13   successful.  Neither has been adjudicated to their finality.  In any event, as previously

14   discussed, the issues raised by Kingston in the amended complaint are different than an

15   ordinary claim for invalidity that is involved in these other adjudications, and the

16   outcome regarding Kingston's counterclaims will have no effect on those pending

17   appeals (nor will it have any impact on the adjudication of validity in this case).

18      In reality, the additional burden to the parties from the amendments will be

19   minimal, will not cause any delay in the schedule already set forth by the Court, and is

20   well justified given the increases in judicial efficiency from having all of these claims

21   tried together rather than in separate trials.  The only real prejudice to SPEX is having

22   to answer for the anti-competitive actions it took while this case was pending.  That is

23   no reason to deny Kingston's motion to claim—it is the natural result of SPEX's

24   behavior.

25

26

27   ---
     [8]  However, to the extent that SPEX relies on privilege to refuse to testify as to its reasons for continuing to assert
     claims 55 and 57, the jury would certainly be entitled to consider that refusal in rendering its decision.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>CONCLUSION</u>**

For the reasons above, Kingston should be granted leave to amend its answer and counterclaims.

KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR

1

2 Dated: September 9, 2019

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

FISH & RICHARDSON P.C.

By:   */s/ David M. Hoffman*
        David M. Hoffman (*pro hac vice*)
        hoffman@fr.com
        David Morris (*pro hac vice*)
        dmorris@fr.com
        One Congress Plaza
        111 Congress Ave., Suite 810
        Austin, TX 78701
        Tel: (512) 472-5070
        Fax: (512) 320-8935

        Joanna M. Fuller (SBN 266406)
        jfuller@fr.com
        555 West Fifth Street 31st Floor
        Los Angeles, CA 90013
        Tel: (213) 533-4240
        Fax: (858) 678-5099

        Oliver J. Richards (SBN 310972)
        orichards@fr.com
        12390 El Camino Real
        San Diego, CA 92130
        Tel: 858-678-4715
        Fax: 858-678-5099

LAW OFFICE OF S.J. CHRISTINE YANG

        Christine Yang (SBN 102048)
        chrisyang@sjclawpc.com
        Victoria Hao (pro hac vice)
        vhao@sjclawpc.com
        17220 Newhope Street, Suite 101-102
        Fountain Valley, CA 92708
        Tel.: (714) 641-4022
        Fax: (714) 641-2082

**Attorneys for Defendants**
Kingston Technology Corporation, Kingston
Digital, Inc., and Kingston Technology
Company, Inc.

1

## <u>CERTIFICATE OF SERVICE</u>

2

      The undersigned hereby certifies that a true and correct copy of the above and

3

foregoing document has been served on September 9, 2019, to all counsel of record

4

who are deemed to have consented to electronic service via the Court's CM/ECF

5

system.  Any other counsel of record will be served by electronic mail and regular mail.

6

                         */s/ David M. Hoffman*

7

                         David M. Hoffman

8

                         hoffman@fr.com

9

                         ***Attorneys for Defendants***

10

                         Kingston Technology Corporation,
Kingston Digital, Inc., and

11

                         Kingston Technology Company, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KINGSTON'S REPLY ISO MOTION TO AMEND
ANSWER, DEFENSES AND COUNTERCLAIMS
8:16-cv-01790-JVS-AGR