1 | *[SEE SIGNATURE BLOCK FOR COUNSEL INFORMATION]*

2

3

4

5

6 | **UNITED STATES DISTRICT COURT**

7 | **CENTRAL DISTRICT OF CALIFORNIA**

8 | **SOUTHERN DIVISION**

9 | SPEX TECHNOLOGIES, INC.,

Case No.  8:16-cv-01790

10 | Plaintiff,

Hon. James V. Selna

v.

11 | KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSTON TECHNOLOGY COMPANY, INC., IMATION CORPORATION, DATALOCKER INC. DATA LOCKER INTERNATIONAL, LLC,

**DEFENDANTS KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., AND KINGSTON TECHNOLOGY COMPANY, INC.'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Defendants.

**JURY TRIAL DEMANDED**

KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSTON TECHNOLOGY COMPANY, INC.

Counterclaimants,

v.

SPEX TECHNOLOGIES, INC.,

Counter-Defendant.

Defendants Kingston Technology Corporation, Kingston Digital, Inc. ("Kingston Digital") and Kingston Technology Company, Inc. ("KTCI") (collectively, "Kingston"), by and through undersigned counsel, hereby respond to the Complaint dated September 27, 2016 ("Complaint") of Plaintiff SPEX Technologies, Inc. ("Plaintiff" or "SPEX").

1.      Kingston denies the allegations and characterizations in Plaintiff's Complaint unless expressly admitted in the following paragraphs.

## PARTIES

2.      Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and therefore denies them.

3.      Kingston admits that Kingston Technology Corporation is a California corporation with a mailing address of 17600 Newhope St., Fountain Valley, California, 92708.  All remaining allegations of this Paragraph are denied.

4.      Admit.

5.      Admit.

6.      Kingston admits that Paragraph 6 refers to Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc. together as "Kingston".  All remaining allegations of Paragraph 6 are denied.

7.      This Paragraph is not directed to Kingston to which no response is required.  To the extent a response to this Paragraph is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph, and therefore denies them.

8.      This Paragraph is not directed to Kingston to which no response is required.  To the extent a response to this Paragraph is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph, and therefore denies them.

9.      This Paragraph is not directed to Kingston to which no response is required.  To the extent a response to this Paragraph is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph, and therefore denies them.

10.     Kingston admits that Paragraph 10 refers to DataLocker Inc. and Data Locker International, LLC together as "DataLocker".  All remaining allegations of Paragraph 6 are denied.

## NATURE OF THE ACTION

11.     Kingston admits that the Complaint purports to state a cause of action for infringement of United States Patent No. 6,088,802 (the "'802 patent") and United States Patent No. 6,003,135 (the "'135 patent") (collectively, the "patents-in-suit") arising under the patent laws of the United States, 35 U.S.C. § 1, et seq., and that what purports to be copies of the '802 patent and '135 patent are attached to Plaintiff's Complaint as Exhibit A and Exhibit B respectively.  All remaining allegations of Paragraph 11 are denied.

12.     To the extent that the allegation is directed to Kingston or its products or services, Kingston denies that it or any of its products or services has infringed the Patents-in-Suit.  All remaining allegations of Paragraph 12 are also denied.

## JURISDICTION AND VENUE

13.     Kingston admits that this Court has subject matter jurisdiction for a patent infringement action pursuant to 28 U.S.C. §§ 1331 & 1338(a) to the extent these actions arise under the patent laws of the United States, including §§ 35 U.S.C. 271, et seq.  To the extent that Paragraph 13 pertains to other defendants, no response it required by Kingston.  All remaining allegations of Paragraph 13 are denied.

14.     Paragraph 14 states legal conclusions to which no response is required. Kingston denies that it has committed acts of patent infringement (direct or otherwise) of any valid, enforceable claims of the Patents-in-Suit.  To the extent that Paragraph 14 pertains to other defendants, no response is required by Kingston.  All remaining allegations of Paragraph 14 are denied.

15.     Paragraph 15 states legal conclusions to which no response is required. Kingston denies it has committed acts of infringement of any valid, enforceable claims of the patents-in-suit.  To the extent that Paragraph 15 pertains to other defendants, no response is required by Kingston.  All remaining allegations of Paragraph 15 are denied.

16.     Paragraph 16 states legal conclusions to which no response is required. Kingston admits that Imation sold certain IronKey assets to Kingston Digital and DataLocker in February 2016 and that Plaintiff purports to assert claims against IronKey-branded products.  All remaining allegations of Paragraph 16 are denied.

## FACTUAL BACKGROUND

17.     Kingston admits that Paragraph 17 refers to Spyrus, Inc. as "Spyrus". Kingston denies that Spyrus is a "pioneering encryption company" as alleged in Complaint.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and therefore denies them.

18.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore denies them.

19.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore denies them.

20.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies them.

21.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and therefore denies them.

22.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and therefore denies them.

23.   Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and therefore denies them.

24.   Paragraph 24 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

25.   Paragraph 25 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

26.   Paragraph 26 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

27.   Paragraph 27 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

28.   Paragraph 28 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

29.     Paragraph 29 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

30.     Paragraph 30 pertains to other defendants so no response is required by Kingston.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

31.     Kingston admits that Spyrus and Kingston Digital entered into a Mutual Confidentiality Agreement dated March 14, 2008 ("NDA") and what purports to be a copy of the NDA is attached to the Complaint as Exhibit C.  As to the contents of the NDA, the document speaks for itself.  Kingston denies that it "improperly used Spyrus' confidential information" as alleged in Complaint.  All remaining allegations of Paragraph 31 are denied.

32.     Kingston admits that the purpose of the NDA as stated in the NDA was for Kingston Digital and Spyrus "[t]o discuss opportunities for joint business partnerships including integration of SPYRUS components and Kingston components into products, use of SPYRUS technologies in Kingston products, and joint development of products and strategies." Almost a year later Kingston Digital and Spyrus executed a technology license agreement and an accompanying appendix specifically directed to a next generation version of Kingston Digital's DataTraveler Black Box product and that referenced the '802 patent.  All remaining allegations of Paragraph 32 are denied.

33.     Kingston admits that on April 14, 2009 Spyrus and Kingston Digital entered into a Technology License and executed Licensed Product Appendix #1. Kingston further admits that certain portions and language of Paragraph 11 of the Technology License are quoted in Paragraph 33 of the Complaint.  All remaining allegations of Paragraph 33 are denied.

