RUSS, AUGUST & KABAT
Marc A. Fenster (SBN 181067)
*mfenster@raklaw.com*
Benjamin T. Wang (SBN 228712)
*bwang@raklaw.com*
Andrew D. Weiss (SBN 232974)
*aweiss@raklaw.com*
Paul A. Kroeger (SBN 229074)
*pkroeger@raklaw.com*
Jacob R. Buczko (SBN 269408)
*jbuczko@raklaw.com*
Justin E. Maio (SBN 304428)
*jmaio@raklaw.com*
12424 Wilshire Boulevard, 12FL
Los Angeles, California 90025
310/826-7474 – Telephone
310/826-6991 – Facsimile

*Attorneys for Plaintiff*
SPEX Technologies, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSON TECHNOLOGY COMPANY, INC., IMATION CORPORATION, DATALOCKE INC., DATA LOCKER INTERNATIONAL, LLC, <br><br> Defendants. | Case No. 8:16-CV-01790-JVS-AGR <br><br> **PLAINTIFF SPEX TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COUNTERCLAIMS AND AFFIRMATIVE DEFENSE OF PATENT MISUSE PURSUANT TO RULE 12(B)(6)** <br><br> HONORABLE JUDGE JAMES SELNA <br><br> DATE: November 25, 2019 <br> TIME: 1:30 P.M. <br> COURTROOM: Santa Ana, 10C |

*RUSS, AUGUST & KABAT*

1

**TABLE OF CONTENTS**

I.      *NOERR-PENNINGTON* IMMUNITY BARS KINGSTON'S
ANTITRUST CLAIMS ................................................................................ 1

        A.      *Noerr-Pennington* Immunity Applies Here Because The
Purported "Antitrust Harm" Is Petitioning Activity (This Litigation)............ 1

        B.      *Noerr-Pennington* Immunity Requires Dismissal Of
Kingston's Antitrust Claims Because Kingston Has Not And Cannot
Plead This Litigation Is Objectively Baseless .................................................. 5

II.     KINGSTON HAS NOT PLED THAT SPEX ENTERED INTO AN
AGREEMENT WITH ANTITRUST IMPLICATIONS ......................................... 12

        A.      Kingston Has Failed To Plead That The Settlement
Agreement Is A "Reverse-Payment" Settlement ............................................ 12

        B.      Kingston's *Handgards* Allegations Must Be Dismissed
Because They Are Not Consistent With *Handgards* ..................................... 15

III.    KINGSTON HAS NOT ADEQUATELY PLED PATENT MISUSE ......... 16

IV.     CONCLUSION ............................................................................................. 18

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

# **TABLE OF AUTHORITIES**

**Cases**

*Asahi Glass Co. v. Pentech Pharm, Inc.*,
   289 F.Supp.2d 986 (N.D. Ill. 2003) ................................................ 6, 13

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998) ...................................................... 16

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
   807 F.3d 1283 (Fed. Cir. 2015) ....................................................... 9

*Duke Univ. v. Akorn, Inc.*,
   Case No. 3:18-cv-14035-BRM-TJB, 2019 WL 4410284 (D.N.J. Sept. 16,
   2019) ......................................................................................... 5

*F.T.C. v. Actavis, Inc.*,
   570 U.S. 136 (2013) ...................................................... 12, 14, 15

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
   45 F.3d 1550 (Fed. Cir. 1995) ........................................................ 18

*Handgards Inc. v. Ethicon, Inc.*,
   743 F.2d 1282 (9th Cir. 1984) ....................................................... 15

*Handgards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) ........................................................ 15

*In re Actos End Payor Antitrust Litig.*,
   No. 13-CV-9244 RA, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) .......... 13

*In re Androgel Antitrust Litig. (No. II)*,
   No. 1:09-CV-955-TWT, 2014 WL 1600331 (N.D. Ga. Apr. 21, 2014) ......... 4

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   186 F.3d 781 (7th Cir. 1999) ......................................................... 4

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017) .......................................................... 5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) .......................................... 4, 13

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017) ....................................................... 5, 6

*Industrial Models, Inc. v. SNF, Inc.*,
   716 Fed. Appx. 949 (Fed. Cir. 2017) ............................................... 14

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   280 F.Supp.3d 691 (D. Md. 2017) .................................................... 6

*MedImmune, Inc. v. Genentech, Inc.*,
   No. CV 03-2567MRP, 2003 WL 25550611 (C.D. Cal. Dec. 23, 2003) ......... 3

ii

RUSS, AUGUST & KABAT

*Nalco Co. v. Turner Designs, Inc.*,
No. 13-CV-02727 NC, 2014 WL 645365 (N.D. Cal. Feb. 19, 2014)...........18

*Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059 (Fed. Cir. 1998) ...................................................................5

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)................................................................................passim

*Rubicon Comms., LP v. Lego A/S*,
Case IPR2016-01187, Paper 100 (PTAB Dec. 14, 2017).........................3, 10

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.*,
No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ......................4

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
762 F.3d 1338 (Fed. Cir. 2014) ................................................................10

*United Food & Commercial Workers Local 1776 & Participating Employers
Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,
74 F.Supp.3d 1052 (N.D. Cal. 2014) .........................................................13

**Statutes**

28 U.S.C. § 1338 .......................................................................................8

28 U.S.C. § 1338(a) ...................................................................................8

35 U.S.C. § 315(b) ...................................................................................10

35 U.S.C. § 315(e) ...............................................................................8, 9, 11

35 U.S.C. § 317(a) ................................................................................3, 10

RUSS, AUGUST & KABAT

SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS
AND AMENDED AFFIRMATIVE DEFENSE

