# EXHIBIT 1

RESTRICTED – ATTORNEY'S EYES ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., | Case No. 8:16-cv-01790-JVS-AGR |
| Plaintiff, | |
| v. | |
| KINGSTON TECHNOLOGY COMPANY, INC., ET AL. | |
| Defendants. | |

## EXPERT REPORT OF JOHN VILLASENOR

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

Executed on March 23, 2018 at San Francisco, CA by:

_____

John Villasenor, Ph.D.

**RESTRICTED – ATTORNEY'S EYES ONLY**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     QUALIFICATIONS ...........................................................................................2

III.    SCOPE AND TERMS OF ENGAGEMENT FOR THIS REPORT .......................5

IV.     MATERIALS AND OTHER INFOMRATION RELIED UPON ............................5

V.      OVERVIEW OF OPINIONS FORMED .............................................................6

VI.     LEGAL BASIS FOR OPINIONS .......................................................................8

    A.      Claim Construction ...............................................................................8

    B.      Means-plus-function ..............................................................................9

    C.      Validity .................................................................................................9

        1.      Prior Art ....................................................................................10

        2.      Anticipation ...............................................................................12

        3.      Obviousness ................................................................................12

        4.      Prior Invention by Another .........................................................15

    D.      Person of Ordinary Skill in the Art ........................................................16

VII.    BACKGROUND OF THE TECHNOLOGY .......................................................16

VIII.   SUMMARY OF THE ASSERTED PATENTS AND PROSECUTION HISTORY
    ...............................................................................................................25

    A.      Overview of the '802 Patent .................................................................25

        1.      Summary of the Prosecution History of the '802 Patent ..................28

        2.      Inter Partes Review (IPR2018-00082; Western Digital) ..................34

        3.      Inter Partes Review (IPR2017-00824; Kingston) ...........................35

        4.      Inter Partes Review (IPR2017-00430; Unified Patents) ..................37

    B.      Overview of the '135 Patent .................................................................38

        1.      Summary of the Prosecution History of the '135 Patent ..................41

        2.      Inter Partes Review (IPR2017-01021; Kingston) ...........................43

        3.      Inter Partes Review (IPR2017-00825; Kingston) ...........................46

IX.     CLAIM CONSTRUCTION ...............................................................................48

    A.      Court Construed Terms .........................................................................48

    B.      Agreed Constructions ...........................................................................52

    C.      Implicit Constructions from Infringement Contentions ...........................53

X.      OVERVIEW OF PRIOR ART............................................................................54

II.     i

A.    U.S. Patent No. 5,623,637 ("Jones") ............................................... 54
B.    Fortezza Crypto Card ............................................................................ 60
        1.    My Investigation of the Fortezza Crypto Card ....................... 60
        2.    Development of Fortezza ............................................................ 64
        3.    Technical Overview of Fortezza ............................................... 76
C.    Lynks System .......................................................................................... 83

XI.   AS SPEX HAS APPLIED THE CLAIMS IN ITS INFRINGEMENT
        CONTENTIONS, THE ASSERTED CLAIMS ARE ANTICIPATED BY THE
        PRIOR ART .............................................................................................. 85
A.    Jones .......................................................................................................... 85
        1.    '802 Claim 1 ................................................................................ 85
                a)    [1pre] A peripheral device, comprising.............................. 85
                b)    [1a] security means for enabling one or more security operations
                        to be performed on data; .............................................. 87
                c)    [1b] target means for enabling a defined interaction with a host
                        computing device; ......................................................... 90
                d)    [1c] means for enabling communication between the security
                        means and the target means; ........................................ 92
                e)    [1d] means for enabling communication with a host computing
                        device; ........................................................................... 95
                f)    [1e] means for operably connecting the security means and/or
                        the target means to the host computing device in response to an
                        instruction from the host computing device; and ............ 97
                g)    [1f] means for mediating communication of data between the
                        host computing device and the target means so that the
                        communicated data must first pass through the security means.
                        ...................................................................................... 109
        2.    '802 Claim 2 .............................................................................. 116
                a)    A peripheral device as in claim 1, wherein the target means
                        comprises means for non-volatilely storing data. ........... 116
        3.    '802 Claim 11 ............................................................................ 117
                a)    [11pre] A peripheral device, comprising ...................... 117
                b)    [11a] security means for enabling one or more security
                        operations to be performed on data; ............................ 117
                c)    [11b] target means for enabling a defined interaction with a host
                        computing device; ....................................................... 118
                d)    [11c] means for enabling communication between the security
                        means and the target means; ...................................... 118
                e)    [11d] means for enabling communication with a host computing
                        device; and .................................................................. 118
                f)    [11e] means for mediating communication of data between the
                        host computing device and the target means so that the

communicated data must first pass through the security means. ................................................................................ 118

4. '802 Claim 12 ............................................................... 119

    a)   A peripheral device as in claim 11, wherein the target means comprises means for non-volatilely storing data. ..................... 119

5. '802 Claim 38 ............................................................... 119

    a)   [38pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: ..................................................................... 119

    b)   [38a] receiving a request from a host computing device for information regarding the type of the peripheral device; and 120

    c)   [38b] providing to the host computing device, in response to the request, information regarding the type of the defined interaction. .................................................................... 121

6. '802 Claim 39 ............................................................... 122

    a)   [39pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: ..................................................................... 122

    b)   [39a] communicating with the host computing device to exchange data between the host computing device and the peripheral device; .................................................................. 122

    c)   [39b] performing one or more security operations and the defined interaction on the exchanged data; and ...................... 123

    d)   [39c] mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations. ........................................... 123

7. '135 Claim 55 ............................................................... 123

    a)   [55pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: ................................. 123

    b)   [55a] receiving a request from the host computing device for information regarding the type of the modular device; .......... 125

    c)   [55b] providing the type of the target module to the host computing device in response to the request; and ................. 125

    d)   [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. ............................ 126

8. '135 Claim 56 ............................................................... 126

a)     A method as in claim 55, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module. ....................................................... 126

9.     '135 Claim 57 ............................................................. 130

a)     [57pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: ................................ 130

b)     [57a] communicating with the host computing device to exchange data between the host computing device and the modular device; ........................................................................ 130

c)     [57b] performing one or more security operations and the defined interaction on the exchanged data; ............................... 131

d)     [57c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and ...................................................................................................... 131

e)     [57d] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. ............................ 132

10.     '135 Claim 58 ............................................................. 132

a)     [58pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: ................................. 132

b)     [58a] receiving an instruction from a host computing device regarding operation of the modular device; and ...................... 132

c)     [58b] operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device. ............................ 134

B.     Fortezza Crypto Card ................................................................. 134

1.     '802 Claim 1 .............................................................. 134

a)     [1pre] A peripheral device, comprising ....................................... 134

b)     [1a] security means for enabling one or more security operations to be performed on data; ............................................. 138

c)     [1b] target means for enabling a defined interaction with a host computing device; ........................................................................ 149

iv

d) [1c] means for enabling communication between the security means and the target means; ....................................................... 161

e) [1d] means for enabling communication with a host computing device; ............................................................................. 163

f) [1e] means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and ................... 167

g) [1f] means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means. .................................................................................... 174

2. '802 Claim 2 ............................................................................. 181

3. '802 Claim 11 ........................................................................... 181

4. '802 Claim 12 ........................................................................... 182

5. '802 Claim 38 ........................................................................... 182

a) [38pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: ................................................................... 182

b) [38a] receiving a request from a host computing device for information regarding the type of the peripheral device; and 183

c) [38b] providing to the host computing device, in response to the request, information regarding the type of the defined interaction. ...................................................................... 186

6. '802 Claim 39 ........................................................................... 188

a) [39 pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: ................................................................... 188

b) [39a] communicating with the host computing device to exchange data between the host computing device and the peripheral device; ................................................................. 188

c) [39b] performing one or more security operations and the defined interaction on the exchanged data; and ...................... 190

d) [39c] mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations. ......................................... 192

7. '135 Claim 55 ........................................................................... 192

a) [55pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is

adapted to enable a defined interaction with the host computing device, a method comprising the steps of:................................ 192

b)   [55b] providing the type of the target module to the host computing device in response to the request; and ................... 194

c)   [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. ............................ 194

8.   '135 Claim 56 ............................................................................ 195

a)   A method as in claim 55, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module. ..................................... 195

9.   '135 Claim 57 ............................................................................ 196

a)   [57pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:................................ 196

b)   [57a] communicating with the host computing device to exchange data between the host computing device and the modular device;.............................................................................. 196

c)   [57b] performing one or more security operations and the defined interaction on the exchanged data; ............................. 196

d)   [57c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and ..................................................................................... 196

e)   [57d] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. ........................... 196

10.   '135 Claim 58 ......................................................................... 197

a)   [58pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:................................ 197

b)   [58a] receiving an instruction from a host computing device regarding operation of the modular device; and ...................... 197

c)   [58b] operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device. ............................ 198

C.    Fortezza "Interface Control" Document ............................................ 198
D.    Fortezza Multi-Function Card ............................................................. 198
E.    Lynks System ...................................................................................... 201

XII.    EVEN IF NOT ANTICIPATED, THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS TO A SKILLED ARTISAN .................................................... 204

A.    Jones In View of the Knowledge of a Skilled Artisan and the PCMCIA Standards ....................................................................................... 204

B.    Fortezza Crypto Card and/or Lynks Card In View of the Knowledge of a Skilled Artisan ............................................................................ 209

C.    Modification of the Jones, Fortezza, or Lynks to Accommodate CF Cards. 212

D.    There Are No Substantive Secondary Indicia of Non-Obviousness Attributable to the Alleged Invention of the '802 and '135 Patents ............. 214

    1.    Commercial Success ................................................................ 214
    2.    Copying ...................................................................................... 216
    3.    Praise by Others ...................................................................... 217
    4.    Patent Citations ...................................................................... 218

XIII.    THE ASSERTED CLAIMS ARE DERIVED FROM THE GOVERNMENT ... 219

RESTRICTED – ATTORNEY'S EYES ONLY

# I.  <u>INTRODUCTION</u>

I, John Villasenor, declare as follows:

1.  I am over the age of 21 and fully competent to make this declaration.  I have personal knowledge of the facts stated herein and they are all true and correct.

2.  I have been retained on behalf of Defendants Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc. (collectively "Kingston") to investigate and opine on certain issues related to infringement, invalidity, and certain damages issues of certain claims of U.S. Patent Nos. 6,088,802 ("the '802 patent") and 6,003,135 ("the '135 patent") (collectively, the "Asserted Patents") asserted by Plaintiff SPEX Technologies, Inc. ("SPEX") against Kingston.  I also understand that SPEX has asserted these same patents against a number of other defendants.

3.  I expect to be available for deposition and to testify at trial in this matter. This report is based on information currently available to me.  I reserve the right to continue my investigation and study, which may include a review of documents and information that may be produced, as well as a review of deposition testimony from depositions for which transcripts are not yet available or that may yet be taken in this case.  Therefore, I expressly reserve the right to expand or modify my opinions as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, any matters raised by SPEX and/or other opinions provided by SPEX's experts, or in light of any relevant orders from the Court or other authoritative body.

RESTRICTED – ATTORNEY'S EYES ONLY

## II.   <u>QUALIFICATIONS</u>

4.   A summary of my educational background, career history, areas of research focus, and other relevant qualifications is provided herein.  My curriculum vitae is attached as Exhibit A to this report.  A list of cases in which I have given testimony at trial or in deposition within the last 5 years is attached as Exhibit C to this report.

5.   I have worked in the area of systems for information security and computing technologies for over a quarter of a century.  I have addressed these technologies both in specific technical contexts, such as the design and implementation of specific algorithms to improve information security, as well as more broadly.

6.   I earned a B.S. in Electrical Engineering from the University of Virginia in 1985, an M.S. in Electrical Engineering from Stanford University in 1986, and a Ph.D. in Electrical Engineering from Stanford University in 1989.

7.   Between 1990 and 1992, I worked for the Jet Propulsion Laboratory in Pasadena, CA, where I helped develop techniques for imaging and mapping the earth from space. Since 1992, I have been on the faculty of the Electrical Engineering Department of the University of California, Los Angeles (UCLA).  Between 1992 and 1996, I was an Assistant Professor; between 1996 and 1998, an Associate Professor; and since 1998, I have been a full Professor.  For several years starting in the late 1990s, I served as the Vice Chair of the Electrical Engineering Department at UCLA.  I also hold faculty appointments in the UCLA Anderson School of Management and in the Department of Public Policy within the UCLA Luskin School of Public Affairs.  I am also a visiting professor at the UCLA School of Law.

**RESTRICTED – ATTORNEY'S EYES ONLY**

8.   In the Engineering School at UCLA, I teach courses on topics such as signal processing and communications, including relevant security considerations.  At the Anderson School of Management, I created and teach a course on Intellectual Property for technology entrepreneurs.  Originally, this course was taught in the Anderson School; more recently it has become a jointly listed course in both the Anderson and Engineering schools.  At the Anderson School, I also advise second-year MBA students on technology-related team projects.  At the Luskin School of Public Affairs, I teach science and technology policy and also advise graduate student project teams.  At the UCLA School of Law, I created and currently teach a course on "Digital Technologies and the Constitution."

9.   Since joining the UCLA faculty in 1992, I have performed extensive research on algorithms and systems for information processing, including the associated devices, systems, architectures, and networks.  My research has addressed software, algorithms, hardware, networking, protocols and other aspects of these devices, systems, architectures, and networks.  My research has also considered areas including signal processing and communications, hardware design methodologies, and security.  For example, in the 1990's, I was working on technologies for what today is often referred to as the Internet of Things.  In that work, among other things, I was developing methods to perform processing tasks as efficiently as possible given the constraints of portable wireless devices and methods to ensure protection of the data communicated to/from and stored on those devices.

10. I am an inventor on approximately 20 issued U.S. patents in areas including cybersecurity, signal processing, data compression, and communications.  I have published almost 200 articles in peer-reviewed journals and academic conference proceedings.  I have

also been asked on multiple occasions to provide congressional testimony on technology topics.

11. In addition to my work at UCLA, I am a nonresident senior fellow at the Brookings Institution in Washington, D.C.  Through Brookings, I have examined policy issues associated with a wide range of topics at the technology/policy intersection, including cybersecurity, wireless mobile devices and systems, intellectual property, driverless cars, and digital currencies.  In addition to publishing in traditional academic venues, such as engineering journals, engineering conference proceedings, and law reviews, I have published papers through the Brookings Institution and articles and commentary in broader-interest venues including Billboard, the Chronicle of Higher Education, Fast Company, Forbes, the Huffington Post, the Los Angeles Times, the New York Times, Scientific American, Slate, and the Washington Post.

12. I am also a Visiting Fellow at the Hoover Institution at Stanford and an affiliate of the Center for International Security and Cooperation (CISAC) at Stanford.  In relation to those affiliations, I have led a research project funded by the U.S. Department of Homeland Security aimed at improving cybersecurity in U.S. critical infrastructure.

13. I am also a member of the Council on Foreign Relations and have also been a member of the World Economic Forum's Global Agenda Council on Cybersecurity.  Previously, I was a member and then vice chair of the World Economic Forum's Global Agenda Council on the Intellectual Property System.

14. I have over 15 years of experience in early stage technology venture capital in the San Francisco Bay Area.  In that capacity, I have met with a large number of startup companies

RESTRICTED – ATTORNEY'S EYES ONLY

seeking venture financing spanning a wide range of technology areas, including those listed above.  Among other things, I have helped to evaluate the proposed technology, the competitive landscape, the market opportunities and risk, the strength of the team, and the company's IP strategy and position.

## III.  SCOPE AND TERMS OF ENGAGEMENT FOR THIS REPORT

15. I have been asked by counsel for Kingston to consider issues regarding validity of the claims 1, 2, 11, 12, 38, and 39 of the '802 patent and claims 55-58 of the '135 patent (the "Asserted Claims") of the Asserted Patents.

16. I am being compensated at my standard rate of $800 per hour for my work on this case.  My compensation does not depend in any way on the content of my testimony and it is not affected by the outcome of the case.  To the best of my knowledge, I own no shares nor do I have any other ownership interest in Kingston.  Furthermore, to the best of my knowledge, I have no financial ties to Kingston and I will not financially benefit from any outcome in this case beyond my hourly consulting fee.

## IV.  MATERIALS AND OTHER INFOMRATION RELIED UPON

17. In preparing this report, I have considered a variety of sources and documents in forming my opinions, including those expressly cited in the body of this report and the exhibits attached to my report.  By way of example, I reviewed the Asserted Patents, the prosecution history of those patents, the Court's *Markman* order, and all other materials cited herein, including patents, publications, contentions, transcripts of depositions taken in this case, discovery responses, and various documents produced by the parties.

**RESTRICTED – ATTORNEY'S EYES ONLY**

18. A listing of the materials that I have considered in producing this report is attached as Exhibit B.  For avoidance of doubt, I have considered all materials cited in this report and all Exhibits even if not listed in Exhibit B.

19. I understand that the parties may not have completed all fact discovery.  I reserve the right to file a supplemental expert report based on, for example, additional deposition testimony and/or additional information that becomes available.  In addition, I reserve the right to provide rebuttal opinions and testimony in response to SPEX's experts, and rebuttal testimony to any of SPEX's fact witnesses.

20. I further reserve the right to use animations, demonstratives, enlargements of real exhibits, and other devices to illustrate my opinions.

## V.      OVERVIEW OF OPINIONS FORMED

21. It is my opinion that the Asserted Claims are invalid as anticipated under 35 U.S.C. § 102 (in the form of that statute as relevant to the Asserted Patents; i.e., prior to the enactment of the America Invents Act) by the Fortezza Crypto Card, as SPEX has applied the claims in its infringement contentions, as discussed below.

22. It is my opinion that the Asserted Claims are invalid as anticipated under 35 U.S.C. § 102 (in the form of that statute as relevant to the Asserted Patents; i.e. prior to the enactment of the America Invents Act) by the EES Lynks Privacy Card ("Lynks System"), as SPEX has applied the claims in its infringement contentions, as discussed below.

23. It is my opinion that, even if not anticipated, the Asserted Claims are invalid under 35 U.S.C. § 103 (in the form of that statute as relevant to the Asserted Patents; i.e. prior to the enactment of the America Invents Act) as obvious over the Fortezza and Lynks Systems in

RESTRICTED – ATTORNEY'S EYES ONLY

light of the knowledge of a skilled artisan at the time of the filing of the Asserted Patents, including knowledge of PCMCIA standards[1] which specify using PC-Cards as memory devices, as discussed below.

24. It is my opinion, in the alternative, that the Asserted Claims are invalid under 35 U.S.C. § 102(a) over the SPEX00009841, an "Interface Control Document" describing the functions and design of the Fortezza Crypto Card.

25. It is my further opinion that the Asserted Claims are invalid under 35 U.S.C. § 102(f) (in the form of that statute as relevant to the Asserted Patents; i.e., prior to the enactment of the America Invents Act) because the claimed inventors of the subject matter of the Asserted Claims derived the invention from the United States government, which developed the Fortezza System and who communicated the subject matter thereof to the purported inventors of the Asserted Patents, as discussed below.

26. It is my opinion that the Asserted Claims are additionally invalid as anticipated under 35 U.S.C. § 102 (in the form of that statute as relevant to the Asserted Patent; i.e. prior to the enactment of the America Invents Act) by U.S. Patent No. 5,623,637 ("Jones"), as SPEX has applied the claims in its infringement contentions, as discussed below.

27. It is my opinion that, even if not anticipated, the Asserted Claims are invalid under 35 U.S.C. § 103 (in the form of that statute as relevant to the Asserted Patents; i.e. prior to the enactment of the America Invents Act) as obvious over Jones in view of the PCMCIA

---

[1] The Personal Computer Memory Card International Association (PCMCIA) is an international organization that set out standards for PC Cards. *See, e.g.,* DEF_INV 0001770-1966; DEF_INV 0001967-2155; DEF_INV 0002156-2276.

standards and the knowledge of a skilled artisan at the time of the filing of the Asserted Patents, as discussed below.

## VI.   **LEGAL BASIS FOR OPINIONS**

28. I am not a legal expert and offer no opinions on the law.  However, I have been informed by counsel of the legal standards that apply with respect to claim construction, means-plus-function claims, and validity, which I have used in arriving at my conclusions.

### A.   **Claim Construction**

29. I have been informed that claim construction is a matter of law.  I am informed that terms in patent claims must be construed as a first step in analyzing whether a claim is infringed.

30. I have also been informed that claims of a patent are construed consistent with the "intrinsic evidence" as it would be understood by a person of ordinary skill in the art at the time of the invention.  "Intrinsic evidence" includes the language of the claim itself, the specification of the patent, and other claims of the patent, all in view of representations made by the applicant to the Patent Office during prosecution of the patent application, as well as prosecution of other patent applications "related" to the patent, such as parent or children patent applications.  I am also informed that other evidence (such as dictionaries, technical references, and articles) not in the intrinsic written record, and referred to as "extrinsic evidence," may also be considered if it is consistent with (not contradictory to) the intrinsic evidence.  I understand that a claim in "dependent form" contains a reference to a claim previously set forth and must specify a further limitation of the subject matter claimed.

RESTRICTED – ATTORNEY'S EYES ONLY

I am informed that a claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

31. I understand that certain of the claim terms in the Asserted Patents have been construed by the Court.  I have applied these definitions to my analysis.  For terms that have not been construed by the Court [or agreed by the parties], I have interpreted claim terms as they would have been understood by a person of ordinary skill in the art at the time of the invention.

### B.   Means-plus-function

32. I have been informed that under 35 U.S.C. §112(6), "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  I have been informed that "means-plus-function" terms must be interpreted according to the specification.  When applying a "means-plus-function" limitation, I understand that the limitation will be held to cover those structures in the patent's description that perform the function stated in the claim, as well as structural equivalents thereto.

### C.   Validity

33. I understand that an issued United States patent is presumed valid.  I have written my report with the understanding that a party challenging the validity of an issued United States patent bears the burden of proving invalidity by clear and convincing evidence.  I understand

RESTRICTED – ATTORNEY'S EYES ONLY

that clear and convincing evidence is more than a preponderance of the evidence but less than beyond a reasonable doubt.

34. I understand that the Asserted Patents are subject to 35 U.S.C. §§ 102, 103, and 112 as they existed prior to the America Invents Act (AIA). The citations herein refer to the pre-AIA versions of those statutes.

### 1. Prior Art

35. Prior art includes any of the following items received into evidence during trial:

- any product or method that was publicly known or used by others in the United States, or patented or described in a printed publication in the United States or another country before the date of invention (35 U.S.C. § 102(a));

- patents that issued more than one year before the effective filing date of the patent (35 U.S.C. § 102(b));

- printed publications in the United States or another country having a date more than one year before the effective filing date of the patent (35 U.S.C. § 102(b));

- any product or method that was in public use or on sale in the United States more than one year before the effective filing date of the patent (35 U.S.C. § 102(b)); and

- communications to the purported inventors of the patents-in-suit that would enable one of ordinary skill to make the patented invention (35 U.S.C. § 102(f)); and

- any product or method that was made by anyone before the named inventors created the patented product or method where the product or method was not abandoned, suppressed, or concealed (35 U.S.C. § 102(g)).

36. It is my understanding that in order to qualify as a printed publication within the meaning of 35 U.S.C. § 102(a), a reference must have been sufficiently accessible to the public interested in the art. Whether a reference is publicly accessible is determined on a case-by-case basis based on the facts and circumstances surrounding the reference's disclosure to members of the public. A reference is considered publicly accessible if it was

10

RESTRICTED – ATTORNEY'S EYES ONLY

disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.

37. It is my understanding that in order to invalidate a patent based on prior knowledge or use "by others" under pre-AIA 35 U.S.C. § 102(a), that knowledge or use must have been available to the public in the United States.  Similarly, to invalidate a patent based on "public use" under pre-AIA 35 U.S.C. § 102(b), the use must have been accessible to the public. Whether prior knowledge or use is sufficiently accessible to the public is determined on a case-by-case basis by considering the totality of the circumstances surrounding the prior use or knowledge, such as: the nature of the activity that occurred in public; the public access to and knowledge of the public use; and whether there was any confidentiality obligation imposed on persons who observed the use.  I also understand that public use or knowledge by others is invalidating if such use or knowledge was before the date of invention; but that public use by the inventor is invalidating if such use was on a date more than one year prior to the filing of the Asserted Patents, regardless of the date of invention.

38. It is my further understanding that a sale or offer for sale of a patented invention, however, need not be "public" in order for the sale to be disqualifying under 35 U.S.C. § 102(b).  I also understand for such a sale to be disqualifying, the invention must have been ready for patenting at the time of the sale, although the commercial benefit triggering the bar may flow from any commercialization of the invention, regardless of whether an embodiment of the invention is itself sold.  Whether a particular transaction counts as a "sale" or offer for sale under 35 U.S.C. § 102(b) is again a case-specific determination based

11

on the facts and circumstances. The touchstone of whether an invention was "on sale" is commercial exploitation of the invention.

## 2. Anticipation

39. It is my understanding that claims of a patent are anticipated (and therefore invalid) by a prior art reference if each and every element of the claim, as properly construed, is found either explicitly or inherently in a single prior art reference.

40. I understand that, although anticipation cannot be established through a combination of references, additional references may be used to interpret the allegedly anticipating reference by, for example, indicating what the allegedly anticipating reference would have meant to one of ordinary skill in the art. However, for the claim to be anticipated, I understand that these other references must make clear that the missing descriptive matter in the patent claim is necessarily or implicitly present in the allegedly anticipating reference, and that it would be so recognized by one of ordinary skill in the art.

41. It is also my understanding that a claim is invalid if the claimed invention was known or used by others in the United States, or was in public use or on sale before the critical date.

42. Consistent with what I noted above regarding the burden of proof, I have written this report with the understanding that anticipation must be shown by clear and convincing evidence.

## 3. Obviousness

43. I further understand that a claimed invention may be invalid even if each and every limitation is not disclosed in a single reference or described by a single use or sale. I have been informed that, a pre-AIA claim may be invalid as obvious if the differences between

**RESTRICTED – ATTORNEY'S EYES ONLY**

the invention and the prior art are such that the subject matter as a whole would have been
obvious at the time the invention was made to a person having ordinary skill in the art to
which the subject matter pertains.  Obviousness, as I understand, is based on the scope and
content of the prior art, the differences between the prior art and the claim, the level of
ordinary skill in the art, and secondary indicia of obviousness and non-obviousness to the
extent they exist.

44. I understand that a claim can be found invalid as obvious if the design incentives or
market forces provided a reason to make an adaptation, and the invention resulted from the
application of the prior knowledge in a predictable manner.  I understand that a claim can be
found invalid as obvious if the claim would have been obvious because the substitution of
one known element for another would have yielded predictable results to one of ordinary
skill in the art at the time of the invention.  I understand that a claim can be found invalid as
obvious if the claim would have been obvious because the technique for improving a
particular class of devices was part of the ordinary capabilities of a person of ordinary skill in
the art.  I understand that a claim can be found invalid as obvious if the claim would have
been obvious because a particular known technique was recognized as part of the ordinary
capabilities of one skilled in the art.  I understand that a claim can be obvious in light of a
single reference, without the need to combine references, if the elements of the claim that
are not found in the reference can be supplied by the common sense of one of skill in the
art.

45. In evaluating whether a claim would have been obvious, I have also considered the
following factors:

13

RESTRICTED – ATTORNEY'S EYES ONLY

- Whether there are any reasons that would have prompted a person of ordinary skill in the art to combine the requirements or concepts from the prior art in the same way as in the claimed invention;

- Whether the claimed invention applies a known technique that had been used to improve a similar device or method in a similar way; and

- Whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art.

46. I understand that it is important to be careful not to determine obviousness using hindsight because many inventions can seem obvious after the fact. Obviousness (for pre-AIA patents) is determined from the position of a person of ordinary skill in the art at the time the claimed invention was made, and it is improper to consider what is known today or what is learned from the teaching of the patent.

47. The ultimate conclusion of whether a claim is obvious should be based on a determination of the following factual issues:

- The level of ordinary skill in the art that someone would have had at the time the claimed invention was made;

- The scope and content of the prior art;

- The differences, if any, that existed between the claimed invention and the prior art; and

- Secondary considerations of non-obviousness.

48. Secondary considerations of non-obviousness include the following:

- Commercial success of a product due to the merits of the claimed invention;

- A long-felt, but unsolved, need for the solution provided by the claimed invention;

- Unsuccessful attempts by others to find the solution provided by the claimed invention;

- Copying of the claimed invention by others;

14

RESTRICTED – ATTORNEY'S EYES ONLY

- Unexpected and superior results from the claimed invention;

- Acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention; and

- Disclosures in the prior art that criticize, discredit, or otherwise discourage the claimed invention and would therefore tend to show that the invention was not obvious.

49. I also understand that evidence that several people purportedly invented the same or very similar inventions around the same time may, in some circumstances, provide evidence that in view of the state of the art, the invention was obvious.

50. I have written this report with the understanding that obviousness must be shown by clear and convincing evidence.

## 4. Prior Invention by Another

51. I understand that an invention may be invalid under pre-AIA 35 U.S.C. § 102(f) if the claimed inventor did not himself invent the subject matter sought to be patented but rather derived the invention from another.

52. I also understand that derivation is not shown by simply showing that each element of the patented invention was known in the prior art, or that even the inventor knew about that prior art.  Rather, derivation requires conception by another and communication of that conception to the purported inventor who filed the patent application where that communication would enable one of ordinary skill to construct and successfully operate the invention.  However, the true inventor need not have reduced his or her invention to practice to give rise to a derivation claim.  In other words, to be patentable, an invention needs to be not only novel and non-obvious, but also must have been invented by the person claiming to have invented it by filing a patent application.

RESTRICTED – ATTORNEY'S EYES ONLY

### D.  Person of Ordinary Skill in the Art

53. It is my opinion that a person of ordinary skill in the art ("POSITA") as of the filing date of the Asserted Patents (June 4, 1997) would have had at least a Bachelor of Science degree in electrical engineering or computer science, and at least one year of experience in computer security and computer architecture for security devices.  I note that additional experience can substitute for education and that additional education can compensate for experience.

54. My opinion for the level of skill stated above is based on my education and experience and my understanding of the requisite expertise for the technology described in the field of each of the Asserted Patents, taking into account the specification and the claims.

## VII.  BACKGROUND OF THE TECHNOLOGY

55. The Asserted Patents generally relate to the use of cryptography in relation to stored information / data.  The use of cryptography to protect stored information is not a new idea. Throughout written history, people have created secret codes to obscure the content of stored information (such as writing on a piece of paper) to prevent un-authorized use of the information.  Indeed, early use of cryptography dates back to Ancient Egypt and Mesopotamia, where, for example, scribes would protect trade secrets (such as formulas for making glazes for pottery) using an encryption code to prevent those who did not know the code from learning the secrets.  *See*, *e.g.*, David Kahn, The Codebreakers, "The First 3000 Years" (1996).  Other famous, more-recent, uses of cryptography include, for example, the

RESTRICTED – ATTORNEY'S EYES ONLY

"Enigma" machine—used to attempt to protect German military communications during World War II, which was famously broken by the Allies.

56. The use of cryptography to prevent unauthorized access to data carried over to the computer age, and the need for security in the context of computing systems has been widely recognized for multiple decades.  Among other reasons, security concerns arise because the data that passes through and/or is retained in computing systems is often sensitive (e.g., proprietary), and there are often strong motivations to minimize the probability that an unauthorized person might get access to these data.  One long-known approach to improving security involves ensuring that when data is stored on a computing system or device, it is stored in a form that is unreadable to unauthorized persons.

57. There was extensive work in the 1970s and 1980s to develop improved encryption methods.  In the context of digital systems, encryption converts a message that can be read by anyone into a form in which the information is represented using a seemingly random sequence of binary ones and zeros.  This conversion is accomplished through the use of a "key".  An encryption algorithm takes as input the message and the key, and produces the encrypted output.  In decryption, the process is reversed: the encrypted message along with a key are provided to an algorithm, which then produces the unencrypted output.

58. In some algorithms, the same key is used to both encrypt and decrypt the message. This type of encryption is known as "symmetric" cryptography.  In this scheme, encryption and decryption are done using the same private key.  Symmetric cryptography was far from new at the time of the filing of the Asserted Patents.  For example, a well-known symmetric cryptography algorithm called the Data Encryption Standard ("DES") was developed in the

RESTRICTED – ATTORNEY'S EYES ONLY

1970s by IBM and the National Security Agency.  DES was published by the Federal Information Processing Standards ("FIPS") on January 15, 1977.  See CODEBREAKERS, at 980-982.

59. DES is a block cipher that operates on 64-bit blocks.  While the key length in DES is sometimes described as 64, because 8 of those bits are parity bits in fact the actual key itself has length 56.  With increasing advances in computing power in the late 1980s and through the 1990s, it became apparent that DES was not sufficiently secure.  For example, in the late 1990s the Electronic Frontier Foundation built a special purpose machine specifically designed to perform a brute force attack on DES, and then used that machine to demonstrate the ability to successfully attack DES in slightly over two days of computing time.

60. These concerns spurred to the development of "Triple DES" (sometimes written "3DES"), which involved applying DES three times.  There are several ways to implement 3DES.  For example, if a different key is used each time, the key length is sometimes described as 168 bits (i.e., 56 times 3), though due to a known better-than-brute-force attack, the security of this approach corresponds to an effective key length of 112 bits.  There is also a version of 3DES in which one of the 56-bit keys is reused (i.e., there are two 56-bit keys, one of which is used once and the other of which is used twice).  The effective key length for this approach is 80 bits, as opposed to the 112-bit key length that would result if there were no better-than-brute-force attacks.

61. Skipjack is another symmetric encryption algorithm.  It was developed by the U.S. government in part for use in the Clipper Chip, and was also used in Fortezza.  Skipjack uses

RESTRICTED – ATTORNEY'S EYES ONLY

a block size of 64 bits, with an 80 bit key.  It was declassified by the U.S. government in

1998.  *See* KT0058266 (https://csrc.nist.gov/csrc/media/projects/cryptographic-algorithm-

validation-program/documents/skipjack/skipjack.pdf).  An NSA press release in June 1998

stated:

> The National Security Agency today announced a decision to declassify both
> the Key Exchange Algorithm (KEA) and the SKIPJACK encryption
> algorithm.  Both algorithms are used in the FORTEZZA PC card for key
> exchange and general purpose encryption, respectively, and the Escrowed
> Encryption Standard (FIPS 185) calls for the use of SKIPJACK.  This
> decision will allow the commercial development of lower cost, alternative
> smart card and software-based FORTEZZA products required to enhance the
> protection of sensitive but unclassified national security applications, while
> also assuring interoperability with the more highly protected mission critical
> applications.

> The release is restricted to these two algorithms, SKIPJACK (an 80 bit
> encryption algorithm that is not extensible to higher key lengths) and KEA (a
> 1024-bit key exchange algorithm), and does not apply to any other classified
> NSA algorithms.  The SKIPJACK and KEA algorithms and their source
> codes have been declassified pursuant to Executive Order 12958.

> Declassification of the KEA and SKIPJACK algorithms is required to enable
> a software implementation in commercial FORTEZZA security-enabled
> applications.  NSA is partnering with vendors to produce FORTEZZA
> toolkits to enable the availability of these applications.

KT0058264 (https://cryptome.org/jya/nsa-press.htm).

62. There is also a class of encryption algorithms in which a pair of keys is used, with one

key applied in the encryption process and the other key applied in the decryption process.

This type of encryption is known as "asymmetric," or "public key" cryptography.  In this

scheme, a user has both a public key and a private key.  The user can share the public key

with anyone that might want to send her a message because the public key can only be used

to encrypt data.  The private key is the inverse of the public key and is used to decrypt data

encrypted by the public key.  Although, in theory, derivation of the private key from the public key is possible, in practice it is technically infeasible if the encryption system is well designed because of the time and difficulty of calculating the private key from the public key. Asymmetric cryptography was also known long before the filing of the Asserted Patents. Mathematicians Ronald Rivest, Len Adleman, and Adi Shamir developed one of the first working public key cryptography algorithms (named RSA, for the initials of the creators) in the same year (1977).  *See* CODEBREAKERS, at 982-984.

63. At least as early as the 1980s, it was widely understood that these types of encryption could be applied in the context of data storage.  Practitioners understood that systems could be designed in a manner enabling data to be stored on the system in an encrypted state, so that even if an unauthorized person were able to extract the data, he or she would be unable to read it due to the encryption.  Practitioners additionally understood that secure storage of data could be obtained when the storage was located within the same housing as other key elements (such as a processor) of a computing system.  Practitioners further understood that secure storage of data could be obtained when the storage was located outside the housing containing key elements (such as a processor) of a computing system.  For example, it was recognized that data could be written to an external disk in encrypted form, so that if an unauthorized person were to get access to the disk, the data would be protected by the encryption.  Indeed, Kirk Skeba—one of the inventors of the Asserted Patents—described working on encrypting data to data storage devices in the early 1990s—long before any of the Asserted Patents were filed.  *See* Skeba Dep. at 19:22-20:11.  As Mr. Skeba testified, he and his colleagues at Xerox PARC were building controllers that could encrypt data and then

RESTRICTED – ATTORNEY'S EYES ONLY

send that encrypted data to a storage device, like a hard drive.  As Mr. Skeba described his previous work, he was encrypting data to "larger storage devices" such as "magnetic disk drives of some type" and to "magnetic tape as well." *Id.* at 21:17-18.  In these prior art systems, data would be supplied to an encrypting processor, be encrypted, and then would be sent to the hard drive to be stored.  And then, to be accessed, the data would be pulled out in reverse and decrypted again through the controller. *See id.* at 22:23-24:9.  Thus, the idea of passing data through an encrypting processor to a data storage device was well known before the Asserted Patents.

