# EXHIBIT F

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

WESTERN DIGITAL CORPORATION
Petitioner

v.

SPEX TECHNOLOGIES, INC.
Patent Owner

_____

Case No. IPR2017-_____

Patent 6,088,802

_____

PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT NO. 6,088,802

Mail Stop **Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Petition for Inter *Partes* Review of US Patent No. 6,088,802

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND RELIEF REQUESTED ........................................1

II. GROUNDS FOR STANDING...................................................................1

III. PROPOSED GROUNDS OF UNPATENTABILITY ....................................1

    A. Statutory Grounds for Challenge ............................................2

    B. Prior Art Offered for the Present Unpatentability Challenges ..............2

IV. BACKGROUND ......................................................................................3

    A. Description of the '802 Patent ...............................................3

    B. Technological Background.....................................................6

V. LEVEL OF ORDINARY SKILL IN THE ART ...........................................7

VI. CLAIM CONSTRUCTION .......................................................................7

    A. "defined interaction" (all Claims) and "interaction with a host
        computing device in a defined way" (Claims 38–39)..........................8

    B. "peripheral device" (all Claims) ............................................9

    C. "security means for enabling one or more security operations to
        be performed on data" (Claims 1–2, 6–7, 11–12, 23–25) and
        "means for performing the one or more security operations"
        (Claim 39)...........................................................................10

    D. "target means for enabling a defined interaction with a host
        computing device" (Claims 1–2, 6–7, 11–12, 23–25) .......................11

    E. "means for enabling communication between the security
        means and the target means" (Claims 1–2, 6–7, 11–12, 23–25).........12

    F. "means for enabling communication with a host computing
        device" (Claims 1–2, 6–7, 11–12, 23–25)............................................12

## TABLE OF CONTENTS
(continued)

Page

G.    "means for operably connecting the security means and/or the
      target means to the host computing device in response to an
      instruction from the host computing device" (Claims 1–2, 6–7)........13

H.    "means for mediating communication of data between the host
      computing device and the target means so that the
      communicated data must first pass through the security means"
      (Claims 1–2, 11–12, 23)......................................................................14

I.    "means for providing to a host computing device, in response to
      a request from the host computing device for information
      regarding the type of the peripheral device, information
      regarding the function of the target means" (Claims 6–7, 23–
      25)...................................................................................................14

J.    "means for non-volatilely storing data" (Claims 2, 12, 25) ...............15

VII.  THE PRIOR ART RENDERS OBVIOUS CLAIMS 1–2, 6–7, 11–12,
      23–25, 38–39 OF THE '802 PATENT.........................................................15

A.    Cited Prior Art .....................................................................................16
1.    Harari ...................................................................................................16
2.    PCMCIA System Architecture: 16-Bit PC Cards (1995) ..................19
3.    Wang.....................................................................................................22
4.    Dumas...................................................................................................24

B.    Ground 1: Claims 1–2, 6–7, 11–12, 23–25, and 38–39 are
      Rendered Obvious by Harari in View of PCMCIA System
      Architecture ........................................................................................25
1.    Motivation to Combine Harari and PCMCIA System
      Architecture ........................................................................................27
2.    Independent Claim 1 ...........................................................................28
3.    Dependent Claim 2...............................................................................45
4.    Independent Claim 6 ...........................................................................46
5.    Dependent Claim 7...............................................................................52
6.    Independent Claim 11 .........................................................................53
7.    Dependent Claim 12.............................................................................53
8.    Independent Claim 23 .........................................................................53
9.    Independent Claim 24 .........................................................................54

## TABLE OF CONTENTS

(continued)

Page

10. Dependent Claim 25 ...........................................................................54
11. Independent Claim 38 ........................................................................54
12. Independent Claim 39 ........................................................................56

C. Ground 2: Claims 1–2, 11–12, 23, and 39 are Rendered Obvious by Harari in View of Wang ...................................................................59
1. Motivation to Combine Harari, Wang, and PCMCIA System Architecture ......................................................................................59
2. Wang Discloses Means for Mediating Communication of Data Between the Host Computing Device and the Target Means So That the Communicated Data Must First Pass Through the Security Means (Elements [1F], [11E], [23E], [39C]).......................60

D. Grounds 3-4: Claims 1–2, 11–12, 23, and 39 are Rendered Obvious for the Same Reasons as Grounds 1-2 when Considered Further in View of Dumas. ..............................................64
1. Motivation to Combine Dumas with Harari, PCMCIA System Architecture, and Wang.....................................................................65
2. Dumas Discloses Mediating Communication of Data Between the Host Computing Device and the Target Means So That the Communicated Data Must First Pass Through the Security Means (Elements [1F], [11E], [23E], and [39C]) ...............................66

VIII. MANDATORY NOTICES .........................................................................67

IX. CONCLUSION............................................................................................69

## TABLE OF AUTHORITIES

**Cases**

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................8

*In Re Rambus Inc.*,
    694 F.3d 42 (Fed. Cir. 2012) .............................................................................8

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ......................................................................15

*SPEX Techs., Inc. v. Western Digital Corp.*,
    Case No. 8:16-cv-01799 (C.D. Cal.) ...............................................................67

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ........................................................................8

**Statutes**

35 U.S.C. § 102(b) ..................................................................................................3

35 U.S.C. § 102(e) ..................................................................................................2

35 U.S.C. § 103 ....................................................................................................15

35 U.S.C. § 311(c) ..................................................................................................1

**Regulations**

37 C.F.R. § 42.6(e) ..................................................................................................1

37 C.F.R. § 42.10(b) ..............................................................................................68

37 C.F.R. § 42.100(b) ..............................................................................................8

**Exhibit List**

| Exhibit Number | Document |
| --- | --- |
| 1001 | U.S. Patent No. 6,088,802 ("the '802 Patent") |
| 1002 | Summons Returned as Executed, *SPEX Techs., Inc. v. Western Digital Corp.*, Case No. 8:16-cv-01799 (C.D. Cal. filed Oct. 31, 2016) |
| 1003 | File History of the '802 Patent |
| 1004 | U.S. Patent No. 5,887,145 to Harari et al. ("Harari") |
| 1005 | U.S. Patent No. 6,199,163 to Dumas et al. ("Dumas") |
| 1006 | Don Anderson, *PCMCIA SYSTEM ARCHITECTURE: 16-BIT PC CARDS* (MindShare, Inc., 2nd ed. 1995) ("PCMCIA Architecture") |
| 1007 | U.S. Patent No. 5,822,196 to Hastings et al. ("Hastings") |
| 1008 | U.S. Patent No. 5,922,060 to Goodrum ("Goodrum") |
| 1009 | U.S. Patent No. 5,941,965 to Moroz et al. ("Moroz") |
| 1010 | U.S. Patent No. 5,943,482 to Culley et al. ("Culley") |
| 1011 | U.S. Patent No. 6,009,151 to Staples ("Staples") |
| 1012 | Windows Developers Journal, Vol. 7, No. 8 (Aug. 1996) |
| 1013 | Claim Construction Briefing in *SPEX Techs., Inc. v. Western Digital Corp.*, Case No. 16-cv-01799 (C.D. Cal.) ("SPEX Claim Construction Brief") |
| 1014 | Tentative Order Regarding Claim Construction, Case No. 16-cv-01799 (C.D. Cal.) ("Tentative Constructions") |
| 1015 | Declaration of Dr. Martin Kaliski, Ph.D. ("Kaliski Decl.") |

| 1016 | Exhibit A (Updated) to Defendants' Reply Claim Construction Brief |
| 1017 | Reporter's Transcript of Proceedings in SPEX Techs, Inc. v. Kingston Tech. Corp., et al., Case No. 16-cv-01790 (C.D. Cal.) ("Markman Hearing Transcript") |
| 1018 | Declaration of Sylvia Hall-Ellis, Ph.D. ("Hall-Ellis Decl.") |
| 1019 | U.S. Patent No. 5,765,027 to Wang et al. ("Wang") |
| 1020 | MARC Record |

## '802 Patent Challenged Claims

| Claim 1 |
|---|
| **[1Pre]** A peripheral device, comprising: |
| **[1A]** security means for enabling one or more security operations to be performed on data; |
| **[1B]** target means for enabling a defined interaction with a host computing device; |
| **[1C]** means for enabling communication between the security means and the target means; |
| **[1D]** means for enabling communication with a host computing device; |
| **[1E]** means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and |
| **[1F]** means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means. |
| **Claim 2** |
| **[2]** A peripheral device as in claim **1**, wherein the target means comprises means for non-volatilely storing data. |
| **Claim 6** |
| **[6Pre]** A peripheral device, comprising: |
| **[6A]** security means for enabling one or more security operations to be performed on data; |
| **[6B]** target means for enabling a defined interaction with a host computing device; |

| |
|---|
| **[6C]** means for enabling communication between the security means and the target means; |
| **[6D]** means for enabling communication with a host computing device; |
| **[6E]** means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device; and |
| **[6F]** means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means. |
| **Claim 7** |
| **[7]** A peripheral device as in claim **6**, wherein the target means comprises means for non-volatilely storing data. |
| **Claim 11** |
| **[11Pre]** A peripheral device, comprising: |
| **[11A]** security means for enabling one or more security operations to be performed on data; |
| **[11B]** target means for enabling a defined interaction with a host computing device; |
| **[11C]** means for enabling communication between the security means and the target means; |
| **[11D]** means for enabling communication with a host computing device; and |
| **[11E]** means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means. |
| **Claim 12** |
| **[12]** A peripheral device as in claim 11, wherein the target means comprises means for non-volatilely storing data. |
| **Claim 23** |
| **[23Pre]** A peripheral device, comprising: |
| **[23A]** security means for enabling one or more security operations to be performed on data; |
| **[23B]** target means for enabling a defined interaction with a host computing device; |
| **[23C]** means for enabling communication between the security means and the target means; |
| **[23D]** means for enabling communication with a host computing device; |
| **[23E]** means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means; and |

| |
|---|
| [23F] means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means. |
| **Claim 24** |
| [24Pre] A peripheral device, comprising: |
| [24A] security means for enabling one or more security operations to be performed on data; |
| [24B] target means for enabling a defined interaction with a host computing device; |
| [24C] means for enabling communication between the security means and the target means; |
| [24D] means for enabling communication with a host computing device; and |
| [24E] means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target. |
| **Claim 25** |
| [25] A peripheral device as in claim 24, wherein the target means comprises means for non-volatilely storing data. |
| **Claim 38** |
| [38Pre.1] For use in a peripheral device |
| [38Pre.2] adapted for communication with a host computing device, |
| [38Pre.3] performance of one or more security operations on data, |
| [38Pre.4] and interaction with a host computing device in a defined way, a method comprising the steps of: |
| [38A] receiving a request from a host computing device for information regarding the type of the peripheral device; and |
| [38B] providing to the host computing device, in response to the request, information regarding the type of the defined interaction. |
| **Claim 39** |
| [39Pre.1] For use in a peripheral device |
| [39Pre.2] adapted for communication with a host computing device, |
| [39Pre.3] performance of one or more security operations on data, |
| [39Pre.4] and interaction with a host computing device in a defined way, a method comprising the steps of: |
| [39A] communicating with the host computing device to exchange data between the host computing device and the peripheral device; |
| [39B] performing one or more security operations and the defined interaction on the exchanged data; and |

**[39C]** mediating communication of the exchanged data between the host
computing device and the peripheral device so that the exchanged data must first
[p]ass through means for performing the one or more security operations.

