# Exhibit N

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

SPEX TECHNOLOGIES, INC.,

        Plaintiff,

    v.

KINGSTON TECHNOLOGY COMPANY, INC., ET AL.

        Defendants.

Case No. 8:16-cv-01790-JVS-AGR

## **EXPERT REPORT OF JOHN VILLASENOR**

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

Executed on January 20, 2020 at San Francisco, California by:

*John Villasenor*
_____
John Villasenor, Ph.D.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     QUALIFICATIONS ............................................................................................2

III.    MATERIALS AND OTHER INFOMRATION RELIED UPON ............................4

IV.     BACKGROUND COMMENTARY & OPINIONS ...............................................5

    A.   Comparison of Claims 38 & 39 of the '802 Patent and Claims 55 & 57 of the '135 Patent ................................................................................................5

        1.   Claim 38 of the '802 Patent and Claim 55 of the '135 Patent .................5

        2.   Claims 39 and 57 ................................................................................12

    B.   Commentary Regarding IPRs ...............................................................16

        1.   IPR2018-00082 ...................................................................................16

        2.   IPR2018-00084 ...................................................................................22

    C.   The "Operably Connecting" Limitation ................................................26

V.      CONCLUSIONS ...............................................................................................31

    A.   Technical Opinions Relating to Patent Misuse .....................................31

        1.   An Objective Litigant's View of the IPRs .............................................33

        2.   An Objective Litigant's View of the Litigation ......................................36

    B.   Further Opinions Concerning the Validity of Claims 55 & 57 ...............39

        1.   Invalidity Over Admitted Prior Art .......................................................40

        2.   Invalidity Over Admitted Prior Art in Combination with Fortezza .....45

        3.   Supplemental Opinion Regarding Derivation ........................................50

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## I.   <u>INTRODUCTION</u>

I, John Villasenor, declare as follows:

1.  I am over the age of 21 and fully competent to make this declaration.  I have personal knowledge of the facts stated herein and they are all true and correct.

2.  As I have noted in earlier reports, I have been retained on behalf of Defendants Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc. (collectively "Kingston") to investigate and opine on certain issues related to infringement, invalidity, and certain damages issues of certain claims of U.S. Patent Nos. 6,088,802 ("the '802 patent") and 6,003,135 ("the '135 patent") (collectively, the "Asserted Patents") asserted by Plaintiff SPEX Technologies, Inc. ("SPEX") against Kingston.  I previously prepared reports on these issues, which I understand have been previously served on SPEX in this litigation.

3.  For this report, I have been asked to review and offer opinions concerning the record in proceedings in the patent office brought by Western Digital against the '802 and '135 patents—namely IPR2018-00082 and IPR2018-00084.  Specifically, I have been asked to evaluate, from a technical perspective, whether a reasonable person familiar with patents and patent office proceedings (i.e. a reasonable litigant) would have expected certain challenged claims to be found unpatentable by the PTAB and whether a reasonable litigant has any basis for continuing to believe the claims are not invalid.

4.  I have also been asked to review the designated 30(b)(6) corporate testimony from SPEX regarding the prior art, and opine on what effect admissions made by SPEX's

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

representative during that deposition have on the validity of claim 55 and 57 of the '135 patent.

5.   I expect to be available for deposition and to testify at trial in this matter. This report is based on information currently available to me.  I reserve the right to continue my investigation and study, which may include a review of documents and information that may be produced, as well as a review of deposition testimony from depositions for which transcripts are not yet available or that may yet be taken in this case.  Therefore, I expressly reserve the right to expand or modify my opinions as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, any matters raised by SPEX and/or other opinions provided by SPEX's experts, or in light of any relevant orders from the Court or other authoritative body.

## II.   <u>QUALIFICATIONS</u>

6.   My previous reports provide a summary of my educational background, career history, areas of research focus, and other relevant qualifications. I am currently a professor of engineering and a professor of law at UCLA.  Rather than repeating information on my background and qualifications in this report, I reference that material from my previous reports and incorporate it herein.

7.   As this report, though, does concern proceedings before the U.S. Patent & Trademark office (specifically *inter partes* review proceedings), I highlight below some of my experience relevant to inter partes review proceedings.  To be clear, I do not purport to be an expert in the legal aspects of IPR proceedings.  I do, however, have familiarity with these

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

proceedings from the standpoint of a person with technology expertise and am qualified as a result of that experience to opine on the subject matter of this report.

8.   I have served as an expert in multiple inter partes review proceedings, in various technology fields including communications, networking, and signal processing.  As part of serving as an expert, I have prepared declarations, I have been deposed, and I have kept informed regarding the outcomes of these proceedings.

9.   I also created and have taught multiple times a course on intellectual property to engineering and business students.  With respect to patents, this course addresses topics including what is and is not patentable, the process for obtaining patents, how patents are asserted in federal district court, how validity of patents can be challenged in federal district court and in the PTO, selected Supreme Court and Federal Circuit rulings regarding patents, and patent licensing.

10. In addition, I conceived and wrote and an online training module called "Intellectual Property Essentials for Academic Researchers," which is hosted online by the University of California (see https://techtransfer.universityofcalifornia.edu/IPAwareness/story.html). This resource is intended to help the entire UC community by providing information regarding patents, copyright, trademarks, and trade secrets.

11. I have provided congressional testimony on the topic of intellectual property before the House Committee on the Judiciary; Subcommittee on Courts, Intellectual Property, and the Internet. I have also published academic papers on intellectual property in the American Intellectual Property Law Association (AIPLA) Quarterly Journal and in Competition Policy International Antitrust Chronicle.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

12. I was also the author of the Brookings Institution policy brief explaining some of the key changes to patent law that occurred with the passage of the America Invents Act, available from the Brookings Institute Website at https://www.brookings.edu/wp-content/uploads/2016/06/09_patents_villasenor.pdf.

## III.   MATERIALS AND OTHER INFOMRATION RELIED UPON

13. In preparing this report, I have considered a variety of sources and documents in forming my opinions, including those expressly cited in the body of this report and the exhibits attached to my report.  As part of my previous reports, I reviewed the Asserted Patents, the prosecution history of the asserted patents, and the Court's claim construction order—materials which I have further considered and consulted in the preparation of this report.  I have additionally reviewed the transcript from the December 19, 2019, 30(b)(6) deposition of Tom Hakel—the corporate representative from SPEX; and from the January 3, 2020, deposition of Western Digital.  Lastly, I have reviewed the filings and the prior art of record from IPR2018-00082 and IPR2018-00084.  A list of materials considered is attached hereto.  For avoidance of doubt, I have considered all materials cited in this report and all Exhibits even if not listed.

14. I understand that the parties may not have completed all fact discovery.  I reserve the right to file a supplemental expert report based on, for example, additional deposition testimony and/or additional information that becomes available.  In addition, I reserve the right to provide rebuttal opinions and testimony in response to SPEX's experts, and rebuttal testimony to any of SPEX's fact witnesses.

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

15. I further reserve the right to use animations, demonstratives, enlargements of real exhibits, and other devices to illustrate my opinions.

## IV.   BACKGROUND COMMENTARY & OPINIONS

### A.   Comparison of Claims 38 & 39 of the '802 Patent and Claims 55 & 57 of the '135 Patent

16. I begin the substantive discussion in this report by providing some background on the two patents asserted by SPEX in this litigation—the '802 and '135 patents.  I have discussed these patents at length in my earlier reports, and I will not repeat that here.  For this report, I will address similarities and differences between claims 38 and 39 of the '802 patent—which have been adjudicated to be unpatentable by the Patent Office—and claims 55 and 57 of the '135 patent—which I understand SPEX continues to assert against Kingston.

### 1.   Claim 38 of the '802 Patent and Claim 55 of the '135 Patent

17. Below, I have set forth claim 38 of the '802 patent (limitation by limitation) on the left, and claim 55 of the '135 patent on the right:

*For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:*

*For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:*

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

| | |
|---|---|
| *receiving a request from a host computing device for information regarding the type of the peripheral device; and* | *receiving a request from the host computing device for information regarding the type of the modular device;* |
| *providing to the host computing device, in response to the request, information regarding the type of the defined interaction.* | *providing the type of the target module to the host computing device in response to the request; and* |
| | *operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.* |

18. As the court has construed the claims, claim 38 of the '802 patent is substantively identical to claim 55 of the '135 patent, except for the last element of claim 55 (the "operably connecting …" limitation, which is present in claim 55 but is not present in claim 38). I go through each limitation in detail below.

### a)      Preambles

19. As to the preamble, claim 38 of the '802 patent recites "For use in a peripheral device adapted for communication with a host computing device"; claim 55 of the '135 patent recites "For use in a modular device adapted for communication with a host computing device." The difference in language between these two portions of the preambles is not substantive, though, as the Court has construed the term "modular device" to have the same meaning as the term "peripheral device," namely "a device the operates functionally separate from a host computing device and that is connected to the host computing device, including

6

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

such devices in the same housing as the host computing device."  Claim Construction Order, at 16.

20. The preamble of claim 38 then goes on to recite that the device is also adapted for "performance of one or more security operations on data," whereas the preamble of claim 55 recites that the device comprises a "security module that is adapted to enable one or more security operations to be performed on data."  This difference in language is again not substantive as the court has interpreted the claims.  The court construed the term "security module" (as used in the '135 patent) to have the same meaning as the term "security means"—which is the terminology the '802 uses to describe the hardware in the peripheral device adapted to perform security operations on data.  *See* Claim Construction Order at 49–50.  Thus, this portion of the preamble simply requires that each of the devices contain hardware adapted to perform security operations.

