# Exhibit P

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    SPEX TECHNOLOGIES, INC.,

5              Plaintiff,
                              Case No.:
6         v.                  8:16-CV-01790-JVS-AGR

7    KINGSTON TECHNOLOGY COMPANY,
     INC., ET AL.,
8
               Defendants.
9    _____

10

11          30(b)(6) DEPOSITION OF EXPERT

12              JOHN VILLASENOR, Ph.D.

13                  VOLUME I

14

15              March 9, 2020

16              10:10 a.m.

17

18

19       201 Montgomery Street, Suite 375

20          San Francisco, California

21

22

23   REPORTED BY:
     Siew G. Ung
24   CSR No. 13994, RPR, CSR

25

1

BARKLEY
Court Reporters

```
1    APPEARANCES:

2

3         For SPEX TECHNOLOGIES, INC.

4              RUSS, AUGUST & KABAT
               MARC A. FENSTER, ESQ.
5              12424 Wilshire Boulevard, Twelfth Floor
               Los Angeles, California 90025
6              310.826.7474
               mfenster@raklaw.com
7
          For KINGSTON TECHNOLOGY COMPANY, INC., ET AL.
8
               FISH & RICHARDSON P.C.
9              OLIVER J. RICHARDS, ESQ.
               12390 El Camino Real
10             San Diego, California 92130
               858.678.4715
11             ojr@fr.com

12

13

14

15        Also Present:

16             Michael Barber, Videographer

17

18

19

20

21

22

23

24

25
```

2

BARKLEY
Court Reporters

```
1                    INDEX TO EXAMINATIONS

2

3              WITNESS: JOHN VILLASENOR, Ph.D.

4    EXAMINATION                                    PAGE

5    BY MR. FENSTER                                    7

6    BY MR. RICHARDS                                 146

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

```
 1                    INDEX TO EXHIBITS

 2                JOHN VILLASENOR, Ph.D.

 3                Monday, March 9, 2020

 4           Siew G. Ung  CSR No. 13994, RPR

 5

 6   MARKED               DESCRIPTION                PAGE

 7

 8   Exhibit 1         Plaintiff SPEX Technologies,      6

 9                     Inc.,'s Third Supplemental

10                     Notice of 30(b)(6) Deposition to

11                     Kingston Technology Corporation,

12                     Kingston Digital, Inc., and

13                     Kingston Technology Company,

14                     Inc. (11 pages)

15

16   Exhibit 2         January 20, 2020, Expert Report  12

17                     of John Villasenor (55 pages)

18

19

20

21

22

23

24

25
```

4

BARKLEY
Court Reporters

```
 1                    (Exhibits Continued)

 2    MARKED                 DESCRIPTION                    PAGE

 3

 4    Exhibit 3          Appeal from the United States     57

 5                       Patent and Trademark Office,

 6                       Patent Trial and Appeal Board in

 7                       No. IPR2017-01021, Decided:

 8                       February 21, 2020 (13 pages)

 9

10    Exhibit 4          Appeal from the United States     59

11                       Patent and Trademark Office,

12                       Patent Trial and Appeal Board in

13                       No. IPR2018-01002 (8 pages)

14

15    Exhibit 5          Declaration of Zaydoon Jawadi,    83

16                       Case No. IPR2018-00084

17                       (57 pages)

18

19

20

21

22

23

24

25
```

5

BARKLEY
Court Reporters

```
 1              SAN FRANCISCO, CALIFORNIA;

 2         MONDAY, MARCH 9, 2020, 10:10 A.M.

 3                    ***

 4         (Whereupon, Exhibit 1 was premarked

 5              for identification.)

 6         THE VIDEOGRAPHER:  Good morning.  My name

 7   is Michael Barber.  I'm a videographer associated

 8   with Barkley Court Reporters, located at 201

 9   California Street, Suite 375, San Francisco,

10   California 94111.  The date is March 9, 2020, the

11   time is 10:10 a.m.  This deposition is taking place

12   at the Barkley Court Reporters' office in San

13   Francisco, in the matter of SPEX Technologies, Inc.,

14   versus Kingston Technology Corporation et al. in the

15   US District Court, Central District of California,

16   Case No. 8:16-CV-01790-JVS-AGR.

17         This is the videotaped deposition of John

18   Villasenor, Ph.D., being taken on behalf of the

19   plaintiff.

20         Counsel, would you please identify

21   yourselves for the record and state whom you

22   represent.

23         MR. FENSTER:  Marc Fenster for the

24   plaintiff.

25         MR. RICHARDS:  Oliver Richards for the
```

6

BARKLEY
Court Reporters

1    Kingston defendants.

2            THE VIDEOGRAPHER:  Thank you.

3            Would the court reporter now swear in the

4    witness.

5                JOHN VILLASENOR, PhD,

6      having been first duly sworn, was examined and

7                testified as follows.

8              EXAMINATION BY MR. FENSTER

9        Q.  Good morning, Dr. Villasenor.

10       A.  Good morning.

11       Q.  I've placed before you what's been marked

12   as Exhibit No. 1, which is a notice of deposition,

13   notice of 30(b)(6) deposition to Kingston Technology

14   Corporation, Kingston Digital, Inc., and Kingston

15   Technology Company, Inc.

16           Do you see that?

17       A.  I do.

18       Q.  Have you seen Exhibit 1 before?

19       A.  I believe I have.

20       Q.  And are you -- do you understand that you

21   are designated by Kingston to speak on their behalf

22   as the 30(b)(6) deponent?

23           MR. RICHARDS:  Objection.

24           THE WITNESS:  My -- my understanding is

25   I'm designated for a subset of the topics listed

7

BARKLEY
Court Reporters

```
 1    here, not for all of them.
 2    BY MR. FENSTER:
 3         Q.  Okay.  And is it your understanding that
 4    you are designated to speak on behalf of Kingston
 5    for Topics 40 through 45, 50 through 52, 56, 59, 63,
 6    67, and 78?
 7         A.  I don't specifically remember, but if --
 8    there's another document which I -- I don't have in
 9    front of me which does actually list the specific
10    topics, and if -- if -- if what you've read is the
11    topics listed then -- then the answer is yes, but I
12    don't recall.
13         Q.  Okay.  Do you know what a 30(b)(6)
14    deposition is?
15         A.  I think I have a general idea.
16         Q.  What is your understanding?
17         A.  My understanding is a 30(b)(6)
18    deposition -- a 30(b)(6) witness is a witness who is
19    provided to testify regarding the facts -- certain
20    facts for certain agreed upon topics, and in doing
21    so, is speaking for the company.
22         Q.  Do you understand that the 30(b)(6)
23    witness is -- strike that.
24              In response to a 30(b)(6) deposition
25    notice, do you understand that Kingston is required
```

8

BARKLEY
Court Reporters

1    to identify the person most knowledgeable regarding

2    these facts for Kingston?

3         A.  I don't -- I don't know all the details of

4    how 30(b)(6) witnesses are identified, so I don't

5    recall specifically having hearing -- heard that,

6    but I don't have any reason to dispute it.

7         Q.  You never heard "person most

8    knowledgeable"?

9         A.  I may have, but I -- I -- I don't

10   specifically recall having heard that.

11        Q.  Are you the person most knowledgeable at

12   Kingston regarding the topics on which you've been

13   designated?

14        A.  I -- I don't know.  I can't say for --

15   with certainty because I don't know the level of

16   knowledge of -- excuse me.  I don't know the level

17   of knowledge of -- of everyone at Kingston regarding

18   each one of these topics.  I only know that I've

19   been designated to speak on behalf of Kingston

20   with -- regarding these topics.

21        Q.  You've been involved in a number of

22   litigations as a technical expert; is that correct?

23        A.  Yes, I have.

24        Q.  And in your experience as a technical

25   expert, you've had occasion to review various

9

BARKLEY
Court Reporters

1    30(b)(6) depositions, correct?

2         A.  That is correct.

3         Q.  And is it fair to say that a 30(b)(6)

4    deposi- -- deponent or the person designated to

5    speak for the company is usually a corporate

6    representative, an officer or director or employee

7    of the company?

8         A.  In my experience -- I haven't done a

9    specific statistical tally, but in my experience, to

10   the best that I can recall, that is generally the

11   case.

12        Q.  And you are not an officer, director, or

13   employee of Kingston; is that correct?

14        A.  That is correct.

15        Q.  You don't hold any stock or have any other

16   interest in Kingston?

17        A.  Not that I'm aware of.

18        Q.  Okay.  You're here testifying on behalf of

19   Kingston because they're paying you to testify on

20   behalf of Kingston, correct?

21        A.  I'm here testifying because I was --

22   I'm -- I'm retained in the litigation, and I was

23   asked to testify in the litigation including in

24   relation to these topics.

25        Q.  And you are being paid for that testimony,

10

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

1    correct?

2          A.   I am being paid for my work on the matter

3    which includes any testimony that I give in the

4    context of my 30(b)(6) designation.

5          Q.   What did you do to prepare to testify as a

6    30(b)(6) deponent in this case?

7          A.   Well, I reviewed some of the documents

8    that were relevant to the topics for which I was

9    designated and, in many cases, the answers to the

10   topics are in document -- in my own report.

11         Q.   Anything else?

12         A.   Well, of course, I spoke with counsel for

13   Kingston about what topics they were asking me to

14   answer questions on.

15         Q.   Anything else?

16         A.   That's all I recall at the moment.

17         Q.   You didn't speak with anyone on behalf --

18   at Kingston to prepare for your deposition?

19         A.   I did not speak with anyone at Kingston

20   recently, to the best of my recollection.

21         Q.   Did you speak with anyone at Kingston to

22   prepare for your deposition?

23         A.   Let me answer the question this way.  I

24   have not spoken with King- -- not -- not recently,

25   not in the last several months, but part of the

11

BARKLEY
Court Reporters

1   preparation for my deposition includes all of the

2   work that I've done in this case, which includes

3   work several years ago, when it was -- before it got

4   stayed and then restarted.  And several years ago,

5   there were -- I did have occasion to speak with

6   people from Kingston.

7           Q.  Okay.  But is it fair that you didn't

8   do -- speak with anyone at Kingston to prepare to

9   testify as a 30(b)(6) witness in response to the

10  deposition notice in this case?

11          A.  Again, my work is -- I haven't spoken with

12  anyone at Kingston since seeing this deposition

13  notice, if -- if that answers the question.

14                  (Whereupon, Exhibit 2 was marked for

15                  identification.)

16  BY MR. FENSTER:

17          Q.  Okay.  I'll hand you what has been marked

18  as Exhibit 2.  This is -- this is the recent expert

19  report that you provided in this case regarding

20  patent misuse and further invalidity; is that

21  correct?

22          A.  This is a -- my -- my recent expert

23  report, that's correct.

24  BY MR. FENSTER:

25          Q.  And does this expert report contain all of

                              12

BARKLEY
Court Reporters

1  your opinions regarding the matters to which it

2  pertains?

3        A.  It can -- not necessarily.  You know, for

4  example, I have had occasion to think further since

5  submitting this report, based on new information.

6        Q.  Did Exhibit 2 contain all of your opinions

7  as of January 20, 2020?

8        A.  Again, it -- it contained the opinions

9  that I believe were necessary to answer the issues I

10  was asked to address, but I can't rule out that I

11  might have had other -- other thoughts that

12  weren't -- weren't in the report.

13        Q.  Is Exhibit 2 incomplete in some way?

14        A.  Not that I'm aware of.

15        Q.  Is it inaccurate in any way?

16        A.  Other than I think there's a typo

17  somewhere, or there's a word that's misspelled that

18  I ran across -- actually, there's a few of those

19  cases.  Like "information" is misspelled in two

20  places, and there's one -- one other place that I

21  saw a typo.  But other than -- other than that, I'm

22  not aware of any inaccuracies.

23        Q.  Who wrote Exhibit 2, who drafted it?

24        A.  I wrote some of it and the rest of it was

25  written at my direction by counsel.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I          

1        Q.  Which parts did you write?

2        A.  I don't specifically recall.  I mean, I

3    know -- I know that I wrote at least some of the

4    sections relating to my background, but I also was

5    involved in writing some of the other sections, but

6    I don't -- I don't recall exactly which words I

7    wrote, which words were written at my direction by

8    counsel.

9        Q.  Can you identify any of the substantive

10   matters in Exhibit 2 that you wrote as opposed to

11   counsel?

12       A.  Well, I think, again, it's important to

13   emphasize that anything in here was written either

14   by me or at my direction, but I don't have a

15   specific map in my head.  Although I do remember

16   that at least for the portion on my background, I --

17   I think I was the primary drafter of that alone

18   without speaking to counsel about it.

19       Q.  Can you identify any of the substantive

20   opinions that you wrote in Exhibit 2 as opposed to

21   counsel?

22       A.  Again, it's -- it was written at my

23   direction and with my input, so I -- I -- I don't

24   know how to answer your question because it's not as

25   if it was -- yeah, I mean, I was -- I was quite

                            14

BARKLEY
Court Reporters

```
 1   involved in -- in the process because it's

 2   expressing my opinions.

 3        Q.  Okay.  There are some things that you

 4   actually drafted by typing into the computer

 5   directly, correct?

 6        A.  That is correct, yes.

 7        Q.  Okay.  And there's other matters that you

 8   didn't draft directly, someone else did, right?

 9        A.  Well, again, it depends on what you mean

10   by "draft directly," I would, for example, have a

11   phone conversation, and then, based on that phone

12   conversation, counsel would write up what I had

13   discussed in the phone conversation, so I'm -- I'm

14   not sure exactly what you mean.

15        Q.  Can you identify any material other than

16   your background as to which you did the initial

17   drafting, the initial input into the computer?

18             MR. SHAPIRO:  Objection.  Asked and

19   answered.  Twice now.

20             THE WITNESS:  I know there was some

21   material like that, but I don't -- I don't

22   specifically recall.

23   BY MR. FENSTER:

24        Q.  So the answer is no?

25             MR. RICHARDS:  Objection.
```

15

BARKLEY
Court Reporters

```
 1          THE WITNESS:  Well, the answer is, again,
 2   that I know there was some, but I don't re- --
 3   recall off the top of my head which specific
 4   sentences and words I was the initial one to put pen
 5   to paper on and which were written by counsel at my
 6   direction and then sent to me for further editing.
 7   I -- I don't recall.
 8   BY MR. FENSTER:
 9          Q.  Did counsel send you a draft before you
10   spoke to him regarding the substantive opinions?
11          A.  I don't think so, but I don't recall.
12   It's -- there were multiple conversations, so I
13   don't exactly recall.
14          Q.  And when you say "counsel," who are you
15   referring to?
16          A.  Mostly Mr. Oliver Richards, but I also had
17   discussions -- it's been a while, but I do remember
18   discussions, I think, with Joanna Fuller.  Joanna
19   Fuller, F-U-L-L-E-R.
20          Q.  And you're not sure if you spoke with
21   Oliver and/or Joanna Fuller before they provided you
22   a draft opinion or if they provided a draft opinion
23   first; is that right?
24          A.  I think I -- I think I had -- I'm not
25   sure, but I think I had a -- had a conversation
```

16

BARKLEY
Court Reporters

1  first, and -- and, again, it wasn't as if -- it
2  wasn't as if there was one conversation and then a
3  draft showed up and that was the end of it.  My
4  recollection, although I may be misrecollecting, is
5  that there was a conversation, and then that kicked
6  off a process of -- of, you know, editing in which
7  I -- I would write some things, be provided some
8  things, provide feedback, in the normal manner, that
9  went back and forth, but I don't -- I couldn't give
10  you a specific -- I don't recall the specifics.
11        Q.  Do you hold yourself out as an expert in
12  reasonable litigation behavior?
13        A.  I think in the context of the opinion I
14  have been asked to draft here, it's a very specific
15  context, I do believe that I have expertise on -- on
16  that topic.
17        Q.  In your report, you identify your
18  experience with patent litigation, which has
19  primarily, as I understand it, been the context as a
20  hired technical expert.  Is that -- is that fair?
21        A.  Much of my experience has been in that
22  context, although I also have experience outside of
23  that context.
24        Q.  Do you have any legal training?
25        A.  I'm not sure what you mean by that

17

1    question.

2         Q.  Have you been to law school?

3         A.  I have not been to law school.  I'm a

4    professor of law, but I haven't been to law school.

5         Q.  Okay.  Have you taken -- are you a

6    registered patent agent?

7         A.  I am not a registered patent agent.

8         Q.  When you say you're a professor of law,

9    what do you mean?

10        A.  I'm a professor at the UCLA School of Law.

11        Q.  And what class, or classes, have you

12   taught at the -- at UCLA School of Law?

13        A.  So there's a constitutional law class,

14   it's -- it's called digital technologies and the

15   constitution in which I created and teach, and so we

16   look at the intersection of digital technologies

17   with -- with constitutional law, frameworks, as well

18   as other related statutory and common law

19   frameworks, so I created that course, I've taught it

20   a number of times.

21             I also have created and taught a course on

22   block-chain law and technology where we looked at

23   block-chain technologies and the related -- the --

24   the related --

25        Q.  That's fine.  Just --

18

BARKLEY
Court Reporters

1      A.   -- the related legal frameworks.  I'm

2  trying to answer your question.

3      Q.   You can just name -- name the classes.

4      A.   I was trying to give you a complete answer

5  here, and so I'd like to finish my answer.

6           So we looked at issues related to

7  securities laws and commodities laws as well as

8  other legal frameworks, so I've taught at the law

9  school for a number of years.  I can't remember

10  exactly how many.  And I do have a faculty

11  appointment there.

12      Q.   Okay.  Are those the only two classes that

13  you've taught there?

14      A.   Those are the -- I mean, I've been a guest

15  lecturer in other classes at the law school, but in

16  terms of classes where I am the primary instructor,

17  those are the two classes that I -- that I have

18  taught at the law school.

19      Q.   Have you ever taught patent law at the law

20  school?

21      A.   In -- as part of other classes, I have --

22  I haven't taught a class on patent law -- only on

23  patent law, but I have addressed it in my classes,

24  and I do teach an intellectual property class at

25  UCLA outside the law school -- or have -- have

19

BARKLEY
Court Reporters

 1   taught one.

 2        Q.  That IP class at UCLA outside the law

 3   school --

 4        A.  Yes.

 5        Q.  -- is that in the electrical engineering

 6   department?

 7        A.  That's offered jointly, it's a class

 8   be- -- jointly offered by the Anderson School of

 9   Management and the school of engineering, and it's a

10   class on intellectual property with a -- a strong

11   emphasis on patents, but not exclusively on patents.

12   And, in fact, you were a guest lecturer in that

13   class a few years ago, as you may remember.

14        Q.  Have you ever been a litigant in patent

15   law --

16        A.  Um.

17        Q.  -- in a patent case?

18        A.  I have -- have I been a litigant in the

19   sense of personally been suing somebody for a patent

20   infringement or being sued for patent infringement,

21   is that the question?

22        Q.  Yes.

23        A.  On a personal level, I have not, no.

24        Q.  Okay.  Have you ever been at a company

25   that has been -- strike that.

BARKLEY
Court Reporters

1            Have you ever been a general counsel of a

2    company that is either -- that is involved in patent

3    litigation?

4        A.  Well, I wouldn't be a general counsel

5    because that would be a person with a law degree,

6    but I -- I have been quite involved in litigation in

7    relation to companies that I'm working with.  Patent

8    litigation, I should say.

9        Q.  Okay.  What companies are those?

10       A.  So, for example, DivX is a comp- --

11           THE REPORTER:  D- --

12           THE WITNESS:  D-I-V-X.

13           -- is a company I've had some experience

14   with.  And -- and when I say "patent litigation"

15   here, I'm referring broadly also to the sort of

16   prelitigation discussions about licensing that often

17   proceed filing of litigation matters.  I've also

18   been involved in patent litigation through my

19   venture capital work.  Again, not personally in

20   terms of any patents I personally own, but in terms

21   of working with companies that are involved in

22   patent litigation of one form or another.

23   BY MR. FENSTER:

24       Q.  Are you an officer or director or employee

25   of DivX?

                            21

BARKLEY
Court Reporters

```
 1           A.   I am not.

 2           Q.   Were you directing patent litigation at

 3    DivX --

 4           A.   I was not --

 5           Q.   -- at any time?

 6           A.   I was not directing patent litigation, no.

 7           Q.   Were you hired as a technical consultant

 8    by DivX?

 9           A.   Over the years, that changed.  I was

10    org- -- initially hired as a technical consultant

11    but then over the years, my consulting relationship

12    evolved, so I was actually spending much less time

13    on that, and a larger fraction of my effort was

14    spent in relation to patent licensing -- matters

15    relating to patent licensing/litigation.

16           Q.   And were you working with general counsel

17    there or some -- or some in-house counsel at DivX?

18           A.   Yes, I was generally working with in-house

19    counsel, and I think there was some engagement with

20    outside counsel as well.

21           Q.   And what litigations have you been

22    involved with in anyway for DivX?

23           A.   I don't recall with enough confidence

24    to -- to state.

25           Q.   Can you give me any idea?
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

```
 1        A.   Again, I -- I don't -- some of them were

 2   quite a number of years ago.  I was working with

 3   DivX from roughly 2000 to roughly, I'm guessing,

 4   around 2016 or so.  I may have those dates wrong,

 5   but -- so -- some of the matters I was involved in

 6   were quite a number of years ago.  I -- I don't

 7   remember with enough clarity to answer questions

 8   about them.

 9        Q.   If you can identify any information about

10   the litigations that you were involved with at -- on

11   behalf of DivX --

12             MR. RICHARDS:  Objection.

13   BY MR. FENSTER:

14        Q.   -- or with DivX --

15             MR. RICHARDS:  Mischaracterizes testimony.

16             THE WITNESS:  No.  I -- I -- I remember

17   some information, but I -- I don't remember -- there

18   was some licensing dis- -- I don't remember which

19   licensing -- licensing discussions simply terminated

20   through a successful license between the parties and

21   which ones went to litigation, and I -- as I don't

22   remember that, I -- I wouldn't be able to identify

23   the parties because of confidentiality obligations.

24   BY MR. FENSTER:

25        Q.   Do you know the parties?  Can you
```

23

BARKLEY
Court Reporters

1   identify -- strike that.

2           If you were involved in a public

3   litigation, it was public, can you identify any

4   public litigations -- any actual litigations that

5   you were involved with on behalf of DivX?

6       A.   I -- I don't recall at the moment.

7       Q.   Okay.  Were you involved in any

8   litigations on behalf -- in connection with your

9   venture capital work?

10      A.   Yes.  There were -- there were

11  occasions -- again, this was quite a while ago, most

12  of it, but there were occasions where companies that

13  I was involved in were -- as -- as I remember,

14  sitting here today, involved in litigation matters.

15      Q.   Can you identify any?

16      A.   Again, I don't recall because it was a

17  number of years ago.

18      Q.   Can you identify any litigations that

19  you've been involved with on behalf of DivX or your

20  venture capital work after the American Invents Act?

21          THE REPORTER:  After the American?

22          MR. FENSTER:  Invents Act.

23          THE WITNESS:  You know, that's a good

24  question.  I mean, I'm assuming -- I mean -- well,

25  the AIA, there's -- I guess there's two dates,

                            24

BARKLEY
Court Reporters

1   right, there's the date of -- there's the date in

2   which it was actually enacted and then there's the

3   date in which things, you know, went into force, so

4   which -- which -- which date are you talking about?

5   BY MR. FENSTER:

6       Q.  Either, Dr. Villasenor.

7       A.  Um.  Because I think it was enacted in

8   2013, but I may be misremembering that.  So, you

9   know, I -- I think there were some around that time

10  frame, because I was asked, you know, by the

11  Brookings Institution to -- to write their policy

12  brief on AIA, and -- and I remember -- I think there

13  were some discussions that -- I remember that being

14  relevant to some discussions I was having with

15  the -- the other parties, but I -- I don't remember

16  the specifics.

17      Q.  So can you identify any public litigations

18  that you were involved with on behalf of either DivX

19  or your venture capital work post-AIA?

20          MR. RICHARDS:  Objection.  Asked and

21  answered.

22          THE WITNESS:  I don't recall -- I -- I

23  think there were some just because I know -- I -- I

24  think there were some IPR matters.  I'm pretty sure

25  there were some IPR matters which would have mean --

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1    which would have meant that that was after the AIA

2    because the AIA is what created the IPR proceeding,

3    but I don't remember the specifics.

4    BY MR. FENSTER:

5        Q.  Okay.  So in connection with the patent

6    litigation you've been involved with as a patent

7    expert, you identified DivX and venture capital

8    work.  Anything else?

9        A.  Not that I recall off -- off the -- off

10   the top of my head in terms of actual -- if you're

11   talking about actual litigation as opposed to -- as

12   opposed to analyzing litigation or teaching about it

13   or being involved in it in other ways.

14       Q.  Have you ever been an officer or a

15   director at a company that was involved in patent

16   litigation?

17       A.  Not -- I don't believe I have.

18       Q.  Have you conducted any surveys of patent

19   litigants?

20       A.  I'm not sure I understand the question.

21       Q.  Have you done any formal studies or

22   analysis to -- or surveys of parties to patent

23   litigation or IPRs?

24       A.  I'm -- I'm familiar with some surveys, but

25   I haven't actually, myself, gone out and asked a

26

1   bunch of litigants a series -- a series of survey

2   questions, if that's the question.

3         Q.  Okay.  So you have not conducted any

4   surveys of patent litigants to form the basis of

5   your opinions in Exhibit 2, correct?

6         A.  I didn't specifically conduct a survey of

7   patent litigants as part of my work, that's correct.

8         Q.  Okay.  Do you cite any surveys in

9   Exhibit 2, any surveys of patent litigants?

10        A.  I don't think -- I don't believe I do.

11  I'd have to look to be sure, but I don't recall that

12  I did.

13        Q.  You're aware that there are different

14  standards for invalidating a patent?

15        A.  I'm not sure what you mean by -- I mean,

16  there's -- there's a standard for invalidating a

17  patent depending on what the context is.

18        Q.  Okay.  What is the standard for in- --

19  invalidating the patent in this litigation with

20  Kingston -- between Kingston and SPEX?

21        A.  Just to be clear, are we talking about the

22  District Court litigation?

23        Q.  Yes.

24        A.  Okay.  So the standard -- I guess I would

25  more accurately say it's not for invalidating a

27

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

1   patent.  If it's for a claim, the standard is clear

2   and convincing evidence in District Court.

3        Q.  Okay.  And what standards are you aware of

4   for -- that the PTAB applies in IPRs?

5        A.  Specifically -- so once an institution

6   decision is made, the decision about whether a claim

7   is invalid or not is made according to the

8   preponderance of the evidence standard.

9        Q.  Okay.  And preponderance of the evidence

10  standard is lower than clear and convincing

11  evidence.  Is that fair?

12       A.  It's a lower burden of proof, that's

13  correct.

14       Q.  And you said once the institution decision

15  is entered or made -- do you know the standard for

16  the PTAB instituting a -- an IPR?

17       A.  Well, that's a different stage of the

18  process, and I believe it's -- has a -- a reasonable

19  likelihood of prevailing on, I think the statute

20  says, at least one claim, but I think the -- the

21  rule-making process has further clarified that so

22  it's done on a -- on a claim-by-claim basis.

23       Q.  Okay.  Would you agree that the reasonable

24  likelihood standard for institution is lower than

25  the preponderance of evidence standard?

28

BARKLEY
Court Reporters

1      A.  I would not agree with that.  I -- I don't

2  think they're -- I think they're different --

3  different stages.  I don't think it's an

4  apples-to-apples comparison.

5      Q.  Do you think the reasonable likelihood of

6  prevailing standard is higher at the institution

7  decision than the preponderance of evidence?

8      A.  Again, it's -- it's not a -- it's -- it's

9  not an apples-to-apples -- I mean, it's -- it's a

10  different stage of the process.  It's -- there's a

11  case, Titan Tire, in the Federal Circuit that gives

12  a really good example of how you can have different

13  standards at different stages of the -- the process,

14  so I don't think it's -- I -- I don't think you can

15  sort of line them up and -- I'll put it this way:

16  Had -- Congress was well aware of the existence of

17  standards such as preponderance of the evidence and,

18  you know, clear and convincing and -- and they did

19  not choose to sort of tie it specifically to -- to

20  one of those two, so I think it's a different thing

21  and not necessarily an apples-to-apples comparison.

22      Q.  Okay.  So you don't know whether -- or you

23  can't say that the reasonable likelihood of

24  prevailing standard is lower than the preponderance

25  of evidence?

29

BARKLEY
Court Reporters

1          A.  Again, I -- I don't -- I think it would

2     be -- you know, again, I -- I don't think it's a --

3     I don't think it's evaluated as, you know, of

4     necessity lower.  You know, if someone says -- if

5     there's reasonably likli- -- reasonable likelihood

6     of rain, that doesn't -- I don't think people would

7     necessarily assume it's certainly less than

8     50 percent, so...  It's a different standard.

9          Q.  You can't say whether the reasonable

10    likelihood of prevailing standard as applied by the

11    PTAB and IPRs is lower than the preponderance of

12    evidence standard as applied by the PTAB and IPRs?

13         A.  I don't recall a regulation specifically

14    stating that, no.

15         Q.  Do you agree that different standards can

16    result in different outcomes?

17         A.  In -- in general, it's certainly the case

18    that, you know, something could satisfy a

19    preponderance of the evidence but not clear and

20    convincing, for example, or not beyond a reasonable

21    doubt, that's -- that's certainly true.

22         Q.  Okay.  Are you aware of -- of any

23    instances where an IPR was instituted and the PTAB

24    panel found a reasonable likelihood of prevailing,

25    but ultimately found the patents not invalid under

30

BARKLEY
Court Reporters

1   the preponderance standard?

2        A.  Well, I'm familiar with some survey --

3   some data from Finnegan, Henderson, and so -- I

4   think that data showed something like 75 percent of

5   the claims that were initially -- were -- where the

6   IPR was instituted, the claims were eventually found

7   invalid up through the -- there was a case in 2018

8   that kind of complicated things, but up through

9   then.

10       Q.  Okay.  You agree that claims as to which

11  the PTAB found a reasonable likelihood of the

12  petitioner prevailing can be found not invalid at

13  the final written decision stage?

14       A.  So absent any other context or

15  conditioning, I think the statistics I read were

16  about 25 percent of the time that that would happen.

17  That's -- that's without any context.  There's --

18  there's a lot of additional context in my report for

19  this particular question, but stripped of any

20  context, I think the number -- the statistic I read

21  was about 25 percent of the time.

22       Q.  Is it true that claims as to which there's

23  been an institution decision can be held to be

24  patentable?

25       A.  Yes.  It is -- that's -- that's -- if that

31

BARKLEY
Court Reporters

1    wasn't true, there would be no need to -- to have

2    the -- the second stage of the inquiry, so, of

3    course, it is -- it's possible that a claim for

4    which an IPR has been instituted can in the end be

5    found to nonetheless be patentable.  That's a

6    minority of the outcomes, but that is possible.

7         Q.  Okay.  You're familiar with the '135

8    patent, correct?

9         A.  Oh, yes.

10         Q.  The '135 patent was dually issued by the

11    United States Patent and Trademark office after

12    examination, fair?

13         A.  As far as I'm aware.  You know, I'm not

14    aware of any irregularities in the prosecution,

15    although I don't recall the specifics.

16         Q.  Patents that are issued by the patent and

17    trademark office are entitled to a presumption of

18    validity, correct?

19         A.  That is correct.

20         Q.  Once issued by the patent and trademark

21    office, a patent is valid until invalidated by a

22    competent body, correct?

23         A.  I think that's the normal course of

24    events.  I mean, I -- you know, yes, it's presumed

25    to be valid, but -- but that presumption can be

32

BARKLEY
Court Reporters

1    overcome, you know, with a District Court finding or

2    an ITC finding or an IPR finding adverse to the

3    patent claim.

4         Q.  Okay.  And the '135 patent is being

5    asserted by SPEX against Kingston in District Court,

6    correct?

7         A.  That is correct.  Or certain claims in the

8    patent, that's right.

9         Q.  Okay.  And the '135 patent was involved in

10   various IPR proceedings both between Kingston and

11   other parties, correct?

12        A.  Ah, yes.  My understanding is there were

13   IPRs -- I'm -- I'm familiar -- specifically I opined

14   relating to Western Digital, but I am aware that

15   there were others as well.

16        Q.  Did you review any of the other IPRs,

17   those filed by Kingston, in connection with your

18   report?

19        A.  Not that I recall.

20        Q.  Is Claim 55 of the '135 patent currently

21   subject to any IPRs that you're aware of?

22        A.  I think it -- there might be an appeal

23   related to that, but I'm not sure.  I don't remember

24   the specifics.

25        Q.  So you don't know the current status of

33

BARKLEY
Court Reporters

1    the -- strike that.

2         What appeals regarding Claim 55 of the

3    '135 patent are you aware of?

4         A.  I don't recall.  I've seen -- I've seen

5    various -- I mean, I think there was a -- I don't --

6    I don't re- -- there was recall a ruling even

7    recently, I think, from the Federal Circuit that

8    related to one of the patents at issue in the

9    District Court litigation.  I don't recall off the

10   top of my head which one it was, and there may have

11   been another appeal as well.  I just -- that -- that

12   was outside the scope of my report, so I don't have

13   the details.

14        Q.  Did you review the recent Federal Circuit

15   opinion regarding the '135 patent?

16        A.  I -- I looked at it -- I looked at --

17   there was a Federal Circuit opinion issued, if I

18   remember correctly, just in the last two weeks or

19   so.  And I remember looking at that relatively

20   briefly.

