1  *[SEE SIGNATURE BLOCK FOR COUNSEL INFORMATION]*

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT

9  CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  SPEX TECHNOLOGIES, INC.,            Case No. 8:16-CV-01790-JVS-AGR

12            Plaintiff,                **KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., AND KINGSTON TECHNOLOGY COMPANY, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY**

13       v.

14

15  KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSTON TECHNOLOGY COMPANY, INC., IMATION CORPORATION, DATALOCKER INC., DATA LOCKER INTERNATIONAL, LLC,

16

17

18

19

20            Defendants.

21

Date:          April 6, 2020
Time:          1:30 p.m.
Courtroom:     10C
Judge:         Hon. James V. Selna

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................. 1

ARGUMENT ...................................................................................................... 8

    I.    SPEX IS BOUND BY ITS ADMISSIONS THAT CLAIM
          LIMITATIONS WERE KNOWN IN THE ART. .................................. 8

    II.   THE COURT SHOULD ENTER JUDGMENT THAT
          CLAIMS 55 & 57 OF THE '135 PATENT ARE INVALID
          BECAUSE SPEX HAS ADMITTED THAT EACH AND
          EVERY ELEMENT OF THESE CLAIMS WAS KNOWN
          IN THE PRIOR ART. ....................................................................... 10

          A.    SPEX'S ADMISSIONS SHOW THAT CLAIM 55 IS
                INVALID. ................................................................................ 10

    III.  CLAIM 57 OF THE '135 PATENT IS INVALID IN VIEW
          OF SPEX'S ADMISSIONS. ............................................................. 18

    IV.  AT MINIMUM, THE COURT SHOULD DIRECT THE
          JURY TO FIND THAT ELEMENTS SPEX HAS
          ADMITTED TO BE IN THE PRIOR ART ARE IN THE
          PRIOR ART. ..................................................................................... 21

CONCLUSION ................................................................................................. 21

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **Cases** **Page(s)**

4 *Abbott Labs. v. Baxter Pharm. Prods.*,

5     471 F.3d 1363 (Fed. Cir. 2006) ............................................................... 8

6 *In re Bakersfield Westar Ambulance, Inc.*,

7     123 F.3d 1243 (9th Cir. 1997) ............................................................... 9

8 *Celotex Corp. v. Catrett*,

9     477 U.S. 317 (1986)............................................................................... 8

10 *Constant v. Advanced Micro-Devices, Inc.*,

    848 F.2d 1560 (Fed. Cir. 1988) ............................................................ 8

11

12 *In re Fout*,

    675 F.2d 297 (C.C.P.A. 1982) ............................................................. 9

13

14 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986)............................................................................... 7

15

16 *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,

    491 F.3d 1342 (Fed. Cir. 2007) ............................................................ 9

17 *In re Reuning*,

18     276 F. App'x 983 (Fed. Cir. 2008) ...................................................... 8

19 *Riverwood Int'l Corp. v. R.A. Jones & Co.*,

20     324 F.3d 1346 (Fed. Cir. 2003) ............................................................ 9

21 *Sjolund v. Musland*,

    847 F.2d 1573 (Fed. Cir. 1988) ............................................................ 9

22

23 *SRI Int'l v. Matsushita Elec. Corp.*,

    775 F.2d 1107 (Fed. Cir. 1985) (en banc) ........................................... 8

24

25 *Telemac Cellular Corp. v. Topp Telecom, Inc.*,

    247 F.3d 1316 (Fed. Cir. 2001) ............................................................ 9

26 *Vanmoor v. Wal-Mart Stores, Inc.*,

27     201 F.3d 1363 (Fed. Cir. 2000) .......................................................... 14

28

Case No. 8:16-cv-01790-JVS-AGR

*WesternGeco LLC v. ION Geophysical Corp.*,
   889 F.3d 1308 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 1216 (2019) .................8

**Statutes**

Patent Act section 103 ...................................................................................9

**Other Authorities**

Fed. R. Civ. P. 56(c) .....................................................................................7

Fed. R. Civ. P. 56(g) ....................................................................................21

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

# INTRODUCTION

The surviving claims of the '135 patent (U.S. Pat. No. 6,003,135)—claims 55 and 57—are not valid. Among SPEX's corporate witness, SPEX's experts, and the '135 patent itself, SPEX has conceded that every limitation of claims 55 and 57 were known and used together in the prior art. This is hardly surprising as claims 55 and 57 are – save one limitation -almost identical to recently invalidated claims 38 and 39 from the also asserted '802 patent.  The sole remaining limitation is conceded by a corporate witness, experts, and the patent itself to be a known part of the PCMCIA standard to which this patent is directed.  Where – as here – every limitation is conceded by the patent owner to be known and used together in the art, there cannot be a credible assertion of validity nor any disputed fact preventing summary judgment of invalidity.

# BACKGROUND

Claims 55 and 57 of the '135 patent (U.S. Pat. No. 6,003,135) regard methods for a modular device to communicate with a host computing device that include a security module. (Dkt. 1-2 ('135 patent, titled "Modular Security Device").) According to the patent, the modular device can perform "security operations," including on "data provided from the host computing device to the modular device (which can then be, for example, stored in the modular device or transmitted to yet another device)." (Dkt. 1-2 ('135 patent) at Abstract.)

