1  *[SEE SIGNATURE BLOCK FOR COUNSEL INFORMATION]*

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

   **SOUTHERN DIVISION**

10

11 SPEX TECHNOLOGIES, INC.,

12  　　　Plaintiff,

13  　　v.

14 KINGSTON TECHNOLOGY

15 CORPORATION, KINGSTON
   DIGITAL, INC., KINGSTON

16 TECHNOLOGY COMPANY, INC.,
   IMATION CORPORATION,

17 DATALOCKER INC., DATA LOCKER

18 INTERNATIONAL, LLC,

19
    　　　Defendants.
20

21

22

23

24

25

26

27

28

Case No. 8:16-CV-01790-JVS-AGR

**KINGSTON TECHNOLOGY
CORPORATION, KINGSTON
DIGITAL, INC., AND KINGSTON
TECHNOLOGY COMPANY, INC.'S
MEMORANDUM IN OPPOSITION
TO SPEX TECHNOLOGIES, INC.'S
MOTION FOR SUMMARY
JUDGMENT OF NO INVALIDITY**

Honorable James V. Selna

Date: April 6, 2020
Time: 1:30 p.m.
Courtroom: Santa Ana, 10C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

LEGAL STANDARD...........................................................................................2

ARGUMENT .......................................................................................................2

    I.     SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT
           REGARDING THE FORTEZZA CRYPTO CARD............................2

           A.     Overview of the Fortezza Crypto Card.........................................2

           B.     Dr. Villasenor Properly Analyzed "Means for
                Mediating" ....................................................................................4

           C.     Dr. Villasenor Correctly Explains that the Fortezza
                Crypto Card Anticipates Claim 55 of the '135 Patent...............12

           D.     Dr. Villasenor Correctly Explains that the Fortezza
                Crypto Card Anticipates Claim 57 ..............................................18

           E.     Conclusion as to Fortezza Crypto Card ......................................21

    II.    KINGSTON HAS PUT FORTH EVIDENCE SHOWING
          THE "FORTEZZA MULTI-FUNCTION CARD" IS PRIOR
          ART ...............................................................................................21

    III.   SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT
         "AS TO" A DOCUMENT WHICH KINGSTON HAS
         NEVER ASSERTED INVALIDATES ANY CLAIM OF
         SPEX'S PATENTS ........................................................................23

    IV.   SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT
         OF NO INVALIDITY OVER THE ADMITTED PRIOR
         ART ...............................................................................................24

CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ....................................................8, 16, 17, 19, 20

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,
516 F.3d 1361 (Fed. Cir. 2008) ...........................................................................21

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) ...........................................................................25

*Ecolochem, Inc. v. S. California Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ......................................................................12, 14

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ...........................................................................15

*Irise v. Axure Software Sols., Inc.*,
No. CV08-03601 SJO 2009 WL 3615075, at *33 (C.D. Cal. Sept.
11, 2009) ..............................................................................................................16

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*,
322 F.3d 1335 (Fed. Cir. 2003) ...........................................................................22

*Link Treasure Ltd. v. Baby Trend, Inc.*,
809 F. Supp. 2d 1191 (C.D. Cal. 2011) ..........................................................21, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..........................................................................................2, 3

*Moba, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2003) ...........................................................................15

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) .........................................................................7, 8

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
324 F.3d 1346 (Fed. Cir. 2003) ...........................................................................24

*Sjolund v. Musland*,
847 F.2d 1573 (Fed. Cir. 1988) ...........................................................................25

## <u>TABLE OF AUTHORITIES - CONTINUED</u>

**Page(s)**

**Cases**

*St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.*,
  No. CA 04-1436-LPS, 2012 WL 1015993 (D. Del. Mar. 26, 2012), aff'd,
  522 F. App'x 915 (Fed. Cir. 2013) ................................................................9, 10

*Toro Co. v. Deere & Co.*,
  355 F.3d 1313 (Fed. Cir. 2004) ...........................................................................7

*Western Digital Corp. v. SPEX Technologies, Inc.*,
  IPR2018-00084 (P.T.A.B. Apr. 25, 2018.) .......................................................16

**Statutes**

35 U.S.C. ¶ 102(b) .....................................................................................................21

35 U.S.C. § 102(b) .............................................................................................3, 22

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................2

# **INTRODUCTION**

SPEX's motion for summary judgment as to invalidity should be denied.  As to the Fortezza Crypto Card, SPEX attempts to shoe-horn this Court's analysis of Apricorn's previous-considered Fortezza ground, but SPEX ignores that Kingston utilized different evidence, different arguments, and a different expert than Apricorn.  Kingston's analysis strictly comports with what this Court said was required in its previous order in the Apricorn case.  Indeed, SPEX does not even allege that Kingston's expert failed to analyze the "overall structure" of the means for mediating limitation, and thus does not even allege that Kingston's analysis of Fortezza suffers the same issues that the Court found in Apricorn's analysis.

To the contrary, SPEX's motion is based on arguing precisely what this Court found to be improper in the Apricorn case—focusing on a few minor components in direct contravention of this Court's prior ruling that "this type of parsing or deconstruction for purposes of showing structural equivalence . . . is not the appropriate way to conduct the analysis."  SPEX's arguments with respect to the method claims of the '135 patent should also be rejected as contrary to binding Federal Circuit law as to how claims are to be interpreted and as contrary to how SPEX itself analyzed claim limitations for its infringement case.

SPEX's other arguments are equally unavailing.  SPEX seeks summary judgment that the Fortezza Multi-Function card is not prior art—ignoring documents it produced in this litigation showing that the Fortezza Multi-Function card was on sale prior to the priority date of its patents.  SPEX also seeks summary judgment as to a document which Kingston has never argued invalidates any claim of either the '802  and '135 patent, in a back-handed attempt to preclude Kingston's expert from properly using this document in the ground Kingston actually put forward.  And SPEX seeks summary judgment of no invalidity on Kingston's admitted prior art ground, ignoring binding admissions made by its witnesses.

## LEGAL STANDARD

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).

## ARGUMENT

### I. SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE FORTEZZA CRYPTO CARD

SPEX first requests summary judgment of no invalidity as to the Fortezza Crypto Card (also referred to herein as the "Fortezza card"). We begin by providing an overview of the Fortezza card before explaining why SPEX is wrong as to each of the arguments it raises.

