*[SEE SIGNATURE BLOCK FOR COUNSEL INFORMATION]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SPEX TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., KINGSTON TECHNOLOGY COMPANY, INC., IMATION CORPORATION, DATALOCKER INC., DATA LOCKER INTERNATIONAL, LLC, <br><br> Defendants. | Case No. 8:16-CV-01790-JVS-AGR <br><br> **KINGSTON TECHNOLOGY CORPORATION, KINGSTON DIGITAL, INC., AND KINGSTON TECHNOLOGY COMPANY, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY** <br><br> Honorable James V. Selna <br><br> Date: April 6, 2020 <br> Time: 1:30 p.m. <br> Courtroom: Santa Ana, 10C |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ........................................................................................................2

    I.     SPEX'S ADMISSIONS ARE BINDING AND AMOUNT
          TO INVALIDITY OF CLAIMS 55 & 57...............................................2

        A.     SPEX Cannot Create Genuine Disputes By Attacking
             the Testimony of its Own Corporate Witness .............................3

        B.     SPEX Cannot Manufacture Genuine Disputes of Fact
             Through Its Attempt to Rehabilitate the Testimony of
             Its Expert .......................................................................................7

        C.     SPEX Fails to Dispute Its Admissions Concerning
             "Operably Connecting"................................................................10

        D.     SPEX Cites No Authority As To Why It Should Not
             Be Bound By Its Admissions.......................................................11

    II.    SPEX'S REMAINING ARGUMENTS ARE IRRELEVANT
          TO KINGSTON'S MOTION ................................................................13

    III.   KINGSTON IS AT LEAST ENTITLED TO A RULE 56(G)
          ORDER .................................................................................................15

CONCLUSION....................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,
298 F. Supp. 2d 930 (E.D. Cal. 2003) ................................................. 16

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ........................................................... 9

*Harmoush v. Allstate Ins. Co.*,
No. CV 10-4664-GW(AGRX), 2012 WL 13005929 (C.D. Cal. Mar. 12, 2012) ............................................................................................ 9

*Hotel 71 Mezz Lender LLC v. National Retirement Fund*,
778 F.3d 593 (7th Cir. 2015) ............................................................... 16

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
324 F.3d 1346 (Fed. Cir. 2003) ........................................................... 11

*Sjolund v. Musland*,
847 F.2d 1573 ...................................................................................... 11, 12

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ........................................................... 12

**Statutes**

35 U.S.C. § 102(a) ................................................................................ 2, 11

35 U.S.C. § 316(a)(11) .......................................................................... 6

**Other Authorities**

Fed. R. Civ. P. 30(b)(6) ........................................................................ 7

Fed. R. Civ. P. 56(g) ............................................................................. 15, 16

## **INTRODUCTION**

SPEX's opposition to Kingston's motion for summary judgment is most notable for what it fails to say rather than what it says.  As set forth below, there is no rationale dispute that invalid claims 38 and 39 of the '802 patent are materially identical to all but one limitation of claims 55 and 57 – the operably connecting limitation.  That is the only even potential difference (although as noted in Kingston's motion, the operably connecting step is admitted to be prior art in the '135 patent itself).  However, in its opposition, SPEX never even tries to argue that it did not admit that the operably connecting limitation would be known in the art. Indeed, SPEX provides no argument on this limitation at all.  Nor does SPEX ever argue that the operably connecting would have been done along with the other admittedly-known steps.  Nor does SPEX challenge that a skilled artisan would know this.

Instead, SPEX's opposition focuses solely on trying to confuse the Court with strawman arguments, to undermine its own witnesses, or to fundamentally misstate the law on party admissions.  With regard to the strawman, Kingston does not assert and has never asserted that the '802 patent is prior art to the '135 patent.  Nor has Kingston ever stated that the "admitted prior art" is only the PCMCIA specification. These are fantasies imagined by SPEX to confuse the issues.  Kingston's "admitted prior art" defense is based precisely on that – admissions made by SPEX's corporate witnesses, its expert, or by the named inventors of the patent itself about the state of the art prior to the filing of the '135 patent.  SPEX's attempts to undermine and discredit its own witnesses are unconvincing, but, importantly, legally irrelevant. The testimony of SPEX's corporate witnesses is binding on SPEX, as discussed further below.