34.     Kingston admits that for purposes of the Technology License executed between Spyrus and Kingston Digital and terminated on or about April 21, 2015 by Spyrus, Paragraph 20.1 of the Technology License agreement states that "the parties agree to the personal and exclusive jurisdiction of and venue in the federal and state courts located in Orange County, California." All remaining allegations of Paragraph 34 are denied.

35.     Kingston admits that Licensed Product Appendix #1 identifies the "Name of the Licensed Product" as Kingston Digital's "Kingston DataTraveler® Black Box Gen. 2." Kingston further admits that the License Product Appendix #1 licensed Spyrus patents, including the '802 patent, that covered the Licensed Technology as that term was defined in the License Product Appendix #1. All remaining allegations of Paragraph 35 are denied.

36.     Kingston admits that the Kingston Digital's DataTraveler Black Box 2 was to be the same size as the DataTraveler Black Box. Kingston admits that Kingston Digital's DataTraveler 5000 was awarded FIPS 140-2 Level 2 certification. Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36 and therefore denies them.

37.     Kingston admits that DataTraveler 5000 was released by Kingston Digital in January 2010 and included a case, a memory card, and cryptographic technology. Kingston admits that Kingston Digital's DataTraveler 5000 was awarded FIPs 140-2 Level 2 certification. Kingston admits Kingston Digital's DataTraveler 5000 was Kingston Digital's first FIPS 140-2 certified product offering. Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 and therefore denies them.

38.    Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies them.

39.    Kingston admits that Kingston Digital's DataTraveler 5000 and the DataTraveler 6000 use cases and memory cards.  Kingston further admits that Kingston Digital's  DataTraveler 6000 included cryptographic technology and was Kingston Digital's first FIPS 140-2 Level 3-certified product offering.   All remaining allegations of Paragraph 39 are denied.

40.    Kingston admits that on or about January 21, 2015, Kingston Digital informed Spyrus of its intent to release the DataTraveler 4000 G2, which had recently achieved FIPS 140-2 Level 3 certification, and that shortly thereafter Kingston Digital received a letter from Spyrus terminating the Technology License with Kingston Digital.  All remaining allegations of Paragraph 40 are denied.

41.     Kingston admits that on or about January 21, 2015, Kingston Digital received a letter from Spyrus terminating the Technology License with Kingston Digital and that the Technology License terminated on or about April 21, 2015. Kingston denies that it improperly used any of Spyrus' confidential or proprietary information.  All remaining allegations of Paragraph 41 are denied.

42.    Denied.

43.    Kingston admits that between November 2008 and April 2010 Spyrus and Kingston Digital exchanged certain information under the Technology License. Kingston denies that the certain information received from Spyrus was not needed to perform obligations under the Technology License.   All remaining allegations of Paragraph 43 are denied.

44.    Kingston denies that it improperly used any of Spyrus' confidential or proprietary information.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 and therefore denies them.

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
8:16-CV-01790-JVS-AGR

45.    Kingston admits that on or about September 15, 2009, Jason Chen spoke with Spyrus personnel, including Burt Tregub, regarding the Licensed Technology under the Technology License executed by Spyrus and Kingston Digital.  All remaining allegations of Paragraph 45 are denied.

46.    Kingston admits that on or about December 11, 2009, a Spyrus representative visited Kingston Digital's office in Fountain Valley, California. Kingston admits that the materials presented by Spyrus' representative during the meeting were marked with confidential designations by Spyrus.   All remaining allegations of Paragraph 46 are denied.

47.    Kingston admits that, Jason Chen called Duane Linsenbardt.  Kingston admits that during the call, Mr. Linsenbardt informed Jason Chen that he was in the car and asked Jason Chen to follow-up via email.  Kingston further admits that Jason Chen explained that he preferred to continue the conversation by phone rather than to correspond by email.  All remaining allegations of Paragraph 47 are denied.

48.    Kingston admits that Phison Electronics Corp. is and has been a supplier to Kingston Digital and has worked with Ben Chen. Kingston denies that Spyrus was unaware that Ben Chen was receiving access to information under the Technology License executed by Spyrus and Kingston Digital.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48 and therefore denies them.

49.    Denied

50.    Denied.

51.    Kingston admits that on or about January 12, 2010, John Terpening received a letter from Burt Tregub. All remaining allegations of Paragraph 51 are denied.

52.    Kingston admits that on or about February 18, 2010, Calvin Leong, Director of the Legal Department sent a letter to Spyrus.  All remaining allegations of Paragraph 52 are denied.

53.    Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 53 and therefore denies them.

54.    Kingston admits that the announcement referenced in Paragraph 54 states, among other things, that "Kingston Technology Corporation and Phison Electronics Corp. plan to jointly invest in a new company focusing on embedded memory system product development, promotion and total solution services."  All remaining allegations of Paragraph 54 are denied.

55.    Kingston admits that on or about February 22, 2011 the release of the DataTraveler 4000 was announced.  Kingston admits that the DataTraveler 4000 uses certain technology developed by Phison.  Kingston denies that the DataTraveler 4000 uses Spyrus' patented technology.  All remaining allegations of Paragraph 55 are denied.

56.    Kingston denies that it improperly used any of Spyrus' confidential or proprietary information.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 56 and therefore denies them.

57.    Kingston admits that the DataTraveler 4000 G2 is certified to FIPS 140-2 Level 3 and uses certain technology developed by Phison.  Kingston admits that the DataTraveler 4000 uses certain technology developed by Phison.  Kingston admits that Andrew Ewing informed Burt Tregub of the impending release of the DataTraveler 4000 G2 on or about January 21, 2015.  Kingston is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57 and therefore denies them.

KINGSTON'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
8:16-CV-01790-JVS-AGR

58.     Denied.

## THE PATENTS-IN-SUIT

59.     Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59 and therefore denies them.

60.     Kingston admits that what purports to be a copy of the United States Patent No. 6,088,802 ("the '802 patent") is attached to the Complaint as Exhibit A and that the face of the '802 patent bears the title "Peripheral Device With Integrated Security Functionality", the Application No. 08/869,305, a filing date of June 4, 1997, and an issue date of July 11, 2000.   All remaining allegations of Paragraph 60 are denied.

61.     Kingston admits that what purports to be a copy of the United States Patent No. 6,003,135 ("the '135 patent") is attached to the Complaint as Exhibit B and that the face of the '135 patent bears the title "Modular Security Device", the Application No. 08/869,120, a filing date of June 4, 1997, and an issue date of December 14, 1999.  All remaining allegations of Paragraph 61 are denied.