The Court should grant SPEX's motion to dismiss Kingston's antitrust and patent misuse claims (Kingston's counterclaims and eleventh affirmative defense) with prejudice. Even assuming all factual allegations as true, Kingston has not and cannot adequately plead its claims. SPEX has immunity as to Kingston's antitrust claims under the *Noerr-Pennington* doctrine. Despite vacillating attempts to obfuscate the issues, the antitrust harm alleged by Kingston ("anti-trust harm, namely SPEX's continued assertion of claims," Opp. at 15) is petitioning activity immunized from antitrust claims by the *Noerr-Pennington* doctrine. And Kingston cannot show that the narrow sham litigation exception to the *Noerr-Pennington* doctrine applies because, not only is Kingston judicially and statutorily estopped from arguing that this litigation is objectively baseless, it has not and cannot sufficiently plead that this litigation is objectively baseless. Kingston's arguments suffer from various critical flaws, and ultimately fail to meet the requirements to show a sham litigation as set forth by the Supreme Court in *PRE*. Kingston's patent misuse claims are similarly irreparably defective because the Federal Circuit has ruled that patent misuse cannot be predicted solely on the assertion of a purportedly known invalid patent, which is all Kingston alleges here.

## I.   *NOERR-PENNINGTON* IMMUNITY BARS KINGSTON'S ANTITRUST CLAIMS

### A.   *Noerr-Pennington* Immunity Applies Here Because The Purported "Antitrust Harm" Is Petitioning Activity (This Litigation)

*Noerr-Pennington* immunity applies to Kingston's antitrust counterclaims because petitioning activity (*i.e.*, enforcement of the '802 and '135 patents in the instant litigation) is the basis for Kingston's claims of purported antitrust harm. Kingston's own summary of its claims illustrates the critical nature of the petitioning activity central to its claims: "the IPR settlement agreement is an unreasonable restraint of trade *because it is designed to facilitate an anti-trust harm, namely SPEX's continued assertion of claims* SPEX knows are invalid and would have

1

1   been found invalid absent the settlement agreement." Opp. at 15 (emphasis added).

2   Kingston has repeatedly confirmed that its alleged harm stems from this litigation.

3   *E.g.*, Dkt. No. 178 at 29 ¶31 ("This settlement allows SPEX to ***continue asserting***

4   ***claims 55 and 57…against Kingston*** and others." (emphasis added)), 31 ¶36

5   (alleging SPEX entered into settlement agreements "so that it may ***continue to assert***

6   these known-invalid claims against Kingston and other companies in the industry"

7   (emphasis added)), 31-32 ¶37 ("SPEX entered into these agreements with the sole

8   purpose of ***freeing it to assert claims 55 and 57 of the '135 patent … against***

9   ***Kingston***"; "SPEX entered into an agreement to allow it to ***continue asserting***

10  known-invalid claims" (emphasis added)), 33 ¶41 (alleging harm to include

11  "attorneys' fees and costs" to defend the instant lawsuit), 33-34 ¶45 (alleging

12  "[t]hese agreements allow SPEX to ***continue to assert*** … known-invalid claims"

13  (emphasis added)), 34 ¶46 (alleging harm from fees and costs of defending the

14  instant litigation), 35 ¶52 ("settlement agreements designed to further an ***antitrust***

15  ***harm (i.e. assertion of known-invalid claims) and by bringing sham litigation***

16  asserting infringement of claims 55 and 57 of the '135 patent" (emphasis added)),

17  35-36 ¶53 (alleging harm from fees and costs of defending the instant litigation). In

18  other words, without SPEX's petitioning activity (this litigation), there is no alleged

19  antitrust harm.

20       Kingston contradicts its own pleading and admissions to argue that its "anti-

21  trust counterclaims do not allege liability for petitioning activity," pointing at partial

22  representations of its allegations regarding the settlement agreements. Opp. at 8-9.

23  But the very paragraphs cited by Kingston show that this litigation is the cause of

24  the purported antitrust harm, not the settlement agreements. *E.g.*, Dkt. No. 178 at 31

25  ¶36 (alleging that the settlement agreements are problematic because they allow

26  SPEX to "continue to assert these known-invalid claims" (*i.e.*, engage in petitioning

27  activity), 33-34 ¶45 ("These agreements allow SPEX to continue to assert … known-

28  invalid claims" (*i.e.*, engage in petitioning activity)), 35 ¶52 ("SPEX has engaged in

RUSS, AUGUST & KABAT

2

actions made unlawful … by entering into settlement agreements designed to further *an antitrust harm (i.e. assertion of known-invalid claims)* and by bringing sham litigation asserting infringement of claims 55 and 57 of the '135 patent" (emphasis added)). Kingston makes no allegations based on the agreements alone, without this litigation, that supposedly cause any antitrust harm. Indeed, the settlements are common patent settlement agreements. It is the enforcement of supposedly known invalid claims (in this litigation) that Kingston complains of. *E.g.*, Opp. at 15; Dkt. No. 178 at 35 ¶52.