64. It was also widely recognized that this type of encryption could be used to protect data that was in transit from one location to another (including, potentially, within two locations inside a computing system).  As was understood at the time, unencrypted data was more exposed to compromise than encrypted data following the same path.  Thus, where appropriate, practitioners often employed mechanisms to ensure that data being transferred along a path involving a risk of interception was encrypted prior to the transfer.  Indeed, Mr. Skeba explained that in the early 1990s while at Xerox he worked on encrypting data being transferred along a network path, again long before any of the Asserted Patents were filed. *See* Skeba Dep. at 16:7-17:9.  As he testified at deposition, he and his colleagues "started building devices that could be used in small businesses and large infrastructures to encrypt between different nodes between buildings, between companies, between sites."  Skeba Dep. at 17:6-9.  As Mr. Skeba explained, "So think of it this way:  We're all sitting in a room with a bunch of laptops and notebooks and we're talking to each other.  But when we want to talk

to the building next door, at that point we'll encrypt it, send it next door, de-encrypt it, and then put it on the local network." *Id.* at 17:19-24.

65. Another important security operation is a hash. A hash is a one-way operation that takes a variable length string of bits as an input, and produces a fixed length "hash" (also sometimes referred to as a "digest") as an output. Hash functions are many-to-one mappings; i.e., there are many (in fact, an infinite number of) input strings that will produce the same hash. However, if a hash is sufficiently long, and if the hash algorithm is sufficiently well designed, a hash can be viewed, with probability approaching 1, as uniquely representing the input. Hash functions are useful because they allow characterization of a variable length (and potentially very long) input using a fixed length (and typically short enough to not be cumbersome) hash. While a hash is typically shorter than the inputs used to produce it, it is also important that it not be too short, as that would compromise its security.

66. For example, if a hash function were only 4 bits long, it would provide no security at all because it is trivial to identify an input sequence that produces any specific 4-bit hash. However, as the hash length grows, it becomes more difficult to find an input sequence that generates a specific hash. Brute force guessing becomes computationally impractical for very long hashes. Hashes can be used, for example, to ensure that an input sequence has not been tampered with, since even an extremely small change to an input will lead to a very different hash. Thus, for example, if a sender sends a (potentially large) file to a recipient, and then separately conveys the hash of that file to the recipient, the recipient can regenerate the hash of the received file locally and ensure that it matches the hash received from the

RESTRICTED – ATTORNEY'S EYES ONLY

sender (of course, such an approach presumes that the transmission of the hash is done in a way that minimizes the risk that the hash itself can be tampered with).  If the message has been altered in any way prior to its reception, the received and locally generated hashes will not match.

67. SHA (secure hash algorithm) is a name for a class of hash algorithms.  SHA is further subdivided into subcategories including SHA-1, which produces a 160-bit hash, and SHA-2, which is a collection of hash algorithms with multiple output length options, including 256 and 512 bits.[2]  SHA-1 was developed by the U.S. government and published in the mid-1990s, while SHA-2, which was also developed by the U.S. government, was published in the early 2000s.  Security concerns with SHA-1 were raised well over a decade ago, and collision attacks have been successfully demonstrated (a collision attack occurs when an attacker is able to construct a message leading to a hash value that is also known to be the hash for a different message).  Despite this, its use is still relatively widespread.

68. In short, although the Asserted Patents claim the use of security algorithms, the purported inventors of the Asserted Patents did not invent those algorithms.  Indeed, Jack Young—Spyrus's technical 30(b)(6) witness—readily admitted that all of the security algorithms described in the Asserted Patents were known and invented by others:

Q.   Do you know what SHA-1 is?

A.   Yes, I do.

Q.   And what -- did Spyrus develop SHA-1?

A.   No, they didn't.

---

[2] There is also an SHA-3 hash algorithm that was developed under the auspices of NIST, and involving a call for contributions from the technology community.

**RESTRICTED – ATTORNEY'S EYES ONLY**

Q.   The next line there's one that says "DES."  What is that?

A.   That's the -- that's a DES, that's a data encryption standard.

Q.   Did Spyrus develop DES?

A.   No, they didn't.

Q.   The next one is DES 3.  Did Spyrus develop DES 3?

A.   Spyrus did not develop DES 3.  They implemented DES 3.

Q.   The next one is RSA.  What does RSA stand for?

A.   It's a public algorithm.

Q.   Did Spyrus develop RSA?

A.   It's a Shamir algorithm.  Spyrus did not develop the RSA algorithm.  But they did implement the RSA algorithm on the --

Q.   Did Spyrus develop the DSA algorithm?

A.   No, they did not.

Q.   Okay.  What is MD2?

A.   MD2 is another hash algorithm.

Q.   Did Spyrus develop MD2?

A.   No, they didn't.

Q.   MD5 another hash algorithm?

A.   Just different, yeah, different.

Q.   Did Spyrus develop MD5?

A.   No.

Q.   Have you heard of a security algorithm called AES?

A.   Yes, I have.

Q.   And what is AES?

A.   Advanced encryption standard.

RESTRICTED – ATTORNEY'S EYES ONLY

> Q.   Did Spyrus develop AES?
>
> A.   No, they didn't.
>
> Q.   Who developed AES; do you know?
>
> A.   I -- it was a standard developed by NIST, National Institute of Standards and Technologies.  Spyrus implemented that on their products.

Young Dep. at 135:1-136:17.  Mr. Housley provided a similar admission:

> Q.   Okay.  And you didn't invent any of these symmetric encryption operations that are described in [the Asserted Patents]?
>
> A.   No, I did not.
>
> Q.   And no one else at SPYRUS invented any of the cryptographic algorithms that are mentioned in [the Asserted Patents]?
>
> A.   That's correct.

Housley Dep. at 173:10-20.

## VIII.  SUMMARY OF THE ASSERTED PATENTS AND PROSECUTION HISTORY

### A.  Overview of the '802 Patent

69. The '802 patent was filed on June 4, 1997.  A copy of the '802 patent is attached as Exhibit D.  The patent lists six inventors:  (1) William P. Bialick, (2) Mark J. Sutherland, (3) Janet L. Dolphin-Peterson, (4) Thomas K. Rowland, (5) Kirk W. Skeba, and (6) Russell D. Housley.  I have been informed that the inventors assigned their complete interest in the '802 patent to Spyrus, Inc. on 12/19/1997, which in turn assigned the patent to SPEX Technologies, Inc. on 2/12/2015.  The '802 patent does not claim priority to any prior applications.

70. The '802 patent is named "Peripheral device with integrated security functionality." '802 patent, Title.  It generally "relates to a peripheral, often portable, device … that can

RESTRICTED – ATTORNEY'S EYES ONLY

communicate with a host computing device to enable one or more security operations to be performed by the peripheral device on data stored within the host computing device, data provided from the host computing device to the peripheral device, or data retrieved by the host computing device from the peripheral device." '802 patent, 1:17-27. "In particular, the peripheral device can be adapted to enable, in a single integral peripheral device, performance of one or more security operations on data, and a defined interaction with a host computing device that has not previously been integrated with security operations in a single integral device." '802 patent, 3:27-33. The '802 patent teaches of a peripheral memory device that encrypts and decrypts data.

71. The '802 patent's Background section describes its purpose: "while portable computing affords a number of advantages, it has a significant disadvantage in that the computational environment (including the portable peripheral devices, the host computing devices in which they are used, and any other computational devices that communicate with those devices) is more susceptible to security breaches, i.e., unauthorized access to, or modification of, programs and/or data resident within the environment. Consequently, cryptographic devices and methods have been developed for use with such computational environments (as well as other computational environments) to enable increased levels of environment security to be obtained." '802 patent, 1:39-51.

72. The alleged invention in the patent seeks to make data transfer more secure. The patent states, "the provision of in-line security in a peripheral device according to the invention enables a more secure exchange of data between a host computing device and the peripheral device, overcoming the problems identified above in previous systems for

RESTRICTED – ATTORNEY'S EYES ONLY

performing security operations on data exchanged between such devices." '802 patent, 3:59-64.

73. The '802 patent states that "[t]he peripheral device can be implemented so that the peripheral device can be operated in any one of multiple user-selectable modes: a security functionality only mode, a target functionality mode, and a combined security and target functionality mode." '802 patent, 3:36-40.

74. The '802 patent further describes that "[t]he peripheral device can also be implemented so that the security operations are performed in-line, i.e., the security operations are performed between the communication of data to or from the host computing device and the performance of the defined interaction.  Moreover, the peripheral device can be implemented so that the security functionality of the peripheral device is transparent to the host computing device." '802 patent, 3:40-48.

75. The patent also states, "A peripheral device according to the invention can advantageously enable application of security operations to a wide variety of interactions with a host computing device. In particular, a peripheral device according to the invention can accomplish this without necessity to use two peripheral devices: one that performs the security operations and one that performs the defined interaction." '802 patent, 3:49-55.

76. Claim 1 from the '802 patent is generally representative of the claimed subject matter, and reads:

> **Claim 1.**  A peripheral device, comprising:
>
> security means for enabling one or more security operations to be performed on data;
>
> target means for enabling a defined interaction with a host computing device;

RESTRICTED – ATTORNEY'S EYES ONLY

means for enabling communication between the security means and the target means;

means for enabling communication with a host computing device;

means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and

means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.

77. The '802 patent includes "a block diagram of a peripheral device according to an embodiment of the invention." '802 patent, 4:25-26. That block diagram is reproduced below:



'802 patent, Fig. 4.

### 1.      Summary of the Prosecution History of the '802 Patent

78. Patent Application No. 08/869,305, which eventually became the '802 patent, was filed on June 4, 1997. SPEX00000366. The application initially included 32 claims relating to data encryption and decryption: claims 1-30 described a product relating to data security, while claims 31-32 described a method relating to data security. *See* SPEX00000279 – SPEX00000285.

RESTRICTED – ATTORNEY'S EYES ONLY

79. On November 6, 1998, the prosecuting attorney and the examiner agreed over the phone that claims 1, 4, 6, 7, 8, 11, 13, 14, 17, 24-26, 28, 29, 30, 31, and 32 would continue in the patent prosecution process, while claims 2, 3, 5, 9, 10, 12, 15, 16, 18, 19-20, 21-23, and 27 would be "withdrawn from further consideration" because they were "drawn to a non-elected invention." SPEX00000316 – SPEX00000317.

80. On November 20, 1998, the USPTO mailed a non-final office action SPEX00000315. In that office action, the examiner not only rejected claims 1, 8, 14, 4, 11, 17, 32, 31, 28, 29, 30, and 24-26 but also objected to claims 6, 7, and 13. *Id.* Specifically, in paragraph 5 of the office action, the examiner detailed that U.S. Patent No. 5,770,849 ("Novis") anticipated claims 24-26 under 35 U.S.C. § 102(e). SPEX00000317 – SPEX00000318. In paragraph 8 of the office action, the examiner further detailed his rationale for finding claims 1, 8, 14, 4, 11, 17, 32, 31, and 28-30 obvious after reviewing Novis in light of the applicant's admitted prior art under 35 U.S.C. § 103(a). SPEX00000319 – SPEX00000321. Finally, in paragraph 9 of the office action, the examiner objected to claims 6, 7, and 13 because "they depend on rejected claims." SPEX00000321.

81. With respect to claim 24, the examiner pointed to the fact that the Novis reference taught of a "security means" using a "biometric device" for authentication, which in turn communicated "with a host computing device." SPEX00000318. For claims 25 and 26, the examiner pointed to the fact that Novis taught that the "biometic device" could be either a "fingerprint scanning device" or "retinal scanning device." *Id.*

82. With respect to claims 1, 8, and 14, the examiner highlighted that Novis taught of a "security means," a "target means," a "means for enabling communication between the

29

security means and the target means," and a "means for enabling communication with a host computing device." SPEX00000319. The examiner further found that the applicants' admitted prior art taught of "operable connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device," and that it would be obvious to combine these references to a "person of ordinary skill in the art" because "the admitted prior art work[ed] fine." SPEX00000320.

83. With respect to claims 4, 11, and 17, the examiner found that Novis taught of a "target means compris[ing] a biometric device." *Id.*

84. The examiner rejected claims 31 and 32 because they did "not cover more than those which are covered by claims 1, 8, and 14." *Id.*

85. The examiner further rejected claim 28-30 because using "peripheral devices" with a "host computing device" would be "obvious to a person of ordinary skill in the art." SPEX00000321.

86. On March 11, 1999, the applicants responded to the USPTO's office action. SPEX00000323. In addition to making certain grammatical changes, the applicants requested that the USPTO cancel claims 1, 19, 21, 24, 27, and 28. *Id.* The applicants further requested to modify claims 2-7, 13, 14, 20, 22, 23, 25, 26, 30, and 32, while adding new claims 33-45. SPEX00000325 – SPEX00000338.

87. The applicants modified claim 6, and amended claims 2-5 to depend on the 6 accordingly. SPEX00000325 – SPEX00000326. Specifically, the applicants rewrote claim 6 to become independent, stating the following (underlined items added, bracketed items removed):

RESTRICTED – ATTORNEY'S EYES ONLY

**Claim 6.**  A peripheral device [as in claim 1], [further] comprising:

security means for enabling one or more security operations to be performed on data;

target means for enabling a defined interaction with a host computing device;

means for enabling communication between the security means and the target means;

means for enabling communication with a host computing device;

means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and

means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.

SPEX00000326.

88. The applicants noted in their remarks that the limitation of a "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means" formed "the basis for allowability of Claim 6."  SPEX00000335.

89. The applicants further rewrote claim 7 to become independent as well (underlined items added, bracketed items removed):

**Claim 7.**  A peripheral device [as in claim 1], [further] comprising:

security means for enabling one or more security operations to be performed on data;

target means for enabling a defined interaction with a host computing device;

means for enabling communication between the security means and the target means;

means for enabling communication with a host computing device;

RESTRICTED – ATTORNEY'S EYES ONLY

> means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and
>
> means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means [for enabling a defined interaction with a host computing device].

SPEX00000326 – SPEX00000327.

90. The applicants noted that the "means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the means for enabling a defined interaction with a host computing device" formed the "basis for allowability of Claim 7." SPEX00000336.

91. The applicants also amended claims 13, 14, and 30 in similar fashion. As to these claims, the applicants inserted the word "target" (and deleted "for enabling ...") in the "means for providing" as follows: "means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means [for enabling a defined interaction with a host computing device]." SPEX00000327 – SPEX00000329. In accordance with those amendments, the applicants further amended claim 20 to depend on claim 37 instead of claim 1. SPEX00000328.

92. In accordance with the applicants' new claims, the applicants modified claims 22 and 23 to depend on claim 38. *Id.* The applicants also modified claims 25 and 26 to depend on claim 11 instead of 24. *Id.*

**RESTRICTED – ATTORNEY'S EYES ONLY**

93. The applicants altered claim 32 as well (underlined items added, bracketed items removed):

> **Claim 32.**  For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:
>
> communicating with the [receiving an instruction from a] host computing device to exchange data between the host computing device and [regarding operation of] the peripheral device; [and]
>
> [performing] performing one or more security operations and the defined interaction [in response to the instruction from the host computing device] on the exchanged data; and
>
> mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations.

SPEX00000330.

94. In their remarks, the applicants submitted that the limitation of "mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations" detailed "functionality similar to that of allowable claims 6, 8, and 29."  SPEX00000337.

95. The applicants proceeded to add four claims (33-36) dependent on claim 7. SPEX00000330 – SPEX00000331.  The claims add limitations of "non-volatilely storing data," "enabling communication between the host computing device and a remote device," "a biometric device," and "means for communicating with a smart card" respectively.  *Id.*

96. In addition, the applicants added claim 37, dependent on claim 9, adding limitations of "non-volatilely storing data" and "a solid-state disk storage device."  SPEX00000331.

33

RESTRICTED – ATTORNEY'S EYES ONLY

97. The applicants also added claim 38, dependent on claim 10, adding the limitation of "a remote device," which wirelessly communicates with the "host computing device." SPEX00000331.

98. The applicants then added claim 39, dependent on claim 15, adding the limitations of "non-volatilely storing data" and "a solid-state disk storage device," similar to claim 37. SPEX00000331.

99. On June 7, 1999, the USPTO mailed the applicants a notice of allowability. SPEX00000347.

## 2. Inter Partes Review (IPR2018-00082; Western Digital)

100. In preparing this report, I also considered documents from *Western Digital Corporation v. SPEX Techs., Inc.*, IPR2018-00082, an Inter Partes Review ("IPR") proceeding that Western Digital filed, challenging a number of claims of the '802 patent. The *Western Digital* IPR relies on the following prior art references:

| Exhibit Number | Prior Art Reference |
| --- | --- |
| 1004 | U.S. Patent No. 5,887,145 to Harari et al. ("Harari") |
| 1005 | U.S. Patent No. 6,199,163 to Dumas et al. ("Dumas") |
| 1006 | Don Anderson, PCMCIA SYSTEM ARCHITECTURE: 16-BIT PC CARDS (MindShare, Inc., 2nd ed. 1995) ("PCMCIA Architecture") |
| 1007 | U.S. Patent No. 5,822,196 to Hastings et al. ("Hastings") |
| 1008 | U.S. Patent No. 5,922,060 to Goodrum ("Goodrum") |
| 1009 | U.S. Patent No. 5,941,965 to Moroz et al. ("Moroz") |
| 1010 | U.S. Patent No. 5,943,482 to Culley et al. ("Culley") |
| 1011 | U.S. Patent No. 6,009,151 to Staples ("Staples") |
| 1012 | Windows Developers Journal, Vol. 7, No. 8 (Aug. 1996) |
| 1018 | U.S. Patent No. 5,765,027 to Wang et al. ("Wang") |

RESTRICTED – ATTORNEY'S EYES ONLY

IPR2018-00082, Paper 1 at i.

101.     Petitioner Western Digital offered four grounds for challenging claims of the '802 patent:  (1) "Harari in view of *PCMCIA System Architecture* renders claims 1-2, 6-7, 11-12, 23-25, and 38-39 obvious under §103(a);" (2) "Harari in view of Wang and in further view of PCMCIA System Architecture renders claims 1-2, 11-12, and 23 obvious under § 103 (a); (3) "Harari in view of Dumas and PCMCIA System Architecture renders claims 1-2, 11-12, 23, and 39 obvious under § 103(a);" (4) "Harari in view of Dumas, Wang and PCMCIA System Architecture renders claims 1-2, 11-12, and 23 obvious under § 103 (a)." *Id.* at 2.

102.     IPR2018-00082 is currently pending before the Patent Trial and Appeals Board ("PTAB").

### 3.     Inter Partes Review (IPR2017-00824; Kingston)

103.     I also reviewed documents from *Kingston Techs. Co., Inc. v. SPEX Techs., Inc.*, IPR2017-00824, an IPR filed by Kingston, which challenged a number of the claims of the '802 patent.  This *Kingston* IPR relied on the following references:

| Exhibit Number | Prior Art Reference |
| --- | --- |
| 1003 | WO 95/16238, to Jones et al. |
| 1004 | US. Pat. No. 5,675, 645, to Schwartz et al. |
| 1005 | U.S. Pat. No. 5,237,609, to Kimura |
| 1007 | U.S. Pat. No. 5,465,338, to Clay |
| 1008 | Common Interface Specification for Conditional Access and Other Digital Video Broadcasting Decoder Applications, Digital Video Broadcasting, DVB Document A017, May 1996 |

IPR2017-00824, Paper 2 at ii.

**RESTRICTED – ATTORNEY'S EYES ONLY**

104.     The PTAB did not institute this IPR.  IPR2017-00824, Paper 8 at 2.

Petitioner argued that claims 1-3, 6-8, 11-15, 23-28, and 36-39 were obvious, according to

the following chart:

| Reference(s) | Claims Challenged |
|---|---|
| Jones | 1–3, 6–8, 11–15, 23–28, and 36–39 |
| Jones and (Schwartz and/or Kimura) | 1, 11, 23, 36, and 39 |
| Jones and Common Interface Specification | 3, 8, 15, and 28 |
| Jones and Clay | 14 and 27 |

*Id.* at 6.

105.     With respect to Jones alone, the PTAB declined to institute review because

Petitioner did "not separately address the 'means for performing . . . one or more security

operations' limitation" from "the recited step of 'mediating communication of the

exchanged data between the host computing device and the peripheral device so that the

exchanged data must first pass through means for performing the one or more security

operations.'"  *Id.* at 18.  With respect to claim 38, the PTAB further found that Petitioner did

not identify any component in Jones the practices "'receiving a request from a host

computing device for information regarding the type of the peripheral device' or 'providing

to the host computing device, in response to the request, information regarding the type of

the defined interaction.'"  *Id.* at 22.

106.     The PTAB declined review on the other three grounds for the same reasons

stated above.  *See id.* at 23.

RESTRICTED – ATTORNEY'S EYES ONLY

### 4. Inter Partes Review (IPR2017-00430; Unified Patents)

107.     Further, I reviewed documents from *Unified Patents, Inc. v. SPEX Techs., Inc.*, IPR2017-00430, an IPR filed by Unified Patents, which challenged a number of the claims of the '802 patent.  This *Unified Patents* IPR relied on the following references:

| Exhibit Number | Prior Art Reference |
| --- | --- |
| 1003 | U.S. Patent No. 5,623,637 ("Jones") |
| 1004 | U.S. Patent No. 5,887,145 ("Harari") |
| 1005 | U.S. Patent No. 5,815,577 ("Clark") |
| 1006 | Universal Serial Bus Specification, Rev. 1.0 |

IPR2017-00430, Paper 8 at 6.

108.     Petitioner argued that claims 1-39 of the '802 patent were invalid, relying on the grounds detailed in the following chart:

| Reference(s) | Basis | Claims Challenged |
| --- | --- | --- |
| Jones | 35 U.S.C. § 102(a) | 1, 2, 6, 7, 11–13, 23–26, and 36–39 |
| Jones and Harari | 35 U.S.C. § 103(a) | 5, 10, 14, 22, 27, and 35 |
| Clark and USB Specification | 35 U.S.C. § 103(a) | 1–39 |

*Id.*

109.     The PTAB did not institute review based on these grounds.  *Id.* at 2.

110.     Specifically, the PTAB denied review with respect to claims 1-37 because "Petitioner [did] not identify any appropriate structure corresponding to the 'security means' limitation."  *Id.* at 12.  As such, the PTAB found that Petitioner did not "meet its burden of showing a reasonable likelihood of prevailing in its challenges."  *Id.*  The PTAB further denied review of claims 38 and 39 merely "[b]ecause the Petition fails to specify where the

37

RESTRICTED – ATTORNEY'S EYES ONLY

steps of claims 38 and 39 are found in Jones or in the combination of Clark and USB Specification." *Id.* at 14.

### B.   Overview of the '135 Patent

111.      The '135 patent was filed on June 4, 1997.  A copy of the '135 patent is attached as Exhibit E.  The patent lists six inventors:  (1) William P. Bialick, (2) Mark J. Sutherland, (3) Janet L. Dolphin-Peterson, (4) Thomas K. Rowland, (5) Kirk W. Skeba, and (6) Russell D. Housley.  I have been informed that the inventors assigned their complete interest in the '135 patent to Spyrus, Inc. on 12/19/1997, which in turn assigned the patent to SPEX Technologies, Inc. on 2/12/2015.  The '135 patent terminally disclaims the '802 patent.

112.      The '135 patent is named "Modular Security Device." '135 patent, Title.  It generally discloses a system that "enables a modular, typically portable, device to communicate with a host computing device to enable one or more security operations to be performed by the modular device on data stored within the host computing device." *Id.* at Abstract.  "In particular, the modular device can include a security module that is adapted to enable performance of one or more security operations on data, and a target module that is adapted to enable a defined interaction with a host computing device." *Id.*  The '135 patent generally teaches of a modular memory device that encrypts and decrypts data.

113.      The '135 patent's Background section describes its purpose:  "while portable computing affords a number of advantages, it has a significant disadvantage in that the computational environment (including the portable peripheral devices, the host computing devices in which they are used, and any other computational devices that communicate with

38

RESTRICTED – ATTORNEY'S EYES ONLY

those devices) is more susceptible to security breaches, i.e., unauthorized access to, or modification of, programs and/or data resident within the environment.  Consequently, cryptographic devices and methods have been developed for use with such computational environments (as well as other computational environments) to enable increased levels of environment security to be obtained.  '135 patent, 1:38-50.

114.     The alleged invention in the '135 patent seeks to make data transfer more secure.  The patent states, "the provision of in-line security in a modular device according to the invention enables a more secure exchange of data between a host computing device and the modular device, overcoming the problems identified above in previous systems for performing security operations on data exchanged between such devices."  '135 patent, 3:62-4:1.

115.     The '135 patent states that "[t]he modular device can be implemented so that the modular device can be operated in any one of multiple user-selectable modes:  a security functionality only mode, a target functionality mode, and a combined security and target functionality mode."  '135 patent, 3:35-39.

116.     The '135 patent further describes that "the modular device can also be implemented so that the security operations are performed 'in-line', i.e., the security operations are performed between the interface of the host computing device to the modular device and the external communications interface of the target module.  Further, the modular device enables a wide variety of secure target module functionality to be easily provided to a host computing device."  '135 patent, 7:57-64.

RESTRICTED – ATTORNEY'S EYES ONLY

117.      The patent also states, "A modular device according to the invention can advantageously enable application of security operations to a wide variety of interactions with a host computing device.  In particular, a modular device according to the invention can accomplish this without necessity to use multiple peripheral devices that each include security functionality in addition to the primary functionality of the peripheral device." '135 patent, 3:48-54.

118.      For example, claim 55 of the '135 patent reads as follows:

> **Claim 55.**  For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to he performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> receiving a request from the host computing device for information regarding the type of the modular device;
>
> providing the type of the target module to the host computing device in response to the request; and
>
> operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

119.      In Fig. 4A, the '135 patent includes "a block diagram of a modular device, according to one embodiment of the invention, including a security module and a target module that, together, can embody the modular device of the system." '135 patent, 6:14-17. That block diagram is reproduced below:

RESTRICTED – ATTORNEY'S EYES ONLY



'135 patent, Fig. 4A.

### 1.     Summary of the Prosecution History of the '135 Patent

120.     Patent Application No. 08/869,120, which eventually became the '135 patent, was filed on June 4, 1997.  SPEX00000215.  The application initially included 52 claims relating to data encryption and decryption:  claims 1-50 describe a product related to data security while claims 51-52 describe a method related to data security.  *See* SPEX00000097 – SPEX00000105.

121.     On December 24, 1998, the USPTO mailed a non-final office action rejecting each of the 52 claims.  SPEX00000152.  The examiner rejected the claims based on "the judicially created doctrine" of "double patenting."  SPEX00000153.  The USPTO required the applicants to submit a terminal disclaimer to the 08/869,305 application to continue the examination process.  *Id.*

RESTRICTED – ATTORNEY'S EYES ONLY

122.     On March 12, 1999, the applicants responded to the office action. SPEX00000171.  Specifically, the applicants added a number of new claims and agreed to submit a terminal disclaimer as the USPTO required.  SPEX00000176 – SPEX00000177.

123.     The applicants filed the terminal disclaimer the same day.  SPEX00000181.

124.     In their response to the USPTO's March 12, 1999 office action, the applicants added claims 53 and 54, dependent on claim 32.  SPEX00000174.  The applicants further added claims 55 and 56, dependent on claim 36.  SPEX00000175.

125.     The applicants also added independent claim 57, relating to a method for securing data. Claim 57 originally read as follows:

> **Claim 57.**  For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> communicating with the host computing device to exchange data between the host computing device and the modular device;
>
> performing one or more security operations and the defined interaction on the exchanged data; and
>
> mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module.

*Id.*

126.     The applicants further added independent claim 58, also relating to a method for securing data.  Claim 58 originally read as follows:

> **Claim 58.**  For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:

RESTRICTED – ATTORNEY'S EYES ONLY

receiving an instruction from a host computing device regarding operation of the modular device; and

operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device.

SPEX00000176.

127.	On July 6, 1999, the applicants conduced a phone interview with the examiner.  SPEX00000187.  During that interview, "[a]pplicant's [sic] attorney agreed to incorporate this claimed limitation (means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device) which is not found in the prior art that will put in all the independent claims as required."  *Id.*  The applicants did so.  *See, e.g.*, SPEX00000238.

128.	On July 19, 1999, the USPTO mailed the applicants a notice of allowability. SPEX00000188 – SPEX00000189.

## 2.	Inter Partes Review (IPR2017-01021; Kingston)

129.	In addition to the file history of the '135 patent, I also reviewed documents from *Kingston Techs. Co., Inc. v. SPEX Techs., Inc.*, IPR2017-01021, an IPR filed by Kingston, which challenged a number of the claims of the '135 patent.  This *Kingston* IPR relied on the following references:

| Exhibit Number | Prior Art Reference |
| --- | --- |
| 1003 | WO 95/16238, to Jones et al. |
| 1004 | Security Modules: Potent Information Security System Components, Charles Cresson Wood and Howard M. Zeidler, Computers & Security 5 (1986) 114-121 |
| 1005 | Common Interface Specification for Conditional Access and Other Digital Video Broadcasting Decoder Applications, Digital Video |

RESTRICTED – ATTORNEY'S EYES ONLY

| | |
|---|---|
| | Broadcasting, DVB Document A017, May 1996 |
| 1006 | US. Pat. No. 5,675, 645, to Schwartz et al. |
| 1007 | U.S. Pat. No. 5,237,609, to Kimura |

IPR2017-01021, Paper 2 at ii.

130.     While Petitioner challenged claims 55-58, the PTAB instituted the IPR only with respect to claim 58.  IPR2017-01021, Paper 7 at 2.  Petitioner relied on the arguments detailed in the chart below:

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Jones | § 102(b) or § 103(a)[2] | 55–58 |
| Jones in combination with either or both of Security Modules and Common Interface Specification | § 103(a) | 55–58 |
| Jones in combination with either or both of Schwartz and Kimura | § 103(a) | 57 |

*Id.* at 6.

131.     Specifically, the PTAB instituted the IPR as to claim 58 based on Jones alone, under 35 U.S.C. § 102.  *Id.* at 24.  The PTAB was "persuaded by Petitioner's showing that the operation of Jones's partition lock and partition unlock commands discloses" the claim limitation "of 'operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device."  *Id.* at 24-25.

132.     The PTAB declined to institute the IPR on Claim 55 because, according to the PTAB, "Petitioner [did] not sufficiently, persuasively explain how Jones's disclosure of a memory card that "stores information enabling [a] host computer to automatically identify

RESTRICTED – ATTORNEY'S EYES ONLY

the particular ... card as soon as the card and host are connected, and to automatically establish [an] appropriate hardware/software interface" teaches or suggests "receiving a request from the host computing device for information regarding the type of the modular device" and "providing the type of the target module to the host computing device in response to the request." *Id.* at 17.

133.     The PTAB declined review of claim 56 for the same reasons. *Id.* at 18.  In particular, "claim 56 depends from claim 55." *Id.*

134.     The PTAB declined review of claim 57 because "Petitioner [did] not identify, in connection with the 'communicating' step of claim 57, any disclosure in Jones of 'communicating ... to exchange data between [a] host computing device and [a] modular device.'" *Id.* at 19.

135.     The PTAB further declined review on Petitioner's argument that the '135 patent was obvious in light of Jones in combination with either or both of Security Modules and Common Interface Specification because "the addition of Security Modules and Common Interface Specification [did] not address the deficiencies of Jones with respect to claims 55–57." *Id.* at 28.

136.     Finally, the PTAB declined review of claims 55-57 on Petitioner's final ground because "Petitioner [did] not rely in the Petition on Schwartz or Kimura to teach or suggest 'communicating with the host computing device' and 'performing one or more security operations and the defined interaction on the exchange[d] data,'" instead relying "solely on Jones for those limitations." *Id.* at 31.

RESTRICTED – ATTORNEY'S EYES ONLY

### 3. Inter Partes Review (IPR2017-00825; Kingston)

137.     I further reviewed documents from *Kingston Techs. Co., Inc. v. SPEX Techs., Inc.*, IPR2017-00825, an IPR filed by Kingston, which challenged a number of the claims of the '135 patent.  This *Kingston* IPR relied on the following references:

| Exhibit Number | Prior Art Reference |
|---|---|
| 1003 | WO 95/16238, to Jones et al. |
| 1004 | Security Modules: Potent Information Security System Components, Charles Cresson Wood and Howard M. Zeidler, Computers & Security 5 (1986) 114-121 |
| 1005 | Common Interface Specification for Conditional Access and Other Digital Video Broadcasting Decoder Applications, Digital Video Broadcasting, DVB Document A017, May 1996 |
| 1006 | US. Pat. No. 5,675, 645, to Schwartz et al. |
| 1007 | U.S. Pat. No. 5,237,609, to Kimura |

IPR2017-00825, Paper 2 at ii.

138.     Petitioner challenged claims 55 and 57 of the '135 patent, but the PTAB did not institute the IPR with respect to either claim.  IPR2017-00825, Paper 8 at 2.  Petitioner relied on the grounds detailed in the chart below:

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Jones | § 102(b) or § 103(a)[2] | 55 and 57 |
| Jones and (Security Modules and/or Common Interface Specification) | § 103(a) | 55 and 57 |
| Jones and (Schwartz and/or Kimura) | § 103(a) | 57 |

*Id.* at 6-7.

RESTRICTED – ATTORNEY'S EYES ONLY

139.     The PTAB declined to institute review on claim 55 because "Petitioner [did] not sufficiently, persuasively explain how Jones's disclosure of a memory card that 'stores information enabling [a] host computer to automatically identify the particular ... card as soon as the card and host are connected, and to automatically establish [an] appropriate hardware/software interface' teaches or suggests 'receiving a request from the host computing device for information regarding the type of the modular device' and 'providing the type of the target module to the host computing device in response to the request.'"  *Id.* at 16.

140.     The PTAB declined to institute review on claim 57 because "Petitioner [did] not identify, in connection with the 'communicating' step of claim 57, any disclosure in Jones of 'communicating ... to exchange data between [a] host computing device and [a] modular device.'"  *Id.* at 18.

141.     PTAB further declined review on Petitioner's argument that claims 55 and 57 were obvious in light of Jones in combination with either or both of Security Modules and Common Interface Specification because "Petitioner [did] not rely in the Petition on Security Modules or Common Interface Specification to teach or suggest 'receiving a request from the host computing device for information regarding the type of the modular device' and 'providing the type of the target module to the host computing device in response to the request.'"  *Id.* at 19.

142.     Finally, the PTAB declined review of claim 57 on Petitioner's final ground because Petitioner "relie[d] solely on Jones" for the limitations of  "'communicating with the

RESTRICTED – ATTORNEY'S EYES ONLY

host computing device' and 'performing one or more security operations and the defined

interaction on the exchange[d] data.'"  *Id.* at 19.

## IX.   CLAIM CONSTRUCTION

### A.   Court Construed Terms

143.     I understand that the Court has construed certain claim terms from the

asserted patents.  I have used these constructions in my analysis below.  The Court's

constructions are as follows:

144.     The Court has construed the term "defined interaction" as used in claims 1,

11, 38, and 39 of the '802 patent and in claims 55, 57, and 58 of the '135 patent to mean "an

interaction [with a host computing device] that can provide one or more of a variety of

functionalities."  (D.I. 122 at 48-49.)

145.     The Court construed the term "peripheral device" as used in all asserted

claims from the '802 patent and the term "modular device" as used in claims 55, 57, and 58

of the '135 patent to have the same meaning, which is "a device that operates functionally

separate from a host computing device that is connected to the host computing device,

including such devices in the same housing as the host computing device."  (D.I. 122 at 49.)

146.     The Court construed the terms "security means for enabling one or more

security operations to be performed on data" as used in claims 1 and 11 of the '802 patent;

the term "means for performing the one or more security operations" as used in claim 39 of

the '802 patent; and the term "security module that is adapted to enable one or more security

operations to be performed on data" as used in claims 55, 57, and 58 of the '135 patent to

have the same meaning.  The Court construed these terms pursuant to 35 U.S.C. ¶ 112(6):

RESTRICTED – ATTORNEY'S EYES ONLY

<u>Recited Function:</u> enabling one or more security operations to be performed on data

<u>Corresponding Structures:</u>

1.  A specific hardware component programmed or configured to perform a security operation disclosed in '802 Patent at 18:1–47 or '135 Patent at 21:29–22:9; [or]

2. A special purpose embedded processor, embodied on a single integrated chip and designated MYK-82 (and referred to by the name Capstone), which includes and ARM6™ processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense.