## I.      INTRODUCTION AND RELIEF REQUESTED

Western Digital Corporation ("Petitioner") petitions for institution of *inter partes* review of U.S. Patent No. 6,088,802 ("the '802 Patent") (Ex. 1001).  The '802 Patent issued on July 11, 2000, and is assigned to SPEX Technologies, Inc. ("Patent-Owner").  Petitioner respectfully requests cancellation of claims 1–2, 6–7, 11–12, 23–25, and 38–39 of the '802 Patent based on the grounds of unpatentability detailed herein.  The prior art and other evidence offered with this Petition establishes that all elements in the challenged claims of the '802 Patent were well known as of the earliest alleged priority date, and that the claimed devices and methods recited in the '802 Patent are obvious.

## II.     GROUNDS FOR STANDING

Petitioner certifies that the '802 Patent is available for review under 35 U.S.C. § 311(c) and that Petitioner is not estopped from requesting an *inter partes* review challenging claims 1–2, 6–7, 11–12, 23–25, and 38–39 on the grounds identified in this Petition.

## III.    PROPOSED GROUNDS OF UNPATENTABILITY

The present Petition relies on prior art references that have not been considered by the Patent Office in the file history of the '802 Patent, Ex. 1003, and details how the challenged claims are obvious.

### A.      Statutory Grounds for Challenge

- Ground 1: Harari in view of *PCMCIA System Architecture* renders claims 1–2, 6–7, 11–12, 23–25, and 38–39 obvious under §103(a);

- Ground 2: Harari in view of Wang and in further view of PCMCIA System Architecture renders claims 1–2, 11–12, and 23 obvious under § 103 (a);

- Ground 3: Harari in view of Dumas and *PCMCIA System Architecture* renders claims 1–2, 11–12, 23, and 39 obvious under § 103(a); and

- Ground 4: Harari in view of Dumas, Wang and PCMCIA System Architecture renders claims 1–2, 11–12, and 23 obvious under § 103 (a).

### B.      Prior Art Offered for the Present Unpatentability Challenges

Grounds 1-4 rely on the following patents and printed publications:

- U.S. Patent No. 5,887,145 to Harari et al. ("Harari") (Ex. 1004) was filed on January 9, 1997; this reference is prior art at least under pre-AIA 35 U.S.C. § 102(e) (the '802 Patent's earliest claimed priority date is June 4, 1997).

- U.S. Patent No. 5,765,027 to Wang et al. ("Wang") (Ex. 1019) was filed on September, 26 1994; this reference is prior art at least under pre-AIA 35 U.S.C. § 102(e).

- U.S. Patent No. 6,199,163 to Dumas et al. ("Dumas") (Ex. 1005) was filed on March 26, 1996; this reference is prior art at least under pre-AIA 35 U.S.C. § 102(e).

- Don Anderson, *PCMCIA System Architecture: 16-Bit PC Cards* (MindShare, Inc., 2nd ed. 1995) (Ex. 1006). *PCMCIA System Architecture* was published in 1995, making it prior art at least under pre-AIA 35 U.S.C. § 102(b). *PCMCIA System Architecture* bears a copyright date of 1995 and a Library of Congress Cataloging-in-Publication with ISBN and been referenced as prior art in numerous patents filed before the earliest claim of priority in this case, including U.S. Patent No. 5,822,196 (filed June 5, 1996) (Ex. 1007); U.S. Patent No. 5,922,060 (filed December 31, 1996) (Ex. 1008); U.S. Patent No. 5,941,965 (filed July 12, 1996) (Ex. 1009); U.S. Patent No. 5,943,482 (filed June 5, 1996) (Ex. 1010); U.S. Patent No. 6,009,151 (filed August 27, 1996) (Ex. 1011), to name a few.  It also appears in a number of applications incorporated by reference or as admitted prior art by the applicant as well, including in the '965 Patent (Ex. 1009) at 3:3336 and the '151 Patent (Ex. 1011) at 4:34-37, listed above.  In addition, *PCMCIA System Architecture* was reviewed as a "recent title" in the August 1996 edition of the Windows Developer's Journal.  Ex. 1012 at 61-63.  PCMCIA System Architecture was published and publicly available by September 22, 1995 according to its MARC record.  *See* Hall-Ellis Decl., Ex. 1018 at ¶20; Ex. 1020.

## IV.   BACKGROUND

### A.   Description of the '802 Patent

3

The '802 Patent relates to a peripheral device that "communicate[s] with a host computing device to enable one or more security operations to be performed by the peripheral device on data stored within the host computing device, data provided from the host computing device to the peripheral device, or data retrieved by the host computing device from the peripheral device." '802 Patent, Ex. 1001, 1:21- 27.  The '802 Patent illustrates the aim of the invention through figures that contrast the claimed invention with the prior art.

Figures 1 and 2, below, are each a block diagram of an admitted "prior art system for enabling a host computing device to provide secured data to, and retrieve secured data from, a portable device."  Ex. 1001, 1:52–54; 2:22–24.



FIG. 1
(PRIOR ART)



**FIG. 2**
(PRIOR ART)

*Id.*, Figs. 1 and 2.

Figure 3A, reproduced below, illustrates how the claimed invention allegedly differs from the prior art: it moves the security function from either within the host computing device or a separate external device into the peripheral device at issue.



**FIG. 3A**

*Id.*, Fig. 3A; *id.* at 3:49-51.  The alleged invention pertains to a peripheral device "adapted to enable, in a single integral peripheral device, performance of one or more security operations on data, and a defined interaction with a host computing device that has not previously been integrated with security operations in a single integral

device." *Id.* at 3:28-33. "[D]efined interactions can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification)." *Id.* at 3:33-35. At bottom, the '802 Patent is directed toward combining a security functionality with an additional functionality in the same peripheral device.

Each challenged claim is directed to a "peripheral device" or a method "[f]or use in a peripheral device." Claims 1–2, 6–7, 11–12, and 23–25 are device claims with means-plus-function elements related to providing security, a defined interaction, and establishing communications between various computer structures. Claims 38–39 are method claims with limitations that parallel the elements in the device claims.

## B. Technological Background

By the early-to-mid 1990s, computers were household items with ever-increasing capabilities and an ever-expanding array of available peripheral devices (*i.e.*, external devices that communicate with a computer) usable with a computer. Kaliski Decl., Ex. 1015, ¶25. To protect sensitive data and to limit access to authorized users, skilled artisans developed ways to secure data, such as by restricting access to data using passwords and encryption. *Id.,* ¶27. Other related technologies such as public key/private key data encryption dates back to this era also. *Id.*, ¶29. Developers began to place encryption within devices that perform

6

additional functions such as communication or data storage once the physical capabilities of the devices could support it. *Id.*, ¶¶26-29. At the same time, a need arose to easily connect peripheral devices to host computers to enable communication between the two. *Id.*, ¶31. Storage became smaller, lighter, and more powerful, utilizing solid state (or Flash) memory. Standards were developed to accomplish this. *Id.*, ¶¶30-31. The Personal Computer Memory Card International Association (PCMCIA) released a standard in September 1990 that enabled a PC Card to easily mate with, for example, the portable computers of the era. *Id.*, ¶32. At first, PCMCIA focused on memory card add-ons, but input/output devices (such as modems and network devices) followed shortly thereafter in Release 2.0. *Id.* With this development of easily portable peripherals, encryption capabilities, such as those mentioned above, became a critical need for many of these peripherals. *Id.*

## V. LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art of the '802 Patent would have at least a Bachelor's degree in electrical engineering or computer science, and at least one year of experience in computer security and/or computer architecture for peripheral devices or equivalent education or experience. Kaliski Decl., Ex. 1015, ¶16.

## VI. CLAIM CONSTRUCTION

Claims of an expired patent in *inter partes review* are construed according to

the standard applied in the district courts under *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *In Re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012); 37 C.F.R. § 42.100(b). Means-plus-function claim elements are restricted to "only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015).

Patent-Owner and Petitioner submitted claim construction briefing in the DCT Litigation.[1] And the Court issued tentative constructions. Ex. 1014. This petition is based on the claim constructions urged by Patent-Owner in the DCT Litigation, or as the parties agreed. *See* Patent-Owner's Opening Claim Construction Br. ("Claim Construction Br."), Ex. 1013.

## A. "defined interaction" (all Claims) and "interaction with a host computing device in a defined way" (Claims 38–39)

Patent-Owner argued that "defined interaction" is "a specific, predefined functionality of the device, such as a data storage, data communication, data input and output, or user identification." Ex. 1013 at 3. Patent-Owner also asserted that "interaction with a host computing device in a defined way" is an "interaction with

---

[1]     The Court has not yet entered an order construing the claims in the DCT Litigation.

a host computing device using a specific, predefined functionality of the device, such as data storage, data communication, data input and output, or user identification." Ex. 1013 at 3-4. Outside the claims, the '802 Patent mentions "defined interaction" only in the Abstract and the Summary of the Invention where it states "the peripheral device can be adapted to enable, in a single integral peripheral device, performance of one or more security operations on data, and a defined interaction with a host computing device that has not previously been integrated with security operations in a single integral device." '802 Patent, Ex. 1001, at Abstract; 3:28-33. The description further explains, "defined interactions can provide a variety of types of functionality (e.g., data storage, data communication, data input and output, user identification)." *Id.* at 3:33-35. The district court tentatively rejected that construction, and construed these terms as meaning: "an interaction [with a host computing device] that can provide a variety of functionalities." Ex. 1014 at 6.

### B. "peripheral device" (all Claims)

The '802 Patent provides a definition of "peripheral device" stating, "'peripheral device' can refer to any device that operates outside of a host computing device and that is connected to the host computing device." '802 Patent, Ex. 1001, 4:52-55. Patent-Owner thus proposed construing this term as "any device that operates outside of a host computing device (i.e. the keyboard-computer-screen system) and that is connected to the host computing device. Typical peripheral

9

devices include but are not limited to a disk drive and a printer." Ex. 1013 at 6. The district court tentatively rejected that construction, and construed these terms as meaning: "a device that operates outside of a host computing device and that is connected to the host computing device, including such devices in the same housing as the host computing device." Ex. 1014 at 9.

**C.** **"security means for enabling one or more security operations to be performed on data" (Claims 1–2, 6–7, 11–12, 23–25) and "means for performing the one or more security operations" (Claim 39)**

The parties agree that this is a means-plus-function term and that the recited function is "enabling one or more security operations to be performed on data" (Claims 1–2, 6–7, 11–12, 23–25) and "performing the one or more security operations" (Claim 39). Patent-Owner proposed that the corresponding structures are: (1) a cryptographic processing device 801 (processor capable of performing the cryptographic operations) based on '802 Patent, Ex. 1001, at 15:63–64, Fig. 8; (2) a security token device that performs security operations and that includes one or more mechanisms (such as, for example, use of a hardware random number generator and/or protected memory) to provide security for the content of those operations based on 5:35–39; (3) a specific hardware component programmed or configured to perform a security operation based on 18:1–47; (4) a special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and

referred to by the name Capstone), which includes an ARM6 processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense based on 16:1–6; or (5) equivalents thereof.  Ex. 1013 at 8–9.