21. The next portion of each of the preambles recites that the device is adapted for "interaction with a host computing device in a defined way" in the case of claim 38; or recites a "target module that is adapted to enable a defined interaction with the host computing device" in the case of claim 55.  These portions of the preamble are also substantively identical.  As with the "security" aspect of the preamble, the term "target module" as used in the '135 patent to have the same meaning as the term "target means," which is how the '802 patent claims the hardware used to perform a defined interaction on data.  Thus, this portion of the preamble simply recites that the respective devices contain hardware that is able to perform a defined interaction.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

22. The last parts of the preambles are identical – each setting up the method that is claimed by the respective claims "a method comprising the steps of" …

23. It is therefore my opinion that, under the court's claim constructions, the preamble of claim 38 of the '802 patent is substantively identical to the preamble of claim 55 of the '135 patent.

24. My conclusion that the preambles of claim 38 and claim 55 are substantively identical is consistent with how both I and SPEX's expert Dr. Rhyne have treated these limitations. In my previous report regarding invalidity, I did perform separate analysis for each respective preamble, but my analysis of the preamble of claim 55 mirrored my analysis concerning the preamble of claim 38.  SPEX's expert, Dr. Rhyne, similarly mirrored his analysis of the preamble of claim 55 with his analysis regarding the preamble of claim 38. For example, with respect to his analysis of the accused DataTraveler 4000, Dr. Rhyne simply referred back to his analysis regarding portions of claim 1 of the '802 patent for his analysis of both preambles.  Rhyne Infringement Report at 44–45 & 48–49.

25. My conclusion that the preambles of these respective claims are identical is also consistent with the sworn corporate testimony from SPEX.  SPEX's designee to testify and its CEO was asked to identify any differences between the preamble of claim 38 and the preamble of claim 55.  The only difference he was able to identify—and he himself acknowledged this was not a material difference—was the difference between "modular" and "peripheral," which I have discussed before.  I have reproduced relevant testimony from his deposition below:

> Q. Did the Court offer different constructions for
> modular device and peripheral device?

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

[A.] To my recollection, no, without reading the whole document.

…

[Q.] Are there any substantive differences between the preamble of claim 38 and the preamble of claim 35?

[A.] I -- I think that that -- I think they -- they say what they say, as you mentioned, but outside of the peripheral and modular, that is the major difference between the preamble in the two. I would concur.

Q. Are there any other substantive differences between the two?

[A.] Again, I -- I -- I'm not -- I do not see any material major differences between the two.

December 19, 2019, 30(b)(6) Deposition of Tom Hakel ("Dec. Hakel Depo.") at 44:3–45:7 (Objections omitted).

### b)      First Step in Each Claim

26. I turn next to the first step recited in each claimed method.  Claim 38 of the '802 patent recites "receiving a request from a host computing device for information regarding the type of the peripheral device"; whereas claim 55 of the '135 patent recites "receiving a request from the host computing device for information regarding the type of the modular device."  These steps are substantively identical.  The only difference in the language is that claim 38 uses the term "peripheral device" and claim 55 uses the term "modular device." However, as I have explained above, the Court has given these terms the same meaning.

27. My conclusion that these elements are substantively identical is consistent with how both I and SPEX's expert have treated these limitations earlier in this case.  In my previous invalidity report, I noted that the only difference was the reference to modular and peripheral—which I explained was not a substantive difference because of how the Court

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

has construed those terms.  E.g.,  Invalidity Report at ¶ 270.  SPEX's expert Dr. Rhyne similarly explained (for example with respect to his analysis of the DataTraveler 4000) that "[b]ecause the terms 'modular device' and 'peripheral device' have been given the same construction, this element is the same as Element 38a of claim 38 of the '802 patent." Rhyne Infringement Report at ¶ 178.

28. SPEX has also acknowledged that these limitations are substantively identical. SPEX's designated corporate expert, acknowledged that the only difference between the two elements is the "peripheral" and "modular" language:

> Q. Does SPEX believe there are any substantive
>     differences between elements 38A from
>     the '802 patent and element 55A from the
>     '135 patent?
>
> [A.] The difference, again, references peripheral
>     modular. Other than that, there are no
>     other differences.

Dec. Hakel Depo at 45:19–46:4.

### c)    Second Step In Each Claim

29. Claim 38 next recites "providing to the host computing device, in response to the request, information regarding the type of the defined interaction"; claim 55 recites "providing the type of the target module to the host computing device in response to the request."  These limitations are again substantively identical.

30. The only linguistic difference between these elements is that claim 38 recites providing "information regarding the type of defined interaction" whereas claim 55 recites "providing the type of target module."  In the context of these patents, this is a distinction without a difference.  The '135 patent specification explains that a "defined interaction" depends on the "exemplary embodiments of the target module." '135 Patent at 4:44–47.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

"The target module can be embodied by any of a variety of modules having different types of functionality (e.g., data storage, data communication, data input and output, user identification)." '135 Patent at 3:31–35.  Thus, the defined interaction is the functionality provided by the target module.  A data storage target module provides the defined interaction of data storage; a data communication target module provides the defined interaction of data communication; etc.  Indeed, the Court construed the term "defined interaction" to mean "an interaction [with a host computing device] that can provide one or more of a variety of functionalities."  Claim Construction Order at 48–49.  Thus, providing information regarding the defined interaction *is* providing information regarding the type of target module.

31. My conclusion that these steps are substantively identical is consistent with how both I and SPEX's expert Dr. Rhyne have treated this step previously in this litigation.  In my previous report regarding invalidity, I referred back to analysis regarding element 38a when analyzing whether element 55a was present in the prior art.  *See, e.g.,* Invalidity Report at ¶ 271.  Dr. Rhyne, in his infringement report, did the same, explaining that the language in 55b is "very similar to the language of Element 38b of claim 38 of the '802 patent.  Like Element 38b of claim 38, this element describes responding to a request for information about the modular device (*i.e.*, an encrypting storage device) with information about the target module (*i.e.,* a storage device)."  Rhyne Infringement Report at ¶ 180.

11

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### d)     The "Operably Connecting" Limitation

32. Thus, the only substantive difference between claim 38 of the '802 patent and claim 39 of the '135 patent is the presence of one additional limitation in claim 55 – the "operably connecting" limitation.   I will discuss this limitation in significant detail later in this report.

### 2.     Claims 39 and 57

33. Below, I have set forth claim 39 of the '802 patent (limitation by limitation) on the left, and claim 57 of the '135 patent on the right:

| | |
|---|---|
| *For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of:* | *For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:* |
| *communicating with the host computing device to exchange data between the host computing device and the peripheral device;* | *communicating with the host computing device to exchange data between the host computing device and the modular device;* |
| *performing one or more security operations and the defined interaction on the exchanged data; and* | *performing one or more security operations and the defined interaction on the exchanged data;* |
| *mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first [p]ass through means for performing the one or more security operations.* | *mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and* |

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

> *operably connecting the security module and/or
> the target module to the host computing device
> in response to an instruction from the host
> computing device.*

34. As the court has construed the claims, claim 39 of the '802 patent is substantively

identical to claim 57 of the '135 patent, save for the last element of claim 57 (the "operably

connecting …" limitation, which is present in claim 57 but is not present in claim 39).  I go

through each limitation in detail below.

### a)    Preambles

35.  The preamble of claim 39 is the same as the preamble of claim 38; and the preamble

of claim 57 is the same as the preamble of claim 55.  Thus, for the reasons I discussed above,

these preambles are substantively identical.

### b)    First Steps

36. The first step of the method claimed by claim 39 is "communicating with the host

computing device to exchange data between the host computing device and the peripheral

device."  The only difference in language between the step recited in claim 39 and the step

recited in claim 57 is that in lieu of the "peripheral device" recited in claim 39, claim 57 uses

the term "modular device."  As the Court has interpreted these terms, this is not a

substantive difference.  Thus, these steps are both substantively identical.

37. My conclusion that these steps is consistent with how I and Dr. Rhyne have treated

this limitation earlier in this litigation.  In my previous invalidity report, I noted that the only

difference was the difference between "peripheral" and "modular," which I noted was not a

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

substantive difference.  *E.g.* Invalidity Report at ¶ 276.  In his infringement report, Dr. Rhyne stated that this step of claim 57 "is the same as Element 39a of the '802 patent" "[i]n view of the Court's constructions."  Rhyne Infringement Report at ¶ 189.

38. SPEX has also admitted that these two steps are the same through the designated testimony of its corporate witness.  When asked to identify any difference between the claims, SPEX's corporate witness explained that "[t]hose are, again, the same," acknowledging that "[t]he only difference between element 39A of the '802 patent and element 57a of the '135 patent is the difference between peripheral and modular."  Dec. Hakel Depo. at 71:22–72:4; 73:10–17.

### c)   Second Steps

39. The next step in both of the claims is linguistically identical: "performing one or more security operations and the defined interaction on the exchanged data."  The second step in claim 39 is therefore exactly and substantively the same as the second step in claim 57.

40. This conclusion is consistent with how both I and Dr. Rhyne have previously treated this limitation.  In my previous invalidity report, my analysis of these elements was the same.  *See, e.g.,* Invalidity Report at ¶¶ 263; 277–278.  Dr. Rhyne explained in his infringement report that element 57b (this step) "is the same limitation as Element 38b of claim 39 of the '802 patent."  Rhyne Infringement Report at ¶ 192.

41. SPEX has also admitted that these elements are the same through the testimony of its designated corporate witness:

**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

> Q. All right. Just so we can get it cleanly on the record, element 39B of the '802 patent is identical to claim 57B of the '135 patent?
>
> A. Yeah.

Dec. Hakel Depo. at 74:14–17.