21        Q.  Did it relate to any of your opinions?

22        A.  It didn't, as far as I know, cause me to

23   change any opinions, but I -- I just don't recall --

24   if -- if you give me a copy, I can refresh my

25   memory, but I don't -- I don't recall exactly.  I

34

BARKLEY
Court Reporters

1  can't recall exactly what it said.

2       Q.  So as between Kingston and SPEX, are you

3  aware of any other opportunities for the '135 patent

4  to be invalidated other than in an IPR or in

5  District Court litigation?

6       A.  I'm not aware.  I mean, if -- if there are

7  such opportunities, I'm -- I'm not aware, but I -- I

8  know that the '135 patent is contested in District

9  Court, for example, but I don't know -- I'm not

10 aware of others.

11      Q.  Is it your opinion that no reasonable

12 litigant could believe that the '135 patent will not

13 be invalidated under a clear and convincing standard

14 in this District Court litigation?

15      A.  I don't believe I've offered that opinion.

16      Q.  Is it your opinion that no reasonable

17 litigant could believe that the '135 patent will not

18 be invalidated in an IPR?

19      A.  I have offered the opinion -- well, let

20 me -- let me be specific to the claims.  I think --

21 let's see what I said here.

22      Q.  Can you answer my specific question?

23      A.  Well, I -- I addressed that specifically

24 in the report, so I'd like to refresh -- refresh my

25 memory.

1          Q.   Okay.  Dr. Villasenor, let me withdraw the

2     question and clarify it.

3          A.   Okay.

4          Q.   I understand that you offer a position as

5     to what you believe a reasonable litigant would have

6     thought might have happened in an IPR that was

7     terminated; is that correct?

8          A.   I -- I don't know if I'd agree with the

9     "might have happened" qualification.  I -- I think

10    when you do the -- the analysis, you say what you

11    believe the reasonable litigant would do.

12         Q.   Okay.  I'm asking about what will happen

13    in an IPR.  Okay?  In other words, is -- is there an

14    existing IPR where this Patent Claims 55 and 57 will

15    be invalidated or that a -- do you understand?  So

16    I'm trying to distinguish between your opinions

17    regarding what a reasonable litigant would have

18    thought about what might happen in a hypothetical

19    IPR versus what -- what will happen in existing

20    IPRs.  Do you have that in mind?  Do you understand

21    my distinction?

22         A.   I think so.

23         Q.   Okay.  So my question specifically is:  Is

24    it your opinion that no reasonable litigant could

25    believe that the '135 patent will -- strike that.

36

BARKLEY
Court Reporters

1            Is it your opinion that no reasonable

2    litigant could believe that Claims 55 and 57 of the

3    '135 patent will not be invalidated in an IPR

4    actually?

5            MR. RICHARDS:  Objection to form.

6            THE WITNESS:  Can I -- can you read that

7    again?

8    BY MR. FENSTER:

9        Q.  Is it your opinion that no reasonable

10   litigant could believe that Claims 55 and 57 of the

11   '135 patent will actually not be invalidated in an

12   actual IPR?

13           MR. RICHARDS:  Objection.  Same objection.

14           THE WITNESS:  It's a little bit hard to

15   parse the language just hearing it because it's got

16   sort of the double -- it's got all the negatives,

17   but I -- I've -- if I can -- the way I think of it

18   is, is that it is my opinion -- my belief that a

19   reasonable litigant would -- in light of all the

20   information, would find that -- you know, would have

21   expected that the -- that the -- the PTAB would find

22   those claims to be invalid in light of the -- the

23   art that was before the PTAB in the Western Digital

24   litigation and -- and the broader context of that

25   IPR and the related IPR for '802.

37

BARKLEY
Court Reporters

1  BY MR. FENSTER:

2      Q.  Okay.  So you're talking about what a

3  reasonable litigant would have expected would happen

4  under certain circumstances.  Okay?  That was your

5  answer.

6          My question is:  Is it your opinion that

7  no reasonable litigant could believe that Claim 55

8  of the '135 patent will be invalidated in an actual

9  IPR?

10     A.  You're asking --

11         MR. RICHARDS:  Objection.  Form.

12         THE WITNESS:  You're asking whether no

13  reasonable litigant could find that it will be

14  invalidated?  I've actually -- I've said -- I've

15  said I think that a reasonable litigant does believe

16  that -- would believe that it would be found invalid

17  in light of -- you know, in -- in that -- in the

18  I- --

19         THE REPORTER:  Oh, wait.  Can you repeat

20  your answer, again, sir?

21         THE WITNESS:  Yeah.

22         I -- I believe -- my --

23  BY MR. FENSTER:

24     Q.  Let me with- -- let me withdraw the

25  question.  I -- I'll strike the question, because

38

BARKLEY
Court Reporters

1    you're right, I misstated it.

2            Is it your opinion that no reasonable

3    litigant could believe that Claim 55 of the '135

4    patent will not be invalidated in an actual existing

5    IPR with Kingston?

6            MR. RICHARDS:  Objection to form.

7            THE WITNESS:  In -- in a Kingston IPR, is

8    that the question?

9    BY MR. FENSTER:

10       Q.  Yes.

11       A.  I haven't offered an opinion with respect

12   to Kingston IPRs.

13       Q.  Is it your opinion that no reasonable

14   litigant could believe that Claim 55 of the '135

15   patent will not be invalidated in any actual

16   existing IPR?

17           MR. RICHARDS:  Objection to form.

18           THE WITNESS:  I'm not aware of any IPRs

19   that are currently existing other than the Kingston

20   IPR, maybe there are more, but my opinion was

21   expressed specifically in relation to the Western

22   Digital IPR not -- not to any other IPR that may --

23   may be ongoing.

24   BY MR. FENSTER:

25       Q.  Okay.  The Western Digital IPR has been

                              39

BARKLEY
Court Reporters

```
 1    terminated, correct?

 2         A.  It has, yes.

 3         Q.  And the Western Digital IPR did not result

 4    in a final written decision finding Claims 55 or 57

 5    invalid, correct?

 6         A.  I think that's because the parties --

 7         Q.  Can you answer my question?

 8             MR. RICHARDS:  Objection.  He can -- let

 9    him answer, please.

10    BY MR. FENSTER:

11         Q.  It's a yes-or-no question.

12         A.  Yeah.  I think it's -- pursuant to a

13    settlement agreement, the IPR was terminated.

14         Q.  The Western Digital IPR did not result in

15    a final written decision finding Claims 55 or 57

16    invalid, correct?

17         A.  Pursuant to the settlement agreement

18    between Western Digital and SPEX, that's correct.

19         Q.  Claims 55 and 57 have not been found to be

20    invalid in any final written decision, correct?

21         A.  I am not aware that they have been found

22    invalid in a final written decision.  That's --

23    that -- that is correct, but -- but the -- the IP --

24    as my report addresses at some length, I believe

25    that a reasonable litigant would have concluded that
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1    they would be found invalid had that IPR not been

2    terminated.

3           MR. FENSTER:  Move to strike everything

4    after "I'm not aware that they've been found to be

5    invalid in a final written decision."

6    BY MR. FENSTER:

7       Q.  Dr. Villasenor, I'd appreciate it if you

8    would answer my questions.  I'm trying to ask you

9    very specific questions.  Your counsel will be able

10   to ask you any questions that he wants.  If you need

11   to answer -- if you can't answer a question "yes" or

12   "no," then, by all means, but I would appreciate a

13   direct answer to a direct question.

14          Will you try to do that?

15      A.  I reserve the right to add context, and

16   sometimes "yes" or "no" is not a -- is not a

17   sufficient answer to -- you know, if you ask me if

18   I'm still robbing banks, I -- I don't think I can

19   ans- -- since I'm not robbing banks and never have,

20   I -- I can't answer that question with just a "yes"

21   or "no," I think I need to provide explanation.

22      Q.  Dr. Villasenor, have Claims 55 or 57 been

23   found to be invalid in any final written decision in

24   an IPR, "yes" or "no"?

25      A.  I'm not aware that they were, but my

41

BARKLEY
Court Reporters

1    report addresses that at some length.

2          Q.  Are you aware of any IPRs which have found

3    Claims 55 or 57 to be not unpatentable in a final

4    written decision?

5          A.  Do you mean have been found to be

6    patentable?  Is that what you mean when you say "not

7    unpatentable"?

8          Q.  Yes.

9          A.  I think that may have been the case with

10   the Kingston IPR which is now on appeal, but -- and

11   then the appeal has -- has raised a question mark on

12   that final written decision, but I may have that

13   wrong because that's not -- that's not something

14   that I was opining on in my report.  I just remember

15   reading the opinion a week or two ago.

16         Q.  You didn't consider any of the Kingston

17   IPRs or the status of those IPRs or appeals in

18   connection with your report.  Is that fair?

19         A.  I -- I don't -- I don't recall addressing

20   those in my report or making those part of the

21   opinion in my report, that's right.

22         Q.  Do you agree that a panel at the PTAB

23   could reach a different decision under the

24   preponderance of the evidence standard in a final

25   written decision than it reached under the

42

BARKLEY
Court Reporters

1    reasonable likelihood standard at the institution

2    phase?

3              THE REPORTER:  Would have reached --

4              THE WITNESS:  I guess -- I guess I don't

5    really understand the question, because they're

6    different -- they're different decisions.  It's not

7    as if -- it's not as if they're making a decision on

8    patentability in both instances, one is -- one is

9    a -- is what's used to decide whether to institute

10   the decision, and -- the investigation, and -- and

11   the other is -- is the actual decision on

12   patentability, and so the question is phrased in a

13   way that -- that makes them more identical than I

14   think they actually are.

15             THE REPORTER:  More identical?

16             THE WITNESS:  More identical than I think

17   they actually are.

18   BY MR. FENSTER:

19        Q.  So if I understand your answer, the

20   institution decision is a decision whether to

21   institute the investigation of the IPR as opposed to

22   whether the patent is actually patentable or not?

23        A.  Well, I would say claims, not patents, and

24   it's a decision whether to institute, and, yes,

25   there's -- it's not a coin flip, the -- the -- the

43

BARKLEY
Court Reporters

1    institution decision is based on this reasonable

2    likelihood of success standard, but the record is

3    not yet complete at that point, and so it's a

4    different -- it's a different decision.

5         Q.  When you say "the record is not complete,"

6    what do you mean?

7         A.  Well, as I understand it, there's a

8    petition, the -- the way an IPR, somebody -- there's

9    a petitioner who asks, essentially, the -- the

10   PTO -- or represented in this case through the PTAB

11   to -- you know, it raises -- attempts to -- to make

12   a case that one or more claims are invalid, and then

13   the patent owner files often a preliminary response

14   and then the board, based on that information, makes

15   an institution decision, and if the board does

16   institute, then there's -- the -- the record is

17   further developed, for example, through the filing

18   of a patent doing a response and -- and then a reply

19   from the petitioner, and it's at that point, in a

20   typical case, that the board will then consider all

21   of that information, not all of which was available

22   to it at the moment of institution, and -- and

23   render its opinion.  Or maybe I -- well, maybe I

24   should say decision, not opinion.

25         Q.  After the record is further developed,

44

BARKLEY
Court Reporters

1    after the institution decision, it is possible

2    panels will find the claims that were -- as to which

3    IPRs were instituted valid.  Is that a possibility?

4         A.  It is a possibility.  Again, that's -- I

5    think I mentioned that 75 percent of the time that

6    that isn't what occurs, and -- but absent any other

7    context, it is -- it is, at least as of 2018 or so,

8    it was happening with about 25 percent of claims is

9    what -- is what I read.

10        Q.  You would agree that a panel can reach

11   different decisions on claims depending on what

12   information is available to it?

13        A.  I'm not sure I understand the question.

14        Q.  So in your expert -- in your report,

15   Exhibit 2, you refer to the '802 -- the Western

16   Digital '802 IPR?

17        A.  Yes, I did.

18        Q.  Okay.  And that patent -- or that IPR, you

19   cite for the final written decision finding

20   Claims 38 and 39 unpatentable, correct?

21        A.  Among other things, that's right, yes.

22        Q.  And that final written decision also

23   upheld various claims, including Claims 1 and 11 and

24   others of the '802 patent, correct?

25        A.  That's right.

BARKLEY
Court Reporters

1          Q.  Now, in the '802 patent, you mention in

2     your -- strike that.

3               In connection with that Western Digital

4     IPR regarding the '802 patent, you mention that

5     there was no patent owner response filed, correct?

6          A.  That is correct.

7          Q.  So it's fair that the board did not

8     consider any expert testimony from SPEX in

9     connection with that decision regarding Claims 38

10    and 39 of the '802 patent, correct?

11         A.  Not necessarily.  I don't recall whether

12    SPEX might have included expert testimony with a

13    patent owner preliminary response prior to

14    institution, so I -- I -- I don't recall that off

15    the top of my head.

16         Q.  Do you agree that it's possible that the

17    panel in the Western Digital IPR regarding the '802

18    patent could have reached a different decision if it

19    considered additional information?

20         A.  I -- I guess I'm not really sure -- if --

21    in a hypothetical, had the -- had the patent owner

22    provided additional information that, you know, in

23    theory, you know, could that have possibly caused

24    the board to -- to come to a different answer, I'm

25    not aware of any.  But I can't say with certainty.

46

BARKLEY
Court Reporters

1          Q.  If the board had additional information

2    available to it, it's theoretically possible that it

3    could have reached a different conclusion.  Is that

4    fair or not?

5          A.  I guess it's -- it's theoretically

6    possible sure, I mean, I can't say that there's no

7    possible way.  It's possible.  It's not what I wrote

8    that I expected in -- expected, but that's possible.

9          Q.  Did you talk to anyone at SPEX about why

10   they chose not to file a POR in connection with the

11   Western Digital IPR regarding the '802 patent?

12         A.  I did not.

13         Q.  Do you have any personal knowledge about

14   why SPEX made the decision not to file a POR in

15   connection with the Western Digital IPR regarding

16   the '802 patent?

17         A.  I do not.  I do not in the sense that if

18   your question is referring to, for example, internal

19   deliberations at SPEX, then -- then the answer is,

20   no, I'm not aware of such deliberations.

21         Q.  Did you reach a conclusion that no

22   reasonable litigant could believe that Claim 55 is

23   valid under the District Court litigation standard

24   of clear and convincing evidence?

25         A.  My analysis was focused on the IPR

47

BARKLEY
Court Reporters

1    proceeding, so I was addressing that proceeding.

2        Q.  So the answer's "no"?

3        A.  Yeah.  I was focused on the IPR.  I was

4    not asked to offer an opinion on what a reasonable

5    litigant would conclude in the District Court

6    proceeding.

7        Q.  Did you reach a conclusion that no

8    reasonable litigant could believe that Claim 57 is

9    valid under the District Court litigation standard

10   of clear and convincing evidence?

11       A.  Again, I was focused on -- I -- I did not,

12   as I was -- my opinion and my report was focused on

13   the IPR, not on the District Court matter.

14       Q.  Did you consider the effect of pros- --

15   IPR estoppel -- strike that.

16           Are you aware of estoppel under

17   Section 315(e)1 of the patent code?

18       A.  I'm generally aware.  I haven't memorized

19   the -- the language, but I'm generally aware of the

20   estoppel provision.

21       Q.  Did you consider the effect of IPR

22   estoppel in connection with rendering your report in

23   this case, Exhibit 2?

24       A.  I'm not sure I understand the question.

25   Yeah, it doesn't -- I -- I don't understand the

48

BARKLEY
Court Reporters

1    question because I was -- I was addressing an IPR,

2    so my understanding is the estoppel applies outside

3    the IPR, as a result of the IPR, but -- but not -- I

4    was not aware of any estoppel factors related to the

5    specific opinions I was offering on what the PTAB --

6    what a reasonable litigant would have expected on --

7    for the PTAB to conclude, for example.

8         Q.  Okay.  Your opinions -- strike that.

9             In your report, you state opinions that:

10   "No reasonable litigant could have believed the

11   patent's valid based on a combination of Harari,

12   Anderson or Harari, Anderson, and Dumas"; is that

13   right?

14        A.  I believe that -- I believe that's right.

15   And I think for -- for clarity, my opinion was that

16   a reasonable litigant would have expected that the

17   board in the '135 IPR would have concluded that

18   those claims were invalid in light of the references

19   you just cited.  That's -- that's -- that's the

20   opinion that I offered.  And just for reference,

21   that's in paragraph 86 of my report.

22        Q.  Okay.  And the IPR that you referred to as

23   the '135 IPR, that's actually the Western Digital

24   IPR regarding the '135 patent?

25        A.  That's correct, yes.

                          49

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

```
 1          Q.  Are you aware that Kingston sought to join

 2    that IPR as a party?

 3          A.  I don't recall that information.  I may

 4    have been informed, but I don't recall off the top

 5    of my head having heard that.

 6          Q.  Are you aware that the PTAB denied

 7    Kingston's motion to join that IPR -- the Western

 8    Digital IPR regarding the '135 finding that it was

 9    estopped from doing so based on its own IPR,

10    Kingston's own IPR?

11          A.  I don't recall.  Again, I may have been

12    told that, but I -- I don't recall having addressed

13    that in detail or considered that in any detail.

14          Q.  Are you aware that the Federal Circuit

15    affirmed the PTAB's decision denying Kingston's

16    petition to join the Western Digital IPR regarding

17    the '135, upholding the finding that it was estopped

18    from doing so based on the result of the final

19    written decision in the Kingston IPR?

20          A.  Same --

21              MR. RICHARDS:  Objection.  Form and

22    mischaracterizes of what the Federal Circuit found.