Claim 55 of the '135 patent is nearly identical to claim 38 of the '802 patent. These claims are reproduced below, with claim 38 of the '802 patent on the left and claim 55 of the '135 patent on the right:

Case No. 8:16-cv-01790-JVS-AGR
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

| Claim 38 of the '802 Patent | Asserted Claim 55 of the '135 Patent |
|---|---|
| [38 Preamble] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: | [55 Preamble] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to he performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: |
| [38a] receiving a request from a host computing device for information regarding the type of the peripheral device; and | [55a] receiving a request from the host computing device for information regarding the type of the modular device; |
| [38b] providing to the host computing device, in response to the request, information regarding the type of the defined interaction. | [55b] providing the type of the target module to the host computing device in response to the request; and |
| | [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. |

(Dkt. 1-1 ('802 patent); Dkt. 1-2 (''135 patent).)

Indeed, SPEX's corporate witness—who was designated to testify on behalf of SPEX as to any alleged differences between claim 55 of the '135 patent and claim 38 of the '802 patent—could identify no substantive differences between these two claims apart from the "operably connecting" step which is recited in claim 55 but not in claim 38. *See* Ex. 9 (Hakel v.3 Dep.), 44:3–45:7, 45:19–46:4[1]; *see also* Ex. 10 (Ex. 1 to Hakel v.3 Dep., listing the 30(b)(6) topics), 7 (asking for SPEX's "knowledge concerning the similarity between claim 38 of the '802 patent and claim 55 of the '135 patent"). The similarity of these claims is confirmed by Kingston's expert Dr. Villasenor. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 5–11. And SPEX's expert admitted that he was "incorrect" with respect to one of two differences he identified in response; and as to the other, he admitted he had no opinion as to whether the

---

[1] Mr. Hakel did note that claim 38 uses the term "peripheral device" but that claim 55 uses the term "modular device," but he acknowledged that, per this Court's claim construction, those two terms have the same meaning. (*See, e.g.*, Dkt. 122, 49.)

1    difference he identified was substantive, only that the language used was different.

2    *See* Ex. 13 (Rhyne Dep., Mar. 4, 2020), 102:12–17 (A. "I'm incorrect in my statement

3    at the end of paragraph 35" regarding differences between the preambles); *id.* at

4    115:3–116:1 (testifying, for example, that the difference in language is "all I looked

5    at" and that "I haven't tried to exhaustively compare them in any way").

6         Similarly, claim 57 of the '135 patent is nearly identical to claim 39 of the '802

7    patent.  These two claims are again set forth below, with claim 39 of the '802 patent

8    on the left and claim 57 of the '135 patent on the right:

| Claim 39 of the '802 Patent | Asserted Claim 57 of the '135 Patent |
|---|---|
| [39 Preamble] For use in a peripheral device adapted for communication with a host computing device, performance of one or more security operations on data, and interaction with a host computing device in a defined way, a method comprising the steps of: | [57 Preamble] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of: |
| [39a] communicating with the host computing device to exchange data between the host computing device and the peripheral device; | [57a] communicating with the host computing device to exchange data between the host computing device and the modular device; |
| [39b] performing one or more security operations and the defined interaction on the exchanged data; and | [57b] performing one or more security operations and the defined interaction on the exchanged data; |
| [39c] mediating communication of the exchanged data between the host computing device and the peripheral device so that the exchanged data must first sass through means for performing the one or more security operations. | [57c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and |
| | [57d] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device. |

(Dkt. 1-1 ('802 patent); Dkt. 1-2 (''135 patent).)

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

Again, the near-identically of these claims is confirmed by explicit admissions from SPEX's corporate witness who was designated to speak as to SPEX's "knowledge concerning the similarity between claim 39 of the '802 patent and claim 55 of the '135 patent." *See* Ex. 10 (Ex. 1 to Hakel v.3 Dep., listing 30(b)(6) topics), 7; *see also* Ex. 9 (Hakel v.3 Dep.), 44:3–45:7 (preambles substantively identical); *id.* at 71:22–72:4, 73:10–17 (first steps substantively identical); 74:14–17 (second steps identical); 77:18–21 (third steps substantively identical).   Mirroring SPEX's admissions, Kingston's expert Dr. Villasenor explains that the only substantive difference between the two claims is the "operably connecting" step in claim 57. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 12–16.  And, as noted above, SPEX has offered no competing expert testimony. *See* Ex. 13 (Rhyne Dep., Mar. 4, 2020), 102:12–17, 115:3–116:1.

The obvious similarity between the claims, SPEX's admissions, Kingston's expert testimony, and the lack of countervailing expert testimony from SPEX leads only to one conclusion—that, apart from the "operably connecting" limitation recited at the end of claims 55 and 57 of the '135 patent, claim 38 of the '802 patent is substantively identical to claim 55 of the '135 patent and claim 39 of the '802 patent is substantively identical to claim 57 of the '135 patent.