### A. Overview of the Fortezza Crypto Card

The "Fortezza Crypto Card" is a "detachable PCMCIA card intended to be plugged into any computer with a PC-Card expansion slot and appropriate support software that provides a number of security functions to the host computer, including encryption." (*See* Dkt. 224-1, at ¶ 195 (internal quotation marks omitted).) The card was developed by the National Security Agency (NSA) starting in 1993 as part of a program to "develop a low-cost-per-user product to protect U.S. Government Type II (Unclassified, but Sensitive) data." (*Id.* at ¶ 180 (internal quotation marks omitted.) Although the program started out using a different name, NSA registered the trademark FORTEZZA in 1994, and provided guidance to government contractors who were to manufacture the card that, in order to use the Fortezza name, cards had to be produced in accordance with specifications developed and put out by the NSA. (*See id.* at ¶ 181.)

Spyrus (the prior owner of the patents-in-suit) was one of several government contractors who manufactured Fortezza Crypto Cards for NSA. Though Spyrus was

not the first manufacturer of Fortezza cards,[1] Spyrus did win a contract to produce the "Second Production of FORTEZZA Crypto Cards." (*See* Dkt. 224-1 at ¶ 186); *see also* Ex. 1 (SPEX00005213–14). The NSA placed an order with Spyrus on September 15, 1995, (*see id.*) meaning that the cards sold pursuant to that contract are prior art to SPEX's patents at least pursuant to pre-AIA 35 U.S.C. § 102(b).

Pictured to the right is one of the Fortezza cards sold pursuant to that contract. (Dkt. 224-1 at ¶ 169.) Dr. Villasenor obtained, and analyzed, several Fortezza cards to support his analysis—cards which SPEX's own 30(b)(6) witness confirmed were the correct version. (*See id.* at ¶¶ 169–170.) Dr. Villasenor additionally analyzed numerous documents



describing the design and functionality of the Fortezza card, including the Statement of Work specifically mentioned in the NSA order and documents identified by that Statement of Work. (*See id.* at ¶¶ 183–185, 188.)

The internals of the Fortezza Crypto Card are pictured below:



(Dkt. 224-1 at ¶ 197.) As confirmed by Dr. Villasenor, the Fortezza Crypto Card

---

[1] Among other evidence undercutting SPEX's claim—not relevant to summary judgment—that Spyrus in fact developed the Fortezza Crypto Card (at 21 n.11), the contract to manufacture the first set of cards was awarded to a different company—Group Technologies, a division of Honeywell. (*See* Dkt. 224-1 at ¶ 182).

contains a security means/module, namely a MYK-82 chip produced by Mykotronx. (*See id.* at ¶ 197, 295, 300.)  This is the very chip mentioned in the specification of SPEX's patents and identified by the Court as corresponding structure.  (*See id.* at ¶ 293; *see also* '802 patent at 16:1–7.)  The Fortezza Crypto Card additionally contains, as pictured above, non-volatile memory (i.e. the target means/module) for storing encrypted user data and a PCMCIA interface to enable communication with a host computer.  (*See, e.g.,* Dkt. 224-1 at ¶¶ 322–325, 333–334.)  The Fortezza Card also meets every other limitation of each of the challenged claims, thus Dr. Villasenor correctly concluded that it anticipated them.  And to the extent not anticipated, Dr. Villasenor proposed easy modifications to the Fortezza card that could and would have been accomplished by a skilled artisan, rendering the claims obvious.

At summary judgment, SPEX asserts Dr. Villasenor's thorough analysis is insufficient as to the "means for mediating" limitation from the '802 patent and as to various aspects of the method claims of the '135 patent.  SPEX's arguments—which are contrary to caselaw and ask more from Kingston's invalidity analysis than SPEX provided for infringement—should be rejected, as described below.

## B.   Dr. Villasenor Properly Analyzed "Means for Mediating"

SPEX first challenges Dr. Villasenor's analysis concerning the "means for mediating" element recited in claims 1 and 11 of the '802 patent.  The Court identified the recited function of this means-plus-function limitation as "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means."  (Dkt. 122 at 37–38.)  And this Court identified the corresponding structure as "Interface control device 910 (as shown in Fig. 9B)."

As SPEX argued to the jury in the Apricorn trial, the "overall structure" shown in Figure 9B is "a three-way interface device" connecting the "host interface"

(i.e. the PCMCIA components above, allowing connection to a host computer); the "security interface" (i.e. connecting to the crypto processor); and the "target interface" (i.e. allowing connection to the "target means," which is a compact flash card as shown in Figure 9B). Ex. 2 (SPEX00089785) at 104:16–22. And, as Kingston explained in its own motion for summary judgment, this overall structure must include certain "indispensable" components, including (for example) the configuration registers. (*See* Dkt. 245 at 13–16.). Figure 9B is reproduced below:



FIG. 9B

### 1. Dr. Villasenor Properly Shows that the Fortezza Crypto Card Anticipates This Element

Dr. Villasenor's analysis shows that the Fortezza Crypto Card anticipates the "means for mediating" element. As Dr. Villasenor explains, the Fortezza card performs the function of "mediating communication of data between the host computing device and the target means so that the communicated data must first pass through the security means." (*See, e.g.,* Dkt. 224-1 at ¶ 348–351.) SPEX does not contend otherwise in its motion. And Dr. Villasenor's analysis also shows that the structure that performs that function in the Fortezza Crypto Card is the same as the "overall structure" shown in Figure 9B. Specifically, as shown (for example) in the annotated figure below from a document describing the Fortezza Crypto Card,



**Figure 4.5-1  How the CI_Library Communicates with a Card**

data is communicated with a host computer via a PCMCIA interface (highlighted in green), consisting of various components which correspond to the PCMCIA components shown in Figure 9B.  (*See* Dkt. 224-1 at ¶ 356–358 (showing figure from Ex. 3 (SPEX00005847) at SPEX00005891).)  Data is then passed from the PCMCIA interface to the interface for the crypto processor (pictured in yellow); and then is passed from the crypto processor to the non-volatile memory for storage (pictured in red).  *See id.*  The lines connecting these interfaces are shown as arrows above, and are shown in greater detail in other documents describing the Fortezza card.  (*See id.*; *see also* Ex. 4 (SPEX00025248) at SPEX00025249–52.)  Dr. Villasenor also explains that the Fortezza Crypto Card contains "configuration registers" to configure the interface.  (*See* Dkt. 224-1 at ¶ 355.)  Thus, Fortezza contains the same "overall structure" shown in Figure 9B.