Moving past the strawman and the attempts to discredit its own witnesses, SPEX's primary substantive argument rests on the idea that the state of the art

before the patent can only come from written prior art references. This is simply not true. Pre-AIA Section 102 prohibits grant of a patent where "the invention was known or used by others in this country *or* patented or described in a printed publication." Importantly, the "described in a printed publication" is wholly separate from the "was known" requirement. Moreover, the Federal Circuit has explicitly held that "[v]alid prior art may be created by the admissions of the parties." Thus, as Kingston explained in its opening brief, it is wholly appropriate to use party admissions to establish what was known in the art.

Here, SPEX correctly realizes that among its corporate witness, its expert, and its patent, it has conceded that every element of the claims was known and used together. As such, it now seeks to discredit its own corporate executive (whom SPEX designated to speak on its behalf) and deny the clear statements of its own expert. But these arguments also fail at least in view of Mr. Hakel's position and the clear testimony of the witnesses. Accordingly, SPEX's own admissions (which by virtue of being admissions are sufficient to be clear and convincing evidence) show that claims 55 and 57 were known in the prior art and are thus invalid.

## ARGUMENT

As a significant portion of SPEX's opposition addresses issues that are wholly unrelated to the actual ground of invalidity asserted by Kingston, we begin by explaining why SPEX is wrong on the issues that are relevant before explaining why SPEX's other arguments are irrelevant.

## I. SPEX'S ADMISSIONS ARE BINDING AND AMOUNT TO INVALIDITY OF CLAIMS 55 & 57

SPEX's opposition offers two relevant lines of attack on Kingston's motion. First, SPEX claims that the testimony of its witnesses (including its designated corporate witness) is unreliable or should not be taken at face value. Second, SPEX

1  claims that even if this testimony is to be believed, it is not binding on SPEX.

2  SPEX is wrong on both counts, as explained below.

3    **A.    SPEX Cannot Create Genuine Disputes By Attacking the Testimony of its Own Corporate Witness**

4

5  SPEX's first attack on Kingston's motion is not actually an attack on

6  Kingston's arguments, but rather an attack on its own corporate witness that it

7  designated to testify on topics relevant to Kingston's motion.  SPEX argues that the

8  witness either didn't mean what he said or that the witness should not be believed.

9  SPEX's attempts to undercut the testimony provided by its own witness do not

10  create genuine disputes of material fact, and should be rejected.

11  SPEX first attempts to claim its corporate witness didn't say what the witness

12  clearly said.  SPEX says, for example, that "Mr. Hakel never admitted that SPEX

13  believed that claims 38 and 39 were invalidated by prior art."  *E.g.* Resp., at 2, 10.

14  SPEX's claim is belied by the actual testimony of Mr. Hakel, reproduced below:

15    ```
    3       Q.   So I'll ask again, does SPEX believe
16      claims 38 and 39 of the '802 patent are invalid?
17      5       A.   Yes.
    ```
18

19  Dkt. 240-9 at 31:3–8.  SPEX cannot create a genuine dispute of fact by simply

20  denying its witness said what the witness said.

21  Nor can SPEX create genuine issues of fact by attempting to re-characterize

22  Mr. Hakel's testimony.  SPEX argues (at 10–11) that when Mr. Hakel testified that

23  SPEX believes claims 38 and 39 of the '802 patent are invalid, what he really meant

24  to say was that the claims had been found invalid by the PTAB in an *inter partes*

25  review proceeding.  For one, this is not Mr. Hakel's testimony.  For example, Mr.

26  Hakel could have answered "they have been found invalid by the PTAB," as he did

27  in response to other questions (*e.g.*, at Dkt. 240-9 at 30:24–31:2), but he did not.

28

His answer was a simple and unequivocal "yes" without anything further.  Given the clarity of both the question and the answer, it is hard to understand how SPEX now tries to argue that the testimony means something other than what the witness actually said.

In any event, SPEX's arguments concerning context are wrong.  SPEX acknowledges that the issues asked about in the deposition not only covered what the Board found, but also what SPEX believed prior to that decision and why SPEX chose not to defend the patentability of claims 38 and 39 in the IPR.  *See* Resp. at 11; *see also, e.g.*, Ex. 1 (Hakel v3 Depo) at 123:14–21.  As Western Digital's witness testified, "SPEX's failure to file a response regarding Claims 38 and 39, which the board had decided in its institution decision were likely to be held invalid, almost guaranteed those patent claims would be held . . . unpatentable in the words of the patent office." Dkt. 240-24 at 16:7–18.  SPEX's failure to defend the patentability of its claims is strong evidence that supports Mr. Hakel's testimony regarding SPEX's belief as to the validity of claims 38 and 39.