62.     Kingston is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 62 and therefore denies them.

## COUNT I
## (ALLEGED KINGSTON'S INFRINGEMENT OF '802 PATENT)

63.     Kingston incorporates by reference its responses to the allegations in Paragraphs 1-62 above as if fully set forth herein.

64.     Paragraph 64 states legal conclusions to which no response is required. Kingston denies that it has made, used, offered for sale, sold, and/or imported into the United States products that infringe any valid, enforceable claim of the '802 patent, and continues to do so.  All remaining allegations of Paragraph 64 are denied.

65.     Denied.

66.     Denied.

KINGSTON'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

67.    Kingston admits that Kingston Digital received a license to the '802 patent as part of the Technology License agreement executed by Spyrus and Kingston Digital in 2008 and terminated in 2015.  Kingston denies that it has infringed the '802 patent.  All remaining allegations of Paragraph 67 are denied.

68.    Denied.

69.    Kingston denies that it or any of its customers or end users is or has infringed (directly or indirectly) the '802 patent. All remaining allegations of Paragraph 69 are denied.

70.    Kingston denies that it has induced, and continues to induce, infringement of the '802 patent under 35 U.S.C. 271(b).

71.    Kingston admits that Kingston Digital received a license to the '802 patent as part of the Technology License agreement executed by Spyrus and Kingston Digital in 2009 and terminated in 2015.  Kingston admits that Spyrus considers that the DataTraveler 5000 and DataTraveler 6000 were associated with the '802 patent through Licensed Product Appendix #1 (and amendments thereto) attached to the Technology License and that under such Licensed Product Appendices Kingston "agree[d] to mark all Licensed Products … to the extent reasonably practical" with the following language "[t]he Licensed Product may embody technology protected by one or more of the following patents or patent applications:  U.S. Pat. Nos. 6,008,802…".  Kingston denies that it improperly used any of Spyrus' confidential or proprietary information.  Kingston denies that it has infringed the '802 patent.  All remaining allegations of Paragraph 71 are denied.

72.    Denied.

73.    Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '802 patent.  All remaining allegations of Paragraph 73 are denied.

74.     Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '802 patent.  All remaining allegations of Paragraph 74 are denied.

75.     Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '802 patent.  All remaining allegations of Paragraph 75 are denied.

## COUNT II

## (ALLEGED KINGSTON'S INFRINGEMENT OF '135 PATENT)

76.     Kingston incorporates by reference its responses to the allegations in Paragraphs 1-75 above as if fully set forth herein.

77.     Paragraph 77 states legal conclusions to which no response is required. To the extent required, Kingston denies that it has made, used, offered for sale, sold, and/or imported into the United States products that infringe any valid, enforceable claim of the '135 patent, and continues to do so.   All remaining allegations of Paragraph 77 are denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Kingston denies that it or any of its customers or end users is or has infringed (directly or indirectly) the '135 patent. All remaining allegations of Paragraph 82 are denied.

83.     Kingston denies that it has induced, and continues to induce, infringement of the '135 patent under 35 U.S.C. 271(b).  All remaining allegations of Paragraph 83 are denied.

84.     Denied.

85.     Denied.

12

86.     Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '135 patent.  All remaining allegations of Paragraph 86 are denied.

87.     Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '135 patent.  All remaining allegations of Paragraph 87 are denied.

88.     Kingston denies that it is infringing or has infringed (directly or indirectly) any valid, enforceable claim of the '135 patent.  All remaining allegations of Paragraph 88 are denied.

## COUNT III

### (ALLEGED IMATION'S INFRINGEMENT OF THE '802 PATENT)

89.     Kingston incorporates by reference its responses to the allegations in Paragraphs 1-88 above as if fully set forth herein.

90.-101.  Paragraphs 90-101 pertain to defendants other than Kingston so no response from Kingston is required.  To the extent a response is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of allegations and therefore denies them.

## COUNT IV

### (ALLEGED IMATION'S INFRINGEMENT OF THE '135 PATENT)

102.  Kingston incorporates by reference its responses to the allegations in Paragraphs 1-101 above as if fully set forth herein.

103.-114.  Paragraphs 103-114 pertain to defendants other than Kingston so no response from Kingston is required.  To the extent a response is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of allegations and therefore denies them.

KINGSTON'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

## COUNT V

## (ALLEGED DATALOCKER'S INFRINGEMENT OF THE '802 PATENT)

115.  Kingston incorporates by reference its responses to the allegations in Paragraphs 1-114 above as if fully set forth herein.

116.-126.  Paragraphs 116-126 pertain to defendants other than Kingston so no response from Kingston is required.  To the extent a response is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of allegations and therefore denies them.

## COUNT VI

## (ALLEGED DATALOCKER'S INFRINGEMENT OF THE '135 PATENT)

127.  Kingston incorporates by reference its responses to the allegations in Paragraphs 1-126 above as if fully set forth herein.

128.-138.  Paragraphs 128-138 pertain to defendants other than Kingston so no response from Kingston is required.  To the extent a response is required, Kingston is without knowledge or information sufficient to form a belief as to the truth of allegations and therefore denies them.

KINGSTON'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

## PLAINTIFF'S PRAYER FOR RELIEF

These Paragraphs set forth Plaintiff's prayer for relief to which no response is required.  To the extent a response is required, Kingston denies that Plaintiff is entitled to any relief whatsoever as prayed or otherwise.

## PLAINTIFF'S JURY TRIAL DEMAND

This Paragraph sets forth Plaintiff's request for trial by jury to which no response is required.

## AFFIRMATIVE DEFENSES

Subject to the responses above, Kingston alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses described below, subject to its responses above, Kingston specifically reserves all rights to allege additional affirmative defenses that become known through the course of litigation and discovery.

### FIRST AFFIRMATIVE DEFENSE
### (Failure To State A Claim)

Each and every one of Plaintiffs' claims for relief and each and every one of its allegations fail to state a claim against each of Kingston Technology Corporation, Kingston Digital, Inc. ("Kingston Digital") and Kingston Technology Company, Inc. ("KTCI") (collectively, "Kingston"), upon which any relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Non-Infringement)

Kingston has not infringed and does not infringe, either literally or under the doctrine of equivalents, nor contributed to infringement by others, nor actively

induced others to infringe, any purportedly valid, enforceable claim of the '802 and/or '135 Patents (the "patents-in-suit").

### THIRD AFFIRMATIVE DEFENSE

### (Invalidity)

On information and belief, the patents-in-suit, and each and every claim thereof, are invalid for failure to comply with one or more requirements of Title 35, United States Code, including without limitation the provisions of 35 U.S.C. §§ 101, 102, 103, 112, and 132, and the rules, regulations, and laws pertaining thereto.