Kingston's cited cases betray the weakness of its argument. In a situation analogous to the situation here, Judge Pfaelzer applied *Noerr-Pennington* immunity where a settlement agreement asked the PTO resolve a priority dispute in a certain manner, and the PTO went on to issue a patent consistent with the request of the settling parties: "the very anti-competitiveness of the agreement depended on the government exercising its independent power to decide priority and issue the ... patent." *MedImmune, Inc. v. Genentech, Inc.*, No. CV 03-2567MRP, 2003 WL 25550611, at *6 (C.D. Cal. Dec. 23, 2003). Judge Pfaelzer's logic applies equally here: it is the government activity (this litigation) that is purportedly causing antitrust harm, not any of the settlement agreements themselves. Even if the settlement agreements were the only purported cause of the antitrust harm (contrary to the specific allegations in the counterclaims), *Noerr-Pennington* still applies as it did in *MedImmune*. In such a case, the only potential antitrust harm is the dismissal of the PTAB proceedings. But just as the parties cannot agree to compel the PTO to make a priority determination or issue a patent, the parties cannot unilaterally agree to dismiss an IPR proceeding. The PTAB has discretion whether to dismiss an IPR proceeding, regardless of whether the parties request dismissal. 35 U.S.C. § 317(a); *see also, e.g.*, *Rubicon Comms., LP v. Lego A/S*, Case IPR2016-01187, Paper 100 at 2-3 (PTAB Dec. 14, 2017) (rejecting a joint motion to dismiss filed late in the proceeding because the Board had already "decided the merits of the proceeding"

3

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

and "the public's interest in the status of the challenged claims"). Just as in *MedImmune*, *Noerr-Pennington* immunity applies here because the agreements were related to protected petitioning activity.[1]

Some of Kingston's cited cases are readily distinguishable because they are traditional "reverse-payment" settlements (in Hatch-Waxman pharmaceutical cases) where the antitrust harm was the ***failure*** to pursue litigation, not the pursuit of litigation as Kingston alleges here. *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 380-85 (D. Mass. 2013) (describing the alleged agreements as preventing generic drug manufacturers from selling their generic drug); *In re Androgel Antitrust Litig. (No. II)*, No. 1:09-CV-955-TWT, 2014 WL 1600331, at *2 (N.D. Ga. Apr. 21, 2014) (same). As discussed below, the undisputed fact that the settlement agreements do ***not*** prevent litigation is one of the reasons Kingston's allegations about a "reverse-payment" settlement must be rejected.

The other cases cited by Kingston are also readily distinguishable. In *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999), the court addressed whether anti-competitive actions are immunized by the *Noerr-Pennington* doctrine when the actions took place before the government authorized the behavior. *Id.* at 789. In *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017), the court addressed whether provisions in a settlement agreement preventing the purchase and distribution of tires was sufficiently related to an ITC investigation even though the investigation was unrelated to the purchase and distribution of those tires. *Id.* at *5-6 ("It only makes sense that the metes and bounds of core petitioning activity in the context of litigation must be determined by reference to the parties and claims to the suit."). Kingston's final case is about the interplay between the *Noerr-Pennington* doctrine

[1] This is not like the *pro forma* petitioning activity, such as compulsory filings or consent decrees, identified by Kingston. An IPR is dismissed only after the PTAB affirmatively makes the decision that a dismissal is appropriate.

SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS
AND AMENDED AFFIRMATIVE DEFENSE

and a consent decree, an issue that bears no relevance here. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 266 (3d Cir. 2017).

Accordingly, *Noerr-Pennington* immunity applies here, and Kingston's claims must be dismissed unless Kingston can establish this litigation is a "sham." Kingston has not made, and cannot make, such a case.

## B. *Noerr-Pennington* Immunity Requires Dismissal Of Kingston's Antitrust Claims Because Kingston Has Not And Cannot Plead This Litigation Is Objectively Baseless

In order to prove that the sham lawsuit exception to *Noerr-Pennington* immunity applies, Kingston must show that ***this lawsuit*** is objectively baseless such that no "objective litigant could conclude that the suit is reasonably calculated to elicit a favor outcome." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)  (hereinafter "*PRE*"); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072 (Fed. Cir. 1998) (a sham suit "must be ... based on a theory of either infringement or invalidity that is objectively baseless"); *Duke Univ. v. Akorn, Inc*., Case No. 3:18-cv-14035-BRM-TJB, 2019 WL 4410284, at *8 (D.N.J. Sept. 16, 2019)[2] ("[t]he assertion of claims in a patent whose validity has not yet been litigated cannot be said to be 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"). A sham litigation allegation is defeated merely by overcoming the low bar of probable cause, which "requires no more than a reasonable belief that there is ***a chance*** that a claim may be held valid upon adjudication." *PRE*, 508 U.S. at 63 (emphasis added; quotation marks and alteration indicators removed). Objective baselessness is judged from the time the lawsuit was filed. *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 148 (3d Cir. 2017) (citing *PRE*, 508 U.S. at 60 n.5);

---

[2] The slip opinion from *Duke Univ.* was cited in the Motion prior to the Westlaw cite being available.

5

RUSS, AUGUST & KABAT

*Duke Univ.*, 2019 WL 4410284, at \*8. Kingston's arguments regarding objective baselessness fail for a number of reasons.[3]

First, Kingston's arguments are grounded entirely in post-filing allegations. Kingston has advanced no allegations in its antitrust claims or argument in the Opposition that this suit, or any claim in this suit, was objectively baseless at the time it was filed. *In re Wellbutrin*, 868 F.3d at 148. Nor could Kingston make any such allegations because SPEX's purported "knowledge" of invalidity did not arise until years after this litigation was filed and after the conclusion of several *inter partes* review proceedings.