(D.I. 122 at 49-50.)  As to the Court's first identified corresponding structure, the security

operations disclosed in the referenced sections of the Asserted Patents include:

- Key exchange operations, including the Department of Defense Standard, the RSA, the Diffie-Hellman, and the X9.42 (ANSI Banking Standard) key exchange algorithms;

- Hash operations, including FIPS 180-1 (SHA-1), the Message Digest 2 (RSA), and the Message Digest 5 (RSA) algorithms;

- Digital Signature operations, including FIPS 186 (DSA--512, 1024) and the RSA Signature (512, 768, 1024, 2048) algorithms;

- Keywrapping operations;

- Symmetric encryption operations, including FIPS 185 (implemented completely in hardware), the DES (including 3DES, EDE3, CBC and ECB), the RC-2 and the RC-4 algorithms;

- Asymmetric encryption operations, including RSA and Diffie-Hellman algorithms; and

- Exponentiation operations.

147.    The Court construed the term "means for operably connecting the security

means and/or the target means to the host computing device in response to an instruction

from the host computing device" as used in claims 1 and 2 of the '802 patent pursuant to 35

U.S.C. § 112(6) as follows:

**RESTRICTED – ATTORNEY'S EYES ONLY**

<u>Recited Function:</u> operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device

<u>Corresponding Structures:</u>

1. PCMCIA interface and memory section 612a; or

2. Interface and a device or host driver

(D.I. 122 at 50-51.)  As relevant to the Court's first identified corresponding structure, the

'802 specification explains:

One way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of the peripheral device.  This is true for a variety of types of peripheral devices, such as, for example, peripheral devices that conform to the PCMCIA standard.  (The PCMCIA standard, for example, includes a specification, called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as "attribute memory", that stores data identifying the type of the PCMCIA card.)  In the system 600, the peripheral device 602 is such a device.  The memory section of the memory device 612 of the peripheral device 602 which the host computing device 601 seeks to access is shown in FIG. 6 as the memory section 612a, and the data stored therein is referred to herein as "peripheral device identification data."

'802 patent, 7:62-8:14.

148.    The Court construed the term "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means" as that term is used in claims 1 and 11 of the '802 patent pursuant to 35 U.S.C. § 112(6) as follows:

<u>Recited Function:</u> mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means

<u>Corresponding Structures:</u> Interface control device 910 (as shown in Fig. 9B)

RESTRICTED – ATTORNEY'S EYES ONLY

(D.I. 122 at 51.)  As relevant to the Court's identified corresponding structure, Fig. 9B is

reproduced below:



FIG. 9B

149.     The Court construed the term "means for enabling communication with a

host computing device" as that term is used in claims 1, 2, 11, and 12 of the '802 patent

pursuant to 35 U.S.C. § 112(6) as follows:

Recited Function: enabling communication with a host computing device

Corresponding Structures:

1. Input/Output (I/O) device;

2. PCMCIA interface;

3. Cord between housing and mating receptacle;

4. Wireless communication interface;

5. Smart card interface;

6. Serial interface (such as RS-232);

7. Parallel interface;

RESTRICTED – ATTORNEY'S EYES ONLY

8. SCSI interface; or

9. IDE interface.

## B.  Agreed Constructions

150.    I further understand that the parties have agreed to the construction of various claim terms.  I have used these constructions in my analysis below.  These agreed constructions are as follows:

151.    The parties have agreed that the term "means for non-volatilely storing data" as used in claims 2 and 12 of the '802 patent should be construed pursuant to 35 U.S.C. § 112(6) as follows:

Recited Function: non-volatilely storing data

Corresponding Structure: Non-volatile memory devices[3]

152.    The parties have agreed that the term "target means for enabling a defined interaction with a host computing device" as used in claims 1 and 11 of the '802 patent and the term "target module that is adapted to enable a defined interaction with the host computing device" should be construed pursuant to 35 U.S.C. § 112(6) as follows:

Recited Function: enabling a defined interaction with a host computing device

Corresponding Structure:

1. memory module adapted to enable non-volatile storage of data;

2. a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver;

3. a smart card reader; or

---

[3] I understand that the parties disagreed as to whether the claim construction should explicitly recite "or equivalents thereof" as part of the § 112(6) corresponding structure.  I understand that equivalent structures can be within the scope of a claim construed pursuant to § 112(6), consistent with how the Court construed the disputed terms.

**RESTRICTED – ATTORNEY'S EYES ONLY**

4. a biometric device

153.     The parties have agreed that the term "means for enabling communication between the security means and the target means" as used in claims 1 and 11 of the '802 patent should be construed pursuant to 35 U.S.C. § 112(6) as follows:

> <u>Recited Function</u>: enabling communication between the security means and the target means
>
> <u>Corresponding structures</u>: conventional computer bus 615

As relevant to the agreed corresponding structure, conventional computer bus 615 is shown in the following excerpt from Fig. 6 of the '802 patent:



## C.     Implicit Constructions from Infringement Contentions

154.     In addition to the Court's constructions and the agreed constructions detailed above, I have also considered the scope of the claims that SPEX has applied in its infringement contentions.  In some instances, I disagree with the claim scope applied by SPEX in order to read the Asserted Claims onto the products it accuses of infringement.  I note my disagreement with those constructions below.  Nonetheless, I have applied the

RESTRICTED – ATTORNEY'S EYES ONLY

constructions used by SPEX where noted and have provided alternate arguments under what, in my opinion, is the proper scope of the claim.

## X.   OVERVIEW OF PRIOR ART

### A.   U.S. Patent No. 5,623,637 ("Jones")

155.     U.S. Patent No. 5,623,637 ("Jones") is titled "Encrypted Data Storage Card Including Smartcard Integrated Circuit for Storing an Access Password and Encryption Keys" and issued on April 22, 1997.  Jones names Michael F. Jones and Arthur Zachai as inventors and identifies the original assignee as Telequip Corporation.  Jones issued from U.S. Application No. 651,205 filed May 17, 1996.  Jones is attached to my report as Exhibit F and incorporated by reference.

156.     As explained in the Abstract, Jones regards "[a] detachable PCMCIA memory card incorporating a smartcard integrated circuit for storing a password value and logic circuitry for preventing access to information stored on the memory card unless the user of the host computer to which the memory card is connected can supply a password matching the stored password.  The smartcard integrated circuit may also be used to store public and private key values used to encrypt and decrypt data stored on the card or elsewhere on the host computed or exchanged with a remote computer."  Jones at Abstract.

157.     Jones states that its "invention relates generally to methods and apparatus for storing, processing and communicating private data."  Jones at 1:10-12.

158.     Jones explains that the prior art includes various encryption and decryption methods, including the "secret key" method used in DES and the "public key" method used in "RSA."  For example, Jones' Background of the Invention explains: "Encryption methods

54

RESTRICTED – ATTORNEY'S EYES ONLY

typically rely on 'secret keys' known only to authorized users of the protected data.  In the widely used Data Encryption Standard ('DES') developed and promulgated by the National Bureau of Standards, data is encrypted in 64-bit blocks using a single 56-bit key, as described in National Bureau of Standards' Federal Information Processing Standards Publication 46 ....  Encryption techniques using two keys, one for encrypting the data and a different key for decryption are called 'public key' systems because the encryption key can be made public so that anyone can use the public key to encrypt sensitive data, but only a recipient with the secret key can decrypt it.  One widely used and highly effective public key algorithm known as the 'RSA' system, named after the inventors Rivest, Shamer, and Adelman, is described in Rivest et al. U.S. Pat. No. 4,405,829." Jones at 1:33-49.[4]

159.     Jones explains that an "object of the invention [is] to securely store private information in a compact, easily transportable storage device which may be detached from the computer with which it is used." Jones at 1:61-4.  According to Jones, "another object of the invention [is] to protect such electronically stored data against unauthorized access when the detachable storage device is lost or stolen." Jones at 1:65-67.  Jones also states that "[i]t is a further object of the present invention to provide a secure data storage device which may, at the option of the user, selectively limit access to all or part of the stored data using one or more passwords." Jones at 2:1-4.  Jones also states that "[i]t is a related object of the invention to securely store access passwords, encryption or decryption keys, or digital

---

[4] U.S. Pat. No. 4,405,829, entitled "Cryptographic Communications System and Method" issued on September 20, 1983.  *See* KT0056623.  It issued from U.S. Appl. No. 860,586 filed December 14, 1977.

**RESTRICTED – ATTORNEY'S EYES ONLY**

signatures, in a tamper-proof substorage unit interconnected with a data access mechanism which are integral parts of a detachable computer memory card." Jones at 2:5-9.

160.     Jones states that "[i]n principle aspect, the present invention takes the form of a removable memory card, preferably implemented in conformity with the PCMCIA (Personal Memory Card Industry Association) interface standard, which provides the host computer to which it is connected with additional high-speed storage, the memory card consisting of a data storage unit, storage-access locking circuitry, and a tamper proof key information substorage unit. In accordance with the invention, the locking circuitry is adapted to prevent access to the data stored on the memory card unless the would-be user first presents identifying information which is validated by the locking circuitry with reference to one or more key values stored in the key information substorage unit." Jones at 2:10-23.

161.     Jones includes Figure 1, "the preferred embodiment of the invention," Jones at 3:16-17, as shown below.

RESTRICTED – ATTORNEY'S EYES ONLY



Fig. 1

162.      Jones explains that Figure 1 illustrates "the form of a personal computer memory card indicated generally at 100. The memory card 100 is interconnected with a host computer 110 by means of a hardware and software interface which conforms to the [PCMCIA] standard which has been widely accepted for use in laptop and notebook computers. PCMCIA cards are commonly used to provide additional high-speed memory capacity to the connected host computer, or to implement ... hard-disk mass storage devices." Jones at 3:16-27. Jones explains that "[t]he removable character of PCMCIA storage devices can provide better data security than storage built into the computer itself, because the card may be detached from the computer and placed in a secure area when not in use. ... The embodiment ... shown in [Figure] 1 provides significant additional security for data and programs stored in a detachable memory card by incorporating an access-locking mechanism for preventing access to the stored data by those who are unable to present an authorizing password." Jones at 3:33-43.

RESTRICTED – ATTORNEY'S EYES ONLY

163.     "The secure memory card 100 ... is adapted to be connected via its PCMCIA interface to the host computer 110. which may in turn be connected to other computers ...." Jones at 3:44-49; *see also* Jones at Fig. 1 (showing connection of remote computer 120 via the telecommunications link 130).

164.     "The secure memory card 100 stores data in a common memory array 150, preferably implemented with non-volatile flash memory integrated circuits ...."  Jones at 3:50-52.  "Data transfers between the common memory array 150 and the host computer 110 are accomplished via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a[n] internal encryption/decryption unit 177, a gate 178 and an internal data bus 179."  Jones at 3:60-64.

165.     Jones describes its use of the PCMCIA standard.  For example: "The address terminals 161, data terminals 171 and control terminals 181 seen in FIG. 1 are a simplified representation of the 68 pin PCMCIA standard interface which includes provision for 26 parallel address conductors (A0—A25), 16 parallel data conductors (D0—D15) and a remaining set of power and control conductors including power and ground connections and a collection of memory control signal connections (enable, select, wait, write, detect, etc).  The PCMCIA standard achieves interchangeability of cards of different functions by establishing standards for the physical card (dimensions and mechanical tolerances for the card and connectors), the card interface (pinout and signal definitions), and card software (which specifies the organization of data on the card and the record formats and protocols by which configuration information and data is exchanged with the host computer).  Complete information which defines the PCMCIA standard is published by and available

58

from the Personal Computer Memory Card International Association, l030G East Duane Avenue, Sunnyvale, Calif. 94086.  The present embodiment of invention conforms to the PC Card Standard Specification, Release 2.01, published in November, 1992."  Jones at 4:1-22.

166.　　According to Jones: "To implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which stores information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected, and to automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 110."  Jones at 4:23-30.

167.　　Jones further describes encryption-decryption: "To provide additional security, the data transferred over the 16-bit data bus between the data bus buffer 173 and the gate 178 is processed by the encryption-decryption unit 177 which prefer[]ably [i]mplements a symmetrical key algorithm, such as DES, based on a key value which stored in and fetched from the EEPROM 275 in the smartcard I.C. 250.  The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the data back into its original form when it is retrieved from the common memory array 150.  This additional encryption mechanism protects data stored in the common memory array even if that data is successfully read from the flash memory chips making up the array 150."  Jones at 6:5-17.

**RESTRICTED – ATTORNEY'S EYES ONLY**

      **B.**      <u>**Fortezza Crypto Card**</u>

          **1.**      **My Investigation of the Fortezza Crypto Card**

168.      In forming my opinions concerning the Fortezza Crypto Card, I investigated both the technical aspects of the Fortezza Crypto Card as well as the development of the Fortezza Crypto Card by the National Security Agency (NSA) and the manufacture of the Fortezza Crypto Card by Spyrus, Inc., the predecessor owner of the Asserted Patents.

169.      My investigation into the technical aspects of the Fortezza Crypto Card involved looking at physical samples of the card.  I was provided several samples by counsel for Kingston.  One such sample is pictured below.



**RESTRICTED – ATTORNEY'S EYES ONLY**



KT0058249 (first picture above); KT0058250 (second picture above).

170.    Mr. Skeba and Mr. Young, both of whom worked on the Fortezza Crypto Card, examined samples and photographs of the Fortezza Crypto Card and confirmed that the card is an authentic Spyrus Fortezza Crypto Card.  *See, e.g.*, Young Dep. at 64:1-6; Skeba Dep. at 87:12-88:4.  Mr. Young referred to this version as the "Barney" card because of the purple coloration of the labeling.  *See id.*  Mr. Young also confirmed that, of the three variants of the Fortezza Crypto Card, the one shown above was the MYK-82 version.  *See* Young Dep. at 43:7-10 (testifying that there were three versions of Fortezza—"There was an MYK-80 version of the Fortezza.  There was an MYK-82 version of Fortezza.  There was an MYK-82A version of the Fortezza."); *id.* at 64:4-5 (identifying the chip in the disassembled Fortezza Crypto Card, pictured below, as the "MYK-82").

171.    During my investigation, I also examined the interior components of one of the Fortezza Crypto Card samples.  Pictured below is a photograph of a disassembled

**RESTRICTED – ATTORNEY'S EYES ONLY**

Fortezza Crypto Card, as well as a close up photo of the PCB contained within the Fortezza

Crypto Card.





Ex. 63 of Skeba Dep. (excerpt) (first picture above); KT0058248 (second picture above).

RESTRICTED – ATTORNEY'S EYES ONLY

172.     Mr. Skeba and Mr. Young were also asked to examine the interior of the Fortezza Crypto Card sample and to identify the components on the PCB.  I reviewed their deposition testimony regarding the internals as part of my analysis as well.

173.     Also as part of my investigation regarding the technical capabilities of the Fortezza Crypto Card, I reviewed multiple technical documents.  These include technical specifications set out by the National Security Agency—which originally designed the Fortezza Crypto Card—as well as documents created by Spyrus (the predecessor in interest to the Asserted Patents), which manufactured cards for NSA.  These technical documents include programming manuals, interface control documents, statements-of-work, Application Implementor's Guides, Configuration Manuals, and marketing materials.  A list of the documents I used to conduct my investigation is provided in Exhibit B.

174.     My investigation of the Fortezza Crypto Card also involved reviewing the deposition testimony of the listed inventors on the Asserted Patents (Mr. Skeba, Mr. Bialick, Mr. Sutherland, Ms. Dolphin-Peterson, Mr. Rowland, and Mr. Housley), some of whom also worked on the Fortezza Crypto Card.  I additionally reviewed the deposition transcript from Mr. Young, who was Spyrus's 30(b)(6) witness designated to testify about Fortezza, and who also worked at the company during the relevant time period.

175.     In addition, I also rely on my own knowledge, skill, and experience.  In confirming and supplementing that knowledge, I relied on several technical manuals, such as documents laying out PCMCIA standards, encryption standards, and government documents.  These documents are also listed on Exhibit B.

RESTRICTED – ATTORNEY'S EYES ONLY

176.      As noted above, I also conducted an investigation as to the development and sale of Fortezza Crypto Card.  I understand that questions as to public availability, public use, and on sale/offers for sale are legal questions.  I am not a legal expert and offer no opinions as to those legal conclusions.  However, I provide a summary of the results of this investigation below.

## 2.      Development of Fortezza

177.      In this section I detail the development of the Fortezza Crypto Card by NSA and the manufacture and sale of the card by Spyrus to NSA.

178.      As information technologies became more affordable and ubiquitous in the late 1980s and early 1990s, and as those technologies began to be more interconnected through the use of the Internet, the need to protect data stored on devices increased.  This was particularly true as more and more sensitive business and other data began to be stored on computers, and as activities to break into that data increased.  By the early to mid-1990s the problem was particularly acute.  For example, in 1994, hackers broke into CitiCorp and stole $12 million by altering records of transactions stored on their computer system.  *See* KT0055462, at KT0054531.  U.S. industries also became popular targets for electronic espionage, with foreign governments and companies stealing data from numerous industries, including *e.g.* biotechnology firms, aerospace firms, telecommunications firms, semiconductor manufacturers, and defense contractors.  *Id.* at KT0054546-47.

179.      In part in response to this growing threat, the United States Government, specifically NSA, began working to develop a set of encryption tools that could be used to protect communications and to secure information stored on computer devices.  This effort

RESTRICTED – ATTORNEY'S EYES ONLY

included two related programs: (1) the Clipper chip initiative; and (2) the Fortezza Crypto Card.  The Clipper chip was designed to protect communications across public switched telephone networks, including voice calls, low-speed data, and faxes.  The Fortezza Crypto Card, on the other hand, was designed for data storage and high-speed data communications.  Although the Clipper chip used some of the same technologies as the Fortezza System (such as using the same Skipjack encryption algorithm), the Fortezza Crypto Card is the more relevant of the two programs here.  *See, e.g.*, *id.* at KT0054762-63; *id.* at KT0054772-73; *see also*, *e.g.*, SPEX00005733, at SPEX00005737-38.

180.     The development of the Fortezza Crypto Card began in 1993 as part of NSA's MOSAIC program, which itself grew out of the Agency's "earlier Pre-Message Security Protocol (PMSP) and Secure Data Network Systems (SDNS) efforts."  SPEX00005733, at SPEX00005737.[5]  A goal of the MOSAIC program was to "develop a low-cost-per-user product to protect U.S. Government Type II (Unclassified, but Sensitive) data.  Other design goals were to use existing data standards as applicable (for example, the X.509 directory structure for certificates), support mobile Users, and provide sufficient extendibility and flexibility to support a large User base (up to 4 million Users)."  *Id.*  Early versions of the card were called the "TESSERA" crypto card.  *Id.*; *see also* KT0058251 (detailing the design of the Tessera Card and the Capstone chip).  Eventually, the Agency changed the name of

---

[5] As Mr. Bialick testified, "in the 1991 time frame," NSA "designed a smart card to implement the cryptographic algorithms that NSA wanted to use for the defense message system. So the PMSP Smart Card was physically a one chip smart card.  That was its program name." Bialick Dep. at 76:8-17.  In 1992, NSA transitioned to the PCMCIA format with the Tessera/Fortezza Crypto Card.  *Id.* at 76:18-25.

RESTRICTED – ATTORNEY'S EYES ONLY

the program to FORTEZZA due to problems securing the trademark for TESSERA. *See* KT0054462, at KT0054773.

181. In 1994, NSA registered the trademark FORTEZZA. *See* SPEX00005733, at SPEX00005737; *see also* KT0058382 (Trademark Registration No. 74582414, *available at* http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4803:4p4oqz.2.10 (October 5, 1994 registration of the FORTEZZA trademark by NSA)). By registering the trademark, the government could control the use of the name and set out standards for what could, and could not be, marketed as "FORTEZZA" cards. "Only products certified as implementing Type II functional requirements in accordance with the NSA specifications and standards can use the FORTEZZA name." SPEX00005733, at SPEX00005737-38. For example, NSA set out certain "Minimum Essential Requirements" for cards that were to use the FORTEZZA name, requiring (for example) that the cards contain non-volatile memory which "shall be used for storage of card firmware and long-term storage of other data" but that "shall not be accessible from outside of the card except through the use of Fortezza commands" to be executed the processor on the card. SPEX00007774, at SPEX00007775. These requirements also specified, for example, that FORTEZZA cards comply with PCMCIA PC Card Standards (v2.1); the type of chip to be used (the CAPSTONE chip); that the cards contain a certain amount of volatile memory (which will be used as a shared "card mailbox" for incoming and outgoing data); and that the CAPSTONE chip used on the card support certain security operations (such as the SKIPJACK encryption/decryption algorithm, the Secure Hash Algorithm, the Key Exchange Algorithm, and the Digital Signature Algorithm). *See id.* at SPEX00007775-78.

RESTRICTED – ATTORNEY'S EYES ONLY

182.     NSA, however, did not make the Fortezza Crypto Cards itself.  Instead, NSA

solicited bids from various companies to produce the cards according to the specifications it

set out.  For the first run of "up to 72,000 FORTEZZA Crypto Cards," NSA awarded the

contract to Group Technologies Corp. on April 28, 1994 via a competitive solicitation.

SPEX00005220, at SPEX00005221; *see also* Bialick Dep. at 78:14-46 ("Group Technologies

was a company in Florida, I'm trying to think where, near Tampa, that won the first Fortezza

production contract.").  Group Technologies was a former division of Honeywell that

specialized in the "built-to-print" market for the government—"building products that have

already been designed" like the Fortezza Crypto Card.  *See, e.g.*, SPEX00002177, at

SPEX00002178.  Notably, Spyrus viewed Group Technologies as a competitor and designed

a strategy (called the "Straw Man Tessera Strategy") to "[p]rovide no aid and comfort to

Group Technologies," hoping for Group Technologies to fail and to "aggressively pursue"

becoming a provider of Tessera/Fortezza Crypto Cards to NSA.  *See id.* at SPEX00002177-

78.[6]

183.     No later than August of 1995, the government opened up bidding for a

"Second Production of FORTEZZA Crypto Cards."  *See generally* SPEX00005220-34 (a

"Statement of Work" laying out requirements for contractors wishing to provide Fortezza

Crypto Cards); *see also* KT0054462, at KT0054773 n.17 & n.18.  In this solicitation for the

second generation of Fortezza, the government again set out specific requirements, laid out

---

[6] Notably, at this time, Spyrus was pushing the government to use an alternative design using
a different chip (the "Keystone") chip that was developed by National Semiconductor rather than
the Mykotronx Chip (the "Capstone").  *See id.* (referencing "Keystone" development); *see also, e.g.*,
SPEX00002073-79; SPEX00002094-95.

**RESTRICTED – ATTORNEY'S EYES ONLY**

in a "Statement of Work," for the Fortezza Crypto Cards.  *See id.*; *see also* Young Dep. at

211:3-7 ("Q. Okay.  And what is a statement of work for a government contract?  A. It's just

a list of – a description of items that would be performed for a possible contract.")  For

example, the Statement of Work specifies that the Fortezza Crypto Cards "shall meet the

Minimum Essential Requirements" according to the document discussed above (in ¶ 179).

*See* SPEX00005220, at SPEX00005231; *id.* at SPEX00005223 (Min. Essential Requirements

document at SPEX00007774).  The Statement of Work also references and requires

contractors adhere to an "Interface Control Document for the Fortezza Crypto Card,

Revision Pl.5. 22 December, 1994."  *Id.* at SPEX00005223; *see also generally* SPEX00009841-

9935 (the "Interface Control Document" referenced in the Statement of Work).  This

interface control document is attached as Exhibit I, and its contents are incorporated herein.

This document provides even more detail about the operation of the Fortezza Crypto Card,

for example it details the design of the Fortezza Crypto Card as shown in the block diagram

below:



**FIGURE 3.0 Hardware Block Diagram**

RESTRICTED – ATTORNEY'S EYES ONLY

SPEX00009841, at SPEX00009854.  The document details how the cards are to work with a

host computer, as shown in the below diagram showing "Software/Hardware relationships":



*Id.* at SPEX00009849; *see also id.* at SPEX00009848-50 (detailed description relating to the

above-diagram).  This document sets out the memory configuration of the Fortezza Crypto

Card, including (1) attribute memory (which "contains the Card Information Structure

(CIS)" which "provides information about the card manufacturer, user RAM available,

ROM, Card Revision, Number of Certificates that can be stored, and the start of the

mailbox communications area between the Host and the Card"; (2) the common memory

area "which is used for communications between the host and the processor" and through

which "All communications between the processor and the host" must pass; and (3) non-

RESTRICTED – ATTORNEY'S EYES ONLY

volatile memory, which "is used to store information for the user and SSO." *Id.* at SPEX00009855. The document also has sixty pages detailing the commands that can be executed by the Capstone chip on the card. *See id.* at SPEX00009876-9935.

184. The "Statement of Work" additionally references and requires contract manufacturers follow the specifications in a document entitled "Firmware Implementations Guidelines for the Fortezza Crypto Card" document (SPEX00007673-7773); a "Cryptologic Interface Programmer's Guide" (SPEX00019722-804)[7]; and the PCMCIA PC Card Standard, Release 2.1 (*see* SPEX00005220, at SPEX00005229 (detailing specific portions of the PCMCIA specification required for the Fortezza Crypto Card)). *See* SPEX00005220, at SPEX00005223. Any deviations from these specifications had to be submitted and approved as an "Engineering Change Proposal." *Id.* at SPEX00005225.

185. Mr. Young confirmed that "the NSA distributed" documents such as the above "to Spyrus and a number of other vendors that were on the Fortezza program." *See* Young Dep. at 110:11-16; *see also id.* at 75:24-76:11.

---

[7] This is a later version of the document than that referred to in the Statement of Work, as the Statement of Work specifically contemplates. *See* SPEX00005220, at SPEX00005223-24 ("As the Fortezza infrastructure evolves and matures, and as the use of Fortezza becomes more widespread, changes will occur in the documents referenced in Section 2.0 of this SOW."). I understand that the original version of this document has not been produced by SPEX or Spyrus and is otherwise unavailable. However, the document itself lists the changes from the previous version on the first page, so it is reasonable to infer that not many changes occurred and we are able to identify which changes did occur. *See* SPEX00019722, at SPEX00019725.

**RESTRICTED – ATTORNEY'S EYES ONLY**

186.    On September 15, 1995, NSA placed an order for an "indefinite number" of

Fortezza Crypto Cards from Spyrus to be delivered over an "indefinite" time period.

SPEX00005213, at SPEX00005213-14.[8]





187.    NSA also provided Spyrus on that same date with a Contract, which

guaranteed purchase of 100,000 units at a price that has been redacted from the contract.  *See*

*id.* at SPEX00005216-17:

---

[8] Note that the order shows that it was issued by the "Maryland Procurement Office."  This entity is part of NSA which handles invoicing and orders.  *See* KT0058381 (https://www.nsa.gov/business/programs/electronic-invoicing.shtml).

RESTRICTED – ATTORNEY'S EYES ONLY





188.     According to the order, the Fortezza Crypto Cards were to be built according to the specifications set out by NSA in its "Statement of Work for the Second Production of Fortezza Crypto Cards Rev. 2.01" dated 11 August 1995, which is the document described in detail above. *See id.* at SPEX00005214.

189.     The date listed on this contract is consistent with statements from Spyrus and SPEX. For example, one contemporaneous document (from 1996) put out by Spyrus states

RESTRICTED – ATTORNEY'S EYES ONLY

that "In October 1995, Spyrus was awarded the production contract for the Fortezza Crypto Cards." SPEX00006617, at SPEX00006620. Spyrus put out a press release on November 14, 2005 "announc[ing] its 10 years of continued support for the FORTEZZA Hardware Security Module." KT0056530. Another contemporaneous document lists products made by Spyrus and the date of introduction, and lists the "Fortezza Crypto Card" as being released in 1994. SPEX00029154, at SPEX00029159. SPEX even alleges in its complaint that Spyrus made Fortezza Crypto Cards starting in "approximately 1993 or 1994" and that, at that time, "[t]he Fortezza Crypto Card was used in a number of government and military and applications." (D.I. 1, at ¶ 20.) This date is also consistent with the testimony of Ms. Sue Pontius—the current CEO of Spyrus and the CEO at Spyrus at the time of Fortezza's development—who testified that the Fortezza Crypto Card was released "in the 1994 time frame." Pontius Dep. at 93:9-16. Moreover, Spyrus admits that it "began manufacturing the MYK-82/82A-based Fortezza" for NSA "in 1995." SPEX's Response to Kingston Interrogatory No. 1. In short, the evidence indicates that Spyrus was selling Fortezza Crypto Cards to the government at the time listed on the contract—namely starting in at least September 1995.

190. Spyrus continued to make Fortezza-related products for NSA. For example, documents from 1996 indicate that NSA was developing a product called the "Fortezza Multi-Function Card." *See, e.g.*, SPEX00008770, at SPEX00008770. On or about August 1, 1996, NSA sent a letter to Spyrus requesting that Spyrus submit a "Firm Fixed Price Proposal" "to perform the requirements of the Statement of Work entitled, 'Fortezza Multi-Function Package' dated 19 July 1996." *Id.* The referenced Statement of Work is attached

73

RESTRICTED – ATTORNEY'S EYES ONLY

to the letter and, like the previous Statement of Work for the Fortezza Crypto Card lays out the requirements for the requested product.  Specifically, the Statement of Work requests that Spyrus produce a "Fortezza Multi-Function Package with removable Communications / Storage Module," specifically "with the removable storage module containing a minimum of 10 MB of storage."  *Id.* at SPEX00008773; *see also id.* at SPEX00008778 (listing the "Deliverable Items").  Other documents indicate that a "compact modem module" was also built for the "Fortezza Multi-Function Card."  *See, e.g.,* SPEX00008838, at SPEX00008839-SPEX00008876.

191.    The "Fortezza Multi-Function Card" was "capable of accepting plug-in modules supporting such functions as flash memory storage, fax/data modem communications, LAN networking, or ISDN interfacing."  *Id.* at SPEX00008841.  The product described in these documents is similar to the Spyrus's modular "Hydra" product which I am informed Spyrus admits practices the Asserted Patents.  Indeed, Ms. Pontius admitted in deposition that the "Fortezza Multi Function Card" "would have become I think the Hydra privacy card."  Pontius Dep. at 165:10-13.

192.    These documents indicate that Spyrus made a proposal to NSA to build these "Fortezza Multi-Function Cards" on May 10, 1996—more than one year prior to the filing of the Asserted Patents.  *See* SPEX00008770, at SPEX00008776:

> **2.3.1.1  (U)  Hardware Design, Prototype and Limited Production Build**
>
> (U)  The contractor shall capture the current Spyrus Fortezza card design and re-design the card to fit within the smaller form factor of the compact flash format. The contractor shall reference the design approach identified in the Spyrus Proposal P5-127: New Multi-Function Package for the Fortezza Crypto Card, section 2.0, dated 10 May 1996.

## RESTRICTED – ATTORNEY'S EYES ONLY

The date listed in the above document from NSA is consistent with the date of a white
paper created for NSA detailing the advantages of the Fortezza Multi-Function card.  *See*
SPEX00008838, at SPEX00008875-76.  This white paper is dated May 24, 1996 (again, more
than one year prior to the filing date of the Asserted Patents) and proposes to sell Compact
Modem cards adapted to work with the Fortezza Multi-Function Card for $1250/unit.  *Id.*
Also of note, Spyrus was awarded a contract to build these devices for NSA on September
27, 1996 (after the 1-year bar date), but the cover letter from Spyrus sending the signed copy
of the contract back to NSA stated that by signing the contract, "Spyrus confirms that the
existing Fortezza card and firmware are existing commercial items of Spyrus ***as they have
been sold, leased, and licensed to the general public***."  SPEX00008792, at
SPEX00008792 (emphasis added).

193.     As related to the above proposal, Mr. Young stated that he had no memory of
the "Fortezza Multi Function Card." *See* Young Dep. at 211:20-23.  However, with respect
to proposals in the government contracting space, Mr. Young testified that a proposal is "a
list of items and what you're going to do. ... It's going to have a description of the items that
you're proposing to build or to software you're going to write, whatever." Young Dep. at
213:13-15.  Mr. Young also testified that "how many devices would be produced" would be
part of the proposal as well as "delivery dates" and prices would be handled by a "contract
person." *Id.* at 215:2-2016:15.  Mr. Young also testified that Mr. Almojuela—the author of
the letter discussed above that states that Spyrus was previously selling the Fortezza Multi-
Function cards—was "right. … [I]f he signed this, this statement is correct." *Id.* at 221:24-
222:5.

RESTRICTED – ATTORNEY'S EYES ONLY

194.     I understand that neither Spyrus nor SPEX has produced the May 10, 1996 proposal discussed above despite requests from Kingston.  Nonetheless, based on the evidence above, I have included the Fortezza Multi Function Card as part of my anticipation analysis below.

### 3.     Technical Overview of Fortezza

195.     As can be seen in the photograph below (KT0058249), the Fortezza Crypto Card is a detachable PCMCIA card "intended to be plugged into any computer with a PC-card expansion slot and appropriate support software" that provides a number of security functions, including encryption.  KT0055462, at KT0054772.



The side with the arrows is the side that is inserted into an appropriate PCMCIA reader and, as the card itself indicates, the side that is showing should be face up.

196.     When inserted into a computer, the Fortezza Crypto Card adds additional security functionality to the computer.  A user can, for example, use the Fortezza Crypto

**RESTRICTED – ATTORNEY'S EYES ONLY**

Card to perform a number of security operations, such as encrypting and decrypting files, digitally signing documents, or verifying the integrity of documents using a hash algorithm. *See, e.g.*, SPEX00007774, at SPEX00007777.  The card also allowed users to securely store data on the card, carry the data with them, and then to access the data later on.  *See, e.g.*, SPEX00019846; SPEX00005952, at SPEX00005976; SPEX00007774, at SPEX00007775; SPEX00018941; DEF_INV 0004302; SPEX00005518, at SPEX00005518; *see also* Skeba Dep. at 60:17-61:2 (testifying that when a user wants to store an encrypted file, the Fortezza Crypto Card "will put the data it wants to be encrypted into the shared memory.  It will send a command in that says, 'Encrypt this.'  The card already knows that the thing it's going to encrypt is in a known spot.  It's going to go pick it up, encrypt it.  It's going to use scratch pad memory and then it's going to put the encrypted output into the non-volatile memory for long-term storage.").

197.     A photograph of the PCB inside the Fortezza Crypto Card is shown below, with the major components labeled:

**RESTRICTED – ATTORNEY'S EYES ONLY**



*See* KT0058248 (annotated).[9]  As shown in the above photograph, the Fortezza Crypto Card

has a "Capstone Chip," specifically a MYK-82 chip (labeled on the PCB as U1)

manufactured by Mykotronx; a PCMCIA interface which allows the card to communicate

with a host computer; a non-volatile (flash) memory for long-term storage of data (labeled

on the PCB as U2); and two "volatile" memory modules (labeled on the PCB as U3 and U4)

used for various functions as well be discussed in more detail below; and a real-time clock

(labeled on the PCB as U5).  On the backside of the PCB is a battery which provides power

allowing the real-time clock to keep time even when the card is not plugged into a host

computer.

---

[9] I performed an analysis of the chips listed on the Board by looking to the model number,
which is printed on each chip, and confirmed its type by looking to product manuals and references
for each of the chips on the PCB.

**RESTRICTED – ATTORNEY'S EYES ONLY**

198.     Notably, Spyrus does not make the components for the card.  As Mr. Young testified:

Q.  I want to confirm this.  But Spyrus didn't design the MYK-82, correct?

A.  Spyrus didn't?  No, I don't think Spyrus did.

Q.  And did Spyrus design the realtime clock DS 1302?

A.  No.

Q.  It was a purchased component?

A.  Yes.

Q.  Did Spyrus design the RAM U3 and U4?

A.  No.

Q.  It was a purchased component as well?

A.  Correct.

Q.  Did Spyrus design the flash memory part U2?

A.  No.

Q.  Also purchased?

A.  Yes.

Q.  Did Spyrus design or fabricate the X2 X3 crystals?

A.  No, they didn't.

Q.  Also purchased?

A.  Yes.

Q.  Did Spyrus design the battery?

A.  Spyrus -- define "design the battery."

Q.  Was the battery purchased on the open market?

A.  But with Spyrus specifications.  It was a custom part.

RESTRICTED – ATTORNEY'S EYES ONLY

Q.   Custom battery?

A.   Custom battery, yes.

Q.   Did Spyrus design the PCMCIA connector?

A.   We worked with a company called dual sonic to come up with that particular connector.

Q.   So you say it's a custom connector?

A.   Custom connector.

Q.   Did it run a standard PCMCIA interface though?

A.   Yes.

Q.   And Spyrus didn't develop the PCMCIA interface, correct?

A.   Correct.

Q.   Spyrus did develop or design the PCB board, correct?

A.   Yes.

Q.   And then Spyrus designed the steel case that was tamper evident?

A.   Correct.

Young Dep. at 68:11-70:11 (objections omitted).

199.     Also notably, the design of the Fortezza Crypto Card mirrors the diagram from the Interface Control Document from NSA dictating the design of the Fortezza Crypto Card:

**RESTRICTED – ATTORNEY'S EYES ONLY**



Just as seen on the PCB above, the block diagram shows a Capstone chip, a real-time clock, volatile and non-volatile memories, and a PCMCIA interface.