The district court tentatively agreed with the proposed function, but limited the structures to: (1) a specific hardware component programmed or configured to perform a security operation disclosed in '802 Patent at 18:1-47 or (2) a special purpose embedded processor, embodied on a single integrated chip and designated as MYK-82 (and referred to by the name Capstone), which includes an ARM6™ processor core and several special purpose cryptographic processing elements that have been developed by the Department of Defense ('802 Patent at 15:67-16:8).  Ex. 1014, at 13–14.

### D. "target means for enabling a defined interaction with a host computing device" (Claims 1–2, 6–7, 11–12, 23–25)

The parties agreed on the construction in the DCT Litigation of this means-plus-function term, subject to Defendants' argument regarding the indefiniteness of the term "defined interaction."  Ex. 1016, at Page 5.  The recited function is "enabling a defined interaction with a host computing device."  The agreed corresponding structures based on the disclosure in the specification, and in view of the parties' proposed constructions for "defined interaction,"  are: (1) a memory

module adapted to enable non-volatile storage of data ('802 Patent at 13:27–29); (2) a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver ('802 Patent at 13:50–62); (3) a smart card reader ('802 Patent at 15:24–28); (4) biometric device ('802 Patent at 14:10–19); or (5) equivalents therefore.

### E.   "means for enabling communication between the security means and the target means" (Claims 1–2, 6–7, 11–12, 23–25)

The parties agreed to the construction in the DCT Litigation for this means-plus-function term.   Ex. 1016, at Page 6.   The recited function is "enabling communication between the security means and the target means."   In the DCT Litigation, the parties agreed that the corresponding structure is conventional computer bus 615 based on the disclosure at 6:40-45.  Ex. 1016, at Page 6.

### F.   "means for enabling communication with a host computing device" (Claims 1–2, 6–7, 11–12, 23–25)

This function for this means-plus-function term is "enabling communication with a host computing device."   Patent-Owner's proposed corresponding structure includes: (1) Input/Output (I/O) device, for example a conventional computer bus based on 6:37-40; (2) PCMCIA based on 5:5-10; (3) Cord between housing and matching receptacle based on 7:3-5; (4) Wireless communication based on 5:5-10; (5) Smart card interface based on 5:5-10; (6) Serial interface (such as RS-232) based on 5:5-10; (7) Parallel interface based on 5:5-10; (8) SCSI interface based on 5:5-

10; (9) IDE interface based on 5:5-10; or (10) equivalents thereof.  Ex. 1013 at 15.

The district court tentatively agreed with Patent-Owner.  Ex. 1014 at 32–33.

> G.    **"means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device" (Claims 1–2, 6–7)**

This means-plus-function term's function is "operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device."

Patent-Owner proposed the corresponding structure is: (1) PCMCIA interface and memory section 612a; and (2) PCMCIA interface and a device or host driver. Ex. 1013 at 18–19 (citing structures from the '802 Patent at 7:60–8:14).

The district court tentatively found that "operably connecting" did not require construction and then agreed with Patent-Owner's proposed function and corresponding structures.  *Id.*  The district court tentatively determined, however, that the plain language of the "operably connecting" language requires two of the three following modes to be available: (i) a security and target mode; (ii) a security or target mode; and (ii) a combination of all three possible modes.  *Id.*at 23; Markman Hearing Transcript, Ex. 1017, at 37–38.

**H.**    **"means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means" (Claims 1–2, 11–12, 23)**

This means-plus-function term's function is "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means."

Patent-Owner proposed that the corresponding structure is: (1) a field programmable gate array (FPGA); and (2) interface control device 910 (as shown in Figure 9B).  Ex. 1013 at 20.  If an algorithm is necessary for the FPGA, Patent-Owner asserts that the algorithm is (1) receiving data from host computing device; (2) depending on configuration settings, providing data to be processed by a cryptographic processor; and (3) transferring data to target means.  Ex. 1013 at 20 (citing '802 Patent at Fig. 9A, 16:58–17:7).

The district court tentatively agreed with Patent-Owner's proposed function, but rejected that the FPGA was a corresponding structure.  Ex. 1014 at 24–25.  Instead, the district court tentatively found that the corresponding structure is interface control device 910 (as shown in Figure 9B).  *Id.*

**I.**    **"means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means" (Claims 6–7, 23–25)**

This means-plus-function term's function is "providing to a host computing

device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means." Patent-Owner asserts that the corresponding structure is memory section 612a. Ex. 1013 at 23 (relying on '802 Patent, Ex. 1001, at 7:60–8:14). The district court tentatively found, however, that the term is invalid for indefiniteness. Ex. 1014 at 30.

### J. "means for non-volatilely storing data" (Claims 2, 12, 25)

This means-plus-function term's function is "non-volatilely storing data." The parties in the DCT Litigation agreed that the corresponding structure is "non-volatile memory devices" based on 13:27-29 and 16:10-12. Ex. 1016, at Page 5.

## VII. THE PRIOR ART RENDERS OBVIOUS CLAIMS 1–2, 6–7, 11–12, 23–25, 38–39 OF THE '802 PATENT

Under 35 U.S.C. § 103, a patent claim is obvious and invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Multiple pieces of prior art along with the general knowledge of those of ordinary skill in the art render the challenged claims of the '802 Patent obvious. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

Each challenged claim, where the prior art teaches or suggests each element of the claim and why a person of ordinary skill would have been motivated to modify

the base reference as outlined in the obviousness combination, is discussed below with citations to the Declaration of Dr. Martin Kaliski, Ex. 1015.

Brackets are used to identify claim elements (e.g., "[1C]") and claim numbers (e.g., "[2]").

### A.    Cited Prior Art
#### 1.    Harari

Harari describes a "peripheral in the form of a PC card that can be removably connected to a host system."  Harari, Ex. 1004, 3:9–12.  Harari teaches that "[t]he externally removable PC card is constituted from a mother card portion and a daughter card portion.   The daughter card portion is removably coupled mechanically and electrically to the mother card by means of a mother/daughter interface."  *Id.* at 3:50–54.  An overall objective in Harari is to separate portions of a peripheral that are common to all or many peripherals from the portions that are necessarily unique in each peripheral.   Harari, Ex. 1004, 3:50–4:33, 3:61–5:6. Figure 1, below, shows a schematic of the mother/daughter PC card and its connectivity with a host computer.



**FIG. 1**

*Id.*, Fig. 1. "Partitioning the externally removable PC card into a mother card and daughter card portion allows the functional components of a peripheral . . . to be advantageously partitioned." *Id.* at 3:60-63.

Figure 3, below, shows the partitioning of components for a flash EEPROM system between the mother card and the daughter card:



**FIG. 3**

*Id.*, Fig. 3. The daughter card, as illustrated in Figure 3, provides memory functionality; Harari teaches that it can also provide other functionalities such as "a

17

modem[,] other communication peripherals such as [a] LAN adapter, or wireless fax modem." *Id.* at 4:65–5:1; *id.* at 8:40–45 (identifying additional peripheral functionality such as a "modem or other communication peripherals"). To identify the type of daughter card, "the removable daughter card has identifying data that is readable by the mother card or the host system coupled thereto." *Id.* at 5:38–40.

While daughter cards provide a variety of functionality, the mother card provides general functions beneficial to each daughter card. Harari explains that the "mother card portion contain[s] the common functional components of a number of peripherals." *Id.* at 4:22–25. To achieve this, the mother card can include "one or more functional modules" as illustrated in Figure 5B and reproduced below. *Id.* at 8:58–60.



*FIG. 5B*

"The functional module 42 may provide error detection and correction, encryption and decryption, compression and decompression of data, image, audio and voice, as

well as other features useful in the mobile computing environment." *Id.* at 8:60–64.

The mother card, daughter card, and host system each contains connectors that enable each part to communicate with the others. "The daughter card 10 has an edge connector 24 and it directly plugs into the mother card by mating with the connector 14 on the mother card." *Id.* at 7:4–6. The mother card contains a memory controller 40 that "interfaces with the host system via a host interface 54, and with the flash memory via a memory interface 56." *Id.* at 7:37–54. "In the preferred embodiment, the host interface 54 communicates with the host system 200 in accordance with PCMCIA specifications or any other standard card interface." *Id.* at 7:54–57.

## 2. PCMCIA System Architecture: 16-Bit PC Cards (1995)

PCMCIA was developed to create a standard PC Card interface. *PCMCIA System Architecture: 16-Bit PC Cards* by Don Anderson, Ex. 1006, was published in 1995 and provides instructional information on implementing the PCMCIA Standards. The book "is intended for use by hardware and software designers and support personnel" who are implementing PCMCIA Standards. *PCMCIA System Architecture*, Ex. 1006, at 6.

*PCMCIA System Architecture* provides an overview of the development of and purposes for the PCMCIA Standards. "PCMCIA was formed to promote the standardization and interchangeability of PC Cards" and "defines the following major issues: [p]hysical design of the PC Card, [p]hysical design of the connector

19

(socket), [e]lectrical interface to PC Cards, [and] [s]oftware architecture." *PCMCIA System Architecture*, Ex. 1006, at 14–15.  PCMCIA can be used to implement "a wide range of memory and I/O devices.  Memory devices include RAM, FLASH memory and various types of ROM." *Id.* at 15.  An even greater array of I/O devices exist including: "voice, data and FAX modems; network interface cards; wireless communications . . . ; AT Attachment (ATA) Hard Drives . . . ; small computer system interface (SCSI) adapters; and many others." *Id.*

"The PCMCIA hardware consists of the PC Card, card socket and the host bus adapter (HBA). . . . The PCMCIA software architecture consists primarily of a PC Card's enablers, card services and socket services." *Id.* at 22.  Fig. 3-1, reproduced below, shows the relationship among components.



*Figure 3-1. Relationship of PCMCIA Software and Hardware*

When a user inserts a PC Card into a host system, the host system must be able to detect the presence of the card, determine its function and system requirements, and then perform required functions to achieve the card's intended purpose. Card services, which reside on the host computer, enable a PC Card by determining the card's configuration requirements and the required system resources. *PCMCIA System Architecture*, Ex. 1006, at 28–29. "Card services provides a software layer consisting of high-level functions that programmers can call to gain access to a card, determine its configuration requirements, and request the system resources it requires." *Id.* at 28.

21

To determine the type of PC Card that is inserted, the PC Card has a data structure called the Card Information Structure, or CIS. "The CIS provides a method for software to determine what kind of PC Card is installed, along with its speed, size, and the system resources required by the card." *PCMCIA System Architecture*, Ex. 1006, at 145. Once this data is obtained from the card, "the [HBA] can be programmed to allow access to the PC Card." *Id.* The data in the CIS is organized in tuples, which are defined sets of data items that characterize some facet of the PC Card. *Id.* at 148. Essentially, these "tuples" provide to the host the required data to enable use of the card. *Id.*

*PCMCIA System Architecture* includes extensive details for each step of implementing PCMCIA to enable and use PC Cards with a host computer. Its disclosures teach one of skill in the art how to implement PCMCIA, and relevant portions are explained in more detail below.

### 3.   Wang

Wang discloses a wireless LAN controller that includes "an application specific integrated circuit (ASIC)/field programmable gate array (FPGA)" and "a local processor and a memory." Wang, Ex. 1019, at Abstract. The controller is "particularly contemplated" to be in the form of a PCMCIA card. *Id.* at 4:14–17. Figure 1 provides a block diagram of the Wang system.