### d)     Third Steps

42. The third step in claim 39 reads: "mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first [p]ass through means for performing the one or more security operations," whereas the third step of claim 57 reads "mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module."

43. The only linguistic difference between these elements (apart from the obvious typo in claim 39 "sass") is that claim 39 uses the terms "peripheral device" and "means for performing . . . . security operations"; but claim 57 uses the terms "modular device" and "security module."  In light of the Court's constructions, these are not material differences. As I have discussed previously, the Court construed the term "modular device" to have the same meaning as "peripheral device."  Claim Construction Order at 48–49.  The Court also construed the term "means for performing . . . security operations" to have the same meaning as "security module."  *Id.*  Thus, these linguistic differences are not substantive differences—these two elements are substantively identical.

44. My opinion is consistent with both my and Dr. Rhyne's previous opinions.  My previously invalidity analysis of these two limitations is the same.  *E.g.* Invalidity Report at ¶¶ 265, 279.  In his infringement report, Dr. Rhyne stated that element 57c (this step) "is the

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

same limitation as Element 39c of claim 39 of the '802 patent." *E.g.* Rhyne Infringement Report at ¶ 194.

45. SPEX has admitted these steps are substantively the same through the testimony of its designated corporate witness.  In response to questions as to whether the linguistic differences were material, the corporate witness testified that his (and therefore SPEX's) "interpretation is that is not a material difference because I would think it's almost implied in 57c as to what is happening."  Dec. Hakel Depo. at 77:18–21.

### e)      "Operably Connecting" Limitation

46. Thus, the only substantive difference between claim 39 of the '802 patent and claim 57 of the '135 patent is the presence of the last limitation in claim 57, which is the same "operably connecting" limitation recited in claim 55.

### B.      Commentary Regarding IPRs

47. The opinions I offer in this report are based in large part on events that occurred during two IPRs originally brought by Western Digital: (1) *Western Digital et al v. SPEX Technologies, Inc.* IPR2018-00082 (PTAB 2018)—challenging the '802 patent; and (2) *Western Digital Corporation et al. v. SPEX Technologies, Inc.*, IPR2018-00084 (PTAB 2018)—challenging the '135 patent.  Below, I briefly discuss aspects of these IPRs which inform the opinions I offer in this report.

### 1.      IPR2018-00082

48. In IPR2018-00082, Western Digital challenged, among other claims, the validity of claims 38 and 39 of the '802 patent.  Specifically, Western Digital asserted that claim 38 was unpatentable (the Patent Office's terminology for invalidity) because it would have been

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

obvious over U.S. Patent No. 5,887,145 to Harari ("Harari") in combination with a book

entitled "PCMCIA Systems Architecture: 16-BIT PC Cards" by Anderson ("Anderson").

Western Digital additionally asserted that claim 39 was unpatentable over Harari and

Anderson; or, alternatively, claim 39 would have been obvious over Harari and Anderson in

view of another patent—U.S. Patent No,. 6,199,163 to Dumas ("Dumas").

49. Western Digital asserted in this IPR that Harari generally describes a "peripheral in

the form of a PC card"—i.e. a card compliant with the PCMCIA standards.  *See* Petition for

IPR, Paper 1 at 16; *see also* Harari at 3:9–12.[1]  This card consists of a "mother card" – i.e. a

card that is designed to be plugged into a host computer; and a "daughter card" – a card that

is designed to be plugged into the mother card, as shown below:



Harari, Fig. 3 (pictured at page 17 of Western Digital's petition).  The daughter card provides

functionality—for example memory for storage—whereas the mother card has the necessary

---

[1] References in this section addressing the -84 IPR are to filings in the -84 IPR.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

hardware etc. for communicating with the host computer through the PCMCIA interface
standard.  *See* Petition at 17–18; *see also* Harari at 4:65–5:1.  As Western Digital asserted, the
daughter card in Harari "has identifying data that is readable by the mother card or the host
system coupled thereto" in order to allow the host computer to identify the type of daughter
card.  Petition at 17–18; *see also* Harari at 5:38–40.  The mother card has "functional
module(s)" which provide functionality as well—namely "error detection and correction,
***encryption and decryption***, compression and decompression," etc.  *See* Petition at 18; *see
also* Harari at 8:60–64.

50. Western Digital asserted in the IPR that Anderson "provides an overview of the
development of and purposes for the PCMCIA standards."  Petition at 19.  It generally
describes both the hardware and software aspects of the PCMCIA standards—including
discussion relating the card services portion of the specification which provides for
functions "that programmers can call to gain access to a card, determine its configuration
requirements, and request the system resources it requires."  Petition at 21; *see also* Anderson
at 28.  Mirroring my previous discussion of these same aspects of the PCMCIA standards in
my original invalidity report (*see, e.g.,* Invalidity Report at ¶¶ 234–239; 259–261, etc.),
Anderson discloses that the Card Information Structure of a PCMCIA standard "provides a
method for determine what kind of PC Card is installed, along with its speed, size, and the
system resources required by the Card."  Petition at 22; Anderson at 145–148.

51. Western Digital asserted in the IPR that Dumas discloses "an encryption circuit for
encrypting and decrypting data to and from" storage.  *See* Petition at 24; Dumas at 1:49–51.
As relevant to the IPR, Dumas explicitly teaches that "[d]ata must pass through" the

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

described encryption circuit "to travel from the hard disk to processor 20" or vice versa.

Petition at 24–25; *see also* Dumas at 2:27–30.  This architecture is shown below:



Dumas, Fig. 2 (reproduced in Petition at 25).

52. The Board instituted review based on the grounds asserted in Western Digital's

petition for IPR, finding that Western Digital had a reasonable likelihood of proving that

claims 38 and 39 are unpatentable.  *See* Institution Decision, Paper 11.  As to claim 38, the

Board stated: "We are persuaded that the Petition has established a reasonable likelihood of

prevailing in showing claims 38 is unpatentable" based on the grounds set forth therein.

Institution Decision at 26.  The Board found that the preamble taught by the structures

shown in Harari and Anderson, and then further concluded that "[f]or purposes of this

Decision, Petitioner has sufficiently shown that the method steps of claim 38 are taught or

suggested by the combination of Harari and Anderson."  Institution Decision at 28–29.  As

to claim 39, the Board was not persuaded by the first ground asserted by Western Digital but

did conclude that Western Digital was likely to succeed as to proving claim 39 unpatentable

over Harari, Anderson, and Dumas.  The Board stated: "We are persuaded that the Petition

has established a reasonable likelihood of prevailing in showing claim 39 is unpatentable

over the combined teachings of Harari, Anderson, and Dumas …"  Specifically, the Board

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

found the preamble (which is the same as claim 38) and most parts of the claim taught by Harari and Anderson, and turned to Dumas for the "mediating" step of claim 39 (which requires data pass through the security component).

53. I understand that, if the Board chooses to institute an IPR, then pursuant to 37 C.F.R. § 42.120 a Patent Owner may, within three months after the institution decision (unless a different deadline is provided in an order from the Board), file a "Patent Owner Response" arguing for the patentability of claims in relation to "any ground for unpatentability not already denied." In my experience, having reviewed these types of responses as well as accompanying expert testimony often submitted with the Patent Owner Response—these papers allow for the Patent Owner to provide reasons to the Board (including rebutting arguments brought by the Petitioner) why the Patent Owner believes the claims are patentable. In my experience, Patent Owners do not generally pass up the statutorily provided opportunity to defend claims that are the subject of instituted IPR. This is because Patent Owners typically continue to believe in their patentability and have sound business reasons for seeking to avoid having the claims declared invalid.

54. I have been informed that SPEX did not file a Patent Owner Response in this IPR. SPEX did file a *pre-institution* preliminary response, but in relation to that filing did not offer any argument, expert testimony, or other evidence to try to convince the Board that claims 38 and 39 are patentable. I do not know why SPEX did not file a Patent Owner Response. What I will say is that their choice not to file a Patent Owner Response is not the customary practice in relation to IPRs.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

55. Indeed, Western Digital testified (through its designated corporate witness) that SPEX did not file a post-institution patent owner response, confirming that "SPEX did not try to defend the validity of Claims 38 and 39." January 3, 2020, Western Digital Rooklidge Depo at 15:21–16:5. The witness for Western Digital (Western Digital's lead counsel who oversaw the IPRs) stated that "SPEX's failure to file a response regarding Claims 38 and 39, which the Board had decided in its institution decision were likely to be held invalid, almost ***guaranteed*** that those patent claims would be held – not invalid, unpatentable in the words of the patent office." WD Depo at 16:13–18.

56. I also note that SPEX (through the testimony of its designated corporate witness) admitted that it knows claims 38 and 39 of the '802 patent are invalid:

> Q. So I'll ask again, does SPEX believe claims 38 and 39 of the '802 patent are invalid?
> A. Yes.

Dec. Hakel Depo. at 31:3–5.

57. In the end, claims 38 and 39 were found unpatentable (i.e. invalid) by the Patent Office. *See* Final Written Decision, Paper 40. Specifically, the Board was "persuaded by a preponderance of the evidence that claim 38 is unpatentable over the combined teachings of Harari and Anderson." Final Written Decision at 29. The Board was also "persuaded by a preponderance of the evidence that claim 39 is unpatentable over the combined teachings of Harari, Anderson, and Dumas" as well as another combination asserted by Western Digital which included another patent to Wang. *See* Final Written Decision at 41.