23              THE REPORTER:  Wait.  Objection.  Form --

24              MR. RICHARDS:  Mischaracterizes what the

25    Federal Circuit found.
```

BARKLEY
Court Reporters

1             THE REPORTER:  Mischaracterizes --

2             MR. RICHARDS:  What the Federal Circuit

3     found.

4             THE REPORTER:  Sorry.

5             THE WITNESS:  Yeah.  Same -- same answer.

6     BY MR. FENSTER:

7         Q.  Are you aware that Kingston has been found

8     to be estopped from asserting invalidity based on

9     Harari, Anderson, and Dumas?

10        A.  Again, same answer, I don't recall if I

11    have been told that or not.  I -- I don't -- I

12    personally have not offered invalidity opinions

13    based on those references in the District Court

14    case, so I -- I just don't know.

15        Q.  You were not involved in any of the

16    Western Digital IPRs regarding the '135 or '802

17    patents to which you've opined; is that fair?

18        A.  That is -- I was not personally involved

19    in -- for example, as an expert in those IPRs,

20    that's right.

21        Q.  And were you involved in any of the

22    Kingston IPRs regarding the '135 patent?

23        A.  As far as I recall, I was not.  It's been

24    a couple of years, but I don't believe so.

25        Q.  Do you know under what conditions or

                              51

BARKLEY
Court Reporters

1   circumstances IPR estoppel will be found to apply?

2        A.  Again, I haven't memorized the -- the

3   language, but I think a party is barred from raising

4   art that they did raise or could have raised in -- a

5   party that files an IPR is then estopped from

6   raising in later proceedings, or other proceedings,

7   art that they did raise or could have raised in

8   the -- in the IPR.  I think it's roughly -- roughly

9   that, but I don't remember the exact wording.

10       Q.  Are you aware that the PTAB has found that

11  Kingston admitted that it knew of or could have

12  raised the Harari, Anderson, and Dumas references?

13       A.  Again, same answer as before, I -- I don't

14  recall.  If I -- if I heard that, I don't recall

15  having heard that, so I don't know.

16       Q.  Do you have any reason to dispute that

17  Kingston was aware of or could have raised Harari,

18  Anderson, and/or Dumas --

19       A.  Um.

20       Q.  -- at the -- at the time of its -- at the

21  time it filed its IPRs.

22       A.  Again, as far as I recall, I wasn't

23  involved in -- in that at all, so I just don't know.

24       Q.  Do you have any legal expertise in IPR

25  estoppel?

52

BARKLEY
Court Reporters

1          A.   I don't believe I have offered opinions on

2     IPR estoppel.

3          Q.   Do you have any legal expertise in the

4     effect of appeals?

5          A.   I'm not sure what you mean by "the effect

6     of appeals."

7          Q.   The effect of Federal Circuit appeals from

8     IPRs.

9          A.   Again, I'm not -- I mean, I know that --

10    that the Federal Circuit is the appeal venue.

11         Q.   Do you have any legal expertise -- are you

12    holding yourself as an expert, a legal expert on the

13    effect of Federal Circuit appeals from IPRs?

14         A.   I don't believe I've held myself as a

15    legal expert on IPR appeals.

16         Q.   Have you had any formal training in what a

17    reasonable litigant -- patent litigant would do?

18         A.   I've certainly had quite a bit of

19    experience in patent litigation, and looking at, you

20    know, reasonableness and in -- in law in general,

21    I'm not sure what you mean by "formal training."  If

22    teaching in law school counts, then -- then I have

23    had experience in some of those things.

24         Q.   Do you cite in your report any studies of

25    litigation or objective litigant's behavior to

53

BARKLEY
Court Reporters

1   support your opinions?

2       A.  I don't recall citing specific studies

3   though I understand that a "reasonable litigant" or

4   "objective litigant" is -- is a term that is

5   understood in -- in -- in practice.

6       Q.  Have you surveyed the case law regarding

7   reasonable litigant or case law regarding the

8   behavior of a reasonable litigant or standards for

9   such?

10      A.  I actually have looked at case law -- some

11  case law and have some familiarity with -- with the

12  record in that respect.

13      Q.  What case law have you reviewed?

14      A.  I think there is a case related to real

15  estate professionals at Columbia -- at Columbia

16  Pictures that addressed the reasonable litigant.

17      Q.  Anything else?

18      A.  There's a number that -- a number of them

19  that come up.  Yeah, that's -- that's all that comes

20  to mind right now, but that was -- I think that was

21  an important case in that respect.

22      Q.  You state the opinion that:  "No

23  reasonable person could believe that Claims 55 or 57

24  of the '135 patent are valid."  Is that right?

25      A.  Can you show me the --

54

BARKLEY
Court Reporters

1    Q.  Is that your opinion?

2    A.  In the context of -- let me just see it

3  here.

4    Q.  Sure.

5    A.  No.  I offered -- I offered two -- I think

6  multiple opinions here.  One is I offered an opinion

7  that a reasonable litigant would expect that the

8  PTAB would find the claims invalid, and then I also

9  offered opinions supplementing my other invalidity

10  opinions in the District Court case.

11    Q.  Is it your opinion that no reasonable

12  person could believe that Claim 55 of the '135

13  patent is valid now?

14    A.  I don't recall saying exactly that.  I

15  think I offered an opinion relating to reasonable

16  litigant, I don't know if I used the phrase

17  "reasonable person."

18    Q.  Is it your person that no reasonable

19  litigant could believe that Claim 55 of the '135

20  patent is currently valid?

21    A.  I don't think I said exactly that phrase,

22  no.

23    Q.  Is it your opinion that no reasonable

24  litigant could believe that Claim 57 of the '135

25  patent is currently valid?

55

BARKLEY
Court Reporters

1    A.  I think what I said is that an

2  objective --

3    Q.  Can you answer my question?

4    A.  I'm trying to.

5    Q.  Go ahead.

6    A.  I think I said an objectively reasonable

7  litigant would not believe that those claims are

8  valid in light of various admissions.  It's in

9  paragraph 91 of my report where I address that.

10    In -- in reading this, I'm realizing that

11  I -- just to make sure there's no confusion, I was

12  answering questions about preponderance of the

13  evidence in relation to the IPR, but obviously, in

14  discussing the District Court litigation, I'm using

15  clear and convincing evidence.

16    Q.  Okay.  You agree that Claim 55 and 57 have

17  not yet been found invalid by either the PTAB or the

18  District Court; is that correct?

19    A.  Yeah.  It hasn't been adjudicated at the

20  District Court level -- well, actually, I -- I

21  should -- I should -- there may have been other

22  matters, but in terms of the matter I'm involved in,

23  which is Kingston, it hasn't been adjudicated and,

24  as I noted before, the PTAB never reached a final

25  written decision, so that's right.

1      Q.  Okay.  And in the one Kingston IPR where

2   it did reach a final written decision on Claims 55

3   and 57, it found that Claims 55 and 57 were

4   patentable, correct?

5      A.  Well, I think that's on appeal, and the

6   Federal Circuit has remanded it.  I think.  Unless

7   I'm -- unless I'm -- I may be getting my proceedings

8   confused, but I thought there was a remand.  But,

9   again, I may be missing things on that.

10               (Whereupon, Exhibit 3 was marked for

11               identification.)

12  BY MR. FENSTER:

13      Q.  I'm handing you what's been marked

14   Exhibit 3.  I'm sorry.  That's not what I was

15   looking for.  Let me see what -- may I have that

16   back?

17          MR. FENSTER:  What did I hand you?

18          MR. RICHARDS:  The opinion.  Are you

19   looking for the brief?

20          MR. FENSTER:  No, no, no.  This -- this is

21   right.  Okay.  I'm sorry.  I only have one copy.

22          MR. RICHARDS:  Okay.  I'm familiar with

23   it.

24          MR. FENSTER:  Yeah.

25  ///

BARKLEY
Court Reporters

1    BY MR. FENSTER:

2         Q.  I've handed you what's been marked as

3    Exhibit 3.

4         A.  Yes.

5         Q.  This is the February 21, 2020, decision in

6    the -- from the Federal Circuit in Kingston versus

7    SPEX; is that right?

8         A.  Ah, yes.

9         Q.  And this is an appeal from the IPR in

10   which the PTAB found in a final written decision

11   Claims 55 and 57 to be valid, correct?

12        A.  That is the -- the PTAB's decision was

13   that and then it was appealed by Kingston thus

14   leading to this ruling.

15           MR. RICHARDS:  I'm going to object to this

16   whole line of questioning as outside the scope of

17   either the 30(b)(6) or his expert report.

18   BY MR. FENSTER:

19        Q.  And in this report -- or in this opinion,

20   Exhibit 3, the Federal Circuit affirms the PTAB's

21   final written decision upholding the patentability

22   of Claim 55, correct?

23        A.  With respect to the Jones reference, that

24   is correct, and then they remanded on a -- remanded

25   on 57.

58

1          Q.   Okay.   Does that refresh your recollection

2    that the Federal Circuit affirmed the PTAB's final

3    written decision that Claim 55 was valid?

4          A.   That is -- that is correct.

5                    (Whereupon, Exhibit 4 was marked for

6                    identification.)

7    BY MR. FENSTER:

8          Q.   I'm going to hand you what's been marked

9    as Exhibit 4.

10              MR. FENSTER:   And, Oliver, this is the

11   July 19, 2019, Federal Circuit decision affirming

12   the dismissal of the first two IPRs.

13              MR. RICHARDS:   Can we just take a brief

14   break so I can get internet access in here?   Or is

15   there a wi-fi?   I'm so sorry.

16              MR. FENSTER:   Sure.

17              MR. RICHARDS:   Can we just go off the

18   record for a second?

19              THE VIDEOGRAPHER:   Going off the record.

20   The time is 11:30 a.m.

21                   (Discussion held off the record.)

22              THE VIDEOGRAPHER:   Back on the record.

23   The time is 11:40 a.m.

24   BY MR. FENSTER:

25          Q.   In the one Kingston IPR where the PTAB did

59

1    reach a final written decision on Claims 55 and 57

2    of the '135 patent, the PTAB found those claims to

3    be patentable, correct?

4          A.  I believe -- okay.  I don't -- I can't be

5    certain that there was only one IPR, but as far as

6    I'm aware -- I'm only aware of this one and in that

7    one, the PTAB found 55 through 57 to be patentable,

8    and -- but then on -- on appeal that was changed

9    with respect to that -- that was vacated with

10   respect to 57.

11         Q.  Okay.  And affirmed with respect to

12   Claim 55, correct?

13         A.  Correct.  Affirmed with respect to

14   Claim 55 and vacated with respect to 57 and remanded

15   back to the PTAB.

16         Q.  Are you aware that Kingston has filed

17   three IPRs challenging the '135 patent?

18         A.  Again, I don't recall the specifics of --

19   of the IPRs.  I have no reason to dispute that, if

20   that's what you represent.

21         Q.  With the appeal now concluded as to the

22   Kingston IPR with respect to the -- Claim 55 of the

23   '135 patent, would you agree that there's no

24   currently pending IPR that you're aware of in which

25   Claim 55 could be invalidated?

60

BARKLEY
Court Reporters

1          A.  I'm a little confused because a moment ago

2    you alluded to three Kingston IPRs, so I'm not aware

3    of the details of the other two.  I'm certainly

4    aware of this -- I don't how -- the Jones -- I'll

5    call it the Jones IPR, I'm aware of this, but I

6    wasn't familiar with the details of the others.

7          Q.  Are you aware that Kingston filed one IPR

8    that was denied institution?

9          A.  I -- I don't recall.  I don't know.

10         Q.  And are you aware that they filed another

11   petition in -- in an attempt to join the Western

12   Digital IPR on the '135 patent, which was dismissed

13   and denied?

14         A.  Your earlier question referenced that, but

15   I didn't recall having known that, although I might

16   have been told that.

17         Q.  Okay.  So -- I'm only asking what you're

18   aware of, Dr. Villasenor.  With respect to -- I'm

19   sorry.  Strike that.

20             With the appeal now concluded as to the

21   Kingston IPR with respect to Claim 55 of the '135

22   patent, are you aware of any currently pending IPR

23   in which Claim 55 could be invalidated?

24         A.  I'm -- I -- I -- I suppose that Kingston

25   has a right to petition the Supreme Court to appeal

1    the Federal Circuit's decision, so -- I don't -- I

2    don't know the details of that.

3        Q.   Other than appealing to the Supreme Court

4    or other -- strike that.

5             Other than further appeals from the

6    Federal Circuit's decisions, are you aware of any

7    IPR in which Claim 55 of the '135 patent could be

8    held invalid?

9        A.   Other than the appeal I mentioned, no, I'm

10   not aware.

11       Q.   And when you sat down to write your

12   report, you weren't aware that Kingston had filed

13   three IPRs against the '135 patent?

14       A.   I can't say that I affirmatively wasn't

15   aware.  I just don't recall what I was aware of.  I

16   just don't know.

17       Q.   It's not something you considered in

18   connection with your report?

19       A.   I don't believe I addressed it in my

20   report.

21       Q.   So even though the PTO dually issued

22   Claim 55 of the '135 patent, the PTAB affirmed the

23   validity of Claim 55 in a final written decision and

24   the Federal Circuit has affirmed that decision

25   upholding the patentability of Claim 55, it's your

BARKLEY
Court Reporters

1    opinion that no reasonable litigant could believe

2    that Claim 55 is valid, is that your opinion?

3            MR. RICHARDS:  Objection.  Form.  And

4    mischaracterizes what various bodies found.

5            THE WITNESS:  Yeah.  I -- I don't think

6    that's -- that's -- it's apples to oranges, right,

7    the -- the -- the -- the Federal Circuit's decision

8    to affirm was based on an IPR from a reference

9    called Jones, and so that's different from the art

10   that was before the PTAB in the Western Digital IPR

11   that was terminated, so I don't think one can draw

12   the conclusion that the Federal Circuit reached on

13   Jones does not of necessity imply that the same

14   conclusion would be applicable for a completely

15   different art.

16   BY MR. FENSTER:

17       Q.  And you're aware that the PTAB found that

18   Kingston had admitted that it was aware of the same

19   art that Western Digital asserted in its petition

20   when Kingston filed its petition; is that right?

21       A.  I -- I don't recall.

22       Q.  And Kingston, in its petition, chose not

23   to assert the prior art that Western Digital

24   asserted, right?

25       A.  I don't recall the details of Kingston's

63

BARKLEY
Court Reporters

1    petitions.  I don't -- for example, you alluded to

2    one that wasn't instituted.  I just don't know.

3           Q.  You agree that the patent office dually

4    issued Claims 55 and 57 of the '135 patent, right?

5           A.  I agree that they were issued by the

6    patent office pursuant to what I assume was a -- an

7    unremarkable prosecution process.

8           Q.  Okay.  And neither of those claims have

9    been invalidated in any PTAB proceeding, correct?

10          A.  I'm sorry.  55 and 57?

11          Q.  Correct.

12          A.  Well, I think that's -- with respect to

13   Claim 55, that's basically a correct statement, but

14   with respect to Claim 57, it's -- it's -- the

15   process hasn't finished, so it's still -- you know,

16   the process has not reached its conclusion yet.

17          Q.  Has Claim 57 been found to be invalid in

18   any final written decision of an IPR?

19          A.  At present, that has not occurred,

20   although, it's -- it is once again before the PTAB

21   on -- on remand, so that -- that could change when

22   they issue a new decision, but at present, that's

23   correct.

24          Q.  And no District Court has invalidated

25   Claims 55 or 57 of the '135 patent, correct?

64

BARKLEY
Court Reporters

1       A.  As far as I'm aware, that's correct, but I

2  know there's been some litigation recently, so I

3  don't know if that would have had an impact on that

4  question.

5       Q.  Do you agree that no court or

6  administrative body has found either Claims 55 or 57

7  invalid under the clear and convincing evidence

8  standard?

9       A.  So I think that standard would apply in

10  District Court, and I'm not aware that any District

11  Court litigation has reached that conclusion.  Or I

12  guess that would also apply in the ITC, but I'm

13  not -- not aware that the ITC has even considered

14  these claims.

15       Q.  And no court or administrative body has

16  found either Claims 55 or 57 invalid under the

17  preponderance of the evidence standard, correct?

18       A.  Again, with the important caveat about

19  Claim 57 in the Jones IPR, the -- I think other --

20  other than that, I think that's correct.

21       Q.  The caveat being that Claim 57 is still

22  subject to a remand?

23       A.  Correct.  It's -- it's before the board

24  and -- and the board may well issue an opinion

25  finding it unpatentable.

1      Q.  In reaching your conclusions regarding

2  what a reasonable litigant would believe with

3  respect to '135, Claims 55 and 57, you relied on the

4  board's decision in the Western Digital IPR

5  regarding the '802 patent for Claims 38 and 39,

6  correct?

7      A.  Among other factors, that was one of the

8  factors I considered, that's correct.

9      Q.  And in rendering the final written

10 decision, the board in the Western Digital IPR

11 regarding the '802 patent did not consider any

12 patent owner response or expert testimony in

13 connection with a patent owner response, correct?

14     A.  My recollection is that -- that is

15 correct, that SPEX did not file a patent owner

16 response.  So that was not before the board, that's

17 right.

18     Q.  You agree that there are differences

19 between Claims 38 and 39 of the '802 patent and

20 Claims 55 and 57 of the '135 patent, correct?

21     A.  I'm not sure what you mean by differences.

22 I -- I --

23     Q.  Are they identical, "yes" or -- are there

24 differences or are they identical?

25     A.  Well, I guess it depends on what the

66

BARKLEY
Court Reporters

1    question means, are there -- is the language word

2    for word identical, the answer is -- is no.  But as

3    explained at some length in my report, for example,

4    I believe, despite the differences in language, for

5    example, the preamble's -- and many of the claim

6    elements are identical -- are effectively identical

7    in what they cover.

8        Q.  In your report, Exhibit 2, starting at

9    page 5, you compare Claims 55 of the '135 patent and

10   Claims 38 of the '102 -- the '802 patent, correct?

11       A.  That's right.

12       Q.  Claim 55 includes the claim term "security

13   module" that is adapted to enable one or more

14   security operations to be performed on data.

15          Do you see that?

16       A.  Yes.

17       Q.  Okay.  And was that phrase construed by

18   the court?

19       A.  I think it was.  I don't have the claim

20   constructions in front of me.

21       Q.  Okay.  And there is no security module

22   limitation in Claim 38, right?

23       A.  It doesn't recite, literally, a security

24   module, that's right?

25       Q.  Is there any other -- strike that.

67

BARKLEY
Court Reporters

1          The court's construction of the security

2    module phrase that we just read requires a

3    corresponding structure -- strike that.

4          The court construed Claim 55 as a means

5    plus function in the claim term, correct -- of the

6    claim?

7          A.  I thought means plus function applied on

8    an element --

9          Q.  Fair.  Are you aware that the court

10   construed the security modules phrase as a means

11   plus function element?

12         A.  Yes, I am.

13         Q.  Okay.  And are you aware that the court's

14   claim construction for the security module means

15   plus function element requires a corresponding

16   structure of a specific hardware component

17   programmed or configured to perform a security

18   operation disclosed in the '802 patent at Columns

19   18, lines 1 through 47, or the '135 patent at Column

20   21, lines 29 through Column 22, line 9?

21         A.  I -- I haven't memorized the construction,

22   but to the extent that you've accurately read it,

23   that sounds right.

24         Q.  Okay.  Claim 38 doesn't similarly --

25   doesn't require any such corresponding structure,

68

BARKLEY
Court Reporters

1    does it?

2         A.  Well, the claim language does not include

3    literally a "security module," but I've addressed

4    this on paragraph 20 of my report.

5         Q.  So in paragraph 20, you say that:  "The

6    court construed 'security module' to have the same

7    meaning as the term security means."

8              Do you see that?

9         A.  Yes.

10        Q.  Okay.  Does Claim 38 recite a security

11   means?

12        A.  It does not use those words, but if you

13   look at the -- the language of the preamble and --

14   ant the spec, it -- it certainly requires, you know,

15   the -- the -- the same functionality.

16        Q.  Is it your opinion, Dr. Villasenor, that

17   Claim 38 require- -- is limited to the corresponding

18   structures identified in the court's claim

19   construction for security module or security means

20   or their equivalents?

21        A.  Can I have the construction again, please?

22             If I could have the written -- if I could

23   have the written constructions, that would be

24   easier.

25        Q.  The corresponding structure in the court's

69

BARKLEY
Court Reporters

1    claim construction for security module is a specific

2    hardware --

3         A.  I'm sorry.  Is it possible to get it in

4    writing?  It's just hard to -- for example, if

5    someone has my original report, it will be there

6    in -- in the chart.

7         Q.  I'm going to hand you a copy of your March

8    23, 2018, expert report of John Villasenor.  We're

9    not going to mark it as -- as an exhibit.

10        A.  I just need the table somewhere.

11             I'm sorry.  The question again.

12   BY MR. FENSTER:

13        Q.  Is it your opinion, Dr. Villasenor, that

14   Claim 38 is limited -- is limited to the

15   corresponding structures identified in the court's

16   claim construction for security module or security

17   means or their equivalents?

18        A.  If you look at the specification, I think

19   in practice, yes, it would be -- for example, it has

20   to be a -- you know, some sort of hardware component

21   -- or it has -- it certainly has to be a hardware

22   device for performing the security operations which

23   would be consistent with the structure for security

24   means.

25        Q.  Okay.  So, Dr. Villasenor, I want to make

1    sure that I got this right.  When you were doing

2    your technical analysis comparing Claims 38 and 35,

3    it was your understanding that Claim 38 required

4    a -- the corresponding structure that the court

5    identified for security means or security module; is

6    that --

7         A.  Well --

8         Q.  -- is that right?

9         A.  No.  It's not -- it's not specifically

10   written in means plus function form, but if you look

11   at in practice -- and so, you know, you don't have

12   to import a construction from a means plus function

13   construction, but if you look at in practice,

14   what -- what the spec shows that this claim

15   requires, in practice, it is going to be hardware

16   for performing the security operations.

17        Q.  Where -- where does Claim 38 limit the

18   security operations to be hardware versus software?

19        A.  Well, it -- if you look at the

20   specification, it's -- it's --

21        Q.  I'm asking about Claim 38, Dr. Villasenor.

22        A.  Well, I'm answering the question is that

23   you interpret, of course, the claim in light of the

24   specification, and so in light of the specification,

25   I think -- my understanding is that the parties -- I

71

BARKLEY
Court Reporters

1    think even SPEX's expert -- at least one of SPEX's

2    experts has -- has agreed that these claims recite

3    hardware security operations.

4         Q.  And where does Claim 38 require the

5    corresponding structure of -- that the -- from the

6    court's claim construction of security module?

7              MR. RICHARDS:  Objection.  Asked and

8    answered.

9              THE WITNESS:  Again, it doesn't -- I don't

10   think of it in terms of --

11   BY MR. FENSTER:

12        Q.  I'm not asking if it's a means plus

13   function.  I'm asking where does Claim 38 -- what --

14   what specifically in Claim 38 are you pointing to as

15   requiring or being limited to the corresponding

16   structures that the court identified in its

17   construction for security module?

18        A.  Well, as I mentioned, it recites in a

19   peripheral device performing security operations,

20   one or more.  And -- and if you look at the

21   specification at what happens in the peripheral

22   device and how those security operations are

23   performed, my understanding is that a person of

24   ordinary skill would understand the security

25   operations to be performed in hardware which is

72

BARKLEY
Court Reporters

1    consistent with the hardware identified in -- in the

2    corresponding structure of -- you know, hardware

3    component that would do that.

4    BY MR. FENSTER:

5        Q.   Okay.  So even though Claim 38 is not --

6    doesn't include a means plus function element, your

7    interpretation of Claim 38 would require the same

8    corresponding structure that the court applied for

9    security module; is that right?

10       A.   Well, again, I would -- as that question

11   phrase- -- is phrased, it makes it sounds like I'm

12   artificially importing a means plus function

13   structural limitation across two different patents,

14   and that's not the way I look at it.  I think the

15   specification is almost identical in -- in these two

16   patents with respect to this issue.  And if you look

17   at the portions of the specification relevant to

18   performing the security operations, a person of

19   ordinary skill in the art would conclude that those

20   security operations would of necessity be performed

21   on hardware, and -- and thus, that means that it

22   also happens to be that that would be consistent

23   with the corresponding structure for Claim 55, but

24   that's -- that's not because I applied the means

25   plus function construction into Claim 38, it's just

BARKLEY
Court Reporters

1    because if you look at the spec and look at what

2    Claim 38 must mean.

3        Q.  Is it your opinion, Dr. Villasenor, that

4    any hardware that performs security operations would

5    be identical or equivalent to the corresponding

6    structures identified by the court for security

7    module?

8        A.  Well, I think it's -- the question -- you

9    have to be careful in the sense that I'm not saying,

10   for example, that any hardware is equivalent to the

11   MYK82.  I'm not saying that at all.  I'm saying that

12   any hardware that I can under- -- that I believe

13   would be consistent with Claim 38 would be within

14   the scope of the structures identified by the court,

15   not -- not -- not that every single example of

16   structures would be of necessity present, but that,

17   you know, there's a certain scope of structures

18   identified in the court -- by the court for

19   Claim 55.  And I do believe that the hardware used

20   in Claim 38 would be within that scope.  So there is

21   a difference.

22       Q.  You agree that the -- that Claims 55 and

23   57 include the operably connecting elements and

24   those are not present in Claims 38 and 39?

25       A.  Correct.

74

BARKLEY
Court Reporters

1     Q.  Claim 55 requires a target module; is that

2   correct?

3     A.  Yes.

4     Q.  Does Claim 38 requires a target module?

5     A.  It does not specifically use the words

6   "target module," no.  I've addressed that in --

7   starting in paragraph 29 of my report.

8     Q.  In your report, you rely on testimony from

9   Tom Hakkel?

10     A.  I don't know if I would say "rely on."

11   I -- I cite Mr. Hakkel's testimony.

12     Q.  Do you rely on the testimony of Mr. Hakkel

13   to support -- strike that.

14        Do you rely on the testimony of Tom Hakkel

15   for any of your opinions?

16     A.  No.  Again, I wouldn't use the word "rely

17   on."  I -- I cite his testimony which corroborates

18   my opinions, but I am not relying on Mr. Hakkel in

19   order to reach my conclusions.

20     Q.  To your knowledge, is Mr. Hakkel a person

21   of ordinary skill in the art as you've defined the

22   term?

23     A.  I haven't -- I've heard that -- I can't

24   remember where I read this, maybe it was in a

25   deposition, I -- I think he does have a degree --

75

BARKLEY
Court Reporters

1    actually, let me just remind -- let me just remind

2    myself of the ordinary skill of the art here.

3            I don't recall.  I mean, I know he had an

4    bachelor's -- an undergraduate degree in computer

5    science, but I don't know -- I thought I had a

6    section here, but maybe somebody can point me to it,

7    or maybe you can remind me of my -- what I said --

8    oh, here it is.

9            So I said, "Bachelor of science in

10   electrical engineering and computer science with at

11   least one year of experience in computer security

12   and computer architecture for security devices."

13           And so my understanding is that -- I -- I

14   believe I remember hearing Mr. Hakkel -- or reading

15   that he does have a bachelor of science, and I think

16   it's one of those two, I think computer science.

17   And if I am mistaken, then, you know, I stand

18   corrected.  That's what I recall.  And I -- I

19   believe he also has experience in computer security.

20   But, again, I haven't been asked to -- to evaluate

21   his professional experience.  I don't --

22           THE REPORTER:  Again, I haven't --

23           THE WITNESS:  I haven't been asked to

24   evaluate his professional experience in detail, so I

25   don't recall the specifics.

76

BY MR. FENSTER:

Q.  You don't have any opinion that Mr. Hakkel is or is not a person of ordinary skill in the art, do you?

A.  I haven't offered a formal opinion other -- although I note that, again, I believe it's undisputed that he does have an undergraduate degree in computer science and has worked in the field of computer security for at least one year, but I haven't offered a specific opinion on whether he's a person of ordinary skill in the art.

Q.  Was Mr. Hakkel -- strike that.

Did Mr. Hakkel apply the court's claim construction in doing any invalidity analysis in any of the testimony that you rely on?

A.  Again, I -- I don't know if I'd use the word "rely on," but I -- I don't -- I don't recall.

Q.  You're not aware -- strike that.

You don't recall Mr. Hakkel applying the court's claim construction or doing any invalidity analysis in any of the testimony that you cite in your report, correct?

A.  I don't recall.  But, again, I -- I cited a conclusion of his.  I didn't cite any analysis he may have performed leading up to that conclusion.  I

77

1    just cited -- you know, he was asked about validity

2    and he offered an opinion, and I cited that opinion,

3    among other things.

4         Q.  And you're talking about -- what -- what

5    testimony are you referring to there?

6         A.  Well, for example, I know I cite him --

7    cite his testimony several times, but, for example,

8    he was asked whether -- "Does SPEX believe Claims 38

9    and 39 of the '802 patent are invalid," was the

10   question, and the answer:  "Yes."

11        Q.  And that was after the PTAB had issued a

12   final written decision in the '802 Western Digital

13   IPR finding them invalid, right?

14        A.  I think -- I think his deposition was

15   after that, but I -- I don't have the dates

16   specifically in mind.

17        Q.  Okay.  Do you believe that the '802 patent

18   is prior art to the '135 patent?

19        A.  I don't recall having offered an opinion

20   on that.  I'd have to refresh my memory on the

21   dates.

22        Q.  Do you believe that Claim 38 and 39 are --

23   of the '802 patent are prior art to the '135 patent?

24        A.  Well, that sounds like the same question.

25   So, again, I'd -- I'd have to -- you know, without

BARKLEY
Court Reporters

1  looking at the dates, I -- I would -- I -- I

2  wouldn't know.

3       Q.  In this case, you have seen expert reports

4  by Dr. Thomas Rhyne?

5       A.  That's right, I have, yes.

6       Q.  Do you know Dr. Thomas Rhyne?

7       A.  Do I personally know him?

8       Q.  Yes.

9       A.  I don't recall having met him, it's -- you

10  know, it's not impossible that I have because, you

11  know, I've been -- he and I have both been, you

12  know, in professional practice for many, many years,

13  so...  But I don't specifically recall meeting him.

14       Q.  Do you have any reason to believe that

15  Dr. Rhyne is not a competent technical expert?

16       A.  I am a firm believer in professional

17  respect and while I disagree with Mr. -- Dr. Rhyne's

18  opinions, I -- I don't believe I've ever impugned

19  his expertise, and I have no intention of doing so.

20       Q.  Do you have any reason to believe that

21  Dr. Rhyne is not an honest person?

22       A.  Not at all.  I -- I -- I expect that both

23  Dr. Rhyne and I endeavor to engage with our work

24  honestly, and I've seen no evidence to the country.

25       Q.  Do you know a Zaydoon Jawadi?

79

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I



1  J-A-W-A-D-I.

2       A.  I remember seeing the name.  I believe it

3  was -- that was the name of a person who provided an

4  opinion in respect to the Western Digital

5  litigation -- IPR, but I may be wrong on that.

6       Q.  Dr. Jawadi provided an expert declaration

7  in support of the patent owner response in the

8  Western Digital IPR regarding the '135 patent.  Does

9  that refresh your recollection?

10       A.  That -- that sounds right.

11       Q.  Do you know Dr. Jawadi?

12       A.  Again, I -- I don't -- I don't recall.

13  Again, it's possible I've met him, but I don't

14  specifically recall having done so.

15       Q.  Do you have any reason to believe that

16  Dr. Jawadi is not a competent technical expert?

17       A.  Again, same answer as I gave with respect

18  to Dr. Rhyne, I am a very firm believer in

19  professional respect, and I have not questioned

20  Dr. Jawadi's competency.

21       Q.  Do you have any reason to believe that

22  Dr. Jawadi is not an honest person?

23       A.  Same answer.  I would -- I would expect

24  that all of us in this litigation would endeavor to

25  engage honestly, and I have seen no evidence to the

80

BARKLEY
Court Reporters

1    contrary.

2         Q.  Do you believe that Dr. Jawadi -- do you

3    have any reason to believe that Dr. Jawadi or

4    Dr. Rhyne would put forward objectively baseless

5    technical opinions?

6         A.  I don't have any reason to believe that he

7    would intentionally put -- put forward an opinion

8    that he believed to be baseless.  I wouldn't --

9         Q.  All right.

10             MR. FENSTER:  All right.  We have to go

11   off the record and change the tape.

12             THE VIDEOGRAPHER:  This is the end of Disk

13   No. 1, Volume 1 of the deposition of John

14   Villasenor, Ph.D.  The time is March 9, 2020 --

15   excuse me.  The time is 12:20 p.m. on March 9, 2020.

16   We're off the record.

17                  (Lunch recess.)

18             THE VIDEOGRAPHER:  Back on the record.

19   This is the beginning of Disk No. 2, Volume 1, in

20   the deposition of John Villasenor, Ph.D.  The time

21   is 12:50 p.m. on March 9th, 2020.

22   BY MR. FENSTER:

23        Q.  Did you have any discussions with counsel

24   regarding your testimony today?

25        A.  No.  He briefly mentioned the duration,

81

BARKLEY
Court Reporters

1    but that was the only thing that we discussed.

2         Q.   Okay.

3              Have you ever testified as an expert in

4    the behavior of reasonable litigants before?

5         A.   I believe this is the first time I have

6    been asked to testify specifically on reasonable

7    litigants.

8         Q.   So you have never provided expert

9    testimony to a court or other body regarding the

10   behavior of reasonable litigants; is that right?

11        A.   To the best of my recollection, that's

12   correct.

13        Q.   You have never been qualified -- strike

14   that.

15             No court has ever found you qualified to

16   opine as an expert in the behavior of reasonable

17   litigants; is that right?

18        A.   Well, I -- I just -- in answering that

19   question, I want to make sure it's not taken out of

20   context.  I -- I don't believe I have ever been -- I

21   don't think any court has ever been asked to qualify

22   me to testify as a -- regarding a reasonable

23   litigant.  And so since the court has -- no court

24   has been asked, then no court has made an

25   affirmative decision.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1        Q.  In your report, Exhibit 2, do you make any

2   reference to the clear and convincing standard that

3   applies in this District Court litigation?

4        A.  I don't think I specifically referenced

5   it, but I -- I can't remember.  It -- it may be

6   there.  I don't recall.

7        Q.  In your expert report, Exhibit 2, do you

8   make any reference to IPR estoppel that may apply to

9   Kingston with respect to the combination of

10  references that you assert in this case?

11       A.  Actually um -- in my last answer, let me

12  just mention that I do make reference to my original

13  invalidity report, and -- and in that report, I

14  certainly do reference the clear and convincing

15  standard.

16            I'm -- I'm sorry, the question about

17  estoppel; is that what it was?

18       Q.  Yes.  Do you make any reference in your

19  report about IPR estoppel that may apply to

20  Kingston?

21       A.  I don't recall making any such reference,

22  but I haven't memorized the report.

23            (Whereupon, Exhibit 5 was marked for

24            identification.)

25            MR. FENSTER:  Let me hand you what has

83

1   been marked as Exhibit 5.  This is the declaration

2   of Zaydoon Jawadi in the IPR2018-00084.  This is the

3   Western Digital IPR regarding the '135 patent.

4   Sorry.

5           THE WITNESS:  Okay.

6   BY MR. FENSTER:

7       Q.  Have you seen this declaration before?

8       A.  I believe I have.  Not in -- not in paper

9   form, but I have an electronic copy of various files

10  for these -- these IPRs.  And I believe I've seen it

11  in there.

12      Q.  Have you reviewed the declaration of

13  Dr. Jawadi?

14      A.  I have looked at it.  I -- obviously, not

15  every word, and -- but I have looked through it.

16      Q.  So while you may di- -- disagree with some

17  of his conclusions, do you believe that Dr. Jawadi's

18  declaration was filed in bad faith or is object- --

19  objectively baseless in any way?

20      A.  I have no reason to expect it would have

21  been filed in bad faith; in fact, I would expect it

22  was probably filed in good faith.  It's the -- the

23  way these things normally go.

24          MR. RICHARDS:  So the 00082?

25          MR. FENSTER:  '84.

84

BARKLEY
Court Reporters

1           MR. RICHARDS:  '84.

2  BY MR. FENSTER:

3      Q.  And the PTAB in connection with the '802

4  IPR, *the Western --

5      A.  Okay.

6      Q.  Okay.  So the Western Digital IPR

7  regarding the '802 patent.  Do you have that in

8  mind?

9      A.  Yes.

10      Q.  Okay.  That panel did not have the benefit

11  of the declaration of Dr. Jawadi, correct?

12      A.  Well, I don't know -- I can't recall

13  whether they submitted any expert testimony with the

14  prelim- -- preliminary patent owner response.  So if

15  you can clarify that point, that would help me

16  answer this question.

17      Q.  Okay.  My understanding is that there was

18  not.

19      A.  Okay.  So if -- if that is the case,

20  then -- then yes, the answer to your question is

21  that the '802 IPR would have been conducted without

22  a declaration from Dr. Jawadi.

23      Q.  Can you say with certainty whether the

24  PTAB would have reached the same result with respect

25  to Claims 38 and 39 if it had considered -- if it

85

BARKLEY
Court Reporters

1    had been presented and had considered the

2    declaration of Dr. Jawadi?

3         A.   I can't say with absolutely certainty, no.

4    I can say what a reasonable litigant would have

5    expected, and that's the -- the -- the perspective

6    I've offered in my IPR.

7         Q.   I'm sorry.

8         A.   I'm sorry, in my report.

9         Q.   In your report, did you offer any opinions

10   as to what a reasonable litigant would have expected

11   with respect to Claims 38 and 39 of the '802 patent?

12        A.   No, I think I addressed what a reasonable

13   litigant would have re- -- would have expected with

14   respect to a '135 patent, given information

15   including the record in the '802 proceeding.

16        Q.   Okay.

17             So the opinion that you've proffered in

18   your expert report has to do with what a reasonable

19   litigant would have expected would have -- to have

20   to happen in the Western Digital IPR regarding the

21   '135 had it gone to conclusion; is that right?

22        A.   Among other things, I -- I think -- and I

23   don't remember the exact words I used, but it was

24   something to that effect, that what a reasonable --

25   I mean, I think I mention it on my -- yeah, I think

86

BARKLEY
Court Reporters

1  paragraph 3, I talk about what a reasonable litigant

2  would have expected in relation to the findings of

3  the -- the PTAB, had -- had a final written decision

4  been reached -- reached.

5      Q.  Okay.  So this exercise that you are going

6  through is opining as to what a reasonable litigant

7  would have expected to happen in something that

8  never happened, right?

9      A.  Yeah, it's -- yeah, would have expected,

10  yes.  That's -- it's -- it's what -- it's --

11      Q.  Okay.

12      A.  -- because we don't -- I mean, I think I

13  also just -- as I mentioned somewhere else, we could

14  be -- yeah, in paragraph 70, I write, "We will never

15  know what would have become of the challenge claims

16  with the '135 patent."  All right?

17          So there's two different things.  There's

18  what -- what act- -- what actually would have

19  happened had it gone to -- we -- we can't know that

20  with certainty because we -- it didn't happen.

21      Q.  Okay.

22      A.  But I'm talking about what a reasonable

23  litigant would have expected.

24      Q.  Okay.  So your opinion has to do with what

25  a reasonable litigant would have expected in

87

BARKLEY
Court Reporters

1    something that never happened, right?

2        A.  Again, it's --

3        Q.  "Yes" or "no"?  I --

4        A.  Well, I just want to make sure it's not

5    taken out of context.  Yes, it's a proceeding.  It's

6    a proceeding that didn't reach its conclusion, and a

7    reasonable litigant would have expected a certain

8    outcome, but we don't know what the outcome actually

9    was.

10       Q.  And one of the pieces of information that

11   you base your conclusion on was what did happen in

12   the '802 patent -- '802 IPR by Western Digital,

13   correct?

14       A.  Among other things.  I would say the

15   entirety of the relevant portions of this -- of the

16   proceeding, that's right.

17       Q.  And, in particular, part of what you were

18   relying on was the fact that the PTAB found Claims

19   38 and 39 invalid in that '802 proceeding, right?

20       A.  Among other things, that's right.

21       Q.  Okay.  And the PTAB, in that proceeding,

22   found those claims invalid without considering a POR

23   or an expert declaration such as Jawadi, correct?

24       A.  That is correct.

25       Q.  And it's possible that the PTAB would have

BARKLEY
Court Reporters

1    reached a different conclusion with respect to the

2    validity of Claims 38 and 39 in that IPR if it had

3    considered additional information, such as a POR or

4    a dec- -- an expert declaration such as Jawadi?

5         A.  I can't -- I can't make an absolute

6    statement.  So it's -- it's possible.  I don't

7    expect that would have occurred, but I -- I think

8    it's certainly possible.

9         Q.  Okay.  Do you believe that SPEX did not

10   have the legal right to reach a settlement with

11   Western Digital regarding the '135 patent?

12            MR. RICHARDS:  Objection.  Vague.

13            THE WITNESS:  I -- I haven't opined on

14   whether SPEX had a -- has -- has a legal right to

15   enter into a settlement.  I know that they -- I know

16   that they did enter into a settlement, but I haven't

17   opined on whether they had a legal right to.

18   BY MR. FENSTER:

19        Q.  Do you have any reason to believe that it

20   was not -- that they did not -- strike that.

21            Do you have any reason to believe that

22   SPEX did not have the legal right to assert -- to

23   enter into that settlement agreement?

24        A.  Well, I -- I understand there was an

25   allegation of patent misuse relating to that

BARKLEY
Court Reporters

1    settlement agreement, and, again, I have not opined

2    on whether or not SPEX engaged in patent misuse, but

3    I understand an allegation has been made.  So I

4    think that's relevant to the question.

5        Q.  Okay.  *Turn to paragraph 70 of your

6    expert report.

7        A.  Yep.

8        Q.  Okay.  Now, you say we'll never know what

9    would have happened to the '135 patent, and

10   particularly to Claims 55 and 57, if that -- if the

11   PTAB had reached -- reached a final written decision

12   because they never did, right?

13       A.  Correct.

14       Q.  Now, you didn't participate in the '802

15   IPR regarding the '135 patent, correct?

16       A.  The '802 IPR --

17       Q.  I'm sorry, the Western Digital, I'm

18   sorry -- strike that.

19           You did not participate in the Western

20   Digital IPR regarding the '135 patent, correct?

21       A.  Correct.

22       Q.  Did you review the declaration of

23   Dr. Jawadi in connection with that IPR?

24       A.  I did look at the declaration, as I think

25   I mentioned a moment ago.

90

BARKLEY
Court Reporters

1        Q.  Okay.

2        A.  I think I listed that as well as one of

3   the documents.  Yes, so it's listed on page 52 of my

4   report.

5        Q.  Okay.  So it's fair that Dr. Jawadi

6   expressed opinions that Claims 55 and 57 of the '135

7   patent were not invalid in that IPR, right?

8        A.  That was his opinion, that's right.

9        Q.  Okay.

10            And he sets forth the bases for his

11   opinion, correct?

12        A.  Yes.  I -- a- -- again, I can't -- I

13   didn't -- I didn't attempt to sort of do a mapping

14   to check if every opinion, he had set forth a basis,

15   but in general, it seemed like a typical expert

16   declaration.

17        Q.  How much time did you spend reviewing the

18   Jawadi declaration?

19        A.  I don't recall.

20        Q.  Can you give me any idea?  Was it five

21   minutes?  Was it an hour?  Was it five hours?

22        A.  You know, I think it was -- I'm quite

23   confident it was more than five minutes.  I don't

24   think it was five hours, but I don't recall

25   specifically.

91

BARKLEY
Court Reporters

1      Q.  Do you know when you reviewed the

2   declaration of Jawadi?

3      A.  I believe it would have been -- you know,

4   in January of this year at the time when I was

5   working on the -- this declaration.

6      Q.  Did you develop the opinion that any of

7   the opinions in Dr. Jawadi's declaration were

8   objectively baseless?

9      A.  I -- I don't think I was -- I wasn't

10  looking to form opinions on his opinions in that

11  sense, so I don't recall concluding that.

12     Q.  In paragraph 76 of your report, you state,

13  "SPEX's designated corporate testimony also confirms

14  that the PCMCIA standard is sufficient to practice

15  the operably connecting step."  Do you see that?

16     A.  I do, yeah.

17     Q.  Okay.  Did Mr. Hakkel -- that's who you

18  are referring to; is that right?

19     A.  Yes.

20     Q.  Okay.  Did Mr. Hakkel ever testify that

21  the PCMCIA standard meets the operably connecting

22  step as construed by the court?

23     A.  He didn't -- he didn't state -- he didn't

24  state it in exactly those words, but he -- he gave

25  testimony that leads to essentially the same

92

BARKLEY
Court Reporters

1   conclusion.

2        Q.  And what you are relying on is the

3   testimony that you've cited in paragraph 76?

4        A.  Well, again, again, I'm -- yes, I'm citing

5   testimony in -- in paragraph 76 that corroborates my

6   statement that -- that corporate testimony confirms

7   that it's sufficient to practice the operably

8   connecting step, the PCMCIA standard.

9        Q.  Okay.  To your knowledge, Mr. Hakkel was

10  never asked whether the PCMCIA standard teaches the

11  operably connecting step as construed by the court,

12  correct?

13       A.  I don't think he was asked that specific

14  question.

15       Q.  And to your knowledge, Dr. -- Mr. Hakkel

16  never testified comparing the PCMCIA standard to

17  operably connecting as construed by the court,

18  right?

19       A.  He was not asked the question in exactly

20  those words, but again, if you look at his answers,

21  then the result is essentially the same.

22       Q.  Do you identify any questions where

23  Mr. Hakkel was asked about the PCMCIA standard in

24  relation to, specifically, the operably connecting

25  limitation?

93

BARKLEY
Court Reporters

1        A.  I don't recall.

2        Q.  In paragraph 77, can you turn to that,

3   please?

4        A.  And, actually, just to -- to

5   clarification, you- -- your earlier question asked

6   about the court's construction of operably

7   connecting, and I don't think the court construed

8   operably connecting for Claims 55 and 56.

9        Q.  Do you -- do you identify any questions

10  where Mr. Hakkel was asked about the PCMCIA standard

11  in relation to the operably connecting limitation?

12       A.  Same answer as before.

13       Q.  Can you turn to paragraph 77 of your

14  report?

15            In paragraph 77, you testify, "SPEX's

16  corporate testimony further confirms that the PCMCIA

17  standard is prior art."  Do you see that?

18       A.  Yes.

19       Q.  Where did Mr. Young testify that the

20  PCMCIA standard is prior art to the '135 patent?

21       A.  Well, he -- as I've quoted here, he

22  acknowledged that -- that -- that the PCM stan- --

23  the PCMCIA standard was not invented by SPEX.

24       Q.  Okay.  Does that mean that it was prior

25  art too?

94

BARKLEY
Court Reporters

1      A.  I think my recollection is that it does,

2   in the context of -- of his testimony.

3      Q.  That's what you are relying on for your

4   conclusion, that Mr. Young testified -- confirmed

5   that the PCMCIA standard is prior art, you are

6   relying on the fact that -- his testimony that SPEX

7   did not invent PCMCIA?

8      A.  My recollection is that he was testifying

9   not only about what SPEX invented generally, but in

10  relation to what SPEX -- SPEX's -- when the -- the

11  application was filed, SPEX was claiming -- the

12  application leading to the '135 patent was filed,

13  SPEX was, of course, claiming to have invented

14  something.  And my recollection for the context of

15  his testimony was that there was a -- questions

16  about what SPEX did and did not invent and he was

17  acknowledging that SPEX did not invent the PCMCIA

18  standard.  So in context, I understood that to mean

19  that not only did SPEX not invent the PCMCIA, but

20  that it existed -- that he was acknowledging that it

21  existed prior to the application.

22      Q.  Okay.  So back at pa- -- paragraph 70.

23  You are testifying as to whether -- what a

24  reasonable litigant would have believed would have

25  happened in the Western Digital IPR regarding the

95

BARKLEY
Court Reporters

1    '135, right?

2         A.  That's correct, yes.

3         Q.  Okay.  And Kingston could have, but did

4    not, file an IPR on the same references that Western

5    Digital did, right?

6         A.  Again, I'm not aware of -- I mean, I think

7    that is probably right, but I haven't looked into

8    what Kingston could or could not have done there.

9         Q.  Okay.  And in the IPR that Kingston did

10   file that went to final written decision, Claim 55

11   and 57 were upheld in the final written decision,

12   right?

13        A.  But, again, Claim 57 is now back with the

14   PTAB on remand, but you are right with respect --

15   but Claim 57 is upheld, even at the Federal Circuit.

16        Q.  I think you misspoke, 55.

17        A.  I'm sorry.  I -- I misspoke.  I meant to

18   say that Claim 55 has been upheld, even after

19   Kingston's appeal in the Federal Circuit, but 57 is

20   back at the PTAB on remand.

21        Q.  Okay.  And in the institution decision --

22   strike that.

23        In the final written decision, the PTAB

24   found that Claim 57 was valid, right?

25        A.  Well, but that's -- that final written

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I    BARKLEY
                                           Court Reporters

1    decision has now been vacated.

2        Q.  Yes, it is.

3            At the final written decision, the PTAB

4    found that Claim 57 was valid, correct?

5        A.  Well, I -- I think it's an unfair question

6    because it's a vacated decision.  That -- that

7    decision has been vacated by the -- by the Federal

8    Circuit.

9        Q.  Okay.

10       A.  So -- so the problem is, if that's taken

11   out of context, it will make it sound like that's

12   the end of the story.  So a full answer requires

13   clarifying that that decision was vacated by a

14   higher court.

15       Q.  Now, in connection with the Western

16   Digital IPR regarding the '135 patent, Dr. Jawadi

17   submitted a sworn declaration that those claims were

18   not invalid, right?

19       A.  That's correct.

20       Q.  Okay.  So it's fair to say that you and he

21   have different opinions as to what would have been

22   the outcome in the '135 IPR by Western Digital,

23   right?

24           MR. RICHARDS:  Objection to what

25   Mr. Jawadi opined on.

97

```
 1              THE WITNESS:  Yeah, I think that's --
 2   again, that's an apples-to-oranges comparison there
 3   because we were addressing different things.
 4   BY MR. FENSTER:
 5        Q.  Well, you agree that Dr. Jawadi was
 6   putting forth his good faith expert opinions as to
 7   why the Western Digital petition did not prove the
 8   invalidity of Claims 55 and 57 of the '135 patent,
 9   fair?
10        A.  Yeah, that was -- I think that was what
11   his -- the goal of his opinion was -- was to -- the
12   goal of his declaration was to, essentially, express
13   that opinion.  That's right.
14        Q.  And, essentially, your expert opinion in
15   this case is guessing what a -- is opining what a
16   reasonable litigant would have expected would have
17   happened in that final written decision had the
18   court considered the Jawadi declaration, right?
19        A.  I don't know if I would agree with the way
20   that's phrased.
21        Q.  Let me rephrase it.
22              Your expert opinion in this case is
23   opining what a reasonable litigant would have
24   expected would happen in the final written decision
25   had the PTAB considered the Jawadi declaration,
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1    right?