Why this conclusion matters, though, is because SPEX's corporate witness also made another admission during the deposition—that SPEX believes that claims 38 and 39 of the '802 patent are invalid. *See* Ex. 9 (Hakel v.3 Dep.), 31:3–5 ("Q. So I'll ask again, does SPEX believe that claims 38 and 39 of the '802 patent are invalid? A. Yes.").  Indeed, the writing was already on the wall that these elements were invalid. SPEX had given up on these claims during Western Digital's IPR of the '802 patent (it didn't even file a response to the petition after institution), *see* Ex. 27 (Rooklidge Dep.), 15:21–16:18 (explaining that "SPEX's failure to file a response regarding Claims 38 and 39 ... almost guaranteed that those patent claims would be held ...

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

unpatentable"). SPEX's own expert had confirmed in an earlier deposition that a prior art standard (the PCMCIA standard) taught most of the limitations. *See* Ex. 11 (Rhyne Validity Dep., Apr. 20, 2018), 65:15–24, 134:18–135:10, 135:17–136:3, 137:11–21. SPEX admitted in briefing before the Federal Circuit that many of these elements were taught by that same prior art standard. *See* Ex. 28 (SPEX's CAFC Response Brief) at 24.

But, what was surprising about the admission was that it was a moment of honesty in litigation where that is often hard to come by. SPEX's corporate witness was designated to testify as to SPEX's knowledge concerning the validity of its patent claims, and the witness offered an honest assessment on that topic. SPEX's lawyers may now try to play this witness off as not knowing what he was talking about, but nothing could be further from the truth. The witness—Mr. Hakel—has a computer science degree and significant experience with the technology, having been the President and CEO of SPEX since its founding. Ex. 9 (Hakel v.3 Dep.), 13:1-20. He is also the CEO of Spyrus, Inc. (predecessor in interest to the asserted patents), and he's the CFO of its newly-formed subsidiary Spyrus Solutions (which sells Spyrus' products and services). Ex. 9 (Hakel v.3 Dep.), 13:1-20. He has been SPEX's President and sole employee since its inception. Ex. 8 (Hakel v.1 Dep.), 48:2-7. And was previously Chief Strategy Officer for Spyrus. Ex. 8 (Hakel v.1 Dep.), 48:2-7. However, SPEX's attorneys' continued assertion that the common elements of claims 55 and 57 of the '135 patent are not known in the art simply fails, and this Court should at least establish the fact that the common elements are known in the art as a matter of law (as will be discussed further below).

This Court should not stop, though, by simply establishing as incontrovertible that the common elements of claims 55 and 57 are known the art. SPEX has also admitted that the last step of each of claims 55 and 57 (the "operably connecting" step) is also known in the art. The specification of the '135 patent itself confirms that

1    there is nothing new about "operably connecting"—it simply points to the prior art

2    PCMCIA standard as teaching how to "operably connect." (*See, e.g.*, Dkt. 1-2 ('135

3    patent), 10:15–23 (describing "operably connecting" and explaining that "the

4    standard for PCMCIA interfaces, specifies such operation); *see also, e.g.*, *id.* at 9:51–

5    65 (pointing to "housekeeping functions associated with PCMCIA interfaces" as an

6    example of how a computer operably connects to a card), 10:28–41 (explaining how

7    a device operably connects with a computer, pointing to the PCMCIA standard,

8    specifically the portion of the standard "called the Card Information Structure"), and

9    19:12–17 (explaining that the "electrical and mechanical characteristics and protocol

10   for the cost computing device I/O interface [] are established in conformance with the

11   appropriate PCMCIA standards").)   SPEX's corporate witness also admitted the

12   teachings of PCMCIA. Ex. 9 (Hakel v.3 Dep.), 87:7–6, 88:24–89:5 (confirming that

13   these portions of the specification describe "how an operating system software

14   interacts with the PCMCIA interface" and describe "what happens when you plug the

15   PCMCIA card" described in the specification "into a computer").

16       Kingston's expert detailed these teachings from the specification—confirming

17   that they admit that "operably connecting" is performed by the PCMCIA standard.

18   *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 26–31.   SPEX has not offered any

19   competing expert testimony.   Indeed, SPEX's own technical experts offered no

20   rebuttal to Dr. Villasenor's prior assertion that the PCMCIA standard was sufficient

21   to practice the "operably connecting" step.  *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020),

22   30–31; Ex. 29 (Rhyne 2020 Rpt.), 11–12.   SPEX may dispute whether its experts'

23   previous failure to address this limitation amounts to an admission, but SPEX cannot

24   dispute the simple fact that their experts' failure to address this limitation in their

25   respective expert reports prevents these experts from testifying about it before the

26   jury—so the effect is the same.