In its motion, SPEX does not argue that the Fortezza Crypto Card lacks the same "overall structure" as shown in Figure 9B.  Instead, SPEX nitpicks Dr. Villasenor's analysis, contending that he did not show structures in Fortezza that correspond with "Card Enable DCDR," "Compact Flash I/O Control," "Compact Flash Sector CNTR" or "PCMCIA I/O Controller" blocks.  (Mot. at 9–10.)  As this Court has previously found, though, "this type of parsing or deconstruction for

purposes of showing structural equivalence between an accused product and a
means-plus-function term is not the appropriate way to conduct the analysis."  Order
re Pending Summary Judgment Motions, *SPEX Technologies, Inc. v. Apricorn*, Dkt.
142 at 14 (hereinafter "Apricorn MSJ Order").  Indeed, the Federal Circuit has
explained that "[t]he individual components, if any, of an overall structure that
corresponds to the claimed function are not claim limitations."  *Odetics, Inc. v.
Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999).  "Rather, the claim
limitation is the overall structure corresponding to the claimed function"—which
includes only those components which are indispensible for performing that
function.  *See id.*; *see also Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1324 (Fed. Cir.
2004).  SPEX's motion does not explain what any of the components it claims are
missing from Dr. Villasenor's analysis are or what they do, much less explain how
any have any relationship to the "overall structure."  Accordingly, SPEX's argument
should be rejected outright.

In any event, Dr. Villasenor did explain how each of these components are
present in Fortezza.  As Dr. Villasenor explains, the specification tells us that the
blocks identified by SPEX "perform functions and operate in a manner that can
readily be understood by those skilled in the art" and these blocks simply show
standard components of a PCMCIA and a Compact Flash interface.  (*See* Dkt. 224-1
at ¶ 356); *see also* Dkt. 1-1 ('802 patent) at 17:47-50.  There can be no question that
the Fortezza Crypto Card utilizes a PCMCIA interface, which utilizes a PCMCIA
I/O Controller.  *See* Dkt. 224-1 at ¶¶ 355–356.  And there similarly is no question
that the Fortezza Crypto Card utilizes Flash Memory, which SPEX itself has
asserted is sufficient to meet the structure for the Compact Flash interface (which is
composed of the "Card Enable DCDR," "Compact Flash I/O Control," "Compact
Flash Sector CNTR").  *See, e.g.*, Ex. 5 (Rhyne Report) at ¶¶ 119, 121.  Hence why,
as Dr. Villasenor explains, the Fortezza Crypto Card anticipates "as SPEX has

applied the claim in its infringement contentions." (Dkt. 224-1 at ¶ 354.)[2]

To the extent this Court believes that these exact components are required identically as shown in figure 9B, this Court should hold SPEX to the same level of scrutiny. As SPEX (incorrectly) accuses Dr. Villasenor of doing, SPEX's own infringement analysis fails to identify corresponding components for the components it mentions, instead conclusorily asserting that components are present because the accused Kingston device uses USB and Flash memory. *See* Ex. 5 (Rhyne Report) at ¶¶ 117, 119. It is an "inviolate rule that patent claims are construed the same way for validity and for infringement." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1317 (Fed. Cir. 2009). And thus if these structures are required to be identically present for invalidity, they must also be identically present for infringement. Accordingly, should the Court require these specific elements be present in the prior art, the Court should grant summary judgment of non-infringement as SPEX has filed to address them in its own analysis.

Lastly, SPEX takes issue with two other aspects of Dr. Villasenor's analysis. First, SPEX complains that Dr. Villasenor has pointed to one block in the block diagram of the Fortezza Crypto Card as meeting what is shown as two separate blocks in Figure 9B. (Mot. at 9–10.) This is no flaw at all. Block diagrams, by their very nature, show logical functionality—they do not (as SPEX's own witness testified) show where "things are physically located." Ex. 2 (SPEX00089853) at 172:17–23. Moreover, it is black letter law that a "structure[] with [a] different numbers of parts" may still infringe and/or invalidate a means-plus-function limitation. *See Odetics*, 185 F.3d at 1268. Thus, there is no reason why two different components or even two different functionalities can be shown in the same

---

[2] Contrary to SPEX's assertion, Dr. Villasenor carefully explains the function, way, and result for each of the components shown in Figure 9B, and then explains why those same components exist in the Fortezza Card. (*See* Dkt. 224-1 at ¶¶ 354–356.) The substance of Dr. Villasenor's report is what matters, and in any event, structural equivalence is not required as the structure is present in Fortezza.

8

block in a block diagram.  Indeed, SPEX's own expert identified only a single block (the USB block) in a block diagram of Kingston's products as matching up with all of the PCMCIA components shown in Figure 9B.  *See* Ex. 5 (Rhyne Report) at ¶ 117.  Here, as Dr. Villasenor explains, the "System Control Block (Mailbox)" serves both as control ***and*** as a mailbox for incoming commands.  (*See* Dkt. 224-1 at ¶ 358.)  Thus there is nothing wrong with pointing to that same block as meeting both the "State Controller" block and the "Command Detector" blocks where it performs both functions.  In any event, SPEX makes no mention as to how these components matter for the "overall structure" and SPEX's own infringement analysis is yet again deficient.  *See* Ex. 5 (Rhyne Report) at ¶¶ 117–126.

Second, SPEX complains (at 8–9) that Dr. Villasenor offered alternative opinions of anticipation and obviousness with respect to the "means for mediating" limitation.  This is again no flaw at all.  Prior to this Court's resolution of cross-motions for summary judgment in the Western Digital and Apricorn matters, SPEX and the defendants disagreed as to what, exactly, was required to be shown is literally present from Figure 9B to meet the "means for mediating" structure.  As indicated in SPEX's infringement report, SPEX asserted that the components relating to Compact Flash were present in the accused products because those products contained Flash memory.  *See* Ex. 5 (Rhyne Report) at ¶ 119.  The defendants, including Kingston, disagreed that this was sufficient to show that the structure was present.  Thus, as courts have routinely required from experts in similar situations, Dr. Villasenor appropriately offered two alternative opinions: (1) that as SPEX had interpreted the "means for mediating" limitation (i.e. that any kind of Flash would do), the limitation was anticipated; and (2) that if any kind of Flash was not sufficient, the limitation would have been obvious.  (*See* Dkt. 224-1 at ¶ 353–354); *see also St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co*., No. CA 04-1436-LPS, 2012 WL 1015993, at *5 (D. Del. Mar. 26,

2012), aff'd, 522 F. App'x 915 (Fed. Cir. 2013) ("[w]hen claim construction remains an open issue at the time the parties serve expert reports and infringement contentions, the parties have an obligation 'to prepare for the fact that the court may adopt [the other party's claim] construction'" and offer alternative opinions). Indeed, SPEX's own infringement expert also offers alternative opinions on this limitation for this same reason.  *See, e.g.,* Ex. 5 (Rhyne Report) at ¶ 121.