Previously, SPEX has claimed that it did not file a response in the IPR in order to prevent the petitioners in the IPR from responding to the Board's decision regarding claims 1, 2, 11, and 12 (which the Board determined at institution unlikely to be found unpatentable).  *See, e.g.*, Ex. 2 (Rhyne Misuse Report) at 6–7 (stating that "by SPEX not filing a Patent Owner Response, Kin[g]ston and the other Petitioners were foreclosed any opportunity to file a subsequent reply . . . hence, there was a greater chance that most of the claims of the '802 patent, including claims 1, 2, 11, and 12, would not be found invalid").  However, as even SPEX's expert acknowledged, this does not and cannot explain SPEX's actions.  Under the rules governing IPR, any reply the petitioners could have filed would have been limited to responding to arguments made by SPEX in a response.  *See* Ex. 3 (Rhyne v3 Depo) at 43:25–44:19 (acknowledging that "a reply may only respond to

1    arguments raised in the corresponding opposition …"); *see also* Ex. 4 (Rhyne v3

2    Depo Exhibit 5) (PTO regulation).  Thus, SPEX could have—but didn't—file a

3    patent owner response solely defending the patentability of claims 38 and 39

4    without giving the petitioners the ability to respond regarding the other claims.  *See,*

5    *e.g.,* Ex. 3 (Rhyne v3 Depo) at 50:14–25.  This realization—together with other

6    issues with this explanation from SPEX—caused even SPEX's expert to opine that

7    "[m]aybe [SPEX] just concluded that [claims 38 and 39 of the '802 patent] were

8    kind of a lost cause …" and that "for all I know, [SPEX] agreed with what the

9    PTAB and the petitioners had said about claims [38 and 39]."  *Id.* at 80:14–81:9.[1]

10         Now, with its own expert having undermined its first attempt to explain its

11    failure to defend the patentability of claims 38 and 39, SPEX offers a new

12    explanation in its response—that SPEX simply made a "business decision" "to

13    speed up the issuance of a Final Written Decision."  *See* Resp. at 10–11 n.5.  This

14    explanation, though, is just as flawed.  For one, SPEX doesn't even attempt to

15    explain the value of "speeding up" a final written decision in the IPR of the '802

16    patent when all of SPEX's district court cases against the various defendants

17    remained stayed pending resolution of ***both*** the IPR of the '802 patent ***and*** the IPR

18    of the '135 patent.  And, more importantly, SPEX's decision did nothing to speed up

19    the IPR at all.  Western Digital's IPR of the '802 patent was instituted on the same

20    day as Western Digital's IPR of the '135 patent.  *Compare* Ex. 5 (Institution

21    Decision in IPR2018-00082) at 1 *with* Ex. 6 (Institution Decision in IPR2018-

22    00084) at 1.  Despite SPEX having filed a patent owner response in one of the IPRs

23    but not the other, the hearing date for both IPRs was scheduled for the same day.

24    *See* Ex. 7 (Paper 36 in IPR2018-00082).  Moreover, the Final Written Decision in

25    the IPR of the '802 patent was issued in April of 2019—at the very end of the one

---

[1]  Note that although the court reporter indicated that Dr. Rhyne was referring to claims 37 and 38, the context of the quote makes clear that he was referring to claims 38 and 39 of the '802 patent.

year time limit provided for by the statute governing IPRs.  *See* Ex. 8 (FWD in IPR2018-00082) at 1; 35 U.S.C. § 316(a)(11) (providing that the Board issue a FWD "not later than 1 year after the date on which the Director notice the institution of a review").  This shifting sands of flawed explanations similarly cannot create a genuine dispute of material fact.