### FOURTH AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel/Disclaimer)

Upon information and belief, by reason of prior art and the proceedings in the U.S. Patent and Trademark Office during the prosecution of the applications that led to the issuance of the patents-in-suit, including, without limitation, amendments, representations, concessions, and admissions made by or on behalf of the applicant, Plaintiff is estopped from asserting that at least some of the patents-in-suit cover and include any Kingston products alleged to infringe the patents-in-suit.

### FIFTH AFFIRMATIVE DEFENSE

### (Waiver, Laches, Estoppel, and Acquiescence)

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver, laches, estoppel, and/or acquiescence, and/or other equitable doctrines.

### SIXTH AFFIRMATIVE DEFENSE

### (Limitation on Damages)

Plaintiff's claims for recovery are barred, in whole or in part, by 35 U.S.C. § 287.

## SEVENTH AFFIRMATIVE DEFENSE

### (Limitation on Damages)

Under the provisions of 35 U.S.C. § 286, Plaintiff is precluded from seeking recovery for any of Kingston's alleged infringing acts occurring more than six years before the filing of the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

### (Absence of Damages)

Plaintiff has not suffered and will not suffer any injury or damages by way of the acts and conduct of Kingston as alleged in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

## TENTH AFFIRMATIVE DEFENSE

### (License/Exhaustion)

Plaintiff is barred from asserting the patents-in-suit against Kingston to the extent Kingston's use is licensed or otherwise authorized and/or to the extent Plaintiff's patent rights in the accused technology are exhausted.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Patent Misuse)

Plaintiff is barred from asserting claims 55 and 57 of the '135 patent against Kingston because, as more fully set forth below in Kingston's counterclaims, Plaintiff has maintained its allegations of infringement of these claims where Plaintiff knows that these claims are invalid.  Kingston incorporates is the facts and assertions in its counterclaims below as at least partially the basis for this defense.

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
8:16-CV-01790-JVS-AGR

## OTHER AFFIRMATIVE DEFENSES

Kingston's investigation of the claims and its defenses is continuing.   In addition to the affirmative defenses set forth herein, Kingston expressly reserves the right to amend its Answer to allege and assert any additional affirmative defenses and counterclaims or to supplement its existing defenses under Rule 8 of the Federal Rules of Civil Procedure.

18

## **PRAYER FOR RELIEF**

WHEREFORE, Kingston denies that Plaintiff is entitled to any relief, including the relief requested in its Prayer for Relief, Kingston respectfully requests that the Court enter a judgment against Plaintiff and in favor of Kingston as follows:

A.     That Plaintiff takes nothing and be denied any relief whatsoever;

B.     That the Complaint be dismissed on the merits and with prejudice;

C.     That the claims of the patents-in-suit be declared to be not infringed by Kingston;

D.     That the claims of the patents-in-suit be declared to be invalid and/or unenforceable;

E.     That Kingston be awarded its costs incurred in connection with this action;

F.     That this case be deemed exceptional pursuant to 35 U.S.C. § 285, such that Kingston be awarded reasonable attorneys' fees; and

G.     That Kingston be awarded such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Kingston demands a trial by jury as to all claims and issues properly triable thereby.

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

# COUNTERCLAIMS

Counterclaimants Kingston Technology Corporation, Kingston Digital, Inc. ("Kingston Digital") and Kingston Technology Company, Inc. ("KTCI") (collectively, "Kingston"), by and through undersigned counsel, counterclaims and alleges against SPEX Technologies, Inc. ("SPEX") as follows:

## INTRODUCTION & NATURE OF SUIT

1.     This is an action arising under section 1 of the Sherman Act, 15 U.S.C. § 1, under the Patent Laws of the United States, and under the anti-trust laws of California whereby Kingston alleges that SPEX violated these anti-trust laws and committed patent misuse by entering into an anti-competitive settlement designed to prolong the life of claims that SPEX knows are invalid and by continued assertion of known-invalid claims.

2.     Kingston's counterclaims arise from a series of settlement agreements that SPEX entered into with Western Digital, Apricorn, and Toshiba (collectively the "PTAB Petitioners").  In these settlements, SPEX gave consideration to the PTAB Petitioners to drop their challenges to the validity of the patents-in-suit. These contracts are unreasonable restraints of trade in the relevant market for secure USB drives in the United States.

3.     The PTAB Petitioners had filed IPRs that put the '135 patent's validity at issue, and as set forth below, SPEX knew that those IPRs would result in invalidity of the '135 patent claims or otherwise believed there was an inordinately high likelihood that this would be the result of the PTAB proceedings. Indeed, the PTAB found at institution all elements of these claims taught by the prior art, and SPEX offered no evidence or argument beyond what the Board had already previously considered at institution.  Yet to avoid adjudication of the validity of, and maintain its ability to assert the '135 patent against other sellers in the relevant market, SPEX chose to "purchase" a dismissal of the IPRs by

providing the PTAB Petitioners free licenses (in actuality or in effect) to the '135 patent—licenses that SPEX previously valued (on information and belief) at over $10 million collectively, and which it continues to demand from others (including Kingston) at exorbitantly high royalties.  In exchange, the PTAB Petitioners dropped the proceedings challenging the validity of the '135 patent.

4.     A settlement in which the patentee pays the accused infringer is known as a "reverse settlement."  Reverse settlements, like any settlement, can be either in cash or in kind.  Reverse settlements typically occur when the patentee knows its patent is invalid and "pays" the accused infringer to drop its challenge to the validity of the patent, so that the patentee can continue to use the patent to perpetuate or to achieve a monopoly or otherwise restrain trade in a relevant market. The fact that a patentee will "pay to make the case against it go away" is powerful evidence that it knows the patent is invalid.

5.     As set forth below, SPEX elected to "purchase" a dismissal of the '135 IPR in order to preserve its ability to demand payment from others in the industry besides the PTAB Petitioners.  PTAB Petitioners were given free licenses to the '135 patent.  The settlements between SPEX and the PTAB Petitioners restrain trade because they enable SPEX to raise prices of products in the relevant market of secure portable USB memory devices in the United States because it believes other sellers who did not or could no longer challenge claims 55 and 57 of the '135 patent at PTAB will take licenses (increasing costs) in order to avoid expensive litigation.  There is no legitimate reason for these licenses.  Accordingly, this reverse settlement violates section 1 of the Sherman Antitrust Act.