Second, Kingston does not allege or argue that this suit in its entirety is objectively baseless. For example, Kingston has advanced no allegations or arguments that SPEX's allegations of infringement of the '802 patent are objectively baseless. As set forth in *PRE* and its progeny, the objective baselessness analysis evaluates the merits of the suit in its entirety, not individual claims. *E.g.*, *PRE*, 508 U.S. at 60 ("If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F.Supp.3d 691, 714-15 (D. Md. 2017) (finding that *Noerr-Pennington* immunity applied in part by analyzing all claims made in the litigation).

Third, Kingston is judicially estopped from making a showing of objective baselessness because Kingston represented that it would not argue that the '135 patent is objectively invalid, and the Court relied on Kingston's admissions. Mot. at 11-14 (admitting, for example, that "Kingston **will not** be seeking to prove that claims 55 and 57 are invalid based on the [sic] Harari and Anderson" (Dkt. No. 175, at 9) (emphasis added)); Dkt. No. 177 at 3-5. But, particularly given the low bar of

---

[3] The issue of objective baselessness may appropriately be decided at the 12(b)(6) stage. *Asahi Glass Co. v. Pentech Pharm, Inc.*, 289 F.Supp.2d 986, 993-995 (N.D. Ill. 2003).

SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS AND AMENDED AFFIRMATIVE DEFENSE

RUSS, AUGUST & KABAT

probable cause to show that this suit is not objectively baseless, there is no way to show that this litigation is objectively baseless without arguing that claims 55 and 57 of the '135 patent are invalid, and thus no objective litigant would believe there was even a reasonable chance of success. Indeed, Kingston tacitly agrees that it must make this showing of invalidity as the majority of this section is dedicated to Kingston's arguments justifying its ability to show that claims 55 and 57 of the '135 patent are invalid.

Kingston dismisses its previous admissions with two arguments. First, contrary to its previous admissions, Kingston now argues that it did in fact plead that SPEX's claim as to the '135 patent was objectively baseless by pointing at a single allegation: "***SPEX's belief*** that these claims are invalid is objectively reasonable." Opp. at 10 (citing Dkt. No. 178 at 28-29 ¶29) (emphasis added). Even if Kingston's characterization of its allegation is taken as true, Kingston's argument is irrelevant because this allegation is only as to the '135 patent, not the litigation itself. Further, Kingston mischaracterizes its allegation. Setting aside that Kingston does not expressly rely on this allegation in its antitrust claims, Kingston does not allege that an ***objective litigant*** would reasonably believe that this lawsuit had no chance of success, as is required by *PRE*. Instead, Kingston's allegation is about the purported reasonableness of ***SPEX's subjective belief***, an irrelevant allegation for this purpose.

Second, Kingston seeks to distance itself from its previous admissions and representations to this Court by arguing that its statements were made only to show that Kingston could make out a *prima facie* case of antitrust violations. Opp. at 11. Kingston's admissions were not, however, so limited. In fact, they were made to overcome SPEX's argument that the proposed amendment was futile because Section 315 estoppel (as a result of Kingston's unsuccessful IPR petition) estopped Kingston from proving its allegations. Kingston made its statements to support its argument that it could in fact prove its claims at trial (which require overcoming *Noerr-Pennington* immunity), not simply that it could make a *prima facie* case as

RUSS, AUGUST & KABAT

7

1   Kingston now argues. Dkt. No. 175 at 8-9 ("We next address SPEX's flawed
2   assertion that the IPR statute bars Kingston from bringing anti-trust and patent
3   misuse counterclaims."). Indeed, the Court relied on Kingston's unconditional
4   admissions to reject SPEX's argument that Section 315 estoppel rendered
5   Kingston's new claims futile. Dkt. No. 177 at 3-5.

6       Kingston next argues that Section 315 estoppel does not apply to any
7   arguments regarding its antitrust claims because its "anti-trust claims do not arise 'in
8   whole or in part' under 28 U.S.C. § 1338." Opp. at 11-12. Kingston is wrong. By the
9   very language relied on by Kingston, the application of 35 U.S.C. § 315(e) is judged
10  based on the entirety of the civil action, and not on the specific claims presented
11  therein as argued by Kingston; Section 315 estops certain invalidity arguments "***in
12  a civil action*** arising in whole or in part under section 1338 of title 28." 35 U.S.C. §
13  315(e) (emphasis added). As the Complaint shows, this is a civil action based on 28
14  U.S.C. § 1338. Dkt. No. 1 at ¶ 13 ("This Court has original jurisdiction over the
15  subject matter of this Complaint under 28 U.S.C. §§ 1331 and 1338(a)"); Dkt.
16  No.178 at ¶ 13 ("Kingston admits that this Court has subject matter jurisdiction for
17  a patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a)"). This
18  action is therefore brought at least in part under Section 1338. The fact that
19  Kingston's antitrust claims do not arise under Section 1338 is irrelevant to the text
20  of Section 315.[4] Section 315 estoppel therefore applies, and it prevents Kingston
21  from arguing that this litigation is objectively baseless.

22      Kingston also argues that Section 315 estoppel does not apply because
23  "rebutting a *Noerr-Pennington* defense is not the same as asserting 'that the claim is

24

25  [4] Section 315 estoppel would apply even if Kingston brought its counterclaims in a
26  separate action. As discussed above, Kingston's purported antitrust harm is
    grounded in SPEX's ability to bring patent infringement actions in which federal
27  courts have original jurisdiction under Section 1338. Kingston's claim would
28  therefore be based at least in part on Section 1338.