200.     The "Capstone" cryptographic chip is at the heart of the Fortezza Crypto Card and is responsible for performing various security functions that the card provides to the host computer.  The Capstone chip is "an integrated-circuit chip that provides a number of encryption services for both stored computer data and data communications." KT0054462, at KT0054772.  The Capstone chip performs a number of security operations, namely encryption through use of the "Skipjack" algorithm; services that "conform to the Digital Signature Standard (FIPS-186) to provide digital signatures that authenticate user identity;" the Secure Hash Standard (FIPS-180); a then-classified algorithm for key exchange (referred to as the Key Exchange Algorithm); and a random number generator.  *See id.*; *see also*, *e.g.*, SPEX00018727, at SPEX00018740-48 (describing "How the Fortezza Card's

Algorithms Work"); SPEX00007774, at SPEX00007776 (stating a Fortezza Crypto Card

must include hashing, signature and verification, and encryption/decryption to meet

minimum requirements).

201.     The non-volatile "memory storage area" "is used to store information for the

user and [site security officer]." SPEX00009841, at SPEX00009855. "Since this is non-

volatile memory, information written to this area will be maintained on board until they are

overwritten with new information." *Id.* Data stored in this area includes user pins,

certificates and keys for encrypting/decrypting, the card's firmware, program storage, and

any data the user wants to store on the card. *See id.* at SPEX00009855-56; *see also*

SPEX00019846; SPEX00005952, at SPEX00005976; SPEX00007774, at SPEX00007775;

SPEX00018941; DEF_INV 0004302; SPEX00005518, at SPEX00005518. The non-volatile

memory area, though, "is not directly accessible by the host system"—rather, data can be

loaded into the non-volatile memory through the use of an appropriate command executed

by the Capstone chip and routed through shared memory portion of the volatile memory.

SPEX00009841, at SPEX00009855-56.

202.     The volatile memory is divided up into two different memory spaces: the

"attribute" memory and the common/shared memory area. *Id.* The attribute memory

"contains the Card Information Structure (CIS)" which "provides information about the

card manufacturer, user RAM available, ROM, Card Revision, Number of Certificates that

can be stored, and the start of the mailbox communications area between the Host and the

Card." *Id.* at SPEX00009855. When the card is first connected to a computer, the computer

queries the card to determine information about the card (including, for example, what

RESTRICTED – ATTORNEY'S EYES ONLY

functions the card can perform), and the card returns the information in the CIS so that the computer can work with the card, as will be explained in greater detail below. The other portion of volatile memory is the "Common" or shared memory area, is used for the working operations of the Fortezza Crypto Card. "All communications between the processor and the host use" a portion of the volatile memory known as the "Mailbox Area," "to communicate through." *Id.*

203. The PCMCIA interface allows communication with the host computer. The pin layout of the connector is standardized by the Personal Computer Memory Card International Association (PCMCIA) in their PC-Card standards. The Fortezza Crypto Card "interfaces via the standard 68-pin PCMCIA connector using a shared-memory interface to pass commands and data between the Card and the host adapter/driver." SPEX00009841, at SPEX00009848.

204. The real-time clock, as the name would imply, keeps time, which is important for various security operations.

205. The details of the design and functionality of the Fortezza Crypto Card will discussed in greater depth during my claim-by-claim analysis below.

## C.   Lynks System

206. As with the Fortezza Crypto Card, I investigated both the technical aspects of the Lynks System as well as the history of its development and sale.

207. In investigating the technical aspects of the Lynks System, I relied on my review of the Fortezza materials discussed above in light of Mr. Young's testimony that the Fortezza Crypto Card and the Lynks cards used the same hardware. *See* Young Dep. at

RESTRICTED – ATTORNEY'S EYES ONLY

138:14-16 ("The Lynks card used commercial algorithms, I guess.  **It was -- used the same hardware as the Fortezza card.**" (emphasis added)).  I additionally relied on multiple technical documents specific to the Lynks cards, which confirmed Mr. Young's testimony that the Lynks System used the same hardware as the Fortezza Crypto Card.  These documents included similar technical documents that I reviewed in my analysis of the Fortezza Crypto Card, and a full list is again provided in Exhibit B.

208.    As with Fortezza, I reviewed the deposition transcripts from the inventors of the Asserted Patents, many of whom were involved with the Lynks System, and the deposition transcripts of Jack Young and Sue Pontius.

209.    I also relied on my knowledge, skill, and experience, as well as other technical materials that informed me as to the knowledge of a skilled artisan at the time of the filing of the Asserted Patents.

210.    According to SPEX, Spyrus developed the Lynks System in 1995.  *See* SPEX Response to Kingston Interrogatory No. 3 ("In 1995, Spyrus developed EES LYNKS Privacy Card using the MYK-82/82A chip.").  This date is confirmed by documents showing that the Lynks System was introduced for sale in 1995.  *See* SPEX00029154, at SPEX00029159.  Moreover, by 1997, Spyrus stated that the Lynks System had been on sale "for years."  SPEX00029154, at SPEX00029156.  In short, the Lynks System was on sale as of 1995, long before the bar date for the Asserted Patents.

211.    As Mr. Young explained, the Lynks System was Spyrus's implementation of the Fortezza Crypto Card using commercial encryption algorithms as opposed to just government encryption algorithms:

84

RESTRICTED – ATTORNEY'S EYES ONLY

Q. What's the relationship between the EES LYNKS Privacy Card and the Fortezza card?

A. The relationship between them?

Q. Yes.

A. The LYNKS card used commercial algorithms, I guess. It was -- used the same hardware as the Fortezza card.

* * *

[Q.] So wherein the Fortezza used government encryption algorithms, the LYNKS used both government and commercial encryption algorithms?

Q. Correct?

A. Yes, the LYNKS used both algorithms.

Young Dep. at 138:7-139:6 (objections omitted).  Thus, according to Mr. Young, the only difference between the Fortezza Crypto Card and the Lynks System was the encryption algorithms used by the cards—not any difference in hardware.

## XI.   AS SPEX HAS APPLIED THE CLAIMS IN ITS INFRINGEMENT CONTENTIONS, THE ASSERTED CLAIMS ARE ANTICIPATED BY THE PRIOR ART

### A. Jones

#### 1.   '802 Claim 1

##### a)   [1pre] A peripheral device, comprising

212.   To the extent the preamble is limiting, Jones discloses this element.  The Court construed "peripheral device" as "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device."

213.   First, Jones discloses "a device that operates functionally separate from a host computing device."  Jones discloses a "detachable PCMCIA memory card" that incorporates

85

**RESTRICTED – ATTORNEY'S EYES ONLY**

a variety of functionalities separate from the host computing device, including security and storage functionality.  For example, Jones discloses: "A detachable PCMCIA memory card incorporating a smartcard integrated circuit for storing a password value and logic circuitry for preventing access to information stored on the memory card unless the user of the host computer to which the memory card is connected can supply a password matching the stored password.  The smartcard integrated circuit may also be used to store public and private key values used to encrypt and decrypt data stored on the card or elsewhere on the host computer or exchanged with a remote computer."  Jones at Abstract.  *See also, e.g.*, Jones at Fig. 1; 3:15-43 ("[The preferred embodiment of the invention takes the form of a personal computer memory card [100] ... interconnected with a host computer 110 by means of a hardware and software interface which conforms to the [PCMCIA] standard .... PCMCIA cards are commonly used to provide additional high-speed memory capacity to the connected host computer or to implement fax and data modems, network access devices, and hard-disk mass storage devices. ... The embodiment of the invention shown in FIG. 1 provides significant additional security for data and programs stored in a detachable memory card by incorporating an access-locking mechanism for preventing access to the stored data by those who are unable to present an authorizing password.").

214.     Second, Jones discloses "a device ... that is connected to the host computing device, including such devices in the same housing as the host computing device."  For example, Jones discloses: "A detachable PCMCIA memory card incorporating a smartcard integrated circuit for storing a password value and logic circuitry for preventing access to information stored on the memory card unless the user of *the host computer to which the memory*

86

RESTRICTED – ATTORNEY'S EYES ONLY

*card is connected* can supply a password matching the stored password." Jones at Abstract (emphasis added). *See also, e.g.*, Jones at Fig. 1; 3:15-43 ("As illustrated in FIG. 1 of the drawings, the preferred embodiment of the invention takes the form of a personal computer memory card indicated generally at 100. *The memory card 100 is interconnected with a host computer 110* by means of a hardware and software interface which conforms to the [PCMCIA] standard ...." (emphasis added)).

> **b)  [1a] security means for enabling one or more security operations to be performed on data;**

215.     Jones discloses this element.  The Court determined that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

> <u>Recited Function</u>: enabling one or more security operations to be performed on data
>
> <u>Corresponding Structures</u>:
>
> 1. A specific hardware component programmed or configured to perform a security operation disclosed in '802 Patent at 18:1-47 or '135 Patent at 21:29-22:9;
>
> 2. A special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and referred to by the name Capstone), which includes an ARM6™ processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense ('802 Patent at 15:67-16:8)

I have been informed that the presence of structure either in accordance with 1 or 2 is sufficient; both are not necessary.

216.     Jones discloses at least the first corresponding structure identified in the Court's construction.  The disclosed structure performs the recited function.  Jones meets

RESTRICTED – ATTORNEY'S EYES ONLY

the claimed security means by its encryption-decryption unit 177 alone or in combination with smartcard I.C. 250.

217.    Jones discloses the structure of "[a] specific hardware component programmed or configured to perform a security operation disclosed in '802 Patent at 18:1-47 or '135 Patent at 21:29-22:9." For example, Jones discloses a "specific hardware component"—the encryption-decryption unit 177 alone or in combination with smartcard I.C. 250—which is programmed or configured to perform a number of the security operations disclosed in the identified patent excerpts, including key exchange operations, digital signature operations, and encryption and decryption operations. For example, Jones discloses: "To provide additional security, the data transferred over the l6-bit data bus between the data bus buffer 173 and the gate 178 is processed by the encryption-decryption unit 177 which prefe[r]ably [i]mplements a symmetrical key algorithm, such as DES, based on a key value which stored in and fetched from the EEPROM 275 [*sic* 257] in the smartcard I.C. 250. The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the data back into its original form when it is retrieved from the common memory array 150. This additional encryption mechanism protects data stored in the common memory array even if that data is successfully read from the flash memory chips making up the array 150." Jones at 6:5-21. *See also, e.g.*, Jones at 3:15 (describing "HARDWARE"); 5:1-19 (disclosing "The smartcard I.C. includes its own processor 260 and non-volatile EEPROM memory circuits 257 which operate as a secret key information substorage system."); 9:38-60 (disclosing "the smartcard I.C. may store one or more public key values such as the public key 435 which enables the host processor to send

RESTRICTED – ATTORNEY'S EYES ONLY

secure transmissions to a selected remote receiving computer in possession of the corresponding private key 460. ... The use of the detachable, password protected secure memory card ... provides additional security by providing an improved key management mechanisms which requires that a would-be user of such a system have both physical possession of the memory card (which holds the needed key values) and knowledge of the password which permits the key values to be accessed."); 2:30-43 ("In accordance with the invention, the key information substorage unit advantageously takes the form of a 'smartcard' integrated circuit capable of storing secret key values which may be used to provide password-protected access to the data stored on the memory card, or optionally to provide secure storage for the encryption or decryption keys, or digital signatures, needed to allow the host computer to access and/or operate a secure information storage or telecommunications system."); 3:50-67 (disclosing "[d]ata transfers between the common memory array 150 and the host computer 110 are accomplished via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a gate 178 and an internal data bus 179"); 6:22-27 ("All of the operative circuitry making up the memory card 100, with the exception of the attribute memory 190, the common memory array 150, and the smartcard I.C. 250, is prefe[r]ably implemented by means of a single, monolithic application specific integrated circuit (ASIC) as indicated within the dashed line rectangle 290 in FIG. 1.").

218.     Jones also discloses the recited function of "enabling one or more security operations to be performed on data."  For example, Jones discloses that "[t]o provide additional security, the data transferred over the 16-bit data bus between the data bus buffer

RESTRICTED – ATTORNEY'S EYES ONLY

173 and the gate 178 is processed by the encryption-decryption unit 177 which preferably emplements [sic] a symmetrical key algorithm, such as DES, based on a key value which stored in and fetched from the EEPROM 275 [*sic* 257] in the smartcard I.C. 250.  The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the data back into its original form when it is retrieved from the common memory array 150."  Jones at 6:5-14.

### c)      [1b] target means for enabling a defined interaction with a host computing device;

219.      Jones discloses this element.  The parties agreed that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and has the following construction:

> Recited function: enabling a defined interaction with a host computing device

> Corresponding structures: (1) a memory module adapted to enable non-volatile storage of data, (2) a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver, (3) a smart card reader, or (4) biometric device, or equivalents thereof.

In addition, the Court construed "defined interaction" as "an interaction [with a host computing device] that can provide one or more of a variety of functionalities."

220.      Jones discloses the corresponding structure.  For example, Jones discloses at least "(1) a memory module adapted to enable non-volatile storage of data."  Jones meets the claimed target means by its common memory array 150.

221.      Jones discloses the structure of "a memory module adapted to enable non-volatile storage of data."  For example, Jones discloses "a memory module" (the "common memory array 150") "adapted to enable non-volatile storage of data" ("preferably implemented with non-volatile flash memory integrated circuits, enabling the common

RESTRICTED – ATTORNEY'S EYES ONLY

memory array to store 10 megabytes of data"). For example, Jones discloses: "The secure memory card 100 *stores data in a common memory array 150*, preferably implemented with *non-volatile flash memory* integrated circuits, enabling the common memory array *to store 10 megabytes of data* in an area small enough to be included on a credit-card sized Type I PCMCIA card." Jones at 3:50-57 (emphasis added). *See also, e.g.,* Jones at 6:5-21 ("The unit 250 encrypts data from the data bus buffer 173 prior to *storing the data in the common memory array 150*, and decrypts the data back into its original form when it is retrieved from the common memory array 150. This additional encryption mechanism protects data stored in the common memory array even if that data is successfully read from the flash memory chips making up the array 150." (emphasis added)).

222.     Jones also discloses the recited function of "enabling a defined interaction with a host computing device" where "defined interaction" is "an interaction [with a host computing device] that can provide one or more of a variety of functionalities." **First**, the "common memory array 150"of Jones "enabl[es] a defined interaction with a host computing device" of the storage of data: "The secure memory card 100 stores data in a common memory array 150, preferably implemented with non-volatile flash memory integrated circuits, enabling the common memory array to store 10 megabytes of data in an area small enough to be included on a credit-card sized Type I PCMCIA card." Jones at 3:50-57. The disclosure that the secure memory card *stores data* is a disclosure of a defined interaction. **Second**, the "common memory array 150" of Jones "enabl[es] a defined interaction with a host computing device" by being partitioned into independently accessed regions: "The address space provided by the common memory array 150 is preferably

RESTRICTED – ATTORNEY'S EYES ONLY

partitioned into independently accessed regions. ... [A] particular partition may be selected by

the address decoder 195 which activates particular chip enable lines with the common

memory enable output 210." Jones at 5:32-34. **Third**, the "common memory array 150" of

Jones "enabl[es] a defined interaction with a host computing device" of allowing data to be

transferred between the common memory array 150 and the host: "The removable memory

card contemplated by the present invention allows data stored on the card to be made

immediately available to the connected host computer upon proper presentation of a

password known only to an authorized user." Jones at 2:23-27. Jones further discloses that

"The secure memory card 100 contemplated the invention is adapted to be connected via its

PCMCIA interface to the host computer 110 which may in turn be connected to other

computers by modem, or by a network, as illustrated by the connection of remote computer

120 via the telecommunications link 130 seen in FIG. 1." Jones at 3:44-49.

> ### d)    [1c] means for enabling communication between the
> ### security means and the target means;

223.      Jones discloses this element. The parties agreed that this is a means-plus-

function term subject to 35 U.S.C. § 112(6) and has the following construction:

> Recited function: enabling communication between the security means and
> the target means
>
> Corresponding structures: conventional computer bus 615.

224.      Jones discloses the corresponding structure. For example, Jones discloses

circuitry and signal lines (*e.g.*, gate 178, internal data bus 179, and associated connections)

that enable the security means (encryption-decryption unit 177 alone or in combination with

smartcard I.C. 250) to communicate with the target means (common memory array 150). As

**RESTRICTED – ATTORNEY'S EYES ONLY**

indicated in Jones (*e.g.*, Figure 1 and associated description in the specification referring to "bus buffer" and "data bus"), Jones' corresponding structure is a conventional computer bus that transfers data among multiple components.  For example, Jones references Fig. 1 (shown below) and discloses that the internal encryption/decryption unit 177 is connected via gate 178 and an internal data bus 179 to the common memory array 150: "Data transfers between the common memory array 150 and the host computer 110 are accomplished via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a gate 178 and an internal data bus 179."  Jones at 3:50-67.  "The attribute memory 190 shares the internal address bus 165, data bus 175 and control bus 185 with the common memory array 150."  Jones at 4:31-33.  *See also, e.g.*, Jones at 4:46-50 ("Gate 178 prevents the common memory array 150 from exchanging data with the host 150 via data bus 179 unless an authorization signal is supplied to the gate 178 via a control line 219 from a card lock logic circuit 220."); 6:5-14 ("To provide additional security, the data transferred over the 16-bit data bus between the data bus buffer 173 and the gate 178 is processed by the encryption-decryption unit 177 which prefe[r]ably [i]mplements asymmetrical key algorithm, such as DES, based on a key value which stored in and fetched from the EEPROM 275 [sic 257] in the Smartcard I.C. 250.  The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the data back into its original form when it is retrieved from the common memory array 150.")  Figure 1 of Jones is shown below:

RESTRICTED – ATTORNEY'S EYES ONLY



Fig. 1

225.      Jones also discloses the recited function of "enabling communication between the security means and the target means."  For example, Jones discloses that the means enables the claimed communication (e.g., "data transfers ... are accomplished").  For example, Jones states: "*Data transfers* between the common memory array 150 and the host computer 110 *are accomplished* via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a gate 178 and an internal data bus 179."  Jones at 3:50-67 (emphasis added).  *See also, e.g.,* Jones at 4:46-50 ("Gate 178 prevents the common memory array 150 from exchanging data with the host 150 via data bus 179 unless an authorization signal is supplied to the gate 178 via a control line 219 from a card lock logic circuit 220.").

RESTRICTED – ATTORNEY'S EYES ONLY

e)     **[1d] means for enabling communication with a host computing device;**

226.     Jones discloses this element.  The Court determined that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

Recited Function: enabling communication with a host computing device

Corresponding Structures:

1. Input/Output (I/O) device; 2. PCMCIA interface; 3. Cord between housing and mating receptacle; 4. Wireless communication interface; 5. Smart card interface; 6. Serial interface (such as RS-232); 7. Parallel interface; 8. SCSI interface; or 9. IDE interface.

227.     Jones discloses the corresponding structure.  For example, Jones discloses at least "2. PCMCIA interface."  For example, Jones discloses: "As illustrated in FIG. 1 of the drawings, the preferred embodiment of the invention takes the form of a personal computer memory card indicated generally at 100.  The memory card 100 is interconnected with a host computer 110 by means of a *hardware and software interface which conforms to the Personal Computer Memory Card International Association (PCMCIA) standard* which has been widely accepted for use in laptop and notebook computers."  Jones at 3:15-27 (emphasis added).  *See also, e.g.*, Jones at 3:44-49 ("The secure memory card 100 contemplated [by] the invention is adapted to be connected via its PCMCIA interface to the host computer 110 which may in turn be connected to other computers by modem, or by a network, as illustrated by the connection of remote computer 120 via the telecommunications link 130 seen in FIG. 1."); 3:50-67 ("Data transfers between the common memory array 150 and the host computer 110 are accomplished via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a gate 178 and an internal data bus 179.

RESTRICTED – ATTORNEY'S EYES ONLY

Control signals are exchanged between the common memory array 150 and the host computer via the PCMCIA interface control terminals 181 and an internal control bus 185."); 4:1-22 ("The address terminals 161, data terminals 171 and control terminals 181 seen in FIG. 1 are a simplified representation of the 68 pin PCMCIA standard interface which includes provision for 26 parallel address conductors (A0-A25), 16 parallel data conductors (D0-D15) and a remaining set of power and control conductors including power and ground connections and a collection of memory control signal connections (enable, select, wait, write, detect, etc.). The PCMCIA standard achieves interchangeability of cards of different functions by establishing standards for the physical card (dimensions and mechanical tolerances for the card and connectors), the card interface (pinout and signal definitions), and card software (which specifies the organization of data on the card and the record formats and protocols by which configuration information and data is exchanged with the host computer).").

228. Jones also discloses the recited function of "enabling communication with a host computing device." The PCMCIA of Jones "enabl[es] a connection with a host computing device" and accomplishes data transfers and exchange of control signals with the host computing device. Jones states: "The secure memory card 100 contemplated [by] the invention is *adapted to be connected via its PCMCIA interface to the host computer 110* which may in turn be connected to other computers by modem, or by a network, as illustrated by the connection of remote computer 120 via the telecommunications link 130 seen in FIG. 1." Jones at 3:44-49 (emphasis added). Jones also states: "*Data transfers* between the common memory array 150 and the host computer 110 *are accomplished via the interface data terminals 171,*

RESTRICTED – ATTORNEY'S EYES ONLY

a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a

gate 178 and an internal data bus 179.  *Control signals are exchanged* between the common

memory array 150 and the host computer *via the PCMCIA interface control terminals 181* and an

internal control bus 185."  Jones at 3:50-67 (emphasis added).  *See also, e.g.*, Jones at 4:1-22

("The address terminals 161, data terminals 171 and control terminals 181 seen in FIG. 1 are

a simplified representation of the 68 pin PCMCIA standard interface which includes

provision for 26 parallel address conductors (A0-A25), 16 parallel data conductors (D0-D15)

and a remaining set of power and control conductors including power and ground

connections and a collection of memory control signal connections (enable, select, wait,

write, detect, etc.).

> **f)   [1e] means for operably connecting the security means
> and/or the target means to the host computing device
> in response to an instruction from the host computing
> device; and**

229.     Jones discloses this element.[10]  The Court determined that this is a means-

plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

---

[10] I understand that in its Tentative Claim Construction Order, the Court stated that this
element cannot be met by a device having only a single mode for a single module:

> This claim language can be read as "operably connecting the security module <u>and</u> the
> target module to the host computing device," "operably connecting the security
> module <u>or</u> the target module to the host computing device," or a combination of all
> three possible modes.  The claim does not cover a device having only a single mode
> for a single module, for example, a device whose only available mode is to operably
> connect to a target module to the host computing device.

Tentative Claim Construction Order, at 23 (Sept. 15, 2017).  I understand that the above language
did not appear in the Court's *Markman* Order, nor was it contradicted by that Order.  *See* Order
Regarding Claim Construction, D.I. 122, at 26-30 (Oct. 18, 2017).  Should the construction of this
term be amended or refined, I reserve the right to amend my opinions.

RESTRICTED – ATTORNEY'S EYES ONLY

<u>Recited Function</u>: operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device

<u>Corresponding Structures</u>: (1) PCMCIA interface and memory section 612a; or (2) Interface and a device or host driver.

230.     Jones discloses the first structure identified in the Court's construction: "(1) PCMCIA interface and memory section 612a." The '802 patent (at 7:62-8:14) states (emphasis added):

> One way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of the peripheral device. This is true for a variety of types of peripheral devices, such as, for example, peripheral devices that conform to the PCMCIA standard. *(The PCMCIA standard, for example, includes a specification, called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as "attribute memory", that stores data identifying the type of the PCMCIA card.)* In the system 600, the peripheral device 602 is such a device. The memory section of the memory device 612 of the peripheral device 602 which the host computing device 601 seeks to access is shown in FIG. 6 as *the memory section 612a, and the data stored therein is referred to herein as "peripheral device identification data."*

231.     Jones discloses the structure of a "PCMCIA interface and memory section 612a." Jones discloses a "PCMCIA interface"—a PCMCIA interface as explained above in regard to claim element [1d], which is incorporated by reference. Jones also discloses structure equivalent to "memory section 612a"—attribute memory 190 alone or in combination with address decoder 195. For example, Jones references Fig. 1 (shown below) and discloses: "To implement the PCMCIA interface standard, the secure memory card includes *a non-volatile attribute memory 190 which stores information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected*, and to

98

RESTRICTED – ATTORNEY'S EYES ONLY

automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 110." Jones at 4:23-30 (emphasis added). Figure 1 of Jones is shown below.



Fig. 1

232.    Jones further discloses: "the attribute memory 190 stores information which specifies the nature of the memory card 100 and the format used for the information stored on the card. The attribute memory 190 holds a Card Information Structure ('CIS') which is organized in a "Metaformat" defined in Section 5 of the PCMCIA PC (Personal Computer) Card Standard, Release 2.01, for handling numerous different data recording formats. The CIS is organized as hierarchy of layers and takes the form of a chain (linked-list) of data blocks called "tuples" which begin at address 0 of the attribute memory 190." Jones at 6:33-47 (emphasis added). Jones further describes the attribute memory 190 and associated circuitry and signal lines. For example, Jones discloses: "The address terminals 161, data

RESTRICTED – ATTORNEY'S EYES ONLY

terminals 171 and control terminals 181 seen in FIG. 1 are a simplified representation of the

68 pin PCMCIA standard interface which includes provision for 26 parallel address

conductors (A0-A25), 16 parallel data conductors (D0-D15) and a remaining set of power

and control conductors including power and ground connections and a collection of

memory control signal connections (enable, select, wait, write, detect, etc.).  The PCMCIA

standard achieves interchangeability of cards of different functions by establishing standards

for the physical card (dimensions and mechanical tolerances for the card and connectors),

the card interface (pinout and signal definitions), and card software (which specifies the

organization of data on the card and the record formats and protocols by which

configuration information and data is exchanged with the host computer)."  Jones at 4:1-22.

*See also, e.g.*, Jones at 3:15-27 (disclosing "[t]he memory card 100 is interconnected with a

host computer 110 by means of a hardware and software interface which conforms to the

[PCMCIA] standard"); 3:44-49 (disclosing "[t]he secure memory card 100 ... is adapted to be

connected via its PCMCIA interface to the host computer 110"); 3:50-67 (disclosing "secure

memory card 100 stores data in a common memory array 150 ... Data transfers between the

common memory array 150 and the host computer 110 are accomplished via the interface

data terminals 171, a data bus buffer 173, an internal data bus 175, a internal

encryption/decryption unit 177, a gate 178 and an internal data bus 179.  Control signals are

exchanged between the common memory array 150 and the host computer via the PCMCIA

interface control terminals 181 and an internal control bus 185.").

233.    Jones also discloses that its corresponding structure for "(1) PCMCIA

interface and memory section 612a" (PCMCIA interface and attribute memory 190 alone or

RESTRICTED – ATTORNEY'S EYES ONLY

in combination with address decoder 195) performs the recited function of "operably connecting ... the target means to the host computing device in response to an instruction from the host computing device," where the target means (as explained above) is common memory array 150.

234.     I note that Jones' multiple references to the PCMCIA standards and to individual specifications that comprise that standard would have reasonably suggested to one of ordinary skill in the art to consider the PCMCIA standards in reading Jones.[11]  *See, e.g.,* Jones at Abstract (stating that Jones regards "[a] detachable PCMCIA memory card"); 2:10-13 ("the present invention takes the form of a removable memory card, preferably implemented in conformity with the PCMCIA (Personal Memory Card Industry Association) interface standard"); 4:8-19 ("Complete information which defines the PCMCIA standard is published by and available from the Personal Computer Memory Card International Association, 1030G East Duane Avenue, Sunnyvale, Calif. 94086.").  *See also, e.g.,* Jones at 3:16-32; 3:33-36; 3:44-49; 3:50-67; 4:1-8; 4:23-40; 6:33-60; 6:61-7:2; 7:3-20; 7:21-8:2; 9:6-10.  Moreover, Jones refers to several individual specifications of the PCMCIA standards: the PC Card Standard, the Card Services Specification, and the Socket Services Specification.  *See, e.g.,* Jones at 4:8-22 ("The present embodiment of invention conforms to the PC Card Standard Specification, Release 2.01, published in November, 1992."); 6:36-40 ("The attribute memory 190 holds a Card Information Structure ('CIS') which is organized in a 'Metaformat' defined in Section 5 of the PCMCIA PC (Personal Computer) Card

---

[11] I have also been informed that Jones incorporates by reference the PC Card Standard and the Card Services Specification of the November 1992 PCMCIA standard.

RESTRICTED – ATTORNEY'S EYES ONLY

Standard, Release 2.01, for handling numerous different data recording formats.”); 6:47-49 (“The standard ‘Socket Services’ and ‘Card Services’ card interface software, when implemented on a given host computer ....”); 7:3-5 (“The programming interface to the PCMCIA Card Services Software is defined in Section 3 of the PCMCIA Standard (Release 2.01) ....”). *See generally* Jones (referencing numerous aspects of the PCMCIA standards). The November 1992 PC Card Standard (“PC Card Standard”) is attached to my report as Exhibit G. The November 1992 Card Services Specification (“Card Services Spec”) is attached to my report as Exhibit H.

235. **First**, Jones with the PCMCIA standards discloses that attribute memory 190 stores information used for “operably connecting.” Jones states: “the attribute memory 190 stores information which specifies *the nature of the memory card 100 and the format used for the information stored on the card.* The attribute memory 190 holds a Card Information Structure (‘CIS’) which is organized in a ‘Metaformat’ defined in Section 5 of the PCMCIA PC (Personal Computer) Card Standard, Release 2.01, for handling numerous different data recording formats. The CIS is organized as hierarchy of layers and takes the form of a chain (linked-list) of data blocks called ‘tuples’ which begin at address 0 of the attribute memory 190.” Jones at 6:33-43 (emphasis added). *See also, e.g.,* Jones at 4:23-30 (stating that “non-volatile attribute memory 190” stores information allowing the “identif[ication of] the particular PCMCIA card” and to “establish the appropriate hardware/software interface”).

**RESTRICTED – ATTORNEY'S EYES ONLY**

236.       **Also**, Jack (John) Young, Director of Hardware Engineering at Spyrus,[12]

admitted that, for the PCMCIA standards, such as that used in Jones, the CIS holds

information regarding the "nature of ... the device," "information about the card in terms of

manufacturer name," "how you access the memory areas," "whether a command is being

executed," "if the response from a command is available," and the "status ... of the card,"

among other things.  Mr. Young testified:

> Q. And what are card information structures in the context of a Fortezza?
>
> A. Okay.  So the CIS, the card information structure, holds basically things of the *nature of the -- of the device* in terms of its description.  There's what they call tuples in the CIS, which give you *information about the card in terms of manufacturer name, how you access the memory areas on the PCMCIA interface.*  There's other areas there that are used to indicate *whether a command is being executed* on the Fortezza card.  And if --
>
> Q. Anything else?
>
> A. And *if the response from a command is available.*
>
> Q. Anything else?
>
> A. Well, there's a status.  You get *status of what the -- of the card in terms of what state it's in* when it's -- it can be in variable states.  So that just gives you the information of what state you're in.
>
> Q. Anything else?
>
> A. No.  Well, I'm sure there is, but –
>
> Q. The CIS and these tuples, you'll agree that this is a defined part of the PCMCIA standard; is that correct?
>
> A. Okay.  Can you -- do you have any more descriptive -- can you be a little more specific?

---

[12] Mr. Jack (John) Young started working for Spyrus in 1995 and has working for Spyrus continuously since then.  Young Dep. at 15:14-25.  He has been the Director of Hardware Engineering since roughly 2006.  *Id.* at 16:9-13.  Mr. Young also owns equity shares in SPEX Technologies.  *Id.* at 231:21-232:24.

RESTRICTED – ATTORNEY'S EYES ONLY

Q. Is the card information structures part of the PCMCIA standard?

A. Yes.

Q. Spyrus didn't dream up having CIS's, correct?

A. No.

Q. And the -- you said that there are tuples that indicate the manufacturing name.  Is that part of the PCMCIA standard?

A. I believe so, yeah.

Q. And the tuples for how you access the memory areas, is that also part of the PCMCIA standard?

A. Yes.

Young Dep. at 96:23-98:16 (emphases added; objections omitted).

237.    **Also**, the PCMCIA standards disclose that the Card Information Structure (or "CIS"), commonly called the Metaformat, contains information regarding the type of the peripheral device: "The information contained in the Card Information Structure ["CIS"] is commonly called the Metaformat."  PC Card Standard (DEF_INV0001770) at page 5-4 (also stating, "the primary CIS be recorded in Attribute Memory starting at address zero"). Information regarding the type of peripheral device is kept in the Metaformat.  For example, the PC Card Standard states: "*The first tuple starting from address 0 in the ATTRIBUTE memory space must be either a 'Device Information tuple' (tuple code 01H)*, a 'Null Control tuple' (tuple code 00H), or an 'End of List tuple' (tuple code FFH, see Section 5.2.5.5 for processing).  *Id.* (emphasis added); *id.* at page 5-7 (specifying the "basic compatibility tuples"); page 5-13 ("The device-information tuples contain information about the card's devices.  The tuples contain: device speed, device size, device type, and address-space layout information for either Attribute-Memory or Common-Memory space."); *id.* at page 5-15 (describing the

RESTRICTED – ATTORNEY'S EYES ONLY

"Device Type Field"; "Bits 4 through 7 of byte 0 of the device-speed/ ID sequence indicate the device type."). The PC Card Standard identifies the following Layer 1 Basic Compatibility Tuples:

**Table 5-2: Tuple Codes**

| Code | Name | Description |
|---|---|---|
| **Layer 1 Basic Compatibility Tuples** | | |
| 00H | CISTPL_NULL | Null tuple - ignore |
| 01H | CISTPL_DEVICE | The device information tuple (common memory) |
| 02H-07H | - | (Reserved for future, upward-compatible versions of the device information tuple). |
| 08H-0F | - | (Reserved for future, incompatible versions of the device information tuple). |
| 10H | CISTPL_CHECKSUM | The checksum control tuple. |
| 11H | CISTPL_LONGLINK_A | The long-link-control tuple (to Attribute Memory). |
| 12H | CISTPL_LONGLINK_C | The long-link-control tuple (to Common Memory). |
| 13H | CISTPL_LINKTARGET | The link-target-control tuple. |
| 14H | CISTPL_NO_LINK | The no-link-control tuple. |
| 15H | CISTPL_VERS_1 | Level 1 version/product-information tuple. |
| 16H | CISTPL_ALTSTR | The alternate-language-string tuple. |
| 17H | CISTPL_DEVICE_A | Attribute Memory device information. |
| 18H | CISTPL_JEDEC_C | JEDEC programming information (for Common Memory). |
| 19H | CISTPL_JEDEC_A | JEDEC programming information (for Attribute Memory). |
| 1AH | CISTPL_CONFIG | The Configuration tuple. |
| 1BH | CISTPL_CFTABLE_ENTRY | The Configuration-Table-Entry tuple. |
| 1CH | CISTPL_DEVICE_OC | Other operating conditions device information for Common Memory. |
| 1DH | CISTPL_DEVICE_OA | Other operating conditions device information for Attribute Memory. |
| 1EH-3FH | - | (Reserved for future standardization) > |

PC Card Standard at page 5-7.

238. **Second**, Jones with the PCMCIA standards discloses that attribute memory 190 alone or in combination with address decoder 195 performs "operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device." For example, the PC Card Standard explains that the host computing device requests information from the CIS including the type of the peripheral: "*The routine that reads a given tuple should be coded to start by examining the tuple code. ...*

RESTRICTED – ATTORNEY'S EYES ONLY

*If the tuple code is known*, and if the tuple does not contain active registers (which is the case for all standard tuples), *then the routine should copy bytes into a buffer in main storage.* Bytes should be copied from the code byte up to the last byte before the next tuple. If the link field is FFH (meaning end-of-list) then a maximum of 256 bytes -the code byte, the link byte and 254 byte of potential tuple data-*should be copied from the card to the main store.*" PC Card Standard at pages 5-12 to 5-13. Also, the Card Services Spec discloses multiple functions (*e.g.*, "Callback," "GetConfigurationInfo," "GetFirst/NextTuple," and "GetTupleData") that allow for "operably connecting" in response to the instruction: "Card Services clients may need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket. (Some clients may receive all the information they require from the CARD_INSERTION event). The Client Utilities functions reduce the code required for individual clients to perform such processing. GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated. The client may concentrate on what to do with tuple data without having to duplicate the link traversal code. The client retrieves the contents of the tuple by using GetTupleData." Card Services Spec at 3-12. *See also, e.g.*, Card Services Spec at pages 3-20 to 3-21 (stating that, for a "CARD_INSERTION" event, Card Services uses a "Callback" function that "attempts to read the [CIS]" and "uses device information from the [CIS] to create region description structures in its internal data area"; "Clients may have enough information provided by a GetConfigurationInfo request to determine if they wish to use the PC Card. If they do not have enough information, clients may use Card Services functions to further process the CIS. Clients may process tuples directly using the memory ReadMemory functions or use

RESTRICTED – ATTORNEY'S EYES ONLY

the tuple processing functions GetFirst/NextTuple, GetFirst/NextRegion or GetFirst/Next Partition."); page 3-24 (stating that "[t]he CLIENT_INFO event requests that the client return its client information data," and indicating that the request uses the "Callback" function); page 5-20 (stating that the "GetConfigurationInfo" function "returns information about the specified socket and PC Card configuration").  In addition, according to the Card Service Spec, the "RequestConfiguration" function "configures the PC Card and socket. Card Services will apply power to the socket if the socket was not powered.  This function must be used by clients that require an I/O interface to their PC Card.  The ClientHandle returned by RegisterClient is passed in the Handle argument.  RequestIO and RequestIRQ must be used before calling this function to specify the IO and IRQ requirements for the PC Card and socket.  After finding an appropriate configuration, RequestConfiguration establishes the configuration in the socket adapter and PC Card."  Card Services Spec at pages 5-67 to 5-68.  Further, "The ConfigIndex field is the value written to the Option register for the configuration index required by the PC Card."  Card Services Spec at page 5-68.  The PC Card Standard similarly states: "The Configuration Option Register is used to configure the card and to issue a soft reset to the card.  The register is a read/ write register which contains two fields.  The Configuration Option Register must be implemented in all configurable cards," PC Card Standard at page 4-35, and includes the below summary of fields in the Configuration Option Register:

RESTRICTED – ATTORNEY'S EYES ONLY

| SRESET | SRESET Card. Setting this bit to one (1) places the card in the reset state. This is equivalent to assertion of the +RESET signal except that this bit is not cleared. Returning this bit to zero (0) leaves the card in the same unconfigured, reset state as following a power-up and hardware reset. This bit is set to zero by power up and hardware reset. |
| LevlREQ | Level Mode interrupts selected when bit is one (1), Pulse Mode interrupts selected when bit is zero (0). |
| Conf Index | Configuration Index. This field is written with the index number of the entry in the card's Configuration Table which corresponds to the configuration which the system chooses for the card. When the Configuration index is 0, the card's I/O is disabled and will not respond to any I/O cycles, and will use the Memory Only interface. |

*See also* PC Card Standard at page 4-11 ("A card remains in the unconfigured state until the Card Configuration Option Register has been written with a valid configuration."); page 4-34 ("Each configurable card is identified by a Card Configuration Table in the card's Card Information Structure.  These cards must have one or more of a set of Card Configuration Registers which are used to control the configurable characteristics of the card.").