To transmit data, "the host computer 110 writes the transmit data to the SRAM 106 via host interface 103 and ASIC/FPGA 101 and commands the local processor 102 via the ASIC/FPGA 101 to forward the transmitted data to the RF communication module 120 via the RF interface 104." Ex. 1019, at 4:39–50.  Then, "[u]nder the control of the ASIC/FPGA 101, the local processor 102 then forwards the transmit data from the SRAM 106 through the local processor 102 to the RF interface 104 and then to the RF communication module 120." *Id.*  Wang teaches that "the ASIC/FPGA 101 enables communication between the host computer 110, the local processor 102, and the RF communication module 120," enables "transmission of control signals between these three components," and "controls host computer 110 and local processor 102 access to the SRAM 106 and FLASH

ROM 105." *Id.* at 4:58–64.

### 4.   Dumas

Dumas discloses "an encryption circuit for encrypting and decrypting data as it travels to and from a hard disk or other mass storage device."  Dumas, Ex. 1005, 1:49–51.  Figure 1, reproduced below, shows a block diagram of a prior art computer system.



"Requests for data from a hard disk 14 are sent by the processor 10 over the bus 12 to a disk controller 16.  The disk controller 16 retrieves the data from the hard disk 14 and returns the data over the bus 12 to the processor." *Id.* at 2:17–20.  Figure 2, reproduced below, shows a block diagram of a computer system incorporating Dumas.



Here, "[t]he present invention adds an encryption circuit 28. Data must pass through the encryption circuit 28 to travel from hard disk 24 to processor 20, or from processor 20 to hard disk 24." *Id.* at 2:27–30.

### B. Ground 1: Claims 1–2, 6–7, 11–12, 23–25, and 38–39 are Rendered Obvious by Harari in View of PCMCIA System Architecture

A person of ordinary skill in the art (POSITA) at the filing date of the '802 patent would have viewed Harari in combination with *PCMCIA System Architecture* as teaching each element of claims 1–2, 6–7, 11–12, 23–25, and 38–39 of the '802 Patent. Kaliski Decl., Ex. 1015, ¶41.





**FIG. 4**

Harari, Ex. 1004, Figs. 4, 5B, 11 (annotations added).

As illustrated above, Harari teaches each element of the challenged claims. Harari teaches a "security means for enabling one or more security operations to be performed on data," [blue – functional modules providing encryption]; "target means for enabling a defined interaction with a host computing device," [green – flash memory or other daughter card functionality]; "means for enabling communication between the security means and the target means," [yellow – a conventional computer bus]; "means for enabling communication with a host computing device," [red – PCMCIA interface]; "means for operably connecting the security means and/or target means to the host computing device in response to an instruction from the host computing device," [red and purple – PCMCIA interface

26

with memory section]; "means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means," [orange – comprehensive controller]; "means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means," [purple – memory section with daughter card identifying information]. Kaliski Decl., Ex. 1015, ¶¶41–42. To the extent Patent-Owner argues that Harari does not teach an element, *PCMCIA System Architecture* provides the requisite teaching.

### 1. Motivation to Combine Harari and PCMCIA System Architecture

A POSITA would have been motivated to combine Harari and *PCMCIA System Architecture*. Kaliski Decl., Ex. 1015, ¶¶57–59. The *PCMCIA System Architecture* reference is in the same technical field as Harari (connecting peripherals to host computers). Harari specifically teaches that it "accommodate[s] . . . peripherals such as modems, network adapters, and hard disks." Harari, Ex. 1004, 2:28–29. Modems, network adapters, and hard disks were, at the time, well-known by skilled artisans to interface with computers using standardized peripheral communications like PCMCIA. *Id.* at ¶57. Using standard architectures to connect peripherals was not only common but also a best practice of skilled artisans at the

time. *Id*. PCMCIA was just such a standard. *Id.*, ¶¶57–59.

Using standardized architectures like PCMCIA reduced the time, complexity, and cost to integrate peripherals into a computer system by leveraging well-known, well-documented architectures in which to operate and ensured compatibility between peripheral components and host systems as well. *Id.*, ¶57. *PCMCIA System Architecture* describes how PCMCIA operates. PCMCIA was a well-known, standardized interface for easily connecting peripherals. Harari even specifically incorporates by reference PCMCIA and utilizes PCMCIA in a preferred embodiment. Harari, Ex. 1004, 2:15–22, 7:54–57. Indeed, *PCMCIA System Architecture* teaches implementation of PCMCIA and teaches that "[t]his book is intended for use by hardware and software designers and support personnel." *PCMCIA System Architecture*, Ex. 1006, at 6.

A POSITA would thus have been highly motivated to combine *PCMCIA System Architecture* with Harari with a reasonable expectation of success to achieve the compatibility and interoperability of the PC Card system with host computers. Kaliski Decl., Ex. 1015, ¶¶57–59 (also noting that skilled artisans rely on standard architectures like PCMCIA to obtain predictable and reliable results).

### 2.   Independent Claim 1

#### a)   [1Pre]: A peripheral device, comprising

To the extent that 1Pre is limiting, Harari teaches a peripheral device through

its removable mother/daughter card combination that is outside of a host computing

device but connected to the host computing device and that Harari specifically refers

to as a "peripheral device."  Harari, Ex. 1004, at Abstract, 11:21–28, Figs. 1, 3, 7.  A

POSITA would have understood Harari to disclose a peripheral device under any

proposed construction of the term (including that proposed by Patent-Owner or the

Court).  Kaliski Decl., Ex. 1015, ¶¶61–63.

    **b)**     **[1A]: security means for enabling one or more
security operations to be performed on data**

Harari teaches performing the Patent-Owner's and the district court's function

for this element (enabling one or more security operations to be performed on data)

by disclosing using "functional modules" or a "comprehensive controller" that can

provide "encryption and decryption" of data.  Harari, Ex. 1004, at 8:58–64, 13:12–

23, 13:65–14:19.  Harari also teaches a structure for performing this function that is

identical or at least structurally equivalent to one of the structures identified by

Patent-Owner and the district court – namely the "specific hardware component

programmed or configured to perform a security operation disclosed at 18:1–47 of

the '802 Patent."  Harari's "functional module" is an identical structure or at least a

structural equivalent thereto.  Kaliski Decl., Ex. 1015, ¶69.  '802 Patent 18:1–47

identifies a number of identified "operations," which provide the security feature,

including cryptographic key exchange operations, hash operations, digital signature

operations, key wrapping operations, symmetric encryption operations, asymmetric (public key) encryption operations, and exponentiation operations.  '802 Patent, Ex. 1001, 18:1–47.  Harari discloses, in Figure 5B, that its mother card has additional functionalities provided by one or more functional modules (labeled 42).  Those functional modules can be used for "encryption and decryption," among other available functionalities.  Harari, Ex. 1004, 8:58–64; 13:63–14:30.  "[F]unctional components 42" can include "data encoding and decoding processing functions such as compression and decompression, encryption and decryption."  *Id.* at 13:12–23.  Harari teaches, "in combination with data security and/or encryption software and hardware in the comprehensive controller or optional functional components, a secret key can be encoded on the daughter card that allows it to communicate with designated host systems or mother cards only."  *Id.* at 13:65–14:3.  As one of those functions, Harari specifically identifies the cryptographic key exchange operation identified in the '802 Patent, which is the RSA key exchange algorithm and thus provides a module programmed to perform one of the operations from the '802 patent 18:1-47. *Compare* '802 Patent, Ex. 1001, 18:3–6 *with* Harari, Ex. 1004, 14:3–19.  Kaliski Decl., Ex. 1015, ¶¶67–68.  To the extent that the structure in the '802 Patent and that in Harari are not identical, the structures are equivalent because they are interchangeable (encryption can be provided in many different ways) and achieve substantially the same result (securing data through performance of a

security operation) in substantially the same way (programming applied to data). Kaliski Decl., Ex. 1015, ¶69.

To the extent the Board agrees with Patent-Owner that a corresponding structure also includes "[c]ryptographic processing device 801 (processor capable of performing the cryptographic operations, as described at '802 patent, 15:63–15:67)," Harari discloses another identical or at least structurally equivalent structure through its disclosure of functional modules that perform encryption and decryption. SPEX Claim Construction Brief, Ex. 1013, at 8. Harari teaches that these functional modules can be hardware components (such as "host processors") originally on the host computer that are "relocated to the mother card" to perform this function. Harari, Ex. 1004, at 8:65–9:2; Kaliski Decl., Ex. 1015, ¶66. A POSITA would have understood that the "functional modules" or "functional components" that provided "processing functions" would require a special purpose processor designed to provide the desired functionality. Kaliski Decl., Ex. 1015, ¶66. Thus, functional modules with special hardware that perform encryption and decryption, as in Harari, are identical to cryptographic processing device 801. A functional module with processing to perform encryption is identical to cryptographic processing device 801 or at least equivalent because processors for encryption were known to be interchangeable and Harari's functional module on a processor with encryption would achieve the function in substantially the same way (use of a processor to

31

execute encryption) to achieve the same result (processing of data into encrypted form) as cryptographic processing device 801. *Id.*

### c)     [1B]: target means for enabling a defined interaction with a host computing device

Under Patent-Owner's proposed construction of "defined interaction," Harari teaches performing the function for this element, which is enabling a defined interaction with a host computing device, where it teaches a daughter card that interacts with a host computer (directly or through the mother card) to provide a variety of functionalities including using a specified, predefined functionality of the host computer such as flash memory, modem communication, LAN adapter, or wireless fax modem. Harari, Ex. 1004, at 4:65–5:1, 8:26–48, Fig. 5A. Harari also discloses an identical or equivalent structure for this element under Patent-Owner's proposed construction. Kaliski Decl., Ex. 1015, ¶¶71–77. The corresponding structure is a memory module adapted to enable non-volatile storage of data and a communications module adapted to enable communications between the host computing device and a modem or LAN transceiver. *Id.* Specifically, Harari's daughter card (*i.e.,* a module), provides memory for non-volatile storage of data. Harari, Ex. 1004, 8:40–53; 4:65–5:1, 7:24–34 (describing use of flash EEPROM), Fig. 3 (illustrating modules on daughter card). The examples given by Harari (flash memory, ROM, main memory, file memory, and backup memory) are all instances

of non-volatile storage of data that a POSITA at the time would have been aware of and were in common use at the time.  Kaliski Decl., Ex. 1015, ¶73.  Thus, these memory structures on the daughter card of Harari are identical to the "memory module adapted to enable non-volatile storage of data," and if the Board does not agree, then those structures are equivalent because they are interchangeable (different forms of memory were known to be interchangeable) and achieve substantially the same result (local storage) in substantially the same way (data storage in a non-volatile way).  Thus, they are equivalent structures as the memory module under Patent-Owner's proposed construction of "defined interaction."  *Id.* at ¶75.