58. SPEX did not appeal this determination, meaning that these claims have been finally found invalid.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 2.    IPR2018-00084

59. In IPR2018-00084, Western Digital challenged, among other claims, claims 55 and 57 of the '135 patent.  Specifically, Western Digital alleged that claim 55 of the '135 patent was invalid over Harari and Anderson—the same combination which (as discussed above) the PTAB found to render obvious claim 38 of the '802 patent.  *See, e.g.,* Petition for IPR, Paper 1, at 2.[2]  Western Digital additionally alleged that claim 57 was unpatentable over Harari and Anderson; or, alternative, that claim 57 was unpatentable over Harari, Anderson, and Dumas—again, the same combination of references over which the Board found claim 39 of the '802 patent to be unpatentable.

60. This IPR proceeding was heard by the same panel of the Board that heard Western Digital's challenge to the '802 patent-the panel that (as discussed above) determined that claims 38 and 39 of the '802 patent were unpatentable.

61. The Harari, Anderson, and Dumas references involved in this IPR are the same references asserted by Western Digital in IPR2018-00082, therefore I will not repeat my discussion of each of these references again here as I have detailed them above.

62. Given the similarity of claims 55 and 57 of the '135 patent to claims 38 and 39 of the '802 patent and that the same prior art was asserted against both sets of claims, it is unsurprising that the Board instituted on these claims as well.  In its decision to institute, the Board found that Western Digital had established a reasonable likelihood of prevailing in showing claim 55 unpatentable over the combined teachings of Harari and Anderson.  *See* Institution Decision, Paper 11, at 23.  The Board additionally found that Western Digital had

---

[2] References in this section refer to filings in IPR2018-00084.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

established a reasonable likelihood of prevailing in showing claim 57 unpatentable over
Harari, Anderson, & Dumas. *See* Institution Decision at 35–36. I detail the Board's findings
at institution in greater detail below.

63. As to claim 55, the Board began by noting that SPEX offered no argument to rebut
Western Digital's mapping of Harari and Anderson to the preamble of claim 55. Indeed, in
its preliminary patent owner response, SPEX's arguments focused entirely on the
"receiving," "providing," and "operably connecting" steps recited in the claim. As to those
steps, the Board rejected SPEX's argument that Harari and Anderson failed to disclose "the
specific request and response required by the claims." Institution Decision at 25–26.
Pointing to Anderson's discussion of specific requests as to how the host computer requests
data regarding the type of device from the PCMCIA card and how the PCMCIA card
provides data in response, the Board found the "receiving" and "providing" steps taught.
*See id.* As to the "operably connecting" limitation, the Board rejected SPEX's argument
(which the Board recognized was unsupported by any evidence) that the "receiving"/
"providing" steps and the "operably connecting" steps must be totally distinct. *See id.*

64. As to claim 57, the Board found that Harari and Anderson were insufficient on their
own to teach every limitation of the claim, but found that Harari and Anderson together
with Dumas were sufficient. *See* Institution Decision, at 35–36. The Board again began with
the preamble (which it noted was the same as the preamble for claim 55), and found
Western Digital likely to succeed the noted above, nearly every limitation of claims 55 and 57
is substantively identical to an preamble taught by Harari and Anderson (particularly given
SPEX's failure to challenged Western Digital's mapping of the elements). The Board then

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

rejected SPEX's argument that the Petition hadn't sufficiently explained how the "performing security operations" step was performed in the prior art, and found that Harari and Anderson taught each of the communicating, performing, and operably connecting limitations as recited in claim 57.  As for the "mediating" step, the Board found that element taught by Dumas, which the Board noted explicitly taught such an arrangement.

65. Following institution, SPEX filed a Patent Owner Response, and Western Digital filed a Reply.  I briefly summarize the arguments presented in those filings below.

66. In the Patent Owner Response, SPEX argued that Western Digital's petition was insufficient in showing that Harari/Anderson teach using a security operation because (according to SPEX), Western Digital's reference back to a means-plus-function element was insufficient.  *See* Patent Owner Response, at 35–36.  This is the same argument SPEX made prior to institution—and it is exactly the same argument that the Board rejected at institution.  *See* Institution Decision, at 30 (rejecting SPEX's argument "that Petitioner's discussion of the security module in the preamble of claim 55 is in the context of a means-plus-function element and is not applicable to a related method step as is recited in claim 57").

67. SPEX also argued that Harari and Anderson filed to disclose the "operably connecting" step because (according to SPEX) the "operably connecting" step needs to be a separate communication than the "receiving" and "providing" steps.  Patent Owner Response, at 32–34.  This argument was rejected by the Board when SPEX made it prior to institution.  *See* Institution Decision at 26–27 (stating "[w]e discern no restriction that a single signal could not serve as both the recited 'request' and the recited 'instruction' to cause

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

two events—providing the requested data to the host computer and operably connecting the target and the host").

68. SPEX also repeats its argument that Harari and Anderson fail to disclose a "request" for information (Patent Owner Response at 29–30). The Board rejected this argument too at institution. *See* Institution Decision at 24–26.

69. As to new arguments, SPEX argues that a person of ordinary skill in the art (POSITA) would not have combined Harari and Anderson with Dumas. Patent Owner Response at 20–22. Notably, the Board found in the IPR of the '802 patent that a POSITA *would* combine these references, and found that the combination rendered nearly-identical claim 39 of the '802 patent invalid. And SPEX argued that the information requested must be different than the information given for the "receiving" and "providing" steps of claim 55. *See* Patent Owner Response at 23–39; Petitioner's Reply at 7–11.

70. We will never know what would have become of the challenged claims of the '135 patent, though, because the PTAB never issued a Final Written Decision. As Western Digital testified, the Board did not issue a Final Written Decision "[b]ecause there was a settlement entered into between all the parties to the IPR involving the '135 patent. That settlement was accepted by the board, and the board did not enter a final written decision." WD Depo, at 19:15–20. That agreement, according to Western Digital, was contingent on dismissal of the IPR, which meant that "regardless of what the PTAB would have ultimately found, [the] claims would not be found unpatentable" because of the settlement. WD Depo at 28:5–9.

25

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### C.   The "Operably Connecting" Limitation

71. Lastly, I will address the "operably connecting" limitation, and provide background on what this limitation means and what various witnesses (including SPEX's designated expert) have said regarding it.

72. As I previously explained in my original invalidity report, in a PCMCIA embodiment of the purported invention claimed by claims 55 and 57 of the '135 patent, "operably connecting …" is what a PCMCIA card does when it is connected to a host computer, according to the standards set out for PCMCIA cards.  Indeed, though the Court did not construe the step of "operably connecting …" the Court did construe the related term from the '802 patent – "means for operably connecting …" as being met by corresponding structure of a "PCMCIA interface and memory section 612a" (e.g., attribute memory as defined by the PCMCIA standard) that performs the function of "operably connecting …" *See* Claim Construction Order, at 50–51.  I understand that this limitation from claim 1 is a means plus function claims.  However, the function recited by this limitation is similar to the step required by the claimed method of claims 55 and 57.  As such, looking to how the Court construed the means-plus-function limitation of claim 1 of the '802 patent is appropriate.  As I explained in my previous invalidity report, in a PCMCIA card such as that disclosed by the prior art and as disclosed and claimed by the '135 patent, the host computer reads information from memory section 612a ("attribute memory"), allowing the host PC to "operably connect" to the PCMCIA card.  *See, e.g.,* Invalidity Report at ¶¶ 234–239; ¶¶ 338–346.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

73. The specification of the '135 patent itself acknowledges that the step of "operably connecting" is satisfied when a PCMCIA card connects to a host computer according to the processes set out in the PCMCIA standard.  An embodiment disclosed by the '135 patent is a PCMCIA card.  *See, e.g.,* '135 Patent, at 9:33–36 ("the modular device can be embodied in a card or disk (e.g., a card conforming to a PCMCIA form factor as established by the appropriate standard)").  Indeed, SPEX has acknowledged (as it must, given the content of the specification) that one of the embodiments disclosed by the '135 patent is a PCMCIA card through the testimony of its designated corporate witness:

> Q. So we're clear on the record, I'll just ask it
>    again, does the '135 patent teach as one of
>    the embodiments of the claimed invention
>    a PCMCIA card?
>
> A. Yeah. Oh. Based on my read, this -- that
>    would be one of the embodiments, as
>    referenced in the patent.

Dec. Hakel Depo. at 80:24–81:10 (objections omitted).

74. In describing how the disclosed PCMCIA card "operably connects" to the host computer, the specification explains that such connection is established in conformity with the PCMCIA standards.  As the specification explains:

> Typically, once the presence of a new peripheral
> device is detected by the operating System
> Software of the host computing device, the
> operating System Software (or companion
> Software program) also identifies the type of the
> peripheral device. This can be accomplished, for
> example, by a standard software device driver
> (hereinafter, "host driver") for devices of the type
> that use the host computing device interface that
> is being used by the modular device 602. In FIG.
> 6, the host driver is shown stored in the memory
> section 606a of the memory device 606 of the
> host computing device 601. (***The Card Services***
> ***or Socket Services programs that often are***
> ***bundled with the Windows95™ operating***
> ***System Software for use in performing***

27

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*various "housekeeping" functions associated*
*with a PCMCIA interface are examples of*
*such drivers*.)