2          A.   Well, the Jawadi declaration and a number

3    of other things, not in isolation.

4          Q.   Uh-huh.

5          A.   But, yes, that is one of the opinions I've

6    offered, but again, not just the Jawadi declaration.

7          Q.   And in the Western Digital IPR, there was

8    never a final hearing?

9          A.   I'm sorry, which IPR?  The --

10         Q.   Okay.  In the Western Digital IPR

11   regarding the '135, right, before the final written

12   decision, there's usually an oral hearing; is that

13   right?

14         A.   Yes, that's right.

15         Q.   Okay.  Was there an oral hearing in the

16   Western Digital IPR regarding the '135 patent?

17         A.   My understanding is that there was not.

18         Q.   Okay.  So the PTAB didn't consider the

19   arguments that would have been made at an oral

20   hearing, fair?

21         A.   By both sides?

22         Q.   That's right.

23         A.   Yes, that's right.

24         Q.   Including the arguments that would have

25   been made by SPEX's counsel, right?

99

BARKLEY
Court Reporters

1            A.  That's right.  An oral hearing is a -- is

2      a venue where both the petitioner and the patent

3      owner are given a chance to present argument.

4            Q.  Okay.  So you are speculating what would

5      have happened, what the board would have done in the

6      final written decision had it considered the POR,

7      had it considered the Jawadi declaration, and had it

8      considered an oral hearing that never happened,

9      right?

10           A.  I -- I wouldn't consider it speculation.

11     I -- I wouldn't characterize it as that way.

12           Q.  Okay.  Can we go to your further opinions

13     regarding the validity of Claims 55 and 57?

14           A.  I'm sorry.  Can you give me a page number?

15           Q.  39.

16           A.  39.  Um, yes.

17           Q.  So you first have an opinion regarding the

18     invalidity over admitted prior art.  Do you see

19     that?

20           A.  Yes.  That's right.

21           Q.  Okay.  Is it your opinion that Claim 55 is

22     anticipated by the admitted prior art?

23           A.  Yes, let me just clarify here that these

24     opinions are relative to the clear and convincing

25     standard, and they are supplementing my earlier

                                100

BARKLEY
Court Reporters

1    invalidity opinions from my earlier report.  And if

2    you look at the end of paragraph 103, which is on

3    page 43, and so -- box, that's just one.  So that --

4    it says, "Accordingly, the last step of Claim 55 is

5    admitted to be in the prior art and the" -- and I

6    should have gone in the other direction.  But in the

7    prior paragraphs, I go through each one of these

8    steps and say that each -- each one of the -- each

9    one of the steps of Claim 55 is in the prior art,

10   so -- and then the same is true for -- for Claim 57.

11        Q.  Okay.  So is it your opinion that Claim 55

12   is anticipated by the admitted prior art?

13        A.  Well, it says -- in paragraph 97, it talks

14   about 102F.  So I believe 102 is a -- is an

15   anticipation statute.

16        Q.  Okay.  So --

17        A.  And -- and obviousness.  They would

18   both -- it would be anticipated, though -- but if

19   not anticipated, then obvious.

20        Q.  Okay.  Do you state a separate obviousness

21   opinion that Claim 55 is obvious over the admitted

22   prior art, separate and apart from your anticipation

23   analysis?

24        A.  I don't recall, but to the extent there is

25   any confusion, I'm clarifying that now.

101

BARKLEY
Court Reporters

1          Q.  Your report doesn't provide any separate

2     obviousness analysis for Claims 55 and 57 over the

3     admitted prior art, correct?

4          A.  I don't know that that's true.  I would

5     have to go through and see.

6          Q.  Can you identify any analysis -- any

7     separate obviousness analysis for Claims 55 and 57

8     over the admitted prior art in your report, please?

9          A.  It would be the same analysis.  In other

10    words, the -- the analysis for Claim 55 would apply

11    both to anticipation, and to the extent not

12    anticipated, to obviousness.

13         Q.  Is your admitted prior art anticipation

14    opinion limited -- is it -- strike that.

15              Is it your opinion that Claims 55 and 57

16    are anticipated by the admitted prior art under

17    102F?

18         A.  That's what's stated in paragraph 97.

19         Q.  Okay.  Are there any other provisions of

20    Section 102 under which you opine that Claims 55 and

21    57 are anticipated, other than 102F?

22         A.  There's none listed here.  But it would

23    probably qualify under 102A as well.

24              And by the way, just since we talked about

25    the AIA, these would be pre-AIA 102.  I mean, if

                              102

BARKLEY
Court Reporters

1    you -- if you want to give me the -- the A, B, C, D,

2    I can tell you which ones.

3         Q.  Is there a single prior art reference that

4    you identify in your report with an admitted prior

5    art that anticipates Claim 55 or 57?

6         A.  I think PCMCIA may be a single reference

7    here.

8         Q.  Does your report state the opinion that

9    PC -- that when you're referring to PCMCIA, are you

10   referring to a particular document or standard or

11   something?

12        A.  Yeah, I'm talking about the PCMCIA

13   specification, and -- or the standard, basically,

14   which -- which is described in the documents that --

15   you know, the standard that is describing it.

16        Q.  Okay.  Does your report contain any

17   opinion that any specific document or documents

18   regarding PCMCIA standard anticipate Claims 55 or 57

19   of the '135 patent?

20        A.  I think it does.  It -- it re- -- it

21   describes the PCMCI -- the PC -- PCMCIA standard.

22        Q.  Is the PCMCIA standard what you are

23   referring to as admitted prior art, part of what you

24   are referring to as admitted prior art, or separate

25   from what you are referring to as admitted prior

103

BARKLEY
Court Reporters

1    art?

2           A.  Well, it's -- it's both.  So all three.

3    So -- so, for example, I note in paragraph 103,

4    "Dr. Rhyne has also admitted that the second step of

5    Claim 38 was known in the prior art PCMCIA

6    standard."

7           And then I also note that, "SPEX admitted

8    that this limitation was" --

9           THE REPORTER:  Oh.

10          THE WITNESS:  Sorry.

11          That, "SPEX also admitted that this

12   limitation was practiced by PCMCIA compliant card in

13   briefing before the Federal Circuit."

14          So I'm citing the PCMCIA standard itself

15   as well as SPEX's expert and corporate witnesses and

16   SPEX itself statements about that standard.

17   BY MR. FENSTER:

18          Q.  Okay.  Dr. Villasenor, I -- I have read

19   through your report and so -- I guess I'm not clear

20   on your anticipation standards or opinions.

21          What -- strike that.

22          In your new report, what references do you

23   opine anticipate claim -- Claims 55 or 57?

24          A.  The PCMCIA standard.

25          Q.  Anything else?

BARKLEY
Court Reporters

1        A.  Not in any -- not that I can recall.

2        Q.  And were you aware of the -- strike that.

3            What specific documents or implementation

4   of the PCMCIA standard are you asserting anticipate

5   Claims 55 and 57 in your new expert report?

6            MR. RICHARDS:  Objection.

7   Mischaracterizes testimony.

8            THE WITNESS:  I'm -- I'm -- yeah, I'm

9   talking about the PCMCIA standard.

10  BY MR. FENSTER:

11       Q.  Is there a particular version or a

12  particular document that you are relying on?

13       A.  Well, I cite those in my original

14  invalidity report, but I don't have them memorized.

15  And, actually, I cite them in this report too

16  somewhere.  Yeah, there's -- there's a -- there's

17  quite a bit of -- starting at page -- paragraph 114,

18  for example.

19       Q.  Okay.  So that's under an obviousness

20  combination, right?

21       A.  Yeah, that's correct.

22       Q.  As I understand it, you set forth two

23  opinions:  One is anticipation under admitted prior

24  art and then an obviousness combination of admitted

25  prior art in combination with Fortezza; is that

105

1    right?

2         A.  Yes, I mean, if you look at paragraph 97,

3    I say, "It is my opinion that Claims 55 and 57 are

4    invalid on" -- "based on what SPEX has admitted to

5    be in the prior art and the admitted prior art from

6    the specification of the '135 patent."

7         Q.  Okay.  So I asked you a minute ago what

8    you claim anticipates Claims 55 and 57, and you said

9    the PCMCIA standard, right?

10        MR. RICHARDS:  Objection.

11   Mischaracterizes testimony.

12        THE WITNESS:  Yeah, the -- the PCMCIA

13   standard as -- as used and described in the -- in

14   the specification.

15   BY MR. FENSTER:

16        Q.  Is there a particular document that you

17   assert in paragraphs 98 through 110?

18        MR. RICHARDS:  Objection.  Asked and

19   answered.  The document speaks for itself.

20   BY MR. FENSTER:

21        Q.  Okay.  So in 98 through 110, that's where

22   you state your opinion of invalidity over the

23   admitted prior art, right?

24        A.  Um, yes.

25        Q.  Okay.  In paragraphs 98 to 110 of your

                              106

1    report, do you identify any document describing or

2    embodying or encompassing the PCMCIA standard that

3    you rely on for anticipation?

4         A.  So I address -- I mention -- in paragraph

5    104, I mention the PCMCIA specification.

6         Q.  Okay.  Where is that?

7         A.  It's five lines from the bottom of

8    paragraph 104.

9         Q.  Okay.  And when you refer to "the PCMCIA

10   specification," what's -- what document are you

11   referring to?  As of what date, what version?

12        A.  That's cited later on.  I have a reference

13   to it later on in par- -- on page 46, for example.

14        Q.  Where is that?

15        A.  At the bot- -- very bottom of the page.

16        Q.  Okay.  So you're talking about the PC card

17   standard and the last line that's got the Bates

18   number DEF --

19        A.  Yes.

20        Q.  -- underlined, INV1770?

21        A.  For example, yes.

22        Q.  Okay.  So the PCMCIA standard, when you

23   referred to the "PCMCIA standard," that is the

24   document you are referring to, the PC card standard

25   with that Bates number?

107

BARKLEY
Court Reporters

1      A.   That is one of the documents that

2  describes the PCMCIA standard, yes.

3      Q.   Okay.  Are you referring to -- for

4  anticipation, for your new anticipation argument,

5  are you relying on other documents describing the

6  PCMCIA standard or just that one?

7      A.   I think, you know, that document plus the

8  knowledge of one of skill in the art, when used to

9  perform security operations, would anticipate these

10  claims.

11          But I -- you know, I also talk about the

12  PCMCIA specification.  So to the extent that there's

13  other documents that describe it, that is also

14  relevant for an invalidity opinion.

15      Q.   Is it relevant to your anticipate- -- I

16  want to know -- I think I'm entitled to, whether you

17  think I'm entitled to or not, I don't know -- but I

18  would like to know, Dr. Villasenor, for your new

19  invalidity opinion expressed in Exhibit 2 with

20  respect to invalidity over the admitted prior art,

21  what documents are you saying anticipate Claims 55

22  and 57?

23          MR. RICHARDS:  Objection.  Asked and

24  answered numerous times.

25          THE WITNESS:  And -- and it's not

108

BARKLEY
Court Reporters

1    necessarily limited to documents, right?  So it can

2    be a system, the PCMCIA system as described by the

3    documents.

4              MR. RICHARDS:  Are you asserting that

5    there is no doctrine of admitted prior art?

6              MR. FENSTER:  Not in the way -- not in the

7    way you guys are using it.  I have no -- no

8    knowledge of that.  That's for sure.

9    BY MR. FENSTER:

10        Q.  Okay.  So in your new expert report, are

11   you asserting anticipation by a document?  And, if

12   so, which documents?

13        A.  So I'm asserting anticipation -- or

14   invalidity in relation to the PCMCIA standard as

15   described with -- in -- in the PCMCIA documents when

16   that standard is applied in, you know, using

17   security operations as described, for example, in --

18   in the specification as admitted prior art.

19        Q.  Okay.  Are you asserting invalidity by

20   anticipation, by obviousness, or something else?

21        A.  Both.

22        Q.  Okay.  Are you asserting anticipation by a

23   particular document?  And, if so, which one?

24        A.  I'm asserting anticipation.  I was

25   informed that if everything is un- -- is in the

BARKLEY
Court Reporters

1  admitted prior art, then that can be a basis for an

2  anticipation argument because -- under 102F.

3      Q.  So let me get your understanding of the

4  admitted prior art doctrine.  Okay?

5          If a patentee admits that three different

6  references are all prior art, okay?

7      A.  Yes.

8      Q.  Are those all admitted prior art now, that

9  can now be treated as one reference in your opinion

10  for anticipation?

11     A.  If it's three different references, I

12  think you would have an obviousness.  I -- I'm most

13  familiar with that as in -- in the context of an

14  obviousness analysis.

15     Q.  Okay.  Based on your understanding, you

16  have no belief that three different prior art

17  references, just because they are admitted to be

18  prior art, can be treated as one for anticipation;

19  is that fair?

20     A.  I don't specifically recall that, that's

21  right.

22         THE REPORTER:  "I don't specifically

23  recall" --

24         THE WITNESS:  Specifically recall that,

25  that's right.

110

BARKLEY
Court Reporters

1  BY MR. FENSTER:

2      Q.  Okay.  And so in connection with your new

3  invalidity opinion in Exhibit 2, invalidity over

4  admitted prior art, are you relying on specific

5  prior art references?  And, if so, which ones?

6      A.  I'm relying on prior art, including

7  references, but not limited to references.

8      Q.  Okay.  So the prior art includes

9  references and other things, such as what?

10     A.  The PCMCIA standard, which can be

11  described through multiple documents.

12     Q.  Okay.  So are you asserting that the prior

13  art, including references, and the PCMCIA standard

14  that can be described in multiple documents are

15  treated as one reference for anticipation of Claims

16  55 and 57?

17     A.  When -- when there's multiple documents,

18  it would normally be obviousness, and certainly that

19  would be one of the things I would -- I believe is

20  relevant here.  But I was also informed that under

21  102F, that is -- that that's an anticipation,

22  separate -- separate -- it's completely separate

23  from an obviousness argument that it is possible to

24  be anticipated under 102F.

25     Q.  What is your understanding of 102F?

111

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

 1        A.  I don't recall the statute.  I summarize

 2   it briefly here, but that's it.

 3        Q.  Is there a single reference -- or a single

 4   document that you identify in your invalidity over

 5   admitted prior art section that anticipates Claims

 6   55 or 57?

 7            MR. RICHARDS:  Objection.  Asked and

 8   answered.  Document speaks for itself.

 9            THE WITNESS:  Yeah, the PCMCIA

10   specification, as I mentioned.

11   BY MR. FENSTER:

12        Q.  Okay.  And when you say "PCMCIA

13   specification," you are specifically referring to

14   the document PC card standard that is produced at

15   Bates DEF/INV -- or underscore INV 1770?

16        A.  Well, that -- to be clear, that's one page

17   of the standard, but -- or of the PC card standard.

18   So the -- the full document includes more than -- or

19   maybe that is one page.  I can't remember -- maybe

20   that's -- maybe that's the Bates stamp of the first

21   page of the multipage document.  But in any case, I

22   would be referring to the full document, you know,

23   when used to perform security operations.

24        Q.  Okay.  Are there any other documents that

25   you believe -- that antici- -- that you state

BARKLEY
Court Reporters

1   anticipate Claims 55 or 57 under the invalidity

2   under admitted prior art section?

3        A.  Not that come to mind at the moment.

4        Q.  Were you aware of the PC card standard

5   document that you cite in this report when you

6   submitted your first expert report on March 23,

7   2018?

8        A.  I don't recall.  I think -- I think -- I

9   think so because I think I cited the same -- I think

10  the text is -- is literally word for word, the same.

11  So I think I -- so since I'm quote -- since I'm

12  quoting it in paragraph 114, I think I quoted it

13  then as well, but I -- I would have to look to be

14  sure.

15       Q.  You were certainly aware of the PCMCIA

16  standard when you submitted your expert report in

17  March 23, 2018, correct?

18       A.  Yeah, I think I discussed it at some --

19  some length.

20       Q.  And did Dr. Rhyne provide any analysis of

21  that specification or PCMCIA documents that you

22  could not have performed on your own?

23       A.  I'm not sure I understand the question.

24       Q.  In your new validity report, you cite

25  certain testimony by Dr. Rhyne, correct?

113

BARKLEY
Court Reporters

1          A.  I believe I do, yes.  Yes.

2          Q.  Did Dr. Rhyne provide any analysis of

3   PCMCIA that you could not have performed on your own

4   in March of 2018?

5          A.  I don't believe I was citing Dr. Rhyne for

6   that purpose.  I was citing him -- both -- both

7   Dr. Rhyne and I had equal access to the documents

8   back in 2018.  So I -- I think we would be equally

9   positioned to analyze them.

10         Q.  Okay.

11             Does your new expert report state the

12  opinion that the preamble of Claim 55 is taught by

13  the PCMCIA specification?

14         A.  I address the preamble in paragraph 101.

15         Q.  Uh-huh.

16         A.  And I -- hold on a sec.  Let me see

17  here -- paragraph 3 -- and I state that it was

18  substantively identical to the preamble of Claim 38

19  in '802, which has been admitted by SPEX to be in

20  the prior art.

21         Q.  Okay.  That wasn't my question.

22             Does your new expert report state the

23  opinion that the preamble of Claim 55 is taught by

24  the PCMCIA specification?

25         A.  Oh, I think that's, essentially, what it's

114

BARKLEY
Court Reporters

1    saying here by saying that SPEX admitted it to be in

2    the prior art.  The thing -- one of the things that

3    SPEX admitted to be in the prior art is the PCMCIA

4    specification, which when performing security

5    operations, does -- does practice the preamble.

6         Q.  Dr. Villasenor, pardon me, but I think

7    that's a non sequitur.

8             So did SPEX admit that the preamble of

9    Claim 55 or the preamble of Claim 38 is taught by

10   the PCMCIA specification?

11        A.  My recollection was there was an

12   equivalent admission to that, but I would have to go

13   look it up.

14        Q.  Do you cite in your report any admission

15   by SPEX that the preamble of Claim 55 of the '135 or

16   the preamble of Claim 38 of the '802 is taught by

17   the PCMCIA specification?

18        A.  I think that's, indirectly, what paragraph

19   101 says.

20             MR. RICHARDS:  Are you at a breaking

21   point, Marc?

22   BY MR. FENSTER:

23        Q.  Dr. Villasenor, can a patent be valid if

24   all elements of a claim are present in the prior art

25   or known in the prior art?

115

BARKLEY
Court Reporters

1        A.   Just generally, if all elements

2   individually are known?

3        Q.   Uh-huh.

4        A.   Yeah, I think, if you had six different

5   pieces of prior art -- six elements, each of which

6   was disclosed by one piece of prior art, distinct

7   piece of prior art, so you had six pieces of prior

8   art total -- in total, and if it would not have been

9   obvious to combine them, then the patent claim

10  can -- can be valid, despite the fact that each

11  element is individually found in the prior art.

12       Q.   So you agree that just showing that every

13  element is known or taught in the prior art is not

14  sufficient, by itself, to show a claim to be

15  invalid, fair?

16       A.   As a general matter, right, that's the

17  whole point of -- of anticipation versus

18  obviousness.  As a general matter, that -- that

19  you -- you need to show more than just the fact that

20  the prior art recognized the elements individually.

21       Q.   Okay.  Beyond that, you need to also do an

22  obviousness analysis showing that one of skill in

23  the art would have been motivated to combine those

24  references in the way to obtain the claimed

25  invention and that would have been feasible and so

116

BARKLEY
Court Reporters

1   forth.  Right?

2        A.  For obviousness, that is absolutely

3   correct.  Of course, there's a different prong,

4   which is invalidity, which -- which doesn't require

5   that analysis.

6        Q.  Are you referring to anticipation?

7        A.  I'm sorry.  Anticipation.  Thank you.

8            MR. FENSTER:  Okay.  All right.  Why don't

9   we take a quick break.

10           THE WITNESS:  Going off the record.  The

11  time is 1:53 p.m.

12                  (Recess taken.)

13           THE VIDEOGRAPHER:  Back on the record.

14  The time is 2:05 p.m.

15  BY MR. FENSTER:

16       Q.  Okay.  Claims 38 and 39 were held invalid

17  in a Western Digital IPR, correct?

18       A.  That's right.

19       Q.  Okay.  And do you have any reason to doubt

20  that that was the basis for Mr. Hakkel's statement

21  that Claims 38 and 39 were invalid?

22       A.  Well, he didn't say that in his answer.

23  He didn't say -- he didn't qualify his answer in --

24  in that way.  He was asked, "Does SPEX believe

25  Claims 38 and 39 of the '802 patent are invalid?"

                        117

BARKLEY
Court Reporters

1    And he said yes.

2         Q.  And that was after the IPR final written

3    decision finding them invalid, right?

4         A.  Chronologically that's right, yes.

5         Q.  Okay.  Do you have any reason to believe

6    or to doubt that the basis for Ms. -- Mr. Hakkel's

7    statement that the basis -- the reason that SPEX

8    believed Claims 38 and 39 were invalid was because

9    they had been held invalid in that IPR?

10        A.  Well, to the extent that he didn't qualify

11   his answer, then that -- I would -- I would have

12   expected him to qualify his answer.  So he didn't

13   say, "Well, you know, we believe they are valid but

14   the PTAB has found otherwise."  He just said he --

15   does SPEX believe they are invalid.

16        Q.  You don't know anything other than the

17   declaration -- the actual transcript in terms of

18   what Mr. Hakkel meant by that, right?

19        A.  Correct.  I -- I have -- only have the

20   words on the page.

21        Q.  Okay.  And the references that were -- do

22   you know what references were used by the PTAB to

23   invalidate Claims 38 and 39?

24        A.  It was Harari and I can't think of the

25   other one -- I'd be -- I can find it if you'd like.

BARKLEY
Court Reporters

```
 1            Do you want me to find it or -- or not?
 2   Would you like me to find it or not?  I can --
 3        Q.  Sure.  If you -- if you can answer the
 4   question, I'd love it.
 5        A.  Harari and Anderson.
 6            THE REPORTER:  Anderson?
 7            THE WITNESS:  Anderson, O-N.
 8   BY MR. FENSTER:
 9        Q.  Do you provide any obviousness analysis in
10   your new expert report to combine Harari and
11   Anderson and PCMCIA standard?
12        A.  I don't recall specifically phrasing it
13   that way.  I don't -- yeah, I don't recall offering
14   an opinion specifically on Harari and Anderson.
15   Most of this report was offering opinions on an IPR
16   involving those things.
17        Q.  So the answer is no?
18        A.  Again, I would have to look at the report.
19   I don't recall offering any opinions specifically on
20   Harari and Anderson outside the context of the IPR.
21        Q.  Okay.  And for your invalidity over
22   admitted prior art section, any obviousness analysis
23   will be in paragraphs 98 through 110; is that
24   correct?
25        A.  In that section, I, at least, was
```

BARKLEY
Court Reporters

1   intending -- I was hoping to keep it self -- you

2   know, self -- I don't know what -- I was hoping to

3   address it in a single portion of the report,

4   although I -- I make some references to other

5   portions of the report.

6          Q.  Do you have any obviousness analysis for

7   your inval- -- invalidity over admitted prior art

8   opinion other than in paragraphs 98 through 110?

9          A.  Again, there are multiple references to

10  other paragraphs within those paragraphs.  So if you

11  include those, then -- then that's -- that's the

12  analysis.

13         Q.  All right.  Can you point me to your

14  obviousness analysis in your expert re- -- report?

15  You can start at paragraph 1 if you want to.  We can

16  spend the whole time, I don't care.

17             So can you show me where in your expert

18  report you have obviousness analysis for your

19  invalidity over admitted prior art section?

20         A.  So, in paragraph 98, for example.

21         Q.  Are you done?

22         A.  Yeah.

23         Q.  You misunderstood my question:  I'd like

24  you to identify all of the obviousness analysis in

25  your opinion that supports your invalidity over

120

BARKLEY
Court Reporters

1   admitted prior art.

2          A.  Well, I think that's the section that

3   starts on page 98 -- I'm sorry, paragraph 98 and

4   goes through paragraph 110, I guess.

5          Q.  Okay.  So can you point me to the

6   obviousness analysis as distinct from anticipation?

7              MR. RICHARDS:  Objection.  Asked and

8   answered.  The document speaks for itself.

9              THE WITNESS:  So I don't call it out

10  separately.  I just provide opinions here that are

11  the basis for my invalidity opinions.

12  BY MR. FENSTER:

13         Q.  In paragraphs 98 through 110, do you

14  provide any motivation to combine any prior art --

15  admitted prior art references?

16         A.  I don't have an explicit discussion of

17  that.

18         Q.  In paragraphs 98 through 110, do you

19  identify any deficiencies in any single prior art

20  reference?

21         A.  Not that I recall.

22         Q.  In paragraphs 98 through 110, do you

23  provide any analysis of expectations of success of

24  combining various admitted prior art references?

25             MR. RICHARDS:  Objection.  Document speaks

121

BARKLEY
Court Reporters

1    for itself.

2              THE WITNESS:  I -- I don't specifically

3    recall having addressed that.

4    BY MR. FENSTER:

5         Q.  In paragraphs 98 through 110, do you

6    identify any secondary indicia of obviousness or

7    nonobviousness?

8         A.  Not in those paragraphs, no.

9         Q.  In paragraphs 98 through 110, do you

10   address the feasibility of combining any particular

11   admitted prior art references?

12        A.  Not that I recall.

13        Q.  In paragraphs 98 through 110, do you

14   provide any analysis of expected success from

15   combining different admitted prior art references?

16        A.  Not that -- I don't have an explicit

17   section on expected success, no.

18        Q.  And in terms of anticipation by a

19   document, the only document that you referred to in

20   the invalidity over admitted prior art section,

21   paragraphs 98 through 110, is the PC card

22   specification you identified earlier that's cited at

23   page 46?

24        A.  As I recall right now, that's correct.

25   I'd have to look again, but that's what I recall.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1          Q.  Okay.  In each section, you -- so let's

2     start with page -- or paragraph 100.

3          A.  Yes.

4          Q.  Okay.  So you say that these -- actually

5     let's go to 101, please.

6               So at the end of paragraph 101, you say,

7     "To the extent the preamble is limiting, the

8     preamble to Claim 55 is admitted to be in the prior

9     art."  Do you see that?

10         A.  Yes.

11         Q.  What prior art are you referring to?

12         A.  Well, it refers back to -- to my earlier

13    discussion of Claim 38, which, as I have already

14    explained, has a substantively identical preamble

15    and which was admitted by SPEX to be in the prior

16    art.

17         Q.  What prior art specifically?

18         A.  I think it was the PCMCIA standard.

19    That's my recollection.

20         Q.  Can you show me support for that in your

21    report?

22         A.  I think that's in the Hakkel testimony.

23         Q.  Where do you cite that?

24         A.  In paragraph 101.

25         Q.  All right.  I'm sorry, Dr. Villasenor, you

123

BARKLEY
Court Reporters

1   are going to have to walk me through that.

2        So can you show me where in 101 you are

3   citing to Hakkel testimony?

4        A.  So I cite to "SPEX's designated corporate

5   witness," which is Mr. Hakkel.

6        Q.  Okay.  And what testimony specifically are

7   you referring to?

8        A.  I don't quote it here, but he -- I quote

9   it elsewhere.  He admitted that there were not

10  substantive differences between the two, between --

11  "the two" meaning the preambles of the two claims

12  that are being discussed here.  And my recollection

13  is that he also admitted that the preamble of Claim

14  38 was in the prior art.  I don't have a quote,

15  though.

16       Q.  And when you say "the preamble" -- okay --

17  so did -- okay -- strike that.

18       Can you show me where in your report you

19  have support that Mr. Hakkel admitted that the

20  preamble of Claim 38 or of Claim 55 is disclosed in

21  the PCMCIA specification?

22       A.  I don't recall where I have that in the

23  report.

24       Q.  Do you have it in the report?

25       A.  I don't recall.

124

BARKLEY
Court Reporters

1      Q.  If you could go to -- so, strike that.

2          So in paragraph 101, at the bottom where

3  you say, "The preamble to Claim 55 is admitted to be

4  in the" -- "the prior art," that's a reference to

5  the PCMCIA specification?

6          MR. RICHARDS:  Objection.

7  Mischaracterizes testimony.

8          THE WITNESS:  It's a reference to

9  Mr. Hakkel's admissions with respect to the contents

10  of the prior art.

11  BY MR. FENSTER:

12      Q.  Okay.  So do you identify any specific

13  prior art?

14      A.  Not in this paragraph, no.

15      Q.  So you don't know if Mr. Hakkel --

16  Mr. Hakkel's testimony related to the PCMCIA

17  specification or some other prior art reference?

18      A.  I think he testified on -- he was asked

19  questions about that is -- is my recollection.  I

20  don't recall.

21      Q.  As you sit here, do you know whether

22  Mr. Hakkel's testimony about the preamble related to

23  the PCMCIA specification or some other prior art

24  reference?

25      A.  Or both, in the sense of the other prior

125

BARKLEY
Court Reporters

1   art reference also having in it citations to the

2   PCMCIA specification, so I don't recall

3   specifically.

4           Q.  Do you have it in your report?

5           A.  I'm not --

6           Q.  You can take the time to find it if you

7   want.

8           A.  Not in this paragraph, but it may be

9   elsewhere.

10          Q.  Can you find it?

11          A.  I can look.

12          Q.  Sure.  If it's in your report, I want to

13  know it.  Let's take the time.

14          A.  Yeah, sure.  I'll take a look.

15              So, for example, I do -- I do cite

16  Mr. Hakkel explaining -- talking about the PCMCIA

17  standard and the fact that it's a -- it -- it's used

18  in an embodiment of the '135 patent and that it

19  connects -- how a device connects with a computer

20  and interacts with a computer.

21          Q.  Where is that?

22          A.  Page 29.

23          Q.  I'm sorry?

24          A.  Page 29.

25              THE VIDEOGRAPHER:  Your microphone.


                              126

BARKLEY
Court Reporters

```
 1   BY MR. FENSTER:

 2        Q.  Okay.  So you are referring to page --

 3   paragraph 76?

 4        A.  Correct.

 5        Q.  So paragraph 76 has to do with the

 6   operably connecting step, right?

 7        A.  Yes, but that's also -- it's related to

 8   the preamble as well.

 9        Q.  Okay.  Can you tell me where in your

10   report you cite evidence that Mr. Hakkel admitted

11   that the preamble is in the prior art and, if so,

12   identify what prior art -- identifying what prior

13   art?

14             MR. RICHARDS:  Objection.  Asked and

15   answered.

16             THE WITNESS:  Yeah, I don't recall other

17   than this text I've just cited here, although,

18   again, I'll note that the -- the operably connecting

19   step, of course, is distinct from the preamble, but

20   it is also very closely related to the -- to the

21   preamble.

22   BY MR. FENSTER:

23        Q.  Okay.  Anything else?

24        A.  That's all that comes to mind right now.

25        Q.  Okay.  So with respect to paragraph 101,
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1   the evidence that you can -- that you have in your

2   report to support your statement that the preamble

3   to Claim 55 is admitted to be in the prior art, and

4   specifically the PCMCIA specification, is the

5   testimony at page 29, paragraph 76; is that right?

6        A.  For example.

7             MR. RICHARDS:  Objection.

8   Mischaracterizes testimony.

9   BY MR. FENSTER:

10       Q.  Okay.  If there's more, I'd like you to

11  find it, please.  I asked you to identify all -- all

12  the evidence that you cite to in your report to

13  support that statement in paragraph 101.

14            You've identified paragraph 76.  Anything

15  else?

16       A.  That's all I found in my brief review

17  here.

18       Q.  Okay.

19            Do you need more time to look?

20       A.  I don't know if I'll find anything else,

21  but, I mean, I don't know.

22       Q.  Have you given me a complete answer to my

23  question?

24       A.  As far as I'm aware.

25       Q.  Okay.

128

BARKLEY
Court Reporters

1          And in paragraph 106, you are talking

2    about Claim 57 and you refer to the preamble of

3    Claim 57 and say it's identical to Claim 55?

4          A.  Ah, yes.

5          Q.  Okay.  So do you have the same support for

6    the statement that it's admitted to be in the prior

7    art, and when you say the prior -- strike that.

8          When you say that preamble is admitted to

9    be in the prior art as with the other, you are

10   specifically talking about the PCMCIA specification?

11         A.  Yes, the same answers for Claim 55 and 57

12   on the preamble because it's the same text.

13         Q.  Okay.  And the only support that you can

14   identify in your report for the pre-- for -- to

15   support that conclusion in paragraph 106 is the

16   testimony that you pointed to -- pointed me to in

17   paragraph 76; is that right?

18         A.  That's the one thing I was able to

19   identify right now.  That's right.

20         Q.  Okay.  So if we can go to paragraph 109.

21         A.  Yes.

22         Q.  There's the mediating communications step,

23   do you see that?

24         A.  Oh, yes.

25         Q.  So you are saying that that is admitted to

129

BARKLEY
Court Reporters

1   be in the prior art, right?

2       A.  Yes.

3       Q.  That's your conclusion?  Okay.

4           When you say "the prior art," there, what

5   specific prior art are you referring to?

6       A.  This, for example, is the PCMCIA standard

7   when performing security operations.

8       Q.  It's your testimony that the PCMCIA

9   standard teaches the mediating communications step?

10          MR. RICHARDS:  Objection.

11  Mischaracterizes testimony.

12          THE WITNESS:  It does when it's being used

13  to perform security operations, yes.

14  BY MR. FENSTER:

15      Q.  Does the PCMCIA standard have a means for

16  performing security operations?  Does it require

17  that the data must first pass through a means for

18  performing security operations?

19      A.  No.  It doesn't -- you can use PCMCIA

20  without performing security operations.

21      Q.  Okay.  So -- but to be clear, in paragraph

22  109, where you say -- state that, "The third step of

23  claim 57 is admitted to be in the prior art," the

24  prior art that you are referring to is the PCMCIA

25  standard?

130

BARKLEY
Court Reporters

```
 1              MR. RICHARDS:  Objection.