27

28

Claims 55 and 57 of the '135 patent also relate to Kingston's counterclaims, which are based on the substantive similarity between these claims and now-invalid claims 38 and 39 of the '802 patent. As a result of *inter partes* review proceedings, claims 38 and 39 of the '802 patent were found to be unpatentable by the PTAB (Patent Trial and Appeal Board). (*See* Dkt. 178, ¶ 21 (citing *Western Digital Corp. et al. v. SPEX Techs., Inc.*, IPR2018-00082, Final Written Decision, Paper 40, at 3 (PTAB Apr. 18, 2019)).) That decision was not appealed by SPEX. (Dkt. 178, p.25 at ¶ 21.) The PTAB separately instituted *inter partes* review of claims 55 and 57 of the '135 patent based on nearly-identical prior art. (Dkt. 178, pp.27-28 at ¶¶ 26, 29 (citing *Western Digital Corp. v. SPEX Technologies, Inc.*, IPR2018-00084, Order Instituting IPR, Paper 14, at 2, 29-30 (PTAB Apr. 25, 2018) (stating that the petition "has established a reasonable likelihood in prevailing in showing that at least one of the challenged claims of the '135 patent is unpatentable")).) However, that *inter partes* review was never adjudicated. (Dkt. 178, p.29 at ¶ 30.) Instead, SPEX settled with Western Digital, Apricorn, and Toshiba, agreeing to drop the '135 patent against them in exchange for dismissal of the *inter partes* review. (Dkt. 178, p.29 at ¶ 30.) SPEX received no monetary compensation in the settlement. (Dkt. 178, p.29 at ¶ 30.) Accordingly, in its counterclaims, Kingston alleges that "SPEX has engaged in patent misuses by, inter alia, maintaining its allegations of infringement of claims 55 and 57 of the '135 patent, knowing these claims to be invalid." (Dkt. 178, p.34 at ¶ 49.)

## LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If a nonmoving party cannot establish a genuine issue for trial on any essential element of its claim,

1  then the moving party is entitled to summary judgment.  *See Celotex Corp. v. Catrett*,
2  477 U.S. 317, 322-23 (1986).

3      "[S]ummary judgment ... is entirely appropriate, in a patent as in any other
4  case." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en
5  banc).  Invalidity of a patent must be established by clear and convincing evidence.
6  *Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006).

7                                   **ARGUMENT**

8  **I.   SPEX Is Bound By Its Admissions That Claim Limitations Were Known
          in the Art.**

9      This motion hinges on admissions made by SPEX through the testimony of its
10  designated corporate witness, by SPEX through its assertions of infringement, and by
11  statements made by SPEX's predecessor-in-interest in the specification of the '135
12  patent.  Having admitted that the material claimed by claims 55 and 57 is in the prior
13  art (as discussed further below), SPEX should be bound to those admissions, and this
14  Court may properly enter summary judgment of invalidity based on SPEX's
15  admissions that each and every element of claims 55 and 57 was known in the prior
16  art.

17      "A statement in a patent that something is in the prior art is binding on the
18  applicant and patentee for determinations of anticipation and obviousness." *Constant
19  v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988).  Thus, where
20  the specification of a patent explains that something is "known in the art," or describes
21  certain features of an invention as being taught by the prior art, a patent owner cannot
22  later dispute that claim elements covering those admitted prior art features were
23  known in the art.  *See id.*; *see also, e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*,
24  889 F.3d 1308, 1329 (Fed. Cir. 2018) (approving of the "Board's consideration of [a
25  challenged patent's] characterization of the prior art" because "[a] statement in a
26  patent that something is in the prior art is binding ... for determinations of anticipation
27  and obviousness"), *cert. denied*, 139 S. Ct. 1216 (2019); *In re Reuning*, 276 F. App'x

983, 986 (Fed. Cir. 2008) ("Having acknowledged that certain claimed elements are taught by the prior art, [a patent owner] cannot now defeat an obviousness rejection by asserting that the cited references fail to teach or suggest these elements."); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *Application of Nomiya*, 509 F.2d 566, 571 (C.C.P.A. 1975) (holding that a patent owner was bound by admissions made in the specification that material was known in the prior art).

There is no reason to treat statements made by a patent owner during the course of litigation any differently. Indeed, the Federal Circuit has held that where a patent owner testifies that certain features of a claimed invention are in the prior art, a jury must accept those features as known in the art "as a matter of law." *See, e.g., Sjolund v. Musland*, 847 F.2d 1573, 1577 (Fed. Cir. 1988); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (holding that the district court properly relied on principal inventor's admissions as to features and performance of the prior art). Moreover, it is black letter law that "admissions in pleadings generally are binding on the parties and the Court." *In re Bakersfield Westar Ambulance, Inc.*, 123 F.3d 1243, 1248 (9th Cir. 1997) (citing *American Title Ins. Co. v. Lacelaw, Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)).

As the Federal Circuit has repeatedly held, "[v]alid prior art may be created by the admissions of the parties." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003) (explaining that the term "prior art" as used in section 103 of the Patent Act is not limited to only those materials described in section 102); *see also In re Fout*, 675 F.2d 297, 300 (C.C.P.A. 1982) (same). Here, as described below, SPEX's admissions constitute prior art that renders claims 55 and 57 invalid.

## II. The Court Should Enter Judgment that Claims 55 & 57 of the '135 Patent Are Invalid Because SPEX Has Admitted that Each and Every Element of these Claims Was Known in the Prior Art.

Through the explicit admissions of its designated corporate witness, through statements made in the specification, and through statements made in briefing, SPEX has admitted that each and every element of claims 55 and 57 was known in the art and that these elements would be used together. SPEX should be bound by these admissions, and the claims should be found invalid.

### A. SPEX's Admissions Show that Claim 55 Is Invalid.

Claim 55 of the '135 patent is reproduced below, with each element labeled to enable easier discussion:

> [55 pre] *For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:*

> [55a] *receiving a request from the host computing device for information regarding the type of the modular device;*

> [55b] *providing the type of the target module to the host computing device in response to the request; and*

> [55c] *operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.*

SPEX has admitted that the preamble and the first two steps (55a and 55b) are known in the art through the admissions made by SPEX's designated corporate witness, by the testimony of SPEX's own expert, and by judicial admission in briefing before the Federal Circuit. The last element (55c) is admitted to be prior art in the specification of the '135 patent. And as these elements would be used together, SPEX's admissions render claim 55 obvious. We detail each of the relevant admissions below.