In resolving the cross-motions for summary judgment in the Western Digital and Apricorn matters, this Court clarified what components were required from Figure 9B.  This Court may use the present cross-motions for summary judgment to further clarify, for example by determining that the "configuration registers" are required structure.  (*See* Dkt. 245 at 14–15.)  However, should there continue to be a dispute between the parties as to whether any Flash interface satisfies the corresponding structure, Kingston should not be precluded from offering alternative opinions.  As discussed above, Dr. Villasenor adequately showed that the "means for mediating" limitation was anticipated as SPEX has interpreted the claim.

### 2. Dr. Villasenor Correctly Explained That the "Means for Mediating" Limitation Would Have Been Obvious

As Dr. Villasenor explains in his report, the Fortezza Crypto Card not only contains the "overall structure" shown in Figure 9B, it contains all of the components shown in Figure 9B except those as to the Compact Flash Interface, as the Fortezza card utilizes Flash memory and not Compact Flash.  (*See* Dkt. 224-1 at 353.)  However, to account for the possibility that any flash memory interface was not sufficient, Dr. Villasenor explains that "a skilled artisan could and would have modified the Fortezza Crypto Card to accommodate Compact Flash" and that such a modification "would have included" a Compact Flash interface, including each of the Compact Flash components shown in Figure 9B.  (*See* Dkt. 224-1 at ¶ 353.)  The rest of the Fortezza card would remain unchanged—meaning it would have all of the same structure discussed by Dr. Villasenor in his anticipation opinion.  (*See id.*)

Dr. Villasenor carefully explained that a skilled artisan would have been motivated to make such a modification because it would (among other reasons) "allow greater interoperability and portability beyond just soldering a non-volative memory card" to a PCB.  (*See* Dkt. 224-1 at ¶ 424.)  And a skilled artisan would have expected success in such a modification because "[a]ll of the specifications for Compact Flash were published and could easily be looked up" and because the Compact Flash and PCMCIA "had essentially the same pin-out configuration."  (*See id.* at ¶ 425.)  Thus, as Dr. Villasenor correctly concluded, the "means for mediating" limitation would have also been obvious to a skilled artisan.

SPEX argues that, with respect to the obviousness combination discussed above, "Kingston [] fails to identify which claim element the modification of the Fortezza Crypto Card with CompactFlash is relevant to." (Mot. at 11.)  SPEX's contention is controverted by simply reading Dr. Villasenor's report, where he clearly and unequivocally explains that this obviousness combination relates to the "means for mediating" element.  (*See* Dkt. 224-1 at ¶ 353 (discussing  Compact Flash but "as I will discuss below with respect to obviousness …").

SPEX also criticizes (in a single sentence without any additional explanation) Dr. Villasenor's analysis as "tenuous and conclusory" based on "hindsight"— attempting to shoe-horn this Court's consideration of Apricorn's invalidity case onto Dr. Villasenor's analysis.  However, this Court's determination of Apricorn's invalidity case hinged upon (among other problems) Apricorn's expert's admission "that the structure is 'not present in the combination as stated.'"  (Apricorn MSJ Order at 17–18.)  There is no such admission in this case; and in any event, the analysis performed by Dr. Villasenor is considerably more substantial and detailed than the analysis quoted from Dr. Jones in the Apricorn MSJ order.  Indeed, contrary to SPEX's assertion that this obviousness combination is hindsight, Dr. Villasenor carefully explains why a skilled artisan could have and would have

modified the Fortezza Card to accommodate Compact Flash.  *See Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000) ("the best defense against hindsight-based obviousness analysis is the rigorous application of the requirement for a showing of a teaching or motivation to combine").

SPEX also criticizes other aspects of Dr. Villasenor's invalidity analysis related to the "target means" that have nothing to do with the "means for mediating" limitation.  This is another mistake by SPEX.  As to the combination of the Fortezza card with the knowledge of a skilled artisan, Dr. Villasenor clearly explains that this combination relates to the "target means" limitation.  (*See* Dkt. 224–2 at ¶¶ 322–325 (explaining that Fortezza teaches storing encrypted user data); (*id.* at ¶¶ 417–422 (explaining that "to the extent not explicitly disclose by Fortezza, it would have been obvious to a skilled artisan to include storage for encrypted user data on the Fortezza Crypto Card").)  Thus, it is unclear why SPEX's is even raising this obviousness combination with a motion relating to "means for mediating."

SPEX also attempts to bring in arguments about the "Fortezza Multi-Function Card" into its assertions about the Fortezza Crypto Card.  These arguments also fail. The Fortezza Multi-Function Card is an entirely different ground of invalidity.  As will be discussed further below, the Fortezza Multi-Function Card is a separate product, and (just like the Fortezza card), it also anticipates SPEX's claims.

### C.   Dr. Villasenor Correctly Explains that the Fortezza Crypto Card Anticipates Claim 55 of the '135 Patent[3]

Dr. Villasenor correctly explains that the Fortezza Crypto Card teaches each and every element of claim 55.  Claim 55 reads (with identifications added):

> [55 preamble] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is

---

[3] SPEX failed to disclose this ground for summary judgment during the parties meet and confer.  *See* C.D. Cal. L-R 7–3; *see also* Dec. of Richards at ¶2010.  Kingston therefore asks that this portion of SPEX's brief be stricken.  *See* C.D. Cal.L-R 7-4.

KINGSTON'S MEMO IOT SPEX'S MOTION FOR
SUMMARY JUDGMENT OF NO INVALIDITY

8:16-cv-1790-JVS-AGR

> adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> [55a] receiving a request from the host computing device for information regarding the type of the modular device;
>
> [55b] providing the type of the target module to the host computing device in response to the request; and
>
> [55c] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

There is little doubt that the Fortezza Crypto Card teaches the preamble. As Dr. Villasenor explains, the Fortezza Crypto Card anticipates this limitation because it is a removable PCMCIA card that communicates with a host computer, that performs security operations on that data utilizing an MYK-82 processor; and stores data in non-volatile storage. (*See* Dkt. 224-1 at ¶¶ 385–388.) SPEX does not contend otherwise in its motion.