Lastly, SPEX cannot create a genuine dispute of material fact by attempting to undermine the credibility of its own witness.  SPEX claims that Mr. Hakel is not an inventor, and that he is "not even a person of ordinary skill in the art."  Resp. at 9.  Putting aside that Mr. Hakel does have a computer science degree and has been involved in the computer security business for years, SPEX has no answer for the fact that SPEX itself designated Mr. Hakel to testify on its behalf as to numerous technical topics, including:

- "knowledge of prior art, past inventions, and past publications" (Topic 2)
- SPEX's "decision not to file a Patent Owner Response in IPR2018-00082" (Topic 11)
- SPEX's "understanding as to what is required to practice or teach the step of 'operably connecting …' as recited in claims 55 and 57 of the '135 patent" (Topic 13)
- SPEX's "knowledge of the PCMCIA specification" (Topic 14)
- SPEX's "knowledge concerning the similarity between claim 38 of the '802 patent and claim 55 of the '135 patent" (Topic 16)
- SPEX's "knowledge concerning the similarity between claim 39 of the '802 patent and claim 57 of the '135 patent" (Topic 17)

(*See* Dkt. 240-10.)  All of the testimony on which Kingston relies from Mr. Hakel's deposition unquestionably falls within the scope of each of these topics.

As this Court knows (and which SPEX ignores), when Mr. Hakel testified about each of these topics, he was not speaking on behalf of himself, he was

speaking on behalf of the plaintiff itself.  *See, e.g.*, Fed. R. Civ. P. 30(b)(6).  Thus, the testimony on which Kingston relies is not just ordinary fact testimony—it is the testimony from a witness who was speaking on behalf of SPEX and whom SPEX had a duty to prepare to testify about each of these topics.  *See id.*  If SPEX believed that Mr. Hakel was not capable of competently testifying about these topics, it should not have designated him to speak on the company's behalf about them.  But SPEX cannot now create a purported genuine dispute of fact simply because it doesn't like the testimony from the witness it designated and prepared to testify on its behalf.

**B.     SPEX Cannot Manufacture Genuine Disputes of Fact Through Its Attempt to Rehabilitate the Testimony of Its Expert**

SPEX next attempts to manufacture a genuine dispute of fact by rehabilitating the testimony of its expert witness.  But just as SPEX cannot avoid the clear and unambiguous testimony of its own corporate witness, SPEX cannot escape the clear testimony from its own expert.

First, SPEX argues that genuine disputes of fact exist regarding the similarity between claims 38 and 39 of the '802 patent and claims 55 and 57 of the '135 patent.  *See* Resp. at 6.  Not so.  SPEX does not, and cannot, deny that Kingston's own expert witness looked to the language and substance of claims 38 and 39 of the '802 patent and the language and the substance of claims 55 and 57 of the '135 patent and concluded, based his analysis, that the only difference between the claims was that each claim of the '135 patent recited the extra step of "operably connecting."  *See, e.g.*, Resp. at 7.  SPEX also cannot deny that its own corporate witness agreed with Dr. Villasenor's analysis – he similarly testified that the claims were substantively identical except for the "operably connecting" limitation—a point which SPEX's opposition fails to address at all.  (*See generally* Dkt. 240-9 at

7

1  Ex. 1 (Hakel v.3 Dep.), 44:3–45:7, 45:19–46:4, 71:22–72:4, 73:10–17, 74:14–17;

2  77:18–20.)

3       As to SPEX's expert, SPEX is correct that the expert included two

4  paragraphs[2] in his report (paragraphs 35 and 36) identifying two alleged differences

5  between the preamble recited by claims 38/39 of the '802 patent and claims 55/57 of

6  the '135 patent.  (*See* Dkt. 240-26 at ¶¶ 35–36.)  Dr. Rhyne's deposition testimony

7  regarding these alleged differences, though, shows that neither are material.  At

8  deposition, Dr. Rhyne testified that the first difference he identified in his report was

9  that, in his view, claim 55 of the '135 patent required hardware to perform security

10  operations but claim 38 of the '802 patent did not.  *See* Ex. 3 (Rhyne v3 Depo) at

11  96:25–97:16.  However, when Dr. Rhyne was confronted with his own previous

12  testimony that the alleged novelty of the claims of the '135 patent "includes the fact

13  that they require hardware encryption"—Dr. Rhyne recanted, testifying that he was

14  "incorrect in [his] statement . . . that claim 38 has no requirement that the operation

15  be performed in hardware."  *See id.* at 98:17–98:15, 102:4–17.