6.     In addition, as also set forth below, the settlements are agreements made to unreasonably restrain trade because they were made with the intent to allow SPEX to continue asserting claims in sham litigation it knows are invalid. While a patentee must be allowed to bring legitimate claims in district court to test

infringement and validity, a patent owner may not assert in bad faith infringement of claims it knows are invalid.  Where an entire market is affected by such a suit, such activity constitutes an unreasonable restraint on trade in violation of section 1 of the Sherman Antitrust Act.

7.     Lastly, for the same reasons, these agreements and SPEX's continued assertion of known-invalid claim violates California anti-trust law and the Federal Patent laws.

## PARTIES

8.     Counterclaim Plaintiff Kingston Technology Corporation is a California corporation with its headquarters at 17600 Newhope St., Fountain Valley, California 92708.

9.     Counterclaim Plaintiffs Kingston Digital Inc. and Kingston Technology Company, Inc. are Delaware corporations with headquarters at 17600 Newhope St., Fountain Valley, California 92708.

10.     On information and belief, counterclaim Defendant SPEX Technologies, Inc. is a California corporation with its headquarters at 1860 Hartog Dr., San Jose, CA 95131.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1337 (anti-trust), 1367 (supplemental jurisdiction), and 2201 (declaratory judgment).

12.     The Court has general personal jurisdiction over counterclaim Defendant SPEX because SPEX is a California corporation with its principle place of business in California.  The Court additionally has specific personal jurisdiction over counterclaim defendant SPEX because SPEX has engaged in substantial conduct giving rise to this lawsuit in California.  This conduct includes, *inter alia*,

the assertion of baseless, sham claims for infringement of claims 55 and 57 of U.S.
Patent No. 6,003,135 ("the '135 patent") which SPEX purports to own.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391
(b) & (c) because a substantial number of the events or omissions giving rise to
Kingston's claims against SPEX occurred in this district.

## FACTUAL BACKGROUND

14.     There is a market in the United States for portable secure USB
memory products.  A portable secure USB memory product is a device that stores
encrypted data in a form factor that is easily transportable, such as a portable USB
thumb drive equipped with non-volatile memory and a hardware encryption chip.
Portable, secure USB memory products are not interchangeable with other USB
storage that is not secure, as these products do not provide the security gained from
encryption.

15.     Consumers will pay more for portable secure USB products to keep
their data safe from disclosure as compared to these other products because these
products meet the need in the market for allowing data to be transportable, but
physically secure.  For example, an employer who equips its employees with
secure USB memory products knows its data is safeguarded, and is not subject to
inadvertent or inadvertent disclosure should the device be lost.  Further, the owner
of secure USB memory products can use physical barriers to bar any attempts to
"hack" the information.

16.     SPEX initially brought its Complaint against Kingston on September
27, 2016.  (*See* D.I. 1.)  SPEX's Complaint alleged that Kingston and three other
defendants (Imation Corporation, DataLocker, Inc., and Data Locker International,
LLC) infringed claims of the '135 patent and claims of U.S. Patent No. 6,088,802
("the '802 patent").  (*See generally id.*)  The specifications for these two patents

are nearly identical, and the inventions claimed by both patents are, as the claim terms have been interpreted by the district court,[1] closely related.

17.     The '802 and '135 patents relate generally to the use of hardware-based encryption to secure data stored on a portable device.  On information and belief, SPEX's predecessor-in-interest to the '135 and '802 patents Spyrus, Inc. ("Spyrus") makes portable, secure USB memory products, including Windows To Go Live Drives (https://www.spyrus.com/windows-to-go-live-drives/) and secure SDHC and USB storage (https://www.spyrus.com/secure-storage/).  SPEX and Spyrus are sister entities.

18.     Spyrus's portable secure USB products sell for higher prices than many other comparable portable secure USB products in the market (including Kingston's) that are the subject of SPEX's suit against Kingston and other portable secure USB memory device suppliers.  If suppliers, like Kingston, are forced to pay a royalty to SPEX, that royalty payment would lead to an increase in Kingston's prices for secure USB drives.  Thus, the retroactive toll SPEX seeks will unfairly burden sellers of secure USB memory, forcing them to charge increase prices to pay for this bill, with no countervailing benefit to the market. Moreover, SPEX's unfounded allegations unfairly suggest that the industry has not innovated beyond SPEX's expired patent, reducing the value of the product and the reputation of its sellers.

---

[1]   The main difference between the two patents is that the '802 patent describes a "peripheral" device with a "security means" and a "target means", whereas the '135 patent describes its purported invention as a "modular" device with a "security module" and a "target module.  Though Kingston contended that the '135 patent's use of the word "module" required separate physical components, this Court interpreted these terms so as to have the same meaning.  (*See* D.I. 122.).  For the purposes of these counterclaims, Kingston does not dispute the application of the district court's constructions, though Kingston reserves the right to later challenge those constructions should the district court case result in a final judgment that is later appealed.

19.    In addition to suing Kingston, SPEX brought suit against numerous other makers and sellers of hardware-encrypted storage devices.  In particular, SPEX initiated litigation against Integral Memory (Case No. 16-1805 in the Central District of California); against Apricorn (Case No. 16-1803 in the Central District of California); against CMS Products Inc. (Case No. 16-1801 in the Central District of California); against Toshiba America Electronics Components, Inc., Toshiba America, Inc., Toshiba America Information Systems, Inc., and Toshiba Corporation (Case No. 16-1800 in the Central District of California); and against Western Digital Corporation, Western Digital Technologies, Inc., and HGST, Inc. (together "Western Digital") (Case No. 16-1799 in the Central District of California).

20.    After SPEX brought suit, the PTAB Petitioners in the various actions sought additional review of the claims of the '802 and '135 patents asserted by SPEX at the United States Patent and Trademark Office.

21.    In particular, the PTAB Petitioners, together with Kingston, brought an *inter partes* review challenge against claims 1, 2, 6, 7, 11, 12, 23–25, 38, and 39 of the '802 patent, asserting that these claims were unpatentable as obvious over U.S. Patent No. 5,887,145 to Harari ("Harari") in various combination with Don Anderson, PCMCIA System Architecture 16-Bit PC Cards, Second Edition, 1995 ("Anderson"), U.S. Patent No. 5,765,027 ("Wang"), and U.S. Patent No. 6,199,163 B1 ("Dumas").  *See Western Digital  Corp. et al. v. SPEX Technologies, Inc.*, IPR2018-00082.  Ultimately, the Board determined that claim 38 was unpatentable as obvious over Harari and Anderson and that claim 39 was unpatentable over Harari and Anderson, or (alternatively) over Harari, Anderson, and Wang.  *See* Final Written Decision, Paper 40, *Western Digital Corp. et al. v. SPEX Technologies, Inc.*, IPR2018-00082 (Patent Trial and Appeal Board, April 18, 2019).  That decision was not appealed by SPEX.