8

RUSS, AUGUST & KABAT

invalid,'" and that differences between proving invalidity and objective baselessness allow them to use prior art to which estoppel would otherwise apply. Opp. at 12-13. Again, Kingston ignores the actual language of Section 315, which estops the mere **assertion** of invalidity on certain prior art bases. 35 U.S.C. § 315(e)(2) ("the real party in interest or privy of the petitioner, may not **assert** … that the claim is invalid" (emphasis added)). In other words, Section 315 estops Kingston not only from proving that the claims of the '135 patent are invalid on certain bases in this litigation, but it estops Kingston from even asserting those arguments. In order to show that this litigation is objectively baseless, Kingston must assert that the '135 patent is invalid based on prior art estopped by Section 315, and that there is no chance that an objective litigant could reasonably believe otherwise.[5] Kingston's argument is an obvious end-run around Section 315 estoppel.

Finally, Kingston argues that showing "objective baselessness" under *PRE* means it only has to "prove that a reasonable person could expect that the claims would be found invalid **before the PTAB** with its lower burden of proof." Opp. at 12 (emphasis added). This is not true; the "objective baselessness" analysis refers to **this litigation** (the purported "sham" limitation), **requiring that Kingston show that no objective litigant could reasonably believe that the '135 patent was valid**. *See, e.g.*, *PRE*, 508 U.S. at 60 (1993) ("If an objective litigant could conclude that **the**

---

[5] Kingston analogizes to objectively reasonable beliefs in the context of willful infringement to argue that it need not prove claims 55 and 57 invalid. It is of course not relevant that an invalidity argument ultimately failed because that is always the case when willfulness is considered (after a finding of infringement and no invalidity). Kingston's cited case shows, however, that it is necessary to show that there was merit to the invalidity defense. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1301 (Fed. Cir. 2015) (rejecting willfulness because defendants' "position on invalidity was substantial enough that our enhancement standard is not met"). In any event, in light of the low bar for reasonableness set by *PRE*, Kingston effectively needs to prove that the claims are invalid to show objective unreasonableness here.

RUSS, AUGUST & KABAT

*suit* is reasonably calculated to elicit a favorable outcome, ***the suit is immunized*** under *Noerr*" (emphasis added)). Even if a ruling from the PTAB were relevant here, an objective litigant would know that Kingston is time-barred from bringing additional challenges at the PTAB (35 U.S.C. § 315(b)), and has already been estopped from bringing the arguments on which the antitrust claims are based (IPR2018-01002, Paper 12 at 9). The objective litigant would also be aware that the PTAB had not yet reached a decision regarding the invalidity of the '135 patent claims because it would not have dismissed the previous IPR proceeding if it had. 35 U.S.C. § 317(a); *Rubicon*, Case IPR2016-01187, Paper 100 at 2-3 (an IPR proceeding will not be dismissed if the Board has already "decided the merits of the proceeding"). Kingston cannot show that an objective litigant would believe that there was not even a chance that the PTAB would find the claims of the '135 patent not invalid.

Because of the presumption of validity and the clear and convincing standard, the Federal Circuit has made clear that the bar is very high in order for *Noerr-Pennington* immunity to be waived where the infringer is making arguments based on invalidity, like Kingston does here:

> it will be a ***rare case*** in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation. Only if the ***exacting standards*** of *PRE* are satisfied will the patentee lose its *Noerr-Pennington* immunity in that setting.

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345-46 (Fed. Cir. 2014) (emphasis added) (rejecting argument that claim was objectively baseless despite argument that prior art purportedly "clearly disclosed" the claimed limitations). The basic facts supporting Kingston's allegations here are a routine set of facts that: a patent holder obtains a dismissal prior to Final Written Decision of an instituted IPR brought by a first defendant, and a second defendant believes that PTAB would have invalidated the claims had the PTAB filed a Final Written

RUSS, AUGUST & KABAT

10

RUSS, AUGUST & KABAT

Decision. This is the not the "rare case" envisioned by the Federal Circuit where the invalidity allegations are so unreasonable that they support a "sham" litigation finding. This conclusion is made stronger by the facts applicable here that Kingston is estopped from making its invalidity arguments both at the PTAB (as the PTAB has already ruled) and in this litigation (pursuant to 35 U.S.C. § 315(e)(2)).

Further, an objective litigant could conclude that this suit is reasonably calculated to elicit a favorable outcome, particularly with respect to the grounds on which Kingston's antitrust claims are based (invalidity of claims 55 and 57 of the '135 patent in light of Harari and Anderson). The PTAB has already found that Kingston is estopped under Section 315(e)(1) from bringing invalidity arguments as to Harari and Anderson, partly based on Kingston's own admission that it knew of Harari and Anderson prior to bringing its third IPR petition. IPR2018-01002, Paper 12 at 9. Kingston's remaining invalidity arguments, to the extent not estopped by Section 315, are normal, contested positions that are not sufficient to form a finding of objective baselessness.[6]

---

[6] The PTAB's '802 ruling, which Kingston also emphasizes, does not provide any basis to conclude that no objective litigant could reasonably believe that the '135 patent was valid. As Kingston acknowledges in the Opposition, the PTAB uses the lower preponderance of the evidence standard. Even if Section 315 estoppel does not apply to Kingston, in order to show invalidity here, Kingston has to show invalidity under the stricter clear and convincing standard. The objective litigant would also be aware of the fact that the decision not to oppose the PTAB's preliminary finding as to claims 38 and 39 of the '802 patent was related to SPEX's litigation strategy, not SPEX admitting that any of the claims are in fact invalid, particularly under the clear and convincing evidence standard. *E.g.*, Case No. SACV-16-01799, May 14, 2018 hearing transcript at 30:9-10 ("We did inform the PTAB that we are withdrawing Claims 38 and 39."); IPR2018-00082, Ex. 2006 at 10:14-22 (SPEX proposed to drop infringement allegations against claims 38 and 39 of the '802 patent).