239.    **Also**, Mr. Jack (John) Young, Director of Hardware Engineering at Spyrus, testified that the host computer requests the content of the CIS (including to allow for "operably connecting" as discussed above) using the GetTupleData command:

> Q. Are you familiar with the host command under the PCMCIA standard called "GetTuples data"?
>
> A. I've heard of it.
>
> Q. What is a GetTuples data command?
>
> A. It allows a computer to be able to read the information from the -- from a device that's connected to the PCMCIA bus.
>
> Q. When you say "allows to read," what do you mean?  If a PCMCIA card receives a GetTuples data command, what does it do?
>
> A. It will return the card information structure.

Young Dep. at 179:16-180:2.

RESTRICTED – ATTORNEY'S EYES ONLY

> **g)** **[1f] means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.**

240.     Jones discloses this element.  The Court determined that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

> Recited Function: mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means
>
> Corresponding Structures: Interface control device 910 (as shown in Fig. 9B).

1.     Under the Court's construction, this corresponding structure must be either literally present or an equivalent must be present.  Under this proper construction, Jones teaches many of the structures shown in Fig. 9B, but does not teach the structures associated with the "Compact Flash Interface," such as the "Compact Flash I/O Control," "Compact Flash Data Buffer," and the "Compact Flash Sector Center."  As I understand the Court's construction, these structures must be part of the corresponding structure for this claim element.  However, as I discuss below with respect to obviousness, a skilled artisan could and would have modified Jones to accommodate Compact Flash, and thus would have included this structure.

241.     However, as SPEX has applied this element in its infringement contentions, Jones discloses the equivalent of the corresponding structure of an "[i]nterface control device 910 (as shown in Fig. 9B)."  In particular, Jones discloses at least address bus terminals 161, address bus buffer circuit 163, address bus 165, interface data terminals 171, data bus buffer 173, internal data bus 175, gate 178, internal data bus 179, card lock logic 220, lock circuit enable line 221, address decoder 195, attribute memory 190, interface

RESTRICTED – ATTORNEY'S EYES ONLY

control terminals 181, control bus 185, and associated connections.  Jones states: "The secure memory card 100 stores data in a common memory array 150, preferably implemented with non-volatile flash memory integrated circuits, enabling the common memory array to store 10 megabytes of data in an area small enough to be included on a credit-card sized Type I PCMCIA card.  The data is stored in random access locations specified by address values supplied via the PCMCIA's standard 26-bit *address bus terminals 161*.  The address terminals 161 provide address signals to an input *address bus buffer circuit 163* which drives an internal *address bus 165*.  Data transfers between the common memory array 150 and the host computer 110 are accomplished via the *interface data terminals 171*, *a data bus buffer 173, an internal data bus 175,* a internal encryption/decryption unit 177, *a gate 178* and an internal *data bus 179*.  Control signals are exchanged between the common memory array 150 and the host computer via the PCMCIA *interface control terminals 181* and an internal *control bus 185*." Jones at 3:50-67 (emphasis added).  Further, Jones states: "Data transfers and operations, both within the memory card 100 and between the card 100 and the host computer 110, *are controlled by the card lock logic circuit 220*.  When the *lock circuit enable line 221* is activated in response to the detection of an access control command address value by *address decoder 195*, the *card lock logic circuit 220 responds to commands and data supplied to the internal data bus 175 from the host computer 110 via the data conductors 171 and the data bus buffers 173*.  The card lock logic circuit 220, the UART 230 and the smartcard I.C. 260 operate under the control of a common timing signal provided by an on-card clock generator circuit seen at 290 in FIG. 1." Jones at 5:20-31 (emphasis added).

RESTRICTED – ATTORNEY'S EYES ONLY

242.     The elements of Fig. 9B of the '802 patent have equivalent structure in Jones. For example, the three connections to the PCMCIA interface (I/O controller, address, data) and associated buffers and connections in Fig. 9B correspond to the three interface terminals and associated buffers and connections in Jones.  *See, e.g.*, Jones at 4:1-8 ("The address terminals 161, data terminals 171 and control terminals 181 seen in FIG. 1 are a simplified representation of the 68 pin PCMCIA standard interface which includes provision for 26 parallel address conductors (A0-A25), 16 parallel data conductors (D0-D15) and a remaining set of power and control conductors including power and ground connections and a collection of memory control signal connections (enable, select, wait, write, detect, etc.").  Compare, for example, Fig. 9B of the '802 patent with Fig. 1 of Jones:



FIG. 9B

RESTRICTED – ATTORNEY'S EYES ONLY



As another example, the "Config Registers" of Fig. 9B correspond to the attribute memory 190 in Jones. *See, e.g.*, PC Card Standard at page 4-4 (describing, as a "Memory Card Feature," that the "Attribute Memory space may be divided into areas for: ... Configuration Registers – an optional set of registers which allow the card to be configured by the system").

243.    Finally, while certain elements of Fig. 9B regard interacting with the compact flash interface (*e.g.*, Compact Flash Sector Cntr, Compact Flash I/O Control, Compact Flash Data Buffer, and Card Enable Decoder), Jones has structure for interacting with its non-volatile flash memory. **First**, Jones discloses that common memory array 150 is a flash memory. *See, e.g.*, Jones at 3:50-55 ("The secure memory card 100 stores data in a common memory array 150, preferably implemented with non-volatile flash memory integrated circuits ...."). **Second**, Jones describes how it has structure that addresses access to and data exchange with common memory array 150. Jones states: "[T]he address decoder 195 selects the common memory array 150 whenever the address on address bus 165 is within the

RESTRICTED – ATTORNEY'S EYES ONLY

address space of array 150 by energizing an common memory enable line 210 which supplies

an enable signal to the gate 178 in the data pathway to the common memory array 150.  Gate

178 prevents the common memory array 150 from exchanging data with the host 150 via

data bus 179 unless an authorization signal is supplied to the gate 178 via a control line 219

from a card lock logic circuit 220.  The card lock logic circuit 220 is connected to address

decoder 195 via the lock enable line 221, permitting card logic 220 to identify addresses

which designate memory locations in the common memory array 150 to which access may

be denied under appropriate circumstances.  The card lock logic circuit 220 is connected to

the internal data bus 175 which provides a pathway for downloading memory access control

commands from the host computer 110."  Jones at 4:41-58.

244.     The '802 patent explains that the bulk of Fig. 9B would "readily be

understood by those skilled in the art."  After identifying "interface control device 910" and

"configuration registers 911," the '802 patent states that the "remainder of the functional

blocks of the interface control device 910 shown in FIG. 9B perform functions and operate

in a manner that can readily be understood by those skilled in the art."  '802 at 17:47-50.

Indeed, the remainder of Fig. 9B shows standard functionality for a PCMCIA card.  For

example, Fig. 9B shows various "buffers," which are temporary storage for data and other

information as that information moves through the structures of the card, and additionally

shows various busses for the transmission of data and commands from the various structure

Fig. 9B also shows a Command Detector used to process incoming commands, and a "state

controller."

113

RESTRICTED – ATTORNEY'S EYES ONLY

245.     Jones also discloses the recited function of "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means."  For example, for security means corresponding to encryption-decryption unit 177, Jones states: "To provide additional security, the data transferred over the l6-bit data bus between the data bus buffer 173 and the gate 178 *is processed by the encryption-decryption unit 177* which prefe[r]ably [i]mplements a symmetrical key algorithm, such as DES, based on a key value which stored in and fetched from the EEPROM 275 in the smartcard I.C. 250.  The unit 250 encrypts data from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the data back into its original form when it is retrieved from the common memory array 150.  This additional encryption mechanism protects data stored in the common memory array even if that data is successfully read from the flash memory chips making up the array 150.  As discussed in more detail later, the secure key storage mechanism provided by the memory card may also be used to protect sensitive data being manipulated by mechanisms external to the memory card 100."  Jones at 6:5-21 (emphasis added).  *See also, e.g.*, Jones at 5:20-31 ("Data transfers and operations, both within the memory card 100 and between the card 100 and the host computer 110, are controlled by the card lock logic circuit 220.  When the lock circuit enable line 221 is activated in response to the detection of an access control command address value by address decoder 195, the card lock logic circuit 220 responds to commands and data supplied to the internal data bus 175 from the host computer 110 via the data conductors 171 and the data bus buffers 173.  The card lock logic circuit 220, the UART 230 and the smartcard I.C. 260 operate under the control of a common timing signal

RESTRICTED – ATTORNEY'S EYES ONLY

provided by an on-card clock generator circuit seen at 290 in FIG. 1."). *See also, e.g.,* Jones at

Title (referencing "Encrypted Data Storage"); 1:33-49 (referencing DES and RSA); 9:48-54

(referencing the "DES and RSA Encryption schemes"); As another example, for security

means corresponding to encryption-decryption unit 177 in combination with smartcard I.C.

250, Jones states: "To provide additional security, the data transferred over the l6-bit data

bus between the data bus buffer 173 and the gate 178 *is processed by the encryption-decryption unit*

*177 which prefe[r]ably [i]mplements a symmetrical key algorithm, such as DES, based on a key value which*

*stored in and fetched from the EEPROM 275 in the smartcard I.C. 250.  The unit 250 encrypts data*

*from the data bus buffer 173 prior to storing the data in the common memory array 150, and decrypts the*

*data back into its original form when it is retrieved from the common memory array 150.  This additional*

*encryption mechanism protects data stored in the common memory array even if that data is successfully read*

*from the flash memory chips making up the array 150.*"  Jones at 6:5-17.  As another example, for

security means corresponding to encryption-decryption unit 177 in combination with

smartcard I.C. 250, Jones states: *"Once a password has been stored for a particular partition, the card*

*lock logic circuit 220 has exclusive control over access to that partition.  Any attempt to access that partition*

*(as detected by the address decoder 195) will be rejected,* notifying the device driver software that a

valid password must be provided.  The driver software then prompts the user with a request

for a valid password which, when entered, is sent via the data buffer 173 for validation.  *The*

*card lock logic 220 routes the offered password to the smartcard I.C. with a request that it be compared with*

*the password stored in the EEPROM 257.  If the passwords match, the smartcard I.C. so notifies the card*

*lock logic 220 which in turn notifies the device driver software executing in the host that the partition has*

*been successfully unlocked.*  Thereafter, when addresses within the unlocked partition are

115

RESTRICTED – ATTORNEY'S EYES ONLY

detected by the address decoder 195, the card lock logic will activate the gate 178 to permit data transfers between that partition and the data terminals 171." Jones at 5:54-6:4. *See also, e.g.,* Jones at 5:42-53 ("The access password itself is stored in the EEPROM 257 within the smartcard I.C. 250, *the password storage operation being accomplished within the memory card 100 whenever a card lock logic activation address is supplied via address terminals 161 and the address buffer 163 to the address decoder 195* which in turn activates the card logic enable line 221. A password loading command applied via the data interface terminals 171 from the host computer is recognized by card lock logic 220 which channels the subsequent data sequence (the password itself) via the UART 230 and the serial port 255 of the smartcard I.C. 250 for storage at a predetermined location in the EEPROM 257." (emphasis added)).

### 2.   '802 Claim 2

####    a)   A peripheral device as in claim 1, wherein the target means comprises means for non-volatilely storing data.

246.   Jones discloses this claim. First, Jones discloses claim 1, as explained above and incorporated herein. Second, Jones discloses the element of "wherein the target means comprises means for non-volatilely storing data." The parties agreed that "means for non-volatilely storing data" is a means-plus-function term subject to 35. U.S.C. § 112(6) and has the following construction:

> Recited Function: non-volatilely storing data

> Corresponding Structures: non-volatile memory devices

247.   Jones discloses the corresponding structure and the recited function. For example, Jones discloses non-volatile memory devices ("common memory array 150,

preferably implemented with non-volatile flash memory integrated circuits") that non-volatilely store data ("enabling the common memory array to store 10 megabytes of data"). Specifically, Jones discloses: "The secure memory card 100 stores data in a common memory array 150, preferably implemented with *non-volatile flash memory* integrated circuits, enabling the common memory array to *store 10 megabytes of data* in an area small enough to be included on a credit-card sized Type I PCMCIA card." Jones at 3:50-55 (emphasis added). *See also, e.g.,* the citations and commentary accompanying element [1b]; Jones at 3:44-49 ("The secure memory card 100 contemplated the invention is adapted to be connected via its PCMCIA interface to the host computer 110 which may in turn be connected to other computers by modem, or by a network, as illustrated by the connection of remote computer 120 via the telecommunications link 130 seen in FIG. 1.").

### 3.     '802 Claim 11

#### a)     [11pre] A peripheral device, comprising

248.     To the extent the preamble is limiting, Jones discloses this element. The language of this element is identical to that of the preamble of claim 1. The citations and commentary accompanying the preamble of claim 1 apply here as well.

#### b)     [11a] security means for enabling one or more security operations to be performed on data;

249.     Jones discloses this element. The language of this element is identical to that of claim element [1a]. The citations and commentary accompanying element [1a] apply here as well.

RESTRICTED – ATTORNEY'S EYES ONLY

c) **[11b] target means for enabling a defined interaction with a host computing device;**

250.     Jones discloses this element.  The language of this element is identical to that of claim element [1b].  The citations and commentary accompanying element [1b] apply here as well.

d) **[11c] means for enabling communication between the security means and the target means;**

251.     Jones discloses this element.  The language of this element is identical to that of claim element [1c].  The citations and commentary accompanying element [1c] apply here as well.

e) **[11d] means for enabling communication with a host computing device; and**

252.     Jones discloses this element.  The language of this element is identical to that of claim element [1d].  The citations and commentary accompanying element [1d] apply here as well.

f) **[11e] means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.**

253.     Jones discloses this element.  The language of this element is identical to that of claim element [1f].  The citations and commentary accompanying element [1f] apply here as well.

RESTRICTED – ATTORNEY'S EYES ONLY

### 4. '802 Claim 12

a) **A peripheral device as in claim 11, wherein the target means comprises means for non-volatilely storing data.**

254.    Jones discloses this claim.  First, Jones discloses claim 11, as explained above and incorporated herein.  Second, Jones discloses the element of "wherein the target means comprises means for non-volatilely storing data."  The language of this element is identical to that of claim 2.  The citations and commentary accompanying claim 2 apply here as well.

### 5. '802 Claim 38

a) **[38pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:**

255.    To the extent the preamble is limiting, Jones discloses this element.  First, Jones discloses "a peripheral device," as explained in the citations and commentary accompanying the preamble of claim 1.

256.    Second, Jones discloses that the device is "adapted for communication with a host computing device," as explained in the citations and commentary accompanying element [1d], excluding the means plus function analysis.

257.    Third, Jones discloses "performance of one or more security operations on data," as explained in the citations and commentary accompanying element [1a], excluding the means plus function analysis.

258.    Finally, Jones discloses "interaction with a host computing device in a defined way."  The Court construed "interaction with a host computing device in a defined way" in

RESTRICTED – ATTORNEY'S EYES ONLY

the same way as it construed "defined interaction." Jones discloses this element as explained in the citations and commentary accompanying elements [1b] and [1d], excluding the means plus function analysis.

> **b)** **[38a] receiving a request from a host computing device for information regarding the type of the peripheral device; and**

259.    Jones discloses this element. **First**, as explained above in the citations and commentary accompanying element [1e] of the '802 patent, Jones, with the PCMCIA standard, discloses receiving a request from a host computing device for information stored in the Card Information System ("CIS"). The Card Services Spec discloses multiple functions (*e.g.*, "Callback," "GetFirst/NextTuple," and "GetTupleData") that can be used to request information including the type of peripheral device from the CIS: "Card Services clients may need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket. (Some clients may receive all the information they require from the CARD_INSERTION event). The Client Utilities functions reduce the code required for individual clients to perform such processing. GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated. The client may concentrate on what to do with tuple data without having to duplicate the link traversal code. The client retrieves the contents of the tuple by using GetTupleData." Card Services Spec at page 3-12. **Second**, Jones, with the PCMCIA standard, discloses that the information requested by the host includes "information regarding the type of the peripheral device," such as the "identi[ty] [of] the particular PCMCIA card," "the appropriate hardware/software interface," and "device speed, device

120

RESTRICTED – ATTORNEY'S EYES ONLY

size, device type, and address-space layout information." Jones states: "To implement the

PCMCIA interface standard, the secure memory card includes a non-volatile attribute

memory 190 which *stores information* enabling the host computer *to* automatically *identify the*

*particular PCMCIA card* as soon as the card and host are connected, *and* to automatically

*establish the appropriate hardware/software interface* using suitable driver software which executes

on the host computer 110." Jones at 4:23-30 (emphasis added). The PC Card Standard

states: "The device-information tuples contain information about the card's devices. The

tuples contain: device speed, device size, device type, and address-space layout information

for either Attribute-Memory or Common-Memory space." PC Card Standard at page 5-13.

### c) [38b] providing to the host computing device, in response to the request, information regarding the type of the defined interaction.

260.     Jones discloses this element. The Court determined that "providing to the

host computing device, in response to the request, information regarding the type of the

defined interaction" did not need construction. However, the Court construed "defined

interaction" as "an interaction [with a host computing device] that can provide one or more

of a variety of functionalities" and determined that "defined interaction" and "interaction

with a host computing device in a defined way" (which is stated in claim element [38pre])

should be "construed the same."

261.     The citations and commentary accompanying element [38a] also disclose

providing "information regarding the type of the defined interaction" to "the host

computing device, in response to the request." For example, Jones states that the response

to the request may include information regarding the "appropriate hardware/software

RESTRICTED – ATTORNEY'S EYES ONLY

interface": "To implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which stores information enabling the host computer to automatically identify the particular PCMCIA card as soon as the card and host are connected, and *to automatically establish the appropriate hardware/software interface using suitable driver software which executes on the host computer 110.*" Jones at 4:23-30 (emphasis added). As another example, the PC Card Standard states that the tuples contain information regarding the defined interaction such as the speed of the device, the size of the device and the memory layout of the device: "The device-information tuples contain information about the card's devices. The tuples contain: device speed, device size, device type, and address-space layout information for either Attribute-Memory or Common-Memory space." PC Card Standard at page 5-13.

### 6.    '802 Claim 39

#### a)    [39pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:

262.    To the extent the preamble is limiting, Jones discloses this element. The language of this element is identical to that of claim element [38pre]. The citations and commentary accompanying the preamble of claim 38 apply here as well.

#### b)    [39a] communicating with the host computing device to exchange data between the host computing device and the peripheral device;

263.    Jones discloses this element. For example, Jones discloses "communicating with the host computing device to exchange data between the host computing device and

RESTRICTED – ATTORNEY'S EYES ONLY

the peripheral device," as explained in the citations and commentary accompanying claim elements [1b] and [1d], excluding the means plus function analysis.

        **c)**    **[39b] performing one or more security operations and the defined interaction on the exchanged data; and**

264.      Jones discloses this element.  Specifically, Jones discloses "performing one or more security operations and the defined interaction on the exchanged data," as explained in the citations and commentary accompanying claim elements [1a], [1b], and [1d], excluding the means plus function analysis.

        **d)**    **[39c] mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations.**

265.      Jones discloses this element.  Specifically, this element's language is similar to the language of claim element [1f] ("means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means").  The citations and commentary accompanying claim element [1f], excluding the means plus function analysis, are equally applicable here. Further, the citations and commentary accompanying claim elements [1a] and [1b], excluding the means plus function analysis, discusses the data passing through means for performing one or more security operations.

      **7.**    **'135 Claim 55**

        **a)**    **[55pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to**

RESTRICTED – ATTORNEY'S EYES ONLY

**be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:**

266.     To the extent the preamble is limiting, Jones discloses this element.  As explained below, Jones discloses: (1) a "modular device" (according to the Court's construction) "adapted for communication with a host computing device" and "compris[es]" (2) "a security module that is adapted to enable one or more security operations to be performed on data" and (3) "a target module that is adapted to enable a defined interaction with the host computing device."

267.     First, Jones discloses a "modular device adapted for communication with a host computing device."  The Court's construction for both "modular device" and "peripheral device" is the same: "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device."  Jones discloses a "modular device," as explained in the citations and commentary accompanying the preamble of claim 1 of the '802 patent.  Jones also discloses that the device is "adapted for communication with a host computing device," as explained in the citations and commentary accompanying element [1d] of the '802 patent, excluding the means plus function analysis.

268.     Second, Jones discloses a "security module that is adapted to enable one or more security operations to be performed on data."  The Court construed this term in the same way as it construed "security means for enabling one or more security operations to be performed on data."  Accordingly, the citations and commentary accompanying element [1a] of the '802 patent apply here as well.

RESTRICTED – ATTORNEY'S EYES ONLY

269.     Third, Jones discloses a "target module that is adapted to enable a defined interaction with the host computing device." The parties agreed that this term should be construed in the same way as "target means for enabling a defined interaction with a host computing device." The Court also construed "defined interaction" the same across both Asserted Patents. Accordingly, the citations and commentary accompanying element [1b] of the '802 patent apply here as well.

**b)     [55a] receiving a request from the host computing device for information regarding the type of the modular device;**

270.     Jones discloses this element. The only substantive difference between this element and element [38a] of the '802 patent is its reference to "modular device" instead of "peripheral device." As comparison, element [38a] of the '802 patent states: "receiving a request from a host computing device for information regarding the type of the peripheral device; and." As stated above, the Court's construction for both "modular device" and "peripheral device" is the same: "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device." Accordingly, the citations and commentary accompanying element [38a] of the '802 patent apply here as well.

**c)     [55b] providing the type of the target module to the host computing device in response to the request; and**

271.     Jones discloses this element. The citations and commentary accompanying element [38a] of the '802 patent also disclose "providing the type of the target module to the host computing devices in response to the request." For example, the citations and commentary accompanying element [38a] of the '802 patent reflect providing the "nature of

RESTRICTED – ATTORNEY'S EYES ONLY

the memory card 100 and the format used for information stored on the card," Jones at

6:33-43, and the "device speed, device size, device type, and address space-layout

information for either the Attribute-Memory or Common-Memory space," PC Card

Standard at 5-13.

> **d)    [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.**

272.    Jones discloses this element.  The Court determined that no construction of

this element was necessary.  However, the Court construed element [1e] of the '802 patent

("means for operably connecting the security means and/or the target means to the host

computing device in response to an instruction from the host computing device; and") to

have a recited function that is identical to this element, except replacing "module" with

"means": "operably connecting the security means and/or the target means to the host

computing device in response to an instruction from the host computing device."

Accordingly, the citations and commentary accompanying element [1e] of the '802 patent

apply here as well, excluding the means plus function analysis.

> **8.    '135 Claim 56**

> > **a)    A method as in claim 55, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target**

RESTRICTED – ATTORNEY'S EYES ONLY

> **module that can be used to identify the type of the
> target module.**

273.    Jones discloses this claim.  First, Jones discloses claim 55, as explained above

and incorporated herein.  Second, and to the extent the preamble is limiting, Jones discloses

the remaining elements, as explained in the citations and commentary provided for the

preamble and elements [55a], [55b], and [55c] of Claim 55 of the '135 patent and as

explained below.

2.    Jones discloses that its "security module is adapted to enable communication

with the host computing device and the target module."  **First**, Jones discloses enabling

communication between the security module and the target module, as explained in the

citations and commentary provided for claim element [1c] of the '802 patent, excluding the

means plus function analysis.  **Second**, Jones discloses enabling communication between the

security module and the host computing device, as explained in the citations and

commentary provided for claim elements [1e] and [1f] of the '802 patent, excluding the

means plus function analysis.

3.    Jones also discloses that its "target module is adapted to enable

communication with the security module and prevent direct communication with the host

computing device."  **First**, Jones discloses enabling communication between the security

module and the target module, as explained in the citations and commentary provided for

claim element [1c] of the '802 patent, excluding the means plus function analysis.  **Second**,

Jones discloses that the "target module is adapted to ... prevent direct communication with

the host computing device."  For example, Jones states that it contains "storage-access

locking circuitry" that is "adapted to prevent access to the data stored on the memory card

RESTRICTED – ATTORNEY'S EYES ONLY

unless the would-be user first presents identifying information." Jones at 2:17-20. *See also, e.g.*, Jones at 5:20-6:4. Jones also states that common memory array 150 "is preferably partitioned into independently accessed regions" and explains that "[o]nce a password has been stored for a particular partition ... [a]ny attempt to access that partition ... will be rejected" and that a user is prompted for a password. Jones at 5:54-60. *See also, e.g.*, Jones at 8:35-41 ("It is important to observe that the data stored in a protected partition within the memory card 100 is available only to those who possess both the card and the password."). As another example, Jones states that the common memory array 150 can be used to "stor[e] additional passwords, key values, access codes and the like" to "support encryption and decryption systems, systems employing digital signatures, and secure telecommunications access protocols" Jones at 7:61-8:2. As another example, the target module is located such that the security module is between it and the host computer. *See* Jones at Fig. 1; 3:60-64 ("Data transfers between the common memory array 150 and the host computer 110 are accomplished via the interface data terminals 171, a data bus buffer 173, an internal data bus 175, a internal encryption/decryption unit 177, a gate 178 and an internal data bus 179."); 4:41-55 ("[T]he address decoder 195 selects the common memory array 150 whenever the address on address bus 165 is within the address space of array 150 by energizing an common memory enable line 210 which supplies an enable signal to the gate 178 in the data pathway to the common memory array 150. Gate 178 prevents the common memory array 150 from exchanging data with the host 150 via data bus 179 unless an authorization signal is supplied to the gate 178 via a control line 219 from a card lock logic circuit 220. The card lock logic circuit 220 is connected to address decoder 195 via the lock enable line 221,

RESTRICTED – ATTORNEY'S EYES ONLY

permitting card logic 220 to identify addresses which designate memory locations in the common memory array 150 to which access may be denied under appropriate circumstances.").

274.	Jones also discloses "the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module." This element is disclosed as explained in the citations and commentary provided for the preamble and elements [55a], [55b], and [55c] of Claim 55 of the '135 patent. In addition, Jones states that the common memory array 150 can be used to "stor[e] additional passwords, key values, access codes and the like" to "support encryption and decryption systems, systems employing digital signatures, and secure telecommunications access protocols" Jones at 7:61-8:2. Also, Jones states that the smartcard I.C. 250 can store passwords associated with partitions in the common memory array 150. *See* Jones at 5:32-59 ("The address space provided by the common memory array 150 is preferably partitioned into independently accessed regions. Each partition is specified in a Card Information Structure or 'CIS' (to be described) which is stored in the attribute memory 190, and preferably corresponds to the memory space provided by one or more integrated circuits making up the array 150 such that a particular partition may be selected by the address decoder 195 which activates particular chip enable lines with the common memory enable output 210. The access password itself is stored in the EEPROM 257 within the smartcard I.C. 250 .... Once a password has been stored for a particular partition, the card lock logic circuit 220 has exclusive control over access to that partition. Any attempt to access that partition (as

129

RESTRICTED – ATTORNEY'S EYES ONLY

detected by the address decoder 195) will be rejected, notifying the device driver software that a valid password must be provided.").

### 9. '135 Claim 57

**a)** **[57pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:**

275.    To the extent the preamble is limiting, Jones discloses this element. The language of this element is identical to that of the preamble of claim 55 of the '135 patent. Accordingly, the citations and commentary accompanying the preamble of claim 55 are equally applicable here.

**b)** **[57a] communicating with the host computing device to exchange data between the host computing device and the modular device;**

276.    Jones discloses this element. The language of this element differs from that of element [39a] of the '802 patent only in its reference to "modular device." As comparison, element [39a] of the '802 patent states: "communicating with the host computing device to exchange data between the host computing device and the peripheral device." As explained above, the Court's construction for both "modular device" and "peripheral device" is the same: "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device." Accordingly, the citations and commentary accompanying element [39a] of the '802 patent are equally applicable here.

RESTRICTED – ATTORNEY'S EYES ONLY

    c)     **[57b] performing one or more security operations and the defined interaction on the exchanged data;**

277.      Jones discloses this element.  The exemplary citations and commentary regarding "a security module that is adapted to enable one or more security operations to be performed on data" previously provided for the preamble of Claim 55 of the '135 patent are applicable here as well.

278.      Further, the exemplary citations and commentary regarding "a target module that is adapted to enable a defined interaction with the host computing device," previously provided for the preamble (and elements [a]-[c], which are referenced in connection with the preamble) of Claim 55 of the '135 apply here as well.

    d)     **[57c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and**

279.      Jones discloses this element.  The language of this element is similar to the language of claim element [1f] of the '802 patent, which states: "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means."  Accordingly, the citations and commentary accompanying claim element [1f] of the '802 patent apply here, except the means plus function analysis.

RESTRICTED – ATTORNEY'S EYES ONLY

e)     **[57d] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.**

280.     Jones discloses this element.  The language of this element is identical to that of element [55c] of the '135 patent.  Accordingly, the citations and commentary previously provided for element [55c] of the '135 patent apply here as well.

**10.     '135 Claim 58**

a)     **[58pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:**

281.     To the extent the preamble is limiting, Jones discloses this element.  The language of this element is identical to that of the preamble of Claim 55 of the '135 patent.  Accordingly, the citations and commentary previously provided for the preamble of Claim 55 of the '135 patent apply here as well.

b)     **[58a] receiving an instruction from a host computing device regarding operation of the modular device; and**

282.     Jones discloses this element.  **First**, as explained above in regard to element [38a] of the '802 patent, Jones, with the PCMCIA standard, discloses "receiving an instruction from a host computing device" for information stored in the Card Information Structure ("CIS").  The Card Services Spec discloses multiple functions (*e.g.*, "Callback," "GetFirst/NextTuple," and "GetTupleData") that can be used to request information including the type of peripheral device from the CIS: "Card Services clients may need to

132

RESTRICTED – ATTORNEY'S EYES ONLY

process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket.  (Some clients may receive all the information they require from the CARD_INSERTION event).  The Client Utilities functions reduce the code required for individual clients to perform such processing.  GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated.  The client may concentrate on what to do with tuple data without having to duplicate the link traversal code.  The client retrieves the contents of the tuple by using GetTupleData." Card Services Spec at 3-12. **Second**, Jones, with the PC Card Standard and the Card Services Spec, discloses that the information requested by the host includes "information regarding operation of the modular device," such as the "identi[ty] [of] the particular PCMCIA card," "the appropriate hardware/software interface," and "device speed, device size, device type, and address-space layout information."  Jones states: "To implement the PCMCIA interface standard, the secure memory card includes a non-volatile attribute memory 190 which *stores information* enabling the host computer *to* automatically *identify the particular PCMCIA card* as soon as the card and host are connected, *and* to automatically *establish the appropriate hardware/software interface* using suitable driver software which executes on the host computer 110."  Jones at 4:23-30 (emphasis added).  The PC Card Standard states: "The device-information tuples contain information about the card's devices.  The tuples contain: device speed, device size, device type, and address-space layout information for either Attribute-Memory or Common-Memory space."  PC Card Standard at page 5-13.

RESTRICTED – ATTORNEY'S EYES ONLY

c)      **[58b] operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device.**

283.      Jones discloses this element.  The language of this element is identical to that of the claim element [55c] of the '135 patent.  Accordingly, the citations and commentary previously provided for element [55c] of the '135 patent are applicable here.

B.      **Fortezza Crypto Card**

1.      **'802 Claim 1**

a)      **[1pre] A peripheral device, comprising**

284.      As discussed above, the Court construed the term "peripheral device" to mean "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device."

285.      To the extent the preamble is limiting, the Fortezza Crypto Card discloses a "peripheral device" pursuant to the Court's construction.  Specifically, "[t]he Fortezza card is a PC-card (formerly known as a PCMCIA card) intended to be plugged into any computer with a PC-card expansion slot and appropriate support software; with the card in place, the host computer is able to provide reliable user authentication and encryption for confidentiality and certify data transmission integrity in any communication with any other computer so equipped."  *See* KT0054462, at KT0054772–73.

286.      As shown in the photo below, the Fortezza Crypto Card was a detachable PCMCIA card that could be plugged into a host computer:

**RESTRICTED – ATTORNEY'S EYES ONLY**



287.     Mr. Young confirmed that the Fortezza Crypto Card is conformed with

PCMCIA specifications.  *See* Young Dep. at 115:12–23:

> Q.  It says that Fortezza crypto cards were to be designed to be a type 1 or
> type 2 PCMCIA card as defined in the PCMCIA PC card standard release 2.1,
> July 1993.  Do you see that?
>
> A.  Yes, I do.
>
> Q.  And were Fortezza crypto cards designed in compliance with the
> PCMCIA PC card standard release 2.1 from July 1993?
>
> A.  Certainly the mechanical form factor of the Spyrus Fortezza card was a
> type 1 -- or it was a type 2 card, yeah.

288.     Mr. Young also confirmed that the Fortezza Crypto Card is a "peripheral

device" according to the Court's construction.  *See* Young Dep. at 152:2-3 (objections

omitted):

> Q.  Okay.  Sir, you would agree that the Fortezza crypto card is a device that
> operates functionally separate from a host computing device, correct?
>
> THE WITNESS:  It does operate outside of the computer.

RESTRICTED – ATTORNEY'S EYES ONLY

Q.  So is that a yes to my question?

THE WITNESS:  Yes.

\* \* \*

Q.  Sir, you would agree that the Fortezza crypto card is connected to a host computing device, correct?

THE WITNESS:  Yes.

289.      Mr. Skeba similarly confirmed that the Fortezza Card was a peripheral device that communicated with a host device.  *See also* Skeba Dep. at 95:21–25 ("Q. "So obviously we -- the Fortezza card was a peripheral device, right? A. Correct. Q. And it communicated with a host device? A. Correct.").

290.      The technical documents bear this out.  For example, NSA's minimum specifications for the Fortezza Crypto Card required that "The FORTEZZA Crypto Card shall be designed to be a Type 1 or Type 2 PCMCIA card as defined in the PCMCIA PC Card Standard."  SPEX00007774, at SPEX00007775.  NSA also required card manufacturers comply with the PCMCIA standards for card dimension, connector, connector reliability, connector durability, card interface, and card metaformat."  SPEX00005220, at SPEX00005229; *see also* SPEX00001744, at SPEX00001757 (Fortezza Crypto Card comes "in a package that complies with PCMCIA Specification Standard Release 2.1"); SPEX00006786, at SPEX00006790 ("The Card complies with the PCMCIA specification Standard Release 2.1."); SPEX00024796, at SPEX00024829 ("Since the Card is PCMCIA compliant, it operates with off-the-shelf socket and card services that comply with the referenced PCMCIA specifications."); SPEX00018727, at SPEX00018766 ("The Card adheres to the PC Card standards, as developed by the PCMCIA, which allows the CARD to

**RESTRICTED – ATTORNEY'S EYES ONLY**

be integrated into different PC hardware platforms and operating systems with relative ease."); SPEX00018727, at SPEX00018767 ("A PC Card reader is either built into a workstation, personal computer or laptop, or is supplied as an external peripheral with its own power supply. An external peripheral PC Card reader connects to a computer via their parallel port or Small Computer Systems Interface (SCSI-II, which supports the 16-bit PCMCIA bus width), thereby providing a PC Card-compliant card interface for PCMCIA-unaware hosts.")  Spyru's marketing documents similarly confirm that the card complied with the PCMCIA standard.  *See* SPEX00018589, at SPEX00018590 ("**Form Factor –** Conforms to the Personal Computer Memory Card Interface Association (PCMCIA Specification 2.1 for Type II cards."); SPEX00018941 (the Fortezza Crypto Card "provides high performance, high security cryptographic processing in a ***personal, portable PC card package***" (emphasis added)).