Harari's daughter card also provides an identical structure under Patent-Owner's proposed construction of "defined interaction," for the communication module adapted to enable communications between the host computing device and a modem or LAN transceiver.  The daughter card specifically functions as a "modem or other communication peripheral[]."  Harari, Ex. 1004, 8:40–53; *id.* at 4:65–5:1 (identifying "a modem or other communication peripherals such as LAN adapter, or wireless fax modem" as additional structures); *id.*, Fig. 5A.  Harari teaches that these structures on the daughter card are able to interact with the host computing device. *Id.* at 7:64–8:16, 2:25–29 (other supportable targets), Fig. 4.  Kaliski Decl., Ex. 1015,

¶76.  Indeed, the device disclosed by Harari is intended to provide a peripheral that interacts with a host computer.  *Id.*  To the extent that Harari's structure is deemed not to be identical to that recited in the structure agreed by the parties under Patent-Owner's proposed construction of "defined interaction," then it is equivalent because it is interchangeable (communication peripherals can be implemented in many ways) and achieves substantially the same result (modem or LAN communication) in substantially the same way (peripheral communication).  Kaliski Decl., Ex. 1015, ¶75.  Thus, a POSITA would have understood Harari teaches this limitation under Patent-Owner's proposed construction of "defined interaction."  *Id.*, ¶¶71–77.

### d)     [1C]: means for enabling communication between the security means and the target means

Harari teaches performing the agreed-to function for this element (enabling communication between the security means and the target means) by teaching that the "functional components are interlinked by an internal bus."  Harari, Ex. 1004, at 7:60–61.  Kaliski Decl., Ex. 1015, ¶79.  Harari also teaches an internal computer bus, which is equivalent to the '802 patent's conventional computer bus 615 that was agreed to as the corresponding structure in the '802 patent.  Kaliski Decl., Ex. 1015, ¶¶78–82.  Specifically, in Harari, the mother card, daughter card, and host are all connected by an "internal bus."  *E.g.*, Harari, Ex. 1004, at 6:59–7:7, 7:60–63, Figs.

34

1, 3, 4. Harari teaches that "[a]n internal bus 55 interconnects the processor 50 with the host interface 54 and the memory interface 56." *Id.* at 8:8–10, 2:40–48 (discussing solid-state memory connection host bus), 7:64–8:17 (discussing flash controllers interfacing with flash memory chips).   Harari's internal bus 55 is interchangeable with the '802 Patent's conventional computer bus 615 and both achieve the function in substantially the same way (connecting components through a multi-pin set of wires) to achieve substantially the same result (allowing two-way communication among devices).   Kaliski Decl., Ex. 1015, ¶81.   These buses are known to be interchangeable because using a conventional computer bus to connect components within a host system or peripheral device is well known and common in all computer devices.   Kaliski Decl., Ex. 1015, ¶80.   Thus, a POSITA would have understood that Harari teaches this limitation.   Kaliski Decl., Ex. 1015, ¶¶78–82.

### e)   [1D]: means for enabling communication with a host computing device

Harari teaches performing the agreed function for this element (enabling communication with a host computing device) by teaching communication with the host computer through a PCMCIA interface and using the PCMCIA standards. *E.g.*, Harari, Ex. 1004, at 6:59–7:3, 7:52–57.   Kaliski Decl., Ex. 1015, ¶84.   Harari also teaches a structure that is identical to or at least structurally equivalent to one or more of the corresponding structures proposed by Patent-Owner and agreed to by

the district court for this element. Kaliski Decl., Ex. 1015, ¶¶84–87. Harari teaches that "[t]he controller interfaces with the host system via a host interface 54, and with the flash memory via a memory interface 56. In the preferred embodiment, the host interface 54 communicates with the host system 200 in accordance with the PCMCIA specifications or any other standard card interface." Harari, Ex. 1004, 7:52–55; *id.*, Fig. 3. Harari is replete with references to using PCMCIA connections to enable communication with a host computing device. *E.g., id.* at 2:15–39, 6:63–7:3, 12:16–19; *id.*, Fig. 1. A PCMCIA form-factor PC card is able to communicate with a host computer through the implementation of PCMCIA, as explained in Harari (*id.* at 2:15–39) and as taught in *PCMCIA System Architecture*. *See* discussion of elements [1E] and [6F] below (incorporated herein by reference). Therefore, Harari discloses a PCMCIA structure, which is identical to one of the corresponding structures identified by Patent-Owner and the district court – PCMCIA. Kaliski Decl., Ex. 1015, ¶87. The interface in Harari is not limited to PCMCIA, though, and can be any "standard interface 212." *Id.* at 12:16–19; Kaliski Decl., Ex. 1015, ¶¶84–85. A POSITA would have understood "any standard interface" to be equivalent structure as SCSI interface, IDE interface, a parallel interface, a serial interface (such as RS-232), and a smart card interface. Each of those structures is one of the corresponding structures identified by Patent-Owner and the district court. Certainly, even if the Board does not believe that the Harari

structures are identical, those structures are equivalent to the corresponding structures because they are interchangeable (each standard provides interface capabilities) and achieve substantially the same result (interface communication with a host computer) in substantially the same way (established standard protocols). Kaliski Decl., Ex. 1015, ¶87.  Thus, a POSITA would have understood that Harari teaches this limitation.  Kaliski Decl., Ex. 1015, ¶¶83–88.

> **f)**  **[1E]:means for operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device**

Under Patent-Owner's interpretation of the recited function, Harari teaches performing the agreed function for this element (operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device) by disclosing using PCMCIA to connect and identify the type of device that is connected in response to an instruction from the host computer.  *E.g.*, Harari, Ex. 1004, at 6:59–7:3, 7:52–57, 13:4–8, 13:47–62. Kaliski Decl., Ex. 1015, ¶90.  Under Patent-Owner's interpretation of the recited function, Harari discloses an identical structure to the corresponding structures identified by Patent-Owner and the district court (both a PCMCIA interface and memory section and a PCMCIA and device or host driver).  Kaliski Decl., Ex. 1015, ¶_91.  Harari discloses a device that uses PCMCIA to enable the mother/daughter

card combination to "communicate with the host system." *Id.* at 6:63–7:3, 7:54–57; *id.*, Fig. 1. The daughter card "functions with a host system either directly when the host system is customized with the support components or indirectly via a mother card." *Id.* at 5:15–27; *id.* at 5:7-10. The mother card "furnish[es] support components, such as a comprehensive controller and optional functional components, necessary for the operation of the peripheral device implemented on the daughter card" and "adapts the native interface of the daughter card to the standard interface of the host system." *Id.* at 5:10–13; 5:28–33 ("support components" include security features such as "data encoding and decoding processing functions such as compression and decompression, encryption and decryption, the key or algorithm for recovering the data is stored with the daughter card."); *id.* at 5:33–36. The host system (and the mother card) can read "identifying data" stored on the daughter card, including "information that identifies what type of peripheral device is implemented on the daughter card" or "an identity code assignable to the daughter card for operational expediency and security applications." *Id.* at 5:37–44, 5:44–48. Device type identification is also "a form of acknowledge signal in a connection protocol for the native interface of the daughter card" and provides "a basis for matching each removable daughter card to a specific host system or mother card, for managerial or security reasons." *Id.* at 5:48–53. Harari thus teaches operably connecting the security means (*e.g.,* the support

components) and/or the target means (*e.g.,* daughter card with memory) to the host computing device in response to an instruction from the host computing device (the request to read "identifying data" such as device type information that is a form of an acknowledge signal). Kaliski Decl., Ex. 1015, ¶¶89–96. These structures are therefore identical to the corresponding structures and are certainly equivalent because they are interchangeable (any memory section that complies with PCMCIA standard must respond according to the standard) and achieve substantially the same result (operable connection with a host computer through PCMCIA or other standard interface) in substantially the same way (following the PCMCIA standard). *Id.* at ¶95.

Patent-Owner may argue that Harari does not teach explicitly or inherently this claimed feature. If so, this feature is explicitly taught in *PCMCIA System Architecture* by explaining the process of a host requesting information from a PC Card peripheral that is used to operably connect the host and peripheral security and/or target means on the PC Card. *PCMCIA System Architecture* teaches that "configuration option information in non-volatile memory within the card itself" with the configuration data "kept in an area within the card known as the (CIS)," also known as the Card Information Structure. *Id.* at 24, 145; Fig. 3-2; 145–62 (describing the CIS). Kaliski Decl., Ex. 1015, ¶99. CIS consists of tuples "that describe the function and characteristics of a PC Card," including device information

and configuration information such as the kind of PC card, its speed, its size, and the system resources required.  *Id.* at 145, 147–149, 151, Table 11-1, 158–162 & Table 11-7 (listing additional tuples).   In addition, there are readable "function Deep Configuration Registers).

Configuration software called enablers is used to detect PC Cards, determine configuration requirements after reading the CIS, and then configure the PC Card so it can be accessed.  *Id.* at 24, 28, 229–30; *id.* at 261-62 (client drivers use Card Services to recognize the PC Card, "read the CIS," and "program[] the host bus adapter (HBA) and configure[] the PC Card."); *id.*, Fig. 20-1, Fig. 11-1.  The CIS is read during "card initialization to determine the configuration options supported by the card" via "card and socket services."  *Id.* at 146.  Once read, "the PC Card client driver programs the HBA and configures the PC Card, again via card and socket services."  *Id.*  Figure 11-1 illustrates this process flow:



*Figure 11-1. PCMCIA Software Flow*

*Id.*, Fig. 11-1; *id.*, Fig. 18-1. "Once a PC Card is configured, it then responds like any other device residing on the host bus." *Id.* at 229–30.

Card services are employed by enablers during PC Card initialization and configuration, PC Card event notification (*e.g.,* insertion and removal), and block transfers to/from memory. *Id.* at 29, 264–65; *id.*, Table 20-1 (listing Card Services). Card Services uses "client services functions" and "client utility services" to initialize the device and detect a PC Card, respectively. *Id.* at 275, 280; *id.*, Table 20-5. The client services functions (*id.*, Table 20-5) are "typically used when a card services client driver performs device initialization," and include the "RegisterClient" function, which is "[u]sed by the client to register with card services as either a memory, MTD or I/O client." *Id.* at 275, 276–77; *id.* at 279

(describing artificial insertion events to allow configuration of currently installed cards). Client utility functions are then used by the client to retrieve the tuple information from the card. *Id.* at 280–81 ("Client drivers can use these utility functions to obtain information regarding the configuration of the PC Card in a given socket, or to scan the CIS itself to determine the exact configuration requirements of the PC Card."). Those functions include the function GetConfigurationInfo, which "[p]rovides the client with information about a specified socket and the PC Card installed" to "determine the configuration requirements of the PC Card installed" by reading the PC Card's CIS. *Id.* at 280, 281 (including device ID, function ID, and manufacturing ID); *id.* Table 20-7 (listing information returned by GetConfigurationInfo Service). Other functions can be used to retrieve additional CIS tuples, such as GetFirstTuple, GetNextTuple, GetTupleData, GetFirst/NextRegion, and GetFirst/NextPartition. *Id.* at 280, 283–84; *id.*, Table 20-6.

*PCMCIA System Architecture* thus teaches operably connecting the security means and/or the target means to the host computing device in response to an instruction from the host computing device by specifying how a host requests CIS information from the PC Card and then configures the system to work with the PC Card. Kaliski Decl., Ex. 1015, ¶¶98–107. It would have been obvious to a POSITA to combine Harari with *PCMCIA System Architecture* when implementing Harari's

PCMCIA embodiment.  Harari, Ex. 1004 at 2:15–23, 7:54–57.  Indeed, *PCMCIA System Architecture* teaches implementation of PCMCIA and teaches that "[t]his book is intended for use by hardware and software designers and support personnel." *PCMCIA System Architecture*, Ex. 1006, at 6.  Thus, a POSITA would have been motivated to combine Harari with *PCMCIA System Architecture* to thus provide a structure that is identical and equivalent to the corresponding structures.  Kaliski Decl., Ex. 1015, ¶¶108–110.