'135 Patent, at 9:51–65 (emphasis added).  The specification then goes on to explain that

"for many combinations of operating system software and device interface, the operating

system software waits for confirmation that the device connected to the device interface is

ready for further interaction with the operating system software before the operating system

software seeks to identify the type of the device connected to the interface (the standard for

PCMCIA interfaces, *specifies such operation*)."  '135 Patent at 10:15–23 (emphasis

added).  Thus, the specification is clear that the PCMCIA standard processes are sufficient to

perform the necessary processes for the claimed "modular device" to connect to the host

computer.  *See also, e.g.,* '135 Patent at 19:12–17 ("For example, a modular device according

to the invention can be adapted for insertion into a PCMCIA slot of a host computing

device.  In such a modular device, the electrical and mechanical characteristics *and*

*protocol* for the host computing device I/O interface 806 are established in conformance

with the appropriate PCMCIA standards.") (emphasis added)

75. Indeed, the specification explains specifically how this happens.  When the modular

device is inserted, the host computer needs to identify the type of device in order to connect

with it.  As the specification explains "[o]ne way in which the operating system software of a

host computing device can identify the type of peripheral device is to access a known

memory section of a memory device of the peripheral device, as established by an interface

standard developed for that type of peripheral device."  '135 Patent, at 10:28–34.  The

PCMCIA standard is such an interface standard.  Indeed, the specification acknowledges

that "[t]his is true for a variety of peripheral devices, such as, for example, peripheral devices

28

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

that conform to the PCMCIA standard." '135 Patent at 10:34–36.  And, for an embodiment of the purported invention of the '135 Patent conforming with the PCMCIA standards, the process for connecting is laid out in the PCMCIA standard, specifically the portion of the standard "called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as 'attribute memory', that stores data identifying the type of the PCMCIA card." '135 Patent at 10:36–41.  This portion of memory (the "attribute memory") is identified in the specification as "memory section 612a," also called the "modular device identification data." '135 Patent at 10:47–49.

76. SPEX's designated corporate testimony also confirms that the PCMCIA standard is sufficient to practice the "operably connecting" step.  As excerpted above, SPEX's designee acknowledged that one embodiment disclosed by the '135 patent is a PCMCIA card. SPEX's designee also testified that "the PCMCIA standards describe how [a PCMCIA] device itself interacts with a computer."  Dec. Hakel Depo. at 86:3–7; *see also id.* at 96:6–17 ("PCMCIA does describe through its industry standards a way of interacting between the PCMI – PCMCIA card and a computer system").   And when specifically asked about the portion of the specification from column 10 that I discuss above (lines 15–25), SPEX's designated witness confirmed that this portion of the specification describes "how an operating system software interacts with the PCMCIA interface" (Dec. Hakel Depo at 87:7– 16) and confirmed that this section describes "what happens when you plug the PCMCIA card" described in the specification "into a computer" (Dec. Hakel Depo. at 88:24–89:5).

77. SPEX's corporate testimony further confirms that the PCMCIA standard is prior art to the '135 patent.  As Mr. Young (who was designated on certain technical topics by SPEX)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

testified, the "card information structures" that contain the attribute memory described above are "part of the PCMCIA standard" and that SPEX did not invent them. *See, e.g.,* Young Dep. at 96:23-98:16.

78. I also note that SPEX has not contested that the "operably connecting …" limitation is practiced by PCMCIA devices earlier in this litigation.   As noted above, I explained that "operably connecting …" is part of the PCMCIA specification and that any PCMCIA-compliant device (such as that disclosed by Jones or the Fortezza/Lynks cards) would practice the "operably connecting" step in my invalidity report.  *See* Invalidity Report at ¶¶ 234-239; ¶¶ 338-346.  In his responsive report, SPEX's expert Dr. Rhyne did not offer any competing expert testimony, and in fact did not address the "operably connecting" limitations at all in his discussion of my report.  For example, in Dr. Rhyne's discussion of claim 1 of the '802 patent (at pp. 81–84 of his report), Dr. Rhyne does not address element 1[e] –the "means for operably connecting …" limitation.  In Dr. Rhyne's discussion of claim 55 (at p. 88) and of claim 57 (at pp. 89–90), Dr. Rhyne similarly does not address the "operably connecting" limitations of these claims.  Similarly, Mr. Gomez—SPEX's other validity expert, did not address element 1[e] in responding to my report regarding the validity of claim 1 of the '802 patent (even though he did as to reports by others, namely reports by Mssrs. Clark and Jones – *see* Gomez Invalidity Report at 56).  Mr. Gomez's discussion of claim 57 of the '135 patent does not address the "operably connecting" limitation at all (*see* pp. 83–86.  And though Mr. Gomez criticizes pointing to the PCMCIA disclosure for multiple elements of the claim (which he, without explanation or evidence asserts is inconsistent with the claim language), he never opines that the "operably connecting" step

isn't practiced by a PCMCIA card when it is inserted into a computer according to the

PCMCIA standards (*see* ¶ 300 in his report).   Thus, throughout SPEX's case against

Kingston, there really hasn't been any dispute that the PCMCIA standard discloses the

"operably connecting …" step or that a card compliant with the PCMCIA standard would

practice the "operably connecting …" step.

## V.      CONCLUSIONS

79. For this report, I have been asked to evaluate the IPRs and corporate testimony

discussed above and offer technical opinions that I am informed relate to two aspects of this

case: (1) Kingston's counterclaims for patent misuses and related anti-trust causes of action;

and (2) the validity or invalidity of claim 55 and 57.  I provide my opinion relating to both

aspects separately below.

### A.      Technical Opinions Relating to Patent Misuse

80. As mentioned above, I have been asked to provide opinions based on my familiarity

with the technology underlying the '135 patent as well as my familiarity with the IPR

process.  I am informed by counsel for Kingston that Kingston has asserted counterclaims

against SPEX relating to the settlement agreement entered into between SPEX and the

proponents of the IPR against the '135 patent that ended the IPR prior to a final written

decision.  I am informed by counsel that Kingston asserts this settlement agreement

improperly preserved claims that would have otherwise rightfully be found to be

unpatentable by the PTAB, thus extending the life of these claims beyond the limits of the

rights rightfully within the patent grant.  I am also informed by counsel that Kingston asserts

that it is harmed by this allegedly improper agreement because SPEX is continuing to assert

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

claims 55 and 57 of the '135 Patent against it in litigation-claims which Kingston claims

SPEX knows to be invalid and which SPEX preserved only by entering into what Kingston

asserts is an anti-competitive settlement agreement.

81. I do not offer any opinion concerning the ultimate conclusion regarding patent

misuse.  Rather, what I have been asked to do in relation to the above claims is to evaluate

the IPR of the '135 patent and provide a reasonable litigant's view of it.  Specifically, I was

asked to evaluate whether a reasonable litigant familiar with patents and IPRs would have

expected SPEX to be successful in preserving its claims through the IPR process.  I have

also been asked to evaluate whether SPEX's continued assertion that claims 55 and 57 are

valid are objectively reasonable in light of the circumstances surrounding the IPRs and

admissions and statements made by SPEX.

82. Based on the record of the IPRs discussed above, and particularly in light of SPEX's

statements regarding the IPRs, it is my opinion that an objectively reasonable litigant would

have expected the PTAB to find claims 55 and 57 of the '135 patent unpatentable had the

PTAB been permitted to enter a Final Written Decision in the IPR.  It is also my opinion

that, following the result of the IPR of the '802 Patent, the filings in the IPR of the '135

patent, and particularly in light of statements made by SPEX through its designated

corporate witness, any continued assertion that claims 55 and 57 are valid is objectively

baseless.  I provide the bases for each of these opinions below.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 1.  An Objective Litigant's View of the IPRs

83. As I have noted above, claims 55 and 57 of the '135 patent are nearly substantively

identical to claims 38 and 39 of the '802 patent.  The only substantive difference between

claims 55 and 57 of the '135 patent and claims 38 and 39 of the '802 patent is that claims 55

and 57 recite, as the last step in each claims, "operably connecting the security module

and/or the target module to the host computing device in response to an instruction from

the host computing device."

84. In the IPR of the '802 patent (IPR2018-00082), the PTAB found claim 38

unpatentable over a combination of Harari and Anderson.  In the IPR of the '135 patent

(IPR2018-00084), the petitioners challenged claim 55 as being invalid over the combination

of Harari and Anderson.  Given that the very same panel of the Board assigned to the IPR

of the '135 patent found (in Western Digital's IPR of the '802 patent) that Harari and

Anderson would have been combined to teach each and every element of claim 38, it is

extremely likely that the same panel of the Board would have found those common elements

in claim 55 to be taught by the same combination of Harari and Anderson.  An objectively

reasonable litigant could not come to a contrary conclusion.  Thus, if claim 55 were to have

survived the IPR, it would have had to have been due to the presence of the last element –

the "operably connecting …" step.

85. In the IPR of the '802 patent (IPR2018-00082), the Board found claim 39

unpatentable over a combination of Harari, Anderson, and Dumas.  In the IPR of the '135

patent (IPR2018-00084), the petitioners challenged claim 57 as being invalid over the

combination of Harari, Anderson, and Dumas.  Given that the very same panel of the Board

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

assigned to the IPR of the '135 patent found (in Western Digital's IPR of the '802 patent) that Harari, Anderson, and Dumas would have been combined to teach each and every element of claim 39, it is extremely likely that the same panel of the Board would have found those common elements in claim 57 to be taught by the same combination of Harari, Anderson, and Dumas. An objectively reasonable litigant could not come to a contrary conclusion. Thus, if claim 57 were to have survived IPR, it would have had to be because of the last element – the same "operably connecting …" step recited in claim 55.