 2    Mischaracterizes testimony.

 3              THE WITNESS:  And also the

 4    specification -- the -- the disclosures in the

 5    specification that were admitted by SPEX to be prior

 6    art.

 7    BY MR. FENSTER:

 8         Q.  Anything else?

 9         A.  That's all that comes to mind.

10         Q.  And what is your basis for your conclusion

11    that SPEX admitted that the third step of Claim 57

12    is admitted to be in the PCMCIA standard and the

13    disclosures in the specification admitted to be

14    prior art?

15         A.  It would include the -- the citations I

16    gave you earlier.

17         Q.  Paragraph 76?

18         A.  Yes.

19         Q.  Anything else?

20         A.  No, that I -- not that I'm aware of, but

21    there could be other things.

22         Q.  And for the operably connecting step,

23    which you address in paragraph 110, you say, "This

24    step is admitted to be in the prior art."  Do you

25    see that?
```

131

BARKLEY
Court Reporters

```
 1         A.  Ah, yes.

 2         Q.  What prior art are you referring to there?

 3         A.  Again, it's the PCMCIA standard when --

 4   well, you know, and also as described in the -- in

 5   the specification when it's doing security

 6   operations.

 7         Q.  And when you say "in the specification,"

 8   what are you talking about?

 9         A.  It just -- the specification describes the

10   use of --

11         Q.  I'm sorry, what specification?

12         A.  Sorry, the '135 specification.

13         Q.  I see.  Go ahead.

14         A.  It describes the use of PCMCIA in relation

15   to security operations, and my understanding has --

16   is that SPEX has admitted that that use of PCMCIA is

17   in the prior art.

18         Q.  Okay.  So the prior art that you are

19   referring to are the PCMCIA standard and,

20   specifically, the PC card standard referenced at the

21   bottom of page 46; is that right?

22         A.  Yes, and which includes commands and hand

23   shaking, I guess, we should call it, or can call it,

24   for performing operably -- operably connecting, and,

25   furthermore, can be used for security operations.
```

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1        Q.  You agree that the '135 specification is a

2    distinct document from the PCMCIA standard that you

3    reference at the bottom of page 46, right?

4        A.  It is a distinct document; that -- that's

5    right, although the description -- the '135

6    specification includes a description of PCMCIA

7    functionality that is part of the '135

8    specification.

9        Q.  In either this report or your first

10   report, do you state an opinion that the PCMCIA

11   specification that you identify at the bottom of

12   page 46 anticipates Claims 40 -- 55 or 57?

13       A.  I don't believe I state that, no.

14       Q.  And in either this report or your first

15   report, did you state an opinion that the PCMCIA

16   specification, by itself, renders Claims 55 or 57

17   obvious?

18       A.  I don't recall.

19       Q.  Okay.  In your next opinion that starts at

20   page 45, you have invalidity over admitted prior art

21   in connection with Fortezza?

22       A.  Ah, yes.

23       Q.  Okay.  So is this an anticipation or

24   obviousness?

25       A.  This is obviousness.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1          Q.  Okay.  And what specific references are

2    you combining for your obviousness combination in

3    this analysis?

4          A.  Well, it says in the paragraph 111,

5    "SPEX's admissions in combination with my previous

6    analysis with the Fortezza card."  And I also note

7    that it supplements -- this report supplements my

8    opinion concerning Fortezza and/or Lynx in view of

9    the knowledge or the skill of the art --

10         Q.  Do you have any opinion that -- so when

11   you refer to Fortezza, you are talking about the

12   Fortezza Crypto Card?

13         A.  Yes.

14         Q.  Okay.  Do you have any opinion that the

15   Fortezza Crypto Card anticipates Claims 55 or 57?

16             MR. RICHARDS:  Objection.  Scope.

17             THE WITNESS:  Yeah, I -- it's addressed --

18   I address Fortezza separately.  So starting on

19   page 134 of my 2000 -- 2018 report.

20             So, for example --

21   BY MR. FENSTER:

22         Q.  Okay.  Do you have any --

23         A.  -- in paragraph 21, I state that it -- I

24   believe the asserted claims are anticipated by

25   Fortezza, so, for example.

                            134

BARKLEY
Court Reporters

1        Q.   So paragraph?

2        A.   Paragraph 21 on page 6.

3        Q.   You are referring to your March 23, 2018

4   report?

5        A.   Right.  I -- I think that's where the

6   answer to your question is found.

7        Q.   Okay.  Okay.

8             So in your new report, Exhibit 2, you

9   don't --

10            THE REPORTER:  Wait.  Can you say that

11   again?  I'm sorry.

12   BY MR. FENSTER:

13        Q.   In your new report, Exhibit 2, you do not

14   state any new anticipation opinions by Fortezza

15   Crypto Card, correct?

16        A.   Correct.

17        Q.   So in paragraphs 111 through 117 --

18        A.   Yes.

19        Q.   -- you have some analysis regarding the

20   PCMCIA specification as applied to Claims 55 and 57

21   in combination with the Fortezza Crypto Card,

22   correct?

23        A.   That's right.

24        Q.   Okay.  Is there anything about the PCMCIA

25   specification that you cite -- cite in paragraphs

135

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

1   111 to 117 that was not available to you in March

2   2018 when you did your first report?

3        A.  Well, in fact, most of this text is copied

4   and pasted from that first report.  So the same --

5   most of it is the same text.

6        Q.  So there isn't anything about the PCMCIA

7   specification that you cite in paragraphs 111 to 117

8   of your new report that was not available to you in

9   March of 2018, correct?

10       A.  About the specification itself, that's --

11  I think that's right.  And I -- I cite some

12  admissions --

13            THE REPORTER:  "I cite some..."

14            THE WITNESS:  Some -- I cite some

15  admissions from SPEX's deponents about PCMCIA that

16  was not available then, but the description of

17  PCMCIA itself is almost -- I think it's copied and

18  pasted in almost its entirety, other than maybe a

19  brief introductory at paragraph 114, I say, "As I

20  previously explained," but then from there on,

21  it's -- my recollection is it's copied and pasted.

22  BY MR. FENSTER:

23       Q.  So what new analysis were you providing

24  based on SPEX's admissions to your prior analysis

25  regarding the Fortezza Crypto Card?

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

1      A.  I think that's mostly in paragraphs 111

2  through 113.

3           So on 112, for example, I explain that,

4  you know, SPEX's admissions follow from IPR

5  determinations resulting from PCMCIA prior art and a

6  reference from Har- -- Harari and Anderson, which

7  was, of course, PCMCIA prior art.  So I -- I don't

8  want to read -- read the whole thing here, but

9  that's -- so paragraphs basically 111 through 114 --

10 113 are new, relating to admissions from SPEX in

11 documents that have been produced or have been

12 created after 2008, my original report.  And then

13 paragraphs 114 through the end of the section, or at

14 least through paragraph 115, are -- are from the

15 earlier report.

16     Q.  Paragraphs 114 and 115 are copied from

17 your prior report; is that right?

18     A.  Except for, like I said, as I mentioned a

19 moment ago, that the beginning of 114 is a -- is

20 sort of a transition sentence, "As I previously

21 explained..."

22     Q.  Uh-huh.

23     A.  But -- but once we get into that sentence,

24 and then from there to the end of paragraph 115,

25 it's -- it's -- they are long paragraphs, but

BARKLEY
Court Reporters

1    that's -- I believe that's the same as my original

2    report.

3         Q.  So you are not combining the crypto -- the

4    Fortezza Crypto Card with any other prior art in

5    this section of your report; is that right?

6         A.  Well, other than the PCMCIA specification,

7    which is part of the Fortezza card, but other --

8    other than that, that's correct.

9              MR. FENSTER:  Okay.  Why don't we go off

10   the record for a few minutes.

11             THE VIDEOGRAPHER:  This is the end of Disk

12   No. 2, Volume 1, in the deposition of John

13   Villasenor, Ph.D.  The time is 2:48 p.m.  And we are

14   off the record.

15                  (Recess taken.)

16             THE VIDEOGRAPHER:  Back on the record.

17   This is the beginning of Disk No. 3, Volume 1, in

18   the deposition of John Villasenor Ph.D.  The time is

19   2:57 p.m. on March 9th, 2020.

20   BY MR. FENSTER:

21        Q.  Can you pull out Exhibit 1, please, the

22   notice of deposition.

23        A.  Oh, yeah.

24        Q.  So you understand that you are designated

25   to testify on behalf of Kingston as to topic No. 40

                              138

BARKLEY
Court Reporters

1   and the others that were mentioned, correct?

2      A.  I haven't -- sorry.

3         MR. RICHARDS:  Subject to the objections

4   in our response.

5         THE WITNESS:  Yeah, I -- I haven't

6   memorized the specific topics.  But yes, to the

7   extent that you have an accurate list, that's right.

8   BY MR. FENSTER:

9      Q.  So if you could turn to topic No. 40.

10      A.  Yes.

11      Q.  "All facts that support your declaratory

12   judgment counterclaim on patent issues."  Do you see

13   that?

14      A.  I do.

15      Q.  Okay.  Do you -- do you understand that

16   you are designated to testify on behalf of Kingston

17   as to that topic?

18      A.  Yes.

19      Q.  And "your declaratory judgment," you

20   understand that refers to Kingston's declaratory

21   judgment counterclaim?

22      A.  Yes.

23      Q.  Okay.  Do you have any facts to support

24   Kingston's declaratory judgment counterclaim patent

25   issues other than what is stated in your expert

139

BARKLEY
Court Reporters

1    report?

2         A.   Ah, no.

3         Q.   Did you talk to anyone at Kingston about

4    this topic to prepare for this deposition today?

5         A.   I -- I -- as I mentioned before, I have

6    not had any conversations with anyone at Kingston.

7    I have had conversations with Kingston's counsel, as

8    in the sense of Mr. Richards, for example, but with

9    no one Kingston themselves.  I have not had any

10   conversation with people at Kingston in recent

11   months.

12        Q.   Okay.  So through that preparation, you

13   have not obtained any facts to support Kingston's

14   declaratory judgment counterclaim on patent issues

15   other than those that are set forth in your expert

16   report of January 20, 2020?

17        A.   Correct.

18        Q.   Okay.  And is that generally true with

19   respect to all of the topics on which you're -- you

20   have been designated to testify, that the only facts

21   that you have are those that are set forth in your

22   expert report?

23        A.   Mostly.  Although, I mean, I think there

24   is one or two where I -- I have other facts.

25        Q.   Can you identify what those are?

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

```
 1        A.  I mean, for example, the settlement

 2   agreement, which I don't think I discussed

 3   specifically.  But, for example -- or there's one

 4   where -- let's see, there's one -- gosh, I wish I

 5   had -- you know, if I had the list.

 6        Q.  Would you like me to read it to you?

 7        A.  Well, I mean, if you just go through the

 8   numbers, I can tell you whether it's -- the answer

 9   is entirely within my report or whether I have

10   something else to add.

11        Q.  Do you have anything to add -- you don't

12   have anything to add with respect to topic No. 40,

13   correct?

14        A.  Correct.

15        Q.  Do you have anything to add, beyond your

16   report, with respect to topic No. 41?

17        A.  No.

18        Q.  42?

19        A.  Nothing to add.

20        Q.  43?

21        A.  Well, this would just be the -- you know,

22   the -- the report plus the settlement agreement.

23        Q.  Okay.  Do you have any analysis regarding

24   the settlement agreement?

25             What -- you reference the "settlement
```

141

BARKLEY
Court Reporters

1   agreement."  What settlement agreement are you

2   talking about?

3        A.  The settlement agreement between Western

4   Digital and SPEX, which led to the -- the

5   termination of the IPR proceeding.

6        Q.  Okay.  And what facts do you have

7   regarding the settlement agreement outside of the

8   settlement agreement itself?

9        A.  Well, the facts are -- are described.  The

10  terms of the settlement agreement are described in

11  the settlement agreement, including, for example,

12  that the settlement agreement was contingent on the

13  PTAB agreeing to terminate proceedings, terminate

14  the IPR.

15       Q.  Okay.  Anything else with respect to topic

16  43?

17       A.  Not that I recall at the moment.

18       Q.  Do you have anything to add outside of

19  your report with respect to topic No. 44?

20       A.  No.

21       Q.  45?

22       A.  Same answer.

23       Q.  50?

24       A.  Same answer.

25       Q.  Do you have anything to add with respect

142

BARKLEY
Court Reporters

1    to topic No. 51?

2         A.  Ah, yeah.  I have nothing to add.

3         Q.  52?

4         A.  Nothing to add.

5         Q.  56?

6         A.  Well, same as the earlier answer where the

7    settlement agreement is -- is a fact that relates to

8    that contention.

9         Q.  Anything else other than the settlement

10   agreement itself?

11        A.  Ah, that, plus the contents of my report.

12   That's it.

13        Q.  Do you have anything -- do you have any

14   facts in response to topic No. 59?

15        A.  Just the fact that Kingston has been

16   caused to incur costs in -- in litigation.

17        Q.  Anything else?

18        A.  That and the report.  That's it.

19        Q.  Do you identify any ways in which Kingston

20   has been harmed in your report?

21        A.  No.  I don't believe I talk about harms to

22   Kingston in my report.

23        Q.  Okay.  So the only facts that you have in

24   connection with claim -- with topic No. 59 that

25   Kingston has been harmed as a result of SPEX's

143

1  unlawful conduct, allegedly, is that Kingston has

2  incurred cost for litigation; is that right?

3      A.  And just to make sure it's clear that the

4  fact that I'm providing is the fact that costs were

5  incurred.  I'm -- I'm not offering an opinion on the

6  contention itself.

7      Q.  Okay.  Do you have any knowledge as to

8  what costs Kingston has incurred as a result of

9  SPEX's conduct?

10     A.  I don't have a specific breakdown, no.

11     Q.  Have you spoken with anyone at Kingston

12  regarding what those are?

13     A.  I have not.

14     Q.  How do you know that Kingston has incurred

15  litigation costs as a result of SPEX's conduct?

16     A.  I was informed by Kingston's counsel.

17     Q.  Mr. Richards?

18     A.  Ah, yes.

19     Q.  Did he tell you the extent?

20     A.  No.  I -- he did not give me a number.

21     Q.  Do you have any facts to add in support of

22  topic No. 63?

23     A.  My report, plus the -- the fact of

24  continued litigation.

25     Q.  And you don't have any opinion as to

144

BARKLEY
Court Reporters

 1    whether SPEX has --

 2              THE REPORTER:  Has what?

 3    BY MR. FENSTER:

 4         Q.  -- whether SPEX has committed patent

 5    misuse or not?

 6         A.  I am not offering any opinion on that

 7    question.

 8         Q.  What efforts did Kingston make to --

 9         A.  I'm sorry, which am I?

10         Q.  Yeah, I'm sorry, referring to topic 67.

11    "What efforts did Kingston make to locate and

12    produce documents in response to SPEX's third set of

13    Request for Production"?

14         A.  So my understanding -- and this would

15    apply both to 67 and 68 -- is that upon receiving

16    the request for production in the case of 67 and the

17    interrogatories, that SPEX's counsel instructed

18    SPEX -- or I'm sorry -- instructed Kingston to

19    locate any documents relevant to the Request for

20    Production in 67, and endeavor to engage with

21    Kingston to respond to 68.

22         Q.  Okay.  And in your answer, where you refer

23    to "SPEX's counsel," did you mean Kingston's

24    counsel?

25         A.  Yes, I misspoke.  I apologize.  Yes, I

                          145

BARKLEY
Court Reporters

 1   meant -- in my previous answer, I was referring to

 2   Kingston's counsel.  I'm sorry.

 3            MR. FENSTER:  All right.  I don't have

 4   anything further.

 5            MR. RICHARDS:  Just very briefly I want to

 6   clear something up.

 7            Okay.

 8               EXAMINATION BY MR. RICHARDS

 9       Q.  It seems like a long time ago, feels like

10   ages ago, you were asked several questions.  I just

11   want to make sure we have it clear for the record.

12   Please turn with me to page 36 of your report.

13       A.  Yep.

14       Q.  Do you see a heading with a "2" before it?

15       A.  Yes.

16       Q.  What does that heading read?

17       A.  "An objective litigant's view of the

18   litigation."

19       Q.  And, presumably, the paragraphs following,

20   90, 91, 92, 93, 94, through 95, do they contain

21   opinions regarding an objective litigant's view of

22   the litigation?

23       A.  Yes, that's the intent.

24       Q.  And have you changed your mind about any

25   of the opinions you offer in these paragraphs?

                        146

1        A.   Not that I'm aware of, no.

2              MR. RICHARDS:   That's all I have.

3              MR. FENSTER:   Is there any reason why this

4    is marked, "Highly Confidential, Attorneys' Eyes

5    Only"?

6              MR. RICHARDS:   I believe just because it

7    references other depositions that have been marked

8    "Attorneys' Eyes Only."   I don't -- there is -- I

9    will double-check, but to my knowledge, there is no

10   Kingston confidential information.   I believe the

11   only confidential information in there would be

12   SPEX's relating to Fortezza to the extent --

13             THE REPORTER:   "To the extent..."

14             MR. RICHARDS:   -- that SPEX is maintaining

15   confidentiality over Fortezza and stuff relating to

16   Fortezza.

17             Make sense?

18             MR. FENSTER:   Okay.

19             THE REPORTER:   Is this highly confidential

20   or not?

21             MR. RICHARDS:   I don't think there's

22   anything in here.

23             MR. FENSTER:   I don't see a need for it.

24             THE VIDEOGRAPHER:   All right.   This is the

25   end of Disk No. 3, Volume 1, and concludes the

147

BARKLEY
Court Reporters

1    deposition of John Villasenor, Ph.D.  The time is

2    3:09 p.m. on March 9th, 2020, and we are off the

3    record.

4              THE REPORTER:  Does anybody need a rough?

5              MR. RICHARDS:  I don't.  When -- when will

6    you have a final?

7              THE REPORTER:  I think it's ten business

8    days.

9              MR. RICHARDS:  Are you-all expediting?

10             MR. FENSTER:  Yes, we will need it

11   expedite, please, and if you could provide a rough.

12             THE REPORTER:  When do you need it

13   expedited by?

14             MR. FENSTER:  If you can, would tomorrow

15   be possible?

16             THE REPORTER:  I can do tomorrow.

17             MR. RICHARDS:  I don't need a copy of the

18   video, but of the transcript, yes, please.

19             THE REPORTER:  Mr. Richards, do you need a

20   rough or not?

21             MR. RICHARDS:  Sure, I'll take a rough.

22             (Deposition concluded at 3:10 p.m.)

23

24

25

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

```
1              DEPOSITION OFFICER'S CERTIFICATE

2     STATE OF CALIFORNIA    )
                             ) ss.
3

4

5

6              I, Siew G. Ung, hereby certify:

7              I am a duly qualified Certified Shorthand

8     Reporter in the State of California, holder of

9     Certificate Number CSR 13994 issued by the Certified Court

10    Reporters' Board of California and which is in full

11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12             I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a)(a)).