As noted above, SPEX's designated corporate witness testified under oath that SPEX knows that the nearly-identical corresponding claim 38 from the '802 patent is invalid—meaning that SPEX knows that each and every element of claim 38 of the '802 patent is known in the art. *See* Ex. 9 (Hakel v.3 Dep.), 31:3–5. This admission translates to the preamble and elements 55a and 55b of claim 55 because, as SPEX's designated witness also testified, these elements of claim 55 are substantively identical to the corresponding elements of claim 38 of the '802 patent.

With respect to the preamble, SPEX's corporate witness could not identify any substantive difference between the preamble of claim 38 of the '802 patent and the preamble of claim 55 of the '135 patent. The only difference he could identify was that claim 38 speaks of a "peripheral device" whereas claim 55 speaks of a "modular device." *See, e.g.*, Ex. 9 (Hakel v.3 Dep.), 44:13-45:7 (Q: "Are there any substantive differences between the preamble of claim 38 and the preamble of claim 35 [sic] ... A: ... outside of the peripheral and modular [terms], that is the major difference between the preamble in the two. I would concur. Q. Are there any other substantive differences between the two? A: ... I do not see any material major differences between the two."). However, as the Court is aware, and as SPEX's corporate witness confirmed, this Court's claim constructions treat these two terms identically. (Dkt. 122, Court's Claim Construction Order, 16 (holding that "[t]he Court construes 'modular device' consistent with 'peripheral device'").)

Kingston's expert, Dr. Villasenor, confirms that the two preambles are substantively identical, through careful analysis of the claim text and the specification of the '135 patent. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 6–9. SPEX has not offered any countervailing expert testimony. Though SPEX's expert Dr. Rhyne did assert in two paragraphs of his report that linguistic differences between the two preambles render them substantively different (*see* Ex. 29 (Rhyne 2020 Rpt.), ¶¶ 35–36), Dr. Rhyne later admitted in deposition that he was "incorrect in [his] statement"

1  regarding the first statement (Ex. 13 (Rhyne Dep. (Mar. 4, 2020)), 102:12–17); and

2  further admitted that he did "tr[y] to exhaustively compare [the two preambles] in any

3  other way, other than the fact that they're written differently" (*id.* at 115:3–116:1).  In

4  short, the only evidence shows that the preambles are substantively identical, and thus

5  SPEX's admission that the preamble of claim 38 of the '802 patent is in the prior art

6  must also mean that the preamble of claim 55 is in the prior art.

7          Element 55a of the '135 patent is also substantively identical to element 38a of

8  the '802 patent.  SPEX's corporate witness could again not identify any differences

9  between these two elements, other than the non-material peripheral/modular device

10  linguistic difference.  Ex. 9 (Hakel v.3 Dep.), 45:19-46:3 ("Q: Does SPEX believe

11  there are any substantive differences between elements 38A from the '802 patent and

12  element 55A from the '135 patent? ...  A: The difference, again, references peripheral

13  [versus] modular.  Other than that, there are no other differences.").  Mr. Hakel further

14  confirmed that he would rely on SPEX's expert's opinion that element 55a and 38a

15  are "the same."  Ex. 9 (Hakel v.3 Dep.), 52:8-53:10 ("Q: [Dr. Rhyne] says, quote,

16  'This element' – referring to element 55A.  It says, quote, 'This element is the same

17  as element 38A of claim 38 of the '802 patent. ...   Does SPEX agree with this

18  statement? ...  A: ... I'd have to rely on what [SPEX's expert] Dr. Rhyne says.");  Ex.

19  1 (Rhyne Inf. Rpt. (Mar. 23, 2018)), ¶ 178 (recognizing the same).  And Dr. Villasenor

20  again explains why these elements are substantively the same through careful analysis

21  of the text and specification.  *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 9–10.  Thus,

22  the only evidence shows that element 55a is substantively identical to its

23  corresponding limitation from claim 38 of the '802 patent, which SPEX has admitted

24  to be in the prior art.

25          SPEX's admission that element 55a is in the prior art should come as no

26  surprise.  Indeed, SPEX's own expert has explicitly testified that element 38a is taught

27  by the PCMCIA standard:

28

12

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

Q. So when a PCMCIA compliant device is used with a PCMCIA compliant device, you believe that that would practice Element 38a?

A. Again, I don't think Dr. Clark has pointed that out with any specificity, but I believe that there is -- *there is teaching within the PCMCIA standard of performing that step*.

Ex. 11 (Rhyne Dep. (Apr. 20, 2018)), 134:18–135:10 (emphasis added).  Showing that this was not some one-off errant admission, Dr. Rhyne later confirmed:

[Q.] So when a PCMCIA compliant device is used with a PCMCIA compliant standard, you, not anybody, you believe that there is a teaching of Element 38a?