As to the recited steps performed by the claimed "modular device," Dr. Villasenor explains that the Fortezza Crypto Card performs them through its compliance with the PCMCIA standard. Specifically, Dr. Villasenor explains that "the Fortezza Crypto Card has 'attribute memory' which 'contains the Card Information Structure (CIS).'" (*See* Dkt. 224-1 at ¶ 367; *see also id.* at ¶ 389. This "Card Information Structure," is a library of information, organized and stored in different containers called "tuples." Among other information stored in this library is the "Device Information Tuple" which "contains information about the card's RAM speed and memory size" and a "Version/Product Information Tuple" which "provide[s] information to the host [computer] about the card's production and revision information," including the "Name of Manufacturer," the "Name of Product," and "Card Type," as shown below from Ex. 6 (SPEX00009841) at SPEX00009858–59. (*See also* Dkt. 224-1 at ¶¶ 368–369).[4]

---

[4] Contrary to SPEX's complaint, there is nothing wrong with Dr. Villasenor efficiently presenting his analysis by referring back to previous analysis, as each of the elements recited in claim 55 is either nearly identical to or closely related to

```
TPLLV_MAJOR - Major version number = 04h.

TPLLV_MINOR - Minor version number = 01h (for release 2.1)

TPLLV1_INFO - Each item is an ASCII string terminated with a zero.  The values are in
0000 for decimal and 0x0000 for hexadecimal.

        Name of Manufacturer            =       "Manufacturer Name"
        Name of Product                 =       "FORTEZZA Crypto
                                                Card" *See Note1 Below
        Card Type                       =       "Processor = _____"
        Number of Certificates          =       "Certificates = _____"
                                                *See Note 2 Below
        Number of Key Registers         =       "Key Registers = _____"
        Number of Concurrent Mailboxes  =       "Multiple Mailboxes = No"
                                                *See Note 3 Below
        Mailbox Start Address           =       "Mailbox Start Address = _____"
                                                *See Note 4 below
        Timeout in Milliseconds         =       "Timeout = _____"
        ICD Compliance Level            =       "ICD = P1.5"
```

Dr. Villasenor explains that, when the Fortezza Crypto Card is first plugged into a computer, the computer recognizes the insertion of the card which triggers a "CARD_INSERTION" event.  (*See* Dkt. 224-1 at p. 171 ¶ 4[5] (citing and quoting Ex. 7 (Ex. H to Villasenor) at 3-20 to 3-21.)  Upon card insertion, the computer issues commands to the card (such as a "Callback" command and a "GetConfigurationInfo" command) that read the information in the CIS.  *See id.*; *see also* Ex. 7 (Ex. H to Villasenor) at 3-20 ("Card services then attempts to read the Card Information Structure").  "Clients may have enough information provided by a GetConfigurationInfo request"—but in the event they don't, the PCMCIA specification also provides additional commands for reading information from the CIS, such as the "GetFirst/Next Tuple" command or a "GetTupleData" command. *See id.*; *see also* Ex. 7 (Ex. H to Villasenor) at 3-12, 3-20 to 3-21.  Dr. Villasenor also explains that the "Request Configuration" function "configures the PC Card and the socket."  (*See id.*)  Through the use of these commands, the host computer requests the identity of the Fortezza Crypto Card (which it returns) and operably connects to the host.  (*See* Dkt. 224-1 at ¶¶ 340–346, 364–375, 389–390.)

---

previous elements of other claims.  Indeed, SPEX's infringement expert did the same.  *See, e.g.,* Ex. 5 (Rhyne Report) at ¶¶ 178–180.
[5] Due to a Microsoft Word error, this paragraph was errantly numbered, so we refer to it by page and paragraph number.

### 1.    Fortezza Crypto Card Teaches Elements (a) & (c)

SPEX's arguments that it is entitled to summary judgment that the Fortezza card fails to disclose steps (a) and (c) of claim 55 are flawed.

First, SPEX asserts that Dr. Villasenor "provides no analysis of how" the commands he identified "meet the claim requirements." (Mot. at 13.)  This is simply not true.  As discussed above, Dr. Villasenor provided extensive analysis of multiple commands, and he explained what each did and how it met the limitations. In fact, neither SPEX nor its experts challenged Dr. Villasenor's identification of commands in response to Dr. Villasenor's invalidity report.  This argument should therefore not only be rejected on the merits, it should also be rejected because SPEX failed to disclose it during discovery.

Second, SPEX argues that Dr. Villasenor's analysis is flawed because, according to SPEX, the host computer command requesting data from the card at step (a) must be *different* than the command to "operably connect" at step (c).  (*See* Mot. at 12–13.)  What SPEX ignores, though, is that Dr. Villasenor did identify numerous commands—including commands that occur at card insertion (*e.g.* "GetConfigurationInfo") and commands that can be used later to request additional configuration information and to actually configure the card (such as "GetTupleData" and "RequestConfiguration").  *See* discussion *supra*.  These commands are more than sufficient to show separate steps.

In any event, SPEX is also wrong that steps (a) and (c) must be distinct steps performed at different times.  As the Federal Circuit has explained,  "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Thus, unless the claim language or specification shows otherwise, a court commits reversible error in construing a method claim to exclude simultaneous performance of multiple steps.  *See, e.g. Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1314 (Fed. Cir. 2003) (reversing district court and

construing claim to "include simultaneous performance"); *see also Irise v. Axure Software Sols., Inc.*, No. CV08-03601 SJO JWJX, 2009 WL 3615075, at *33 (C.D. Cal. Sept. 11, 2009) (rejecting an argument that method claim required steps to be performed separately because "[i]f the claim language and specification does not support such a limiting construction, however, a court may construe the method steps to include simultaneous performance").

Here, SPEX cites nothing in the claim language that suggests the steps must be performed in any particular order, and indeed cites nothing at all from the specification of the '135 patent. Nor does SPEX cite any caselaw suggesting that the steps must be performed separately. In short, SPEX provides no reason that this Court should depart from the default rule that, unless otherwise indicated, no order is required for steps in method claims. Thus, this Court should reject this argument from SPEX just as the PTAB did when SPEX made the exact same argument in IPR. *See* Decision, Institution of IPR, Paper 14*, Western Digital Corp. v. SPEX Technologies, Inc.*, IPR2018-00084 (P.T.A.B. Apr. 25, 2018.)