16       For the second difference identified in his report (the recitation of a "target

17  module"), Dr. Rhyne admitted that the only analysis he performed was looking to

18  the language of the claims.  He specifically admitted that he "ha[dn't] tried to

19  compare [the claims] in any other way, other than the fact that they're written

20  differently."  (*See* Dkt. 240-13 at115:3–12.)  He also admitted that it was "certainly

21  true" that he hadn't "looked at anything beyond the language of the claims"—while

22  at the same time acknowledging that the claims must be interpreted in light of the

23  specification (which he didn't look at).  (Dkt. 240-13 at 115:13–20); *see also* Ex. 3

24  (Rhyne v3 Depo) at 99:13–14.  Dr. Villasenor, on the other hand, looked both at the

25  text and the substance, and concluded that because the claim recited a peripheral

26  _____

27  [2]  Notably, and contrary to SPEX's characterization of the analysis as "conclusory," Kingston's expert Dr. Villasenor spends 11 pages in his report

28  analyzing the similarities between the claims.  (*See* Dkt. 240-2 at 5–16.)

1   device "adapted for" the performance of a defined interaction, the device must have

2   a target module on which to perform that defined interaction.  (Dkt. 240-2 at ¶ 21.)

3           The only thing left for SPEX is attorney argument.  As an initial matter,

4   attorney argument is not admissible at trial, and cannot create genuine disputes of

5   fact.  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1312 (Fed. Cir. 2014)

6   ("attorney argument, alone, may not create a material question of fact regarding

7   technical evidence"); *Harmoush v. Allstate Ins. Co.*, No. CV 10-4664-GW(AGRX),

8   2012 WL 13005929, at *2 (C.D. Cal. Mar. 12, 2012) ("attorney argument is not

9   evidence").  In any event, all SPEX does is point to differences in the language

10  between the claims and state that "[d]ifferences in language *can* mean different

11  scopes of an invention being claimed."  Resp. at 8.[3]  The question here, though, is

12  not whether the language is different or even whether differences in language can be

13  material—it is whether the elements of claims 38/39 of the '802 patent actually and

14  materially differ in scope to the common elements of claims 55/57 of the '135

15  patent.  And on that question, there is only one conclusion that can be reached by the

16  jury based on the admissible evidence.

17          Lastly, SPEX also attempts (at 13) to rehabilitate testimony from its own

18  expert admitting that elements of claims 55 and 57 were known in the art by

19  claiming Kingston ignores the "context" of the testimony.  Again, the testimony

20

21

22

23

24

25  _____
    [3]  Contrary to SPEX's characterization, Dr. Villasenor did look at differences in
26  language and concluded they were not substantive.  For example, as Dr.
    Villasenor explained in his own deposition, claims 38 and 39 of the '802 patent
27  do require hardware because they recite a device "adapted for" performance of
    security operations and defined interactions.  (*See, e.g.,* Dkt. 233-16 at 69:10-15,
28  71:13–24, 75:3–21.)

speaks for itself, and shows further admissions that elements are known in the art, *e.g.*:

> Q.   So when a PCMCIA compliant device is used with a PCMCIA compliant device, you believe that that would practice Element 38a?
>
> A.   Again, I don't think Dr. Clark has pointed that out with any specificity, but I believe that there is -- there is teaching within the PCMCIA standard of performing that step.

> Q.   Does the PCMCIA standard also disclose in general teaching providing to the host computing device in response to a request information regarding the type of defined interaction?
>
> A.   That is -- is within the standard, yes.

Dkt. 240-11 (Rhyne Dep.) at 151:4–10, 153:6–22.  It is unclear what "context" SPEX believes is missing here or how any alleged context would detract from these clear admissions.

## C.   SPEX Fails to Dispute Its Admissions Concerning "Operably Connecting"

SPEX's opposition also entirely fails to respond to Kingston's arguments concerning its admissions about the "operably connecting" step—which is the only unique step recited in claims 55 and 57.  As Kingston explained in its opening brief, the specification of the '135 patent simply points to the PCMCIA standard to disclose how the step of "operably connecting" is performed.  (*See* Dkt. 237-1 at 5–6; *see also id.* at 14–16.)  This admission from the specification is confirmed by similar admissions from two of SPEX's designated corporate witnesses, who explained what the PCMCIA teaches and how it relates to the disclosure in the specification.  (*See id.* at 16–17.)  Despite significant portions of Kingston's

opening memorandum addressing "operably connecting," neither the word "operably" nor "connect" appears anywhere in the opposition, nor does SPEX address any of its admissions concerning "operably connecting" anywhere in its brief.  As noted above, this silence is essentially dispositive.  With the admission from the patent on the "operably connecting" limitation not contested, the only remaining limitations are substantively identical to claims 38 and 39, which SPEX's admits are invalid.