KINGSTON'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

22.    Claims 38 and 39 of the '802 patent are substantively very similar to claims 55 and 57 of the '135 patent.  Each of these claims recite a method for use in a "peripheral" (the '802 patent) or "modular" (the '135 patent) device, which the Court has construed to be the same.

23.    As to claim 38 of the '802 patent and claim 55 of the '135, the steps claimed to be performed by the "peripheral"/ "modular" device are substantively the same, apart from one additional step recited in claim 55 of "operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device."  (*See* Appendix A for a chart comparing the limitations).  Indeed, SPEX's litigation expert expressly acknowledged in his infringement report that the first step of claim 55 "is the same as element 38a of claim 38 of the '802 patent"; and further acknowledged the substantive similarity of elements 38b and 55b because he did not perform any separate analysis of the second step of claim 55, but rather "refer[red] to and incorporate[d] by reference [his] opinion with respect to Element 38b of claim 38 of the '802 patent above."

24.    As to claim 39 of the '802 patent and claim 57 of the '135 patent, both are again substantively identical save for the addition of the same "operably connecting" appearing in claim 57.  (*See* Appendix A for a chart comparing the limitations).  This is again confirmed by SPEX's litigation expert, who stated in his expert report that the first step of claim 57 "is the same as Element 39a of claim 39 of the '802 patent," that the second step of claim 57 "is the same limitation as Element 39b of claim 39 of the '802 patent"; and that the third step of claim 57 is "is the same limitation as Element 39c of claim 39 of the '802 patent."

25.    Thus, the only substantive difference between claims 38 and 39 of the '802 patent—which have been adjudicated to be invalid—and claims 55 and 57 of the '135 patent is the step of "operably connecting the security module and/or the

target module to the host computing device in response to an instruction from the host computing device."  SPEX knows that this step, though, does not amount to validity for claims 55 and 57, as the same prior art which rendered all other elements of these claims unpatentable (as determined by the PTAB) also teaches the "operably connecting" step.

26.     For example, SPEX knows that the Patent Trial and Appeal Board already determined that the same references over which the Board found claims 38 and 39 of the '802 unpatentable (Harari and Anderson) teach the "operably connecting" limitation in the IPR that the PTAB Petitioners brought the '135 patent.  The Board specifically found that "Petitioner has sufficiently shown that Harari, alone or in combination with Anderson, teaches or suggests the step of operably connecting . . . in response to an instruction from the host."  Decision, Institution of Inter Partes Review, Paper 14, *Western Digital Corp. v. SPEX Technologies, Inc.*, IPR2017-00084 (Patent Trial and Appeal Board, Apr. 25, 2018).  SPEX provided no new arguments regarding the "operably connecting" limitation after the institution decision, but rather chose to enter into a "reverse settlement" to circumvent a final determination by the Board, evidencing its knowledge that these claims would be found unpatentable.

27.     SPEX's conduct in this litigation also shows it knows claims 55 and 57 are invalid.  In this case, Kingston has asserted that the asserted claims of the '802 and '135 patent are anticipated and/or obvious over U.S. Patent 5,623,637 ("Jones"), which teaches a PMCIA memory card that can store encrypted data.  With respect to the "operably connecting" element, Kingston's expert explained that Jones teaches the claimed "operably connecting" step through its practice of standard PCMCIA functionality.  SPEX's expert did not contest that Jones-through the PCMCIA specification-taught the "operably connecting" limitation.  Indeed, SPEX's invalidity expert report does not even address this limitation in contending

that claims 55 and 57 were patentable over Jones, meaning that SPEX knows that a
card compliant with PCMCIA standard performs the "operably connecting" step
recited in claim 55 and 57.  As SPEX knows, the references which the Board found
to render claims 38 and 39 of the '802 patent unpatentable teach cards that are
compliant with PCMCIA specifications, and thus practice the "operably
connecting" step.

28.     Indeed, SPEX has been unable to articulate any reason why these
claims would not have been found invalid had it let an adjudication of the validity
of these claims proceed.  Following admissions made by its expert in deposition,
and following SPEX's failure to raise any argument as to the "operably
connecting" limitation, Kingston sent SPEX a letter asking for SPEX's basis for
continuing to assert claims 38 and 39 of the '802 patent and claims 55 and 57 of
the '135 patent .  Kingston received no response.

29.     SPEX's belief that these claims are invalid is objectively reasonable.
Both Harari and Anderson address peripherals that comply with the PCMCIA
standard.  As the Board correctly recognized when instituting review of claims 55
and 57, the PCMCIA standard teaches a process where PCMCIA-compliant
peripheral devices are "operably connected" to the host computer when plugged in.
*See Western Digital Corp. v. SPEX Technologies, Inc.*, Order Instituting IPR,
Paper 14, at 29-30 (PTAB Apr. 25, 2018) (accepting petitioner's argument that
"Anderson discloses this feature as the PCMCIA card services and enablers
scanning the CIS information from a PC Card-i.e., the reading or scanning of CIS
information is the recited instruction to which the peripheral device responds to
operably connect the PC Card to the host system").  Indeed, Anderson describes
generally the operation of any PCMCIA card (of which Harari discloses one
example) wherein the host computer reads information identifying the type of
PCMCIA card and other information which allows the host computer to operate

with the PCMCIA peripheral, i.e., to operably connect to it.  All of this was also explained in this litigation by Kingston's expert with respect to another PCMCIA peripheral device described in Jones.

30.     Yet rather than allow the validity of these claims to actually be adjudicated, SPEX entered into a "reverse settlement" with the PTAB petitioners to circumvent a PTAB hearing that claims 55 and 57 of the '135 patent would be invalidated.  Just days before the oral hearing was scheduled in PTAB Petitioner's IPR of the '135 patent, on information and belief, SPEX reached an agreement with the PTAB Petitioners whereby SPEX would drop its allegations of infringement against the petitioners in exchange for them requesting that the IPR be terminated without a final decision.  *See generally* Joint Motion to Terminate, Paper 36, *Western Digital Corp. v. SPEX Technologies, Inc.*, IPR2018-00084 (PTAB Jan. 11, 2019).  On information and belief, SPEX received no monetary compensation in this settlement.  The only benefit SPEX received was that the challenge to the patentability of the '135 patent would end without the Board finally finding these claims unpatentable.  The only reasonable inference from the settlement was that SPEX believed that the Board would find these claims unpatentable and entered into these "reverse settlements" to avoid that outcome.  A copy of the settlement agreement filed publicly with the PTAB is attached as Appendix B.