11

1  Accordingly, Kingston's antitrust allegations must be dismissed with

2  prejudice because Kingston has not, and cannot, plead allegations to overcome

3  *Noerr-Pennington* immunity.

4  **II.  KINGSTON HAS NOT PLED THAT SPEX ENTERED INTO AN AGREEMENT WITH ANTITRUST IMPLICATIONS**

5  

6  **A.  Kingston Has Failed To Plead That The Settlement Agreement Is A "Reverse-Payment" Settlement**

7  A "reverse-payment" settlement is an unusual type of settlement agreement

8  with specific requirements. "Payment in return for ***staying out of the market***" is one

9  of the required elements. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 154 (2013) (emphasis

10  added). Indeed, the agreement requiring a competitor to stay out of the market was

11  one of the key anti-competitive effects of "reverse-payment" settlements that the

12  Supreme Court emphasized. *Id.* ("[P]ayment in return for staying out of the market—

13  simply keeps prices at patentee-set levels .... The patentee and the challenger gain;

14  the consumer loses."). The factual situation here, as pled by Kingston, is directly

15  opposite to the situation addressed in *Actavis* and the litany of other "reverse-

16  payment" settlement cases cited by Kingston. The settlement agreements here allow

17  Western Digital, Toshiba and Apricorn to ***continue to sell*** their products, the

18  opposite of staying out of the market (Mot. at 19). *See Actavis, Inc.*, 570 U.S. at 154

19  (the Supreme Court explaining that, like here, a settlement permitting entry into a

20  market ***creates***, not harms, competition). Because Kingston has not and cannot plead

21  the essential "stay out of the market" requirement of a "reverse-payment" settlement,

22  its antitrust claims must be dismissed with prejudice.

23  Kingston does not dispute that it cannot plead that the settlement agreements

24  bar Western Digital, Toshiba and Apricorn from selling their products. Instead,

25  Kingston argues that "SPEX's argument … again confuses the factual contours of

26  the *Actavis* decision with its holding." Opp. at 18-19. But Kingston only discusses

27  the notion as to whether *Actavis* requires monetary payments or not, a notion that

28  

**SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS AND AMENDED AFFIRMATIVE DEFENSE**

RUSS, AUGUST & KABAT

Kingston's own cited cases (which are persuasive authority at best) admit is disputed among courts.[7] *E.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 391 (D. Mass. 2013) ("It is true that some courts have opted for a narrow construal of the term 'payment.'"); *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F.Supp.3d 1052, 1069 (N.D. Cal. 2014) (citing to two contrary cases but disagreeing with them). The closest Kingston comes to addressing SPEX's argument is dismissing *Asahi Glass Co. v. Pentech Pharm, Inc.*, 289 F.Supp.2d 986 (N.D. Ill. 2003) as no longer applying based on the conclusion of a single district court opinion. Opp. at 19. At least one other district court has come to a different conclusion. *In re Actos End Payor Antitrust Litig.*, No. 13-CV-9244 RA, 2015 WL 5610752, at *14 (S.D.N.Y. Sept. 22, 2015) (quoting same portion of *Asahi* as SPEX does in its motion). Furthermore, Kingston's *United Food* case does not hold that the portion of the case cited by SPEX is inaccurate under current law (it is not), and the *United Food* district court factually distinguished the case. 74 F. Supp. 3d at 1068.

Kingston also argues that a "reverse-payment" settlement need not be in the Hatch-Waxman context. Despite its argument, Kingston has failed to cite a single case that finds the existence of a "reverse-payment" settlement outside of the Hatch-Waxman context. Instead, Kingston argues based on general principles about the "rule of reason" and that patent settlement agreements are not *per se* immune from antitrust considerations. Opp. at 15-16. Kingston's argument is a red herring. Kingston's antitrust allegations are based on the settlement agreement being a specific type of settlement agreement: a "reverse-payment" settlement. *E.g.*, Dkt. No. 178 at 32 ¶38, 33-34 ¶45; Opp. at 8 ("Kingston alleges that SPEX violated

---

[7] For the reasons detailed in the Motion, and to the extent necessary, this Court should find that monetary payments are necessary to incur potential antitrust concerns of a "reverse-payment" settlement.

**SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS AND AMENDED AFFIRMATIVE DEFENSE**

RUSS, AUGUST & KABAT

section 1 of the Sherman Anti-Trust Act … by entered into an ***illegal reverse settlement***") (emphasis added)). Thus, the relevant question (and the question addressed in the Motion) is whether Kingston has adequately pled a "reverse-payment" settlement under *Actavis* even though this is not a Hatch-Waxman litigation. The Supreme Court itself acknowledged that it is unlikely that "reverse-payment" settlement agreements can exist outside of the pharmaceutical/Hatch-Waxman context: "Apparently ***most if not all*** reverse payment settlement agreements arise in the context of the pharmaceutical drug regulation, and specifically [in the Hatch-Waxman context]." *Actavis*, 570 U.S. at 141 (emphasis added). The Federal Circuit has affirmed that *Actavis* applies to a unique type of agreement that arises only in the Hatch-Waxman context. *Industrial Models, Inc. v. SNF, Inc.*, 716 Fed. Appx. 949, 957 (Fed. Cir. 2017) ("*Actavis* ... limited its holding to particular types of settlement agreements in the context of the Hatch-Waxman drug-regulatory framework.").[8] Indeed, the circumstances of a Hatch-Waxman litigation (as discussed in the Motion and in *Actavis*) are such that neither party has been able to locate a single case finding a "reverse-payment" settlement outside of the pharmaceutical context. Because Kingston has not and cannot plead that this is a pharmaceutical action, a Hatch-Waxman action, or that the unique incentives associated with a Hatch-Waxman action are present here, this is yet another basis to dismiss Kingston's antitrust claims with prejudice.[9]