291.    As seen below, the Card's use of the PCMCIA standard allowed the card to be plugged into a variety of systems, provided that those systems had PCMCIA adaptors either built in or external:

**RESTRICTED – ATTORNEY'S EYES ONLY**



292.    The PCMCIA interface, which allows the connection to the host computer, is shown below and will be discussed further with respect to element [1d].

> **b)    [1a] security means for enabling one or more security operations to be performed on data;**

293.    The Court determined that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

Recited Function: enabling one or more security operations to be performed on data

RESTRICTED – ATTORNEY'S EYES ONLY

Corresponding Structures:

1. A specific hardware component programmed or configured to perform a
security operation disclosed in '802 Patent at 18:1-47 or '135 Patent at 21:29-
22:9;

2. A special purpose embedded processor, embodied on a single integrated
chip and designated as MYK-82 (and referred to by the name Capstone),
which includes an ARM6™ processor core and several special purpose
cryptographic processing elements that have been developed by the
Department of Defense ('802 Patent at 15:67-16:8)

294.    First, the Fortezza Crypto Card meets this limitation because the Fortezza

Card uses the exact same processor as the Court's second corresponding structure, which

enables one or more security operations to be performed on data.  .

295.    The Capstone chip is shown in the photo from the PCB of the Fortezza

Crypto card below:



The chip is labeled U1 on the PCB, and the chip itself reads "MYK82," indicating that it is

the MYK-82 Capstone chip manufactured by Mykotronx and developed by the Department

of Defense.

RESTRICTED – ATTORNEY'S EYES ONLY

296.     My analysis of the PCB is confirmed by testimony from Mr. Young and Mr. Skeba, both of whom confirmed that the chip highlighted above is the MYK-82 Capstone chip.  *See* Young Dep. at 67:1-5:

> Q.  Five.  Can you identify what the five chips on a Fortezza -- the Fortezza encrypt[ion] card shown in Exhibit 7 are?
>
> A.  Yes.  So the -- what's designated as U1 in the picture is the Microtronics MYK-82.

*See also* Skeba Dep. at 140:15–18.

297.     Mr. Young also confirmed that the second generation of the Fortezza Crypto Card included a MYK-82 processor.  *See* Young Dep. at 161:18-162:4:

> Q.  Sir, would you agree with me that a second generation Fortezza included an MYK-82 processor?
>
> A.  And you define a second [generation]  Fortezza as a processor change?
>
> Q.  The way that you've been describing it, the Barney card.
>
> A.  The Barney card had an MYK-82 processor.
>
> Q.  And was the MYK-82 known as the Capstone chip?
>
> A.  I think it was -- it was called the Capstone chip, yes.

Mr. Bialick similarly confirmed that the Fortezza Crypto Card used the MYK-82 Capstone processor.  Bialick Depo, at 126:23-24 ("In the initial versions of Fortezza, correct, it used the MYK-82 chip.")

298.     The Capstone chip "is an integrated circuit chip that provides a number of encryption services for both stored computer data and data communications.  For confidentiality, the Capstone chip uses the Skipjack algorithm ....  In addition, the Capstone chip ... provides services that conform to the Digital Signature Standard (FIPS-186) to

RESTRICTED – ATTORNEY'S EYES ONLY

provide digital signatures that authenticate user identify and the Secure Hash Standard (FIPS-180); the chip also implements a classified algorithm for key exchange (usually referred to as the Key Exchange Algorithm (KEA)) and a random number generator." KT0054462, at KT0054472.

299.    As the '802 patent itself acknowledges, the Capstone chip was developed by the U.S. government and was well known to persons skilled in the art.  *See* '802 patent, 16:2–9 (describing a "special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and also referred to by the name ***Capstone***), which includes an ARM6TM processor core and several special purpose cryptographic processing elements ***that have been developed by the Department of Defense***. The construction and operation of the Capstone chip ***is known by those skilled in the art of cryptographic processing***.") (emphases added).

300.    Multiple technical documents confirm that the Fortezza Crypto Card contains a Capstone chip that performed the security operations of the card.  For example, NSA's minimum specifications for the crypto card required that "[t]he contractor shall use the CAPSTONE chip" to implement the Secure Hash Algorithm, the Digital Signature Algorithm, the Key Exchange Algorithm, and the SKIPJACK Algorithm.  *See* SPEX00007774, at SPEX00007777.  NSA's interface control document (which set out the specifications for the Fortezza Crypto Card) similarly explained that "[t]he Card's cryptographic and processor functions are supported by the CAPSTONE chip," as shown in the below block diagram from that document. SPEX00009841, at SPEX00009854

RESTRICTED – ATTORNEY'S EYES ONLY



*See also* SPEX00009344, at SPEX00009348 (defining "Capstone Chip" as "[t]he chip that contains the cryptographic engine of The Card") & SPEX00009352 ("The Card contains a Capstone chip . . .").

301.    Some of the documents indicate that earlier versions of the Fortezza Crypto Card contained the predecessor Capstone chip, the MYK-80.  *See, e.g.,* SPEX00025248, at SPEX00025248 (bill of materials listing the MYK-80 chip).  However, this card is certainly equivalent to its successor, the MYK-82, as defined by the Court's construction and as described in the Asserted Patents.  As the Asserted Patent explain, the MYK-82 chip contained an ARM processor.  *See* '802 patent, 16:4–5.  Like the MYK-82, the MYK-80 included an ARM processor core.  *See* KT0058251, at KT0058253 ("The [MYK80] Capstone is designed using and Advanced RISC Machine's (ARM) processor").  Moreover, as the Asserted Patents describe, the MYK-82 chip has "several special purpose cryptographic processing elements."  *See* '802 patent, 16:5–6.  Like the MYK-82, the MYK-80 also contained special purpose cryptographic processing elements to execute DOD-designed

RESTRICTED – ATTORNEY'S EYES ONLY

encryption algorithms, such as the dedicated SKIPJACK logic ("Encrypt") and

"Randomizer" shown in the diagram below:



KT0058251, at KT0058255.  Moreover, both the MYK-82 and MYK-80 serve the same

purpose—being the cryptographic engine of the Fortezza (Tessera) Crypto Card and

performing security operations.  For example, the MYK-80 (like the MYK-82) performed

the "Digital Signature" algorithm, the "Secure Hash Standard" algorithm,  and the

SKIPJACK algorithm.  *Id.* at KT0058254.  Moreover, any improvement from the MYK-80

to the MYK-82 was certainly not a result of work from Spyrus as another company

(Mykotronx) made the chip and, as Mr. Young testified, Spyrus simply bought the chip and

did not make or design it.  *See* Young Depo, at 64:4–6.

RESTRICTED – ATTORNEY'S EYES ONLY

302.    In any event, the Fortezza Crypto Card with either the MYK–82 chip or the MYK–80 chip certainly meets the Court's construction in that it has a "specific hardware component programmed or configured to perform a security operation" disclosed in the relevant sections of the Asserted Patents.  The security operations listed in the Asserted Patents include:

- Key exchange operations, including the Department of Defense Standard, the RSA, the Diffie-Hellman, and the X9.42 (ANSI Banking Standard) key exchange algorithms;
- Hash operations, including FIPS 180-1 (SHA-1), the Message Digest 2 (RSA), and the Message Digest 5 (RSA) algorithms;
- Digital Signature operations, including FIPS 186 (DSA--512, 1024) and the RSA Signature (512, 768, 1024, 2048) algorithms;
- Keywrapping operations;
- Symmetric encryption operations, including FIPS 185 (implemented completely in hardware), the DES (including 3DES, EDE3, CBC and ECB), the RC-2 and the RC-4 algorithms;
- Asymmetric encryption operations, including RSA and Diffie-Hellman algorithms; and
- Exponentiation operations.

303.    As laid out in the government "minimum specifications" document, the Fortezza Crypto Card was required to support (through the use of the Capstone chip) the following algorithms:

- Key exchange operations (the "Key exchange algorithm")
- Hash operations (the "Secure Hash Algorithm")
- Digital signature operations (the "Digital Signature Algorithm" "per FIPS-180")
- Key Wrap (also the "SKIPJACK" algorithm)
- Symmetric Encryption (the "SKIPJACK" algorithm)
- "Exponentiation"

144

**RESTRICTED – ATTORNEY'S EYES ONLY**

SPEX00007774, at SPEX00007776–77.  The government also required a number of

additional security operations not listed in the Asserted Patents, such as a Real-Time clock.

*See id.*

304.      Mr. Young admitted that the Fortezza Crypto Card performed the security

operations listed above.  *See* Young Dep. at 124:9-125:25 (objections omitted).

> Q.   Would it be correct to say that the items listed under security functions in
> SPEX00007774] are various security functions provided by the Fortezza
> crypto card?
>
> THE WITNESS:  I would say yes and also add that I don't know about where
> the real time clock values are stored.
>
> Q.   Okay.  Well, let's get there.  So you would consider the real time clock to
> be one of the security functions on a Fortezza crypto card, correct?
>
> A.   Correct.
>
> *   *   *
>
> Q.   Okay.  And looking at the second page, you consider the secure hash
> algorithm to be one of the security operations on a Fortezza crypto card,
> correct?
>
> A.   That is correct.
>
> Q.   And you'd consider the digital signature algorithm to be one of security
> operations for a Fortezza crypto card, correct?
>
> A.   That's correct.
>
> Q.   And you consider the key exchange algorithm to be one of the security
> operations in a Fortezza crypto card?
>
> THE WITNESS:  Which one was it?
>
> Q.   Key exchange algorithm.
>
> THE WITNESS:  Fortezza card does use the key exchange algorithm.

*See also* Young Dep. at 127:4-10 (objection omitted):

RESTRICTED – ATTORNEY'S EYES ONLY

Q.  Sir, is the skipjack algorithm an example of a security operation in a Fortezza crypto card?

THE WITNESS:  The answer is yes, skipjack is.

305.      The interface control document put out by NSA also details the security

operations that the Fortezza Crypto Card must "implement[] the Digital Signature Algorithm

(DSA), the NIST Secure Hash Algorithm (SHA-1 ), the Key Exchange Algorithm (KEA),

and SKIPJACK."  SPEX00009841, at SPEX00009845; *see also id.* at SPEX0000987 (showing

the Fortezza Crypto Card commands), excerpted below:



Figure 8.0 Command Set Organization

RESTRICTED – ATTORNEY'S EYES ONLY

The interface control document also provided specific instructions regarding each of these commands.

306.     Multiple other technical documents confirm that the Fortezza Crypto Card had specialized hardware to perform the Key Exchange Algorithm, the SKIPJACK algorithm (both for encryption and Key Wrap), the SHA-1 hashing algorithm, and the DSA algorithm for digital signatures.  *See* SPEX00005516, at SPEX00005516; SPEX00018834, at SPEX00018836; *see also, e.g.,* SPEX00005733, at SPEX00005745-68 (describing in great detail the security operations of Fortezza, including "Encryption and Decryption," the "Key Exchange Algorithm," the "Hashing Algorithm," "Digital Signatures," "Digital Timestamps," and "Certificates."); *see also, e.g.,* SPEX00007791, at SPEX00007801-22 (same); *see also, e.g.,* SPEX00025120, at SPEX00025133–54 (same).  *See also, e.g., generally* SPEX00001744, at SPEX00001827-2065 (listing and describing security commands that can be executed by the processor).

307.     Notably, the Court's construction only requires that the specific hardware component be configured to perform "*a*" security operation, and the Capstone chip in the Fortezza Crypto Card performs multiple of the security operations listed in the Asserted Patents.  Moreover, Spyrus does not even claim to have invented any of the security operations performed by the Fortezza Crypto Card or even any of the security operations listed in the Asserted Patents.  As Mr. Young admitted (Dep. at 135:3-136:17):

Q.  And what -- did Spyrus develop SHA 1?

A.  No, they didn't.

Q.  The next line there's one that says DES. What is that?

147

RESTRICTED – ATTORNEY'S EYES ONLY

A.   That's the – that's a DES, that's a data inscription standard.

Q.   Did Spyrus develop DES?

A.   No, they didn't.

Q.   The next one is DES 3.  Did [Spyrus] develop DES 3?

A.   Spyrus did not develop DES 3.  They implemented DES 3.

Q.   The next one is RSA.  What does RSA stand for?

A.   It's a public algorithm.

Q.   Did Spyrus develop RSA?

A.   It's a Shamir algorithm.  Spyrus did not develop the RSA algorithm.  But they did implement the RSA algorithm on the --

Q.   Did Spyrus develop the DSA algorithm?

A.   No, they did not.

Q.   Okay.  What is MD 2?

A.   MD 2 is another hash algorithm.

Q.   Did Spyrus develop MD 2?

A.   No, they didn't.

Q.   MD 5 and other hash algorithms?

A.   Just different, yeah, different.

Q.   Did Spyrus develop MD 5?

A.   No.

Q.   Have you heard of a security algorithm called AES?

A.   Yes, I have.

Q.   And what is AES?

A.   Advanced encryption standard.

Q.   Did Spyrus develop AES?

RESTRICTED – ATTORNEY'S EYES ONLY

A.   No, they didn't.

Q.   Who developed AES; do you know?

A.   I -- it was a standard developed by NIST, National Institute of Standards and Technologies.  Spyrus implemented that on their products.

### c)     [1b] target means for enabling a defined interaction with a host computing device;

308.     The parties agreed that this is a means-plus-function term subject to 35 U.S.C.

§ 112(6) and has the following construction:

> Recited function: enabling a defined interaction with a host computing device
>
> Corresponding structures: (1) a memory module adapted to enable non-volatile storage of data, (2) a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver, (3) a smart card reader, or (4) biometric device, or equivalents thereof.

In addition, the Court construed "defined interaction" as "an interaction [with a host computing device] that can provide one or more of a variety of functionalities."

309.     The Fortezza Crypto Card meets this limitation at least because it contains a "memory module adapted to enable non-volatile storage of data" and that non-volatile memory "enables" an interaction whereby the Fortezza Crypto Card provides a variety of functions to a host computing device.

310.     The non-volatile memory is shown in the below photograph, the identification of which is confirmed by both Mr. Young and Mr. Skeba.  *See* Young Depo, at 67:9 ("And U2 is a flash part."); Skeba Depo, at 89:2–3 ("U2 is the non-volatile chip."); *see also* Young Depo, at 80:4-7 ("Q.   And so then would you agree with me that the Fortezza crypto card included a nonvolatile storage that we talked about? A.   It had -- it has persistent storage, yes.")

149

**RESTRICTED – ATTORNEY'S EYES ONLY**



311.     Among other things, this non-volatile memory "enables" the Fortezza Crypto Card to interact with the host computer to provide functions because the non-volatile memory stores data necessary for the Fortezza Crypto Card to carry out those functions. For example, a "defined interaction" may be the host computer sending data to the Fortezza Crypto Card, asking the card to encrypt the data, and then the Card returns the encrypted data to the host computer.  Another defined interaction may be the host computer sending data to the Fortezza Crypto Card and asking the card to hash the data and return the hash to the host computer, or where the host computer sends data to the card and asks the card to digitally sign the data.  In each of these scenarios, the Fortezza Crypto Card interacts with the host computer to provide functionality to the host computer.  The non-volatile memory "enables" these defined interactions because, at least, it stores instructions and other data necessary for the card to carry out these functions.

**RESTRICTED – ATTORNEY'S EYES ONLY**

312.     For example, as specified in NSA's interface control document, the non-volatile memory stores a "user Pin Phrase" used to provide user authentication functionality, a "SSO pin phrase" similarly used for authentication functionality, key value and certificates used to provide encryption functionality, key values and certificates used to provide digital signature functionality, and various other various security functionalities that are utilized by the host computer.  SPEX00009841, at SPEX00009855.  This data is shown in the diagram below, again from NSA's interface control document:



*Id.* at SPEX00009857.

313.     As an example of how the data shown above stored in non-volatile memory "enables" the Fortezza Crypto Card to provide a security functionality to the host computer, let us examine the Digital Signature Algorithm[13] used by the Fortezza Card to provide

---

[13] The Hashing Algorithm is considered part of the Digital Signature Algorithm, so the SHA-1 (Hashing Algorithm) is also shown as part of the diagram below.

RESTRICTED – ATTORNEY'S EYES ONLY

hashing and digital signature functionality to the host computer. A flow diagram of the

Digital Signature Algorithm is shown below:



Figure 2.4.4-1    Fortezza Digital Signatures

SPEX00018727, at SPEX00018743. As the flow chart indicates, User A sends both the data

itself and a signed hash of the data to User B. User B then generates a hash from the

received data and compares that with the hash received from User A. If the two hash values

are identical, User B can conclude that User A really did send the data, and that the data has

not been altered. As the documentation explains, "[t]he digital signature requires the Hash

Value, User A's DSA Private Key x, denoted User $A_{(x, DSA)}$, User A's p, q and g values,

denoted User $A_{(p, q, g, DSA)}$, and a random number generated internally by the Card, denoted

**RESTRICTED – ATTORNEY'S EYES ONLY**

Card(random, DSA)." *Id.* The result of the DSA algorithm is two "cascaded 20-byte parameters" r and s, which are sent with the message to User B. *Id.*

314.     As the foregoing makes clear, the values **necessary** to be able to digitally sign a document—namely the DSA Private Key x and the user's p, q, and g values—are all stored in non-volatile memory on the Fortezza Crypto Card:



Indeed, the NSA "minimum requirements document" **required** there to be sufficient space to store "Two sets of DSA [Digital Signature Algorithm] . . . parameters ($P_{DSA}$, $Q_{DSA}$, $G_{DSA}$)" and for "Two (2) 160-bit X-value storage fields (one for the DSA X-value …)." SPEX00007774, at SPEX00007775.

315.     Non-volatile memory also stores values essential to perform the Key Exchange algorithm (shown in the above diagram as p-KEA, q-KEA, g-KEA, and x-KEA) as well as other data necessary to perform security operations—including the user and SSO keys that "enable" the user or SSO to able to even use the card at all. *See id.*; *see also*

153

RESTRICTED – ATTORNEY'S EYES ONLY

SPEX00005733, at SPEX00005778 ("NV Memory holds the User's storage key (K$_s$), the SSO and User PINs, IV error counts, SSO and User PIN logon failure counts, the last read RTC value, and storage space for the FORTEZZA certificates. . . . . Because certificates and their associated public/private keys are kept in NV Memory, all Certificate Register contents are maintained between logon sessions and through power on/off/on cycles."); SPEX00005373, at SPEX00005388 ("The Card uses non-volatile memory to store the covered PINs, certificates, User data, and any Card specific data.")

316.    Mr. Young was asked about the diagram shown in paragraph 302 (from NSA's interface control document) at deposition, and he confirmed that the data stored in the non-volatile memory was data used by the Card to provide security functionalities. *See* Young Dep. at 85:23-88:15 (objections omitted):

> Q.   Can you explain what a user pin phrase is?
>
> A.   Yes.  User pin phrase is basically how you authenticate to the card.  So a user would enter their pin, as you do on an ATM today, and that would unlock the crypto services of the card.
>
> Q.   So the user's pin is what's stored in that spot that says user pin phrase?
>
> Q.   And that is a memory location, correct?
>
> A.   That is a memory location.
>
> Q.   The user pin is stored as a series of ones and zeros?
>
> THE WITNESS:  Yes, it's stored as ones and zeros.
>
> Q.   It's not a tricky question.  It's the only way to store stuff in memory, right?  And what about the SSO pin phrase?
>
> A.   It is very much the same.
>
> Q.   And what does -- what does that mean,  though, SSO pin phrase?
>
> A.   Site security officer.

154

RESTRICTED – ATTORNEY'S EYES ONLY

\* \* \*

Q.   An official who's in the organization's security infrastructure would have a separate pin from the user; is that right?

Q.   And this would be their pin?

THE WITNESS:  There is a SSO or site security officer pin.

Q.   And the SSO pin phrase is also stored as 1s and zeros?

A.   Yes.

Q.   Next we've got something that's called certificate N/KEA and DSA values.

A.   Yes.

Q.   What are those?

A.   Okay.  So certificates are basically X509 certificates that are used during the authentication process for the key encryption algorithm and the digital signature algorithms.

Q.   And those that we see there are P-KEA?

A.   Those are the P[s, ]Qs and Gs for the KEA  operations.  And the X is a private key. These -- and then there's a set of P[s ]Qs and Gs for the DSA and a private key.

Q.   So KEA stands for?

A.   Key encryption algorithm.

Q.   Let me just ask it.  KEA stands for key encryption algorithm?

A.   Yes.

Q.   And [D]SA stands for digital signature algorithm?

A.   Yes.

Q.   And these are related to private and public key encryption?

A.   Yes.

RESTRICTED – ATTORNEY'S EYES ONLY

317.     As another example, the firmware is stored in the non-volatile memory, which "enables" the Fortezza Crypto Card to perform its security functions for the host computer. As Mr. Young, admitted:

> Q. So you'd agree, sir, that the nonvolatile memory from a Fortezza crypto card is used for storage of **card firmware** and the short or long-term storage of X 509 certificate data, SSO pin data, and user pin data?
>
> A.  Yes.

*See* Young Dep. at 121:2-7 (emphasis added); *see also* SPEX00007774, at SPEX00007775 ("The [non-volatile] memory shall be used for storage of **card firmware** ..." (emphasis added)).  Without the firmware, the card could not function.  Thus, through the storage of the firmware, the non-volatile similarly "enables" the Fortezza Crypto Card to interact with the host computer to provide security functionality.

### (1)     Storage of Encrypted Data

318.     Based on the above, the Fortezza Card meets this limitation as that limitation has been construed by the Court.  However, I  understand that SPEX may suggest this claim limitation requires that **encrypted** data be stored in non-volatile memory.  I do not believe that to be required by this either the agreed construction as to the "target means" or this Court's construction of "defined interaction," which together simply requires that the target means "enable" "an interaction [with a host computing device] that can provide one or more of a variety of functionalities."  As discussed above, the non-volatile storage of the Fortezza Crypto Card "enables" the functionality that the card provides to the host computer.

319.     In any event, the Fortezza Crypto Card **does** store encrypted data in non-volatile memory.  In the cryptographic arts, "key wrapping" is often used to protect keys

156

RESTRICTED – ATTORNEY'S EYES ONLY

while they are in transit, or while they are being stored, as recognized by the Asserted Patents. *See, e.g.,* '802 patent, 18:18–20 ("A key wrapping operation can ensure that plaintext keys are not accessible external to the peripheral device.").  In the context of the Fortezza Crypto Card, the SKIPJACK algorithm serves as a "Key Wrap" algorithm which can protect secret keys when being stored on the card (as well as being the data encryption/decryption algorithm).  *See, e.g.,* SPEX00005373, at SPEX00005383 (defining the SKIPJACK algorithm as the "FORTEZZA data encryption/decryption **and key wrap/unwrap algorithm**." (emphasis added)).  Thus, when a document refers to some data as "wrapped," the document is talking about storing encrypted data.  *See* SPEX00005373, at SPEX00005383 (definition of "Wrap"); SPEX00009841, at SPEX00009847 (definition of "wrap").  Similarly, cryptologists use the term "cover" when referring to encrypted data, and, in the context of these documents, "Cover" is a "term used to describe the protection afforded private keys (X's) and TEKs while they are stored in the Card. Specifically, encryption of an internally stored key with a $K_s$ derivative."  SPEX00005373, at SPEX00005379.  (N.B. $K_s$ is the "User's Storage Key" which "can be used to encrypt and decrypt archive data" using the SKIPJACK algorithm.  *Id.* at SPEX00005381; *see also* SPEX00006786, at SPEX00006791).  Thus, when data is described as "covered," it too is being stored in encrypted format.

320.     The Fortezza Crypto Card stores "wrapped"/ "covered" (i.e. encrypted) data in non-volatile memory.  For example, "[t]he card uses non-volatile memory to store the **covered** PINs, certificates, User data and any Card specific data."  SPEX00005373, at SPEX00005388.  As another example, as discussed above X is a secret value is used for various security algorithms (i.e. the Digital Signature Algorithm).  One of the commands laid

out in NSA's original interface control document ("Generate X") allows "the SSO or the User" to generate X and Y components for use in the Digital Signature Algorithm and the Key Exchange Algorithm.  *See* SPEX00009841, at SPEX00009897.  A User or the SSO will execute the command, and once a new secret X is generated, "[t]he secret X is **wrapped in $K_s$ and stored in non-volatile memory**," meaning that the X is **encrypted** using the User's storage key prior to it being stored in non-volatile memory.  *Id.* (emphasis added); *see also id.* at SPEX00009907 (the "Install X" command which allows a User or the SSO to "restore an archived private DSA or KEA X-value" from the archive on non-volatile memory which involves the steps of "Load[ing] the password, **wrapped** X-value" and "Unwrap[ping]" the X-value) (emphasis added); *id.* at SPEX00009917 ("Load the password, wrapped X-value"); SPEX00018727, at SPEX00018809 ("$K_s$ is used for file encryption, **encrypted data archiving and key backup purposes**" (emphasis added)).

321.      Thus, the Fortezza Cards store encrypted data in volatile memory.  Moreover, it is this encrypted data that "enables" the defined interaction with the host computer—as the data being "wrapped" and stored are the secret X values used for the Digital Signature Algorithm and the Key Exchange Algorithm, as discussed above.

### (2)      Storage of User Data

322.      I also understand that SPEX may contend that this claim element requires storage of user data in non-volatile memory.  I do not believe that storage of user data is required by the claim as construed any more than I believe that storage of encrypted data is required.  As I have noted above, the claim construction simply requires a target means that

RESTRICTED – ATTORNEY'S EYES ONLY

"enables" a defined interaction (an interaction to provide functionality to the host computing device)..

323.     Nonetheless, the Fortezza Crypto Card does store user data.  For example, a document states explicitly states that users "may optionally use the memory reserved for a X.509 certificate for the purpose of storing **any** data in the Card (for example, biometric data, bit-mapped photographs), as long as this 'certificate" is not used for cryptographic functions.  Applications can load this 'certificate' into the Card's non-volatile storage and retrieve it from storage **like a memory card**."  SPEX00005952, at SPEX00005976 (first emphasis in original, second emphasis added).  In other words, the document (which is a guide for application developers) specifically allows these developers to write applications which use the non-volatile storage of the Fortezza Card "**like a memory card**" by using part of the non-volatile memory for storage of "**any data**" rather than for a certificate that that is used in card's security functionality.  This was no aberration—this same statement was repeated in multiple versions of the application implementer's guide(*see* SPEX00005847, at SPEX00005868; SPEX00005733, at SPEX00005757) and storage of such user data was called for by NSA in the specifications it set out, *see* SPEX00007774, at SPEX00007775 (stating that "[n]on-volatile memory shall be used for storage of card firmware **and long term storage of other data**" (emphasis added)); SPEX00009344, at SPEX00009352 ("The Card uses its non-volatile memory to store the covered PIN phrases, certificates, **user data** and any Card specific data." (emphasis added)); SPEX00001744, at SPEX00001789 (Section titled "Non-Volatile Memory Area - **User** and Certificate Storage").  Indeed, these specifications also included API commands that allow for the manipulation of "user data,"

159

RESTRICTED – ATTORNEY'S EYES ONLY

such as "Get User Data" (*id.* at SPEX00002008); "Get User Data Directory" (*id.* at SPEX00002009); and, notably, "Load User Data" which stores the user data passed to the card from the host computer "into NV memory" (*id.* at SPEX00002025).[14]

324.     Moreover, a February 1996 "Fortezza Program Overview" explained that "Fortezza provides several methods to archive data (such as email)" where a user can encrypt the stored data  using an MEK or the $K_s$ (the user's personal storage key, as discussed above).  DEF_INV 0004302.  This document's assertion is bolstered by testimony from Mr. Skeba—one of the inventors of the Asserted Patents who also worked on the Fortezza Crypto Card, who testified that a user could encrypt and store a file in non-volatile memory.  *See* Skeba Depo. at 60:17–61:2 (testifying that when a user wants to store an encrypted file, the Fortezza Crypto Card "will put the data it wants to be encrypted into the shared memory. It will send a command in that says, 'Encrypt this.' The card already knows that the thing it's going to encrypt is in a known spot. It's going to go pick it up, encrypt it. It's going to use scratch pad memory and then it's going to put the encrypted output into the non-volatile memory for long-term storage.").

325.     Spyrus's own marketing materials also tout this benefit.  Brochures for its Fortezza Crypto Card boast that the card offers "Secure Storage – secure on-card storage" (SPEX00018941); "Non-Volatile Storage" for "user data" (SPEX00005517); and "Up to

---

[14] Although this document says that, for this version of the Fortezza Card, the "user data" option is "Not Supported at this time," the presence of the commands and the document itself suggest that the Card was, in fact, capable of storing user data.  Moreover, none of the other documents detailing this feature have any similar reservations.

RESTRICTED – ATTORNEY'S EYES ONLY

400k bytes available for non-volatile user data storage" (SPEX00005518, at SPEX00005518[15]).

### d) [1c] means for enabling communication between the security means and the target means;

326.     The parties agreed that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and has the following construction:

> <u>Recited function</u>: enabling communication between the security means and the target means
>
> <u>Corresponding structures</u>: conventional computer bus 615.

327.     The Fortezza Crypto Card contains a conventional computer bus that enables communication between the security means and the target means.  Mr. Young admitted as much during deposition.  *See* Young Dep. at 186:17-25 (objection omitted):

> Q.  Sir, in Fortezza crypto cards, in your opinion, is there a conventional computer bus between the Capstone chip and the nonvolatile memory chip?
>
> THE WITNESS:  My answer is, yes, there is a bus between the Capstone chip and the nonvolatile memory and the device.

328.     A circuit diagram of the Fortezza Crypto Card indeed confirms a standard bus between the security means (the Capstone chip) and the target means (the non-volatile storage):

---

[15] This document is a marketing document for the Lynks card.  However, Mr. Young testified that the Lynks card and the Fortezza card "used the same hardware," *see* Young Dep. at 138:14-16, so it stands to reason that this also applied to the Fortezza Crypto Card.

RESTRICTED – ATTORNEY'S EYES ONLY



*See* SPEX00025248, at SPEX00025249–52 (four pages reproduced as a single image above, shown as annotated).  According to the labeling in the diagram, the Capstone chip is U11 in this circuit design, and the NV memory is U1.  *See id.* at SPEX00025248.  Both are annotated in orange in the above diagram for readability.  The bus is shown in the bolded, darker lines above, and the connection along that bus between the Capstone chip and the Non-volatile memory is highlighted.

329.     This is a conventional computer "bus" as that term is commonly understood in the industry because not only does it provide for connections between the non-volatile memory and the Capstone chip, it also allows for connections between the other

RESTRICTED – ATTORNEY'S EYES ONLY

components of the Fortezza Crypto Card.  For example, the darker lines above are also shown connecting the non-volatile memory to the volatile memory chips, and between each of those components and the PCMCIA interface.  Moreover, the "interface control" document describes data moving in between the volatile memory, the non-volatile memory, the Captstone chip, and the PCMCIA interface, meaning that a conventional computer bus was used to move data between these various components.  *See generally* SPEX00009841, at SPEX00009855–57.  As can be seen in the diagram above, this conventional computer bus provides for communication between the Capstone Chip and the non-volatile memory.

### e)  [1d] means for enabling communication with a host computing device;

330.     The Court determined that this is a means-plus-function term subject to 35 U.S.C. § 112(6) and construed this term as follows:

Recited Function: enabling communication with a host computing device

Corresponding Structures:

1. Input/Output (I/O) device; 2. PCMCIA interface; 3. Cord between housing and mating receptacle; 4. Wireless communication interface; 5. Smart card interface; 6. Serial interface (such as RS-232); 7. Parallel interface; 8. SCSI interface; or 9. IDE interface.

331.     The Fortezza Crypto Card meets this limitation because it contained an input/output device—namely a PCMCIA interface—that enabled communication with the host computing device.

332.     The PCMCIA interface is shown in the below annotated photograph of a disassembled Fortezza Card:

**RESTRICTED – ATTORNEY'S EYES ONLY**



333.     Mr. Young additionally admitted that the Fortezza Crypto Card met this

limitation.  Young Dep. at 159:8-16 (objection omitted):

> Q.   Did the Fortezza crypto card include an input/output device between the
> host computer and the Fortezza crypto card?

> THE WITNESS:  Yes.

> Q.   Did the Fortezza crypto card include a PCMCIA interface?

> A.   Yes, it did.

334.     Mr. Young's admission is corroborated by the Fortezza technical documents.

The interface control document that set out the requirements for the Fortezza Crypto Card

specified that card have a "Standard 68 Pin PCMCIA Connector:"

164

RESTRICTED – ATTORNEY'S EYES ONLY



SPEX00009841, at SPEX00009854; *see also* SPEX00007774, at SPEX00007775 (requiring

that Fortezza Crypto Cards be "designed to be a Type 1 or Type 2 PCMCIA card as defined

in the PCMCIA PC Card Standard, Release 2.1, July 1993").

335.    A diagram showing the Fortezza Crypto Card interfacing with a host PC

through a PCMCIA adapter is shown below:

**RESTRICTED – ATTORNEY'S EYES ONLY**



SPEX00009841, at SPEX00009849; *see also* SPEX00005733, at SPEX00005780 (explaining that PC Cards plug into Card Readers which are "either built-[in to a workstation, personal computer or laptop, or is supplied as an add-on external peripheral with its own power supply").

RESTRICTED – ATTORNEY'S EYES ONLY

> **f)  [1e] means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and**

336.     The Court determined that this is a means-plus-function term subject to 35

U.S.C. § 112(6) and construed this term as follows[16]:

> <u>Recited Function</u>: operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device
>
> <u>Corresponding Structures</u>:  (1) PCMCIA interface and memory section 612a; or (2) Interface and a device or host driver.

337.     The '802 patent (at 7:62-8:14) states (emphasis added):

> One way in which the operating system software of a host computing device can identify the type of a peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device, that stores data representing the type of the peripheral device.  This is true for a variety of types of peripheral devices, such as, for example, peripheral devices that conform to the PCMCIA standard.  (The PCMCIA standard, for example, includes a specification, called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card,

---

[16] I understand that in its Tentative Claim Construction Order, the Court stated that this element cannot be met by a device having only a single mode for a single module:

> This claim language can be read as "operably connecting the security module and the target module to the host computing device," "operably connecting the security module or the target module to the host computing device," or a combination of all three possible modes. The claim does not cover a device having only a single mode for a single module, for example, a device whose only available mode is to operably connect to a target module to the host computing device.

Tentative Claim Construction Order, at 23 (Sept. 15, 2017).  I understand that the above language did not appear in the Court's Markman Order, nor was it contradicted by that Order.  *See* Order Regarding Claim Construction, D.I. 122, at 26-30 (Oct. 18, 2017).  Should the construction of this term be amended or refined, I reserve the right to amend my opinions.

denoted as "attribute memory", that stores data identifying the type of the PCMCIA card.)  In the system 600, the peripheral device 602 is such a device. The memory section of the memory device 612 of the peripheral device 602 which the host computing device 601 seeks to access is shown in FIG. 6 as the memory section 612a, and the data stored therein is referred to herein as "peripheral device identification data."

338.     The Fortezza Crypto card meets the "means for operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device" because the Fortezza Crypto Card's PCMCIA interface, in combination with its attribute memory, allows it to "operatively" connect to a host computer.  Indeed, the structure used by Fortezza is the same structure disclosed in the '802 patent.

339.     As discussed above with respect to element [1d], the Fortezza Crypto Card uses a PCMCIA interface to enable communication with the host computing device.  This PCMCIA interface allows communication between the security means (the Capstone chip) and the host computer through the use of the PCMCIA interface and a "shared memory interface" to the host (RAM "is used for communications between the host and the processor."  SPEX00009841, at SPEX00009855.  "All communications between the processor and the host use this area, the 'Mailbox Area', to communicate through."  *Id.*

340.     In addition, the Fortezza Crypto Card contains "attribute memory," which corresponds with the Court's identified structure "memory 612a" (which is "attribute memory" in the '802 patent, as seen in the above excerpt).  As explained in the "interface control document" laying out the specifications for a Fortezza Crypto Card, "[t]he host **must** access Attribute memory before initiating any communications with the FORTEZZA Crypto Card."  *Id.* at SPEX00009858 (emphasis added).  This attribute memory  "contains

168

RESTRICTED – ATTORNEY'S EYES ONLY

the Card Information Structure (CIS)" which "provides information about the card manufacturer, user RAM available, ROM, Card Revision, Number of Certificates that can be stored, and the start of the mailbox communications area between the Host and the Card." *Id.* at SPEX00009855.  "By reading the tuples in the CIS, the host can determine the start of the mailbox area used for command execution by the Card's processor."  *Id.* at SPEX00009858.  Thus this read of the tuples data in the attribute memory allows the security means to "operably connect" with the host computer.

341.     Both the "Attribute Memory" and the process by which that attribute memory is ready by the computer are set out in the PCMCIA PC Card standard.  *See id.* at SPEX00009858 ("The use and function of Attribute memory is defined in the Card Metaformat section of the PCMCIA 2.1 specification.  The FORTEZZA Crypto Card is compliant with this specification and uses Attribute memory to store the hardwired basic compatibility structure. For further information, please reference Section 5 of the PCMCIA 2.1 Specification. The Attribute memory contains the Card Information Structure (CIS) which is read by the host This memory is at the beginning of the card address space and describes the low-level organization of the data on the card. All information in Attribute memory is written in the tuple format, per the PCMCIA standard.").