> **g)** **[1F]: means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means**

Harari teaches performing the agreed function for this element (mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means) by teaching that the comprehensive controller and the functional modules may encrypt and decrypt data that is being transferred to and from the daughter card.  Harari, Ex. 1004, at 8:58–64, 13:63–14:19.  Harari discloses a comprehensive controller or the functional modules can be used to encrypt and decrypt data that is being transferred to the daughter card.  Harari, Ex. 1004, at 8:58–64, 13:63–14:19.  Harari's mother/daughter card combinations include "one or more functional modules 42." Harari, Ex. 1004, at 8:58–60; *id.*, Fig. 5B.  The functional module 42 from Harari

"may provide error detection and correction, encryption and decryption, compression and decompression of data, image, audio and voice, as well as other features useful in the mobile computing environment." *Id.* at 8:60–64; Harari at 13:12–23. Figure 7 illustrates "how such a memory card essentially takes care of all storage requirements of the computer" and illustrates "the memory partition and related data and control paths among the host, mother card and daughter card." Kaliski Decl., Ex. 1015, ¶114.



**FIG. 7**

Harari at 9:18–23; *id.*, Fig. 7. Harari teaches that controller 41 has: "the functionality of both a DMA controller as well as a disk drive/flash/floppy/peripheral controller" and "the intelligence to move blocks of files (software, microcode, or data) into and out of the disk/flash/floppy media on the daughter card 20 and into/out of the DRAM/SRAM/ROM/Flash (main memory) space 60 on the mother card 10, as well

as do automatic backup of the main memory into the disk/flash/floppy." Harari, Ex. 1004, at 9:23–30.

As previously explained in connection with the security means limitation 1A, which is incorporated by reference herein, Harari discloses a functional module that may be used to encrypt data for the target means. In order to encrypt the data being stored on the Harari target means, a POSITA would have understood that the data must first pass through the security means by operation of the circuitry described above. Kaliski Decl., Ex. 1015, ¶115. Mediating communication between the host computing device and the target means so that the communicated data must first pass through the security means would have been obvious in view of Harari because it would have been obvious to use the data encryption module disclosed in Harari to encrypt the data before storing it in memory in view of Harari's disclosure of an encryption module on the mother card between the host computer and target memory device. Kaliski Decl., Ex. 1015, ¶¶115–116.

### 3. Dependent Claim 2

#### a) [2]: A peripheral device as in claim 1, wherein the target means comprises means for non-volatilely storing data

Harari and PCMCIA System Architecture disclose a peripheral device as discussed above related to claim 1. Harari further teaches the agreed function of non-volatilely storing data. Kaliski Decl., Ex. 1015, ¶¶117–121. And, the structure

provided by Harari for that function includes structure that is identical to the agreed corresponding structure of non-volatile memory devices. Specifically, Harari teaches that the PC Card can have "a specific type of semiconductor memory system having non-volatility" and that the "daughter card" contains "solid state memory" such as an "array of non-volatile flash EEPROM cells." Harari, Ex. 1004, at 3:15–19, 7:31–32 ("flash EEPROM memory chips"), 15:22–26. Indeed, Harari's claims specifically require solid state memory systems. *Id.* at claims 1 and 19 (claiming solid state memory systems). A POSITA would have understood that flash EEPROM is a non-volatile memory device and would also have understood that it is a structure equivalent to a non-volatile memory device because it is interchangeable (different forms of memory were known to be interchangeable) and achieves substantially the same result (local storage) in substantially the same way (non-volatile memory). Kaliski Decl., Ex. 1015, ¶120. Thus, a POSITA would have understood that Harari in view of *PCMCIA System Architecture* teaches claim 2. Kaliski Decl., Ex. 1015, ¶¶117-121.

### 4.   Independent Claim 6

Harari teaches the limitations of independent claim 6 for the same reasons it teaches the limitations of claim 1. Specifically, claim element 6Pre is disclosed for the same reasons as element 1Pre. Claim element 6A is disclosed for the same reasons as element 1A. Claim element 6B is disclosed for the same reasons as

element 1B.  Claim element 6C is disclosed for the same reasons as element 1C. Claim element 6D is disclosed for the same reasons as element 1D.  Claim element 6E is disclosed for the same reasons as element 1E.  Claim element 6F is discussed below.

>    a)    **[6F]: means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means**

Under Patent-Owner's proposed construction, Harari teaches performing the Patent-Owner's stated function for this element (providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means) by teaching identifying "the type of the peripheral device the daughter belongs to."  Harari, Ex. 1004, at 13:47–62.  Harari also teaches using the PCMCIA standard to establish communication with the mother/daughter card, as explained below.  Harari also teaches a structure that is identical and at least structurally equivalent to Patent-Owner's proposed corresponding structure – Memory section 612a.  Kaliski Decl., Ex. 1015, ¶¶124–128.  Specifically, Harari's daughter card contains "identifying data" in memory that "allows maximum flexibility with the possibility of assigning the identifying data 220 in the field."  Harari, Ex. 1004, at 13:47–51; *id.*, Fig. 11.  In another implementation, "a group of pins" is encoded "in

the native interface by hard-wiring to represent the identifying data." *Id.* at 13:51–53. That "identifying data" in Harari includes "a type field that identifies the type of peripheral device the daughter card belongs to." *Id.* at 13:54–57; *id.* at 5:7–53. The identifying data "is readable by the mother card or the host system coupled thereto," including "information that identifies what type of peripheral device is implemented on the daughter card" or "an identity code assignable to the daughter card for operational expediency and security applications." *Id.* at 5:37–44; *id.* at 5:44–48, 13:57–62. The device type identification also provides "a form of acknowledge signal in a connection protocol for the native interface of the daughter card" and provides "a basis for matching each removable daughter card to a specific host system or mother card, for managerial or security reasons." *Id.* at 5:48–53. The identifying data is "preferably stored in the daughter card." *Id.* at 13:43–49; *id.*, Fig. 11. That structure in Harari is equivalent to memory section 612a because it is interchangeable (different forms or locations of memory were known to be interchangeable) and achieves substantially the same result (identifiable memory storage of peripheral functionality) in substantially the same way (storing identity information). Kaliski Decl., Ex. 1015, ¶128.

Moreover, providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral

device, information regarding the function of the target means, would have been obvious in view of Harari because it would have been obvious for the host computer to use a standard software device driver to identify a peripheral device. Kaliski Decl., Ex. 1015, ¶129. Indeed, the '802 Patent itself states as much. '802 Patent at 7:17–31. Harari thus teaches this limitation of claim 6 under Patent-Owner's proposed construction.

To the extent Patent-Owner argues that Harari does not teach explicitly or inherently this claimed feature, then this feature is explicitly taught in *PCMCIA System Architecture* where it discloses a structure for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means through its configuration process. That process is described in *PCMCIA System Architecture* as providing to the host computing device information regarding the function of the PCMCIA device.

*PCMCIA System Architecture* teaches that "configuration option information in non-volatile memory within the card itself" with the configuration data "kept in an area within the card known as the (CIS)," also known as the Card Information Structure. *Id.* at 24, 145, Fig. 3-2, 45–62 (describing the CIS). CIS consists of tuples "that describe the function and characteristics of a PC Card," including device information and configuration information such as the kind of PC card, its speed, its

size, and the system resources required. *Id.* at 145, 147–149, 151, Table 11-1; *id.*, at 158–162 & Table 11-7 (listing additional tuples). In addition, there are readable "function configuration registers" which are used to identify the I/O functions on a PC Card. *Id.* at 162–173 (Function Configuration Registers); *id.* at 427 (glossary for "configuration registers"). PCMCIA I/O devices require that the CIS also contain "configuration tables" with entries that "describe[] a set of configuration options that the PC Card needs for normal operation." *Id.* at 151–154, 158–160 (describing "device information" tuples CISTPL_DEVICE and CISTPLE_DEVICE_A and "configuration tuple" CISPTL_CONFIG; CIS "device information" tuples); *id.* at 31 (also listing higher level tuples in the data organization layer and system specific layer); App'x E (listing higher layer tuples).

For example, for PC CARD ATA devices, a "function ID" tuple for disk function is "used to identify the disk as an ATA interface and to specify features supported by the ATA card" and may also be followed by disk device function extension tuples. *Id.* at 202, 207–208, 199–208 (ATA PC Card Example); *id.*, App'x D (ATA Disk CIS Example). For example, for ATA, the CIS the function extension tuple describes the disk interface protocol as PC Card ATA. *Id.* at 208.

Configuration software called enablers is used to detect PC Cards, determine configuration requirements after reading the CIS, and then configures the PC Card so it can be accessed. *Id.* at 24, 28, 229–30; *id.* at 261–62 (client drivers use Card

Services recognize the PC Card, "read the CIS," and "program[] the host bus adapter (HBA) and configures the PC Card."); *id.*, Fig. 20-1, Fig. 11-1.  The CIS is read during "card initialization to determine the configuration options supported by the card" via "card and socket services."  *Id.* at 146.  Once read, "the PC Card client driver programs the HBA and configures the PC Card, again via card and socket services."  *Id.*; *id.*, Figs. 11-1, 18-1 (illustrating this process flow).  "Once a PC Card is configured, it then responds like any other device residing on the host bus."  *Id.* at 229–30.

Card services are employed by enablers during PC Card initialization and configuration, PC Card event notification (*e.g.,* insertion and removal), and block transfers to/from memory.  *Id.* at 29, 264–65; *id.*, Table 20-1 (listing Card Services). Card Services uses "client services functions" and "client utility services" to initialize the device and detect a PC Card, respectively.  *Id.* at 275, 280; *id.*, Table 20-5.  The client services functions (*id.*, Table 20-5) are "typically used when a card services client driver performs device initialization," and include the "RegisterClient" function, which is "[u]sed by the client to register with card services as either a memory, MTD or I/O client."  *Id.* at 275, 276–77; *id.* at 279 (describing artificial insertion events to allow configuration of currently installed cards).  Client utility functions are then used by the client to retrieve the tuple information from the card.  *Id.* at 280–81 ("Client drivers can use these utility

functions to obtain information regarding the configuration of the PC Card in a given socket, or to scan the CIS itself to determine the exact configuration requirements of the PC Card."). Those functions include the function GetConfigurationInfo, which "[p]rovides the client with information about a specified socket and the PC Card installed" to "determine the configuration requirements of the PC Card installed" by reading the PC Card's CIS. *Id.* at 280, 281 (including device ID, function ID, and manufacturing ID); *id.* Table 20-7 (listing information returned by GetConfigurationInfo Service). Other functions can be used to retrieve additional CIS tuples, such as GetFirstTuple, GetNextTuple, GetTupleData, GetFirst/NextRegion, and GetFirst/NextPartition. *Id.* at 280, 283–84; *id.*, Table 20-6. The structure identified in *PCMCIA System Architecture* is equivalent to memory section 612a because it is interchangeable and achieves substantially the same result (identifiable memory storage of peripheral functionality) in substantially the same way.