86. However, no reasonable litigant could have found the "operably connecting" limitation to not be taught by Harari and Anderson as well. For one, in the IPR of the '802 patent, the Board already found that Harari and Anderson sufficiently taught "PCMCIA standards [which] establish communication between a host and a peripheral device and, as part of that process, provide the host with device information regarding the function of the PCMCIA device." -82 Final Written Decision, at 30. The Board further found that Harari teaches storing identification information and that "Anderson discloses that such identifying information is read from the CIS memory of a peripheral device by a host device to identify the type of peripheral"—i.e. exactly the type of process described by the specification of the '135 patent for "operatively connecting …"

87. Western Digital pointed to these same disclosures of Harari and Anderson as disclosing "operatively connecting" in its petition. *See* -84 Petition for IPR, at 38–39. SPEX did not appear to dispute these teachings of Harari and Anderson, but rather asserted that they were insufficient because, according to SPEX, the "receiving" and "providing" steps must be accomplished through a separate communication between host PC and peripheral

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

than the "operably connecting …" step. *See* -84 Preliminary Patent Owner Response, at 21–22. In making this argument, SPEX neither cited case law nor evidence, and the Board rejected this argument at institution. As the Board noted, "Patent Owner does not identify support in the '135 patent that the required 'request' and the recited 'instruction' must be two different types of communication," and thus the Board "discern[ed] no restriction that a single signal could not serve as both the recited 'request' and the recited 'instruction' to cause two events—providing the requested data to the host and operably connecting the target and the host." -84 Institution Decision at 26–27. Following institution, SPEX repeated this same argument – again without citing to anything from the '135 patent specification or any case law that would require two separate communications. *See* -84 Patent Owner Response, at 32–34. As the Patent Owner response added nothing beyond what had already been rejected by the Board, a reasonable litigant would not have expected the Board to suddenly change its mind based on no new argument or evidence[3].

88. I also note that both Harari and Anderson teach PCMCIA-compliant cards. As I noted previously, in this litigation, I asserted that PCMCIA-compliant cards practice the "operably connecting …" step—and SPEX has not asserted otherwise. And I also note that the specification of the '135 patent, as well as designated corporate testimony from SPEX, also acknowledge that the PCMCIA specification teaches how a PCMCIA card "operably connects …" to a host computer.

---

[3] I understand that SPEX did submit an expert declaration along with its Patent Owner Response, and cites to that declaration in its discussion. However, in looking at the expert declaration, the expert similarly did not cite any portion of the '135 specification or any other support for his or her contention that "a person of ordinary skill in the art would understand that the claims contemplate two types of communication." *See* -84, Exhibit 2007, at 47–48.

89. Based on the above, a reasonable litigant would have expected the PTAB to issue a decision finding claims 55 and 57 unpatentable had SPEX not prevented the Board from doing so by entering into a settlement agreement.

## 2.      An Objective Litigant's View of the Litigation

90. For many of the same reasons, any continuing assertion that these claims are not invalid is objectively baseless.  As noted above, the claims would have (and should have) been found unpatentable in the IPR.  A reasonable litigant looking at the record of the IPR would expect that the PTAB would have reached this conclusion—rendering the claims unpatentable and unable to be asserted in litigation.  Just because the settlement agreement resulted in the Board not issuing a decision does not change the facts of what was presented in the IPRs—a presentation of prior art which teaches each and every element of claims 55 and 57.

91. Even beyond the IPRs, though, an objectively reasonable litigant would not believe that claims 55 and 57 are valid in light of certain admissions and other information provided by SPEX's designated testimony and its own experts.

92. SPEX testified under oath (through its designated corporate witness) that SPEX knows that claims 38 and 39 of the '802 patent are invalid.  *See* Dec. Hakel Depo. at 31:3–5. As such, SPEX knows and has admitted that each and every element of those claims are known in the prior art.  I am informed by counsel that I may consider such an admission as "admitted prior art"—similar to how I might treat a statement in a specification of a patent that a certain feature was known in the prior art.  As I have also noted above, the limitations of claims 55 and 57 are substantively identical to the limitations of claims 38 and 39—save

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

for the "operatively connecting …" step at the end of each of claims 55 and 57.  Thus, SPEX has admitted that every part of claims 55 and 57 were known in the prior art except for the "operatively connecting … " limitation.  As I have also noted above, I have previously opined that the "operatively connecting …" limitation is practiced by any PCMCIA-compliant card—a contention with which SPEX has not disagreed in this litigation.

93. SPEX has also admitted, in briefing before the Federal Circuit, that the PCMCIA specification is sufficient to practice the "receiving" and "providing" limitations of claim 55.  Specifically, SPEX stated to the Court of Appeals that:

> [o]ne of ordinary skill seeking to practice the invention of claim 55 with a PCMCIA card would know—without undue experimentation—that specific features described in the PCMCIA standard must be implemented in order to practice the claimed 'receiving' and 'providing' steps.  This is true even if those features are optional (*i.e.*, not mandatory) under the PCMCIA standard.

Response Brief at 24, *Kingston Technology Co. v. SPEX Technologies, Inc.*, CAFC Case No. 19-1256.

94. In addition, SPEX's own expert Dr. Rhyne has admitted that many of the claimed steps are practiced by PCMCIA-compliant cards.  In particular, Dr. Rhyne repeatedly admitted that elements 39a and 39b were practiced by any PCMCIA-compliant card:

> Q. Okay. So -- so **you agree then that by identifying a PCMCIA standard interface and usage in Harari, that is sufficient for him to meet the requirements of 38a and 38b?**
>
> A. **I agree**, but as I said, I don't think -- Dr. Clark never identified any disclosure within that standard. Look at the last sentence of Paragraph 141. 'Although Dr.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

> Clark points to the disclosure of the PCMCIA standard, he again fails to point to any request in that standard that meets this limitation.'

Rhyne Validity Depo at 65:15–24.

> Q. So it's your opinion that the PCMCIA standard on its own does not disclose the elements of 38a?
>
> A. 38a. Well, my first opinion, as I said in 41, is that doctor -- 141, that Dr. Clark didn't do it, but then I was asked further by Mr. Cote about, well, what was my opinion. *I think that the PCMCIA does disclose -- the PCMCIA standard does disclose receiving a request from the host computing device for information regarding the type of the peripheral device when a PCMCIA compliant device is plugged into a PCMCIA terminal.*
>
> Q. So when a PCMCIA compliant device is used with a PCMCIA compliant device, you believe that that would practice Element 38a?
>
> A. Again, I don't think Dr. Clark has pointed that out with any specificity, but I believe that there is -- *there is teaching within the PCMCIA standard of performing that step.*

Rhyne Validity Depo at 134:18–135:10.

> [Q.] So when a PCMCIA compliant device is used with a PCMCIA compliant standard, you, not anybody, you believe that there is a teaching of Element 38a?
>
> A. If -- if the host device has the appropriate driver and -- and the host device and the device that's plugged into the PCMCIA terminal are both compliant with the standard, there is teaching in the  standard –
>
> Q. Okay.
>
> A. -- as to how a request for information will take place.

Rhyne Validity Depo at 135:17–136:3.

> [Q.] So would it -- would it be correct to say that you would agree that the PCMCIA standard teaches providing to the host

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

> computing device in response to a request information of some type?
>
> A. I -- I think it does teach that in general.
>
> Q. Okay.
>
> A. Okay.
>
> Q. Does the PCMCIA standard also disclose in general teaching providing to the host computing device in response to a request information regarding the type of defined interaction?
>
> A. That is -- is within the standard, yes.

Rhyne Validity Depo at 137:11–21 (emphasis added).   As I have noted throughout this report, elements 38a and 38b are substantively identical to elements 55a and 55b.  The only remaining step recited in claim 55 is the "operably connecting" step –which (for reasons also described throughout this report) is also practiced by any PCMCIA card.

95. Below, I detail several additional grounds of invalidity based on recent admissions by SPEX.  As I will explain below, in my opinion these admissions render claims 55 and 57 invalid, as SPEX has admitted that each and every element of the claims is in the prior art.  In my opinion, a reasonable litigant in SPEX's position—faced with these admissions by its own expert and its own designated corporate witnesses—would conclude that claims 55 and 57 are invalid.

### B.    Further Opinions Concerning the Validity of Claims 55 & 57

96. In addition to the opinions relating to patent misuse, I have also been asked to further opine regarding the validity of claims 55 and 57 in light of SPEX's recent admissions concerning them.

97. As described further below, it is my opinion that the claims 55 and 57 are invalid based on what SPEX has admitted to be in the prior art and the admitted prior art from the

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

specification of the '135 patent; and that the claims are invalid over the admitted prior art in

combination with the Fortezza prior art I previously discussed in my previous invalidity

report.  The recent admission (from SPEX's corporate witness and from SPEX in its

briefing before the Federal Circuit, discussed above) also further bolster my opinion that

claims 55 and 57 of the '135 patent are invalid under 102(f) because SPEX did not invent the

subject matter but rather derived it from another.  I detail each additional ground of

invalidity below.

### 1. Invalidity Over Admitted Prior Art

98. I am informed by counsel that I may treat statements made by SPEX's corporate

witness as "admitted prior art."  I am also informed by counsel that statements made in the

specification of the '135 patent that certain material was known prior to the '135 patent also

as "admitted prior art."  Specifically, counsel has informed me that admissions made during

litigation that something is in the prior art will be binding on SPEX to the same extent as

any other admission and cannot be ignored by the jury.  I am informed that a statement

made to the Patent Office that a particular subject matter of another, or a reference or

invention of another is prior art, are binding on the applicant and makes that matter,

reference, or other invention prior art for all purposes of determining patent validity.

### a) Claim 55

99. Through the testimony of its designated corporate witness, SPEX has admitted that it

knows claim 38 of the '802 patent is invalid.  Dec. Hakel Depo. at 31:3–5 ("Q. So I'll ask

again, does SPEX believe claims 38 and 39 of the '802 patent are invalid? A. Yes.").  I am

informed by counsel that I may treat this as an admission by SPEX that the preamble (to the

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

extent it is limiting) and each and every element of claim 38 is admitted prior art, and that I

may treat the subject matter claimed by claim 38 as prior art.