17             I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22             I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                           / / /
```

149

**BARKLEY**
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3        Before completion of the deposition, review of

4    the transcript [  ] was [XX] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8    Dated: 03/10/20

9

10

11    _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

150

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I

BARKLEY
Court Reporters

**\***

**\*\*\* (1)**
6:3
**\*the (1)**
85:4
**\*Turn (1)**
90:5

**/**

**/// (1)**
57:25

**A**

**a- (1)**
91:12
**able (3)**
23:22;41:9;129:18
**absent (2)**
31:14;45:6
**absolute (1)**
89:5
**absolutely (2)**
86:3;117:2
**access (2)**
59:14;114:7
**according (1)**
28:7
**Accordingly (1)**
101:4
**accurate (1)**
139:7
**accurately (2)**
27:25;68:22
**acknowledged (1)**
94:22
**acknowledging (2)**
95:17,20
**across (2)**
13:18;73:13
**Act (2)**
24:20,22
**act- (1)**
87:18
**actual (9)**
24:4;26:10,11;
37:12;38:8;39:4,15;
43:11;118:17
**actually (22)**
8:9;13:18;15:4;
22:12;25:2;26:25;
37:4,11;38:14;43:14,
17,22;49:23;54:10;
56:20;76:1;83:11;
87:18;88:8;94:4;
105:15;123:4
**adapted (1)**
67:13
**add (11)**
41:15;141:10,11,

12,15,19;142:18,25;
143:2,4;144:21
**additional (5)**
31:18;46:19,22;
47:1;89:3
**address (8)**
13:10;56:9;107:4;
114:14;120:3;
122:10;131:23;
134:18
**addressed (10)**
19:23;35:23;
50:12;54:16;62:19;
69:3;75:6;86:12;
122:3;134:17
**addresses (2)**
40:24;42:1
**addressing (4)**
42:19;48:1;49:1;
98:3
**adjudicated (2)**
56:19,23
**administrative (2)**
65:6,15
**admission (2)**
115:12,14
**admissions (8)**
56:8;125:9;134:5;
136:12,15,24;137:4,
10
**admit (1)**
115:8
**admits (1)**
110:5
**admitted (64)**
52:11;63:18;
100:18,22;101:5,12,
21;102:3,8,13,16;
103:4,23,24,25;
104:4,7,11;105:23,
24;106:4,5,23;
108:20;109:5,18;
110:1,4,8,17;111:4;
112:5;113:2;114:19;
115:1,3;119:22;
120:7,19;121:1,15,
24;122:11,15,20;
123:8,15;124:9,13,
19;125:3;127:10;
128:3;129:6,8,25;
130:23;131:5,11,12,
13,24;132:16;133:20
**adverse (1)**
33:2
**affirm (1)**
63:8
**affirmative (1)**
82:25
**affirmatively (1)**
62:14
**affirmed (6)**
50:15;59:2;60:11,
13;62:22,24

**affirming (1)**
59:11
**affirms (1)**
58:20
**Again (58)**
12:11;13:8;14:12,
22;15:9;16:1;17:1;
21:19;23:1;24:11,
16;29:8;30:1,2;37:7;
38:20;45:4;48:11;
50:11;51:10;52:2,13,
22;53:9;57:9;60:18;
64:20;65:18;69:21;
70:11;72:9;73:10;
75:16;76:20,22;77:6,
16,23;78:25;80:12,
13,17;88:2;90:1;
91:12;93:4,4,20;
96:6,13;98:2;99:6;
119:18;120:9;
122:25;127:18;
132:3;135:11
**against (2)**
33:5;62:13
**agent (2)**
18:6,7
**ages (1)**
146:10
**ago (14)**
12:3,4;20:13;23:2,
6;24:11,17;42:15;
61:1;90:25;106:7;
137:19;146:9,10
**agree (19)**
28:23;29:1;30:15;
31:10;36:8;42:22;
45:10;46:16;56:16;
60:23;64:3,5;65:5;
66:18;74:22;98:5,
19;116:12;133:1
**agreed (2)**
8:20;72:2
**agreeing (1)**
142:13
**agreement (17)**
40:13,17;89:23;
90:1;141:2,22,24;
142:1,1,3,7,8,10,11,
12;143:7,10
**Ah (9)**
33:12;58:8;129:4;
132:1;133:22;140:2;
143:2,11;144:18
**ahead (2)**
56:5;132:13
**AIA (5)**
24:25;25:12;26:1,
2;102:25
**al (1)**
6:14
**allegation (2)**
89:25;90:3
**allegedly (1)**

**144:1**
**alluded (2)**
61:2;64:1
**almost (3)**
73:15;136:17,18
**alone (1)**
14:17
**Although (11)**
14:15;17:4,22;
32:15;61:15;64:20;
76:6;120:4;127:17;
133:5;140:23
**American (2)**
24:20,21
**Among (6)**
45:21;66:7;78:3;
86:22;88:14,20
**analysis (34)**
26:22;36:10;
47:25;71:2;77:14,21,
24;101:23;102:2,6,7,
9,10;110:14;113:20;
114:2;116:22;117:5;
119:9,22;120:6,12,
14,18,24;121:6,23;
122:14;134:3,6;
135:19;136:23,24;
141:23
**analyze (1)**
114:9
**analyzing (1)**
26:12
**and/or (3)**
16:21;52:18;134:8
**Anderson (13)**
20:8;49:12,12;
51:9;52:12,18;119:5,
6,7,11,14,20;137:6
**ans- (1)**
41:19
**answered (8)**
15:19;25:21;72:8;
106:19;108:24;
112:8;121:8;127:15
**answer's (1)**
48:2
**ant (1)**
69:14
**antici- (1)**
112:25
**anticipate (6)**
103:18;104:23;
105:4;108:9,21;
113:1
**anticipate- (1)**
108:15
**anticipated (9)**
100:22;101:12,18,
19;102:12,16,21;
111:24;134:24
**anticipates (5)**
103:5;106:8;
112:5;133:12;

134:15
**anticipation (26)**
101:15,22;102:11,
13;104:20;105:23;
107:3;108:4,4;
109:11,13,20,22,24;
110:2,10,18;111:15,
21;116:17;117:6,7;
121:6;122:18;
133:23;135:14
**apart (1)**
101:22
**apologize (1)**
145:25
**appeal (13)**
33:22;34:11;
42:10,11;53:10;
57:5;58:9;60:8,21;
61:20,25;62:9;96:19
**appealed (1)**
58:13
**appealing (1)**
62:3
**appeals (8)**
34:2;42:17;53:4,6,
7,13,15;62:5
**apples (1)**
63:6
**apples-to-apples (3)**
29:4,9,21
**apples-to-oranges (1)**
98:2
**applicable (1)**
63:14
**application (3)**
95:11,12,21
**applied (7)**
30:10,12;68:7;
73:8,24;109:16;
135:20
**applies (3)**
28:4;49:2;83:3
**apply (8)**
52:1;65:9,12;
77:13;83:8,19;
102:10;145:15
**applying (1)**
77:19
**appointment (1)**
19:11
**appreciate (2)**
41:7,12
**architecture (1)**
76:12
**argument (4)**
100:3;108:4;
110:2;111:23
**arguments (2)**
99:19,24
**around (2)**
23:4;25:9
**art (113)**
37:23;52:4,7;63:9,

15,19,23;73:19;
75:21;76:2;77:3,11;
78:18,23;94:17,20,
25;95:5;100:18,22;
101:5,9,12,22;102:3,
8,13,16;103:3,5,23,
24;104:1,5;105:24,
25;106:5,5,23;108:8,
20;109:5,18;110:1,4,
6,8,16,18;111:4,5,6,
8,13;112:5;113:2;
114:20;115:2,3,24,
25;116:5,6,7,8,11,13,
20,23;119:22;120:7,
19;121:1,14,15,19,
24;122:11,15,20;
123:9,11,16,17;
124:14;125:4,10,13,
17,23;126:1;127:11,
12,13;128:3;129:7,9;
130:1,4,5,23,24;
131:6,14,24;132:2,
17,18;133:20;134:9;
137:5,7;138:4
artificially (1)
  73:12
assert (4)
  63:23;83:10;
  89:22;106:17
asserted (4)
  33:5;63:19,24;
  134:24
asserting (9)
  51:8;105:4;109:4,
  11,13,19,22,24;
  111:12
associated (1)
  6:7
assume (2)
  30:7;64:6
assuming (1)
  24:24
attempt (2)
  61:11;91:13
attempts (1)
  44:11
Attorneys' (2)
  147:4,8
available (6)
  44:21;45:12;47:2;
  136:1,8,16
aware (64)
  10:17;13:14,22;
  27:13;28:3;29:16;
  30:22;32:13,14;
  33:14,21;34:3;35:3,
  6,7,10;39:18;40:21;
  41:4,25;42:2;46:25;
  47:20;48:16,18,19;
  49:4;50:1,6,14;51:7;
  52:10,17;60:6,6,16,
  24;61:2,4,5,7,10,18,
  22;62:6,10,12,15,15;

63:17,18;65:1,10,13;
68:9,13;77:18;96:6;
105:2;113:4,15;
128:24;131:20;
147:1

B

Bachelor (2)
  76:9,15
bachelor's (1)
  76:4
back (12)
  17:9;57:16;59:22;
  60:15;81:18;95:22;
  96:13,20;114:8;
  117:13;123:12;
  138:16
background (3)
  14:4,16;15:16
bad (2)
  84:18,21
banks (2)
  41:18,19
Barber (1)
  6:7
Barkley (2)
  6:8,12
barred (1)
  52:3
base (1)
  88:11
based (13)
  13:5;15:11;44:1,
  14;49:11;50:9,18;
  51:8,13;63:8;106:4;
  110:15;136:24
baseless (4)
  81:4,8;84:19;92:8
bases (1)
  91:10
basically (3)
  64:13;103:13;
  137:9
basis (9)
  27:4;28:22;91:14;
  110:1;117:20;118:6,
  7;121:11;131:10
Bates (4)
  107:17,25;112:15,
  20
be- (1)
  20:8
become (1)
  87:15
beginning (2)
  81:19;137:19;
  138:17
behalf (14)
  6:18;7:21;8:4;
  9:19;10:18,20;
  11:17;23:11;24:5,8,
  19;25:18;138:25;

139:16
behavior (6)
  17:12;53:25;54:8;
  82:4,10,16
belief (2)
  37:18;110:16
believer (2)
  79:16;80:18
benefit (1)
  85:10
best (5)
  10:10;11:20;82:11
beyond (3)
  30:20;116:21;
  141:15
bit (3)
  37:14;53:18;
  105:17
block-chain (2)
  18:22,23
board (12)
  44:14,15,20;46:7,
  24;47:1;49:17;
  65:23,24;66:10,16;
  100:5
board's (1)
  66:4
bodies (1)
  63:4
body (4)
  32:22;65:6,15;
  82:9
bot- (1)
  107:15
both (14)
  33:10;43:8;79:11,
  22;99:21;100:2;
  101:18;102:11;
  104:2;109:21;114:6,
  6;125:25;145:15
bottom (6)
  107:7,15;125:2;
  132:21;133:3,11
box (1)
  101:3
break (2)
  59:14;117:9
breakdown (1)
  144:10
breaking (1)
  115:20
brief (5)
  25:12;57:19;
  59:13;128:16;
  136:19
briefing (1)
  104:13
briefly (4)
  34:20;81:25;
  112:2;146:5
broader (1)
  37:24
broadly (1)

21:15
Brookings (1)
  25:11
bunch (1)
  27:1
burden (1)
  28:12
business (1)
  148:7

C

CALIFORNIA (4)
  6:1,9,10,15
call (4)
  61:5;121:9;
  132:23,23
called (2)
  18:14;63:9
can (87)
  10:10;13:3;14:9,
  19;15:15;19:3;
  22:25;23:9,25;24:3,
  15,18;25:17;29:12,
  14;30:15;31:12,23;
  32:4,25;34:24;
  35:22;37:6,6,17;
  38:19;40:7,8;41:18;
  45:10;54:25;56:3;
  59:13,14,17;63:11;
  69:21;74:12;76:6,7;
  85:15,23;86:4;
  91:20;94:2,13;
  100:12,14;102:6;
  103:2;105:1;109:1;
  110:1,9,18;111:10,
  14;115:23;116:10,
  10;118:25;119:2,3;
  120:13,15,15,17;
  121:5;123:20;124:2,
  18;126:6,10,11;
  127:9;128:1;129:13,
  20;130:19;132:23,
  25;135:10;138:21;
  140:25;141:8;
  148:14,16
capital (5)
  21:19;24:9,20;
  25:19;26:7
card (16)
  104:12;107:16,24;
  112:14,17;113:4;
  122:21;132:20;
  134:6,12,15;135:15,
  21;136:25;138:4,7
care (1)
  120:16
careful (1)
  74:9
Case (31)
  6:16;10:11;11:6;
  12:2,10,19;20:17;
  29:11;30:17;31:7;

42:9;44:10,12,20;
48:23;51:14;54:6,7,
10,11,13,14,21;
55:10;79:3;83:10;
85:19;98:15,22;
112:21;145:16
cases (2)
  11:9;13:19
cause (1)
  34:22
caused (2)
  46:23;143:16
caveat (2)
  65:18,21
Central (1)
  6:15
certain (8)
  8:19,20;33:7;38:4;
  60:5;74:17;88:7;
  113:25
certainly (11)
  30:7,17,21;53:18;
  61:3;69:14;70:21;
  83:14;89:8;111:18;
  113:15
certainty (5)
  9:15;46:25;85:23;
  86:3;87:20
challenge (1)
  87:15
challenging (1)
  60:17
chance (1)
  100:3
change (3)
  34:23;64:21;81:11
changed (3)
  22:9;60:8;146:24
characterize (1)
  100:11
chart (1)
  70:6
check (1)
  91:14
choose (1)
  29:19
chose (2)
  47:10;63:22
Chronologically (1)
  118:4
Circuit (22)
  29:11;34:7,14,17;
  50:14,22,25;51:2;
  53:7,10,13;57:6;
  58:6,20;59:2,11;
  62:24;63:12;96:15,
  19;97:8;104:13
Circuit's (3)
  62:1,6;63:7
circumstances (2)
  38:4;52:1
citations (2)
  126:1;131:15

**cite (25)**
27:8;45:19;53:24;
75:11,17;77:21,24;
78:6,7;105:13,15;
113:5,24;115:14;
123:23;124:4;
126:15;127:10;
128:12;135:25,25;
136:7,11,13,14

**cited (9)**
49:19;77:23;78:1,
2;93:3;107:12;
113:9;122:22;
127:17

**citing (6)**
54:2;93:4;104:14;
114:5,6;124:3

**claim (114)**
28:1,6,20;32:3;
33:3,20;34:2;38:7;
39:3,14;47:22;48:8;
55:12,19,24;56:16;
58:22;59:3;60:12,14,
22,25;61:21,23;62:7,
22,23,25;63:2;64:13,
14,17;65:19,21;67:5,
12,12,19,22;68:4,5,6,
14,24;69:2,10,17,18;
70:1,14,16;71:3,14,
17,21,23;72:4,6,13,
14;73:5,7,23,25;
74:2,13,19,20;75:1,
4;77:13,20;78:22;
96:10,13,15,18,24;
97:4;100:21;101:4,9,
10,11,21;102:10;
103:5;104:5,23;
106:8;114:12,18,23;
115:9,9,15,16,24;
116:9,14;123:8,13;
124:13,20,20;125:3;
128:3;129:2,3,3,11;
130:23;131:11;
143:24

**claim-by-claim (1)**
28:22

**claimed (1)**
116:24

**claiming (2)**
95:11,13

**claims (87)**
31:5,6,10,22;33:7;
35:20;36:14;37:2,10,
22;40:4,15,19;41:22;
42:3;43:23;44:12;
45:2,8,11,20,23,23;
46:9;49:18;54:23;
55:8;56:7;57:2,3;
58:11;60:1,2;64:4,8,
25;65:6,14,16;66:3,
5,19,20;67:9,10;
71:2;72:2;74:22,24;
78:8;85:25;86:11;

87:15;88:18,22;
89:2;90:10;91:6;
94:8;97:17;98:8;
100:13;102:2,7,15,
20;103:18;104:23;
105:5;106:3,8;
108:10,21;111:15;
112:5;113:1;117:16,
21,25;118:8,23;
124:11;133:12,16;
134:15,24;135:20

**clarification (1)**
94:5

**clarified (1)**
28:21

**clarify (3)**
36:2;85:15;100:23

**clarifying (2)**
97:13;101:25

**clarity (2)**
23:7;49:15

**class (8)**
18:11,13;19:22,
24;20:2,7,10,13

**classes (8)**
18:11;19:3,12,15,
16,17,21,23

**clear (19)**
27:21;28:1,10;
29:18;30:19;35:13;
47:24;48:10;56:15;
65:7;83:2,14;
100:24;104:19;
112:16;130:21;
144:3;146:6,11

**closely (1)**
127:20

**code (1)**
48:17

**coin (1)**
43:25

**Columbia (2)**
54:15,15

**Column (2)**
68:19,20

**Columns (1)**
68:18

**combination (8)**
49:11;83:9;
105:20,24,25;134:2,
5;135:21

**combine (4)**
116:9,23;119:10;
121:14

**combining (5)**
121:24;122:10,15;
134:2;138:3

**commands (1)**
132:22

**committed (1)**
145:4

**commodities (1)**
19:7

**common (1)**
18:18

**communications (2)**
129:22;130:9

**comp- (1)**
21:10

**companies (4)**
21:7,9,21;24:12

**Company (8)**
7:15;8:21;10:5,7;
20:24;21:2,13;26:15

**compare (1)**
67:9

**comparing (2)**
71:2;93:16

**comparison (3)**
29:4,21;98:2

**competency (1)**
80:20

**competent (3)**
32:22;79:15;80:16

**complete (4)**
19:4;44:3,5;
128:22

**completely (2)**
18:14;111:22

**compliant (1)**
104:12

**complicated (1)**
31:8

**component (3)**
68:16;70:20;73:3

**computer (12)**
15:4,17;76:4,10,
11,12,16,19;77:8,9;
126:19,20

**concerning (1)**
134:8

**conclude (3)**
48:5;49:7;73:19

**concluded (5)**
40:25;49:17;
60:21;61:20;148:22

**concludes (1)**
147:25

**concluding (1)**
92:11

**conclusion (18)**
47:3,21;48:7;
63:12,14;64:16;
65:11;77:24,25;
86:21;88:6,11;89:1;
93:1;95:4;129:15;
130:3;131:10

**conclusions (3)**
66:1;75:19;84:17

**conditioning (1)**
31:15

**conditions (1)**
51:25

**conduct (4)**
27:6;144:1,9,15

**conducted (3)**

26:18;27:3;85:21

**confidence (1)**
22:23

**confident (1)**
91:23

**Confidential (4)**
147:4,10,11,19

**confidentiality (2)**
23:23;147:15

**configured (1)**
68:17

**confirmed (1)**
95:4

**confirms (3)**
92:13;93:6;94:16

**confused (2)**
57:8;61:1

**confusion (2)**
56:11;101:25

**Congress (1)**
29:16

**connecting (14)**
74:23;92:15,21;
93:8,11,17,24;94:7,
8,11;127:6,18;
131:22;132:24

**connection (17)**
24:8;26:5;33:17;
42:18;46:3,9;47:10,
15;48:22;62:18;
66:13;85:3;90:23;
97:15;111:2;133:21;
143:24

**connects (2)**
126:19,19

**consider (8)**
42:16;44:20;46:8;
48:14,21;66:11;
99:18;100:10

**considered (13)**
46:19;50:13;
62:17;65:13;66:8;
85:25;86:1;89:3;
98:18,25;100:6,7,8

**considering (1)**
88:22

**consistent (4)**
70:23;73:1,22;
74:13

**constitution (1)**
18:15

**constitutional (2)**
18:13,17

**construction (15)**
68:1,14,21;69:19,
21;70:1,16;71:12,13;
72:6,17;73:25;77:14,
20;94:6

**constructions (2)**
67:20;69:23

**construed (5)**
67:17;68:4,10;
69:6;92:22;93:11,

17;94:7

**consultant (2)**
22:7,10

**consulting (1)**
22:11

**contain (4)**
12:25;13:6;
103:16;146:20

**contained (1)**
13:8

**contention (2)**
143:8;144:6

**contents (2)**
125:9;143:11

**contested (1)**
35:8

**context (23)**
11:4;17:13,15,19,
22,23;27:17;31:14,
17,18,20;37:24;
41:15;45:7;55:2;
82:20;88:5;95:2,14,
18;97:11;110:13;
119:20

**contingent (1)**
142:12

**continued (1)**
144:24

**contrary (1)**
81:1

**conversation (7)**
15:11,12,13;
16:25;17:2,5;140:10

**conversations (3)**
16:12;140:6,7

**convincing (12)**
28:2,10;29:18;
30:20;35:13;47:24;
48:10;56:15;65:7;
83:2,14;100:24

**copied (4)**
136:3,17,21;
137:16

**copy (5)**
34:24;57:21;70:7;
84:9;148:17

**corporate (6)**
10:5;92:13;93:6;
94:16;104:15;124:4

**Corporation (2)**
6:14;7:14

**corrected (1)**
76:18

**correctly (1)**
34:18

**corresponding (13)**
68:3,15,25;69:17,
25;70:15;71:4;72:5,
15;73:2,8,23;74:5

**corroborates (2)**
75:17;93:5

**cost (1)**
144:2

**costs (4)**
143:16;144:4,8,15
**Counsel (26)**
6:20;11:12;13:25;
14:8,11,18,21;15:12;
16:5,9,14;21:1,4;
22:16,17,19,20;41:9;
81:23;99:25;140:7;
144:16;145:17,23,
24;146:2
**counterclaim (4)**
139:12,21,24;
140:14
**country (1)**
79:24
**counts (1)**
53:22
**couple (1)**
51:24
**course (10)**
11:12;18:19,21;
32:3,23;71:23;
95:13;117:3;127:19;
137:7
**Court (52)**
6:8,12,15;7:3;
27:22;28:2;33:1,5;
34:9;35:5,9,14;
47:23;48:5,9,13;
51:13;55:10;56:14,
18,20;61:25;62:3;
64:24;65:5,10,11,15;
67:18;68:4,9;69:6;
71:4;72:16;73:8;
74:6,14,18,18;82:9,
15,21,23,23,24;83:3;
92:22;93:11,17;
94:7;97:14;98:18
**court's (9)**
68:1,13;69:18,25;
70:15;72:6;77:13,
20;94:6
**cover (1)**
67:7
**created (5)**
18:15,19,21;26:2;
137:12
**Crypto (7)**
134:12,15;135:15,
21;136:25;138:3,4
**current (1)**
33:25
**currently (6)**
33:20;39:19;
55:20,25;60:24;
61:22

**D**

**D- (1)**
21:11
**data (4)**
31:3,4;67:14;

130:17
**date (6)**
6:10;25:1,1,3,4;
107:11
**dates (5)**
23:4;24:25;78:15,
21;79:1
**days (1)**
148:8
**dec- (1)**
89:4
**decide (1)**
43:9
**decision (69)**
28:6,6,14;29:7;
31:13,23;40:4,15,20,
22;41:5,23;42:4,12,
23,25;43:7,10,11,20,
20,24;44:1,4,15,24;
45:1,19,22;46:9,18;
47:14;50:15,19;
56:25;57:2;58:5,10,
12,21;59:3,11;60:1;
62:1,23,24;63:7;
64:18,22;66:4,10;
78:12;82:25;87:3;
90:11;96:10,11,21,
23;97:1,3,6,7,13;
98:17,24;99:12;
100:6;118:3
**decisions (3)**
43:6;45:11;62:6
**declaration (25)**
80:6;84:1,7,12,18;
85:11,22;86:2;
88:23;89:4;90:22,
24;91:16,18;92:2,5,
7,97:17;98:12,18,25;
99:2,6;100:7;118:17
**declaratory (5)**
139:11,19,20,24;
140:14
**DEF (1)**
107:18
**DEF/INV (1)**
112:15
**defendants (1)**
7:1
**deficiencies (1)**
121:19
**defined (1)**
75:21
**degree (4)**
21:5;75:25;76:4;
77:7
**deliberations (2)**
47:19,20
**denied (3)**
50:6;61:8,13
**denying (1)**
50:15
**department (1)**
20:6

**depending (2)**
27:17;45:11
**depends (2)**
15:9;66:25
**deponent (3)**
7:22;10:4;11:6
**deponents (1)**
136:15
**deposi- (1)**
10:4
**deposition (22)**
6:11,17;7:12,13;
8:14,18,24;11:18,22;
12:1,10,12;75:25;
78:14;81:13,20;
138:12,18,22;140:4;
148:1,22
**depositions (2)**
10:1;147:7
**describe (1)**
108:13
**described (10)**
103:14;106:13;
109:2,15,17;111:11,
14;132:4;142:9,10
**describes (4)**
103:21;108:2;
132:9,14
**describing (3)**
103:15;107:1;
108:5
**description (3)**
133:5,6;136:16
**designated (12)**
7:21,25;8:4;9:13,
19;10:4;11:9;92:13;
124:4;138:24;
139:16;140:20
**designation (1)**
11:4
**despite (2)**
67:4;116:10
**detail (3)**
50:13,13;76:24
**details (6)**
9:3;34:13;61:3,6;
62:2;63:25
**determinations (1)**
137:5
**develop (1)**
92:6
**developed (2)**
44:17,25
**device (4)**
70:22;72:19,22;
126:19
**devices (1)**
76:12
**di- (1)**
84:16
**difference (1)**
74:21
**differences (5)**

66:18,21,24;67:4;
124:10
**different (33)**
27:13;28:17;29:2,
3,10,12,13,20;30:8,
15,16;42:23;43:6,6;
44:4,4;45:11;46:18,
24;47:3;63:9,15;
73:13;87:17;89:1;
97:21;98:3;110:5,11,
16;116:4;117:3;
122:15
**Digital (45)**
7:14;18:14,16;
33:14;37:23;39:22,
25;40:3,14,18;45:16;
46:3,17;47:11,15;
49:23;50:8,16;
51:16;61:12;63:10,
19,23;66:4,10;78:12;
80:4,8;84:3;85:6;
86:20;88:12;89:11;
90:17,20;95:25;
96:5;97:16,22;98:7;
99:7,10,16;117:17;
142:4
**direct (2)**
41:13,13
**directing (2)**
22:2,6
**direction (6)**
13:25;14:7,14,23;
16:6;101:6
**directly (3)**
15:5,8,10
**director (4)**
10:6,12;21:24;
26:15
**dis- (1)**
23:18
**disagree (2)**
79:17;84:16
**disclosed (3)**
68:18;116:6;
124:20
**disclosures (2)**
131:4,13
**discussed (5)**
15:13;82:1;
113:18;124:12;
141:2
**discussing (1)**
56:14
**Discussion (3)**
59:21;121:16;
123:13
**discussions (7)**
16:17,18;21:16;
23:19;25:13,14;
81:23
**Disk (5)**
81:12,19;138:11,
17;147:25

**dismissal (1)**
59:12
**dismissed (1)**
61:12
**dispute (3)**
9:6;52:16;60:19
**distinct (5)**
116:6;121:6;
127:19;133:2,4
**distinction (1)**
36:21
**distinguish (1)**
36:16
**District (23)**
6:15,15;27:22;
28:2;33:1,5;34:9;
35:5,8,14;47:23;
48:5,9,13;51:13;
55:10;56:14,18,20;
64:24;65:10,10;83:3
**DivX (13)**
21:10,25;22:3,8,
17,22;23:3,11,14;
24:5,19;25:18;26:7
**D-I-V-X (1)**
21:12
**doctrine (2)**
109:5;110:4
**document (26)**
8:8;11:10;103:10,
17;105:12;106:16,
19;107:1,10,24;
108:7;109:11,23;
112:4,8,14,18,21,22;
113:5;121:8,25;
122:19,19;133:2,4
**documents (22)**
11:7;91:3;103:14,
17;105:3;108:1,5,13,
21;109:1,3,12,15;
111:11,14,17;
112:24;113:21;
114:7;137:11;
145:12,19
**done (8)**
10:8;12:2;26:21;
28:22;80:14;96:8;
100:5;120:21
**double (1)**
37:16
**double-check (1)**
147:9
**doubt (3)**
30:21;117:19;
118:6
**down (1)**
62:11
**Dr (48)**
7:9;25:6;36:1;
41:7,22;61:18;
69:16;70:13,25;
71:21;74:3;79:4,6,
15,17,21,23;80:6,11,

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

16,18,20,22;81:2,3,
4;84:13,17;85:11,22;
86:2;90:23;91:5;
92:7;93:15;97:16;
98:5;104:4,18;
108:18;113:20,25;
114:2,5,7;115:6,23;
123:25
**draft (7)**
15:8,10;16:9,22,
22;17:3,14
**drafted (2)**
13:23;15:4
**drafter (1)**
14:17
**drafting (1)**
15:17
**draw (1)**
63:11
**dually (3)**
32:10;62:21;64:3
**duly (1)**
7:6
**Dumas (4)**
49:12;51:9;52:12,
18
**duration (1)**
81:25

### E

**earlier (9)**
61:14;94:5;
100:25;101:1;
122:22;123:12;
131:16;137:15;
143:6
**easier (1)**
69:24
**editing (2)**
16:6;17:6
**effect (7)**
48:14,21;53:4,5,7,
13;86:24
**effectively (1)**
67:6
**effort (1)**
22:13
**efforts (2)**
145:8,11
**either (10)**
14:13;21:2;25:6,
18;56:17;58:17;
65:6,16;133:9,14
**electrical (2)**
20:5;76:10
**electronic (1)**
84:9
**element (6)**
68:8,11,15;73:6;
116:11,13
**elements (6)**
67:6;74:23;

115:24;116:1,5,20
**else (17)**
11:11,15;15:8;
26:8;54:17;87:13;
104:25;109:20;
127:23;128:15,20;
131:8,19;141:10;
142:15;143:9,17
**elsewhere (2)**
124:9;126:9
**embodiment (1)**
126:18
**embodying (1)**
107:2
**emphasis (1)**
20:11
**emphasize (1)**
14:13
**employee (3)**
10:6,13;21:24
**enable (1)**
67:13
**enacted (2)**
25:2,7
**encompassing (1)**
107:2
**end (10)**
17:3;32:4;81:12;
97:12;101:2;123:6;
137:13,24;138:11;
147:25
**endeavor (3)**
79:23;80:24;
145:20
**engage (3)**
79:23;80:25;
145:20
**engaged (1)**
90:2
**engagement (1)**
22:19
**engineering (3)**
20:5;9;76:10
**enough (2)**
22:23;23:7
**enter (3)**
89:15,16,23
**entered (1)**
28:15
**entirely (1)**
141:9
**entirety (2)**
88:15;136:18
**entitled (3)**
32:17;108:16,17
**equal (1)**
114:7
**equally (1)**
114:8
**equivalent (3)**
74:5,10;115:12
**equivalents (2)**
69:20;70:17

**essentially (6)**
44:9;92:25;93:21;
98:12,14;114:25
**estate (1)**
54:15
**estopped (4)**
50:9,17;51:8;52:5
**estoppel (12)**
48:15,16,20,22;
49:2,4;52:1,25;53:2;
83:8,17,19
**et (1)**
6:14
**evaluate (2)**
76:20,24
**evaluated (1)**
30:3
**even (7)**
34:6;62:21;65:13;
72:1;73:5;96:15,18
**events (1)**
32:24
**eventually (1)**
31:6
**everyone (1)**
9:17
**evidence (22)**
28:2,8,9,11,25;
29:7,17,25;30:12,19;
42:24;47:24;48:10;
56:13,15;65:7,17;
79:24;80:25;127:10;
128:1,12
**evolved (1)**
22:12
**exact (2)**
52:9;86:23
**exactly (10)**
14:6;15:14;16:13;
19:10;34:25;35:1;
55:14,21;92:24;
93:19
**EXAMINATION (3)**
7:8;32:12;146:8
**examined (1)**
7:6
**example (35)**
13:4;15:10;21:10;
29:12;30:20;35:9;
44:17;47:18;49:7;
51:19;64:1;67:3,5;
70:4,19;74:10,15;
78:6,7;104:3;
105:18;107:13,21;
109:17;120:20;
126:15;128:6;130:6;
134:20,25;137:3;
140:8;141:1,3;
142:11
**Except (1)**
137:18
**exclusively (1)**
20:11

**excuse (2)**
9:16;81:15
**exercise (1)**
87:5
**Exhibit (31)**
6:4;7:12,18;12:14,
18;13:6,6,13,23;14:10,
20;27:5,9;45:15;
48:23;57:10,14;58:3,
20;59:5,9;67:8;70:9;
83:1,7,23;84:1;
108:19;111:3;135:8,
13;138:21
**existed (2)**
95:20,21
**existence (1)**
29:16
**existing (5)**
36:14,19;39:4,16,
19
**expect (6)**
55:7;79:22;80:23;
84:20,21;89:7
**expectations (1)**
121:23
**expected (21)**
37:21;38:3;47:8,8;
49:6,16;86:5,10,13,
19;87:2,7,9,23,25;
88:7;98:16,24;
118:12;122:14,17
**expedite (1)**
148:11
**expedited (1)**
148:13
**expediting (1)**
148:9
**experience (13)**
9:24;10:8,9;17:18,
21,22;21:13;53:19,
23;76:11,19,21,24
**expert (49)**
9:22,25;12:18,22,
25;17:11,20;26:7;
45:14;46:8,12;
51:19;53:12,12,15;
58:17;66:12;70:8;
72:1;79:3,15;80:6,
16;82:3,8,16;83:7;
89:4;90:6;91:15;
98:6,14,22;104:15;
105:5;109:10;113:6,
16;114:11,22;
119:10;120:14,17;
139:25;140:15,22
**expertise (5)**
17:15;52:24;53:3,
11;79:19
**experts (1)**
72:2
**explain (1)**
137:3

**explained (4)**
67:3;123:14;
136:20;137:21
**explaining (1)**
126:16
**explanation (1)**
41:21
**explicit (2)**
121:16;122:16
**express (1)**
98:12
**expressed (3)**
39:21;91:6;108:19
**expressing (1)**
15:2
**extent (10)**
68:22;101:24;
102:11;108:12;
118:10;123:7;139:7;
144:19;147:12,13
**Eyes (2)**
147:4,8

### F

**fact (13)**
20:12;84:21;
88:18;95:6;116:10,
19;126:17;136:3;
143:7,15;144:4,4,23
**factors (3)**
49:4;66:7,8
**facts (13)**
8:19,20;9:2;
139:11,23;140:13,
20,24;142:6,9;
143:14,23;144:21
**faculty (1)**
19:10
**fair (16)**
10:3;12:7;17:20;
28:11;32:12;42:18;
46:7;47:4;51:17;
68:9;91:5;97:20;
98:9;99:20;110:19;
116:15
**faith (4)**
84:18,21,22;98:6
**familiar (7)**
26:24;31:2;32:7;
33:13;57:22;61:6;
110:13
**familiarity (1)**
54:11
**far (7)**
32:13;34:22;
51:23;52:22;60:5;
65:1;128:24
**feasibility (1)**
122:10
**feasible (1)**
116:25
**February (1)**

Case 8:16-cv-01790-JVS-AGR   Document 233-16   Filed 03/13/20   Page 157 of 167   Page ID
#:6287

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

58:5

**Federal (25)**
29:11;34:7,14,17;
50:14,22,25;51:2;
53:7,10,13;57:6;
58:6,20;59:2,11;
62:1,6,24;63:7,12;
96:15,19;97:7;
104:13

**feedback (1)**
17:8

**feels (1)**
146:9

**FENSTER (80)**
6:23,23;7:8;8:2;
12:16,24;15:23;
16:8;21:23;23:13,
24;24:22;25:5;26:4;
37:8;38:1,23;39:9,
24;40:10;41:3,6;
43:18;51:6;57:12,17,
20,24;58:1,18;59:7,
10,16,24;63:16;
70:12;72:11;73:4;
77:1;81:10,22;
83:25;84:6,25;85:2;
89:18;98:4;104:17;
105:10;106:15,20;
109:6,9;111:1;
112:11;115:22;
117:8,15;119:8;
121:12;122:4;
125:11;127:1,22;
128:9;130:14;131:7;
134:21;135:12;
136:22;138:9,20;
139:8;145:3;146:3;
147:3,18,23;148:10,
14

**few (3)**
13:18;20:13;
138:10

**field (1)**
77:8

**file (5)**
47:10,14;66:15;
96:4,10

**filed (13)**
33:17;46:5;52:21;
60:16;61:7,10;
62:12;63:20;84:18,
21,22;95:11,12

**files (3)**
44:13;52:5;84:9

**filing (2)**
21:17;44:17

**final (37)**
31:13;40:4,15,20,