A. If -- if the host device has the appropriate driver and -- and the host device and the device that's plugged into the PCMCIA terminal are both compliant with the standard, there is teaching in the standard –

Q. Okay.

A. -- as to how a request for information will take place.

*Id.* at 135:17–136:3.  And further showing that the expert's testimony accords with SPEX's understanding of the claims, SPEX told the Federal Circuit that a person of skill in the art would know that "features described in the PCMCIA standard must be implemented in order to practice the claimed 'receiving' and 'providing' steps" (i.e. 55a and 55b).  Ex. 28 (SPEX's CAFC Response Brief), 24.  These admissions by SPEX and its expert—which SPEX has never tried to disavow—further confirm that there can be no dispute that this element is known in the art.

As to the next step—element 55b—the story is much the same.  SPEX and its expert admitted this element was identical to element 38b of the '802 patent.  SPEX admitted it would rely on its expert's opinion that element 55b of the '135 patent is the same as element 38b of the '802 patent.  Ex. 9 (Hakel v.3 Dep.), 46:8-16 ("Q. Does SPEX believe there are any substantive differences between element 38B of the

13

'802 patent and element 55B of the '135 patent? THE DEPONENT: I think, again, they speak for themselves; and would rely on experts to interpret it."). And SPEX's expert, Dr. Rhyne, relied on the similarities between element 55b of the '135 patent and element 38b of the '802 patent to conclude that Kingston's accused products infringed element 38b of the '135 patent. Ex. 1 (Rhyne Inf. Rpt. (Mar. 23, 2018)), ¶ 180 (stating "[t]his [55b] claim language is very similar to the language of Element 38b ... I therefore refer to and incorporate by reference my opinion with respect to Element 38b")). Dr. Villasenor explains that these limitations are substantively identical, with no countervailing expert testimony from SPEX. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 10–11. These admissions, coupled with SPEX's admission that claim 38 is invalid, show that this limitation was in the prior art.

And, again, SPEX's expert admitted that this step—step 55b (and its counterpart, 38b)—is performed by the PCMCIA standard. Ex. 11 (Rhyne Dep. (Apr. 20, 2018)), 289:20-24 ("[Q.] In order to disclose what's necessary in your view to meet the Element 38b, is it sufficient to identify within a prior art reference adherence to the PCMCIA standard? A. I think it is"). SPEX's expert continued: "Q. Does the PCMCIA standard also disclose in general teaching providing to the host computing device in response to a request information regarding the type of defined interaction? A. That is — is within the standard, yes." Ex. 11 (Rhyne Dep. (Apr. 20, 2018)), 137:18-22. And (as discussed above), SPEX agreed with its expert in briefing to the Federal Circuit. *See* Ex. 28 (SPEX CAFC Response Brief) at 24.

Lastly, as to 55c, the "operably connecting" limitation, the specification of the '135 patent makes clear that this step can be met by simply applying the PCMCIA standard.[2] In the words of SPEX's own expert, this step involves the "handshake"

---

[2] SPEX also admits this element is taught by the prior art USB 1.0 standard by alleging infringement based solely on the identical USB 1.1 standard. *See* Ex. 1 (Rhyne Inf. Rpt. (Mar. 23, 2018)), ¶ 183; *e.g.,* Ex. 12 (USB Rev. 1.0 (Jan. 15, 1996)), at DEF_INV0004158. Admissions through accusations of infringement are binding. *See, e.g.*, *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000).

Case No. 8:16-cv-01790-JVS-AGR
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

that occurs when the claimed modular device is first inserted to a computer and, as (as SPEX has alleged infringement) is met when "***the host issues a command to read configuration information about the device***."   Ex. 1 (Rhyne Inf. Rpt. (Mar. 23, 2018)), ¶ 183 (emphasis added).  The specification describes exactly this process as being performed according to the PCMCIA standard.  As the specification explains:

> Typically, once the presence of a new peripheral device is detected by the operating System Software of the host computing device, the operating System Software (or companion Software program) also identifies the type of the peripheral device. This can be accomplished, for example, by a standard software device driver (hereinafter, "host driver") for devices of the type that use the host computing device interface that is being used by the modular device 602. In FIG. 6, the host driver is shown stored in the memory section 606a of the memory device 606 of the host computing device 601. (***The Card Services or Socket Services programs that often are bundled with the Windows95^{TM} operating System Software for use in performing various "housekeeping" functions associated with a PCMCIA interface are examples of such drivers***.)

Dkt. 1-2 ('135 patent), 9:51–65 (emphasis added).  The specification then goes on to explain that "for many combinations of operating system software and device interface, the operating system software waits for confirmation that the device connected to the device interface is ready for further interaction with the operating system software before the operating system software seeks to identify the type of the device connected to the interface (the standard for PCMCIA interfaces, ***specifies such operation***)."   Dkt. 1-2 ('135 patent), 10:15–23 (emphasis added); *see also id.* at 19:12–17 ("In such a modular device, the electrical and mechanical characteristics ***and protocol*** for the host computing device I/O interface 806 are established in conformance with the appropriate PCMCIA standards.") (emphasis added).