To the extent the Court disagrees, this Court should hold SPEX to the same standard for infringement that it says is required to prove invalidity. As discussed above, it is an "inviolate rule that patent claims are construed the same way for validity and for infringement." *Abbott Labs.*, 566 F.3d at 1317. What SPEX is asking for here is, in essence, additional claim construction as to the order of the steps. Yet SPEX did not apply that claim construction in its own infringement analysis—pointing to the same process laid out in the USB standard for both steps (a) and (c) of the '135 patent. *See* Ex. 5 (Rhyne Report) at ¶¶ 152–153, 178 (the host computer asks the USB device for information about itself); *id.* at ¶ 183 (same).

## 2. Fortezza Crypto Card Teaches Element (b)

Finally, SPEX argues that the Fortezza card does not anticipate step (b) as a matter of law because, according to SPEX, the information provided by the

peripheral device must be different than the information requested by the host computer.  SPEX is again wrong, for a multitude of reasons.

SPEX again cites nothing in the specification of the '135 patent or any caselaw that would support its new claim construction argument.  More significantly, though, information about the "target module" *is* information about the type of modular device, as required by the claim.  For example, when a data storage "target module" is plugged into the modular device, the PCMCIA card is a data storage card.  So the request for information says "who are you" and the answer is "I'm a data storage card" – providing information about the type of target module. *See* Dtk. 224-5 (Villasenor Misuse Report) at ¶ 30.

Dr. Villasenor's report also explains precisely how the response to the request provides information about the "target module."  As Dr. Villasenor explains, the Card Information Structure "contains 'Card Information Tuples' which provide 'information pertaining to the logical organization of the card's memory and data areas.'"  (Dkt. 224-1 at ¶ 370.)  "This provides the host computer with information such as the address of the card's first data byte ....[a]s well as other information regarding the memory areas of the Fortezza Crypto Card."  *Id.*; *see also* Ex. 9 (SPEX00001744) at SPEX00001800 (detailing the "Card Information Tuple" which "serves to introduce information pertaining to the logical organization of the card's memory and data areas").  This is information about the target module, as the identified "target module" in the Fortezza card is memory that stores data.

Notably, SPEX's argument is yet again contrary to its own infringement analysis.  With respect to element 55(b), SPEX's expert Dr. Rhyne simply refers back to his analysis concerning claim 38 of the '802 patent (which does not recite providing information "regarding the type of modular device").  *See* Ex. 5 (Rhyne Report) at ¶ 180.  And with respect to claim 38, Dr. Rhyne explains that the information requested is a "Class Code," which he says would be "Mass Storage"

for the accused devices—which is exactly the information he alleges is returned in response to the request.  *See id.* at ¶¶ 152–155.

### D.  Dr. Villasenor Correctly Explains that the Fortezza Crypto Card Anticipates Claim 57[6]

Finally, SPEX argues that it is entitled to summary judgment of no invalidity by the Fortezza Crypto Card of claim 57, which reads:

> [57 pre] For use in a modular device adapted for communication with a host computing device, the modular device comprising a security module that is adapted to enable one or more security operations to be performed on data and a target module that is adapted to enable a defined interaction with the host computing device, a method comprising the steps of:
>
> [57 a] communicating with the host computing device to exchange data between the host computing device and the modular device;
>
> [57 b] performing one or more security operations and the defined interaction on the exchanged data;
>
> [57 c] mediating communication of the exchanged data between the host computing device and the modular device so that the exchanged data must first pass through the security module; and
>
> [57 d] operably connecting the security module and/or the target module to the host computing device in response to an instruction from the host computing device.

The preamble and element [d] are identical to elements from claim 55, discussed above.  Element [a] recites communicating data with a host computer, which the Fortezza Crypto Card unquestionably does.  (*See* Dkt. 224-1 at ¶¶ 378–379, 395.) Element [b] recites performing security operations on that data, which again the Fortezza Crypto Card unquestionably does through the use of its MYK-82 chip. (*See id.* at ¶¶ 381–382, 396.)  And element [c] recites "mediating communications …" which the Fortezza Crypto Card does, as discussed extensively above.

SPEX does not appear to dispute that each of these elements is present in the Fortezza Crypto Card, but instead SPEX takes issue with alleged inconsistencies in

---

[6] This ground was similarly not disclosed prior to SPEX's motion, and should similarly be struck.  *See* n. 5 *supra*.

1   how Dr. Villasenor discusses the security functionality, the target functionality, and

2   the defined interaction.  SPEX is wrong—there are no inconsistencies.

3         As SPEX acknowledges, the specification of the '135 patent teaches several

4   different kinds of  "target modules," each of which (according to the agreed

5   construction of target module) "enabl[es]" a "defined interaction."  (*See, e.g.,* Dkt.

6   224-1 at ¶ 308 (agreed claim construction).)  For example, the target module may be

7   a data storage device (which may "enable," among other things, the defined

8   interaction of data storage); a communications module (which may "enable"

9   communications); or a smart card reader or biometric device, which may "enable"

10  user authentication or digitally signing documents.  (*See id.*); *see also* '135 patent at

11  4:22–31.  And along with each of the "defined interactions" "enabl[ed]" by each of

12  the target modules, the security module performs one or more of a wide variety of

13  security operations, including encryption/decryption, hashing, and generating digital

14  signatures.  *See* '135 patent at 21:28–44.

15        Consistent with the specification, Dr. Villasenor analyzes a number of

16  different "defined interactions" enabled by the non-volatile memory of the Fortezza

17  Crypto Card.  For example, Dr. Villasenor explains that the Fortezza Crypto Card

18  allows a user to digitally sign a document.  (*See, e.g.* Dkt. 224-1 at ¶¶ 313–314.)  As

19  Dr. Villasenor explains, the "defined interaction" in this case is providing a digital

20  signature; the target module (memory) "enables" that defined interaction because it

21  stores unique user data to generate a digital signature, and the security operation

22  performed is generating the digital signature.  (*See id.*)  Put in terms of claim 57, the

23  data communicated from the host computer would be the data that requires a digital

24  signature, the card would perform a security operation of generating the digital

25  signature, and the defined interaction would be digitally signing.

26        To be clear, contrary to SPEX's assertions, nothing in the above example

27  conflates the defined interaction with the security functionality; nor did Dr.