> **D.    SPEX Cites No Authority As To Why It Should Not Be Bound By Its Admissions**

Lastly, SPEX appears to claim that it should not be bound by its admissions because, in its view, the "admitted prior art" doctrine is limited to only statements made during prosecution.  *See* Resp. at 5.  SPEX is wrong.  Kingston cited numerous cases in its opening brief explaining how prior art may be created by admissions of the parties—made both during the prosecution of the patents ***and*** made during the course of litigation.  For example, the Federal Circuit has explicitly explained that "[v]alid prior art may be created by the admissions of the parties." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003). This is because patents, printed publications, and prior art systems are "not the only source" of prior art that can be used to invalidate claims or show they are obvious. *See id.*  Indeed, even section 102 provides that it is sufficient to show that the subject matter of a claim was "known" in the United States "before the invention thereof by the applicant for patent."  *See* 35 U.S.C. § 102(a) (pre-AIA).

Besides attempting to mischaracterize Kingston's challenge (discussed further below), SPEX spends only a few sentences attempting to distinguish just some of the cases cited by Kingston in its opening memorandum.  For example, SPEX attempts to distinguish *Sjolund v. Musland* by arguing that "the Federal Circuit held that the jury must accept prior art ***described in the specification***."  Resp. at 5

1   (emphasis in original).  This is an incorrect reading of the case.  The Federal Circuit

2   specifically referred to (and reproduced in its opinion) testimony from the patent

3   owner admitting that a particular type of crab trap described in the specification was

4   prior art to his improved crab trap.  *See* 847 F.2d 1573, 1577.  Because of this

5   testimony, the Federal Circuit explained that the jury had to accept that type of trap

6   as prior art "as a matter of law."  *See id.*  The Federal Circuit, however, then went on

7   to consider another type of trap (not described in the specification).  However, the

8   patent owner too had admitted this other type of trap was known, leading the

9   Federal Circuit to explain that "[g]iven [the patent owner's] admission, substantial

10  evidence ***supports only one finding***," namely that the subject matter admitted to be

11  in the prior art by the patent owner was "known or used by others prior to the date"

12  of the patent owner's purported invention.  *See id.* at 1579.  In short, this case fully

13  supports relying on the admissions of a patent owner to establish that elements of a

14  claim (or a claim in its entirety) were known in the art.  *See id.*

15         SPEX's attempt to distinguish *Telemac Cellular Corp. v. Topp Telecom, Inc.*

16  similarly falls short.  SPEX claims that this case addressed only the "meaning of a

17  term of art in the prior art."  Resp. at 5.  What SPEX ignores, though, was that the

18  meaning of this disputed term determined the content of the prior art.  Under the

19  patent owner's interpretation—there would be no invalidation because the feature

20  claimed would not be in the art; under the alleged infringer's interpretation, the

21  claim would be invalid.  *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247

22  F.3d 1316, 1329 (Fed. Cir. 2001).  That dispute, though, was definitively resolved

23  by an admission made by the patent owner that the prior art was as the alleged

24  infringer had argued.  *See id.*  The district court found so in granting summary

25  judgment of invalidity and the Federal Circuit agreed, finding that the district "court

26  was correct to rely on the admissions" of the patent owner regarding the content of

27  the prior art.  *See id.*

28

1    Apart from its attempt to distinguish Kingston's cases, SPEX offers no other

2  relevant legal authority.  SPEX cites no cases to support its contention that admitted

3  prior art is limited to statements made in the prosecution, nor any cases as to why it

4  should not be bound by its own admissions.  Indeed, apart from cases cited by

5  Kingston in its opening brief, SPEX cites only two cases in the entirety of its

6  opposition—the Supreme Court case providing the standard for obviousness (*see*

7  Resp. at 2, citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415-16 (2007) for the

8  unremarkable proposition that a claim is obvious when the elements of the claim are

9  known in the art); and a case holding that an inventor's own work cannot be prior

10  art, which is totally irrelevant to Kingston's motion (*see* Resp. at 3, citing *In re*

11  *Nomiya*, 509 F.2d 566, 571 (CCPA 1975)).  SPEX's unsupported argument

12  regarding the scope of the "admitted prior art" doctrine should therefore be rejected,

13  and its claims held invalid.