31.     This settlement allows SPEX to continue asserting claims 55 and 57—claims that it knows are invalid—against Kingston and others.  Indeed, SPEX plans to take these claim to trial against Kingston.  (D.I. 167, at 4.)  SPEX's assertion of these claims against Kingston is particularly egregious, given that SPEX has asserted that Kingston should no longer be able to contest the validity of these claims based on the prior art SPEX knows teaches these claims due to estoppel.

32.     SPEX's continued assertion of these invalid claims will cause Kingston to have to engage in motion practice about these claims and, potentially, to have to spend money to defend itself against the allegations regarding these claims at trial.  These damages flow directly from SPEX's injury to the market. Kingston should be entitled to recover these fees as damages due to SPEX's bad faith assertion of invalid claims.  Kingston, now, therefore, brings these counterclaims to recover the injuries it has and will continue to suffer as a result of SPEX's actions, as set forth below.

33.     SPEX's "reverse settlement" continued assertion of known-invalid claims also damages Kingston's financial structure, reputation, and right to control its products.  SPEX's actions also place a cloud over the legitimacy, functionality, and technical promise of Kingston's products.

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
8:16-CV-01790-JVS-AGR

## COUNT 1

### Contract or Conspiracy in Restraint of Trade or Commerce
### in Violation of § 1 of the Sherman Act

34.   Counterclaim Plaintiff Kingston repeats and re-alleges each of the allegations contained in paragraphs 1 through 33 above as if fully set forth herein.

35.   Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  As the Ninth Circuit has articulated, "[t]o state a claim under Section 1 of the Sherman Act," a plaintiff must plead facts that would prove "(1) a contract, combination or conspiracy amongst two or more persons or distinct business entities; (2) by which the persons intended to harm or restrain trade or commerce among the several states, or with foreign nations; and (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

36.   As discussed above, while it was knowing or it should have known that the claims 55 and 57 of the '135 patent are invalid, SPEX entered into contracts with the PTAB Petitioners whereby SPEX granted these entities a free at least *de facto* license to the '135 patent in exchange for the PTAB Petitioners dropping their challenge to the validity of, inter alia, claims 55 and 57 of the '135 patent, so that it may continue to assert these known-invalid claims against Kingston and other companies in the industry.

37.   The purpose of these contracts was enable SPEX to harm competition in the relevant market for secure portable USB memory products in the United States.  In particular, SPEX entered into these agreements with the sole purpose of freeing it to assert claims 55 and 57 of the '135 patent—claims that SPEX knows are invalid—against Kingston.  Such an assertion "contribute[s] nothing to the furtherance of the policies of either the patent law or the antitrust law" and thus can

31

constitute an illegal restraint on trade.  *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d
986, 993 (9th Cir. 1979).  Because SPEX entered into an agreement to allow it to
continue asserting known-invalid claims, SPEX entered into the contract with the
intent to unreasonably harm commerce in these products.  SPEX continues to
assert these claims knowing the allegations are objectively baseless.

38.     Moreover, these agreements constitute illegal "reverse payment
settlements."  As the Supreme Court recognized in *F.T.C. v. Actavis, Inc.*, 570 U.S.
136 (2013), reverse payment settlement where a patent owner gives an alleged
infringer something of value to drop his or her challenge to the validity of a patent
have the "potential for genuine adverse effects on competition." *Id.* at 153.  Here,
that anti-trust harm was the reason behind the settlement—SPEX got nothing of
value other than the ability to extract licensing fees from Kingston and other
companies for claims it knew were invalid.

39.     As stated above, there is a relevant market for secure USB drives in
the United States.  These products differ from other USB drives because they
encrypt data stored on them using firmware in the product; and these products
differ from cloud-based storage because it allows users to have physical control
over their data and protect their data with physical barriers as well as encryption.
Consumers will pay a premium for secure USB drives to protect data in the event
of loss or theft of the device, and because the devices automatically encrypt data
eliminating human error or intervention while allowing for the use of physical
barriers to protect the devices.

40.     Competition in the relevant market has been injured as a result of
SPEX's illegal settlements and also its baseless litigation.  The agreements enable
SPEX to force the majority of secure portable USB memory device suppliers to
suffer a significant price burden, causing price increases.  For example, the
settlements allow SPEX's sister company Spyrus to maintain its high prices in the

industry of secure USB drives by potentially forcing the payment of royalties on a patent that–save the settlement agreements–would have been invalidated or otherwise limit supply.

41.     As a direct and proximate result of SPEX's unlawful conduct and its restraint on the relevant market, Kingston has been harmed in an amount to be established at trial.  Kingston's damages include the attorneys' fees and costs it has incurred in defending against SPEX's baseless claims for infringement of claims 55 and 57 of the '135 patent, as well as compensation for the damages to Kingston's reputation, its right to control its products and its products' legitimacy, functionality, and future availability clouded by SPEX's assertion of its invalid patent made possible by the licenses, and by its competitors being able to market their products clear of allegations of infringement.  All damages must be trebled.

## COUNT 2

### Violation of the Cartwright Act

42.     Counterclaim Plaintiff Kingston repeats and re-alleges each of the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

43.      The California Cartwright Act prohibits "trusts," which are defined as combinations of capital, skill, or acts by two or more persons to, inter alia, create or carry out restrictions in trade or commerce.  *See* California Bus. & Prof. Code § 16720.  This statute is the California counterpart to section 1 of the Sherman Antitrust Act, and California courts have looked to federal law when interpreting the provisions of this act.  Thus, like section 1 of the Sherman Act, the Cartwright Act "prohibits combinations in unreasonable restraint of trade."  *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 493 (2011).

44.     Kingston's secure USB memory business is based in California.

45.     As discussed above, SPEX's "reverse settlements" with the PTAB Petitioners constitute agreements that unreasonably restrain trade in the relevant

market in the United States and in California.  These agreements allow SPEX to continue to assert, and to attempt to extract royalties from, known-invalid claims. As such, the agreements fall within the scope of agreements made illegal under the Cartwright Act.

46.     As a direct and proximate result of SPEX's unlawful conduct restraining the market identified above in the United States including California, Kingston has been harmed in an amount to be established at trial.  Kingston's damages include the attorneys' fees and costs it has incurred in defending against SPEX's baseless claims for infringement of claims 55 and 57 of the '135 patent, as well as compensation for the damages to Kingston's financial structure, reputation, its right to control its products, and by its competitors being able to market their products clear of allegations of infringement.