[8] Kingston argues that reliance on *Industrial Models* is inappropriate by mischaracterizing SPEX's argument as saying that only settlement agreements in the Hatch-Waxman context can be anti-competitive. Opp. at 17-18. SPEX does not make such an argument. Instead, SPEX cites *Industrial Models* to support its argument that the Federal Circuit agrees that the "reverse-payment" settlements addressed in *Actavis* are limited to the pharmaceutical/Hatch-Waxman context.

[9] In Footnote 5 of the Opposition, Kingston argues that the settlement agreement "does not increase competition in the marketplace as SPEX continues to assert the '802 patent." Kingston's argument contradicts its antitrust claims as pled. Kingston pleads harm because license fees for the '135 patent SPEX will create "significant

14

RUSS, AUGUST & KABAT

1    Kingston's inability to successfully plead a "reverse-payment" settlement, a

2    key feature of its antitrust claims, is another reason to dismiss Kingston's antitrust

3    claims.

4    **B.    Kingston's *Handgards* Allegations Must Be Dismissed Because**
        **They Are Not Consistent With *Handgards***

6    Kingston argues the Motion should be denied because SPEX did not address

7    Kingston's allegations regarding *Handgards*. Opp. at 15. This is not true, as SPEX

8    discussed these allegations in Footnote 2 of the Motion. Kingston relies on

9    *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 (9th Cir. 1979) ("*Hangards I*")

10   for the allegation that the settlement agreements are purportedly improper solely

11   because of SPEX's purported improper subjective intent. Dkt. No. 178 at 31-32 ¶31

12   (pleading agreements "entered into … with the sole purpose of freeing it to assert

13   claims … constitute an illegal restraint on trade."). As addressed in the Motion,

14   Kingston's allegations regarding *Handgards* do not support a claim for relief

15   because a later appeal in the same case recognized that objective baselessness needed

16   to be determined *before* subjective intent became relevant. *Handgards Inc. v.*

17   *Ethicon, Inc.*, 743 F.2d 1282, 1298 (9th Cir. 1984) ("*Handgards II*") ("The district

18   court instructed the jury that *first* it had to determine the invalidity of the patent on

19   the basis of a particular defense and *only* then could it determine whether Ethicon

20   knew the patent was invalid on basis of that defense.") (emphasis added)).

21   Further, to the extent *Handgards I* could be interpreted as holding that only

23   price burden, causing price increases." Dkt. No. 178-79 ¶40. Indeed, Kingston

24   alleges the monetary component of a "reverse-payment" settlement by pointing out

     the fact that Western Digital, Apricorn and Toshiba were given free licenses to the

25   '135 patent purportedly equivalent to ten million dollars. *Id.* at 21 ¶3. By Kingston's

26   own logic, the settlement agreement must *increase competition* because Western

     Digital, Toshiba and Apricorn are not subject to the "significant price burden,

27   causing price increases." Regardless, it certainly does not prevent entry into a

     market, as required by *Actavis* to be a potentially illegal "reverse-payment"

28   settlement.

15

subjective intent is relevant in an antitrust analysis, *Handgards I* was decided years before *PRE* set out the objective and subjective prongs of the sham litigation exception inquiry. Any such holding was abrogated by the Supreme Court's *PRE* holding.

## III. KINGSTON HAS NOT ADEQUATELY PLED PATENT MISUSE

Kingston's patent misuse affirmative defense and counterclaim should be dismissed because it has not pled a cognizable claim for patent misuse under *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998). Kingston's actual allegation of patent misuse is a single paragraph alleging patent misuse because SPEX has "maintain[ed] its allegations of infringement of claims 55 and 57 of the '135 patent, knowing these claims to be invalid." Dkt. No. 178 at 34-35 ¶49; 17; *see also* Dkt No. 172-1 at 15 ("Kingston properly states a claim for patent misuse by pleading that SPEX has engaged in bad faith litigation … by attempting to enforce and seek licensing fees of claims it knows to be invalid."). This is precisely the type of patent misuse claim rejected by the Federal Circuit in *C.R. Bard*.

Kingston offers two responses, neither of which is persuasive. First, Kingston argues that *C.R. Bard* and its progeny are not applicable here because the allegation that "SPEX's belief in invalidity was objectively reasonable" is enough to overcome *Noerr-Pennington* immunity. Opp. at 21. As shown above, Kingston's allegation is not consistent with the analysis set forth by *PRE*, and further Kingston cannot plead facts sufficient to overcome *Noerr-Pennington* immunity.

Second, Kingston argues that it has pled a "laundry-list of bad acts," and "extensive gamesmanship," "including entering into a settlement agreement." Opp. at 21-22. Kingston notably fails to cite to its patent misuse claims, or any portion of its Answer and Counterclaims, to identify this "laundry-list of bad acts" supposedly supporting its patent misuse claim. The only purported "bad act" expressly mentioned in its counterclaim and affirmative defense is the bare allegation of

16

RUSS, AUGUST & KABAT

1   purportedly improperly maintaining SPEX's claims as to the '135 patent (Dkt. No.