342.     Mr. Young admitted as much in deposition, explaining that on the Fortezza Crypto Card, "the CIS, card information structure, holds basically things of the nature of the -- of the device in terms of its description.  There's what they call tuples in the CIS which give you information about the card in terms of manufacturer name, how you access the memory areas on the PCMCIA interface.  There's other areas there that are used to indicate

169

RESTRICTED – ATTORNEY'S EYES ONLY

whether a command is being executed on the Fortezza card."  Young Dep. at 96:25-97:8.

Mr. Young further explained that, in Fortezza, the CIS is "part of the PCMCIA standard"

and that Spyrus did not invent the CIS.  *Id.* at 98:3-8; *see also id.* at 98:9-20:

> Q.   And the -- you said that there are tuples indicate the manufacturing name. Is that part of the PCMCIA standard?
>
> A.   I believe so, yeah.
>
> Q.   And the tuples for how you access the memory areas, is that also part of the PCMCIA standard?
>
> A.   Yes.
>
> Q.   And the attribute memory, that's accessible by the host; is that right?
>
> A.   The attribute memory is accessible by the host.

343.     Per the PCMCIA PC-Card standard, a PCMCIA equipped host computer runs

"Card Services" which is a software management interface that is also part of the PCMCIA

standard and "provide a single-component, hardware-independent interface for the device

driver to the socket services on the host system."  *Id.* at SPEX00009848; *see also id.* at

SPEX00009848 ("since the Card is PCMCIA compliant it will operate with off-the-shelf

socket services and card services defined under the PCMCIA specification").

344.     The interaction between the PCMCIA "Card Services" and the Fortezza

Crypto Card is shown in the below diagram from the "interface control document:"

RESTRICTED – ATTORNEY'S EYES ONLY



4.     Per the PCMCIA standard (specifically the programming interface defined in Section 3 of the Card Service Spec), the Card Services program on the host computer sends commands to the Fortezza Crypto Card (*e.g.*, "Callback," "GetFirst/NextTuple," and "GetTupleData") that can be used to request information from the CIS: "Card Services clients may need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket.  (Some clients may receive all the information they require from the CARD_INSERTION event).  The Client Utilities functions reduce the code required for individual clients to perform such processing.

171

RESTRICTED – ATTORNEY'S EYES ONLY

GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated.  The client may concentrate on what to do with tuple data without having to duplicate the link traversal code.  The client retrieves the contents of the tuple by using GetTupleData."  Card Services Spec at 3-12.  *See also, e.g.*, Card Services Spec at 3-20 to 3-21 (stating that, for a "CARD_INSERTION" event, Card Services uses a "Callback" function that "attempts to read the [CIS]" and "uses device information from the [CIS] to create region description structures in its internal data area"; "Clients may have enough information provided by a GetConfigurationInfo request to determine if they wish to use the PC Card. If they do not have enough information, clients may use Card Services functions to further process the CIS.  Clients may process tuples directly using the memory ReadMemory functions or use the tuple processing functions GetFirst/NextTuple, GetFirst/NextRegion or GetFirst/Next Partition."); 3-24 (stating that "[t]he CLIENT_INFO event requests that the client return its client information data," and indicating that the request uses the "Callback" function); page 5-20 (stating that the "GetConfigurationInfo" function "returns information about the specified socket and PC Card configuration").  In addition, according to the Card Service Spec, the "RequestConfiguration" function "configures the PC Card and socket.  Card Services will apply power to the socket if the socket was not powered.  This function must be used by clients that require an I/O interface to their PC Card.  The ClientHandle returned by RegisterClient is passed in the Handle argument.  RequestIO and RequestIRQ must be used before calling this function to specify the IO and IRQ requirements for the PC Card and socket.  After finding an appropriate configuration, RequestConfiguration establishes the configuration in the socket adapter and PC Card."

RESTRICTED – ATTORNEY'S EYES ONLY

Card Services Spec at pages 5-67 to 5-68.  Further, "The ConfigIndex field is the value

written to the Option register for the configuration index required by the PC Card."  Card

Services Spec at page 5-68.  The PC Card Standard similarly states: "The Configuration

Option Register is used to configure the card and to issue a soft reset to the card.  The

register is a read/ write register which contains two fields.  The Configuration Option

Register must be implemented in all configurable cards," PC Card Standard at page 4-35, and

includes the below summary of fields in the Configuration Option Register:

| SRESET | SRESET Card. Setting this bit to one (1) places the card in the reset state. This is equivalent to assertion of the +RESET signal except that it is not cleared. Returning this bit to zero (0) leaves the card in the same unconfigured, reset state as following a power-up and hardware reset. This bit is set to zero by power up and hardware reset. |
| LevlREQ | Level Mode interrupts selected when bit is one (1). Pulse Mode interrupts selected when bit is zero (0). |
| Conf Index | Configuration index. This field is written with the index number of the entry in the card's Configuration Table which corresponds to the configuration which the system chooses for the card. When the Configuration index is 0, the card's I/O is disabled and will not respond to any I/O cycles, and will use the Memory Only interface. |

*See also* PC Card Standard at page 4-11 ("A card remains in the unconfigured state until the

Card Configuration Option Register has been written with a valid configuration."); page 4-34

("Each configurable card is identified by a Card Configuration Table in the card's Card

Information Structure.  These cards must have one or more of a set of Card Configuration

Registers which are used to control the configurable characteristics of the card.").

345.     Indeed, again, Mr. Young admitted that the host computer accesses this

information by issuing a command to the Fortezza Crypto card which "return[s] the card

information structure."  *See* Young Dep. at 179:19-180:2:

> Q. What is a GetTuples data command?
>
> A. It allows a computer to be able to read the information from the -- from a
> device that's connected to the PCMCIA bus.
>
> Q. When you say "allows to read," what do you mean? If a PCMCIA card
> receives a GetTuples data command, what does it do?

RESTRICTED – ATTORNEY'S EYES ONLY

A. It will return the card information structure.

346.     Thus, the PCMCIA interface allows a connection between the Fortezza

Crypto Card and the host computer, and the card's "attribute memory" which returns

information about how the card will interact with the PC (and which must be accessed prior

to the card providing any functionality to the host PC) allows that connection to be

operable.

> **g)     [1f] means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.**

347.     The Court determined that this is a means-plus-function term subject to 35

U.S.C. § 112(6) and construed the term as follows:

> Recited Function: mediating communication of data between the host
> computing device and the target means so that the communicated data must
> first pass through the security means
>
> Corresponding Structures:  Interface control device 910 (as shown in Fig. 9B)

348.     The Fortezza Crypto Card performs the function of mediating

communications according to the Court's construction.  Specifically, government required

that the non-volatile memory (the target means) was not accessible directly by the host

computer, but would be accessible only through commands executed by the Capstone

processor the security means.  For example, the government's "interface control" document

states that the non-volatile memory "is **not directly accessible by the host system**."

SPEX00009841, at SPEX00009855 (emphasis added).  Instead, the government required

that "[a]ll communications with the non-volatile storage area must go through the shared

memory RAM area. Data is written into FORTEZZA Crypto Card non-volatile storage

174

RESTRICTED – ATTORNEY'S EYES ONLY

through the use of the Load Certificate or other appropriate commands," which are executed by the card's crypto processor.  *See id.* at SPEX00009855–56; *id.* at SPEX00009855 ("The second area is defined as the Common memory area. This consists of the RAM space on the Card. The RAM provides the shared memory interface to the host which is used for communications between the host and the processor. This read/write memory is called the Common Shared Memory Area. All communications between the processor and the host use this area, the 'Mailbox Area', to communicate through."); *see also* SPEX00001744, at SPEX00001814 ("This area is not directly accessible by the host system.  All communications with the non-volatile storage area must go through the shared memory RAM area."); *id.* at SPEX00001789 (NVS memory is not directly accessible by the host.  All information is stored and retrieved from NV memory through the mailbox communications with the appropriate non-volatile management commands.")  This is also set out in the government's required minimum standards for Fortezza Crypto Cards.  *See* SPEX00007774, at SPEX00007775 ("Non-volatile memory shall not be accessible from outside the card except through the use of Fortezza commands such as Load Certificate, Firmware Update, etc.").

349.     This "Common Shared Memory Area" is RAM where data is temporarily stored for the processor to perform commands on it.   *See* SPEX00009841, at SPEX00009864 ("The common shared memory area of RAM contains the shared memory 'mailbox'. This area is used by the host to set up commands and data by which the Card executes. Writing a command into this mailbox area, and subsequently writing bit 1=0 in

**RESTRICTED – ATTORNEY'S EYES ONLY**

register 2, indicates to the Card that data is available in the shared memory area for command execution.")

350.    Indeed, Mr. Young admitted that the non-volatile memory "is not directly accessible by the host system" but could only be accessed by the security means (i.e. the MYK-82 chip).  *See* Young Dep. at 110:11-16:

> [Q.]  You would agree, sir, that in a Fortezza crypto card, the nonvolatile memory is not accessible from outside the card excepted for use of Fortezza commands such as load certificate, firmware update, et cetera?
>
> A.  Yes, I would say that's true.

351.    *See* Young Dep. at 72:22-73:1:

> Q.  So it would be correct to say that in a Fortezza crypto card the host is not able to access the nonvolatile storage but the MYK-82, or previously the 80, was able to do it?
>
> A.  Yes.

352.    As to the corresponding structure identified by the court, interface control device 910, the Court's identified structure, is shown below:

RESTRICTED – ATTORNEY'S EYES ONLY



FIG. 9B

353.     Under the Court's construction, this corresponding structure must be either literally present or an equivalent must be present.  Under this proper construction, the Fortezza Crypto Card teaches many of the structures shown in the above diagram, but does not teach the structures associated with the "Compact Flash Interface," such as the "Compact Flash I/O Control," "Compact Flash Data Buffer," and the "Compact Flash Sector Center."  As I understand the Court's constructions, these structures must be part of the corresponding structure for this claim limitation.  However, as I will discuss below with respect to obviousness, a skilled artisan could and would have modified the Fortezza Crypto Card to accommodate Compact Flash, and thus would have included this structure.

354.     However, as SPEX has applied the claim in its infringement contentions, Fortezza teaches this structure.  As described in the specification of the Asserted Patent, interface control device 910 "includes sets of configuration registers 911. The data stored in the configuration registers 911 establish operating characteristics of the interface control

RESTRICTED – ATTORNEY'S EYES ONLY

device: in particular, the content of the configuration registers enables the interface control
device to present to the host computing device a desired identification of the peripheral
device, and determines whether data passing through the peripheral device must be
subjected to security operations." *E.g.*, '802 patent, 17:25–33. In addition, as shown in the
above figure, the interface control device 910 includes a "RDY/BSY" register.

355.     The Fortezza Crypto card similarly contains "configuration registers" which
are used "to obtain state information or request the Card to begin executing a command in
the shared memory area." SPEX00009841, at SPEX00009855. These configuration
registers are part of the PCMCIA specification, *see* SPEX00001744, at SPEX00001794, and,
as noted throughout my discussion, the Fortezza Crypto Card complies with PCMCIA
specifications. In any event, these configuration registers, like those described above,
provide necessary information regarding the operation of the card, including, for example,
information about the current state of the card and the type of hardware configuration used.
*See* SPEX00001744, at SPEX00001799–1800. The Fortezza Crypto Card additionally has a
"Ready/Busy" register which indicates whether the card is ready to accept a new command.
*See* SPEX00001744, at SPEX00001788 ("While the Fortezza Plus is accessing this shared
memory, the Ready/Busy- line is held busy. The Host can monitor activity of this RAM by
reading the Ready/Busy- Configuration register. After successful execution of the Host
command, the Ready/ Busy- line becomes ready and the Host can read the command
response in shared memory"); *see also id.* at SPEX00001797 (showing the "Ready/Busy"
register).

RESTRICTED – ATTORNEY'S EYES ONLY

356.     The specification of the Asserted Patents states that the "remainder of the
functional blocks of the interface control device 910 shown in FIG. 9B perform functions
and operate in a manner that can readily be understood by those skilled in the art," *see* '802
patent, at 17:47-50, and indeed, the remainder of this diagram shows standard functionality
for a PCMCIA card.  For example, Figure 9B shows various "buffers," which are temporary
storage for data and other information as that information moves through the structures of
the card, and additionally shows various busses for the transmission of data and commands
from the various structure Figure 9B also shows a Command Detector used to process
incoming commands, and a "state controller."

357.     Under the interpretation of this claim limitation as SPEX has accused
Kingston's products of infringing, the Fortezza Crypto Card contains this remaining
structure, as I will discuss with reference to the below diagram from SPEX00005847, at
SPEX00005891.



**Figure 4.5-1   How the CI_Library Communicates with a Card**

179

RESTRICTED – ATTORNEY'S EYES ONLY

358.     For example, the Fortezza Crypto Cardo contains "Data In Block (DIB) buffer area where the input data is written" and a similar "Data Out Block (DOB) buffer location" for outgoing data, just like the data buffers shown in Figure 9B above.  *See id.* at SPEX00005892; *see also* SPEX00009841, at SPEX00009869 ("The Data-In Block is used to provide input data to commands executed on the Card."); *id.* at SPEX00009870 ("The Data Out Block Structure").  Moreover, the Fortezza Crypto Card contains a "System Control Block (Mailbox) in Attribute memory which notifies the Card that there is a command to execute," just like the "Command Detector" block shown in Figure 9B above, and a "state machine" which interprets the incoming commands.  *Id.*  Lastly, the Command Block contains "address buffers" which store the addresses where memory is stored.  Specifically, "[t]he Command block is made up of six fields including the Command field, the Pointer to Next Command Block field, the Pointer to Data-In field, the Pointer to Data-Out field, Response, and Channel field."  SPEX00001744, at SPEX00001802.  The "Pointers" "are 32-bit addresses in the Fortezza Plus's memory space" where the next command, the data in, and the data out are stored.  *Id.*  These addresses "may be calculated from the shared memory address by adding the value from the CIS tuple, TPLLVl_INFO, to the shared memory address.  The tuple is the address into which Fortezza Plus has mapped shared memory. Since the Mailbox start address is required to be 0000h, the 32-bit addresses in the Pointer fields are the same as the [Fortezza Crypto Card's] shared memory space, that is, the same as the PCMCIA interface addresses."  *Id.*; *see also* SPEX00009841, at SPEX00009866 (same).

RESTRICTED – ATTORNEY'S EYES ONLY

### 2. '802 Claim 2

359. Claim 2 recite "[a] peripheral device as in claim 1, wherein the target means comprises means for non-volatilely storing data."

360. As described with respect to element [1b], the Fortezza Crypto Card contains a target means comprising a means for non-volatilely storing data, namely non-volatile storage.

### 3. '802 Claim 11

361. Claim 11 recites:

> A peripheral device, comprising:
>> security means for enabling one or more security operations to be performed on data;
>> target means for enabling a defined interaction with a host computing device;
>> means for enabling communication between the security means and the target means;
>> means for enabling communication with a host computing device; and
>> means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means.

362. Claim 11 is identical to claim 1 except that claim 11 does not recite a "means for operably connecting …" Thus, for the reasons described above for claim 1 (except as to that limitation), the Fortezza Crypto Card meets the limitations set out by Claim 11.

**RESTRICTED – ATTORNEY'S EYES ONLY**

### 4. '802 Claim 12

363.    Claim 12 recites "[a] peripheral device as in claim 11, wherein the target means comprises means for non-volatilely storing data."  As discussed above with respect to claim 2 and element [1b], the Fortezza Crypto card meets this limitation.

### 5. '802 Claim 38

a)    **[38pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:**

364.    To the extent that the preamble is limiting, the Fortezza Crypto Card satisfies it.

365.    As discussed above with respect to the preamble of claim 1, the Fortezza Crypto Card is a peripheral device.  The Fortezza Crypto Card is also undoubtedly "adapted for communication with a host computing device" as it contains a PCMCIA interface which enables communication with a host computing device, as also discussed above with respect to element [1d].

366.    In addition, the Fortezza Crypto Card is adapted "for ... performance of one or more security operations on data."  As discussed above with respect to element [1a], the Fortezza Crypto card contains a cryptographic processor (the "Capstone" chip) which performs a number of security operations on data, including encryption/decryption, hashing, and digital signatures.  Moreover, the Fortezza Crypto Card is "adapted" to interact with a host computing device in a defined way in that it provides the host computer with the security functionality provided by the cryptologic processor, as also discussed above with

RESTRICTED – ATTORNEY'S EYES ONLY

respect to element [1a].  In addition, as discussed above with respect to the "target means" limitation (element [1b]), the Fortezza Crypto Card is adapted for storage of user data.

b) **[38a] receiving a request from a host computing device for information regarding the type of the peripheral device; and**

367.     As noted above with respect to element [1e], the Fortezza Crypto Card has "attribute memory" which "contains the Card Information Structure (CIS)" which "provides information about the card manufacturer, user RAM available, ROM, Card Revision, Number of Certificates that can be stored, and the start of the mailbox communications area between the Host and the Card."  SPEX00009841, at SPEX00009855.  As also noted above, a program on the host computer called "Card Services" accesses the information in the CIS by sending an appropriate command to obtain that information.

368.     The information stored in the "attribute memory" includes information regarding the type of peripheral device.  As laid out in the "interface control" document, attribute memory includes a "Device Information Tuple" which "contains information about the card's RAM speed and memory size. This is the first information to the host that allows the host to determine how much RAM memory is available and its access speed." SPEX00009841, at SPEX00009858.

369.     In addition, the attribute memory also includes a "Version/Product Information Tuple" which "contains Level 1 version compliance and card manufacturer information.  The Level 1 Version/Production information tuples provide information to the host about the cards production and revision information.  This tuple will be used to indicate the base address of the mailbox communications area.  This allows hosts to adapt to

RESTRICTED – ATTORNEY'S EYES ONLY

different manufacturers or revision releases of the card." *Id.* at SPEX00009859. For example, this information would look like the following for the Fortezza Crypto Card:

TPLLV_MAJOR - Major version number = 04h.

TPLLV_MINOR - Minor version number = 01h (for release 2.1)

TPLLV1_INFO - Each item is an ASCII string terminated with a zero. The values are in 0000 for decimal and 0x0000 for hexadecimal.

| | | |
|---|---|---|
| Name of Manufacturer | = | "Manufacturer Name" |
| Name of Product | = | "FORTEZZA Crypto Card" *See Note1 Below |
| Card Type | = | "Processor = _____" |
| Number of Certificates | = | "Certificates = _____" *See Note 2 Below |
| Number of Key Registers | = | "Key Registers = _____" |
| Number of Concurrent Mailboxes | = | "Multiple Mailboxes = No" *See Note 3 Below |
| Mailbox Start Address | = | "Mailbox Start Address = _____" *See Note 4 below |
| Timeout in Milliseconds | = | "Timeout = _____" |
| ICD Compliance Level | = | "ICD = P1.5" |

*Id.* As can be seen in the above example, the information included in this tuple includes "information regarding the type of peripheral device" including the "Name of Manufacturer," the "Name of Product," and the "Card Type." *See id.*; *see also* SPEX00001744, at SPEX00001787, SPEX00001794-95 (describing the "attribute memory architecture" and the "Level 1 Version/Product Information Tuple").

370.    The CIS also contains "Card Information Tuples" which provide "information pertaining to the logical organization of the card's memory and data areas." *Id.* at SPEX00009863-64. This provides the host computer with information such as the address of the card's first data byte (the "TPLLV2_DINDEX" field), as well as other information regarding the memory areas of the Fortezza Crypto Card. *See id.*; *see also*

RESTRICTED – ATTORNEY'S EYES ONLY

SPEX00001744, at SPEX00001800 (detailing the "Card Information Tuple" which "serves to introduce information pertaining to the logical organization of the card's memory and data areas").

371.    Mr. Young indeed confirmed that "the CIS, card information structure, holds basically things of the nature of the -- of the device in terms of its description.  There's what they call tuples in the CIS which give you information about the card in terms of manufacturer name, how you access the memory areas on the PCMCIA interface.  There's other areas there that are used to indicate whether a command is being executed on the Fortezza card."  Young Dep. at 96:25-97:8.

372.    As noted above with respect to element [1e], the Card Services Spec discloses multiple functions (*e.g.*, "Callback," "GetFirst/NextTuple," and "GetTupleData") that can be used to request information including the type of peripheral device from the CIS: "Card Services clients may need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket.  (Some clients may receive all the information they require from the CARD_INSERTION event).  The Client Utilities functions reduce the code required for individual clients to perform such processing. GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated.  The client may concentrate on what to do with tuple data without having to duplicate the link traversal code.  The client retrieves the contents of the tuple by using GetTupleData."  Card Services Spec at 3-12.  *See also, e.g.*, Card Services Spec at 3-20 to 3-21 (stating that, for a "CARD_INSERTION" event, Card Services uses a "Callback" function that "attempts to read the [CIS]" and "uses device information from the [CIS] to create

RESTRICTED – ATTORNEY'S EYES ONLY

region description structures in its internal data area"; "Clients may have enough information provided by a GetConfigurationInfo request to determine if they wish to use the PC Card. If they do not have enough information, clients may use Card Services functions to further process the CIS.  Clients may process tuples directly using the memory ReadMemory functions or use the tuple processing functions GetFirst/NextTuple, GetFirst/NextRegion or GetFirst/Next Partition."); 3-24 (stating that "[t]he CLIENT_INFO event requests that the client return its client information data," and indicating that the request uses the "Callback" function).

> c)   **[38b] providing to the host computing device, in response to the request, information regarding the type of the defined interaction.**

373.     As noted above with respect to element [38a], the Card Services program on the host computer requests information from the CIS, and the Fortezza Crypto Card provides information from the CIS in response to that request.

374.     The information in the CIS includes information regarding the type of defined interaction (i.e. the functionality the Fortezza Crypto Card provides to the host computer). For example, as noted above, the "Version/Product Information Tuple" indicates that the Fortezza Crypto Card is a Fortezza Crypto Card (indeed, the relevant "field MUST contain the 'Crypto Card' string to be FORTEZZA Crypto Card compliant," *see* SPEX00009841, at SPEX00009859).  Because the host computer knows that the card is a Fortezza Crypto Card, the host computer knows the functionality the card can provide to the host computer. Moreover, this same tuple also indicates the type of crypto processor the used in the card (in the "Card Type" field), indicates the number of certificates the card (in the "Number of

RESTRICTED – ATTORNEY'S EYES ONLY

Certificates" field), and indicates the number of key registers (in the "Number of Key Registers" field). *See id.* Each of these fields in this tuple provides information about the security functionality provided by the Fortezza Crypto Card (i.e. the type of defined interaction).

375.    Moreover, if the "defined interaction" is storage on the Fortezza Crypto Card, the information in the CIS also provides information regarding memory size and structure. *See id.* at SPEX00009858 ("By reading the tuples in the CIS, the host can determine the start of the mailbox area used for command execution by the Card's processor"); *id.* at SPEX00009858 ("The first tuple, identified by CISTPL_DEVICE = 01h, contains information about the card's RAM speed and memory size."); *id.* at SPEX00009864 ("The Host can obtain the amount of RAM available to the Host by reading the CISTPL_DEVICE, Device Information Tuple."); SPEX00009909 ("The Card Information Structure (CIS) tuples can be read to determine the maximum number of certificates that can be stored on the card."). Moreover, commands such as "Get User Data Directory" "provide[] the Host system with total amount of available NV memory, the amount of NV memory that is free and a list of all, Type 1 and Type 2, stored data." SPEX00001744, at SPEX00002009.

RESTRICTED – ATTORNEY'S EYES ONLY

### 6.    '802 Claim 39

> **a)    [39 pre] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:**

376.    To the extent the preamble is limiting, the Fortezza Crypto Card meets it as discussed above with respect to the preamble of claim 38.

> **b)    [39a] communicating with the host computing device to exchange data between the host computing device and the peripheral device;**

377.    As discussed above with respect to elements [1d], the Fortezza Crypto Card has a means for enabling communication with the host computing device.

378.    Data is indeed exchanged via the PCMCIA interface between the host computer and the Fortezza Crypto Card.  For example, when a user wishes to encrypt some data, the host computer will issue a command to the Fortezza Crypto Card and the data to be encrypted will be transmitted via the PCMCIA interface to the Fortezza Crypto Card, as shown in the below diagram:

**RESTRICTED – ATTORNEY'S EYES ONLY**



**Figure 4.5-1   How the CI_Library Communicates with a Card**

SPEX00005847, at SPEX00005891; *see also* SPEX00024901, at SPEX00024950.  As shown in the above figure, the host PC (the blocks in white) transmits a command (at step 3) to the Fortezza Crypto Card (the shaded blocks) and additional exchanges data with the Fortezza Crypto Card through the "Data In" and "Data Out" blocks.  *See id.*

379.    Mr. Young confirmed in deposition that the Fortezza Crypto Card exchanged data with the host computer.  *See* Young Dep. at 197:15-21 (objection omitted):

> Q.   After being connected to the host computer, you had agree that the Fortezza crypto card or the LYNKS privacy cards, either initial or EES version, could commune communicate with the host computer?
>
> THE WITNESS:  The LYNKS and the Fortezza card could communicate with a computer.

189

RESTRICTED – ATTORNEY'S EYES ONLY

### c) [39b] performing one or more security operations and the defined interaction on the exchanged data; and

380.     The Fortezza Crypto Card can perform a security operation and a defined interaction on the exchanged data, as discussed above with respect to elements [1a], [1b], and [1d].

381.     How the card communicates and performs security operations and defined interactions with the exchanged data is illustrated in the figure below:



**Figure 4.5-1     How the CI_Library Communicates with a Card**

As shown in the above diagram, a command is loaded into the Fortezza Crypto Card's command block and exchanged data is loaded into the Data In Block buffer.  *See* SPEX00024901, at SPEX00024951.  (As also noted above, the Command block additionally contains "pointers" indicating the address where the data in the Data In Block buffer is stored, *see id.*).  After the card performs other functions to prepare the command for execution, "[i]f all is OK, the Card may write information to Working or Non-Volatile

190

RESTRICTED – ATTORNEY'S EYES ONLY

Memory during command execution." *Id.* For example, if the command requests that the Card encrypt data and send it back to the host computer, the card will execute the encrypt command on the data in the Data In Block buffer, then places the outgoing data into the "Data Out Block buffer," where it then can be read by the host PC. *See id.*; *see also* SPEX00009841, at SPEX00009864 (describing the "Mailbox" area including the data blocks discussed above); *id.* at SPEX00009866-70 (describing the command block structure, the data in block structure, and the data out block structure); *id.* at SPEX00009874 (showing the Fortezza Crypto Card Commands).

382. For example, as Mr. Young testified, the Fortezza Crypto Card can encrypt data (a security operation) and then can send the encrypted data back to the host PC (a defined interaction). *See* Young Dep. at 203:9-204:10 (objections omitted):

> Q. Sir, if someone were to use the encrypt command you just mentioned, they could perform encryption on data that was sent from the host computer to either a Fortezza card or a LYNKS card, correct?
>
> THE WITNESS: Yes, data can be sent from a Fortezza in LYNKS using the encrypt command to a -- to a computer.
>
> Q. And after the data is encrypted on a LYNKS -- after data is encrypted on a LYNKS or Fortezza card, it can be sent back to the host computer, correct?
>
> THE WITNESS: Yes, data can be sent back to the computer after an encrypt command.
>
> Q. And that sending encrypted data back to the host computer, that is performed by the Capstone processor within a Fortezza or LYNKS card, correct?
>
> THE WITNESS: Yes, that data is sent through the hardware accelerated or -- skipjack engine in the Capstone chip and back to the computer.

Specifically, in the example described by Mr. Young, the host computer transfers data to the Fortezza Crypto Card and sends a command to the card to encrypt that data. The card

RESTRICTED – ATTORNEY'S EYES ONLY

executes the requested security operation (encrypt) and then returns the data to the host computer.  Thus, the Fortezza Crypto Card performs a security operation (encryption) on the exchanged data and the defined interaction on the data (returning encrypted data to the host PC).

> ### d)   [39c] mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through means for performing the one or more security operations.

383.      As discussed above at element [1f] the Fortezza Crypto Card mediates communication of exchanged data between the host computing device and the peripheral device so that the exchanged data must first pass through the security means.  Further, the citations and commentary accompanying claim elements [1a] and [1b], excluding the means plus function analysis, discusses the data passing through means for performing one or more security operations.

### 7.   '135 Claim 55

> ### a)   [55pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:

384.      To the extent the preamble is limiting, the Fortezza Crypto Card meets it.

385.      The Court interpreted the term "modular device" to have the same construction as the term "peripheral device" as used in the claims of the '802 patent.  As discussed above with respect to element [1pre] of the '802 patent, the Fortezza Crypto Card

RESTRICTED – ATTORNEY'S EYES ONLY

meets this construction in that it is "a device that operates functionally separate from a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device."

386.     The Fortezza Crypto Card is "adapted for communication with a host computing device." Specifically, as discussed above with respect to element [1d], the Fortezza Crypto Card contains a PCMCIA interface that enables communication with a host computing device.

387.     In addition, the Fortezza Crypto Cad comprises a "security module that is adapted to enable one or more security operations to be performed on data." The Court construed the term "security module" to have the same meaning as the term "security means" as that term is used in the claims of the '802 patent. As discussed about with respect to element [1a] of the '802 patent, the Fortezza Crypto Card contains a "security module" as that term has been interpreted by the Court.

388.     Lastly, the Fortezza Crypto Card contains a "target module that is adapted to enable a defined interaction with the host computing device." Consistent with how the Court interpreted the "security module" to have the same scope as the "security means" from the '802 claims, I have used the same construction for "target module" that the parties agreed for the similar "target means" limitation from the claims of the '802 patent. Moreover, the Court construed the term "defined interaction" for the claims of the '135 patent the same way as the term was construed for the term as used in the claims of the '802 patent. Thus, for the reasons discussed above with respect to element [1b] of the '802 patent, the Fortezza Crypto Card contains a "target module."

RESTRICTED – ATTORNEY'S EYES ONLY

> **(1)    [55a] receiving a request from the host computing device for information regarding the type of the modular device;**

389.    As described above with reference to element [1e] and [38a] and [38b] of the Fortezza Crypto Card, the card has an "attribute memory" which contains information regarding the type of "modular device."  As also discussed above with respect to those limitations, the Card Services program on the host computer sends a command for that information to the Fortezza Crypto Card.

> **b)    [55b] providing the type of the target module to the host computing device in response to the request; and**

390.    As described above with reference to element [1e] and [38a] and [38b], the Fortezza Crypto Card provides information from attribute memory about the operation of the card's memory structures in response to a request.  As also noted above, the card provides specific information regarding the structure of the non-volatile memory (the target means).  Specifically, commands such as "Get User Data Directory" "provide[] the Host system with total amount of available NV memory, the amount of NV memory that is free and a list of all, Type 1 and Type 2, stored data."  SPEX00001744, at SPEX00002009.

> **c)    [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.**

391.    As described above with respect to element [1e], the Fortezza Crypto Card operably connects the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

194

8. **'135 Claim 56**

    a) **A method as in claim 55, wherein the security module is adapted to enable communication with the host computing device and the target module, and the target module is adapted to enable communication with the security module and prevent direct communication with the host computing device, the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module.**

392.    As described above with respect to element [1f] of the '802 patent, the Fortezza Crypto Card, the Fortezza Crypto Card contains a "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means." As described with respect to that element, the Fortezza Crypto Card is adapted to enable communication between the host computer and the security means and the security means and the target means/module. However, as also described above, the Fortezza Crypto Card prevents direct access to the target means (the non-volatile memory) by the host computer.

393.    As described above with reference to element [1e] and [38a] and [38b] (and further at [55a]–[55c]), the Fortezza Crypto Card provides information from attribute memory about the operation of the card's memory structures in response to a request. As also noted above, the card provides specific information regarding the structure of the non-volatile memory (the target means). Specifically, commands such as "Get User Data Directory" "provide[] the Host system with total amount of available NV memory, the

RESTRICTED – ATTORNEY'S EYES ONLY

amount of NV memory that is free and a list of all, Type 1 and Type 2, stored data."

SPEX00001744, at SPEX00002009.

#### 9.    '135 Claim 57

a)    **[57pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:**

394.    *See* [55pre].

b)    **[57a] communicating with the host computing device to exchange data between the host computing device and the modular device;**

395.    As described above with respect to element [39a] of the '802 patent, the Fortezza Crypto Card meets this limitation.  *See also generally* discussion for Claim 55.

c)    **[57b] performing one or more security operations and the defined interaction on the exchanged data;**

396.    As described above with respect to element [39b] of the '802 patent, the Fortezza Crypto Card meets this limitation.

d)    **[57c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and**

397.    As described above with respect to element [1f] of the '802 patent, the Fortezza Crypto Card meets this limitation.

e)    **[57d] operably connecting the security module and/or the target module to the host computing device in**

RESTRICTED – ATTORNEY'S EYES ONLY

response to an instruction from the host computing device.

398.     *See* [55c]

**10.     '135 Claim 58**

a)     **[58pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:**

399.     *See* [55pre].

b)     **[58a] receiving an instruction from a host computing device regarding operation of the modular device; and**

400.     As described above with reference to element [1e] and [38a] and [38b] of the Fortezza Crypto Card, the card has an "attribute memory" which contains information regarding the operation of "modular device." Specifically, as noted above, this information includes information about the version of the card, the size and speed of memory, and any particular configuration of the card. *See* SPEX00009841 at SPEX00009858–64 (detailing the tuples used by the Fortezza Crypto Card, including the "Device Information Tuple" which "includes information about the card's RAM speed and memory size"; the "Version/Product Information Tuple" which "provides information to the host about the cards production and revision information"; the "Configuration Tuple" which "describes interface support of the card and the location of the card configuration registers"; and "Card Information Tuples" which "serve[] to introduce information pertaining to the logical organization of the card's memory and data areas.") As also discussed above with respect to

RESTRICTED – ATTORNEY'S EYES ONLY

those limitations, the Card Services program on the host computer sends a command for that information to the Fortezza Crypto Card.

> c)  **[58b] operably connecting the security module and/or the target module to the host computing device in response to the instruction from the host computing device.**

401.    *See* [55c].

## C.  Fortezza "Interface Control" Document

5.    As noted above, the functions and design of the Fortezza Crypto Card are detailed in a December 1994 "Interface Control Document" that was sent to Spyrus and other partners who were to build Fortezza Crypto Cards for NSA.  This document is cited extensively in my claim-by-claim analysis of the Fortezza Crypto Card.  For the reasons described above with respect to my discussion of the Fortezza Crypto Card, this document additionally anticipates the Asserted Claims as SPEX has applied those claims in its infringement contentions.

## D.  Fortezza Multi-Function Card

402.    As noted above in the introduction, Spyrus offered to sell a follow-up product to the Fortezza Crypto Card —the "Fortezza Multi-Function Card"—to NSA on May 10, 1996.  This product was to be a "re-design" of the Fortezza Crypto Card in a "smaller form factor" that would "retain full compatibility with full compatibility with the complete Fortezza ICD," but would add the capability of accepting a "Compact Flash module." SPEX000087770, at SPEX00008773; *see also id.* at SPEX00008776 ("contractor shall capture the current Spyrus Fortezza card design and re-design the card to fit within the smaller form factor of the compact flash format.")  The goal of modifications to then-current Fortezza

198

RESTRICTED – ATTORNEY'S EYES ONLY

Crypto Card was "to develop a generic non-proprietary 50 pin bus interface to communicate with modems, memory, Ethernet and biometric devices." *Id.* at SPEX00008776.

403.     Because the Fortezza Multi-Function Card retained all previous aspects of the Fortezza Crypto Card (but in a more compact form factor), the Fortezza Multi Function Card meets the limitations of the asserted claims, as discussed above in my discussion of the Fortezza Crypto Card.

404.     However, unlike the Fortezza Crypto Card, the Fortezza Multi Function Card explicitly contains a "Compact Flash module" to accommodate long-term storage of encrypted data. This Compact Flash module was to be a "10.0 MB Compact Flash Module" that would serve as a "Storage Unit." SPEX00008770, at SPEX00008776; *id.* at SPEX00008778. The design changes to necessitate this modification would include, for example, modifying the "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means," to accommodate Compact Flash, which would mean that such means in the Fortezza Multi-Function Card would include the components shown in Figure 9B relating to the use of Compact Flash module. For example, in order to communicate with Compact Flash, the Fortezza Crypto Card would have to contain a "Compact Flash Interface," as well as a data buffer and an I/O controller for Compact Flash. The Fortezza Multi-Function Card would also have to contain a Compact Flash Sector Center in order to properly address data being sent to the Compact Flash module. Thus, even under a proper interpretation of this claim element, the Fortezza Multi-Function card would meet it.

RESTRICTED – ATTORNEY'S EYES ONLY

405.    Another module would be a "communications" module which was an "Ilex CompactModem card,"  SPEX00008770, at SPEX00008778; SPEX00008838, at SPEX00008875–76, as pictured below:

**Ilex Systems Fortezza/Compact Modem Specification**



SPEX00008338, at SPEX00008843.

406.    Both of these modules would satisfy the "target means" limitation.  The Flash storage module would constitute non-volatile storage that would "enable" encrypted storage functionality to the host computer, and the CompactModem module would "enable" secure communications functionality to the host computer.