Thus, *PCMCIA System Architecture* teaches this limitation to a POSITA under Patent-Owner's proposed construction. Kaliski Decl., Ex. 1015, ¶¶131–148.

### 5. Dependent Claim 7

a) **[7] A peripheral device as in claim 6, wherein the target means comprises means for non-volatilely storing data.**

Harari and PCMCIA System Architecture disclose the peripheral device of

claim 6 discussed above for that claim. Harari further teaches the limitation of dependent claim 7 for the same reasons it teaches the limitation of dependent claim 2. Kaliski Decl., Ex. 1015, ¶150.

### 6.   Independent Claim 11

Harari teaches the limitations of independent claim 11 for the same reasons it teaches the limitations of claim 1. Specifically, claim element 11Pre is disclosed for the same reasons as element 1Pre. Claim element 11A is disclosed for the same reasons as element 1A. Claim element 11B is disclosed for the same reasons as element 1B. Claim element 11C is disclosed for the same reasons as element 1C. Claim element 11D is disclosed for the same reasons as element 1D. Claim element 11E is disclosed for the same reasons as element 1F. Kaliski Decl., Ex. 1015, ¶151.

### 7.   Dependent Claim 12

Harari and PCMCIA System Architecture disclose the peripheral device as in claim 11 for the reasons discussed above with regard to claim 11. Harari further teaches the limitation of dependent claim 12 for the same reasons it teaches the limitation of dependent claim 2. Kaliski Decl., Ex. 1015, ¶151.

### 8.   Independent Claim 23

Harari teaches the limitations of independent claim 23 for the same reasons it teaches the limitations of claims 1 and 6. Specifically, claim element 23Pre is disclosed for the same reasons as element 1Pre. Claim element 23A is disclosed for

the same reasons as element 1A.  Claim element 23B is disclosed for the same reasons as element 1B.  Claim element 23C is disclosed for the same reasons as element 1C.  Claim element 23D is disclosed for the same reasons as element 1D. Claim element 23E is disclosed for the same reasons as element 1F.  Claim element 23F is disclosed for the same reasons as element 6F.  Kaliski Decl., Ex. 1015, ¶152.

### 9.   Independent Claim 24

Harari teaches the limitations of independent claim 24 for the same reasons it teaches the limitations of claims 1 and 6.  Specifically, claim element 24Pre is disclosed for the same reasons as element 1Pre.  Claim element 24A is disclosed for the same reasons as element 1A.  Claim element 24B is disclosed for the same reasons as element 1B.  Claim element 24C is disclosed for the same reasons as element 1C.  Claim element 24D is disclosed for the same reasons as element 1D. Claim element 24E is disclosed for the same reasons as element 6F.  Kaliski Decl., Ex. 1015, ¶153.

### 10.   Dependent Claim 25

Harari and PCMCIA System Architecture disclose the peripheral device as in claim 24 for the reasons discussed above with regard to claim 24.  Harari further teaches the limitation of dependent claim 25 for the same reasons it teaches the limitation of dependent claim 2.  Kaliski Decl., Ex. 1015, ¶¶153.

### 11.   Independent Claim 38

Harari teaches the limitations of independent claim 38 for the same reasons it teaches the limitations of claims 1 and 6.  Specifically, claim element 38Pre.1 is disclosed for the same reasons as element 1Pre.  Claim element 38Pre.2 ("adapted for communication with a host computing device") is disclosed for the same reasons as element 1D ("means for enabling communication with a host computing device") because it teaches communicating with the host computer through a PCMCIA interface and using the PCMCIA standards.  *E.g.*, Harari, Ex. 1004, at 6:59–7:3, 7:52–57, Fig. 3; *id.*, at 2:15–39, 6:63–7:3, 12:16–19, Fig. 1; Kaliski Decl., Ex. 1015, ¶155.  Claim element 38Pre.3 ("performance of one or more security operations on data") is disclosed for the same reasons as element 1A ("security means for enabling one or more security operations to be performed on data") because it teaches "functional modules" that can provide "encryption and decryption" and other security operations of data.  Harari, Ex. 1004, at 8:58–64; 18:1–47; *id.* at 8:65–9:2, 13:12–23, 13:63–14:30, Fig. 5B.  Claim element 38Pre.4 ("interaction with a host computing device in a defined way") is disclosed for the same reasons as element 1B ("target means for enabling a defined interaction with a host computing device") because it teaches a daughter card that interacts with a host computer (directly or through the mother card) to provide various interactions with the host computer such as flash memory, modem communication, LAN adapter, or wireless fax modem. Harari, Ex. 1004, at 2:25–29, 4:65–5:1, 7:24–34, 7:64–8:16, 8:40–53, Fig. 4, Fig.

5A.  Claim element 38A ("receiving a request from a host computing device for information regarding the type of the peripheral device") is disclosed for the same reasons as element 6F ("means for providing to a host computing device, in response to a request from the host computing device for information regarding the type of the peripheral device, information regarding the function of the target means") because Harari teaches identifying "the type of the peripheral device the daughter belongs to" and using the PCMCIA standard to establish communication with the mother/daughter card.  Harari, Ex. 1004, at 5:7–53, 13:47–62, Fig. 11.  *PCMCIA System Architecture* also teaches this element through its configuration process as part of providing to the host computing device information regarding the function of the PCMCIA device.  *PCMCIA System Architecture,* Ex. 1006, at 24, 28–29, 31, 145–173, 199–208, 229–30, 261–62, 264–65, 275–77, 279–81, 283–84, 427, Fig. 3-2, Fig. 11-1, Fig, 18-1, Fig. 20-1, Table 11-1, Table 11-7, Table 20-5, Table 20-6, Table 20-7, App'x D.  Claim element 38B ("providing to the host computing device, in response to the request, information regarding the type of the defined interaction") is disclosed for the same reasons as element 6F ("providing to the host computing device, in response to the request, information regarding the type of the defined interaction") in both Harari and *PCMCIA System Architecture* as just discussed for element 38A.  Kaliski Decl., Ex. 1015, ¶155.

## 12.  Independent Claim 39

Harari teaches the limitations of independent claim 39 for the same reasons it teaches the limitations of claims 38 and 1. Specifically, claim element 39Pre.1 is disclosed for the same reasons as element 38Pre.1. Claim element 39Pre.2 is disclosed for the same reasons as element 38Pre.2. Claim element 39Pre.3 is disclosed for the same reasons as element 38Pre.3. Claim element 39Pre.4 is disclosed for the same reasons as element 38Pre.4. Claim element 39B ("performing one or more security operations and the defined interaction on the exchanged data") is taught for the same reasons as elements 38Pre.3 ("performance of one or more security operations on data") and 38Pre.4 ("interaction with a host computing device in a defined way"). Claim element 39C ("mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first [p]ass through means for performing the one or more security operations") is disclosed for the same reasons as elements 1F ("means for mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means") because Harari teaches that the comprehensive controller or the functional modules can be used to encrypt and decrypt data that is being transferred to the daughter card. Harari, Ex. 1004, at 8:58–64, 9:18–30, 13:12–23, 13:63–14:19, Fig. 5B, Fig. 7. Claim element 39A is discussed in further detail below. Kaliski Decl., Ex. 1015, ¶¶156–157.

a)  **[39A] communicating with the host computing device
to exchange data between the host computing device
and the peripheral device**

Claim element 39A is disclosed for the same reasons as element 1D.  In

addition, Harari teaches a number of structures for communicating with the host

computing device to exchange data between the host computing device and the

peripheral device.  Kaliski Decl., Ex. 1015, ¶¶158–159.  Specifically, as explained

for element 1D (incorporated herein), Harari teaches means for enabling

communication with a host computing device.  Element 39A adds the requirement

of communicating to exchange data between the host computing device and the

peripheral device but Harari discloses this additional requirement.  Harari teaches,

"[t]he controller interfaces with the host system via a host interface 54, and with the

flash memory via a memory interface 56" and that "[i]n the preferred embodiment,

the host interface 54 *communicates with the host system* 200 in accordance with the

PCMCIA specifications or any other standard card interface."  Harari, Ex. 1004,

7:52–57 (emphasis supplied); *id.*, Fig. 3.  Further, Figure 4 "illustrat[es] in more

detail the functional components of a flash EEPROM system and related data and

control paths" and "[t]he host interface 54 typically includes a buffer memory for

buffering data between the host and the peripheral."  *Id.* at 7:64–8:5; *id.*, Fig. 4.

Harari thus teaches communicating with the host computing device to exchange data

between the host computing device and the peripheral device to a POSITA.

58

### C.   Ground 2: Claims 1–2, 11–12, 23, and 39 are Rendered Obvious by Harari in View of Wang

A POSITA would have viewed Harari in combination with Wang and *PCMCIA System Architecture* as teaching each element of claims 1–2, 6–7, 11–12, 23, and 39 of the '802 Patent.  Kaliski Decl., Ex. 1015, ¶¶160–175.

### 1.   Motivation to Combine Harari, Wang, and PCMCIA System Architecture

In addition to the reasons for combining Harari with *PCMCIA System Architecture* (*see supra*, § VI.B.1.), a POSITA would have been motivated to combine the teaching in Wang with Harari and *PCMCIA System Architecture*. Kaliski Decl., Ex. 1015, ¶¶163–166.

Wang teaches an ASIC/FPGA to control a host computer and local processor access to memory portions of a peripheral device and mediate communications between the host computer, local processor, and a communication module on the peripheral.  Ex. 1019, at 4:58–64.  Harari also enables communication between a host computer, local processor, and a "daughter card" with a functionality (e.g., communication or data storage modules).  *See, e.g.*, Harari, Ex. 1004, at 4:65–5:1, 8:40–53 (communication modules), 7:31–34 (data storage), 7:48–54 (controller contains a processor and interfaces with host system and peripheral memory), Fig. 5A.  Harari and Wang are also both focused on peripherals with a PCMCIA form factor.  Harari, Ex. 1004, at 3:24–26; Wang, Ex. 1019, at 2:20–25.

Wang improves Harari by teaching a specific system for moving data between a host computer and a peripheral communication module with a PCMCIA form factor. Wang solves the problem of "a controller for interfacing with a [RF LAN] that is compatible with [PCMCIA] architecture." Ex. 1019, at 2:14–17. Wang provides a specific "method of enabling communications between a host computer . . . and a [LAN] via a controller," *Id.* at 3:13–15, while Harari also provides a peripheral device that uses a controller to enable communications between a host computer and a daughter card, which can provide a LAN adapter. *See supra*, § VI.A.1. Kaliski Decl., Ex. 1015, ¶165.

Wang also improves Harari by teaching that the controller in Harari could be implemented using an FPGA. Like the controller in Harari, the FPGA in Wang interfaces with PCMCIA on one end and a processor on another. Kaliski Decl., Ex. 1015, ¶166. Thus, a POSITA would have been motivated to use Wang as a specific way to implement the teachings of Harari. Kaliski Decl., Ex. 1015, ¶¶163–166.

### 2. Wang Discloses Means for Mediating Communication of Data Between the Host Computing Device and the Target Means So That the Communicated Data Must First Pass Through the Security Means (Elements [1F], [11E], [23E], [39C])

Harari in view of the *PCMCIA System Architecture* teaches all the limitations of claims 1–2, 11–12, and 23, as discussed above and incorporated by reference herein. To the extent Patent-Owner argues that neither Harari nor *PCMCIA System*

*Architecture* teach the corresponding structure for Elements 1F, 11E, and 23E. Under the proposed construction of Patent-Owner, the corresponding structure is taught by Harari in view of Wang.  Kaliski Decl., Ex. 1015, ¶¶169–175.  Claim 39 has a similar limitation (Element 39C) that, although not in means-plus-function form, is also taught by Wang for the same reasons explained below.