100.    In its brief to the Federal Circuit, SPEX has also admitted that the "receiving"

and "providing" steps recited by claim 55 are disclosed in the PCMCIA specification.  *See*

Response Brief at 24, *Kingston Technology Co. v. SPEX Technologies, Inc.*, CAFC Case No. 19-

1256.  I am informed by counsel that I may treat this as an admission that the "receiving"

and "providing" limitations were known in the art.

101.    The preamble of claim 55 reads:

> *For use in a modular device adapted for communication*
> *with a host computing device, the modular device*
> *comprising a security module that is adapted to enable one*
> *or more security operations to he performed on data and a*
> *target module that is adapted to enable a defined*
> *interaction with the host computing device, a method*
> *comprising the steps of:*

As I have discussed above (*see* paras. 19–25), the preamble of claim 55 of the '135 patent is

substantively identical to the preamble of claim 38 of the '802 patent—which has been

admitted by SPEX to be in the prior art.  SPEX's designated corporate witness admitted that

that there were not substantive differences between the two.  *See* para. 23, *supra*.

Accordingly, to the extent the preamble is found to be limiting, the preamble to claim 55 is

admitted to be in the prior art.

102.    The first step recited by claim 55 reads:

> *receiving a request from the host computing device for*
> *information regarding the type of the modular device;*

As I have discussed above (*see* paras. 26–28), the first step of claim 55 of the '135 patent is

substantively identical to the first step of claim 38 of the '802 patent.  Indeed, SPEX's

designated corporate witness admitted that there were no substantive differences between

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the first step of claim 38 and the first step of claim 55.  *See* para. 26, *supra*.  Claim 38 has been

admitted to be in the prior art by SPEX's own designated corporate witness, and indeed

SPEX's own chosen expert witness has admitted that this step is performed by any prior art

PCMCIA-complaint device.  *See* Dec. Hakel Depo. at 31:3–5 ("Q. So I'll ask again, does

SPEX believe claims 38 and 39 of the '802 patent are invalid? A. Yes."); *see also* para. 95,

*supra*.  SPEX also admitted that this limitation was practiced by PCMCIA compliant card in

briefing before the Federal Circuit.  *See* para. 94, *supra*.  Accordingly, the first step of claim 55

is admitted to be in the prior art.

103.     The second step recited by claim 55 reads:

> *providing the type of the target module to the host*
> *computing device in response to the request; and*

As I have discussed above (*see* paras. 29–31), the second step of claim 55 of the '135 patent is

identical to the first step of claim 38 of the '802 patent—which SPEX has admitted is in the

prior art through its designated corporate testimony.  I also note that SPEX's chosen

expert—Dr. Rhyne—has also admitted that the second step of claim 38 was known in the

prior art PCMCIA standard.  *See* para. 95, *supra*.  SPEX also admitted that this limitation was

practiced by PCMCIA compliant card in briefing before the Federal Circuit.  *See* para. 94,

supra.  Accordingly, the second step of claim 55 is admitted to be in the prior art.

104.     The third and final step recited by claim 55 reads:

> *operably connecting the security module and/or the target*
> *module to the host computing device in response to an*
> *instruction from the host computing device.*

As I have discussed above (*see* paras. 73–75), the specification of the '135 patent explains that

this step is practiced, among other ways, according to the PCMCIA standard, which the

specification acknowledges is prior art to the '135 patent.  Indeed, the specification refers to

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

how this accomplished as part of the "standard" operation when a PCMCIA card is inserted into a host computer. *See, e.g.,* '135 patent, at 10:55–65 (explaining that how the claimed modular device connects to the host computer is "accomplished, for example, by a ***standard*** device driver" such as the "Card Services or Socket Services programs that often are bundled with the Windows95™ operating system software for use in performing various 'housekeeping' functions associated with a PCMCIA interface" (emphasis added)). I also note that SPEX's designated corporate representative also testified that the specification of the '135 patent explains that a connection between the host computer and the modular device is accomplished according to the PCMCIA specification, which is prior art to the '135 patent. *See* paras. 76–77, supra. I understand and agree that the '135 patent may not be limited to an PCMCIA-card embodiment, but I am informed by counsel that the disclosure of a single embodiment is sufficient to teach a limitation even where the limitation may also cover other embodiments. Accordingly, the last step of claim 55 is admitted to be in the prior art.

### b)    Claim 57

105.    Through its designated corporate testimony, SPEX has admitted that claim 39 of the '802 patent is invalid. I am informed by counsel that I may treat this as an admission by SPEX that the preamble (to the extent it is limiting) and each and every element of claim 39 is admitted prior art, and that I may treat the subject matter claimed by claim 39 as prior art.

106.    The preamble of claim 57 reads:

> *For use in a peripheral device adapted for communication*
> *with a host computing device, performance of one or more*

HIGHLIGHTED CONFIDENTIAL – ATTORNEY'S EYES ONLY

> *security operations on data, and interaction with a host*
> *computing device in a defined way, a method comprising the*
> *steps of:*

This identical to the preamble of claim 55, which is admitted to be in the prior art, as

discussed above at para. 101.

107.     The first step of claim 57 reads:

> *communicating with the host computing device to exchange*
> *data between the host computing device and the modular*
> *device;*

As I have discussed above (*see* paras. 36–38), the first step of claim 57 of the '135 patent

is substantively identical to the first step of claim 39 of the '802 patent.  SPEX has

admitted as much through the testimony of its designated corporate witness.  *See* para.

36, *supra*.  As the first step of claim 39 of the '802 patent is admitted to be in the prior

art, so too is the first step of claim 57.

108.     The second step of claim 57 reads:

> *performing one or more security operations and the defined*
> *interaction on the exchanged data*

As I have discussed above (*see* paras. 39–41), the second step of claim 57 of the '135 patent is

both substantively and linguistically identical to the second step of claim 39 of the '802

patent, as confirmed by SPEX's corporate testimony.  As the second step of claim 39 of the

'802 patent is admitted to be in the prior art, so too is the second step of claim 57.

109.     The third step of claim 57 reads:

> *mediating communication of the exchanged data between*
> *the host computing device and the peripheral device so that*
> *the exchanged data must first sass through means for*
> *performing the one or more security operations*

As I have discussed above (*see* paras. 42–45), the third step of claim 57 of the '135 patent

is substantively identical to the second step of claim 39 of the '802 patent.  Both SPEX's

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

designated corporate witness and SPEX's chosen expert has confirmed as much.  *See* paras. 44–45, *supra*.  Accordingly, because the third step of claim 39 of the '802 patent is admitted to be in the prior art, the third step of claim 57 also is admitted to be in the prior art.

110.     The fourth and final step of claim 57 reads:

> *operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.*

This is the same limitation as the last step of claim 55.  For the same reasons discussed with respect to that step (*see* para. 104), this step too is admitted to be in the prior art.

## 2.     Invalidity Over Admitted Prior Art in Combination with Fortezza

111.     As I have discussed above, in my opinion SPEX's admissions are sufficient basis to conclude that claims 55 and 57 are invalid.  It is also my opinion that SPEX's admissions in combination with my previous analysis concerning the Fortezza Card also render the claims invalid.  Specifically, in this section I supplement my prior opinions that claims 55 and 57 of the '135 patent are invalid over the Fortezza Crypto Card (*see* pp. 192–195 & pp. 196–197 in my previous invalidity report); over the Fortezza "Interface Control" Document (*see* p. 198 of my previous invalidity report); over the Fortezza Multi-Function Card (*see* pp. 198–201 of my previous invalidity report); and over the Lynks system (*see* pp. 201–203 of my previous invalidity report).  This report also supplements my opinion concerning the Fortezza Crypto Card and/or Lynks Card in View of the Knowledge of a Skilled Artisan (pp. 209–212 in my previous invalidity report).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

112.     As discussed in my earlier reports, each of the prior art cards are PCMCIA cards; and as such, SPEX's admissions bolster my opinion that the prior art Fortezza & Lynks cards practice claims 55 and 57.  SPEX's admissions largely follow from IPR determinations resulting from PCMCIA prior art (i.e. Harari and Anderson).  A person of skill the art, faced with such admissions, would naturally turn to the PCMCIA standard documents to learn more about the PCMCIA processes.  Thus, a person of skill and the art would and could implement PCMCIA standards that are not otherwise implicit in SPEX's admissions with SPEX's admission to arrive at the purported invention claimed by claims 55 and 57.

113.     As discussed above, all but the last element of each of claims 55 and 57 is admitted to be prior art because SPEX has admitted that claims 38 and 39 of the '802 patent are invalid.  SPEX also admitted in briefing to the Federal Circuit that the PCMCIA standard taught the "receiving and "providing" steps of claim 55.  The only element not covered by these admissions is the "operably connecting" limitation.  The "operably connecting" limitation is taught by the prior art Fortezza and/or Lynks cards at least because they are PCMCIA cards (indeed, the '135 patent points to the PCMCIA specification in its disclosure regarding how the modular device operably connects with the host computer).