22;41:5,23;42:3,12,
24;45:19,22;50:18;
56:24;57:2;58:10,
21;59:2;60:1;62:23;
64:18;66:9;78:12;

87:3;90:11;96:10,11,
23,25;97:3;98:17,24;
99:8,11;100:6;
118:2;148:6

**find (12)**
37:20,21;38:13;
45:2;55:8;118:25;
119:1,2;126:6,10;
128:11,20

**finding (11)**
33:1,2,2;40:4,15;
45:19;50:8,17;
65:25;78:13;118:3

**findings (1)**
87:2

**fine (1)**
18:25

**finish (1)**
19:5

**finished (1)**
64:15

**Finnegan (1)**
31:3

**firm (2)**
79:16;80:18

**first (13)**
7:6;16:23;17:1;
59:12;82:5;100:17;
112:20;113:6;
130:17;133:9,14;
136:2,4

**five (5)**
91:20,21,23,24;
107:7

**flip (1)**
43:25

**focused (4)**
47:25;48:3,11,12

**follow (1)**
137:4

**following (1)**
146:19

**follows (1)**
7:7

**force (1)**
25:3

**form (12)**
21:22;27:4;37:5;
38:11;39:6,17;50:21,
23;63:3;71:10;84:9;
92:10

**formal (4)**
26:21;53:16,21;
77:5

**Fortezza (17)**
105:25;133:21;
134:6,8,11,12,15,18,
25;135:14,21;
136:25;138:4,7;
147:12,15,16

**forth (8)**
17:9;91:10,14;
98:6;105:22;117:1;

140:15,21

**forward (2)**
81:4,7

**found (39)**
30:24,25;31:6,11,
12;32:5;38:16;
40:19,21;41:1,4,23;
42:2,5;50:22,25;
51:3,7;52:1,10;
56:17;57:3;58:10;
60:2,7;63:4,17;
64:17;65:6,16;
82:15;88:18,22;
96:24;97:4;116:11;
118:14;128:16;
135:6

**fraction (1)**
22:13

**frame (1)**
25:10

**frameworks (4)**
18:17,19;19:1,8

**FRANCISCO (3)**
6:1,9,13

**front (2)**
8:9;67:20

**full (3)**
97:12;112:18,22

**Fuller (3)**
16:18,19,21

**F-U-L-L-E-R (1)**
16:19

**function (10)**
68:5,7,11,15;
71:10,12;72:13;73:6,
12,25

**functionality (2)**
69:15;133:7

**further (10)**
12:20;13:4;16:6;
28:21;44:17,25;
62:5;94:16;100:12;
146:4

**furthermore (1)**
132:25

## G

**gave (3)**
80:17;92:24;
131:16

**general (9)**
8:15;21:1,4;22:16;
30:17;53:20;91:15;
116:16,18

**generally (7)**
10:10;22:18;
48:18,19;95:9;
116:1;140:18

**given (3)**
86:14;100:3;
128:22

**gives (1)**

29:11

**goal (2)**
98:11,12

**goes (1)**
121:4

**Good (7)**
6:6;7:9,10;24:23;
29:12;84:22;98:6

**gosh (1)**
141:4

**guess (11)**
24:25;27:24;43:4,
4;46:20;47:5;65:12;
66:25;104:19;121:4;
132:23

**guessing (2)**
23:3;98:15

**guest (2)**
19:14;20:12

**guys (1)**
109:7

## H

**Hakkel (24)**
75:9,12,14,18,20;
76:14;77:2,12,13,19;
92:17,20;93:9,15,23;
94:10;118:18;
123:22;124:3,5,19;
125:15;126:16;
127:10

**Hakkel's (6)**
75:11;117:20;
118:6;125:9,16,22

**hand (6)**
12:17;57:17;59:8;
70:7;83:25;132:22

**handed (1)**
58:2

**handing (1)**
57:13

**happen (10)**
31:16;36:12,18,
19;38:3;86:20;87:7,
20;88:11;98:24

**happened (10)**
36:6,9;87:8,19;
88:1;90:9,9;95:25;
98:17;100:5,8

**happening (1)**
45:8

**happens (2)**
72:21;73:22

**Har- (1)**
137:6

**Harari (11)**
49:11,12;51:9;
52:12,17;118:24;
119:5,10,14,20;
137:6

**hard (2)**
37:14;70:4

**hardware (15)**
68:16;70:2,20,21;
71:15,18;72:3,25;
73:1,2,21;74:4,10,
12,19

**harmed (1)**
143:20,25

**harms (1)**
143:21

**head (6)**
14:15;16:3;26:10;
34:10;46:15;50:5

**heading (2)**
146:14,16

**heard (7)**
9:5,7,10;50:5;
52:14,15;75:23

**hearing (6)**
9:5;37:15;76:14;
99:8,12,15,20;100:1,
8

**held (6)**
31:23;53:14;
59:21;62:8;117:16;
118:9

**help (1)**
85:15

**Henderson (1)**
31:3

**higher (2)**
29:6;97:14

**Highly (2)**
147:4,19

**hired (3)**
17:20;22:7,10

**hold (3)**
10:15;17:11;
114:16

**holding (1)**
53:12

**honest (2)**
79:21;80:22

**honestly (2)**
79:24;80:25

**hoping (2)**
120:1,2

**hour (1)**
91:21

**hours (2)**
91:21,24

**hypothetical (2)**
36:18;46:21

## I

**I- (1)**
38:18

**idea (3)**
8:15;22:25;91:20

**identical (13)**
43:13,15,16;66:23,
24;67:2,6,6;73:15;
74:5;114:18;123:14;

129:3
**identification (5)**
6:5;12:15;57:11;
59:6;83:24
**identified (12)**
9:4;26:7;69:18;
70:15;71:5;72:16;
73:1;74:6,14,18;
122:22;128:14
**identify (30)**
6:20;9:1;14:9,19;
15:15;17:17;23:9;
22;24:1,3,15,18;
25:17;93:22;94:9;
102:6;103:4;107:1;
112:4;120:24;
121:19;122:6;
125:12;127:12;
128:11;129:14,19;
133:11;140:25;
143:19
**identifying (1)**
127:12
**impact (1)**
65:3
**implementation (1)**
105:3
**imply (1)**
63:13
**import (1)**
71:12
**important (3)**
14:12;54:21;65:18
**importing (1)**
73:12
**impossible (1)**
79:10
**impugned (1)**
79:18
**in- (1)**
27:18
**inaccuracies (1)**
13:22
**inaccurate (1)**
13:15
**Inc (3)**
6:13;7:14,15
**include (5)**
69:2;73:6;74:23;
120:11;131:15
**included (1)**
46:12
**includes (8)**
11:3;12:1,2;67:12;
111:8;112:18;
132:22;133:6
**including (7)**
10:23;45:23;
86:15;99:24;111:6,
13;142:11
**incomplete (1)**
13:13
**incur (1)**

143:16
**incurred (4)**
144:2,5,8,14
**indicia (1)**
122:6
**indirectly (1)**
115:18
**individually (3)**
116:2,11,20
**information (17)**
13:5,19;23:9,17;
37:20;44:14,21;
45:12;46:19,22;
47:1;50:3;86:14;
88:10;89:3;147:10,
11
**informed (4)**
50:4;109:25;
111:20;144:16
**infringement (2)**
20:20,20
**in-house (2)**
22:17,18
**initial (3)**
15:16,17;16:4
**initially (2)**
22:10;31:5
**input (2)**
14:23;15:17
**inquiry (1)**
32:2
**instances (2)**
30:23;43:8
**institute (4)**
43:9,21,24;44:16
**instituted (5)**
30:23;31:6;32:4;
45:3;64:2
**instituting (1)**
28:16
**Institution (15)**
25:11;28:5,14,24;
29:6;31:23;43:1,20;
44:1,15,22;45:1;
46:14;61:8;96:21
**instructed (2)**
145:17,18
**instructor (1)**
19:16
**intellectual (2)**
19:24;20:10
**intending (1)**
120:1
**intent (1)**
146:23
**intention (1)**
79:19
**intentionally (1)**
81:7
**interacts (1)**
126:20
**interest (1)**
10:16

**internal (1)**
47:18
**internet (1)**
59:14
**interpret (1)**
71:23
**interpretation (1)**
73:7
**interrogatories (1)**
145:17
**intersection (1)**
18:16
**into (9)**
15:4,17;25:3;
73:25;89:15,16,23;
96:7;137:23
**introductory (1)**
136:19
**INV (1)**
112:15
**INV1770 (1)**
107:20
**inval- (1)**
120:7
**invalid (36)**
28:7;30:25;31:7,
12;37:22;38:16;
40:5,16,20,22;41:1,
5,23;44:12;49:18;
55:8;56:17;62:8;
64:17;65:7,16;78:9,
13;88:19,22;91:7;
97:18;106:4;116:15;
117:16,21,25;118:3,
8,9,15
**invalidate (1)**
118:23
**invalidated (15)**
32:21;35:4,13,18;
36:15;37:3,11;38:8,
14;39:4,15;60:25;
61:23;64:9,24
**invalidating (4)**
27:14,16,19,25
**invalidity (29)**
12:20;51:8,12;
55:9;77:14,20;
83:13;98:8;100:18;
101:1;105:14;
106:22;108:14,19,
20;109:14,19;111:3,
3;112:4;113:1;
117:4;119:21;120:7,
19,25;121:11;
122:20;133:20
**invent (4)**
95:7,16,17,19
**invented (3)**
94:23;95:9,13
**invention (1)**
116:25
**Invents (2)**
24:20,22

**investigation (2)**
43:10,21
**involved (26)**
9:21;14:5;15:1;
21:2,6,18,21;22:22;
23:5,10;24:2,5,7,13,
14,19;25:18;26:6,13,
15;33:9;51:15,18,21;
52:23;56:22
**involving (1)**
119:16
**IP (2)**
20:2;40:23
**IPR (120)**
25:24,25;26:2;
28:16;30:23;31:6;
32:4;33:2,10;35:4,
18;36:6,13,14,19;
37:3,12,25,25;38:9;
39:5,7,16,20,22,22,
25;40:3,13,14;41:1,
24;42:10;43:21;
44:8;45:16,18;46:4,
17;47:11,15,25;48:3,
13,15,21;49:1,3,3,17,
22,23,24;50:2,7,8,9,
10,16,19;52:1,5,8,
24;53:2,15;56:13;
57:1;58:9;59:25;
60:5,22,24;61:5,7,
12,21,22;62:7;63:8,
10;64:18;65:19;
66:4,10;78:13;80:5,
8;83:8,19;84:3;85:4,
6,21;86:6,20;88:12;
89:2;90:15,16,20,23;
91:7;95:25;96:4,9;
97:16,22;99:7,9,10,
16;117:17;118:2,9;
119:15,20;137:4;
142:5,14
**IPR2018-00084 (1)**
84:2
**IPRs (26)**
26:23;28:4;30:11,
12;33:13,16,21;
36:20;39:12,18;42:2,
17,17;45:3;51:16,19,
22;52:21;53:8,13;
59:12;60:17,19;
61:2;62:13;84:10
**irregularities (1)**
32:14
**isolation (1)**
99:3
**issue (4)**
34:8;64:22;65:24;
73:16
**issued (8)**
32:10,16,20;
34:17;62:21;64:4,5;
78:11
**issues (5)**

13:9;19:6;139:12,
25;140:14
**ITC (3)**
33:2;65:12,13

**J**

**January (3)**
13:7;92:4;140:16
**Jawadi (26)**
79:25;80:6,11,16,
22;81:2,3;84:2,13;
85:11,22;86:2;
88:23;89:4;90:23;
91:5,18;92:2;97:16,
25;98:5,18,25;99:2,
6;100:7
**J-A-W-A-D-I (1)**
80:1
**Jawadi's (3)**
80:20;84:17;92:7
**Joanna (3)**
16:18,18,21
**John (8)**
6:17;7:5;70:8;
81:13,20;138:12,18;
148:1
**join (4)**
50:1,7,16;61:11
**jointly (2)**
20:7,8
**Jones (6)**
58:23;61:4,5;63:9,
13;65:19
**judgment (5)**
139:12,19,21,24;
140:14
**July (1)**
59:11

**K**

**keep (1)**
120:1
**kicked (1)**
17:5
**kind (1)**
31:8
**King- (1)**
11:24
**Kingston (80)**
6:14;7:1,13,14,14,
21;8:4,25;9:2,12,17,
19;10:13,16,19,20;
11:13,18,19,21;12:6,
8,12;27:20,20;33:5,
10,17;35:2;39:5,7,
12,19;42:10,16;50:1,
19;51:7,22;52:11,17;
56:23;57:1;58:6,13;
59:25;60:16,22;61:2,
7,21,24;62:12;63:18,
20,22;83:9,20;96:3,

Case 8:16-cv-01790-JVS-AGR   Document 233-16   Filed 03/13/20   Page 159 of 167   Page ID
#:6289

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

8,9;138:25;139:16;
140:3,6,9,10;143:15,
19,22,25;144:1,8,11,
14;145:8,11,18,21;
147:10
**Kingston's (12)**
50:7,10,15;63:25;
96:19;139:20,24;
140:7,13;144:16;
145:23;146:2
**knew (1)**
52:11
**knowledge (11)**
9:16,17;47:13;
75:20;93:9,15;
108:8;109:8;134:9;
144:7;147:9
**knowledgeable (3)**
9:1,8,11
**known (5)**
61:15;104:5;
115:25;116:2,13

## L

**language (7)**
37:15;48:19;52:3;
67:1,4;69:2,13
**larger (1)**
22:13
**last (5)**
11:25;34:18;
83:11;101:4;107:17
**later (3)**
52:6;107:12,13
**law (29)**
18:2,3,4,4,8,10,12,
13,17,18,22;19:8,15,
18,19,19,22,23,23;
20:2,15;21:5;53:20,
22;54:6,7,10,11,13
**laws (2)**
19:7,7
**leading (3)**
58:14;77:25;95:12
**leads (1)**
92:25
**least (9)**
14:3,16;28:20;
45:7;72:1;76:11;
77:9;119:25;137:14
**lecturer (2)**
19:15;20:12
**led (1)**
142:4
**legal (12)**
17:24;19:1,8;
52:24;53:3,11,12,15;
89:10,14,17,22
**length (4)**
40:24;42:1;67:3;
113:19
**less (2)**

22:12;30:7
**level (4)**
9:15,16;20:23;
56:20
**license (1)**
23:20
**licensing (5)**
21:16;22:14;
23:18,19,19
**licensing/litigation (1)**
22:15
**light (7)**
37:19,22;38:17;
49:18;56:8;71:23,24
**likelihood (10)**
28:19,24;29:5,23;
30:5,10,24;31:11;
43:1;44:2
**likli- (1)**
30:5
**limit (1)**
71:17
**limitation (6)**
67:22;73:13;
93:25;94:11;104:8,
12
**limited (7)**
69:17;70:14,14;
72:15;102:14;109:1;
111:7
**limiting (1)**
123:7
**line (4)**
29:15;58:16;
68:20;107:17
**lines (3)**
68:19,20;107:7
**list (3)**
8:9;139:7;141:5
**listed (5)**
7:25;8:11;91:2,3;
102:22
**literally (3)**
67:23;69:3;113:10
**litigant (51)**
20:14,18;35:12,
17;36:5,11,17,24;
37:2,10,19;38:3,7,
13,15;39:3,14;40:25;
47:22;48:5,8;49:6,
10,16;53:17,17;54:3,
4,7,8,16;55:7,16,19,
24;56:7;63:1;66:2;
82:23;86:4,10,13,19;
87:1,6,23,25;88:7;
95:24;98:16,23
**litigants (9)**
26:19;27:1,4,7,9;
82:4,7,10,17
**litigant's (3)**
53:25;146:17,21
**litigation (43)**
10:22,23;17:12,

18;21:3,6,8,14,17,18,
22;22:2,6;23:21;
24:3,14;26:6,11,12,
16,23;27:19,22;34:9;
35:5,14;37:24;
47:23;48:9;53:19,
25;56:14;65:2,11;
80:5,24;83:3;
143:16;144:2,15,24;
146:18,22
**litigations (8)**
9:22;22:21;23:10;
24:4,4,8,18;25:17
**little (2)**
37:14;61:1
**locate (2)**
145:11,19
**located (1)**
6:8
**long (2)**
137:25;146:9
**look (23)**
18:16;27:11;
69:13;70:18;71:10,
13,19;72:20;73:14,
16;74:1,1;90:24;
93:20;101:2;106:2;
113:13;115:13;
119:18;122:25;
126:11,14;128:19
**looked (8)**
18:22;19:6;34:16,
16;54:10;84:14,15;
96:7
**looking (6)**
34:19;53:19;
57:15,19;79:1;92:10
**lot (1)**
31:18
**love (1)**
119:4
**lower (6)**
28:10,12,24;
29:24;30:4,11
**Lunch (1)**
81:17
**Lynx (1)**
134:8

## M

**maintaining (1)**
147:14
**makes (3)**
43:13;44:14;73:11
**making (3)**
42:20;43:7;83:21
**Management (1)**
20:9
**manner (1)**
17:8
**many (5)**
11:9;19:10;67:5;

79:12,12
**map (1)**
14:15
**mapping (1)**
91:13
**Marc (2)**
6:23;115:21
**MARCH (14)**
6:2,10;70:7;81:14,
15,21;113:6,17;
114:4;135:3;136:1,
9;138:19;148:2
**mark (2)**
42:11;70:9
**marked (12)**
7:11;12:14,17;
57:10,13;58:2;59:5,
8;83:23;84:1;147:4,
7
**material (2)**
15:15,21
**matter (6)**
6:13;11:2;48:13;
56:22;116:16,18
**matters (10)**
13:1;14:10;15:7;
21:17;22:14;23:5;
24:14;25:24,25;
56:22
**may (25)**
9:9;17:4;20:13;
23:4;25:8;34:10;
39:22,23;42:9,12;
50:3,11;56:21;57:7,
9,15;65:24;77:25;
80:5;83:5,8,19;
84:16;103:6;126:8
**maybe (10)**
39:20;44:23,23;
75:24;76:6,7;112:19,
19,20;136:18
**mean (38)**
14:2,25;15:9,14;
17:25;18:9;19:14;
24:24,24;25:25;
27:15,15;29:9;
32:24;34:5;35:6;
42:5,6;44:6;47:6;
53:5,9,21;66:21;
74:2;76:3;86:25;
87:12;94:24;95:18;
96:6;102:25;106:2;
128:21;140:23;
141:1,7;145:23
**meaning (2)**
69:7;124:11
**means (21)**
41:12;67:1;68:4,7,
10,14;69:7,11,19;
70:17,24;71:5,10,12;
72:12;73:6,12,21,24;
130:15,17
**meant (4)**

26:1;96:17;
118:18;146:1
**mediating (2)**
129:22;130:9
**meeting (1)**
79:13
**meets (1)**
92:21
**memorized (6)**
48:18;52:2;68:21;
83:22;105:14;139:6
**memory (3)**
34:25;35:25;78:20
**mention (6)**
46:1,4;83:12;
86:25;107:4,5
**mentioned (10)**
45:5;62:9;72:18;
81:25;87:13;90:25;
112:10;137:18;
139:1;140:5
**met (2)**
79:9;80:13
**Michael (1)**
6:7
**microphone (1)**
126:25
**might (7)**
13:11;33:22;36:6,
9,18;46:12;61:15
**mind (8)**
36:20;54:20;
78:16;85:8;113:3;
127:24;131:9;
146:24
**minority (1)**
32:6
**minute (1)**
106:7
**minutes (3)**
91:21,23;138:10
**Mischaracterizes (11)**
23:15;50:22,24;
51:1;63:4;105:7;
106:11;125:7;128:8;
130:11;131:2
**misrecollecting (1)**
17:4
**misremembering (1)**
25:8
**missing (1)**
57:9
**misspelled (2)**
13:17,19
**misspoke (3)**
96:16,17;145:25
**misstated (1)**
39:1
**mistaken (1)**
76:17
**misunderstood (1)**
120:23
**misuse (4)**

12:20;89:25;90:2;
145:5
**module (17)**
67:13,21,24;68:2,
14;69:3,19;70:1,16;
71:5;72:6,17;73:9;
74:7;75:1,4,6
**module' (1)**
69:6
**modules (1)**
68:10
**moment (8)**
11:16;24:6;44:22;
61:1;90:25;113:3;
137:19;142:17
**MONDAY (1)**
6:2
**months (2)**
11:25;140:11
**more (13)**
27:25;39:20;
43:13,15,16;44:12;
67:13;72:20;91:23;
112:18;116:19;
128:10,19
**morning (3)**
6:6;7:9,10
**most (8)**
9:1,7,11;24:11;
110:12;119:15;
136:3,5
**Mostly (3)**
16:16;137:1;
140:23
**motion (1)**
50:7
**motivated (1)**
116:23
**motivation (1)**
121:14
**Move (1)**
41:3
**Much (3)**
17:21;22:12;91:17
**multipage (1)**
112:21
**multiple (6)**
16:12;55:6;
111:11,14,17;120:9
**must (2)**
74:2;130:17
**MYK82 (1)**
74:11
**myself (3)**
26:25;53:14;76:2

**N**

**name (5)**
6:6;19:3,3;80:2,3
**necessarily (5)**
13:3;29:21;30:7;
46:11;109:1

**necessary (1)**
13:9
**necessity (4)**
30:4;63:13;73:20;
74:16
**need (13)**
32:1;41:10,21;
70:10;116:19,21;
128:19;147:23;
148:4,10,12,17,19
**negatives (1)**
37:16
**neither (1)**
64:8
**new (18)**
13:5;64:22;
104:22;105:5;108:4,
18;109:10;111:2;
113:24;114:11,22;
119:10;135:8,13,14;
136:8,23;137:10
**next (1)**
133:19
**non (1)**
115:7
**none (1)**
102:22
**nonetheless (1)**
32:5
**nonobviousness (1)**
122:7
**normal (2)**
17:8;32:23
**normally (2)**
84:23;111:18
**note (2)**
77:6;104:3,7;
127:18;134:6
**noted (1)**
56:24
**notice (6)**
7:12,13;8:25;
12:10,13;138:22
**number (14)**
9:21;18:20;19:9;
23:2,6;24:17;31:20;
54:18,18;99:2;
100:14;107:18,25;
144:20
**numbers (1)**
141:8
**numerous (1)**
108:24

**O**

**object (1)**
58:15
**object- (1)**
84:18
**Objection (31)**
7:23;15:18,25;
23:12;25:20;37:5,13,

13;38:11;39:6,17;
40:8;50:21,23;63:3;
72:7;89:12;97:24;
105:6;106:10,18;
108:23;112:7;121:7,
25;125:6;127:14;
128:7;130:10;131:1;
134:16
**objections (1)**
139:3
**objective (5)**
53:25;54:4;56:2;
146:17,21
**objectively (4)**
56:6;81:4;84:19;
92:8
**obligations (1)**
23:23
**obtain (1)**
116:24
**obtained (1)**
140:13
**obvious (4)**
101:19,21;116:9;
133:17
**obviously (2)**
56:13;84:14
**obviousness (26)**
101:17,20;102:2,7,
12;105:19,24;
109:20;110:12,14;
111:18,23;116:18,
22;117:2;119:9,22;
120:6,14,18,24;
121:6;122:6;133:24,
25;134:2
**occasion (3)**
9:25;12:5;13:4
**occasions (2)**
24:11,12
**occurred (2)**
64:19;89:7
**occurs (1)**
45:6
**off (17)**
16:3;17:6;26:9,9,
9;34:9;46:14;50:4;
59:17,19,21;81:11,
16;117:10;138:9,14;
148:2
**offer (4)**
36:4;48:4;86:9;
146:25
**offered (19)**
20:7,8;35:15,19;
39:11;49:20;51:12;
53:1;55:5,5,6,9,15;
77:5,10;78:2,19;
86:6;99:6
**offering (6)**
49:5;119:13,15,
19;144:5;145:6
**office (6)**

6:12;32:11,17,21;
64:3,6
**officer (4)**
10:6,12;21:24;
26:14
**often (2)**
21:16;44:13
**Oliver (4)**
6:25;16:16,21;
59:10
**O-N (1)**
119:7
**once (5)**
28:5,14;32:20;
64:20;137:23
**one (58)**
9:18;13:20,20;
16:4;17:2;20:1;
21:22;28:20;29:20;
34:8,10;43:8,8;
44:12;55:6;57:1,21;
59:25;60:5,6,7;61:7;
63:11;64:2;66:7;
67:13;72:1,20;76:11,
16;77:9;88:10;91:2;
99:5;101:3,7,8,9;
105:23;108:1,6,8;
109:23;110:9,18;
111:15,19;112:16,
19;115:2;116:6,22;
118:25;129:18;
140:9,24;141:3,4
**ones (3)**
23:21;103:2;111:5
**ongoing (1)**
39:23
**only (18)**
9:18;19:12,22;
57:21;60:5,6;61:17;
82:1;95:9,19;
118:19;122:19;
129:13;140:20;
143:23;147:5,8,11
**operably (15)**
74:23;92:15,21;
93:7,11,17,24;94:6,
8,11;127:6,18;
131:22;132:24,24
**operation (1)**
68:18
**operations (23)**
67:14;70:22;
71:16,18;72:3,19,22,
25;73:18,20;74:4;
108:9;109:17;
112:23;115:5;130:7,
13,16,18,20;132:6,
15,25
**opine (3)**
82:16;102:20;
104:23
**opined (6)**
33:13;51:17;

89:13,17;90:1;97:25
**opining (4)**
42:14;87:6;98:15,
23
**opinion (86)**
16:22,22;17:13;
34:15,17;35:11,15,
16,19;36:24;37:1,9,
18;38:6;39:2,11,13,
20;42:15,21;44:23,
24;48:4,12;49:15,20;
54:22;55:1,6,11,15,
23;57:18;58:19;
63:1,2;65:24;69:16;
70:13;74:3;77:2,5,
10;78:2,2,19;80:4;
81:7;86:17;87:24;
91:8,11,14;92:6;
98:11,13,14,22;
100:17,21;101:11,
21;102:14,15;103:8,
17;106:3,22;108:14,
19;110:9;111:3;
114:12,23;119:14;
120:8,25;133:10,15,
19;134:8,10,14;
144:5,25;145:6
**opinions (43)**
13:1,6,8;14:20;
15:2;16:10;27:5;
34:21,23;36:16;49:5,
8,9;51:12;53:1;54:1;
55:6,9,10;75:15,18;
79:18;81:5;86:9;
91:6;92:7,10,10;
97:21;98:6;99:5;
100:12,24;101:1;
104:20;105:23;
119:15,19;121:10,
11;135:14;146:21,25
**opportunities (2)**
35:3,7
**opposed (5)**
14:10,20;26:11,
12;43:21
**oral (5)**
99:12,15,19;100:1,
8
**oranges (1)**
63:6
**order (1)**
75:19
**ordinary (6)**
72:24;73:19;
75:21;76:2;77:3,11
**org- (1)**
22:10
**original (5)**
70:5;83:12;
105:13;137:12;
138:1
**others (5)**
33:15;35:10;

Case 8:16-cv-01790-JVS-AGR   Document 233-16   Filed 03/13/20   Page 161 of 167   Page ID
#:6291

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

45:24;61:6;139:1
**otherwise (1)**
118:14
**out (8)**
13:10;17:11;
26:25;82:19;88:5;
97:11;121:9;138:21
**outcome (3)**
88:8,8;97:22
**outcomes (2)**
30:16;32:6
**outside (10)**
17:22;19:25;20:2;
22:20;34:12;49:2;
58:16;119:20;142:7,
18
**Over (17)**
22:9,11;100:18;
101:21;102:2,8;
106:22;108:20;
111:3;112:4;119:21;
120:7,19,25;122:20;
133:20;147:15
**overcome (1)**
33:1
**own (6)**
11:10;21:20;50:9,
10;113:22;114:3
**owner (10)**
44:13;46:5,13,21;
66:12,13,15;80:7;
85:14;100:3

**P**

**pa- (1)**
95:22
**page (25)**
67:9;91:3;100:14;
101:3;105:17;
107:13,15;112:16,
19,21;118:20;121:3;
122:23;123:2;
126:22,24;127:2;
128:5;132:21;133:3,
12,20;134:19;135:2;
146:12
**paid (2)**
10:25;11:2
**panel (5)**
30:24;42:22;
45:10;46:17;85:10
**panels (1)**
45:2
**paper (2)**
16:5;84:8
**par- (1)**
107:13
**paragraph (57)**
49:21;56:9;69:4,5;
75:7;87:1,14;90:5;
92:12;93:3,5;94:2,
13,15;95:22;101:2,

13;102:18;104:3;
105:17;106:2;107:4,
8;113:12;114:14,17;
115:18;120:15,20;
121:3,4;123:2,6,24;
125:2,14;126:8;
127:3,5,25;128:5,13,
14;129:1,15,17,20;
130:21;131:17,23;
134:4,23;135:1,2;
136:19;137:14,24
**paragraphs (25)**
101:7;106:17,25;
119:23;120:8,10,10;
121:13,18,22;122:5,
8,9,13,21;135:17,25;
136:7;137:1,9,13,16,
25;146:19,25
**pardon (1)**
115:6
**parse (1)**
37:15
**part (8)**
11:25;19:21;27:7;
42:20;88:17;103:23;
133:7;138:7
**participate (2)**
90:14,19
**particular (8)**
31:19;88:17;
103:10;105:11,12;
106:16;109:23;
122:10
**particularly (1)**
90:10
**parties (8)**
23:20,23,25;
25:15;26:22;33:11;
40:6;71:25
**parts (1)**
14:1
**party (3)**
50:2;52:3,5
**pass (1)**
130:17
**pasted (3)**
136:4,18,21
**patent (139)**
12:20;17:18;18:6,
7;19:19,22,23;20:14,
17,19,20;21:2,7,14,
18,22;22:2,6,14,15;
26:5,6,15,18,22;
27:4,7,9,14,17,19;
28:1;32:8,10,11,16,
20,21;33:3,4,8,9,20;
34:3,15;35:3,8,12,
17;36:14,25;37:3,11;
38:8;39:4,15;43:22;
44:13,18;45:18,24;
46:1,4,5,10,13,18,21;
47:11,16;48:17;
49:24;51:22;53:17,

19;54:24;55:13,20,
25;60:2,17,23;61:12,
22;62:7,13,22;64:3,
4,6,25;66:5,11,12,13,
15,19,20;67:9,10;
68:18,19;78:9,17,18,
23,23;80:7,8;84:3;
85:7,14;86:11,14;
87:16;88:12;89:11,
25;90:2,9,15,20;
91:7;94:20;95:12;
97:16;98:8;99:16;
100:2;103:19;106:6;
115:23;116:9;
117:25;126:18;
139:12,24;140:14;
145:4
**patentability (4)**
43:8,12;58:21;
62:25
**patentable (7)**
31:24;32:5;42:6;
43:22;57:4;60:3,7
**patentee (1)**
110:5
**patents (10)**
20:11,11,21:20;
30:25;32:16;34:8;
43:23;51:17;73:13,
16
**patent's (1)**
49:11
**paying (1)**
10:19
**PC (9)**
103:9,21;107:16,
24;112:14,17;113:4;
122:21;132:20
**PCM (1)**
94:22
**PCMCI (1)**
103:21
**PCMCIA (83)**
92:14,21;93:8,10,
16,23;94:10,16,20,
23;95:5,7,17,19;
103:6,9,12,18,21,22;
104:5,12,14,24;
105:4,9;106:9,12;
107:2,5,9,22,23;
108:2,6,12;109:2,14,
15;111:10,13;112:9,
12;113:15,21;114:3,
13,24;115:3,10,17;
119:11;123:18;
124:21;125:5,16,23;
126:2,16;128:4;
129:10;130:6,8,15,
19,24;131:12;132:3,
14,16,19;133:2,6,10,
15;135:20,24;136:6,
15,17;137:5,7;138:6
**pen (1)**

16:4
**pending (2)**
60:24;61:22
**people (5)**
12:6;30:6;140:10
**percent (6)**
30:8;31:4,16,21;
45:5,8
**perform (4)**
68:17;108:9;
112:23;130:13
**performed (7)**
67:14;72:23,25;
73:20;77:25;113:22;
114:3
**performing (10)**
70:22;71:16;
72:19;73:18;115:4;
130:7,16,18,20;
132:24
**performs (1)**
74:4
**peripheral (2)**
72:19,21
**person (17)**
9:1,7,11;10:4;
21:5;54:23;55:12,17,
18;72:23;73:18;
75:20;77:3,11;
79:21;80:3,22
**personal (2)**
20:23;47:13
**personally (6)**
20:19;21:19,20;
51:12,18;79:7
**perspective (1)**
86:5
**pertains (1)**
13:2
**petition (8)**
44:8;50:16;61:11,
25;63:19,20,22;98:7
**petitioner (4)**
31:12;44:9,19;
100:2
**petitions (1)**
64:1
**phase (1)**
43:2
**PhD (7)**
6:18;7:5;81:14,20;
138:13,18;148:1
**phone (3)**
15:11,11,13
**phrase (5)**
55:16,21;67:17;
68:2,10
**phrase- (1)**
73:11
**phrased (3)**
43:12;73:11;98:20
**phrasing (1)**
119:12

**Pictures (1)**
54:16
**piece (2)**
116:6,7
**pieces (3)**
88:10;116:5,7
**place (2)**
6:11;13:20
**placed (1)**
7:11
**places (1)**
13:20
**plaintiff (2)**
6:19,24
**please (11)**
6:20;40:9;69:21;
94:3;102:8;123:5;
128:11;138:21;
146:12;148:11,18
**plus (14)**
68:5,7,11,15;
71:10,12;72:12;73:6,
12,25;108:7;141:22;
143:11;144:23
**pm (8)**
81:15,21;117:11,
14;138:13,19;148:2,
22
**point (8)**
44:3,19;76:6;
85:15;115:21;
116:17;120:13;
121:5
**pointed (2)**
129:16,16
**pointing (1)**
72:14
**policy (1)**
25:11
**POR (5)**
47:10,14;88:22;
89:3;100:6
**portion (2)**
14:16;120:3
**portions (3)**
73:17;88:15;120:5
**position (1)**
36:4
**positioned (1)**
114:9
**possibility (2)**
45:3,4
**possible (16)**
32:3,6;45:1;46:16;
47:2,6,7,7,8;70:3;
80:13;88:25;89:6,8;
111:23;148:15
**possibly (1)**
46:23
**post-AIA (1)**
25:19
**practice (9)**
54:5;70:19;71:11,

13,15;79:12;92:14;
93:7;115:5
**practiced (1)**
104:12
**pre- (1)**
129:14
**pre-AIA (1)**
102:25
**preamble (26)**
69:13;114:12,14,
18,23;115:5,8,9,15,
16;123:7,8,14;
124:13,16,20;125:3,
22;127:8,11,19,21;
128:2;129:2,8,12
**preambles (1)**
124:11
**preamble's (1)**
67:5
**prelim- (1)**
85:14
**preliminary (3)**
44:13;46:13;85:14
**prelitigation (1)**
21:16
**premarked (1)**
6:4
**preparation (2)**
12:1;140:12
**prepare (5)**
11:5,18,22;12:8;
140:4
**preponderance (12)**
28:8,9,25;29:7,17,
24;30:11,19;31:1;
42:24;56:12;65:17
**present (6)**
64:19,22;74:16,
24;100:3;115:24
**presented (1)**
86:1
**presumably (1)**
146:19
**presumed (1)**
32:24
**presumption (2)**
32:17,25
**pretty (1)**
25:24
**prevailing (6)**
28:19;29:6,24;
30:10,24;31:12
**previous (2)**
134:5;146:1
**previously (2)**
136:20;137:20
**primarily (1)**
17:19
**primary (2)**
14:17;19:16
**prior (105)**
46:13;63:23;
78:18,23;94:17,20,

24;95:5,21;100:18,
22;101:5,7,9,12,22;
102:3,8,13,16;103:3,
4,23,24,25;104:5;
105:23,25;106:5,5,
23;108:20;109:5,18;
110:1,4,6,8,16,18;
111:4,5,6,8,12;
112:5;113:2;114:20;
115:2,3,24,25;116:5,
6,7,7,11,13,20;
119:22;120:7,19;
121:1,14,15,19,24;
122:11,15,20;123:8,
11,15,17;124:14;
125:4,10,13,17,23,
25;127:11,12,12;
128:3;129:6,7,9;
130:1,4,5,23,24;
131:5,14,24;132:2,
17,18;133:20;
136:24;137:5,7,17;
138:4
**probably (3)**
84:22;96:7;102:23
**problem (1)**
97:10
**proceed (1)**
21:17
**proceeding (12)**
26:2;48:1,1,6;
64:9;86:15;88:5,6,
16,19,21;142:5
**proceedings (5)**
33:10;52:6,6;57:7;
142:13
**process (9)**
15:1;17:6;28:18,
21;29:10,13;64:7,15,
16
**produce (1)**
145:12
**produced (2)**
112:14;137:11
**Production (3)**
145:13,16,20
**professional (5)**
76:21,24;79:12,
16;80:19
**professionals (1)**
54:15
**professor (3)**
18:4,8,10
**proffered (1)**
86:17
**programmed (1)**
68:17
**prong (1)**
117:3
**proof (1)**
28:12
**property (2)**
19:24;20:10

**pros- (1)**
48:14
**prosecution (2)**
32:14;64:7
**prove (1)**
98:7
**provide (11)**
17:8;41:21;102:1;
113:20;114:2;119:9;
121:10,14,23;
122:14;148:11
**provided (9)**
8:19;12:19;16:21,
22;17:7;46:22;80:3,
6;82:8
**providing (2)**
136:23;144:4
**provision (1)**
48:20
**provisions (1)**
102:19
**PTAB (44)**
28:4,16;30:11,12,
23;31:11;37:21,23;
42:22;44:10;49:5,7;
50:6;52:10;55:8;
56:17,24;58:10;
59:25;60:2,7,15;
62:22;63:10,17;64:9,