The specification then goes on to explain exactly how the card "operably connects" to the host computer, again referencing the PCMCIA specification. As the specification explains "[o]ne way in which the operating system software of a host computing device can identify the type of peripheral device is to access a known memory section of a memory device of the peripheral device, as established by an interface standard developed for that type of peripheral device." Dkt. 1-2 ('135 patent), 10:28–34. The PCMCIA standard is such an interface standard. Indeed, for an embodiment of the purported invention of the '135 Patent conforming with the PCMCIA standards, the process for connecting is laid out in the PCMCIA standard, specifically the portion of the standard "called the Card Information Structure, that defines, among other things, a location in a portion of memory of a PCMCIA card, denoted as 'attribute memory', that stores data identifying the type of the PCMCIA card." Dkt. 1-2 ('135 patent), 10:36–41. This portion of memory (the "attribute memory") is identified in the specification as "memory section 612a," also called the "modular device identification data." Dkt. 1-2 ('135 patent), 10:47–49.

Kingston's expert, Dr. Villasenor, details these teachings of the '135 patent at length, explaining that the PCMCIA standard, as taught in the specification of the '135 patent, is sufficient to teach this limitation. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 26–29. SPEX has no response. Indeed, SPEX's experts did not contest that the "operably connecting" limitation was met by the PCMCIA standard in their original reports. *See id.* at 30–31. And neither of SPEX's validity experts—both of whom offered response reports to Dr. Villasenor's most recent report—offered any rebuttal to Dr. Villasenor's analysis of the specification of the '135 patent.

To the contrary, the only testimony from SPEX confirms what the specification of the '135 patent and Dr. Villasenor say. SPEX's corporate witness, Mr. Hakel, testified that he would defer to Mr. Young—another witness designated on SPEX's behalf—in regard to technical matters regarding PCMCIA. Ex. 9 (Hakel v.3 Dep.),

108:14-17 ("Q. If you had questions about PCMCIA, would you rely on answers Mr. Young gave you?   A. He would be a source for technical matters on hardware, absolutely.").  Mr. Young's testimony—which is likewise binding on SPEX—in turn, provides that, pursuant to the PCMCIA standard, the host issues a command (a "GetTuples" command) to read configuration information about the device. According to Mr. Young, the computer issues a GetTuples command to get the "card information structure," which comprises the "nature of the – of the device in terms of its description" and "information about the card in terms of manufacture name, [and] how you access the memory areas on the PCMCIA interface" (Ex. 14 (Young Dep.), 96:25-97:5), among other things:

> Q. Are you familiar with the host command under the PCMCIA standard called "GetTuples data"?
>
> A. I've heard of it.
>
> Q. What is a GetTuples data command?
>
> A. It allows a computer to be able to read the information from the – from a device that's connected to the PCMCIA bus.
>
> Q. When you say "allows to read," what do you mean?  If a PCMCIA card receives a GetTuples data command, what does it do?
>
> A. It will return the card information structure.

Ex. 14 (Young Dep.), 179:16-180:2, 98:3-5 ("Q. Is the card information structures part of the PCMCIA standard?  A. Yes.").

As described above, each of the elements of claim 55 are clearly and unambiguously admitted by SPEX to be in the prior art.  There is similarly no dispute that each of these elements would be used together.  Claim 55 is directed to a "modular device," such as a device designed according to the PCMCIA standard.  SPEX, through its admissions, has admitted that the device itself (as described in the preamble) is in the prior art.  Naturally, such a device would need to be identified when plugged into a host computer, and would subsequently need to "operably connect" to the computer in order to work at all.  The PCMCIA standard—which

SPEX has admitted teaches each of the steps involved in the claim when used with such a modular device—describes how that happens.  Thus, the claim is obvious over SPEX's admissions.

**III.   Claim 57 of the '135 Patent Is Invalid in View of SPEX's Admissions.**

Claim 57 is reproduced below, again with labeling to facilitate discussion:

> [57 pre] *For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:*

> [57a] *communicating with the host computing device to exchange data between the host computing device and the modular device;*

> [57b] *performing one or more security operations and the defined interaction on the exchanged data;*

> [57c] *mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and*

> [57d] *operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.*

SPEX has admitted that the preamble and first three steps (57a, 57b, and 57c) are in the prior art through designated corporate testimony.  The last step (57d) is identical to the last step of claim 55, and is admitted to be in the prior art for the same reasons discussed above.  We turn to each limitation below.

SPEX's designated corporate witness testified under oath that SPEX knows that the nearly-identical corresponding claim 39 from the '802 patent is invalid—meaning that SPEX knows that each and every element of claim 39 of the '802 patent is known in the art.  See Ex. 9 (Hakel v.3 Dep.), 31:3–5.  This admission translates to the preamble and elements 57a, 57b, and 57c of claim 57 because, as SPEX's designated witness also testified, these elements of claim 57 are substantively identical to the corresponding elements of claim 39 of the '802 patent.

The preamble of claim 57 is identical to the preamble of claim 55, each of which are in turn are substantively identical to the preambles of claims 38 and 39 of the '802 patent.  Thus, all of the discussion above with respect to the preamble of claim 55 applies here as well.  SPEX's corporate witness admitted the preambles were substantively identical; Kingston's expert testified that they were; and SPEX's expert offered no real rebuttal.  The preamble of 57 is thus admitted to be in the prior art.