28

19

Villasenor ever identify simply sending data back to the host computer from the card as the "defined interaction." *Cf.* Mot. at 15–16.  Rather, Dr. Villasenor simply applied the claim constructions adopted by the Court and agreed by the parties, and applied them in a way directly contemplated by the specification.  For example, as discussed above, a "target module" contemplated by the specification and explicitly included in the agreed construction is a "smart card." (*See, e.g.*, Dkt. 224-1 at ¶ 308); Dkt. 1-2 ('135 patent) at 4:30-31.  The unique user data stored on that smart card is exactly the same kind of data stored in the non-volatile memory of the Fortezza Crypto-Card—user-identifying data that allows, among other things, digital signing of documents.  *See, e.g.*, Dkt. 1-2 ('135 patent) at 34–47.  Yet SPEX now argues that this type of functionality is not within the scope of its claims.  *See, e.g.,* Mot. at 18.

SPEX sought, and obtained, broad claims from the USPTO.  SPEX sought, and obtained, broad constructions of those claims from this Court.  SPEX should now have to live with these choices.  SPEX's transparent attempt to disclaim the scope of its claims to only what it believes necessary to prove infringement should be rejected, as should its flawed argument in favor of summary judgment.

In any event, Dr. Villasenor also explains that the Fortezza Crypto Card does perform in exactly the narrow way SPEX is asserting that its claims should now be read.  Specifically, though he does not believe the claim to be limited to such a scenario, Dr. Villasenor explains that the Fortezza Crypto Card allows for storage of encrypted user data.  (*See, e.g.,* Dkt. 224-1 at 322–325.)  Dr. Villasenor's conclusion is supported by more than ample evidence, including SPEX's own marketing materials concerning the Fortezza Crypto Card and the testimony of one of the inventors of the '135 patent.  (*See id.*); *see also, e.g.* Ex. 10 (SPEX00018941) (touting "Secure Storage – secure on-card storage); Ex. 11 (SPEX00005517) ("Non-Volatile Storage" for "user data"); Ex. 12 (Skeba Dep.) at 60:17–61 (explaining how

the Fortezza Crypo Card allowed for storage of encrypted data).  SPEX does not challenge this analysis at all, meaning summary judgment is inappropriate even under SPEX's overly-narrow interpretation of the claim.

### E.     Conclusion as to Fortezza Crypto Card

As described above, Dr. Villasenor provided ample analysis that each and every asserted claim is practiced by the Fortezza Crypto Card.  This testimony and the evidence supporting it at least creates genuine issues of fact, precluding summary judgment of no invalidity by the Fortezza Crypto Card.  And as SPEX has offered no separate arguments concerning derivation from the NSA, SPEX's summary judgment of no derivation should similarly be denied.

## II.     KINGSTON HAS PUT FORTH EVIDENCE SHOWING THE "FORTEZZA MULTI-FUNCTION CARD" IS PRIOR ART

SPEX next moves (at 19–20) for summary judgment of no invalidity by the Fortezza Multi-Function Card, contending that Kingston has not put forth evidence that it was on sale prior to the priority date.  SPEX is wrong.

Pursuant to 35 U.S.C. ¶ 102(b), a product constitutes prior art if it is subject to a "commercial offer for sale" before the priority date, regardless of whether any sale actually occurred before that date.  *See, e.g.*, *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1363, 1365 (Fed. Cir. 2008) (presenting prototype to customer at patentee's facilities for customer's inspection, and invoicing the customer for the prototype before the critical date created an on-sale bar even though prototype was not physically delivered to the customer).  And as this Court has previously recognized, the fact that an offer for sale was made can be proven by circumstantial evidence.  *See, e.g., Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1198 (C.D. Cal. 2011).

Here, Kingston has provided more than substantial circumstantial evidence to show that the Fortezza Multi-Function Card was the subject of a commercial offer for sale prior to the priority date.  For example, SPEX itself produced a document

KINGSTON'S MEMO IOT SPEX'S MOTION FOR
SUMMARY JUDGMENT OF NO INVALIDITY

8:16-cv-1790-JVS-AGR

from NSA showing that Spyrus made a proposal to sell Fortezza Multi-Function Cards to the NSA on May 10, 1996—before the priority date of either of the patents at issue in this case.  *See, e.g.* Ex. 13 (SPEX00008770) at SPEX00008776 (referencing "Spyrus Proposal P5-127: New Multi-Function Package for the Fortezza Crypto Card, . . . , dated 10 May 1996").  As SPEX's own 30(b)(6) witness who is familiar with government contracting testified, a proposal like the one above "is a list of items and what you're going to do. … It's going to have a description of the items that you're proposing to build or to software you're going to write, whatever." Ex. 14 (Young Dep.) at 213:13-15.  He also testified that "how many devices would be produced" would be part of the proposal as well as "delivery dates" and prices would be handled by a "contract person." *Id.* at 215:2-216:15. Though both SPEX and Spyrus claimed to not be able to locate or produce the proposal referenced, this evidence is sufficient to show that a proposal was made and that it constitutes an "offer for sale" under 35 U.S.C. § 102(b).  *See, e.g.*, *Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003) (evidence of custom and practice within a given industry can be used in determining whether activities constitute a commercial offer for sale). SPEX also produced a letter accepting the contract for the Fortezza Multi-Function Card, in which Spyrus stated that the cards had already previously been on sale. *See* Ex. 15 (SPEX00008792) at SPEX00008792.

Contrary to SPEX's bare and conclusory assertion, Kingston has also produced sufficient evidence to show that the Fortezza Multi-Function Card practices the claims.  This evidence includes technical documentation describing the Fortezza Multi-Function Card, including a statement describing what exactly is changed from the original Fortezza card.  (*See, e.g.,* Dkt. 224-1 at ¶¶ 402–404); *see also, e.g.,* Ex. 13 (SPEX00008770) at SPEX00008773.  And this evidence also includes testimony from Spyrus's CEO Sue Pontius, who testified that the Fortezza

Multi-Function Card was the same as Spyrus's "Hydra" product, which SPEX identified as a product that practices the claims of the '135 patent.  *See* Ex. 16 (Pontius Dep.) at 184:2–10; Ex. 17 (SPEX Response to Common Rog 1).

Accordingly, because genuine disputes of material fact exist, summary judgment of no invalidity by the Fortezza Multi-Function Card is inappropriate.

## III.   SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT "AS TO" A DOCUMENT WHICH KINGSTON HAS NEVER ASSERTED INVALIDATES ANY CLAIM OF SPEX'S PATENTS

SPEX next seeks (at 20–21) summary judgment "as to" a document describing the Fortezza Plus Card.  It is unclear what, exactly, SPEX is seeking here.  Kingston has never asserted that the Fortezza Plus Card, nor the document describing it, invalidates any asserted claims of either the '802 or '135 patents.  So to the extent that SPEX is seeking summary judgment of no invalidity by the Fortezza Plus Card, what it seeks is pointless, and should be denied as such.

What SPEX appears to be seeking, though, is to preclude Kingston's expert from relying at all on the document in any way.  To the extent that this is what SPEX is seeking, SPEX's motion should be denied as it is not seeking judgment on any claim or defense, but rather an order in limine.  In any event, even as a motion in limine, SPEX's argument should be rejected.  To preclude Dr. Villasenor from relying on the document, SPEX would need to show that Dr. Villasenor's reliance on the document is unreliable—which SPEX has not even attempted to do here.

Indeed, as SPEX acknowledges, the Fortezza Plus Card is a variant of the Fortezza Crypto Card.  *See* Mot. at 20.  As such, the Fortezza Plus Card shares much in common with its predecessor.  *See, e.g.,* Ex. 9 (SPEX00001744) at SPEX00001756 (noting similarities).  Therefore, Dr. Villasenor relied on this document to bolster his opinions where relevant, and did not where not relevant.  Should SPEX disagree with Dr. Villasenor's assessments of relevance, it is free to cross-examine Dr. Villasenor about them at trial.

## IV.  SPEX IS NOT ENTITLED TO SUMMARY JUDGMENT OF NO INVALIDITY OVER THE ADMITTED PRIOR ART

Lastly, SPEX moves (at 22–25) for summary judgment of no invalidity by the admitted prior art.  This ground is also the subject of a cross-motion for summary judgment by Kingston (*see* Dkt. 237), thus we do not spend much time repeating here what has already been stated about this ground.  We do, however, address SPEX's attempt to confuse this ground of invalidity and explain why SPEX's arguments about it are wrong.

SPEX first spends considerable effort trying to get out from under the clear and unambiguous statement of its own corporate witness designated to testify about SPEX's knowledge regarding the validity of the claims.  For example, SPEX contends (at 22) that Mr. Hakel is not a skilled artisan, and that his testimony is unreliable.  But SPEX ignores that Mr. Hakel fits the definition of a skilled artisan accepted by both parties—he has a computer science degree and has far more than a year of experience in computer security having been the CEO of a computer security company for well over a year.  (*See* Dkt. 237-1 at 5; Dkt. 224-1 at ¶ 53); *see also* Ex. 18 (Gomez Invalidity Report) at ¶ 41.  And SPEX ignores its own choice to designate Mr. Hakel as the person most knowledgeable concerning, among other things, the validity/invalidity of SPEX's claims.  (*See* Dkt. 240-10 at 6-9.)  SPEX also asserts that what Mr. Hakel explicitly said is not what he meant, arguing that Mr. Hakel's statement should be construed to mean that the claims were found invalid in IPR.  Beyond the simple fact that that is not what the question asked nor was it what Mr. Hakel answered, this (at most) creates a disputed issue of fact.

SPEX also contends that it should not be bound by its own corporate witnesses statement because, according to SPEX, "admitted prior art" is limited to statements made during prosecution.  SPEX's interpretation about the scope of "admitted prior art" is far too narrow.  As Kingston explained in its motion, "[v]alid prior art may be created by the admissions of the parties." *Riverwood Int'l Corp. v.*

*R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003).  This includes both statements made during prosecution, *see Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988); ***and*** statements made by the patent owner during the course of litigation, *see Sjolund v. Musland*, 847 F.2d 1573, 1577 (Fed. Cir. 1988).  Thus, Kingston properly relies on statements made in both contexts.

SPEX's only other arguments are red herrings.  SPEX argues (at 23) that the '802 patent cannot be prior art to the '135 patent—but that is not the basis of the admitted prior art ground.  And SPEX argues that it is entitled to summary judgment "if" the admitted prior art ground "means the PCMCIA standard" – but the admitted prior art is not the same thing as the PCMCIA standard.  The admitted prior art is far broader.  Kingston's actual ground of invalidity makes it clear that the admitted prior art is (as the name makes clear) the admissions by Mr. Hakel as well as the admissions in the patents themselves.  Any purported confusion SPEX has as to the basis for this ground is a result of its own repeated questioning of Dr. Villasenor as to what "document" or "reference" he discusses in the admitted prior art ground, in response to which he testified that the PCMCIA standard was a document he mentions in that section of his report.  (*See, e.g.,* Dkt. 233-16 at 103:3–104:16; 106:21–107:5.)  Dr. Villasenor's testimony, like his report, is clear that this ground is based on the admitted prior art.  *See, e.g., id.* at 105:22–106:14.) [7]  The complete basis for this ground is explained in Kingston's motion for summary judgment.

Lastly, SPEX's motion does not appear address Kingston's proposed combination of Fortezza with the Admitted Prior Art, so summary judgment on this ground of invalidity would also be inappropriate.

## **CONCLUSION**

For the reasons above, SPEX's motion should be denied.

---

[7] Notably, SPEX only attaches a small portion of Dr. Villasenor's deposition here to support their taking statements out of context, despite attaching the entire transcript as an exhibit to another motion.

Kingston's Memo IOT SPEX's Motion for
Summary Judgment of No Invalidity

Dated: March 23, 2020

FISH & RICHARDSON P.C.

By:   */s/ Oliver J. Richards*

David M. Hoffman (*pro hac vice*)
hoffman@fr.com
David Morris (*pro hac vice*)
dmorris@fr.com
One Congress Plaza
111 Congress Ave., Suite 810
Austin, TX 78701
Tel: (512) 472-5070
Fax: (512) 320-8935

Joanna M. Fuller (SBN 266406)
jfuller@fr.com
633 W. 5th Street, 26th Floor
Los Angeles, CA 90071
Tel: (213) 533-4240
Fax: (858) 678-5099

Oliver J. Richards (SBN 310972)
orichards@fr.com
12390 El Camino Real
San Diego, CA 92130
Tel: 858-678-4715
Fax: 858-678-5099

LAW OFFICE OF S.J. CHRISTINE YANG

Christine Yang (SBN 102048)
chrisyang@sjclawpc.com
Victoria Hao (*pro hac vice*)
vhao@sjclawpc.com
17220 Newhope Street, Suite 101
Fountain Valley, CA 92708
Tel.: (714) 641-4022
Fax: (714) 641-2082

*Counsel for Defendants*
Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc.

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 23, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

*/s/ Oliver J. Richards*
Oliver J. Richards
orichards@fr.com