## II.   SPEX'S REMAINING ARGUMENTS ARE IRRELEVANT TO KINGSTON'S MOTION

16    SPEX's remaining arguments all have little resemblance to the motion

17  actually brought by Kingston.  As Kingston explained in its opening brief, it is

18  seeking a judgment of invalidity based on admissions made by SPEX.  Through the

19  deposition testimony of SPEX's designated witness, through statements made in the

20  specification of the '135 patent, and through SPEX's statements made before

21  judicial bodies, SPEX has admitted that each and every limitation of claims 55 and

22  57 of the '135 patent were known and would be used together.  Yet instead of

23  responding to Kingston's arguments, SPEX instead decided to spend significant

24  portions of its opposition responding to strawmen arguments Kingston never made.

25    For example, SPEX argues that "Kingston has failed to meet its burden to

26  show that the '802 patent is prior art to the '135 patent."  Resp. at 3.  Kingston has

27  never contended that the '802 patent is prior art to the '135 patent, though.  Rather,

28

13

1    Kingston has relied on SPEX's admission that it knows that the subject matter

2    covered claims 38 and 39 of the '802 patent was known prior to the '802 patent.

3    (*See* Dkt. 237-1 at 4–5.)  This admission is relevant to claims 55 and 57 of the '135

4    patent because those claims from the '135 patent share substantively identical

5    limitations with the '802 patent.  (*See id.* at 3–4.)  Nothing about this argument

6    relies on the '802 patent itself to show what was known in the art.

7         SPEX also pretends that Kingston's "admitted prior art" ground is the

8    PCMCIA standard, standing alone.  *See* Resp. at 11–13.  SPEX cites nothing from

9    Kingston's actual motion to support this belief.  To the contrary, the basis for

10    Kingston's motion is clear.  Kingston relied on statements made in the specification

11    of the '135 patent regarding the content of the prior art PCMCIA specification

12    (which SPEX does not dispute is prior art), as well as statements by SPEX's

13    designated corporate witness about same.  (*See* Dkt. 237-1 at 5–6.)[4]  No testimony

14    from Dr. Villasenor is to the contrary—Dr. Villasenor simply pointed to the

15    PCMCIA specification when repeatedly asked to identify a document discussed in

16    his admitted prior art opinion.  (*See, e.g.*, Dkt. 233-16 at 103:3–104:16; 106:21–

17    107:5.)  Dr. Villasenor's testimony, like his report, is clear that this ground is based

18    on the admitted prior art.  (*See, e.g., id.* at 105:22–106:14.)  SPEX's arguments

19    concerning the PCMCIA specification are therefore irrelevant to the ground actually

20    put forward by Kingston.

21         Lastly, SPEX argues "Kingston has not shown that the findings of the PTAB

22    should be applied here."  Resp. at 6.  But again, this is not Kingston's argument.

23    Nothing in Kingston's invalidity motion relies in any way on what the PTAB found

24    in either the IPR of the '802 patent nor the IPR of the '135 patent.  Rather, again,

25

---

26   [4]   Although not relevant to the present motion, SPEX is also wrong that the PCMCIA standard is more than one printed publication.  Just as a book is a

27      single prior art reference even though it may contain several chapters, the PCMCIA specification is a single document that contains several sections.

28

what Kingston relies on is the admission made by SPEX's designated witness, who was asked without reference to the PTAB's determination whether SPEX believed claims 38 and 39 of the '802 patent were invalid, to which he unequivocally answered "yes."  (Dkt. 240-9 at 31:3–8.)

## III.  KINGSTON IS AT LEAST ENTITLED TO A RULE 56(g) ORDER

Lastly, Kingston is at least entitled to an order pursuant to Fed. R. Civ. P. 56(g) establishing facts that have been admitted or cannot seriously be disputed. SPEX's opposition is not only remarkable in that it invents arguments Kingston never made, but also because of how little of Kingston's actual motion it does respond to.  For example, as noted above, nothing in SPEX's opposition addresses the numerous statements in the specification of the '135 patent conceding that the admittedly prior art PCMCIA standard teaches how to perform the "operably connecting …" step.  (*See* Dkt. 237-1 at 5–6.)  Nowhere in its opposition does SPEX argue that the steps recited by claims 38 and 39 of the '802 patent are not substantively identical to the similar steps recited by claims 55 and 57 of the '135 patent.  (*See* Dkt. 237-1 at 3–4.)  SPEX also fails to address that ***neither*** of its validity experts challenged the "operably connecting" limitation—the only limitation not substantively identical to limitations from claims 38 and 39 of the '802 patent—in their original validity reports.  (*See id.* at 16.)  SPEX fails to address the testimony from another SPEX designated corporate witness (John Young) that the PCMCIA standard teaches requesting and receiving information from a host card regarding the card's capabilities (i.e. the defined interaction).  (*See id.* at 17.) SPEX does not (and cannot) deny that it told the Federal Circuit that the PCMCIA taught how to practice the "receiving" and "providing" limitations from claim 55. (*See* Resp. at 14 n.5.)  And SPEX offers no response to Kingston's contention that a skilled artisan would have been motivated (and could) use all of the admitted limitations together.  (*See* Dkt. 237-1 at 17–18,  20–21.)

As explained above, SPEX's only relevant arguments are unavailing and should be rejected.  Kingston is therefore entitled to summary judgment of invalidity.  However, based on the admitted prior art, Kingston is at least entitled to an order pursuant to Rule 56(g) establishing as true that all of the steps recited by claims 55 and 57 of the '135 patent, other than the "operably connecting" steps, were known in the prior art.  Accordingly, to the extent that the Court does not grant summary judgment on invalidity, it would be proper to enter an order under Rule 56(g) establishing that each of the elements of claims 55 and 57 were known in the art prior to the '135 patent.  Contrary to SPEX's contention, such an order would unquestionably narrow the issues for trial and would be beneficial for this Court and the jury.  As numerous courts have found, rule 56(g) "serve[s] a useful brush-clearing function even if it does not obviate the need for trial" and "may also facilitate the resolution of the remainder of the case through settlement."  *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 606 (7th Cir. 2015); *see also California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930, 939 (E.D. Cal. 2003).  Both of these goals would be served by such an order here.

## CONCLUSION

For the reasons above, it is clear that there are no remaining issues of fact regarding the invalidity of claims 55 and 57.  While SPEX may wish to ignore or discredit the admissions of its corporate witnesses, its experts, or its patent, the law is clear that it cannot do so.  The admissions are binding and claims 55 and 57 should be held invalid.

Respectfully Submitted,

Dated: March 30, 2020

FISH & RICHARDSON P.C.

By: */s/ Oliver J. Richards*

David M. Hoffman (*pro hac vice*)
hoffman@fr.com
David Morris (*pro hac vice*)
dmorris@fr.com
111 Congress Ave., Suite 810
Austin, TX 78701
Tel: (512) 472-5070
Fax: (512) 320-8935

Joanna M. Fuller (SBN 266406)
jfuller@fr.com
633 W. 5th Street, 26th Floor
Los Angeles, CA 90071
Tel: (213) 533-4240
Fax: (858) 678-5099

Oliver J. Richards (SBN 310972)
orichards@fr.com
12390 El Camino Real
San Diego, CA 92130
Tel: 858-678-4715
Fax: 858-678-5099

LAW OFFICE OF S.J. CHRISTINE YANG

Christine Yang (SBN 102048)
chrisyang@sjclawpc.com
Victoria Hao (*pro hac vice*)
vhao@sjclawpc.com
17220 Newhope Street, Suite 101
Fountain Valley, CA 92708
Tel.: (714) 641-4022
Fax: (714) 641-2082

***Counsel for Defendants***
Kingston Technology Corporation, Kingston Digital, Inc., and Kingston Technology Company, Inc.

KINGSTON'S REPLY ISO MPSJ OF INVALIDITY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 30, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

*/s/ Oliver J. Richards*
Oliver J. Richards
orichards@fr.com

***Attorney for Defendants***
Kingston Technology Corporation,
Kingston Digital, Inc., and
Kingston Technology Company, Inc.

KINGSTON'S REPLY ISO MPSJ OF INVALIDITY

8:16-cv-1790-JVS-AGR