## COUNT 3

### Declaratory Judgment of Patent Misuse

47.     Counterclaim Plaintiff Kingston repeats and re-alleges each of the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

48.     The federal Patent Laws make it unlawful for the owner of a patent to attempt to extend the monopoly right granted by a patent beyond its appropriate bounds, for example by attempting to obtain licensing fees and/or damages for claims that are invalid.  A finding of Patent Misuse renders a patent unenforceable.

49.     SPEX has engaged in patent misuses by, inter alia, maintaining its allegations of infringement of claims 55 and 57 of the '135 patent, knowing these claims to be invalid.  "Only valid patents confer [a] right to exclusivity—invalid patents do not." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1931 (2015) (Scalia, J., dissenting); *see also Actavis*, 570 U.S. at 147 (explaining that "[a] valid patent excludes all except its owner from the use of the protected process or product" and "may permit the patent owner to charge a higher-than-competitive

price for the patented product. But an invalidated patent carries with it no such

right."). As SPEX has continued to seek exclusivity based on claims it knows are

invalid—exclusivity that is not appropriately within the grant of the patent—SPEX

has committed patent misuse.

## COUNT 4

### Violation of California Business & Professions Code

50.     Counterclaim Plaintiff Kingston repeats and re-alleges each of the

allegations contained in paragraphs 1 through 49 above as if fully set forth herein.

51.     The California Business & Professions Code, section 17200 et seq.

make it unlawful for any person to engage in unfair competition, which includes

"any unlawful, unfair or fraudulent business act or practice." "The 'unlawful'

practices prohibited by section 17200 are any practices forbidden by law, be it civil

or criminal, federal, state, or municipal, statutory, regulatory, or court-made. It is

not necessary that the predicate law provide for private civil enforcement."

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc*., 178 F. Supp. 2d 1099, 1120

(C.D. Cal. 2001).

52.     SPEX has engaged in actions made unlawful under at least Section 1

of the Sherman Act, the Cartwright Act, and under the Patent Laws of the United

States, by entering into settlement agreements designed to further an antitrust harm

(i.e. assertion of known-invalid claims) and by bringing sham litigation asserting

infringement of claims 55 and 57 of the '135 patent, knowing these claims to be

invalid.

53.     As a direct and proximate result of SPEX's unlawful conduct,

Kingston has been harmed in an amount to be established at trial. Kingston's

damages include the attorneys' fees and costs it has incurred in defending against

SPEX's baseless claims for infringement of claims 55 and 57 of the '135 patent, as

well as compensation for the damages to Kingston's reputation, its right to control

its products and its products' legitimacy, functionality, and future availability clouded by SPEX's assertion of its invalid patent made possible by the licenses, and by its competitors being able to market their products clear of allegations of infringement.

## **PRAYER FOR RELIEF**

WHEREFORE, Kingston respectfully requests that the Court enter a judgment against SPEX and in favor of Kingston as follows:

A.  That the conduct alleged herein be declared, adjudged and/or decreed to be unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.  That the conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

C.  That the conduct alleged herein be declared, adjudged, and/or decreed to constitute Patent Misuses under the Patent Laws of the United States;

D.  That the conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Section 17200 of the California Business & Professions Code;

E.  That Kingston recover its damages, trebled, in the amount established at trial;

F.  That Kingston recover its costs of the suit, including reasonable attorneys' fees as provided by law;

G.  That the asserted patents be declared unenforceable;

H.  That SPEX be enjoined from further assertion of claims 55 and 57 of the '135 patent; and

I.  That Kingston be granted such other, further, and different relief in law or in equity that this Court deems to be just, equitable and appropriate.

## **JURY DEMAND**

Kingston demands a trial by jury as to all claims and issues properly triable thereby.

37

1

2  Dated: September 25, 2019

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

FISH & RICHARDSON P.C.

By:   */s/ David M. Hoffman*
       David M. Hoffman (*pro hac vice*)
       hoffman@fr.com
       David Morris (*pro hac vice*)
       dmorris@fr.com
       One Congress Plaza
       111 Congress Ave., Suite 810
       Austin, TX 78701
       Tel: (512) 472-5070
       Fax: (512) 320-8935

       Joanna M. Fuller (SBN 266406)
       jfuller@fr.com
       Garrett K. Sakimae (SBN 288453)
       sakimae@fr.com
       555 West Fifth Street 31st Floor
       Los Angeles, CA 90013
       Tel: (213) 533-4240
       Fax: (858) 678-5099

       Oliver J. Richards (SBN 310972)
       orichards@fr.com
       12390 El Camino Real
       San Diego, CA 92130
       Tel: 858-678-4715
       Fax: 858-678-5099

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE OF S.J. CHRISTINE YANG

Christine Yang (SBN 102048)
chrisyang@sjclawpc.com
Victoria Hao (*pro hac vice*)
vhao@sjclawpc.com
17220 Newhope Street, Suite 101-102
Fountain Valley, CA 92708
Tel.: (714) 641-4022
Fax: (714) 641-2082

***Attorneys for Defendants***
Kingston Technology Corporation,
Kingston Digital, Inc., and Kingston
Technology Company, Inc.

39

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 25, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

*/s/ David M. Hoffman*
David M. Hoffman
hoffman@fr.com

***Attorneys for Defendants***
Kingston Technology Corporation,
Kingston Digital, Inc., and
Kingston Technology Company, Inc.

KINGSTON'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

8:16-CV-01790-JVS-AGR

1

## APPENDIX A

2

Below are charts comparing the limitations of the claims discussed in Kingston's
counterclaims:

3

4

| '802 Claim 38 | '135 Claim 55 |
|---|---|
| receiving a request from a host computing device for information regarding the type of the peripheral device; and | receiving a request from the host computing device for information regarding the type of the modular device; |
| providing to the host computing device, in response to the request, information regarding the type of the defined interaction. | providing the type of the target module to the host computing device in response to the request; and |
| | operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. |

| '802 Claim 39 | '135 Claim 57 |
|---|---|
| communicating with the host computing device to exchange data between the host computing device and the peripheral device; | communicating with the host computing device to exchange data between the host computing device and the modular device; |
| performing one or more security operations and the defined interaction on the exchanged data; and | performing one or more security operations and the defined interaction on the exchanged data; |
| mediating communication of the | mediating communication of the |

| | |
|---|---|
| exchanged data between the host computing device and the peripheral device so that the exchanged data must first [p]ass through means for performing the one or more security operations. | exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and |
| | operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. |