2   178 at 34-35 ¶49, 17), an allegation that not even Kingston disputes has been found

3   by the Federal Circuit to be insufficient. Kingston also fails to explain how these

4   unidentified purported "bad acts" were not reasonably within the patent grant.

5   Indeed, the only additional purported "bad act" identified by Kingston in its

6   Opposition is "entering into a settlement agreement," which is a common occurrence

7   that is without a doubt reasonably within the patent grant.

8        Indeed, Kingston cannot even prove its claim that maintaining this action is

9   improper because of SPEX's purported "knowledge" that claims 55 and 57 of the

10  '135 patent are invalid in light of Harari and Anderson. Kingston's claim is based

11  on the purported fact that the '135 patent is, in fact, invalid. Dkt. No. 178 at 34-35

12  ¶49 (pleading that "[o]nly valid patents confer a right to exclusivity" (quotation

13  marks and alternation markings removed)). In order to prove this pre-requisite fact

14  at trial, Kingston must show that the '135 patent is invalid pursuant to Harari and

15  Anderson. But ***Kingston is estopped from making this argument pursuant to***

16  ***Section 315*** because Kingston has already admitted it was aware of both Harari and

17  Anderson prior to its unsuccessful IPR petition. IPR2018-00084, Paper 40 at 8-9

18  ("we determine Petitioner is estopped from requesting or maintaining this Petition

19  based on Harari, Anderson, and Dumas—references that reasonably could have been

20  raised in its earlier petition in Case IPR2017-01021 or contemporaneously in a

21  sibling petition").

22       Kingston has also failed to show how it properly pled the "improper purpose"

23  requirement for patent misuse. Indeed, Kingston's cited cases highlight Kingston's

24  deficient pleading. Kingston must plead more than a "laundry-list" of purported "bad

25  acts." "Improper purpose" requires a showing that the "goal [of SPEX's purportedly

26  improper action] is not to win a favorable judgment, but to harass a competitor and

27  deter others from competition, by engaging the litigation process itself, regardless of

28  the outcome." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45

RUSS, AUGUST & KABAT

17

F.3d 1550, 1558 (Fed. Cir. 1995). An example of such an improper purpose is where a patentee with a ninety percent market share engages in litigation and threatening customer letters to harass a competitor and its customers. *Nalco Co. v. Turner Designs, Inc.*, No. 13-CV-02727 NC, 2014 WL 645365, at *12 (N.D. Cal. Feb. 19, 2014). There are no such facts here, and Kingston makes no such allegations in its claim or affirmative defense. Even considering Kingston's Answer and Counterclaims in their entirety, SPEX's purported improper action (seeking judgment in this action despite purportedly "knowing" the '135 patent is invalid) is dependent on winning a favorable judgment (Kingston being "forced to pay a royalty to SPEX"), not the litigation process itself as required by *Glaverbel*. *E.g.*, Dkt. No. 178 at 24 ¶18. Kingston has no allegations as to show the continuation of the litigation itself, regardless of outcome, is beneficial to SPEX.

Kingston's patent misuse counterclaim and affirmative defense should therefore be denied.

## IV.   CONCLUSION

The Court should dismiss all of Kingston's Counterclaims, as well as its Eleventh Affirmative Defense, with prejudice because Kingston has not and cannot plead sufficient facts to maintain its claims. Kingston's antitrust claims (Sherman Act, Cartwright Act, and California Business & Professions Code claims) are grounded in petitioning activity (the maintenance of this lawsuit), and are therefore immunized from liability pursuant to the *Noerr-Pennington* doctrine. Federal Circuit precedent shows that Kingston's patent misuse counterclaim and affirmative defense are similarly immunized from liability pursuant to the *Noerr-Pennington* doctrine, and that the patent misuse defense must also be dismissed because Kingston has failed to plead the second, "improper purpose" prong of the claim.

RUSS, AUGUST & KABAT

18

1

2      Dated:   November 11, 2019            Respectfully submitted,

3                                            **RUSS AUGUST & KABAT**

4                                            By:    /s/ Paul A. Kroeger
                                                    Paul A. Kroeger
5

6                                            Marc A. Fenster, SBN 181067
                                             Benjamin T. Wang, SBN 228712
7                                            Andrew D. Weiss, SBN 232974
                                             Paul A. Kroeger, SBN 229074
8                                            12424 Wilshire Boulevard, 12th Floor
                                             Los Angeles, California  90025
9                                            Tel:   (310) 826-7474
                                             Fax:  (310) 826-6991
10                                           Email:  mfenster@raklaw.com
                                             Email:  bwang@raklaw.com
11                                           Email:  aweiss@raklaw.com
                                             Email:  pkroeger@raklaw.com
12
                                             *Attorneys for Plaintiff*
13                                           SPEX Technologies, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

**SPEX'S REPLY IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS COUNTERCLAIMS AND AMENDED AFFIRMATIVE DEFENSE**

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify pursuant to the Federal Rules of Civil Procedure and LR 5-3

3

and 5-4 that **PLAINTIFF SPEX TECHNOLOGIES, INC.'S REPLY IN**

4

**SUPPORT OF ITS MOTION TO DISMISS COUNTERCLAIMS AND**

5

**AFFIRMATIVE DEFENSE OF PATENT MISUSE PURSUANT TO RULE**

6

**12(B)(6)** was served upon the attorney(s) of record for each party through the ECF

7

system as identified on the Notice of Electronic Filing on November 11, 2019.

8

9

DATED: November 11, 2019

10

_____/s/ *Paul A. Kroeger*_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

20