407.    Thus, in my opinion, the Fortezza Crypto Card would teach each and every element of the Asserted Claims.  Indeed, Sue Pontius testified that the Fortezza Multi-Function Card was the same as Spyrus's "Hydra" product, which Spyrus admits practices the Asserted Claims.  Pontius Depo, at 165:10–13.

**RESTRICTED – ATTORNEY'S EYES ONLY**

## E.     <u>Lynks System</u>

408.     As noted above, the Lynks System used the same hardware as the Fortezza

Crypto Card, as Mr. Young admitted in Deposition.  Young Depo, at 138:7–139:6.  The only

difference between the Lynks System and the Fortezza Crypto Card was that the Lynks

System implemented additional encryption algorithms—specifically commercial encryption

algorithms that were not used on the Fortezza Crypto Card.  *Id.*  In other words, the Lynks

System had all of the same hardware features, and had all of the same algorithms, as the

Fortezza Crypto Card, but added commercial algorithms.

409.     That the Lynks System and the Fortezza Crypto Card were essentially the

same product under different branding (and with different algorithms) is shown in

SPEX00005373—a "Cryptologic Programmer's Guide" put out by Spyrus  for the Lynks

System ***and*** the Fortezza Crypto Card.  This guide conflates the Fortezza Crypto Card and

the Lynks card, stating "The FORTEZZA card and all implementations of the LYNKS

Privacy Card™ are hereafter referred to as 'the Card.' The Card is a PCMCIA-based

cryptographic module that implements U.S. Government and/or commercial encryption,

decryption, hash, digital signature, authentication, timestamp, data, card and key

management services in tamperproof hardware."  *Id.* at SPEX00005377.  The document also

indicates that Lynks had the same functionality as the Fortezza Crypto Card, stating "existing

FORTEZZA applications can use a LYNKS Card's FORTEZZA compliant functions with

no impact" but also explains that the Lynks System has "algorithm switching abilities" that

allow it to use U.S. domestic commercial and government algorithms.  *Id.*; *see also id.* at

RESTRICTED – ATTORNEY'S EYES ONLY

SPEX00005377–78 (indicating that the Lynks Card implements the "function calls" of the Fortezza Crypto Card).

410. Moreover, as with the Fortezza Crypto Card, Mr. Young admitted that limitations of the Asserted claims were present on the Lynks card. For example, Mr. Young admitted that the Lynks card was a "peripheral" / modular device according to the Court's construction:

> Q. Sir, you would agree that a LYNKS, either the first generation or the EES LYNKS, is a device that operates functionally separate from a host computing device, correct?
>
> THE WITNESS: Yes.

Young Dep. at 158:14-21 (objection omitted). Mr. Young and SPEX both admit that the Lynks System used a Capstone processor to implement security functionality—meeting the Court's construction of "security means" / "security module" :

> Q. Either first generation or EES included a Capstone processor?
>
> THE WITNESS: There was a version that had the Capstone processor.
>
> Q. For the --
>
> A. For the EES.

Young Dep. 162:25-163:7 (objection omitted); *see also* SPEX Response to Kingston Interrogatory No. 3 ("In 1995, Spyrus developed EES LYNKS Privacy Card **using the MYK-82/82A chip**." (emphasis added)). Mr. Young further admitted that the Lynks card used non-volatile memory, like the Fortezza Crypto Card:

> Q. And you would also agree with me that the LYNKS, whether first generation or the EES LYNKS, included a module that was adapted to enable the nonvolatile storage of data?
>
> 10 THE WITNESS: I would say the answer is yes. It's data.

**RESTRICTED – ATTORNEY'S EYES ONLY**

Young Dep. at 170:4-11 (objection omitted).  Mr. Young admitted that the Lynks system used a "conventional computer bus" –the Court's construction for the "means for enabling communication between the security means and the target means":

> [Q.] Did the LYNKS, either the first generation or the EES version, include a conventional computer bus?
>
> THE WITNESS: Yes.

Young Dep. at 172:22-173:2 (objection omitted).  Mr. Young admitted that the Lynks Card used a I/O interface to connect to the host computer, like with the Fortezza Crypto Card, which meets the Court's construction of the "means for enabling communication with the host computing device":

> Q. Did the LYNKS, either the original version or the EES version, include an input/output device between the host computer and the card?
>
> A. Yes.

Young Dep. at 174:24-175:2.  Mr. Young admitted that indeed, the Lynks card could communicate with the host computer over that interface:

> Q. After being connected to a host computer, you would agree that the Fortezza Crypto Card or the LYNKS Privacy Cards, either initial or EES version, could communicate with the host computer?
>
> THE WITNESS: The LYNKS and the Fortezza card could communicate with a computer.
>
> * * *
>
> [Q.] And the -- either the LYNKS or the Fortezza Crypto Card could exchange data with the host computer, correct?
>
> THE WITNESS: The answer is, yes, the Fortezza and LYNKS card could exchange data with a  host computer.  And that data would be command data and response data from the LYNKS and Fortezza card, a response to a command.

RESTRICTED – ATTORNEY'S EYES ONLY

Young Dep. at 197:15-198:8 (objections omitted).  And Mr. Young confirmed that, like the

Fortezza Crypto Card, the Lynks card would use PCMCIA commands (such as "Get Tuples

Data") to provide information about the card to the host computer:

> [Q.] If a LYNKS, either the original or the EES card, receives a GetTuples
> data command from a host, what does it respond with?
>
> THE WITNESS: It would be the same answer4 as the previous question
> [regarding Fortezza Crypto Card].
>
>             *  *  *
>
> Q. I didn't ask you before in regard to LYNKS.  I want to make sure there's a
> clear record as to LYNKS.  Can you please respond to the question?
>
> A. So the LYNKS and the Fortezza card will respond the same except with
> the product name will be different and possibly the memory -- amount of
> common memory that's available on the PCMCIA interface.

Young Dep. at 181:24-182:4; 182:17–25 (objection omitted).  As discussed above, this in

combination with the PCMCIA interface meets the court's construction of "means for

operatively connecting . . ."

411.     Thus, like the Fortezza Crypto Card, and for the reasons discussed above with

respect to Fortezza Crypto Card in addition to those reasons discussed in this section, the

Lynks system teaches the Asserted Claims.

## XII.   EVEN IF NOT ANTICIPATED, THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS TO A SKILLED ARTISAN

### A.   Jones In View of the Knowledge of a Skilled Artisan and the PCMCIA Standards

412.     As explained above in my analysis of Jones, Jones would have reasonably

suggested to one of ordinary skill in the art to consider the PCMCIA standards in reading

Jones.  Further, as explained above, it is my opinion that Jones discloses "means for operably

RESTRICTED – ATTORNEY'S EYES ONLY

connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device" from claim element [1e] of the '802 patent and related elements of claims 1 and 38 of the '802 patent (namely: [1f]: "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means"; and [38a]: "receiving a request from a host computing device for information regarding the type of the peripheral device") and claims 55, 56, and 58 of the '135 patent (namely: [55b] "receiving a request from the host computing device for information regarding the type of modular device"; [56] "the method further comprising the step of controlling the security module to communicate with the target module so as to obtain information from the target module that can be used to identify the type of the target module"; and [58a] "receiving an instruction from a host computing device regarding operation of the modular device"). However, to the extent it is determined that these elements are not anticipated by Jones, they would have been obvious to one of ordinary skill in the art.

413.    **First**, the '802 patent admits that these elements (regarding operably connecting and requesting/receiving information about the type of peripheral device, target module, and its operation) were known in the art and would have been obvious to one of ordinary skill in the art.  The '802 patent states that "[t]ypically ... the presence of a new peripheral device is detected" and there is a "standard software device driver (hereinafter, 'host driver')" that "identifies the type of the peripheral device."  The '802 patent states:

> **Typically**, once **the presence of a new peripheral device is detected** by the operating system software of the host computing device, the operating system software (or companion software program) also identifies **the type of the peripheral device**.  This can be accomplished, for example, by a

RESTRICTED – ATTORNEY'S EYES ONLY

> **standard** software device driver (hereinafter, "host driver") for devices of the type that use the host computing device interface that is being used by the peripheral device 602. In FIG. 6, the host driver is shown stored in the memory section 606a of the memory device 606 of the host computing device 601. (**The Card Services or Socket Services programs that often are bundled with the Windows95™ operating system software for use in performing various "housekeeping" functions associated with a PCMCIA interface are examples of such drivers.**)

'802 patent at 7:17-31 (emphasis added). Further, as shown above, the '802 patent also specifically states that PCMCIA "Card Services or Socket Services programs ... are examples of such drivers." *Id.*

414.     **Second**, this element is obvious in view of Jones in combination with the PCMCIA Standards. A person of ordinary skill in the art would have been motivated to combine Jones with the PCMCIA standards, because, **first**, Jones repeatedly states that its invention complies with the PCMCIA Standard. For example, Jones regards "[a] detachable PCMCIA memory card." Jones at Abstract. Jones also states that "the present invention takes the form of a removable memory card, preferably implemented in conformity with the PCMCIA (Personal Memory Card Industry Association) interface standard." Jones at 2:10-13. Jones additionally states: "The PCMCIA standard achieves interchangeability of cards of different functions by establishing standards for the physical card (dimensions and mechanical tolerances for the card and connectors), the card interface (pinout and signal definitions), and card software (which specifies the organization of data on the card and the record formats and protocols by which configuration information and data is exchanged with the host computer). Complete information which defines the PCMCIA standard is published by and available from the Personal Computer Memory Card International Association, 1030G East Duane Avenue, Sunnyvale, Calif. 94086." Jones at 4:8-19. *See also,*

*e.g.*, Jones at 3:16-32; 3:33-36; 3:44-49; 3:50-67; 4:1-8; 4:23-40; 6:33-60; 6:61-7:2; 7:3-20; 7:21-8:2; 9:6-10.  The PCMCIA standards includes several documents, including the PC Card Standard and the Card Services Spec.  For example, as stated in the PC Card Standard, the PCMCIA Standards included six individual specifications:

The release of the *PCMCIA Standards* incorporates a number of enhancements and additions over the previous release of the Specification. The *PCMCIA Standards* now includes the following individual specifications.

| Title | Release | Date Published |
|---|---|---|
| PC Card Standard Specification | 2.01 | November, 1992 |
| Socket Services Specification | 2.00 | November, 1992 |
| Card Services Specification | 2.00 | November, 1992 |
| PC Card ATA Mass Storage Specification | 1.01 | November, 1992 |
| AIMS Specification | 1.01 | November, 1992 |
| Recommended Extensions | 1.00 | November, 1992 |

PC Card Standard at Preface.  *See also, e.g.*, Card Services Spec at page 1-3 (identifying, as a "related document," the PCMCIA PC Card Standard, Release 2.01, November 1992).

415.     **Third**, as to the PC Card Standard, Jones specifically references this document and states that its invention "conforms" to this standard: "The present embodiment of *invention conforms to the PC Card Standard Specification, Release 2.01, published in November, 1992.*"  Jones at 4:8-22 (emphasis added).  **Fourth**, as to the Card Services Spec, Jones states that the programming interface related to the Jones is "defined" by the PCMCIA Card Services software and references the Card Services software throughout the specification: "The programming interface to the *PCMCIA Card Services Software* is defined in Section 3 of the PCMCIA Standard (Release 2.01) which specifies a variety of services which are available to Client Device Drivers, as well as callback mechanisms for notifying Client Device Drivers of status changes.  In addition to conventional memory operations provided

RESTRICTED – ATTORNEY'S EYES ONLY

by Bulk Memory Service functions, the Card Services software also provides Client Utility functions which allow client device drivers to access and manipulate the CIS stored in the memory card's attribute memory 190. ... These card management routines in turn utilize the functions provided by the PCMCIA Card Services software to implement the following two special operations which not required for conventional PCMCIA memory cards"  Jones at 7:3-20. *See also, e.g.*, Jones at 6:47-50 ("The [PCMCIA] standard 'Socket Services' and 'Card Services' card interface software, when implemented on a given host computer, provides a Card Services interface with 'Client Device Drivers,' significantly simplifying the design of device drivers by providing much of the functionality required for communicat[i]on with socketed PCMCIA cards."); 6:61 (referring to "utilizing available Card Services routines"); 7:42-51 (stating "the Client Device Driver is notified by the Card Services software (via its CARD_INSERTION callback function)" and that "the Client Device Driver calls Card Services function to process the card[']s CIS entries").  *See generally* Jones (referencing numerous aspects of the PCMCIA standard).

416.     The combination of Jones with the PCMCIA standards renders these claim elements obvious.  The citations and commentary supporting anticipation by Jones with the PCMCIA standards reflect that these claim elements are obvious.  As another example, the PC Card Standard indicates that the host computer requests from the peripheral card ("[b]efore configuring a card, the system must examine the card's Card Information Structure") "information regarding the type of the peripheral device" ("I/O address space, interrupt request, and other requirement of the possible card configurations"):

RESTRICTED – ATTORNEY'S EYES ONLY

> Peripheral cards must be configured by the system before their I/O Interface becomes active. Before configuring a card, the system must examine the card's Card Information Structure to determine the I/O address space, interrupt request, and other requirements of the possible card configurations. The system uses this information to select the best configuration from those available in the card, as determined by the system's hardware and software capabilities, as well as the requirements of other cards installed concurrently. If no card configuration is suitable for the system, because the card requires resources which are not available in the system, or which have already been assigned by the system to other cards, the system may reject the card without configuring it.

PC Card Standard at page 4-6.

## B.    Fortezza Crypto Card and/or Lynks Card In View of the Knowledge of a Skilled Artisan

417.    As discussed above in my analysis of the Fortezza, nothing in the claim language or the constructions requires that storage of encrypted data on the peripheral device.  Moreover, as also discussed above, the Fortezza Crypto Card is able to store encrypted user data in non-volatile memory.

418.    However, to the extent that this is required by the claims, and to the extent not explicitly disclosed by Fortezza, it would have been obvious to a skilled artisan to include storage for encrypted user data on the Fortezza Crypto Card in light of a skilled artisan's understanding that PCMCIA PC Cards were originally designed for, and easily adapted to include, portable storage of data.

419.    A skilled artisan would have been motivated to include secure data storage on the Fortezza Crypto Card at the time of the filing of the asserted patents.  One of the reasons the Fortezza Crypto Card was designed as a PCMCIA PC-Card, rather than building the same functionality into host computers themselves, was to allow portability.  *See, e.g.*, SPEX00018941 (boasting that the Fortezza Crypto Card "provide[s] high performance, high security cryptographic processing *in a personal, portable PC card package.*"); SPEX00005733, at SPEX00005786 ("These algorithms, plus the *need for portable, writer-*

209

RESTRICTED – ATTORNEY'S EYES ONLY

*to-reader security*, form the technical basis for Type II system applications."). This made sense at the time, because it allowed workers to take security with them as they moved in between desktops, and allowed the workers to use the security with a variety of different hardware, such as desktop PCs, laptops, or even PDAs. A skilled artisan would understand that a worker might need to carry data with them between these multiple devices as well—thus would recognize the need for not only a portable security device, but a portable security device that would allow the worker to carry around data as well as the means for performing those security operations. Indeed, it was recognized at the time that a PCMCIA PC-Card was advantageous because it allowed for interoperability between different types of devices and allowed a user to carry data with them and to move data from different devices.

420.    At the same time, flash memory chips that could non-volatilely store data were becoming increasingly common and popular. As one industry magazine from the time explained, these flash memory chips "have the potential to replace low-capacity magnetic disks. Cards of up to 20M-byte capacity are available today in volume at about US $30 per megabyte, and that price is expected to drop fairly quickly in the near future." KT0056666. This same industry publication declared that "The combination of increasing storage capacities, falling memory prices, and a standardized expansion slot for portables (110 cards) is accelerating the proliferation of portable computer, consumer, and industrial products. Thanks to the industry's broad acceptance of the PCMCIA/Jeida standard, those products will work well with one another and will integrate smoothly into the existing computer environment." *Id.* at KT0056670. In fact, the industry publication declared that "all the elements needed to support a mass market for PC-card-equipped products are in place" and

RESTRICTED – ATTORNEY'S EYES ONLY

that "[a]s mass market acceptance pushes prices down and encourages the development of

supporting products, commercial and industrial applications will expand as well." *Id.* In

short, at the time, skilled artisans would have though that "The future is in the PC cards,"

particularly portable PCMCIA-based memory cards. Indeed, one of the original purposes

for the Personal Computer *Memory Card* International Association (PCMCIA) was to

develop a standard for portable memory cards. *See* KT0056671, at KT0056676 (explaining

that PCMCIA "was founded in 1989 by a small group of companies that wanted to

standardized *memory cards*" (emphasis added)).

421.    In view of Fortezza, and in view of the generalized need to protect data (as

described in the background section in part VII, and in the background concerning the

development of Fortezza in part X.B.2, a skilled artisan would have recognized the

advantages of storing that data encrypted. Specifically, because the data storage would be

portable (and thus, could be easily lost or stolen), a skilled artisan would recognize that

sensitive data stored on the PCMCIA card should be stored in a way that could not be

accessed by anyone except those authorized to view the data. Thus, a skilled artisan would

have recognized that modifying the Fortezza Crypto Card to allow for portable storage of

secure data would have been advantageous and would have been commercially desirable

given the market forces at the time.

422.    In addition, a skilled artisan would have expected such modifications to be

successful. Modifying the Fortezza Crypto Card to accommodate long-term storage of data

would not have been difficult. Textbooks readily available at the time provided examples of

PCMCIA flash-cards that were capable of storing user data. *See, e.g.,* DEF_INV 0000972, at

RESTRICTED – ATTORNEY'S EYES ONLY

DEF_INV 0001165-71 (a chapter of a textbook entitled "PCMCIA System Architecture" providing an example of a "Flash fCard" PCMCIA memory card).  Indeed, the only modification needed would have been to either include an additional non-volatile storage chip on the card or to use a larger size non-volatile storage chip on the card.  As noted above, such chips were readily available at the time.  Moreover, the Fortezza Crypto Card used a standard bus to connect its Capstone chip and the non-volatile storage—so no special engineering would have been required to accomplish this.  Simply put, it would have been trivial to accomplish this modification.

## C.      Modification of the Jones, Fortezza, or Lynks to Accommodate CF Cards

423.      As noted above, a skilled artisan would have been motivated to modify (to the extent not already part of Fortezza) the Fortezza Crypto Card to include non-volatile storage of user data.  Similarly, Jones also includes non-volatile flash memory.  *See*, *e.g.*, Jones at 3:50-55 ("The secure memory card 100 stores data in a common memory array 150, preferably implemented with non-volatile flash memory integrated circuits, enabling the common memory array to store 10 megabytes of data in an area small enough to be included on a credit-card sized Type I PCMCIA card.")  One of the options at the time for long-term non-volatile storage of data would have been a Compact Flash memory card.

424.      Using Compact Flash memory would have been particularly advantageous as it allows a number of benefits beyond those discussed above.  First, Compact Flash memory would allow greater interoperability and portability beyond just soldering a non-volatile memory card to the detachable PCMCIA memory card of Jones.  The Compact Flash memory could, for example, be removed from the detachable PCMCIA card of Jones and be

RESTRICTED – ATTORNEY'S EYES ONLY

used with any reader for such memory, like those built into computers, laptops, and portable devices.  Moreover, a user could also encrypt multiple Compact Flash memory components without having to purchase multiple PCMCIA memory cards-thus decreasing the cost of encrypting and storing larger amounts of data.

425.     Modifying Fortezza Crypto Card or Lynks or Jones to accommodate Compact Flash storage would not have been difficult.  Compact Flash, like PCMCIA, is a set of standardized technologies just like the technologies that are part of the PCMCIA standards. All of the specifications for Compact Flash were published and could easily be looked up by a skilled artisan at the time.  Moreover, it appears that Spyrus was able to accomplish modifying the PCMCIA Fortezza Crypto Card to accommodate Compact Flash modules without much difficulty shortly after it began manufacturing the cards for NSA.  As noted above, Spyrus proposed a Fortezza Multifunction card that was adapted to use Compact Flash memory cards a few months after receiving the contract to manufacture Fortezza Cards-the contract was awarded in September/October 1995, and Spyrus proposed modifying the card to NSA in May of 1996.  Indeed, PCMCIA-ATA flash memory cards and Compact Flash cards were often interchangeable.  Both Compact Flash and PCMCIA PC-Cards had essentially the same pin-out configuration.  *See* KT0059385.  "While PC Card is a 68 pin parallel bus, and CompactFlash is only 50 pin, the difference is irrelevant as the 18 pins not found on CompactFlash are unused and or reserved pins still undefined. This is why PC Card to CompactFlash Card media adapters are a passive pin out only."  *Id.*  Indeed, products at the time were capable of either using PCMCIA-ATA cards or Compact Flash Cards.  *See* KT0059283, at KT0059331.

RESTRICTED – ATTORNEY'S EYES ONLY

### D. There Are No Substantive Secondary Indicia of Non-Obviousness Attributable to the Alleged Invention of the '802 and '135 Patents

426.     To the extent the claims of the '802 and '135 patents are anticipated, it is my understanding it is unnecessary to consider whether those claims are obvious in light of the prior art.  I also understand that the obviousness inquiry may involve the consideration of secondary indicia of nonobviousness attributable to the alleged invention. It is my opinion that the evidence supporting obviousness, as discussed above, is strong enough that it cannot be overcome by any secondary indicia of nonobviousness.

427.     I understand SPEX contends that there is evidence of secondary indicia, including commercial success, copying, and praise by others.[17]  I disagree that SPEX has shown the existence of any of these secondary indicia or the required nexus between the purported merits of its invention and any alleged secondary indicia.

### 1. Commercial Success

428.     Specifically, SPEX claims that "the claimed technologies form the basis for the entire hardware-encrypted storage market."  However, as shown above, hardware encryption was known before the Asserted Patents, as was hardware-encrypted storage. Moreover, as also noted above, nothing in the claims actually requires storage of encrypted data on the peripheral device.  At most, the Asserted Patents claim a particular *implementation* of hardware encryption, and SPEX has not provided any basis for me to conclude that Asserted Patents' implementation of hardware encryption formed the basis for demand for any product, much less the "entire hardware-encrypted storage market."

---

[17] SPEX's Supplemental Response to Common Interrogatory No. 8 (Jan. 29, 2018).

**RESTRICTED – ATTORNEY'S EYES ONLY**

429.	I understand that SPEX also contends that the commercial success of the accused products supports a conclusion of non-obviousness and that a nexus between the sales of the accused products and the patented inventions exists because of Defendants (including Kingston's) "marketing and/or pricing of the hardware encryption features of the accused/marked products."  I have reviewed the relevant Kingston documents cited by SPEX that it contends supports this contention (specifically KT0002492, KT0002525, KT0002767, and KT0002833).  These documents tout the numerous features of various Kingston products that are different from the alleged inventions described by the Asserted Claims.  For example, KT0002492 lists the following features, each of which is not covered by the claims of the Asserted Patents:

- "Capacities up to 16 GB."  This advertises that the Kingston product has a large capacity for data storage, which is not required by the Asserted Claims.

- FIPS certification – the FIPS certification includes both encryption and a number of unclaimed features, including physical security mechanisms to prevent physical access to the internals.  Nothing in the Asserted Claims requires such tamper-prevention

- "Enforced complex password protection" – Nothing in the Asserted Claims requires the use of "complex password protection."

- "On-Board full entropy key generation" for NIST SP-800-90 and AES 256-bit keys.  Neither of these forms of encryption are mentioned in the Asserted Claims, nor does anything in the claims require on-peripheral-device key generation

- "Digitally signed firmware updates."  Nothing in the Asserted Claims requires digitally-signed firmware updates

- "tamper-free" autorun files.  Again, nothing in the Asserted Claims addresses auto-run files.

- "Malware scanning."  Nothing in the Asserted Claims requires malware detection on the peripheral device

The marketing documents also boast that the drive is waterproof (up to 4 feet) and is backed by a five-year warranty and tech support.  Again, nothing in the Asserted Claims requires

RESTRICTED – ATTORNEY'S EYES ONLY

these features.  The other documents also tout features that differ from the inventions claimed by the Asserted Patents, including "Anti-Virus Protection," fast read/write speeds, tamper-evident physical design, shock-resistant hardware, and management software that restricts the use of USB drives.

430.     Moreover, I am informed that the products that were licensed by Spyrus to Kingston were not commercially successful and that Kingston discontinued at least one line of products due to low sales volumes.

431.     In short, I do not find this purported evidence of commercial success to have any connection to the claims of the Asserted Patents.  However, I reserve the right to provide opinions regarding any other evidence or argument of commercial success presented by SPEX or its experts.

## 2.     Copying

432.     I also understand that SPEX pointed to the allegations in its complaint as evidence that Kingston copied the claimed invention.  SPEX's complaint asserts that "Kingston used the partnership with Spyrus to learn Spyrus' confidential information in order to develop its own competing technology" and that "proprietary, confidential information" was improperly shared.  Complaint, at ¶¶ 42–58.  I understand that Kingston denies these allegations.  However, even if taken as true, the allegations do not support a conclusion of non-obviousness because SPEX never explains what specific "proprietary, confidential" information was allegedly shared, nor does Spyrus provide any explanation as to how that information has any connection to the invention claimed by the Asserted Patents.

RESTRICTED – ATTORNEY'S EYES ONLY

433.     Should SPEX introduce additional evidence or expert testimony to support its contention regarding a nexus between the alleged copying and the Asserted Patents, I reserve the right to provide additional opinions on this topic.

### 3.     Praise by Others

434.     I understand that SPEX contends that "praise by others" also suggests non-obviousness.  Specifically, SPEX pointed to a number of articles about and reviews of its products which it contends show praise for the patented features:  Specifically, Spyrus cites:

- PC Magazine Review of the Spyrus "WorkSafe Pro." This review lists the positive aspects as "Makes Windows 8.1 available on any system. Includes Mac support. Military-grade hardware and software-based security tools. Rugged design. Includes tool for creating a usable Windows image on the drive."

- PC Magazine Review of the Spyrus "Worksafe."  Like the review of the Worksafe pro, the review lists the positives aspects as: "Makes Windows 8.1 available on any system. Includes Mac support. Rugged design. Hardware- and software-based security tools. Includes tool for creating a usable Windows image on the drive."

- SSD review from (http://www.thessdreview.com/our-reviews/spyrus-worksafe-prowtg-secure-flash-drive-review-worlds-secure-flash-drive/3/). This article is not available at the URL and I understand that Spyrus has not produced a copy of this article.

- Alleged awards listed at (https://www.spyrus.com/spyrus-named-winner-in-2011-golden-bridge-awards-forvirtual-office-technology/).  The referenced content is not available at the URL and I understand that Spyrus has not produced a copy of the content.

- An article from a publication called "Dark Reading" regarding Spyrus's Hydra PC meeting NSA security requirements.  The article discusses the security features of (1) encrypting data " on an individual file/folder basis, which provides much stronger security than standard sector-based encryption"; (2) using ECC P-384, AES-256 and SHA-384 encryption algorithms; (3) a "tamper-resistant security boundary (4) "Private keys cannot be imported, exported, or corrupted.;" and (5) "Hydra PC permanently deletes the encryption keys after 10 incorrect PIN entries, rendering the encrypted data undecipherable."

RESTRICTED – ATTORNEY'S EYES ONLY

- A Spyrus press release on BusinessWire, titled "Info Security Products Guide Names SPYRUS Hydra Privacy Card(R) Series II Winner of the 2006 Global Excellence in Secure and Removable Mass Storage Device Award"

- An SC Media Product Information Page for the Spyrus Hydra Privacy Card Series II, which touts that the card is "tamper-resistant and it destroys the encryption keys after a predetermined number of failed PIN attempts rendering the data stored on the device unrecoverable," among other features.

435.    I have reviewed these articles and disagree that these articles support non-obviousness.  To the extent that these articles are indeed praise "by others" (for example, Spyrus's press release provides no information about why it received the award, and Spyrus's praise of itself in that article is not praise by others), Spyrus has not demonstrated a nexus between the praise and the Asserted Claims.  If anything, from my review of the articles, the praise relates to unclaimed, other features, such as the ability to have a portable version of Windows on a USB stick and rugged design.

436.    Should SPEX provide an explanation as to what patented features it believes these articles are praising, I reserve the right to address those arguments in a subsequent report.

### 4.    Patent Citations

437.    Lastly, I understand that SPEX claims that the number of citations to the Asserted Patents by other patents supports non-obviousness.  I understand that SPEX contends these citations show both commercial success and industry praise.

438.    I do not find patent citations to be convincing evidence of commercial success or industry praise.  When an inventor cites a prior art patent during prosecution, he or she does so inform the PTO (and later, the public) regarding potentially relevant prior art –- and

not to assert that the prior art patent was novel or non-obviousness, and certainly citations by others do not show commercial success

## XIII.  THE ASSERTED CLAIMS ARE DERIVED FROM THE GOVERNMENT

439.     Lastly, it is my opinion that the Asserted Claims are invalid because the purported inventors of the Asserted Patents derived the inventions claimed from NSA.  As discussed above, the Fortezza Crypto Card teaches the claimed invention as SPEX has applied the claims to the accused products.  However, the Fortezza Crypto Card was invented by NSA, not the inventors listed on the patents, and the NSA provided the inventors at Spyrus with enabling instructions on how to build a Fortezza Crypto Card prior to the purported invention of the Asserted Patents.

440.     As described above in my discussion of the background of the Fortezza Crypto Card, NSA—not Spyrus—invented the Fortezza Crypto Card.  Indeed, Mr. Skeba testified that the Fortezza Crypto Card was "completely developed by the federal government," Skeba Dep. at 29:14-17;  and documents uniformly and consistently refer to the Fortezza Crypto Card as being developed by NSA, *see, e.g.,* SPEX00006617, at SPEX00006620 ("The National Security Agency (NSA) has developed the FORTEZZA program for the Department of Defense (DoD) in response to the growing need for economical and secure messaging"); SPEX00007791, at SPEX00007794 (describing the history of Fortezza, including its development by NSA); SPEX00018727, at SPEX00018736-37 ("The National Security Agency (NSA) developed the Fortezza Program for the Department of Defense in response to the growing need for economical and secure electronic messaging").  *See also* Bialick Dep. at 68, 74-77, 86, 87.  While Spyrus built

RESTRICTED – ATTORNEY'S EYES ONLY

Fortezza Crypto Cards for NSA, it did not invent any of the components of the card, nor any of the algorithms the card used. *See* Young Dep. at 68:11-70:11 (reproduced above in Section X.B, discussing components); *Id.* at 135:3-136:17 (reproduced above in Section XI.B.1(b), discussing algorithms); *see also* Skeba Dep. at 30:1-4; Bialick Dep. at 68:3-16.

441.    Spyrus built Fortezza Crypto Cards for the government, but, at the time, Spyrus was not "an intellectual property, per se, company, because a lot of the stuff we did was with the government that [it] couldn't patent." *Id.* at 72:2-5. Spyrus, however, leveraged what the government developed to build commercial cards, such as the Lynks EES card discussed above. *See* Bialick Dep. at 31:3-10 ("it's a fundamental point of everyone dealing with the government is to leverage technology and apply it in the commercial market.") And when Spyrus leveraged the government's invention into its own commercial product, it "could start to patent it." Skeba Dep. at 72:6-7. I will note, however, that nothing in the Asserted Patents limits the claims to what Spyrus purportedly added to Fortezza—which was the use of commercial algorithms rather than the algorithms developed by the government. *See* Skeba Depo, at 185:1-3 ("I think the novelty for me was the '802 patent was how we got all the commercial stuff onto a cryptographic entity like this.")

442.    Nor is anything about how SPEX has applied the claims to the Asserted Patents related to what the inventors themselves believed was novel about the claims. Mr. Skeba, for example, believed that the novel aspect of the patents was related to creating a "modular" card where the target module could be removed—a feature I understand is not present in the accused products and a feature not required by the claims. *See* Skeba Depo, at 71:14-19:

RESTRICTED – ATTORNEY'S EYES ONLY

> Q. Having the -- having the ability to pull the target module out and --
>
> A. Right.
>
> Q. -- use it as a normal card was -- was new at the time?
>
> A. Right.

*See also* Skeba Depo, at 180:17-181:22:

> Q. Okay. And in talking about the '135 patent, what do you believe was novel and unique about that patent?
>
> A. The fact that it was a modular two-part piece to it, that we could take any commercial entity that was out there at the time, a CompactFlash interface, plug it into this module.  It would function exactly what people thought it was, but it would be encrypting the data lynks, so that you could get a generic off-the-shelf 3Com modem, plug it in and it would work, but it would talk cryptographically through the modem to another side that would decrypt it. But, to you, it was buying a $30 3Com modem, plugging it in.
>
> Same is true with memory cards. Right?  Same is true with modems or Ethernet cards. We had to work within the protocols of how these things communicated, but we wanted to make it so that you could buy off-the-shelf consumer stuff, plug it in to your computer, and your computer would -- the operating systems at the time would say, "Oh, this is a 3Com modem. I know how to talk to that."
>
> Q. Right. So it's kind of like a new intermediary piece that connects to a lot of other products?
>
> A. It's a shim that --
>
> Q. That connects to a lot of other products.
>
> A. It's a shim that basically sits in there and is transparent but provides all the cryptographic capability.

Mr. Bialick similarly thought that what made Fortezza different from the "Hydra" product

that was the Spyrus product that practiced the invention at the time, was the ability to use

different modules.  *See also,* Bialick Depo, at 354:21-355:19:

> Q Conceptually, how was Fortezza different, if at all, from Hydra?

221

RESTRICTED – ATTORNEY'S EYES ONLY

A All right. So to compare and contrast, the cryptographic functions and the compatibility would have been -- in order to call it Fortezza compatible -- would have been mandated. The differences would be the physical architecture and the ability to extend its peripheral.

Q In your last answer when you say its -- the ability to extend its peripheral, what are you referring to?

A The ability to plug hardware modules into a Hydra Card.

Q And Fortezza you're saying didn't have that ability?

A Fortezza did not have that ability.

*See also, e.g.,* Bialick Depo, at 35:23-36:4 (describing the practicing Hydra product made by Spyrus as a "PCMCIA form factor cryptographic card[] with the ability to insert, remove modules," which explained were "things, like, CompactFlash cards, input/output devices such as a modem or ethernet card, other transmission media.").  Similarly, Mr. Housely similarly thought that the patents were about modularity, testifying :"So you could buy one encryption device and put multiple of those one at a time into it or a modem to encrypt dial-up communications or a network interface device to Ethernet or layer three or so on.  So that was the idea, is that one encryption capability and multiple applications instead of building a new device for each and every one of them."  Housely Depo, at 50:7-15.  Mr. Housley also testified that without this modularity, the patents wouldn't be novel. *See* Houseley Depo, at 217:16-218:10:

Q Now, what I'm asking is, assuming you had a device that had encryption on the front, it could be any kind of encryption, and then you had on the back end memory storage.

A Uh-huh.

Q But it was not interchangeable. You couldn't change that memory storage out. It's just one composite piece.

RESTRICTED – ATTORNEY'S EYES ONLY

A Right.

Q Do you believe that would have been novel?

A No. That -- I think that is what the Wang device did.

Q So I think the answer would be no then.

A That's correct.

443.      Rather, as SPEX has applied the claims, and as the Court has construed them, the claims are taught by the Fortezza Crypto Card and thus conceived by NSA.  Moreover, the NSA communicated its invention to Spyrus.  As discussed above, the design and operation of Fortezza are detailed in a number of documents that were communicated from NSA to Spyrus by at least August 1995.  Specifically, the government issued a "Statement of Work" (SPEX00005220) laying out the requirements for the contractors building the Fortezza Crypto Cards, which references and incorporates additional documents (at SPEX00005223), namely:

- "Interface Control Document for the Fortezza Crypto Card, Revision Pl.5. 22 December, 1994" (SPEX00009841)
- "Minimum Essential Requirements for the Fortezza Crypto Card, Revision 1.1, June 26, 1995" (SPEX00007774)
- "Firmware Implementation Guidelines for the Fortezza Crypto Card, Revision 1.0, July 8, 1995" (SPEX00007673)

Mr. Young confirmed that these documents (in particular the "Interface Control" document containing a detailed description of the operation and design of the Fortezza Card) was "distributed" by NSA "to Spyrus and a number of other vendors that were on the Fortezza program."  Young Depo, at 110:13-16; *see also, e.g.,*  Housley Depo, at 107:19-21 ("My memory is that NSA was providing this to people who were doing that kind of work.")

RESTRICTED – ATTORNEY'S EYES ONLY

444.     These documents would enable a skilled artisan to build a Fortezza Crypto

Card.  Specifically, the documents provide extensive detail about how the Fortezza Crypto

Card was to be designed, including (for example) providing a block diagram showing the

components of the card:



(SPEX00009841, at SPEX00009854) and a detailed description of how these components

operate together (*see generally* SPEX00009841 *et seq.*).  These documents reference the

standards which a skilled artisan should reference when trying to build a Fortezza Crypto

Card (*e.g.,* the PCMCIA PC-Card Standard).  In short, the documents provide an instruction

manual as to how to build a Fortezza Crypto Card (and thus the invention claimed by the

Asserted Patents) specifically because these documents **were intended** to be an instruction

manual for contractors who wanted to build the Fortezza Crypto Cards for the government.

The specific teachings of these documents are detailed above in my claim-by-claim analysis

of the Fortezza Crypto Card, which relies on the descriptions from these documents to

show how the Fortezza Crypto Card teaches the Asserted Claims.