Patent-Owner proposed that this term's corresponding structure included a field programmable gate array (FPGA).  Ex. 1013 at 20.  If an algorithm is necessary for the FPGA, Patent-Owner asserts that the algorithm is (1) receiving data from host computing device; (2) depending on configuration settings, providing data to be processed by a cryptographic processor; and (3) transferring data to target means. Ex. 1013 at 20 (citing '802 Patent at Fig. 9A, 16:58–17:7).  Wang teaches the FPGA structure to mediate communication of data between a host computer and a target means.

The '802 Patent illustrates the FPGA structure in its Figure 8, and Wang provides nearly identical illustration for its disclosure in its Figure 1, each reproduced below.



FIG. 8

FIG. 1

Specifically, Wang teaches using an ASIC/FPGA to mediate communication of data between a host computer and a PCMCIA peripheral device (RF Communication Module). In Wang, the peripheral device "enables communication between the host computer 110, the local processor 102, and the RF communication module 120 [target means]." Wang, Ex. 1019, at 4:58–60. The ASIC/FPGA also "enables transmission of control signals between these three components and controls host computer 110 and local processor 102 access to the SRAM 106 and the FLASH ROM 105." *Id.* at 4:60–64. Thus, Wang's FPGA mediates communication of data between the host computer and target means (communication module). Wang also discloses the FPGA algorithm proposed by Patent-Owner. Wang teaches: (1) "the host computer 110 writes the transmit data to the SRAM 106 via host interface 103 and ASIC/FPGA 101" (receiving data from the host computing device); (2) "and commands the local processor 102 via the ASIC/FPGA 101 to

forward the transmitted data to the RF communication module 120" (depending on configuration settings, providing data to be processed by a [] processor); and (3) "[u]nder the control of the ASIC/FPGA 101, the local processor 102 then forwards the transmit data from the SRAM 106 through the local processor 102 . . . to the RF communication module 120" (transferring data to target means). Ex. 1019 at 4:42–50. Thus, Wang teaches structure identical to the FPGA in the '802 Patent.

As explained above in relation to Element 1F, incorporated herein by reference, Harari teaches adding a functional module that provides encryption and decryption (security means) to encrypt and decrypt data as it moves to the communication module (target means).

To the extent that the structure in the '802 Patent and that in Wang are not identical, the structures are equivalent because they are interchangeable (FPGAs can be implemented in many different ways) and achieve substantially the same result (mediating communication of data between a host computer and a target functionality) in substantially the same way (by using an FPGA that controls the movement of data). Kaliski Decl., Ex. 1015, ¶174.

When combined with the teachings of Harari, a POSITA would have been motivated to use an FPGA as the controller in Harari to mediate communication of data between the host computer and a daughter card and place Harari's "functional modules" that provide encryption, between the daughter card and the FPGA so that

the communicated data must first pass through the encryption "module" before being sent to the daughter card.  Kaliski Decl., Ex. 1015, ¶¶175.

### D.    Grounds 3-4: Claims 1–2, 11–12, 23, and 39 are Rendered Obvious for the Same Reasons as Grounds 1-2 when Considered Further in View of Dumas.

To the extent the Board believes Grounds 1-2 do not disclose claim elements 1F, 11E, 23E, and 39C, Dumas, Ex. 1005, meets these limitations.  Kaliski Decl., Ex. 1015, ¶¶176–187.



Dumas, Ex. 1005, Fig. 2 (annotations added).

Dumas teaches "security means for enabling one or more security operations to be performed on data," [blue – encryption circuit]; "target means for enabling a defined interaction with a host computing device," [green – hard disk memory]; "means for enabling communication between the security means and the target means," [yellow – a conventional computer bus]; "means for mediating communication of data between the host computing device and the target means so

that the communicated data must first pass through the security means," [orange – disk controller].

### 1. Motivation to Combine Dumas with Harari, PCMCIA System Architecture, and Wang

In addition to the reasons for combining Harari with *PCMCIA System Architecture* (*see supra*, § VI.B.1.) and with Wang (§ VI.C.1.), a POSITA would have been motivated to combine the teaching in Dumas with these references. Kaliski Decl., Ex. 1015, ¶¶180–183. Dumas teaches an enhanced interface for security (which Harari already accomplishes) without impacting processing time. Kaliski Decl., Ex. 1015, ¶181. As already discussed with regard to "security means" element 1A, Harari is already focused on encryption circuits, teaching that its function modules "may provide . . . encryption and decryption" among other available functionalities. Harari, Ex. 1004, 8:58–67; 13:63–14:30 (also teaching use of optional secret key and/or RSA data encoding); *id.* at 9:1–2 ("'host' processors" could be a functional module); 13:12–23 ("data encoding and decoding functions such as compression and decompression, encryption and decryption").

Dumas improves Harari by specifically solving the problem of "protect[ing] data removed from the computer" such as on "removable hard disks." Dumas, Ex. 1005, 1:36–45. Dumas provides a specific "encryption circuit for encrypting data as it travels to and from a hard disk or other mass storage device," resulting in "a

removed hard disk [that] cannot be read without the user supplied password and a similar encryption circuit." *Id.* at 1:49–55. Dumas's encryption circuit is also fast, making it an attractive option for one of skill in the art to combine with Harari and *PCMCIA System Architecture*. *Id.* at 2:33–37 (Dumas "can encrypt or decrypt a word of data in a single clock cycle," which "allows the encryption process to work within the normal data transfer time and hence be transparent to the rest of the computer system.").

A POSITA would have had a reasonable expectation of success in combining the teachings of Dumas with Harari and *PCMCIA System Architecture* because Dumas is a simple circuit to improve security through quick and transparent encryption/decryption. Kaliski Decl., Ex. 1015, ¶182 (also noting that such a system could easily be dropped into an existing architecture without much effort).

### 2. Dumas Discloses Mediating Communication of Data Between the Host Computing Device and the Target Means So That the Communicated Data Must First Pass Through the Security Means (Elements [1F], [11E], [23E], and [39C])

Harari in view of the *PCMCIA System Architecture* and Wang teaches all the limitations of claims 1–2, 11–12, 23, and 39, as discussed above and incorporated by reference herein. To the extent Patent-Owner argues that these references do not teach Elements 1F, 11E, 23E, and 39C, the claimed features are explicitly taught in Dumas. Kaliski Decl., Ex. 1015, ¶¶184–187.

Specifically, Dumas describes its invention as "add[ing] an encryption circuit 28" where "[d]ata must pass through encryption circuit 28 to travel from hard disk 24 to processor 20, or from processor 20 to hard disk 24." That data "is encrypted as it passes through encryption circuit 28, as it goes from processor 20 to hard disk 24. Data is decrypted as it passes through encryption circuit 28 as it goes from hard disk 24 to processor 20." Dumas, Ex. 1005, at 2:28–41; *id.*, Fig. 2. Thus, Dumas teaches these elements. Kaliski Decl., Ex. 1015, ¶186.

When combined with the teachings of Harari, a POSITA would have been motivated to place Harari's "functional modules," that provide encryption, between the daughter card and the controller so that the "[d]ata must mass through [the functional module] to travel from [daughter card] to [controller], or from [controller] to [daughter card]." Ex. 1005, at 2:28–30. In such an arrangement, the controller in Harari mediates data being communicated to the target means so that the communicated data must first pass through the relevant functional module (security module).

## VIII. MANDATORY NOTICES

Real Party in Interest: Petitioner Western Digital Corporation is the real party-in-interest for this Petition.

Related Matters: Petitioner has been charged with infringement of the '802 Patent in the parallel litigation styled *SPEX Techs., Inc. v. Western Digital Corp.,*

Case No. 8:16-cv-01799 (C.D. Cal.), filed September 28, 2016 ("DCT Litigation").

Petitioner was served with the complaint in that litigation on October 17, 2016.  Ex.

1002.  A petition for *Inter Partes* Review of another asserted patent, U.S. Patent No.

6,003,135, is to be filed contemporaneously with this petition.[2]

Designation of Counsel: Petitioner designates the following Lead and Back-up Counsel.  Concurrently filed with this Petition is a Power of Attorney per 37 C.F.R. § 42.10(b).  Service via hand-delivery may be made at the postal mailing address below.  Petitioner consents to electronic service by e-mail.

| Lead Counsel | Back-Up Counsel |
|---|---|
| Brian Buroker (Reg. No. 39,125)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-5306<br>(202) 955-8541<br>bburoker@gibsondunn.com | Blair A. Silver (Reg. No. 68,003)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-5306<br>(202) 955-8690<br>bsilver@gibsondunn.com<br><br>Rustin K. Mangum**<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvine, CA 92612-4412<br>(949) 451-4069<br>rmangum@gibsondunn.com<br><br>**Mr. Mangum is not admitted to |

---

[2]  The patent applications that became the '135 Patent and the '802 Patent were filed

on the same day and contain very similar disclosures.  Each specification explicitly

incorporates the other by reference.

| | practice before the USPTO, but he plans to file a motion to appear pro hac vice. |
|---|---|

Fees and Credits: The Patent Trial and Appeal Board is hereby authorized to charge any fees or credit any overpayment to Deposit Account No. 50-1408.

## IX.    CONCLUSION

The prior art references cited herein demonstrate that '802 Patent claims 1–2, 6–7, 11–12, 23–25, 38–39 are obvious.  Petitioner requests that the PTAB grant this Petition and institute *inter partes* review of and cancel '802 Patent claims 1–2, 6–7, 11–12, 23–25, 38–39.

Respectfully submitted,

Date: October 16, 2017          By: /Brian M. Buroker/

Brian M. Buroker (Reg. No. 39,125)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8541
Facsimile: (202) 467-0539
bburoker@gibsondunn.com

*Attorney for Petitioner*

## **Certificate of Service**

The undersigned certifies service pursuant to 37 C.F.R. § 42.6(e) on the Petitioner by Express Mail of a copy of this Petition for *Inter Partes* Review and supporting materials upon the following parties:

> Law Office of Robert Rose
> PO Box 301272
> Escondido CA 92030-1272

Date: <u>October 16, 2017</u>          By: <u>/Brian M. Buroker/</u>          

> Brian M. Buroker (Reg. No. 39,125)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C. 20036-5306
> Telephone: (202) 955-8541
> Facsimile: (202) 467-0539
> bburoker@gibsondunn.com
>
> *Attorney for Petitioner*

## Certification of Type-Volume Limitations

The Petition complies with the type-volume limitation of 37 C.F.R. § 42.24.

The Petition contains 13,950 words, excluding the parts of the Petition exempted by

of 37 C.F.R. § 42.24(a).

Date: <u>October 16, 2017</u>                By: <u>/Brian M. Buroker/</u>
                                         Brian M. Buroker (Reg. No. 39,125)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         1050 Connecticut Avenue, N.W.
                                         Washington, D.C. 20036-5306
                                         Telephone: 202.955.8541
                                         Facsimile: 202.467.0539
                                         bburoker@gibsondunn.com

                                         *Attorney for Petitioner*