114.     As I previously explained, according to the PCMCIA specification (which lays out how PCMCIA cards work), the Card Information Structure (or "CIS"), commonly called the Metaformat, contains information regarding the type of the peripheral device: "The information contained in the Card Information Structure ["CIS"] is commonly called the Metaformat."  PC Card Standard (DEF_INV0001770) at page 5-4 (also stating, "the primary

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

CIS be recorded in Attribute Memory starting at address zero").  Information regarding the type of peripheral device is kept in the Metaformat.  For example, the PC Card Standard states: "*The first tuple starting from address 0 in the ATTRIBUTE memory space must be either a 'Device Information tuple' (tuple code 01H)*, a 'Null Control tuple' (tuple code 00H), or an 'End of List tuple' (tuple code FFH, see Section 5.2.5.5 for processing).  *Id.* (emphasis added); *id.* at page 5-7 (specifying the "basic compatibility tuples"); page 5-13 ("The device-information tuples contain information about the card's devices.  The tuples contain: device speed, device size, device type, and address-space layout information for either Attribute-Memory or Common-Memory space."); *id.* at page 5-15 (describing the "Device Type Field"; "Bits 4 through 7 of byte 0 of the device-speed/ ID sequence indicate the device type.").  The PC Card Standard identifies the following Layer 1 Basic Compatibility Tuples:

**Table 5-2: Tuple Codes**

| Code | Name | Description |
|---|---|---|
| Layer 1 Basic Compatibility Tuples | | |
| 00H | CISTPL_NULL | Null tuple - ignore |
| 01H | CISTPL_DEVICE | The device information tuple (common memory) |
| 02H-07H | - | (Reserved for future, upward-compatible versions of the device information tuple). |
| 08H-0F | - | (Reserved for future, incompatible versions of the device information tuple). |
| 10H | CISTPL_CHECKSUM | The checksum control tuple. |
| 11H | CISTPL_LONGLINK_A | The long-link-control tuple (to Attribute Memory). |
| 12H | CISTPL_LONGLINK_C | The long-link-control tuple (to Common Memory). |
| 13H | CISTPL_LINKTARGET | The link-target-control tuple. |
| 14H | CISTPL_NO_LINK | The no-link-control tuple. |
| 15H | CISTPL_VERS_1 | Level 1 version/product-information tuple. |
| 16H | CISTPL_ALTSTR | The alternate-language-string tuple. |
| 17H | CISTPL_DEVICE_A | Attribute Memory device information. |
| 18H | CISTPL_JEDEC_C | JEDEC programming information (for Common Memory). |
| 19H | CISTPL_JEDEC_A | JEDEC programming information (for Attribute Memory). |
| 1AH | CISTPL_CONFIG | The Configuration tuple. |
| 1BH | CISTPL_CFTABLE_ENTRY | The Configuration-Table-Entry tuple. |
| 1CH | CISTPL_DEVICE_OC | Other operating conditions device information for Common Memory. |
| 1DH | CISTPL_DEVICE_OA | Other operating conditions device information for Attribute Memory. |
| 1EH-3FH | - | (Reserved for future standardization)> |

PC Card Standard at page 5-7.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

115.     The PC Card Standard also explains that the host computing device requests information from the CIS including the type of the peripheral: "*The routine that reads a given tuple should be coded to start by examining the tuple code.  ...  If the tuple code is known*, and if the tuple does not contain active registers (which is the case for all standard tuples), *then the routine should copy bytes into a buffer in main storage*.  Bytes should be copied from the code byte up to the last byte before the next tuple.  If the link field is FFH (meaning end-of-list) then a maximum of 256 bytes -the code byte, the link byte and 254 byte of potential tuple data- *should be copied from the card to the main store*."  PC Card Standard at pages 5-12 to 5-13.  Also, the Card Services Spec discloses multiple functions (*e.g.*, "Callback," "GetConfigurationInfo," "GetFirst/NextTuple," and "GetTupleData") that allow for "operably connecting" in response to the instruction: "Card Services clients may need to process a PC Card's Card Information Structure (CIS) to determine if and how they will interact with a card detected in a socket.  (Some clients may receive all the information they require from the CARD_INSERTION event).  The Client Utilities functions reduce the code required for individual clients to perform such processing.  GetFirst/NextTuple allow a client to traverse the OS without being aware of how tuple links are evaluated.  The client may concentrate on what to do with tuple data without having to duplicate the link traversal code.  The client retrieves the contents of the tuple by using GetTupleData."  Card Services Spec at 3-12.  *See also, e.g.*, Card Services Spec at pages 3-20 to 3-21 (stating that, for a "CARD_INSERTION" event, Card Services uses a "Callback" function that "attempts to read the [CIS]" and "uses device information from the [CIS] to create region description structures in its internal data area"; "Clients may have enough information provided by a

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

GetConfigurationInfo request to determine if they wish to use the PC Card.  If they do not have enough information, clients may use Card Services functions to further process the CIS.  Clients may process tuples directly using the memory ReadMemory functions or use the tuple processing functions GetFirst/NextTuple, GetFirst/NextRegion or GetFirst/Next Partition."); page 3-24 (stating that "[t]he CLIENT_INFO event requests that the client return its client information data," and indicating that the request uses the "Callback" function); page 5-20 (stating that the "GetConfigurationInfo" function "returns information about the specified socket and PC Card configuration").  In addition, according to the Card Service Spec, the "RequestConfiguration" function "configures the PC Card and socket.  Card Services will apply power to the socket if the socket was not powered.  This function must be used by clients that require an I/O interface to their PC Card.  The ClientHandle returned by RegisterClient is passed in the Handle argument.  RequestIO and RequestIRQ must be used before calling this function to specify the IO and IRQ requirements for the PC Card and socket.  After finding an appropriate configuration, RequestConfiguration establishes the configuration in the socket adapter and PC Card."  Card Services Spec at pages 5-67 to 5-68.  Further, "The ConfigIndex field is the value written to the Option register for the configuration index required by the PC Card."  Card Services Spec at page 5-68.  The PC Card Standard similarly states: "The Configuration Option Register is used to configure the card and to issue a soft reset to the card.  The register is a read/ write register which contains two fields.  The Configuration Option Register must be implemented in all configurable cards," PC Card Standard at page 4-35, and includes the below summary of fields in the Configuration Option Register:

| SRESET | SRESET Card. Setting this bit to one (1) places the card in the reset state. This is equivalent to assertion of the +RESET signal except that this bit is not cleared. Returning this bit to zero (0) leaves the card in the same unconfigured, reset state as following a power-up and hardware reset. This bit is set to zero by power up and hardware reset. |
|---|---|
| LevlREQ | Level Mode interrupts selected when bit is one (1), Pulse Mode interrupts selected when bit is zero (0). |
| Conf Index | Configuration Index. This field is written with the index number of the entry in the card's Configuration Table which corresponds to the configuration which the system chooses for the card. When the Configuration Index is 0, the card's I/O is disabled and will not respond to any I/O cycles, and will use the Memory Only Interface. |

*See also* PC Card Standard at page 4-11 ("A card remains in the unconfigured state until the

Card Configuration Option Register has been written with a valid configuration."); page 4-34

("Each configurable card is identified by a Card Configuration Table in the card's Card

Information Structure.  These cards must have one or more of a set of Card Configuration

Registers which are used to control the configurable characteristics of the card.").

116.     That these portions of the PCMCIA specification are practiced by the

Fortezza Crypto Card is confirmed by the documents concerning the Fortezza and/or Lynks

cards, as I discussed in my previous invalidity report.  *See* Invalidity Report, at paras. 339–

344; 391; 408–411.

117.     Accordingly, the Fortezza and the Lynks cards practice the "operably

connecting" step.

### 3.     Supplemental Opinion Regarding Derivation

118.     As I explained in my previous invalidity report, in my opinion all asserted

claims of the '802 and '135 patents are invalid because they were derived from NSA—which

developed the Fortezza Card and communicated the technical details of the Fortezza Card

to Spyrus (the predecessor in interest and original owner of each of the '802 and '135

patents).  The admissions made by SPEX and SPEX's expert (discussed above), bolster my

conclusion that the purported inventions were derived from communications from NSA

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

because SPEX has now acknowledged that the subject matter claimed by claims 38 and 39 were known in the art.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## MATERIALS CONSIDERED

Patents
USP 6,088,802
USP 6,003,135

Materials from IPR2018-00082
I considered the record in this IPR, with a particular focus on the following documents:

Petition for Inter Partes Review, Paper 1
5,887,145 to Harari ("Harari"), Exhibit 1004
PCMCIA System Architecture ("Anderson"), Exhibit 1006
U.S. Patent No,. 6,199,163 to Dumas ("Dumas"), Exhibit 1005
Expert Declaration of Martin Kaliski, Exhibit 1015
Patent Owner's Preliminary Response, Paper 6
Institution Decision, Paper 11
Final Written Decision, Paper 40

Materials from IPR2018-00084
I considered the record in this IPR, with a particular focus on the following documents:

Petition for Inter Partes Review, Paper 1
Harari, Exhibit 1004
Anderson, Exhibit 1006
Dumas, 1005
Expert Declaration of Martin Kaliski, Exhibit 1016
Patent Owner Preliminary Response, Paper 8
Institution Decision, Paper 14
Patent Owner Response, Paper 22
Expert Declaration of Zaydoon Jawadi, Exhibit 2007
Petitioner's Reply, Paper 30
Joint Motion to Terminate, Paper 36
Settlement Agreement, Exhibit 2010
Order Dismissing Proceedings, Paper 40

Depositions
December 19, 2019, 30(b)(6) Deposition of Tom Hakel
January 3, 2020, Western Digital Rooklidge Depo

Expert Reports
My Previous Invalidity Expert Report
Infringement Report of Dr. V. Thomas Rhyne
Response Invalidity Report of Dr. V. Thomas Rhyne
Response Invalidity Report of Mr. Gomez

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

<u>Court Documents</u>
Claim Construction Order
SPEX's Response Brief in CAFC Case No. 19-1256

<u>Other Documents</u>
PC Card Standard (DEF_INV0001770) (cited and discussed in my previous invalidity report)

For the avoidance of doubt, I considered all materials cited in this report and additionally drew upon my previous review of materials used in my previous invalidity report.