20;78:11;85:3,24;
87:3;88:18,21,25;
90:11;96:14,20,23;
97:3;98:25;99:18;
118:14,22;142:13
**PTAB's (4)**
50:15;58:12,20;
59:2
**PTO (2)**
44:10;62:21
**public (4)**
24:2,3,4;25:17
**pull (1)**
138:21
**purpose (1)**
114:6
**pursuant (3)**
40:12,17;64:6
**put (5)**
16:4;29:15;81:4,7,
7
**putting (1)**
98:6

**Q**

**qualification (1)**
36:9
**qualified (2)**
82:13,15
**qualify (5)**
82:21;102:23;
117:23;118:10,12
**quick (1)**

117:9
**quite (8)**
14:25;21:6;23:2,6;
24:11;53:18;91:22;
105:17
**quote (4)**
113:11;124:8,8,14
**quoted (2)**
94:21;113:12
**quoting (1)**
113:12

**R**

**rain (1)**
30:6
**raise (2)**
52:4,7
**raised (5)**
42:11;52:4,7,12,17
**raises (1)**
44:11
**raising (2)**
52:3,6
**ran (1)**
13:18
**re- (5)**
16:2;34:6;86:13;
103:20;120:14
**reach (9)**
42:23;45:10;
47:21;48:7;57:2;
60:1;75:19;88:6;
89:10
**reached (14)**
42:25;43:3;46:18;
47:3;56:24;63:12;
64:16;65:11;85:24;
87:4,4;89:1;90:11,11
**reaching (1)**
66:1
**read (13)**
8:10;31:15,20;
37:6;45:9;68:2,22;
75:24;104:18;137:8,
8;141:6;146:16
**reading (3)**
42:15;56:10;76:14
**real (1)**
54:14
**realizing (1)**
56:10
**really (3)**
29:12;43:5;46:20
**reason (16)**
9:6;52:16;60:19;
79:14,20;80:15,21;
81:3,6;84:20;89:19,
21;117:19;118:5,7;
147:3
**reasonable (67)**
17:12;28:18,23;
29:5,23;30:5,9,20,

24;31:11;35:11,16;
36:5,11,17,24;37:1,
9,19;38:3,7,13,15;
39:2,13;40:25;43:1;
44:1;47:22;48:4,8;
49:6,10,16;53:17;
54:3,7,8,16,23;55:7,
11,15,17,18,23;56:6;
63:1;66:2;82:4,6,10,
16,22;86:4,10,12,18,
24;87:1,6,22,25;
88:7;95:24;98:16,23
**reasonableness (1)**
53:20
**reasonably (1)**
30:5
**recall (88)**
8:12;9:5,10;10:10;
11:16;14:2,6;15:22;
16:3,7,11,13;17:10;
22:23;24:6,16;
25:22;26:9;27:11;
30:13;32:15;33:19;
34:4,6,9,23,25;35:1;
42:19;46:11,14;50:3,
4,11,12;51:10,23;
52:14,14,22;54:2;
55:14;60:18;61:9,
15;62:15;63:21,25;
76:3,18,25;77:17,19,
23;78:19;79:9,13;
80:12,14;83:6,21;
85:12;91:19,24;
92:11;94:1;101:24;
105:1;110:20,23,24;
112:1;113:8;119:12,
13,19;121:21;122:3,
12,24,25;124:22,25;
125:20;126:2;
127:16;133:18;
142:17
**receiving (1)**
145:15
**recent (4)**
12:18,22;34:14;
140:10
**recently (4)**
11:20,24;34:7;
65:2
**recess (3)**
81:17;117:12;
138:15
**recite (3)**
67:23;69:10;72:2
**recites (1)**
72:18
**recognized (1)**
116:20
**recollection (14)**
11:20;17:4;59:1;
66:14;80:9;82:11;
95:1,8,14;115:11;
123:19;124:12;

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

125:19;136:21

**record (21)**
6:21;44:2,5,16,25;
54:12;59:18,19,21,
22;81:11,16,18;
86:15;117:10,13;
138:10,14,16;
146:11;148:3

**refer (5)**
45:15;107:9;
129:2;134:11;
145:22

**reference (24)**
49:20;58:23;63:8;
83:2,8,12,14,18,21;
103:3,6;107:12;
110:9;111:15;112:3;
121:20;125:4,8,17,
24;126:1;133:3;
137:6;141:25

**referenced (3)**
61:14;83:4;132:20

**references (25)**
49:18;51:13;
52:12;83:10;96:4;
104:22;110:6,11,17;
111:5,7,7,9,13;
116:24;118:21,22;
120:4,9;121:15,24;
122:11,15;134:1;
147:7

**referred (3)**
49:22;107:23;
122:19

**referring (26)**
16:15;21:15;
47:18;78:5;92:18;
103:9,10,23,24,25;
107:11,24;108:3;
112:13,22;117:6;
123:11;124:7;127:2;
130:5,24;132:2,19;
135:3;145:10;146:1

**refers (2)**
123:12;139:20

**refresh (6)**
34:24;35:24,24;
59:1;78:20;80:9

**regarding (49)**
8:19;9:1,12,17,20;
12:19;13:1;16:10;
34:2,15;36:17;46:4,
9,17;47:11,15;49:24;
50:8,16;51:16,22;
54:6,7;66:1,5,11;
80:8;81:24;82:9,22;
84:3;85:7;86:20;
89:11;90:15,20;
95:25;97:16;99:11,
16;100:13,17;
103:18;135:19;
136:25;141:23;
142:7;144:12;

146:21

**registered (2)**
18:6,7

**regulation (1)**
30:13

**relate (1)**
34:21

**related (14)**
18:18,23,24;19:1,
6;33:23;34:8;37:25;
49:4;54:14;125:16,
22;127:7,20

**relates (1)**
143:7

**relating (8)**
14:4;22:15;33:14;
55:15;89:25;137:10;
147:12,15

**relation (11)**
10:24;21:7;22:14;
39:21;56:13;87:2;
93:24;94:11;95:10;
109:14;132:14

**relationship (1)**
22:11

**relative (1)**
100:24

**relatively (1)**
34:19

**relevant (9)**
11:8;25:14;73:17;
88:15;90:4;108:14,
15;111:20;145:19

**relied (1)**
66:3

**rely (8)**
75:8,10,12,14,16;
77:15,17;107:3

**relying (9)**
75:18;88:18;93:2;
95:3,6;105:12;
108:5;111:4,6

**remand (5)**
57:8;64:21;65:22;
96:14,20

**remanded (4)**
57:6;58:24,24;
60:14

**remember (26)**
8:7;14:15;16:17;
19:9;20:13;23:7,16,
17,18,22;24:13;
25:12,13,15;26:3;
33:23;34:18,19;
42:14;52:9;75:24;
76:14;80:2;83:5;
86:23;112:19

**remind (3)**
76:1,1,7

**render (1)**
44:23

**rendering (2)**
48:22;66:9

**renders (1)**
133:16

**repeat (1)**
38:19

**rephrase (1)**
98:21

**reply (1)**
44:18

**report (117)**
11:10;12:19,23,
25;13:5,12;17:17;
31:18;33:18;34:12;
35:24;40:24;42:1,14,
18,20,21;45:14;
48:12,22;49:9,21;
53:24;56:9;58:17,
19;62:12,18,20;67:3,
8;69:4;70:5,8;75:7,
8;77:22;83:1,7,13,
13,19,22;86:8,9,18;
90:6;91:4;92:12;
94:14;101:1;102:1,
8;103:4,8,16;104:19,
22;105:5,14,15;
107:1;109:10;113:5,
6,16,24;114:11,22;
115:14;119:10,15,
18;120:3,5,14,18;
123:21;124:18,23,
24;126:4,12;127:10;
128:2,12;129:14;
133:9,10,14,15;
134:7,19;135:4,8,13;
136:2,4,8;137:12,15,
17;138:2,5;140:1,16,
22;141:9,16,22;
142:19;143:11,18,
20,22;144:23;146:12

**reporter (23)**
7:3;21:11;24:21;
38:19;43:3,15;
50:23;51:1,4;76:22;
104:9;110:22;119:6;
135:10;136:13;
145:2;147:13,19;
148:4,7,12,16,19

**Reporters (1)**
6:8

**Reporters' (1)**
6:12

**reports (1)**
79:3

**represent (2)**
6:22;60:20

**representative (1)**
10:6

**represented (1)**
44:10

**Request (3)**
145:13,16,19

**require (5)**
68:25;72:4;73:7;
117:4;130:16

**require- (1)**
69:17

**required (2)**
8:25;71:3

**requires (7)**
68:2,15;69:14;
71:15;75:1,4;97:12

**requiring (1)**
72:15

**reserve (1)**
41:15

**respect (35)**
39:11;54:12,21;
58:23;60:9,10,11,13,
14,22;61:18,21;
64:12,14;66:3;
73:16;79:17;80:4,17,
19;83:9;85:24;
86:11,14;89:1;
96:14;108:20;125:9;
127:25;140:19;
141:12,16;142:15,
19,25

**respond (1)**
145:21

**response (14)**
8:24;12:9;44:13,
18;46:5,13;66:12,13,
16;80:7;85:14;
139:4;143:14;
145:12

**rest (1)**
13:24

**restarted (1)**
12:4

**result (10)**
30:16;40:3,14;
49:3;50:18;85:24;
93:21;143:25;144:8,
15

**resulting (1)**
137:5

**retained (1)**
10:22

**review (5)**
9:25;33:16;34:14;
90:22;128:16

**reviewed (4)**
11:7;54:13;84:12;
92:1

**reviewing (1)**
91:17

**Rhyne (13)**
79:4,6,15,21,23;
80:18;81:4;104:4;
113:20,25;114:2,5,7

**Rhyne's (1)**
79:17

**RICHARDS (57)**
6:25,25;7:23;
15:25;16:16;23:12,
15;25:20;37:5,13;
38:11;39:6,17;40:8;

50:21,24;51:2;57:18,
22;58:15;59:13,17;
63:3;72:7;84:24;
85:1;89:12;97:24;
105:6;106:10,18;
108:23;109:4;112:7;
115:20;121:7,25;
125:6;127:14;128:7;
130:10;131:1;
134:16;139:3;140:8;
144:17;146:5,8;
147:2,6,14,21;148:5,
9,17,19,21

**right (109)**
15:8;16:23;25:1;
33:8;39:1;41:15;
42:21;45:21,25;
49:13,14;51:20;
54:20,24;56:25;
57:21;58:7;61:25;
63:6,20,24;64:4;
66:17;67:11,22,24;
68:23;71:1,8;73:9;
78:13;79:5;80:10;
81:9,10;82:10,17;
86:21;87:8,16;88:1,
16,19,20;89:10,14,
17,22;90:12;91:7,8;
92:18;93:18;96:1,5,
7,12,14,24;97:18,23;
98:13,18;99:1,11,13,
14,22,23,25;100:1,9,
20;105:20;106:1,9,
23;109:1;110:21,25;
116:16;117:1,8,18;
118:3,4,18;120:13;
122:24;123:25;
127:6,24;128:5;
129:17,19,19;130:1;
132:21;133:3,5;
135:5,23;136:11;
137:17;138:5;139:7;
144:2;146:3;147:24

**robbing (2)**
41:18,19

**rough (4)**
148:4,11,20,21

**roughly (4)**
23:3,3;52:8,8

**rule (1)**
13:10

**rule-making (1)**
28:21

**ruling (2)**
34:6;58:14

---

## S

**Same (32)**
37:13;50:20;51:5,
5,10;52:13;63:13,18;
69:6,15;73:7;78:24;
80:17,23;85:24;

92:25;93:21;94:12;
96:4;101:10;102:9;
113:9,10;129:5,11,
12;136:4,5;138:1;
142:22,24;143:6
**SAN (3)**
6:1,9,12
**sat (1)**
62:11
**satisfy (1)**
30:18
**saw (1)**
13:21
**saying (8)**
55:14;74:9,11,11;
108:21;115:1,1;
129:25
**school (13)**
18:2,3,4,10,12;
19:9,15,18,20,25;
20:3,8,9;53:22
**science (6)**
76:5,9,10,15,16;
77:8
**scope (6)**
34:12;58:16;
74:14,17,20;134:16
**sec (1)**
114:16
**second (3)**
32:2;59:18;104:4
**secondary (1)**
122:6
**Section (14)**
48:17;76:6;
102:20;112:5;113:2;
119:22,25;120:19;
121:2;122:17,20;
123:1;137:13;138:5
**sections (2)**
14:4,5
**securities (1)**
19:7
**security (50)**
67:12,14,21,23;
68:1,10,14,17;69:3,
6,7,10,19,19;70:1,16,
16,22,23;71:5,5,16,
18;72:3,6,17,19,22,
24;73:9,18,20;74:4,
6;76:11,12,19;77:9;
108:9;109:17;
112:23;115:4;130:7,
13,16,18,20;132:5,
15,25
**seeing (2)**
12:12;80:2
**seemed (1)**
91:15
**seems (1)**
146:9
**self (2)**
120:1,2

**send (1)**
16:9
**sense (7)**
20:19;47:17;74:9;
92:11;125:25;140:8;
147:17
**sent (1)**
16:6
**sentence (2)**
137:20,23
**sentences (1)**
16:4
**separate (8)**
101:20,22;102:1,
7;103:24;111:22,22,
22
**separately (2)**
121:10;134:18
**sequitur (1)**
115:7
**series (2)**
27:1,1
**set (5)**
91:14;105:22;
140:15,21;145:12
**sets (1)**
91:10
**settlement (20)**
40:13,17;89:10,15,
16,23;90:1;141:1,22,
24,25;142:1,3,7,8,10,
11,12;143:7,9
**several (5)**
11:25;12:3,4;78:7;
146:10
**shaking (1)**
132:23
**SHAPIRO (1)**
15:18
**show (7)**
54:25;116:14,19;
120:17;123:20;
124:2,18
**showed (2)**
17:3;31:4
**showing (2)**
116:12,22
**shows (1)**
71:14
**sides (1)**
99:21
**similarly (1)**
68:24
**simply (1)**
23:19
**single (7)**
74:15;103:3,6;
112:3,3;120:3;
121:19
**sit (1)**
125:21
**sitting (1)**
24:14

**six (3)**
116:4,5,7
**skill (9)**
72:24;73:19;
75:21;76:2;77:3,11;
108:8;116:22;134:9
**software (1)**
71:18
**somebody (3)**
20:19;44:8;76:6
**someone (3)**
15:8;30:4;70:5
**sometimes (1)**
41:16
**somewhere (4)**
13:17;70:10;
87:13;105:16
**Sorry (30)**
51:4;57:14,21;
59:15;61:19;64:10;
70:3,11;83:16;84:4;
86:7,8;90:17,18;
96:17;99:9;100:14;
104:10;117:7;121:3;
123:25;126:23;
132:11,12;135:11;
139:2;145:9,10,18;
146:2
**sort (7)**
21:15;29:15,19;
37:16;70:20;91:13;
137:20
**sought (1)**
50:1
**sound (1)**
97:11
**sounds (4)**
68:23;73:11;
78:24;80:10
**speak (9)**
7:21;8:4;9:19;
10:5;11:17,19,21;
12:5,8
**speaking (2)**
8:21;14:18
**speaks (4)**
106:19;112:8;
121:8,25
**spec (3)**
69:14;71:14;74:1
**specific (23)**
8:9;10:9;14:15;
16:3;17:10,14;35:20,
22;41:9;49:5;54:2;
68:16;70:1;77:10;
93:13;103:17;105:3;
111:4;125:12;130:5;
134:1;139:6;144:10
**specifically (38)**
8:7;9:5,10;14:2;
15:22;27:6;28:5;
29:19;30:13;33:13;
35:23;36:23;39:21;

71:9;72:14;75:5;
78:16;79:13;80:14;
82:6;83:4;91:25;
93:24;110:20,22,24;
112:13;119:12,14,
19;122:2;123:17;
124:6;126:3;128:4;
129:10;132:20;
141:3
**specification (48)**
70:18;71:20,24,
24;72:21;73:15,17;
103:13;106:6,14;
107:5,10;108:12;
109:18;112:10,13;
113:21;114:13,24;
115:4,10,17;122:22;
124:21;125:5,17,23;
126:2;128:4;129:10;
131:4,5,13;132:5,7,
9,11,12;133:1,6,8,11,
16;135:20,25;136:7,
10;138:6
**specifics (7)**
17:10;25:16;26:3;
32:15;33:24;60:18;
76:25
**speculating (1)**
100:4
**speculation (1)**
100:10
**spend (2)**
91:17;120:16
**spending (1)**
22:12
**spent (1)**
22:14
**SPEX (48)**
6:13;27:20;33:5;
35:2;40:18;46:8,12;
47:9,14,19;58:7;
66:15;78:8;89:9,14,
22;90:2;94:23;95:6,
9,10,11,13,16,17,19;
104:7,11,16;106:4;
114:19;115:1,3,8,15;
117:24;118:7,15;
123:15;131:5,11;
132:16;137:10;
142:4;145:1,4,18;
147:14
**SPEX's (19)**
72:1,1;92:13;
94:15;95:10;99:25;
104:15;124:4;134:5;
136:15,24;137:4;
143:25;144:9,15;
145:12,17,23;147:12
**spoke (3)**
11:12;16:10,20
**spoken (3)**
11:24;12:11;
144:11

**stage (4)**
28:17;29:10;
31:13;32:2
**stages (2)**
29:3,13
**stamp (1)**
112:20
**stan- (1)**
94:22
**stand (1)**
76:17
**standard (81)**
27:16,18,24;28:1,
8,10,15,24,25;29:6,
24;30:8,10,12;31:1;
35:13;42:24;43:1;
44:2;47:23;48:9;
65:8,9,17;83:2,15;
92:14,21;93:8,10,16,
23;94:10,17,20,23;
95:5,18;100:25;
103:10,13,15,18,21,
22;104:6,14,16,24;
105:4,9;106:9,13;
107:2,17,22,23,24;
108:2,6;109:14,16;
111:10,13;112:14,
17,17;113:4,16;
119:11;123:18;
126:17;130:6,9,15,
25;131:12;132:3,19,
20;133:2
**standards (7)**
27:14;28:3;29:13,
17;30:15;54:8;
104:20
**start (2)**
120:15;123:2
**starting (5)**
67:8;75:7;105:17;
134:18
**starts (2)**
121:3;133:19
**state (20)**
6:21;22:24;49:9;
54:22;92:12,23,24;
101:20;103:8;
106:22;112:25;
114:11,17,22;
130:22;133:10,13,
15;134:23;135:14
**stated (2)**
102:18;139:25
**statement (8)**
64:13;89:6;93:6;
117:20;118:7;128:2,
13;129:6
**statements (1)**
104:16
**States (1)**
32:11
**stating (1)**
30:14

Case 8:16-cv-01790-JVS-AGR   Document 233-16   Filed 03/13/20   Page 165 of 167   Page ID
#:6295

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

**statistic (1)**
31:20
**statistical (1)**
10:9
**statistics (1)**
31:15
**status (2)**
33:25;42:17
**statute (3)**
28:19;101:15;
112:1
**statutory (1)**
18:18
**stayed (1)**
12:4
**step (14)**
92:15,22;93:8,11;
101:4;104:4;127:6,
19;129:22;130:9,22;
131:11,22,24
**steps (2)**
101:8,9
**still (3)**
41:18;64:15;65:21
**stock (1)**
10:15
**story (1)**
97:12
**Street (1)**
6:9
**strike (27)**
8:23;20:25;24:1;
34:1;36:25;38:25;
41:3;46:2;48:15;
49:8;61:19;62:4;
67:25;68:3;75:13;
77:12,18;82:13;
89:20;90:18;96:22;
102:14;104:21;
105:2;124:17;125:1;
129:7
**stripped (1)**
31:19
**strong (1)**
20:10
**structural (1)**
73:13
**structure (10)**
68:3,16,25;69:25;
70:23;71:4;72:5;
73:2,8,23
**structures (7)**
69:18;70:15;
72:16;74:6,14,16,17
**studies (3)**
26:21;53:24;54:2
**stuff (1)**
147:15
**subject (3)**
33:21;65:22;139:3
**submitted (2)**
85:13;97:17;
113:6,16

**submitting (1)**
13:5
**subset (1)**
7:25
**substantive (4)**
14:9,19;16:10;
124:10
**substantively (2)**
114:18;123:14
**success (4)**
44:2;121:23;
122:14,17
**successful (1)**
23:20
**sued (1)**
20:20
**sufficient (4)**
41:17;92:14;93:7;
116:14
**suing (1)**
20:19
**Suite (1)**
6:9
**summarize (1)**
112:1
**supplementing (2)**
55:9;100:25
**supplements (2)**
134:7,7
**support (14)**
54:1;75:13;80:7;
123:20;124:19;
128:2,13;129:5,13,
15;139:11,23;
140:13;144:21
**supports (1)**
120:25
**suppose (1)**
61:24
**Supreme (2)**
61:25;62:3
**sure (31)**
15:14;16:20,25;
17:25;25:24;26:20;
27:11,15;33:23;
45:13;46:20;47:6;
48:24;53:5,21;55:4;
56:11;59:16;66:21;
71:1;82:19;88:4;
109:8;113:14,23;
119:3;126:12,14;
144:3;146:11;
148:21
**survey (3)**
27:1,6;31:2
**surveyed (1)**
54:6
**surveys (6)**
26:18,22,24;27:4,
8,9
**swear (1)**
7:3
**sworn (2)**

7:6;97:17
**system (2)**
109:2,2

**T**

**table (1)**
70:10
**talk (5)**
47:9;87:1;108:11;
140:3;143:21
**talked (1)**
102:24
**talking (15)**
25:4;26:11;27:21;
38:2;78:4;87:22;
103:12;105:9;
107:16;126:16;
129:1,10;132:8;
134:11;142:2
**talks (1)**
101:13
**tally (1)**
10:9
**tape (1)**
81:11
**target (3)**
75:1,4,6
**taught (14)**
18:12,19,21;19:8,
13,18,19,22;20:1;
114:12,23;115:9,16;
116:13
**teach (2)**
18:15;19:24
**teaches (1)**
93:10;130:9
**teaching (2)**
26:12;53:22
**technical (9)**
9:22,24;17:20;
22:7,10;71:2;79:15;
80:16;81:5
**Technologies (4)**
6:13;18:14,16,23
**Technology (4)**
6:14;7:13,15;
18:22
**ten (1)**
148:7
**term (5)**
54:4;67:12;68:5;
69:7;75:22
**terminate (2)**
142:13,13
**terminated (6)**
23:19;36:7;40:1,
13;41:2;63:11
**termination (1)**
142:5
**terms (9)**
19:16;21:20,20;
26:10;56:22;72:10;

118:17;122:18;
142:10
**testified (5)**
7:7;82:3;93:16;
95:4;125:18
**testify (13)**
8:19;10:19,23;
11:5;12:9;82:6,22;
92:20;94:15,19;
138:25;139:16;
140:20
**testifying (4)**
10:18,21;95:8,23
**testimony (42)**
10:25;11:3;23:15;
46:8,12;66:12;75:8,
11,12,14,17;77:15,
21;78:5,7;81:24;
82:9;85:13;92:13,
25;93:3,5,6;94:16;
95:2,6,15;105:7;
106:11;113:25;
123:22;124:3,6;
125:7,16,22;128:5,8;
129:16;130:8,11;
131:2
**theoretically (2)**
47:2,5
**theory (1)**
46:23
**third (3)**
130:22;131:11;
145:12
**Thomas (2)**
79:4,6
**though (5)**
54:3;62:21;73:5;
101:18;124:15
**thought (5)**
36:6,18;57:8;68:7;
76:5
**thoughts (1)**
13:11
**three (7)**
60:17;61:2;62:13;
104:2;110:5,11,16
**thus (2)**
58:13;73:21
**tie (1)**
29:19
**times (3)**
18:20;78:7;108:24
**Tire (1)**
29:11
**Titan (1)**
29:11
**today (3)**
24:14;81:24;140:4
**told (3)**
50:12;51:11;61:16
**Tom (2)**
75:9,14
**tomorrow (2)**

148:14,16
**top (5)**
16:3;26:10;34:10;
46:15;50:4
**topic (14)**
17:16;138:25;
139:9,17;140:4;
141:12,16;142:15,
19;143:1,14,24;
144:22;145:10
**topics (14)**
7:25;8:5,10,11,20;
9:12,18,20;10:24;
11:8,10,13;139:6;
140:19
**total (2)**
116:8,8
**Trademark (3)**
32:11,17,20
**training (3)**
17:24;53:16,21
**transcript (2)**
118:17;148:18
**transition (1)**
137:20
**treated (3)**
110:9,18;111:15
**true (6)**
30:21;31:22;32:1;
101:10;102:4;
140:18
**try (1)**
41:14
**trying (5)**
19:2,4;36:16;41:8;
56:4
**turn (4)**
94:2,13;139:9;
146:12
**Twice (1)**
15:19
**two (19)**
13:19;19:12,17;
24:25;29:20;34:18;
42:15;55:5;59:12;
61:3;73:13,15;
76:16;87:17;105:22;
124:10,11,11;140:24
**typical (2)**
44:20;91:15
**typing (1)**
15:4
**typo (2)**
13:16,21

**U**

**UCLA (4)**
18:10,12;19:25;
20:2
**ultimately (1)**
30:25
**Um (6)**

SPEX TECHNOLOGIES, INC. v.
KINGSTON TECHNOLOGY COMPANY, INC.

JOHN VILLASENOR, Ph.D., 30(b)(6)-VOL. I
March 9, 2020

20:16;25:7;52:19;
83:11;100:16;
106:24
**un- (1)**
109:25
**under (21)**
30:25;35:13;38:4;
42:23,25;47:23;48:9,
16;51:25;65:7,16;
102:16,20,23;
105:19,23;110:2;
111:20,24;113:1,2
**under- (1)**
74:12
**undergraduate (2)**
76:4;77:7
**underlined (1)**
107:20
**underscore (1)**
112:15
**understood (2)**
54:5;95:18
**undisputed (1)**
77:7
**unfair (1)**
97:5
**United (1)**
32:11
**unlawful (1)**
144:1
**Unless (2)**
57:6,7
**unpatentable (4)**
42:3,7;45:20;
65:25
**unremarkable (1)**
64:7
**up (9)**
15:12;17:3;29:15;
31:7,8;54:19;77:25;
115:13;146:6
**upheld (4)**
45:23;96:11,15,18
**upholding (3)**
50:17;58:21;62:25
**upon (2)**
8:20;145:15
**use (8)**
69:12;75:5,16;
77:16;130:19;
132:10,14,16
**used (11)**
43:9;55:16;74:19;
86:23;106:13;108:8;
112:23;118:22;
126:17;130:12;
132:25
**using (3)**
56:14;109:7,16
**usually (2)**
10:5;99:12

## V

**vacated (6)**
60:9,14;97:1,6,7,
13
**Vague (1)**
89:12
**valid (19)**
32:21,25;45:3;
47:23;48:9;49:11;
54:24;55:13,20,25;
56:8;58:11;59:3;
63:2;96:24;97:4;
115:23;116:10;
118:13
**validity (6)**
32:18;62:23;78:1;
89:2;100:13;113:24
**various (8)**
9:25;33:10;34:5;
45:23;56:8;63:4;
84:9;121:24
**venture (5)**
21:19;24:9,20;
25:19;26:7
**venue (2)**
53:10;100:2
**version (2)**
105:11;107:11
**versus (5)**
6:14;36:19;58:6;
71:18;116:17
**video (1)**
148:18
**VIDEOGRAPHER (12)**
6:6,7;7:2;59:19,
22;81:12,18;117:13;
126:25;138:11,16;
147:24
**videotaped (1)**
6:17
**view (3)**
134:8;146:17,21
**Villasenor (24)**
6:18;7:5,9;25:6;
36:1;41:7,22;61:18;
69:16;70:8,13,25;
71:21;74:3;81:14,
20;104:18;108:18;
115:6,23;123:25;
138:13,18;148:1
**Volume (5)**
81:13,19;138:12,
17;147:25

## W

**wait (3)**
38:19;50:23;
135:10
**walk (1)**
124:1

**wants (1)**
41:10
**way (19)**
11:23;13:13,15;
29:15;37:17;43:13;
44:8;47:7;73:14;
84:19,23;98:19;
100:11;102:24;
109:6,7;116:24;
117:24;119:13
**ways (2)**
26:13;143:19
**week (1)**
42:15
**weeks (1)**
34:18
**weren't (3)**
13:12,12;62:12
**Western (3)**
33:14;37:23;
39:21,25;40:3,14,18;
45:15;46:3,17;47:11,
15;49:23;50:7,16;
51:16;61:11;63:10,
19,23;66:4,10;78:12;
80:4,8;84:3;85:4,6;
86:20;88:12;89:11;
90:17,19;95:25;
96:4;97:15,22;98:7;
99:7,10,16;117:17;
142:3
**what's (7)**
7:11;43:9;57:13;
58:2;59:8;102:18;
107:10
**Whereupon (5)**
6:4;12:14;57:10;
59:5;83:23
**whole (4)**
58:16;116:17;
120:16;137:8
**wi-fi (1)**
59:15
**wish (1)**
141:4
**with- (1)**
38:24
**withdraw (2)**
36:1;38:24
**within (4)**
74:13,20;120:10;
141:9
**without (6)**
14:18;31:17;
78:25;85:21;88:22;
130:20
**witness (45)**
7:4,24;8:18,18,23;
12:9;15:20;16:1;
21:12;23:16;24:23;
25:22;37:6,14;38:12,
21;39:7,18;43:4,16;
51:5;63:5;72:9;

76:23;84:5;89:13;
98:1;104:10;105:8;
106:12;108:25;
110:24;112:9;
117:10;119:7;121:9;
122:2;124:5;125:8;
127:16;130:12;
131:3;134:17;
136:14;139:5
**witnesses (2)**
9:4;104:15
**word (8)**
13:17;67:1,2;
75:16;77:17;84:15;
113:10,10
**wording (1)**
52:9
**words (11)**
14:6,7;16:4;36:13;
69:12;75:5;86:23;
92:24;93:20;102:10;
118:20
**work (11)**
11:2;12:2,3,11;
21:19;24:9,20;
25:19;26:8;27:7;
79:23
**worked (1)**
77:8
**working (6)**
21:7,21;22:16,18;
23:2;92:5
**write (6)**
14:1;15:12;17:7;
25:11;62:11;87:14
**writing (2)**
14:5;70:4
**written (43)**
13:25;14:7,13,22;
16:5;31:13;40:4,15,
20,22;41:5,23;42:4,
12,25;45:19,22;
50:19;56:25;57:2;
58:10,21;59:3;60:1;
62:23;64:18;66:9;
69:22,23;71:10;
78:12;87:3;90:11;
96:10,11,23,25;97:3;
98:17,24;99:11;
100:6;118:2
**wrong (5)**
23:4;42:13;80:5
**wrote (7)**
13:23,24;14:3,7,
10,20;47:7

## Y

**year (3)**
76:11;77:9;92:4
**years (11)**
12:3,4;19:9;20:13;
22:9,11;23:2,6;

24:17;51:24;79:12
**Yep (2)**
90:7;146:13
**yes-or-no (1)**
40:11
**you- (1)**
94:5
**you-all (1)**
148:9
**Young (2)**
94:19;95:4

## Z

**Zaydoon (2)**
79:25;84:2

## 0

**00082 (1)**
84:24

## 1

**1 (13)**
6:4;7:12,18;45:23;
68:19;81:13,13,19;
120:15;138:12,17,
21;147:25
**1:53 (1)**
117:11
**10:10 (2)**
6:2,11
**100 (1)**
123:2
**101 (9)**
114:14;115:19;
123:5,6,24;124:2;
125:2;127:25;
128:13
**102 (4)**
67:10;101:14;
102:20,25
**102A (1)**
102:23
**102F (5)**
101:14;102:17,21;
110:2;111:21,24,25
**103 (2)**
101:2;104:3
**104 (2)**
107:5,8
**106 (2)**
129:1,15
**109 (2)**
129:20;130:22
**11 (1)**
45:23
**11:30 (1)**
59:20
**11:40 (1)**
59:23
**110 (14)**

106:17,21,25;
119:23;120:8;121:4,
13,18,22;122:5,9,13,
21;131:23
**111 (6)**
134:4;135:17;
136:1,7;137:1,9
**112 (1)**
137:3
**113 (2)**
137:2,10
**114 (7)**
105:17;113:12;
136:19;137:9,13,16,
19
**115 (3)**
137:14,16,24
**117 (3)**
135:17;136:1,7
**12:20 (1)**
81:15
**12:50 (1)**
81:21
**134 (1)**
134:19
**135 (70)**
32:7,10;33:4,9,20;
34:3,15;35:3,8,12,
17;36:25;37:3,11;
38:8;39:3,14;49:17,
23,24;50:8,17;51:16,
22;54:24;55:12,19,
24;60:2,17,23;61:12,
21;62:7,13,22;64:4,
25;66:3,20;67:9;
68:19;78:18,23;
80:8;84:3;86:14,21;
87:16;89:11;90:9,15,
20;91:6;94:20;
95:12;96:1;97:16,
22;98:8;99:11,16;
103:19;106:6;
115:15;126:18;
132:12;133:1,5,7
**1770 (1)**
112:15
**18 (1)**
68:19
**19 (1)**
59:11

**2**

**2 (21)**
12:14,18;13:6,13,
23;14:10,20;27:5,9;
45:15;48:23;67:8;
81:19;83:1,7;
108:19;111:3;135:8,
13;138:12;146:14
**2:05 (1)**
117:14
**2:48 (1)**

138:13
**2:57 (1)**
138:19
**20 (4)**
13:7;69:4,5;
140:16
**2000 (2)**
23:3;134:19
**2008 (1)**
137:12
**201 (1)**
6:8
**2013 (1)**
25:8
**2016 (1)**
23:4
**2018 (11)**
31:7;45:7;70:8;
113:7,17;114:4,8;
134:19;135:3;136:2,
9
**2019 (1)**
59:11
**2020 (10)**
6:2,10;13:7;58:5;
81:14,15,21;138:19;
140:16;148:2
**21 (4)**
58:5;68:20;
134:23;135:2
**22 (1)**
68:20
**23 (4)**
70:8;113:6,17;
135:3
**25 (3)**
31:16,21;45:8
**29 (5)**
68:20;75:7;
126:22,24;128:5

**3**

**3 (8)**
57:10,14;58:3,20;
87:1;114:17;138:17;
147:25
**3:09 (1)**
148:2
**3:10 (1)**
148:22
**30b6 (14)**
7:13,22;8:13,17,
18,22,24;9:4;10:1,3;
11:4,6;12:9;58:17
**315e1 (1)**
48:17
**35 (1)**
71:2
**36 (1)**
146:12
**375 (1)**
6:9

**38 (43)**
45:20;46:9;66:5,
19;67:10,22;68:24;
69:10,17;70:14;71:2,
3,17,21;72:4,13,14;
73:5,7,25;74:2,13,
20,24;75:4;78:8,22;
85:25;86:11;88:19;
89:2;104:5;114:18;
115:9,16;117:16,21,
25;118:8,23;123:13;
124:14,20
**39 (18)**
45:20;46:10;66:5,
19;74:24;78:9,22;
85:25;86:11;88:19;
89:2;100:15,16;
117:16,21,25;118:8,
23

**4**

**4 (2)**
59:5,9
**40 (5)**
8:5;133:12;
138:25;139:9;
141:12
**41 (1)**
141:16
**42 (1)**
141:18
**43 (3)**
101:3;141:20;
142:16
**44 (1)**
142:19
**45 (3)**
8:5;133:20;142:21
**46 (5)**
107:13;122:23;
132:21;133:3,12
**47 (1)**
68:19

**5**

**5 (3)**
67:9;83:23;84:1
**50 (3)**
8:5;30:8;142:23
**51 (1)**
143:1
**52 (3)**
8:5;91:3;143:3
**55 (93)**
33:20;34:2;36:14;
37:2,10;38:7;39:3,
14;40:4,15,19;41:22;
42:3;47:22;54:23;
55:12,19;56:16;57:2,
3;58:11,22;59:3;
60:1,7,12,14,22,25;

61:21,23;62:7,22,23,
25;63:2;64:4,10,13,
25;65:6,16;66:3,20;
67:9,12;68:4;73:23;
74:19,22;75:1;
90:10;91:6;94:8;
96:10,16,18;98:8;
100:13,21;101:4,9,
11,21;102:2,7,10,15,
20;103:5,18;104:23;
105:5;106:3,8;
108:21;111:16;
112:6;113:1;114:12,
23;115:9,15;123:8;
124:20;125:3;128:3;
129:3,11;133:12,16;
134:15;135:20
**56 (3)**
8:5;94:8;143:5
**57 (66)**
36:14;37:2,10;
40:4,15,19;41:22;
42:3;48:8;54:23;
55:24;56:16;57:3,3;
58:11,25;60:1,7,10,
14;64:4,10,14,17,25;
65:6,16,19,21;66:3,
20;74:23;90:10;
91:6;96:11,13,15,19,
24;97:4;98:8;
100:13;101:10;
102:2,7,15,21;103:5,
18;104:23;105:5;
106:3,8;108:22;
111:16;112:6;113:1;
129:2,3,11;130:23;
131:11;133:12,16;
134:15;135:20
**59 (3)**
8:5;143:14,24

**6**

**6 (1)**
135:2
**63 (2)**
8:5;144:22
**67 (5)**
8:6;145:10,15,16,
20
**68 (2)**
145:15,21

**7**

**70 (3)**
87:14;90:5;95:22
**75 (2)**
31:4;45:5
**76 (9)**
92:12;93:3,5;
127:3,5;128:5,14;
129:17;131:17

**77 (3)**
94:2,13,15
**78 (1)**
8:6

**8**

**8:16-CV-01790-JVS-AGR (1)**
6:16
**802 (33)**
37:25;45:15,16,
24;46:1,4,10,17;
47:11,16;51:16;66:5,
11,19;67:10;68:18;
78:9,12,17,23;85:3,
7,21;86:11,15;88:12,
12,19;90:14,16;
114:19;115:16;
117:25
**84 (2)**
84:25;85:1
**86 (1)**
49:21

**9**

**9 (5)**
6:2,10;68:20;
81:14,15
**90 (1)**
146:20
**91 (2)**
56:9;146:20
**92 (1)**
146:20
**93 (1)**
146:20
**94 (1)**
146:20
**94111 (1)**
6:10
**95 (1)**
146:20
**97 (3)**
101:13;102:18;
106:2
**98 (15)**
106:17,21,25;
119:23;120:8,20;
121:3,3,13,18,22;
122:5,9,13,21
**9th (3)**
81:21;138:19;
148:2