As to element 57a, SPEX's corporate witness also testified that element 57a is substantively identical to the corresponding element from claim 39 of the '802 patent. *See* Ex. 9 (Hakel v.3 Dep.), 71:22–72:4; 73:10–17.  Dr. Villasenor concluded that these limitations were substantively the same, as did SPEX's own expert witness. *See* Ex. 2 (Villasenor Rpt., Jan. 20, 2020), 13–14; Ex. 1 (Rhyne Inf. Rpt. (Mar. 23, 2018)), ¶ 189.  As SPEX has admitted that the corresponding element of claim 39 was known, element 57a is admitted to be in the prior art.

Turning next to 57b, SPEX admitted the obvious—that 57b and 39b are identical. Ex. 9 (Hakel v.3 Dep.), 74:14-17 ("Q. All right. Just so we can get it cleanly on the record, element 39B of the '802 patent is identical to claim 57B of the '135 patent? A. Yeah."). Coupled with SPEX's admission that claim 39 is invalid, SPEX, accordingly, admits this limitation was known in the prior art.

In regard to 57c, SPEX admitted that 57c and 39c differ in their "peripheral" vs. "modular" language and, although there is one other minor linguistic difference

between them, that difference is not "material," because "it's almost implied in [57c]." Ex. 9 (Hakel v.3 Dep.), 76:11-19 ("Q. … So what – what is one difference between 39C and 57C?  A. The – the – … [A.] Again, the differences I'm seeing here – one is the reference to a peripheral device versus the modular device, which we've talked about quite a bit."); Ex. 9 (Hakel v.3 Dep.), 76:20-77:21 ("Q. … And are there any other differences?  [A.] The other difference that I reference here, outside of the device is the additional descriptor about why it's passing through that security module for the – the purpose of performing the one or more security operations, which is referenced in 39C; but *the intent, I think, is very similar*.  Q. … So you're referring to the linguistic difference between – in 39C, quote, 'means for performing the one or more security operations' and in 57C the, quote, 'security module'?  A. Yes.  Yes. Q. Does SPEX believe that linguistic difference is material? …   [A.] I am not technical.  I, obviously, didn't write the patent. …  I am not technical.  I did not write them.  But *my interpretation is that is not a material difference because I would think it's almost implied in 57C as to what is happening*.").  SPEX's admission comports with this Court's order construing "security module" and "security means" the same way.  Dkt. 122 (Claim Construction Order), 25 ("The parties submit the same proposed § 112(6) structures for the term 'security module' as the term 'security means.'  The Court adopts Defendants' proposed structures for the same reasons stated above with respect to 'security means.'").  Coupled with SPEX's admission that claim 39 is invalid, SPEX, accordingly, admits this element was in the prior art.

Element 57d is identical to element 55c discussed above. Accordingly, it is in the prior art as explained above.  Kingston incorporates that discussion herein.  And as discussed previously, a person of skill in the art would recognize that all of these admitted prior art elements should be used together.  The preamble describes a now-admitted prior art device which connects to a host computer to perform security operations.  That device would undoubtedly need to share information with the

computer in order to perform security operations, and would undoubtedly need to "operably connect" in order to do so.  And, to enforce security, the device would also need to ensure that data actually passes through the hardware used to perform that security.  Thus, a person of skill in the art would find claim 57 obvious over SPEX's admissions.

## IV.    At Minimum, the Court Should Direct the Jury to Find that Elements SPEX Has Admitted to Be in the Prior Art Are in the Prior Art.

As discussed above, summary judgment of invalidity is warranted.  However, Kingston specifically requests that, to the extent the Court is not willing to grant it the full relief requested, the Court should enter an order establishing that each of the limitations of claims 55 and 57 of the '135 patent are known in the prior art as, based on SPEX's admissions, this cannot be seriously disputed.  *See* Fed. R. Civ. P. 56(g).

## CONCLUSION

In sum, based on the obvious similarities between asserted claims 55 and 57 of the '135 patent and the admittedly-invalid claims 38 and 39 of the '802 patent, and SPEX's related admissions, claims 55 and 57 of the '135 patent should be held invalid.  Thus, Kingston respectfully requests the Court grant partial summary judgment of invalidity of claims 55 and 57 of the '135 patent.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Dated: March 13, 2020          FISH & RICHARDSON P.C.

By:   /s/ Oliver J. Richards
        David M. Hoffman (*pro hac vice*)
        hoffman@fr.com
        David Morris (*pro hac vice*)
        dmorris@fr.com
        111 Congress Ave., Suite 810
        Austin, TX 78701
        Tel: (512) 472-5070
        Fax: (512) 320-8935

        Joanna M. Fuller (SBN 266406)
        jfuller@fr.com
        633 W. 5th Street, 26th Floor
        Los Angeles, CA 90071
        Tel: (213) 533-4240
        Fax: (858) 678-5099

        Oliver J. Richards (SBN 310972)
        orichards@fr.com
        12390 El Camino Real
        San Diego, CA 92130
        Tel: 858-678-4715
        Fax: 858-678-5099

LAW OFFICE OF S.J. CHRISTINE YANG

        Christine Yang (SBN 102048)
        chrisyang@sjclawpc.com
        Victoria Hao (*pro hac vice*)
        vhao@sjclawpc.com
        17220 Newhope Street, Suite 101-102
        Fountain Valley, CA 92708
        Tel.: (714) 641-4022
        Fax: (714) 641-2082

*Attorneys for Defendants*
Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 13, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

*/s/ Oliver J. Richards*
Oliver J. Richards
orichards@fr.com

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY